James M. Wagstaffe (#95535)
Frank Busch (#258288)
**WAGSTAFFE, VON LOEWENFELDT,**
**BUSCH & RADWICK LLP**
100 Pine Street, Suite 2250
San Francisco, CA 94111
Tel: (415) 357-8900
Fax: (415) 357-8910
wagstaffe@wvbrlaw.com
busch@wvbrlaw.com

*Liaison Counsel for Plaintiff*

Christopher J. Keller (*pro hac vice forthcoming*)
Eric J. Belfi (*pro hac vice forthcoming*)
Francis P. McConville (*pro hac vice forthcoming*)
**LABATON SUCHAROW LLP**
140 Broadway
New York, NY  10005
Telephone: 212 907 0700
Fax: 212 818 0477
ckeller@labaton.com
ebelfi@labaton.com
fmcconville@labaton.com

*Counsel for Plaintiff*

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

|  |  |
|---|---|
| PLUMBERS AND STEAMFITTERS LOCAL 60 PENSION TRUST, Individually and on Behalf of All Others Similarly Situated,<br><br>                          Plaintiff,<br><br>        v.<br><br>META PLATFORMS, INC. (f/k/a FACEBOOK, INC.), MARK ZUCKERBERG, DAVID WEHNER, SHERYL SANDBERG, and SUSAN LI,<br><br>                          Defendants. | Case No.: ____<br><br>**CLASS ACTION**<br><br>**COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS**<br><br>**DEMAND FOR JURY TRIAL** |

## I.    INTRODUCTION

Plaintiff Plumbers and Steamfitters Local 60 Pension Trust ("Plaintiff"), individually and on behalf of all others similarly situated, alleges the following based on personal knowledge as to Plaintiff and Plaintiff's own acts, and upon information and belief as to all other matters based upon the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of press releases and other public statements issued by Defendants ((Meta Platforms, Inc. ("Meta" or the "Company"), Mark Zuckerberg, David Wehner, Sheryl Sandberg, Susan Li)), Meta's filings with the U.S. Securities and Exchange Commission ("SEC"), and media and analyst reports about the Company. Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## II.    SUMMARY OF THE ACTION

1.    Facebook – now known as "Meta Platforms" after a recent rebranding – is a social media giant. But as a going concern that investors would want to own for value, Meta cannot make money simply by operating a social media platform that allows users to interact, post pictures and videos, or communicate. To make money, ***Meta sells ads***. In fact, its revenues are almost entirely from selling ads to businesses who want to get the attention of people who use social media within Meta's family of companies, including Facebook and Instagram. The Company admits as much:

> ***Substantially all of our revenue is currently generated from third parties advertising on Facebook and Instagram.*** As is common in the industry, our marketers do not have long-term advertising commitments with us.

2.    A big part of those ad sales historically was targeted toward users in the United States (and elsewhere) on iPhones. Meta made a lot of money selling ads seen on iPhones. It successfully did this by using a wealth of data obtained about its users by tracking their activities, as it also admits:

> Our advertising revenue is dependent on targeting and measurement tools that incorporate data signals from user activity on websites and services that we do not control ….

In other words, without the ability to track users' activity, Meta cannot really sell ads, and thus, would suddenly experience a material step down to the source of "substantially all" of its revenue.

3.      Fast forward to June 2020. Apple Inc., the maker of the ubiquitous iPhone, decided that iPhone users deserved to have more control over their own privacy and the data associated with what people do on their iPhones and other devices. So, Apple announced that it would roll out a host of changes to the iOS operating software that runs iPhones (and iPads). These changes would essentially cut off Facebook and its sister services from almost all the tracking and targeting abilities and information that they needed to sell targeted ads as they had been for many years.

4.      Apple's new privacy protections were a sea change to the advertising world that Meta and its subsidiaries lived in. In fact, they were certain to derail Meta's increasing revenue-growth trajectory and high price-to-earnings ratio, and transform Meta into a staid media company with a materially lower growth profile. But Defendants failed to tell investors this. Throughout the Class Period, which spans from March 2021 (shortly before the Apple changes went into effect) to February 2022, Defendants—including the most senior echelon of Meta's upper management—misled investors about mitigation efforts that Meta was implementing to try and counteract the devastating impacts to Meta's advertising business from Apple's new privacy protections. Defendants omitted to tell investors that Meta's mitigation efforts were not adequately mitigating the headwinds to advertising revenue caused by the new privacy protections or otherwise making the iOS changes "manageable" for Meta's advertising business.

5.      Defendants acknowledged that Apple's changes would be bad for Meta. It would create "headwinds" to its advertising business. But Defendants failed to tell investors by what order of magnitude the changes would hurt the ad business until February 2, 2022, when they admitted to a staggering $10 billion impact on revenue. At the same time, Defendants failed to also warn investors that it was facing materially increasing competition from rival social media platform TikTok, causing Meta to steer users from its services like "Stories" to its "Reels" service.

6.      Instead of being transparent with investors, Defendants painted a false and misleading picture of the mitigation efforts Meta put in place to counteract the changes in iOS and rebuild Meta's advertising business model. These efforts included, *inter alia*, requiring less data in targeted ad campaigns; claims that Meta was building other data sources that advertisers could make use of; having more onsite conversion opportunities for advertisers; implementing

"aggregated events management," which would allow Meta and its advertisers to make use of aggregated ad-campaign-level data for users who opted out of being tracked once the iOS changes were implemented; closing a supposed "underreporting gap" to identify a supposedly more robust and more accurate return on investment for advertisers; and automation to allow advertisers to leverage machine learning to find audiences for targeted ad campaigns.

7.      Throughout the Class Period, Defendants omitted to tell investors the true impact that these mitigation efforts were having, leading investors to believe that any impacts of the iOS changes to Meta's advertising business were, as Defendant Wehner put it, "manageable." Not so.

8.      On February 2, 2022, Meta released weak Q4 2021 financial results and provided disappointing 2022 revenue guidance.  During the related earnings call, Defendants disclosed that the mitigation efforts in fact had not rendered the effects of the iOS changes "manageable." Instead, Meta's advertising business would suffer a shattering $10 billion revenue hit from the iOS privacy changes.  Defendants also attributed its weak results and guidance on the slowing user growth due to competition from TikTok.  These admissions caused over 26% of Meta's market capitalization to be wiped out in one day, as the value of Meta's common stock sank over $85 a share.

9.      As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages. Plaintiff now brings this securities class action on behalf of all persons or entities who purchased or otherwise acquired Meta securities between March 2, 2021 and February 2, 2022, inclusive (the "Class Period"), against Defendants for violations of the Securities Exchange Act of 1934 (the "Exchange Act") and SEC Rule 10b-5 promulgated thereunder.

## III.    JURISDICTION AND VENUE

10.      The claims asserted arise under Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (see 17 C.F.R. § 240.10b-5).

11.      This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act (15 U.S.C. § 78aa).

12. Venue is proper in this District pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1391(b). Defendant Meta maintains its headquarters in this District. Many of the acts charged herein, including the preparation or dissemination of materially false or misleading information, occurred in substantial part in this Judicial District.

13. In connection with the acts alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

## IV.    PARTIES

14. Plaintiff purchased Meta securities during the Class Period, as set forth in the certification attached as Exhibit 1 to this Complaint, and was damaged as a result of Defendants' wrongdoing as alleged in this complaint.

15. Defendant Meta is a Delaware corporation with its principal executive offices located at 1601 Willow Road, Menlo Park, California 94025. The Company's common stock is listed on the Nasdaq under the ticker symbol "FB." Meta was previously known as "Facebook, Inc." but rebranded itself as "Meta Platforms, Inc." on or about October 28, 2021.

16. Defendant Mark Zuckerberg is, and was during the Class Period, Meta's Chief Executive Officer.

17. Defendant David Wehner is, and was during the Class Period, Meta's Chief Financial Officer.

18. Defendant Sheryl Sandberg is, and was during the Class Period, Meta's Chief Operating Officer.

19. Defendant Susan Li is, and was during the Class Period, a Vice President of Finance at Meta.

20. Defendants Zuckerberg, Wehner, Sandberg, and Li are collectively referred to hereinafter as the "Executive Defendants." The Executive Defendants, because of their positions with the Company, possessed the power and authority to control the contents of Meta's reports to the SEC, press releases, and presentations to securities analysts, money portfolio managers and

1   investors, i.e., the market. Executive Defendants were provided with copies of the Company's

2   reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance

3   and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because

4   of their positions and access to material non-public information available to them, the Executive

5   Defendants knew that the adverse facts specified herein had not been disclosed to, and were being

6   concealed from, the public, and that the positive representations which were being made were then

7   materially false or misleading. The Executive Defendants are liable for the false statements pleaded

8   herein, as those statements were each "group-published" information, the result of the collective

9   actions of the Executive Defendants.

10      21.    Meta and the Executive Defendants are collectively referred to herein as

11  "Defendants."

12  **V.    SUBSTANTIVE ALLEGATIONS**

13      **A.    Materially False and Misleading Statements Issued During the Class Period**

14      22.    The Class Period begins on March 2, 2021. On this date, Defendants Sandberg and

15  Wehner spoke on behalf of Meta at the 2021 Morgan Stanley Technology, Media and Telecom

16  Conference. Morgan Stanley's Brian Nowak asked about what Meta was doing "to help advertisers

17  navigate through this difficult period that Apple's created?" Defendant Wehner stated in relevant

18  part:

> We're going to be watching when this actually launches, we expect it to be in Q1, so later in March. And then there's going to be the question of what's the pace of upgrades to iOS 14, which is a little bit more known because we're able to sort of monitor the pace of other updates in the past. We'll be obviously looking at what the opt-in rates are there. We're looking at things like a pre-prompt to provide additional context of what we're doing and why we're doing it and why it benefits the user. So, all of those things will be part of how we kind of assess what the impact for the business is going to be.

> But we do expect this to be an impact to the business and to impact our growth rates as we go into – further into 2020. And so that's factored into the outlook that I gave on the Q4 call. On the mitigation front, I think there's a few different things, obviously going on. One is, this is a broad platform wide change. It doesn't just affect Facebook. It affects everybody in the ecosystem. And so there's going to be a relative effect and that relative effect is not clear yet.

23.     Defendant Sandberg was asked what she was "still most excited about within the family of apps from both a user perspective and a business offering perspective for [Meta's] advertisers?" Sandberg responded in relevant part: "So I think ads is a great business and I think we have to scratch the surface of what's possible. I think as we show that we can continue to put out new products that people really engage with, whether it's our messaging products or things like Reels, we have more opportunity to connect businesses with advertisers."

24.     On or about March 18, 2021, Defendant Zuckerberg appeared on Josh Constine's PressClub where he discussed Meta's business. Speaking about the upcoming iOS changes, Zuckerberg stated: "When it comes to, the iOS 14 changes, for example, and their impact on our business, I think the reality is that I'm confident that we're gonna be able to manage through that situation. And we'll be in a good position. I think it's possible that we may even be in a stronger position." On March 19, 2021, Meta's stock rose to close at $290.11 on heavy trading.

25.     During that same interview, Zuckerberg stated:

> I mean I think that there's been a lot of people have focused on the iOS 14 ad changes and whether that's going to be an impact for our business, for example, and, it might make some kind of headwind. The reality is we make changes in our products all the time that, try to prioritize health and wellbeing across the services that reduce our revenue.
>
> So over the long-term, the iOS 14 business changes are actually not the biggest concern I have with Apple.

26.     On April 28, 2021, Meta held a conference call to discuss its 2021 fiscal Q1 results. During this call, Defendant Sandberg stated: "We're rebuilding meaningful elements of our ad tech so that our system continues to perform when we have access to less data in the future." Speaking about the impact of Apple's iOS 14.5 privacy changes, Wehner stated that "the impact on our own business, we think, will be manageable. We continue to expect it will be a headwind for the remainder of the year, but we're making encouraging progress … on our own solutions to help advertisers navigate these changes."

27.     On the April 28, 2021 conference call, Wehner also stated that "in addition to these mitigations, we're also just seeing very strong overall ad demand, which is contributing to a more positive outlook for 2021."

28.     The statements in ¶¶ 22-27 were false or misleading because they omitted to state that: the iOS privacy changes were having a material impact on Meta's ability to provide the kind of targeted advertising that its customers wanted and, as a result, customer ad spend was dropping precipitously; Meta's so-called "mitigation efforts" were either not properly implemented or ineffective; measurement of ads was not accurate as mitigation efforts were failing; and Meta did not have a plan in place to properly address the impact of the iOS privacy changes.

**B.      The Truth Begins to Partially Emerge**

29.     On July 28, 2021, Meta held a conference call to discuss its 2021 fiscal Q2 results. In a partial disclosure of the truth, Defendant Wehner stated: "We continue to expect increased ad targeting headwinds in 2021 from regulatory and platform changes, notably the recent iOS updates, which we expect to have a more significant impact in the third quarter compared to the second quarter."

30.     But Defendants continued to mislead by falsely reassuring investors that they were on the case and that the impacts were manageable. For example, Defendant Li spoke about supposed "mitigation" efforts Meta was undertaking to counteract any negative impact Apple's iOS privacy changes would have on Meta's advertising business and stated that Meta's "aggregated events management" was a mitigation effort that "has definitely mitigated some of the impact" of the Apple iOS changes.

31.     In reaction to this news, Meta's common stock closed down $14.96 a share the next day, to close at $358.32 a share.

32.     On October 25, 2021, Meta held a conference call to discuss its 2021 fiscal Q3 results. In a partial disclosure of the truth, Defendant Sandberg stated:

> We've been open about the fact that there were headwinds coming – and we've experienced that in Q3. The biggest is the impact of Apple's iOS14 changes, which have created headwinds for others in the industry as well, major challenges for small businesses, and advantaged Apple's own advertising business. We started to see that impact in Q2, but adoption on the consumer side ramped up by late June, so it hit critical mass in Q3. As a result, we've encountered two challenges. One is that the accuracy of our ads targeting decreased, which increased the cost of driving outcomes for our advertisers. And the other is that measuring those outcomes became more difficult.

33.     But here yet again, Defendants pivoted and continued to mislead by falsely reassuring the market that they were on it. For example, Defendant Sandberg discussed Meta's advertising business and stated that Meta recently disclosed that it believed it was "underreporting iOS web conversions." In other words, "real world conversions" arising out of advertising with Meta, "like sales and app installs, are higher than what's being reported for many advertisers, especially small advertisers. We're making good progress fixing this."

34.     Defendant Zuckerberg stated that "we expect we'll be able to navigate these headwinds [related to iOS] over time with investments that we're already making today." Later on that same call, Zuckerberg also stated:

> As Apple's changes make e-commerce and customer acquisition less effective on the web, solutions that allow businesses to set up shop right inside our apps will become increasingly attractive and important to them. We've built solutions like ads that can dynamically point to either a business's website or their Shop on our platforms depending on what will perform better for them, and that will help more businesses navigate this challenging environment.

35.     Defendant Wehner also stated on this call that "on the iOS question as it relates to Q4 versus Q3, the bulk of iOS 14 updates were completed as we entered Q3, which contributed to the step up in the impact from Q2 to Q3. Since iOS 14 is now widely adopted, we don't expect a similar step up in Q4."

36.     In reaction to this news, Meta's common stock closed down $12.88 a share the next day, to close at $315.81 a share.

37.     The statements in ¶¶ 29-30 and ¶¶ 32-35 were false or misleading because they omitted to state that: the iOS privacy changes were having a very material impact on Meta's ability to provide the kind of targeted advertising that its customers wanted and, as a result, customer ad spend was dropping precipitously; Meta's so-called "mitigation efforts" were either not properly implemented or ineffective; measurement of ads was not accurate as mitigation efforts were failing; and Meta did not have a plan in place to properly address the impact of the iOS privacy changes.

**C.     The Truth Is Fully Revealed**

38.     On February 2, 2022, Meta released weak Q4 2021 financial results and provided disappointing 2022 revenue guidance.  During the related earnings call, Defendants confirmed the

significant headwinds Apple's iOS privacy changes caused for Meta's advertising business. Specifically, Defendant Wehner stated that "we believe the impact of iOS overall as a headwind on our business in 2022 is on the order of $10 billion, so it's a pretty significant headwind for our business." Defendant Zuckerberg stated that "we're rebuilding a lot of our ads infrastructure so we can continue to grow and deliver high-quality personalized ads." Defendant Sandberg admitted that Defendants were "working to try and improve things, for example by making progress in closing the underreporting gap for iOS web conversions, and by introducing tools like [Meta's] Aggregated Events Measurement solution to deliver better insights for advertisers. These efforts will help to mitigate some of the challenges, but we expect the overall targeting and measurement headwinds to moderately increase from Apple's changes and from regulatory changes in Q1 and throughout 2022." Defendants also attributed its weak results and guidance on the slowing user growth due to competition from TikTok.

39.     On this news, Meta's stock collapsed, closing on February 3, 2022 (the next day of trading after the corrective disclosure) at $237.76, a drop of over $85 from the prior day's close. This wiped out approximately 26% of Meta's market capitalization and was devastating to Plaintiff and the proposed Class.

40.     As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

### D.     Violation of Item 303 of Regulation S-K

41.     Meta's annual and quarterly reports filed with the SEC are subject to the disclosure requirements of Item 303 of Regulation S-K, among other things, that requires disclosure of "any known trends or uncertainties that have had or that are reasonably likely to have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations." 17 C.F.R. § 229.303(b)(2). Companies must also disclose events that the registrant knows will "cause a material change in the relationship between costs and revenues" and "any unusual or infrequent events or transactions or any significant economic changes that materially affected the amount of

reported income from continuing operations and, in each case, indicate the extent to which income was so affected." 17 C.F.R. § 229.303(b)(2).

42.     In violation of Item 303, Meta's SEC filings during the Class Period failed to disclose known trends that were reasonably likely to—and did—have a material impact on Meta's financial results including material known adverse facts and trends in Meta's core advertising business, including that advertising customers were slowing or reducing their purchases in light of the iOS changes, and that Meta's purported efforts to mitigate the impacts of iOS changes were not rendering the latter "manageable."

43.     In further violation of Item 303, Meta's SEC filings during the Class Period failed to disclose known trends related to an exodus of Facebook or Instagram users to rival social media platform TikTok; and that in an effort to counter this undisclosed material trend, Meta was cannibalizing itself by pushing revenue-generating business away from Facebook's "Stories" and elsewhere to its lower-margin "Reels" video function.

**E.      Additional Scienter Allegations**

44.     During the Class Period, as alleged herein, the Executive Defendants acted with scienter in that they knew or were reckless as to whether the public documents and statements issued or disseminated in the name of the Company during the Class Period were materially false and misleading; knew or were reckless as to whether such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws.

45.     The Executive Defendants permitted Meta to release these false and misleading statements and failed to file the necessary corrective disclosures, which artificially inflated the value of the Company's securities.

46.     The Executive Defendants, by virtue of their receipt of information reflecting the true facts regarding Meta, their control over, receipt, or modification of Meta's materially misleading statements and omissions, or their positions with the Company that made them privy to confidential information concerning Meta, participated in the fraudulent scheme alleged herein.

47.     The Executive Defendants are liable as participants in a fraudulent scheme and course of conduct that operated as a fraud or deceit on purchasers of Meta securities by disseminating materially false and misleading statements or concealing material adverse facts. The scheme deceived the investing public regarding Meta's business, operations, and management and the intrinsic value of Meta securities and caused Plaintiff and members of the Class to purchase Meta securities at artificially inflated prices.

**F.      Loss Causation/Economic Loss**

48.     During the Class Period, as detailed herein, Meta and the Executive Defendants made false and misleading statements and engaged in a scheme to deceive the market and a course of conduct that artificially inflated the prices of Meta securities, and operated as a fraud or deceit on Class Period purchasers of Meta securities by misrepresenting the Company's business and prospects. Later, when Defendants' prior misrepresentations and fraudulent conduct became known to the market, the price of Meta securities declined as the prior artificial inflation came out of the price over time. As a result of their purchases of Meta securities during the Class Period, Plaintiff and other members of the Class suffered economic loss, i.e., damages, under the federal securities laws.

**G.      Applicability of Presumption of Reliance: Fraud on the Market**

49.     Plaintiff will rely upon the presumption of reliance established by the fraud-on-the-market doctrine in that, among other things:

(a)     Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

(b)     the omissions and misrepresentations were material;

(c)     the Company's stock traded in an efficient market;

(d)     the misrepresentations alleged would tend to induce a reasonable investor to misjudge the value of the Company's stock; and

(e)     Plaintiff and other members of the Class purchased Meta securities between the time Defendants misrepresented or failed to disclose material facts and the time the true facts were disclosed, without knowledge of the misrepresented or omitted facts.

50.     At all relevant times, the markets for Meta securities were efficient for the following reasons, among others:

(a)     as a regulated issuer, Meta filed periodic public reports with the SEC;

(b)     Meta regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the major newswire services and through other wide-ranging public disclosures, such as communications with the financial press, securities analysts, and other similar reporting services;

(c)     Meta was followed by several securities analysts employed by a major brokerage firm(s) who wrote reports that were distributed to the sales force and certain customers of their respective brokerage firm(s) and that were publicly available and entered the public marketplace; and

(d)     Meta securities were actively traded in an efficient market, namely the Nasdaq stock exchange, under the ticker symbol "FB."

51.     As a result of the foregoing, the market for Meta securities promptly digested current information regarding Meta from publicly available sources and reflected such information in Meta's stock price. Under these circumstances, all purchasers of Meta securities during the Class Period suffered similar injury through their purchase of Meta securities at artificially inflated prices and the presumption of reliance applies.

52.     Further, to the extent that the Defendants concealed or improperly failed to disclose material facts with regard to the Company, Plaintiff is entitled to a presumption of reliance in accordance with *Affiliated Ute Citizens of Utah* v. *United States*, 406 U.S. 128, 153 (1972).

**H.     No Safe Harbor**

53.     The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. The statements alleged to be false and misleading herein all relate to then-existing facts and conditions. In addition, to the extent certain of the statements alleged to be false may be characterized as forward-looking, they were not identified as "forward-looking statements" when made and there were no meaningful cautionary statements identifying important factors that could cause actual

results to differ materially from those in the purportedly forward-looking statements. In the alternative, to the extent that the statutory safe harbor is determined to apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements were made, the speaker had actual knowledge that the forward-looking statement was materially false or misleading, or the forward-looking statement was authorized or approved by an executive officer of Meta who knew that the statement was false when made.

## VI.    CLASS ACTION ALLEGATIONS

54.    Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23 on behalf of all persons or entities who purchased or otherwise acquired Meta securities between March 2, 2021 and February 2, 2022, inclusive, against Defendants for violations of the Securities Exchange Act of 1934 and SEC Rule 10b-5 promulgated thereunder; and

55.    The members of the Class are so numerous that joinder of all members is impracticable. The disposition of their claims in a class action will provide substantial benefits to the parties and the Court. As of January 28, 2022, Meta had over two million shares of common stock outstanding.

56.    There is a well-defined community of interest in the questions of law and fact involved in this case. Questions of law and fact common to the members of the Class which predominate over questions which may affect individual Class members include:

(a)    Whether Defendants violated the Exchange Act;

(b)    Whether Defendants omitted or misrepresented material facts;

(c)    Whether Defendants' statements omitted material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading;

(d)    Whether Defendants knew or recklessly disregarded that their statements were false and misleading;

(e)    Whether the price of Meta securities was artificially inflated; and

(f)     The extent of damage sustained by Class members and the appropriate measure of damages.

57.     Plaintiff's claims are typical of those of the Class because Plaintiff and the Class sustained damages from Defendants' wrongful conduct.

58.     Plaintiff will adequately protect the Class's interests. It has retained counsel experienced in securities class action litigation and its interests do not conflict with the Class's.

59.     A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

## VII.     CAUSES OF ACTION

### COUNT I

#### Section 10(b) of the Exchange Act and Rule 10b-5
#### (Against All Defendants)

60.     Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

61.     During the Class Period, Defendants disseminated or approved the false statements specified above, which they knew or recklessly disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

62.     Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 in that they:

(a)     Employed devices, schemes, and artifices to defraud;

(b)     Made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

(c)     Engaged in acts, practices, and a course of business that operated as a fraud or deceit upon Plaintiff and others similarly situated in connection with their purchases of Meta securities during the Class Period.

63.     Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for Meta securities. Plaintiff and the Class would not

have purchased Meta securities at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by Defendants' misleading statements.

64.     As a direct and proximate result of these Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their purchases of Meta securities during the Class Period.

## COUNT II

### Section 20(a) of the Exchange Act
### (Against the Executive Defendants)

65.     Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

66.     The Executive Defendants acted as controlling persons of Meta within the meaning of Section 20(a) of the Exchange Act. By virtue of their positions and their power to control public statements about Meta, the Executive Defendants had the power and ability to control the actions of Meta and its employees. By reason of such conduct, Defendants are liable pursuant to Section 20(a) of the Exchange Act.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for judgment as follows:

A.     Declaring this action to be a proper class action pursuant to Federal Rule of Civil Procedure 23;

B.     Awarding Plaintiff and the members of the Class damages and interest;

C.     Awarding Plaintiff's reasonable costs, including attorneys' fees; and

D.     Awarding such equitable, injunctive, or other relief as the Court may deem just and proper.

1

2

## JURY DEMAND

3      Plaintiff demands a trial by jury.

4  Dated: March 8, 2022

5

6                                              By: /s/ James M. Wagstaffe
                                                 **WAGSTAFFE, VON LOEWENFELDT,**
7                                                **BUSCH & RADWICK LLP**
                                                 100 Pine Street, Suite 2250
8                                                San Francisco, CA 94111
                                                 Tel: (415) 357-8900
9                                                Fax: (415) 357-8910
                                                 wagstaffe@wvbrlaw.com
10                                               busch@wvbrlaw.com

11                                               *Liaison Counsel for Plaintiff*

12

13                                               **LABATON SUCHAROW LLP**
                                                 Christopher J. Keller (*pro hac vice forthcoming*)
                                                 Eric J. Belfi (*pro hac vice forthcoming*)
14                                               Francis P. McConville (*pro hac vice forthcoming*)
                                                 140 Broadway
15                                               New York, NY  10005
                                                 Tel: (212) 907-0700
16                                               Fax: (212) 818-0477
                                                 ckeller@labaton.com
17                                               ebelfi@labaton.com
                                                 fmcconville@labaton.com

18

19                                               *Counsel for Plaintiff*

20

21

22

23

24

25

26

27

28

DEMAND FOR JURY TRIAL
CASE NO.: _____                                                              16

**CERTIFICATION**

I, Ronald Rosser, as Secretary of the Board of Trustees of Plumbers and Steamfitters Local 60 Pension Trust ("UA Local 60"), hereby certify as follows:

1.      I am fully authorized to enter into and execute this Certification on behalf of UA Local 60.  I have reviewed a complaint prepared against Meta Platforms, Inc. f/k/a Facebook, Inc. ("Facebook"), alleging violations of the federal securities laws, and authorize the filing of this pleading;

2.      UA Local 60 did not purchase securities of Facebook at the direction of counsel or in order to participate in any private action under the federal securities laws;

3.      UA Local 60 is willing to serve as a lead plaintiff and representative party in this matter, including providing testimony at deposition and trial, if necessary.  UA Local 60 fully understands the duties and responsibilities of the lead plaintiff under the Private Securities Litigation Reform Act, including the selection and retention of counsel and overseeing the prosecution of the action for the Class;

4.      UA Local 60's transactions in Facebook securities during the Class Period are reflected in Exhibit A, attached hereto;

5.      UA Local 60 sought to serve as a representative party in the following class action under the federal securities laws filed during the last three years:

> *Plumbers and Steamfitters Local 60 Pension Trust v. Intel Corporation*,
> No. 3:20-cv-6467 (N.D. Cal.)

6.      Beyond its pro rata share of any recovery, UA Local 60 will not accept payment for serving as a lead plaintiff and representative party on behalf of the Class, except the reimbursement of such reasonable costs and expenses (including lost wages) as ordered or approved by the Court.

I declare under penalty of perjury, under the laws of the United States, that the foregoing is true and correct this _28th_ day of February, 2022.

Ronald Rosser
*Secretary of the Board of Trustees*
*Plumbers and Steamfitters Local 60 Pension Trust*

2

**EXHIBIT A**

**TRANSACTIONS IN META PLATFORMS, INC. F/K/A FACEBOOK, INC.**

| Transaction Type | Trade Date | Shares | Price Per Share | Cost/Proceeds |
|---|---|---|---|---|
| Sales | 3/10/2021 | -30 | $263.77 | $7,913.22 |
| Sales | 3/18/2021 | -210 | $279.85 | $58,768.79 |
| Purchases | 4/15/2021 | 180 | $308.04 | ($55,447.16) |
| Purchases | 6/7/2021 | 138 | $336.14 | ($46,387.14) |
| Purchases | 6/8/2021 | 11 | $334.82 | ($3,683.07) |
| Purchases | 7/1/2021 | 558 | $354.03 | ($197,548.63) |
| Purchases | 8/6/2021 | 915 | $363.44 | ($332,544.31) |
| Purchases | 8/10/2021 | 41 | $361.16 | ($14,807.58) |
| Purchases | 8/12/2021 | 11 | $362.74 | ($3,990.14) |
| Purchases | 9/21/2021 | 164 | $357.41 | ($58,614.47) |
| Sales | 10/7/2021 | -1,089 | $333.84 | $363,552.52 |
| Sales | 10/26/2021 | -217 | $315.63 | $68,491.47 |
| Sales | 11/3/2021 | -397 | $329.05 | $130,634.24 |