1  **POMERANTZ LLP**
Jeremy A. Lieberman (pro hac vice)
2  Austin P. Van (pro hac vice)
600 Third Avenue, 20th Floor
3  New York, NY 10016
Telephone: (212) 661-1100
4  jalieberman@pomlaw.com
avan@pomlaw.com
5
Jennifer Pafiti (SBN 282790)
6  1100 Glendon Avenue, 15th Floor
Los Angeles, California 90024
7  Telephone: (310) 405-7190
jpafiti@pomlaw.com
8
*Counsel for Lead Plaintiffs*
9
*Additional Counsel on Signature Page*
10

11              **UNITED STATES DISTRICT COURT**

12              **NORTHERN DISTRICT OF CALIFORNIA**

13                     **OAKLAND DIVISION**

14

15  PLUMBERS AND STEAMFITTERS          CASE NO.  4:22-cv-01470-YGR
LOCAL 60 PENSION TRUST, Individually
16  and on Behalf of All Others Similarly    **AMENDED COMPLAINT FOR**
Situated,                                **VIOLATIONS OF THE FEDERAL**
17                                        **SECURITIES LAWS**
                    Plaintiff,
18                                        **CLASS ACTION**
       v.
19                                        **DEMAND FOR JURY TRIAL**
META PLATFORMS, INC., MARK
20  ZUCKERBERG, DAVID WEHNER,
SHERYL SANDBERG, and SUSAN LI,
21                                        Hon. Yvonne Gonzalez Rogers
                    Defendants.
22

23

24

25

26

27

28

# TABLE OF CONTENTS

I.    INTRODUCTION ........................................................................................................ 1

II.   JURISDICTION AND VENUE ............................................................................... 6

III.  PARTIES ..................................................................................................................... 7

      A.   Lead Plaintiffs ................................................................................................... 7

      B.   Defendants ......................................................................................................... 7

           1.   Corporate Defendant ............................................................................ 7

           2.   Individual Defendants .......................................................................... 7

IV.   META COMPANY BACKGROUND ...................................................................... 8

      A.   Meta's Businesses ............................................................................................. 8

           1.   Family of Apps ..................................................................................... 8

           2.   Reality Labs .......................................................................................... 9

      B.   Meta's History ................................................................................................... 9

           1.   Facebook, Inc. ...................................................................................... 9

           2.   Facebook Inc.'s Transition to Meta ................................................... 10

           3.   Introduction of "Stories" .................................................................... 11

           4.   Introduction of "Reels" ...................................................................... 11

      C.   Advertising Revenue Is Vital to Meta's Business ............................................ 12

V.    META FAILED TO DISCLOSE THAT IT HAD ENTERED AN AGREEMENT WITH
      GOOGLE TO PREVENT THEIR COMPETITION ............................................... 15

      A.   Overview of Advertiser Business Model .......................................................... 15

      B.   The Introduction of Header Bidding Threatened Google's Monopoly on Ad
           Servers ............................................................................................................. 17

      C.   Meta Considered Adopting Header Bidding to Compete with Google .............. 19

      D.   Meta Entered an Agreement with Google Not To Introduce Header Bidding in
           Exchange for Benefits in Meta's Pricing ......................................................... 21

           1.   Google Gave Facebook a Leg up in Publishers' and Developers' Auctions
                in Return for Facebook Backing Off from Header Bidding .................... 23

2.     Google and Facebook Agreed To Limit Their Competitive Bidding for Developers' In-App Inventory ................................................................ 27

E.     Meta Repeatedly Told Investors That It Faced Significant Competition from Google, Yet Failed To Disclose That They Were Secretly Colluding ............... 33

F.     Lawsuits Filed by Numerous State Attorneys General Reveal the Truth That Google and Facebook Collaborated ........................................................ 34

VI.    META MISLED INVESTORS TO BELIEVE THAT META'S COO, DEFENDANT SANDBERG, WAS NOT RECEIVING IMPROPER ADDITIONAL BENEFITS IN THE FORM OF PERSONAL ASSISTANCE ................................................. 36

A.     Meta's Code of Conduct Prohibits Use of Company Personnel for Personal Use Where Not Authorized ........................................................................ 36

B.     Defendant Sandberg Repeatedly Received Personal Benefits Unrelated to Her Job, Including Assistance with Her Personal Book, Assistance in Planning Her Wedding, and Assistance in Private Matters ........................................ 37

C.     Defendants Sandberg Signed Multiple Proxy Statements that Failed to List Her Personal Benefits among the Perquisites and Additional Benefits She Received 41

D.     *The Wall Street Journal* Revealed the Truth that Sandberg Had Failed to Disclose these Perquisites that Violated Company Policy ................................... 42

VII.   META MISLED INVESTORS TO BELIEVE THAT THE IMPACT OF IOS CHANGES ON ITS BUSINESS WAS NOT MATERIAL ............................. 43

A.     Meta's Reliance on Apple's iOS Platform ............................................. 43

B.     Apple Announced Changes to Its iOS Privacy Settings ........................... 43

C.     Meta Acknowledged that Apple's iOS Privacy Changes Would Create "Headwinds," but Directly Implied that the Impact Was Not Currently Material When It Was ............................................................................... 45

1.     First Quarter 2021 ................................................................ 46

2.     Second Quarter 2021 ............................................................ 47

3.     Third Quarter 2021 .............................................................. 50

D.     Meta Disclosed the Truth that the Impact of Apple's iOS Privacy Changes Had Been Highly Material ........................................................................ 51

VIII.  META MISLED INVESTORS TO BELIEVE THAT ITS TRANSITION TO REELS WAS NOT IMPACTING ITS RESULTS OF OPERATIONS ........................... 52

A.     Meta's Competition from TikTok ......................................................... 52

B.    Meta's Transition to Reels To Compete Against TikTok ................................... 53

C.    Meta Acknowledged That Its Introduction of Reels Would Shift Engagement from Stories to Reels, but Stated That Reels Increased Overall Engagement, and Implied That This Shift Was Not Currently Impacting Its Results of Operations 54

D.    Meta Discloses the Truth that the Shift to Reels Is Negatively Impacting Its Results of Operations ................................... 58

IX.    DEFENDANTS' FALSE AND MISLEADING STATEMENTS ................................. 59

A.    Defendants' False and Misleading Statements in 2021 ................................. 60

1.    January 28, 2021 ................................. 60

2.    April 9, 2021 ................................. 63

3.    April 29, 2021 ................................. 64

4.    July 29, 2021 ................................. 67

5.    October 26, 2021 ................................. 71

B.    Defendants' False and Misleading Statements in 2022 ................................. 74

1.    February 3, 2022 ................................. 74

2.    April 8, 2022 ................................. 77

3.    June 1, 2022 ................................. 77

X.    DUTY TO DISCLOSE ADVERSE FACTS ................................. 78

A.    Share Repurchase Program ................................. 78

B.    Regulation S-K Item 105 ................................. 78

C.    Regulation S-K Item 303 ................................. 79

XI.    LOSS CAUSATION ................................. 79

A.    April 11, 2021 ................................. 80

B.    July 28, 2021 ................................. 81

C.    October 25, 2021 ................................. 81

D.    January 18, 2022 ................................. 82

E.    February 2, 3, 4, 7 & 8, 2022 ................................. 82

F.    March 11, 2022 ................................. 83

G.    April 20, 2022 ................................................................................... 83

H.    April 21, 2022 ................................................................................... 84

I.    June 1, 2022 ..................................................................................... 84

J.    June 10, 2022 ................................................................................... 84

XII.    ADDITIONAL SCIENTER ALLEGATIONS ................................................. 84

A.    Defendants Zuckerberg and Sandberg Discussed, and Defendant Sandberg Signed, the 2018 "Jedi Blue" Agreement with Google ...................................... 85

B.    Defendant Sandberg Knew About Her Personal Use of Company Resources.... 85

C.    The Company, Including Defendant CFO Wehner, Repeatedly Informed Investors that the Impact of Apple's iOS Changes Were in Line with the Company's Expectations ................................................................................... 86

D.    Defendants Repeatedly Discussed the Impact of the Transition to Reels on User Engagement and Incorporated the Impact of the Transition into the Company's Guidance ........................................................................................ 88

E.    Defendants Wehner and Zuckerberg Enriched Themselves Through Large Sales of Inflated Meta Stock During the Class Period ................................................ 88

F.    Core Operations .................................................................................. 94

1.    Meta's 2018 Jedi Blue Agreement with Google Concerned Its Core Operation........................................................................................ 94

2.    Apple's iOS Changes Directly Affected Meta's Core Operations. ......... 95

3.    Meta's Transition to Reels Directly Affected Its Core Operations.......... 95

XIII.    CLASS ACTION ALLEGATIONS .......................................................... 96

XIV.    NO SAFE HARBOR ............................................................................ 98

XV.    COUNT ONE .................................................................................... 99

XVI.    COUNT TWO ................................................................................... 101

XVII.    COUNT THREE ............................................................................... 102

XVIII.  COUNT FOUR ................................................................................. 104

XIX.    PRAYER FOR RELIEF ...................................................................... 106

XX.    JURY DEMAND ............................................................................... 106

1    Lead Plaintiffs Menorah Mivtachim Insurance Ltd., Menorah Mivtachim Pensions and

2  Gemel Ltd., The Phoenix Insurance Company Ltd., and The Phoenix Provident Pension Fund Ltd.

3  (collectively, "Plaintiffs" or "Lead Plaintiffs") on behalf of a class of all persons or entities who

4  purchased or otherwise acquired Meta Platforms, Inc. ("Meta" or the "Company") common stock

5  between January 28, 2021 and June 9, 2022, inclusive (the "Class Period") and were damaged as

6  a result,[1] bring this Amended Complaint for Violations of the Federal Securities Laws (the

7  "Complaint") against Meta and several of Meta's senior executives—Chief Executive Officer

8  Mark Zuckerberg, Chief Financial Officer David Wehner, Chief Operating Officer Sheryl

9  Sandberg, and Vice President of Finance Susan Li (collectively, "Individual Defendants," and

10  together with Meta, "Defendants").

11    Lead Plaintiffs' claims are based on personal knowledge as to their own acts, and on

12  information and belief as to all other matters, based upon, among other things, a review and

13  analysis of:   (1) reports and documents filed by Meta with the Securities and Exchange

14  Commission ("SEC"); (2) reports issued by analysts covering or concerning Meta and its business;

15  (3) press releases, news articles, transcripts, videos, and other public statements issued by or about

16  Meta, its business, and the Individual Defendants, including articles by *The Wall Street Journal*;

17  (4) an investigation conducted by Lead Plaintiffs' attorneys and their agents, including interviews

18  with former Meta employees; (5) publicly filed complaints based on independent investigations of

19  state attorneys general, including the complaints filed in the matter *In re:   Google Digital*

20  *Advertising Antitrust Litigation*, No. 1:21-md-03010-PKC (S.D.N.Y.); and (6) other publicly

21  available information concerning Meta, its business, and the allegations in this Complaint.  Lead

22  Plaintiffs believe that substantial additional evidentiary support exists for the allegations in this

23  Complaint.

24  **I.     INTRODUCTION**

25    1.     This is a federal securities class action (the "Action") on behalf of a class of persons

26  or entities that acquired the securities of Meta between January 28, 2021 and June 9, 2022, both

27  ───────────────

28  [1] Excluded from the Class are Defendants, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

dates inclusive, seeking to recover damages and to obtain other remedies for Defendants' violations of the Securities Exchange Act of 1934.

2. Meta is a social media company that operates in two segments, "Family of Apps" and "Reality Labs." The Family of Apps segment's products include Facebook, Instagram, Messenger, and WhatsApp. The Reality Labs segment provides augmented and virtual reality hardware, software, and content. The Company was formerly known as Facebook, Inc. and rebranded as Meta Platforms, Inc. in October 2021. Meta's revenue derives almost entirely from selling ads to businesses.

3. Meta has grown to be so large that its size and influence is genuinely difficult to imagine. Almost half of the world's inhabitants regularly uses one or more of Meta's products for social interaction. If Meta's revenue were a national GDP, Meta would rank higher than two-thirds of all countries. As members of European Parliament have recognized, Meta is currently threatening not to comply with European privacy laws and cease operations in Europe because it believes that if it does not comply, European leaders, rather than Meta, will have to change their policies to avoid political backlash from hundreds of millions of European citizens who regularly use Facebook, Instagram and WhatsApp.[2] In important ways, Meta is so large it believes it can write its own rules.

4. Indeed, Meta's titanic power appears to have left the Company with the belief that U.S. laws that apply to ordinary companies do not apply in the same way to Meta. In the past decade, Meta has repeatedly violated U.S. laws and regulations, suffered punishments, and then violated those laws and regulations again.[3] It is the rare quarter in which Meta is not the subject of a major controversy stemming from its law-bending conduct.

---

[2] *See, e.g.*, Sam Shead, *Meta Says It May Shut Down Facebook and Instagram in Europe Over Data-Sharing Dispute*, CNBC (February 22, 2022), available at:
https://www.cnbc.com/2022/02/07/meta-threatens-to-shut-down-facebook-and-instagram-in-europe.html.

[3] *See, e.g.*, Federal Trade Commission, *FTC Imposes $5 Billion Penalty and Sweeping New Privacy Restrictions on Facebook* (July 24, 2019), https://www.ftc.gov/news-events/news/press-releases/2019/07/ftc-imposes-5-billion-penalty-sweeping-new-privacy-restrictions-facebook.

5.     Most importantly for the purposes of this Action, Meta appears to believe it can regularly bend U.S. securities laws.  Lead Plaintiffs bring this Action because, during the Class Period, Meta repeatedly made statements about central aspects of its business that were blatantly misleading.  So stark was the difference between the picture of the Company that Meta painted for investors and the truth, that when the true state of the Company was partly revealed, Meta's share price fell 26% in a single day on February 22, 2022—in absolute terms, the largest single-day drop in value of a U.S. Company in history.

6.     Throughout the Class Period, Meta misled investors about four aspects of its business.  *First*, Meta misled investors to believe that it faced significant competition in every aspect of its business that overlapped with Google's.  In fact, Google and Meta had secretly been colluding for years in the advertising business.  About seven years ago, an innovation in the digital advertising space called "header bidding" allowed advertisers to bypass Google's monopoly on digital advertising by permitting digital ad space to trade on an open exchange, rather than run through Google's exchange that heavily favored Google's own advertising business.  Meta openly considered adopting header bidding and competing directly against Google's ad server monopoly, which would have been disastrous for Google but a massive advancement in fair competition. Instead, Meta realized it was easier to partner with Google and to share in Google's monopoly profits.  In 2018, Meta entered an agreement with Google in which Meta effectively agreed not to adopt header bidding in exchange for receiving a host of advantages from Google in the digital advertising space.  This agreement was clearly anticompetitive, and a group of seventeen state attorneys general is currently suing Google for violations of antitrust laws, based in large part on this agreement.

7.     Importantly for the purposes of this lawsuit, Meta blatantly misled investors by telling them that it faced significant competition from Google in every aspect of its advertising business, when in fact, Google and Meta were acting as collaborative partners.  There is no question that this misrepresentation was knowing—Defendant Zuckerberg personally discussed and approved the agreement, and Defendant Sandberg personally signed it.  *See* Part V.

8.      *Second*, Meta repeatedly concealed from investors that Meta's second-in-command, COO Defendant Sheryl Sandberg, was routinely using Company resources for personal matters.  Defendant Sandberg used Meta employees to assist her in planning her wedding, in editing her personal books, and in helping with her family's foundation.  Sandberg even used a team of Meta employees to develop a strategy to prevent the U.K. newspaper *Daily Mail*, and its online version, from publishing a story that would have been damaging to her ex-boyfriend.  U.S. Securities laws and regulations detail exactly what executives in publicly traded companies must disclose in SEC proxy filings about the benefits they receive.  Defendant Sandberg had a duty to disclose, yet refused to disclose, that she was using Meta employees for purposes that had nothing to do with her employment at Meta.  There is likewise no question that Sandberg knew about these misrepresentations—Sandberg was clearly aware of her own actions in using Meta employees for personal projects.  *See* Part VI.

9.      *Third*, Meta misled investors by directly implying that changes to Apple's iOS privacy settings were not materially impacting the Company's business, when in fact they were.  In April 2021, Apple introduced a new operating system for the iPhone smartphone, iOS 14, in which Apple updated its privacy settings to permit users to opt-out of privacy protections that largely prevented apps like Facebook and Instagram from accessing information about the users' activities.  Meta had been using this information to allow advertisers to target customers most likely to engage with those advertisers' products and services and to measure the success of their ad campaigns.  Apple's iOS privacy changes hindered Meta's and advertisers' target and measurement capabilities, which in turn made Meta's platforms far less attractive spaces for advertising.

10.     During 2021, Meta discussed the Apple iOS privacy changes with investors on several occasions, but the Company repeatedly downplayed the significance of the changes and assured investors that the changes were "manageable" and that the Company was taking numerous steps to "mitigate" the impact of the changes on the Company's business.  Yet the Company also flatly misled investors about the impact of the iOS privacy changes.  Crucially, in its quarterly reports on Form 10-Q, every word of which is painstakingly scrutinized by the hundreds of

1   sophisticated analysts globally covering Meta's valuation, Meta directly implied that Apple's iOS

2   privacy changes were not materially impacting the Company's targeting and measurement

3   capabilities and were not materially impacting the Company's financial results.  The Company

4   stated, "*If we are unable to mitigate these developments as they take further effect in the future,*

5   *our targeting and measurement capabilities will be materially and adversely affected, which would*

6   *in turn significantly impact our future advertising revenue growth.*"   Those statements were

7   blatantly misleading because such a material adverse impact was not merely a future possibility—

8   it had already occurred by the second quarter of 2021.  As the Company made clear in February

9   2022, Apple's privacy changes were materially impacting the Company's business by the second

10  quarter of 2021—they were costing the Company approximately $2.5 billion per quarter, or $10

11  billion annually.  Here again, there is no question that the Company knew that the impact of

12  Apple's privacy changes was materially impacting the Company's business.  Defendant CFO

13  Wehner stated in each quarter following the introduction of the privacy changes that the impact

14  from the changes on the Company's business was "in line" with what the Company had

15  calculated—an indisputable admission by Meta's CFO that the Company had calculated the impact

16  of Apple's iOS privacy changes on its business, and that the impact was known to the Company's

17  highest executives.  *See* Part VII.

18          11.     *Fourth*, Meta misled investors to believe that its transition from its older content

19  platforms, like Facebook's News Feed, to short-form video format, called "Reels," was not

20  adversely impacting its business, when in fact it was.  Meta has traditionally been most successful

21  in selling ads in Facebook's News Feed, where ads can easily be placed frequently between user-

22  generated text and photos.  However, as the Company has recognized, Meta now faces significant

23  competition from the app TikTok, which allows users to create and scroll through short-form

24  videos.  To compete with TikTok, in 2020 Meta launched Reels, a platform within Instagram and

25  Facebook that copies TikTok's short-form video format.

26          12.     Reels is objectively more engaging than News Feed and Meta's other older content

27  platforms—users on average spend more hours in total on Reels than on other platforms.  However,

28  given the short-form video format, ads cannot be interspersed as frequently in Reels as on older

1   platforms.  Accordingly, while users spend more hours on Reels, they view fewer ads per hour

2   than on other Meta platforms.  In this way, Meta's transition from News Feed and older formats

3   for Reels involves a tradeoff—in transitioning to Reels, users spend more total hours on Meta's

4   apps, but view fewer ads per hour.  Whether this tradeoff has a net positive or negative impact on

5   Meta's ad business overall turns on whether the total ads viewed by users increases or decreases

6   with the transition to Reels.

7          13.    Meta made clear to investors that it was transitioning to Reels to compete with

8   TikTok and that this transition would involve the tradeoff described above.  However, in its

9   conference calls, Meta left investors completely in the dark as to whether this tradeoff on net

10  helped or harmed Meta's business.  Rather, the only indication Meta ever gave of the net impact

11  of its transition to Reels again appeared in its highly scrutinized quarterly reports on Form 10-Q.

12  There, Meta directly and repeatedly implied that the transition was having no adverse effect on

13  Meta's business or results of operations—the Company stated as a *mere possibility* that the

14  transition "may adversely affect our business and results of operations," when in fact, as the

15  Company revealed in February 2022, the transition all along was having a negative net impact on

16  its business.  Here as well, there is simply no doubt that the Company knew about this impact—

17  when finally revealing the negative impact of the transition, Defendants CEO Zuckerberg and CFO

18  Wehner made clear that the transition had been undertaken pursuant to careful strategic calculation

19  that recognized short-term losses would be suffered for long-term gains.  *See* Part VIII.

20         14.    Meta's misrepresentations straightforwardly violated the U.S. securities laws and

21  caused many billions of dollars of losses to investors.  The Class is entitled to recover those losses.

22  **II.    JURISDICTION AND VENUE**

23         15.    The claims asserted herein arise under Sections 10(b), 14(a) and 20(a) of the

24  Securities Exchange Act of 1924 (the "Exchange Act"), 15 U.S.C. §§ 78j(b), 78n(a) and 78t(a),

25  and Rules 10b-5(a), (b), and (c) and 14a-9 promulgated thereunder by the SEC, 17 C.F.R.

26  §§ 240.10b-5, 240.14a-9.

27         16.    This Court has jurisdiction over the subject matter of this action pursuant to

28  28 U.S.C. §§ 1331 and 1337, and Section 27 of the Exchange Act, 15 U.S.C. § 78aa.

17.     Venue is proper in this District pursuant to § 27 of the Exchange Act and 28 U.S.C. § 1391(b)-(c) because Meta's headquarters are located in this District, the Company conducts substantial business in this District, and many of the acts and practices complained of in this Complaint occurred in substantial part in this Judicial District.

18.     In connection with the acts, conduct, and other wrongs alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the United States mail, interstate telephone communications, and the facilities of the national securities exchange.

## III.     PARTIES

### A.     Lead Plaintiffs

19.     Plaintiffs Menorah Mivtachim Insurance Ltd., Menorah Mivtachim Pensions and Gemel Ltd., The Phoenix Insurance Company Ltd., and The Phoenix Provident Pension Fund Ltd., as set forth in the certifications attached as Exhibit C to the Declaration of Jennifer Pafiti (ECF. 17-2), incorporated in this Complaint by reference, acquired Meta securities at artificially inflated prices during the Class Period and suffered damages as a result.

### B.     Defendants

#### 1.     Corporate Defendant

20.     Defendant Meta is incorporated in Delaware, and its principal executive offices are located at 1601 Willow Road, Menlo Park, California 94025.  The Company's common stock is listed on the NASDAQ under the ticker symbol "META."   Meta was previously known as "Facebook, Inc." but rebranded itself as "Meta Platforms, Inc." on or about October 28, 2021.  The Company's common stock was formerly listed on the NASDAQ under the ticker symbol "FB," which had been used since its initial public offering in 2012 and began trading on the NASDAQ under the ticker symbol "META" on June 9, 2022.

#### 2.     Individual Defendants

21.     Defendant Mark Zuckerberg ("Zuckerberg") is, and was during the Class Period, Meta's Chief Executive Officer.

AMENDED COMPLAINT (CASE NO. 4:22-cv-01470-YGR)

22.     Defendant David Wehner ("Wehner") is, and was during the Class Period, Meta's Chief Financial Officer.

23.     Defendant Sheryl Sandberg ("Sandberg") is, and was during the Class Period, Meta's Chief Operating Officer.

24.     Defendant Susan Li ("Li") is, and was during the Class Period, a Vice President of Finance at Meta.

25.     Defendants Zuckerberg, Wehner, Sandberg, and Li are collectively referred to in this Complaint as the "Individual Defendants."  Defendant Meta and the Individual Defendants are collectively referred to in this Complaint as "Defendants."

IV.     **META COMPANY BACKGROUND**

A.     **Meta's Businesses**

1.     **Family of Apps**

26.     Meta's "Family of Apps" refers to its Facebook, Instagram, Messenger, and WhatsApp products.  For its Family of Apps, Meta "generate[s] substantially all of [its] revenue from selling advertising placements to marketers."  This revenue is generated by displaying ad products on Facebook, Instagram, Messenger, and third-party affiliated website or mobile applications.

27.     Facebook is an online social media and social networking service.  Through a Facebook account, users may post content about their own lives and interests, and view content that their connections have posted.  Facebook uses a feature called News Feed, a constantly updated, personally customized scroll of photos and links to news stories, to push content to its users.  The News Feed is the primary mechanism through which users are exposed to content on Facebook, and Facebook uses an algorithm to control what content appears in each user's News Feed.

28.     Instagram allows users to share photos, videos, and private messaging as well as connect and shop from businesses.  Instagram uses a similar feature to Facebook's News Feed, called Instagram Feed.

29.     Messenger is a messaging application for users to connect with friends, family, groups, and businesses across platforms and devices through chat, audio, and video calls.

30.     WhatsApp is a messaging application used by people and businesses around the world.

31.     Through this Family of Apps, Meta provides multiple services that permit cross-platform activities.

**2.     Reality Labs**

32.     Facebook Reality Labs drives innovation through AR/VR related consumer hardware, software, and content.  Reality Labs revenue, only 2% of Meta's annual revenue, is generated from the delivery of consumer hardware products.

33.     During its third quarter earnings release for 2021, Meta revealed that it planned to spend at least $10 billion on Reality Labs to bring its "metaverse" vision to life, described further below.

**B.     Meta's History**

**1.     Facebook, Inc.**

34.     Defendant Zuckerberg launched Facebook in February of 2004 with a group of fellow Harvard University classmates.  At its start, Facebook connected Harvard University students with one another.

35.     Soon after its founding, Facebook expanded rapidly.  Because many people use social network platforms to engage with others, the presence of many people on a particular personal social network both attracts new users and keeps existing users on the network.  Facebook quickly expanded to other campuses around the globe and by the end of 2004, Facebook had one million users, private investment, and Zuckerberg left Harvard University to run the Company from its new headquarters in California.  Facebook became widely available to the public in 2006.

36.     Facebook grew rapidly following its 2006 expansion beyond schools to the public and has been the world's dominant social network platform since around 2011.

AMENDED COMPLAINT (CASE NO. 4:22-cv-01470-YGR)

37.     Facebook has a history of acquiring other companies that it viewed as competitive threats.  Facebook acquired Instagram, a photo and video sharing app, in 2012 for $1 billion and WhatsApp, a secure messaging app, in 2014 for approximately $19 billion.

38.     Facebook operates the world's largest family of social networking sites, accessed by more than 3.5 billion users.  In addition to its flagship social network, Facebook, Instagram, and WhatsApp, the Company also runs Messenger, a messaging app.

### 2.     Facebook Inc.'s Transition to Meta

39.     On October 28 2021, Defendant Zuckerberg announced that Facebook would be rebranding as Meta, bringing together its Family of Apps and technologies under one brand. Multiple sources have opined that the Company rebranded as Meta in part to distance itself from the many controversies it faced, including regulatory criticism.[4]  The timing of the rebranding occurred as the Company grappled with some of the most intense scrutiny in its history from regulators and the public over Meta's role in amplifying political misinformation and its alleged knowledge of its harmful effects on teenagers' well-being.[5]  Corporate rebranding such as this has precedent, such as tobacco giant Philip Morris's rebranding to Altria Group after years of reputational damage stemming from the damaging effects of cigarettes.

40.     The stated new focus of Meta is to create the "metaverse," Zuckerberg's vision for a virtual reality social platform.  Broadly speaking, the metaverse is meant to provide a parallel digital universe connected to our own physical world through multiple digital technologies.  The Company stated that, "In the metaverse, you'll be able to do almost anything you can imagine— get together with friends and family, work, learn, play, shop, create—as well as completely new experiences that don't really fit how we think about computers or phones today."

---

[4] Mike Isaac, *Facebook Renames Itself Meta*, The New York Times (Oct. 28, 2021), available at https://www.nytimes.com/2021/10/28/technology/facebook-meta-name-change.html.

[5] Alexandra S. Levine, *Facebook Changes Its Name to 'Meta' Amid Backlash to Whistleblower Revelations*, Politico (Oct. 28, 2021), available at https://www.politico.com/news/2021/10/28/facebook-meta-whistleblower-517449; Barbara Ortutay, In the Middle of a Crisis, Facebook Inc. Renames Itself Meta, AP News (Oct. 28, 2021), available at https://apnews.com/article/facebook-meta-mark-zuckerberg-technology-business-5ad543ab7780caae435935f0aca9fac6.

AMENDED COMPLAINT (CASE NO. 4:22-cv-01470-YGR)

41.     The metaverse is years, and perhaps decades, away from being fully realized.  Since the Company's announcement of its transition, Meta has hired thousands of additional employees to create hardware and software for the metaverse.  During its third quarter earnings release for 2021, Meta revealed that it planned to spend at least $10 billion on Reality Labs to bring its metaverse vision to life.

42.     The corporate structure of the Company did not change with its transition to Meta, but starting with the fourth quarter of 2021, the Company began reporting two separate operating segments:  Family of Apps and Reality Labs.  The Company also started trading under a new stock ticker, META, on June 9, 2022.

### 3.     Introduction of "Stories"

43.     On August 2, 2016, Instagram launched Instagram Stories, a feature that lets users share multiple photos and videos that appear together in a slideshow and disappear after 24 hours.  Stories appear in a bar at the top of a user's Instagram feed.

44.     Advertisers may run ads on Instagram Stories which are immersed seamlessly into a user's Stories viewing experience.  Unlike user-created Stories, an Instagram Story ad does not disappear after 24 hours—advertisers may choose the length of the campaign and frequency of ads on Instagram, like any other ad created for Instagram or Facebook.

45.     On March 28, 2017, Facebook launched Facebook Stories, a way to post ephemeral short form videos and photos in its mobile apps that sits at the top of the News Feed in a horizontal scrolling feed.  Much like Instagram Stories, Facebook Stories consist of photos and videos that disappear 24 hours after they are posted.

46.     By the fourth quarter of 2018, Instagram Stories had over 500 million daily active users with 2 million advertisers and by the third quarter of 2019, ad revenue on Instagram Stories had grown almost 70% year over year and accounted to 10% of total Facebook ad revenue for the quarter.

### 4.     Introduction of "Reels"

47.     On August 5, 2020, Instagram announced the launch of Instagram Reels, a new way to create and discover short videos on Instagram.  Reels were originally designed as a 15-second

multi-clip video with audio, effects, and other creative tools to share with followers and friends within the Instagram app.  Reels are viewed as full-screen videos that users may scroll through one at a time.  Reels may be viewed in the Reels or Discover page of the Instagram app, and a user does not have to follow the user who posted to be recommended a Reel.  Meta launched Reels primarily to compete with the highly successful app TikTok owned by the Chinese company ByteDance.  Reels mimics TikTok's format.

48.   On June 16, 2021, Instagram announced the launch of Reels ads, which appear as full screen vertical videos, like ads in Stories, interspersed between individual Reels.

49.   On July 29, 2021, during a conference call with investors to discuss financial results from the second quarter of 2021, Defendant Zuckerberg acknowledged, "Video now accounts for almost half of all time spent on Facebook, and Reels is already the largest contributor to engagement growth on Instagram.  Across all forms of video, short-form video like Reels is growing especially quickly."

50.   On September 29, 2021, Facebook announced the launch of Reels on Facebook for iOS and Android in the U.S.  On Facebook, Reels are located in the News Feed or in Groups and may be engaged with by users through comments or sharing with friends.  Initially, many Instagram Reels' features were available on Facebook Reels, and additional features were added over time.  Users may browse Reels created by other users in the News Feed, where they can like, comment, or share them just as they would any other type of Facebook post.

51.   Like much other Facebook content, Reels are recommended algorithmically to users based on what content users find interesting and engaging as well as what is popular.

**C.   Advertising Revenue Is Vital to Meta's Business**

52.   Meta's revenues come almost entirely from selling ads to businesses for display within Meta's Family of Apps.  According to the Company's public earnings reports, "We generate substantially all of our revenue from advertising."  Approximately 98% of Meta's annual revenue during the Class Period came from advertising, as illustrated in the following table.

| Revenue for Year Ended December 31, (dollars in millions)[6] | | |
|---|---|---|
| | **2021** | **2020** | **2019** |
| **Advertising** | 114,934 | 84,169 | 69,655 |
| **Other Revenue** | 721 | 657 | 541 |
| **Family of Apps** | 115,655 | 84,826 | 70,196 |
| **Reality Labs** | 2,274 | 1,139 | 501 |
| **Total Revenue** | 117,929 | 85,965 | 70,697 |

53.    In particular, a large portion of Meta's revenue derives from selling ads seen on iPhones.  Meta uses data obtained about its users by tracking their activities.  Meta has stated:

Our advertising revenue is dependent on targeting and measurement tools that incorporate data signals from user activity on websites and services that we do not control . . . .

54.    While there are several ways in which personal social networking could be monetized, Meta monetizes its products by mining its users' personal data and selling behavioral advertising.

55.    This practice has been highly profitable for Meta.  Advertisers pay billions of dollars to display their ads to specific sets of Meta users.  Meta serves up these "audiences" using algorithms that analyze the vast quantity of data that the Company collects on its users.  This allows advertisers to target different campaigns and messages to different groups of users.  Ads displayed by Meta are interspersed with—and can be similar in appearance to—user-generated content.

56.    Social advertising is a distinct form of display advertising.  Display advertising refers to the display of advertisements—in the form of images, text, or videos—on websites or apps when a user visits or uses them.  Through display advertising, advertisers may reach consumers during their online activity (including during their use of mobile devices like smartphones and tablets).  Display advertising allows for interactive ads and permits advertisers to target users through their personal data generated and collected by their online activity.  Display advertising is also distinct from search advertising, which is a form of digital advertising that is

---

[6] *See* Meta's Annual Report on Form 10-K filed with the SEC on February 3, 2022.

AMENDED COMPLAINT (CASE NO. 4:22-cv-01470-YGR)

shown to a person when that person enters a specific search term in an online search engine like Google. Advertisers buy search advertising to target consumers who are actively inquiring about a particular type of product or service. By contrast, display advertising reaches consumers who are not actively querying a search engine, including consumers who may be further from making a specific purchase decision.

57.     Social advertising is a type of display advertising, but it is distinct in several ways from the non-social display advertising found on websites and apps that are not personal social networks. For example, in part because users must log in to a personal social network with unique user credentials, social advertising enables advertisers to target users based on personalized data regarding users' personal connections, activities, identity, demographics, interests, and hobbies.

58.     Also, in contrast to display advertising on other websites and apps, social advertising leverages high engagement and frequent contact with users, as well as the integration of advertisements directly into a user's feed of content generated by personal connections (including ads that resemble "native" content and boosted content). In addition, social advertising facilitates forms of engagement with the advertisement that are not available with other forms of display advertising—such as allowing a user to share an advertisement with a personal connection, or to "like" or follow an advertiser's page. Among other things, these characteristics enable social advertising providers to sell advertisers access to personally targeted "audiences" of highly engaged users, and to reach users that need not be actively searching for—or even aware of—the advertised product or service.

59.     The widespread adoption of smartphones in the 2010s marked a significant change in the way people consumed digital services, with users shifting from desktop computers to mobile devices. With smartphones being easily portable and offering integrated digital cameras, social networking through taking, sharing, and interacting with photos and videos via mobile apps optimized for such activities became increasingly popular.

60.     Meta collects user data in multiple ways. When users use Facebook, they can choose to share things about themselves like their age, gender, hometown, or friends. They may click or like posts, pages, or articles. Meta uses this information to understand users' interests to

show them relevant ads.  Advertisers may also buy Meta customer information so they may reach those individuals on Facebook.  Meta also may track users across other websites and services like the various apps users also have on their mobile devices.

## V.     META FAILED TO DISCLOSE THAT IT HAD ENTERED AN AGREEMENT WITH GOOGLE TO PREVENT THEIR COMPETITION

61.     The allegations in this section are based in substantial part on the Third Amended Complaint filed in *In re:  Google Digital Advertising Antitrust Litigation*, U.S. District Court for the Southern District of New York, No. 1:21-md-03010-PKC, which are in turn based on an extensive investigation undertaken by the Attorney General of the State of Texas and the attorneys general of sixteen other states.  Lead Plaintiffs have taken steps to confirm that the allegations in that Complaint have a factual basis uncovered in this investigation by the attorneys general, including by interviewing participants in that investigation, including an Assistant Attorney General of the State of Utah, who confirmed that the allegations were based on "actual facts" uncovered in the investigation.

### A.     Overview of Advertiser Business Model

62.     Meta sells ad impressions.  Ad impressions are functionally distinct from ads traditionally distributed via hardcopy publications.  An ad impression is not just space on a page, it is an opportunity to sell an advertisement "targeted" to a specific user or type of user.  Unlike an ad in traditional print media, a single slot for a display ad can be sold to numerous different advertisers in millions of separate transactions at different prices.  For example, if a publisher's entire website has just five pages each with five ad slots, and those pages are viewed by one thousand users per day, the publisher has up to 25,000 unique impressions to sell every day.

63.     Managing ad inventory in a way that maximizes publishers' yield is a critical task for today's online publishers.  To accomplish this goal, almost all major publishers use a unique type of product called an "**ad server**."  When an impression becomes available, the ad server gathers and communicates information about the impression (e.g., dimensions, placement, and user information).  At the heart of any ad server is an engine that automates split-second decisions about which ad to display.

64.     Advertisers use specialized "**ad buying tools**" to optimize and effectuate their purchases of ad impressions.  These tools let advertisers set various decision-engine parameters integral to their unique ad campaigns and automated purchasing decisions (e.g., details about the types of users to target, the bids to submit for various types of ad inventory, etc.).  Using these parameters, the ad buying tool will then automatically place bids to purchase impressions on the advertiser's behalf.

65.     Publishers using ad servers and advertisers using ad buying tools connect with one another in the "**ad exchange**," which is a real-time auction marketplace.  They do this billions of times every day.  As the communication channel between publishers and advertisers in these auctions, the exchange has unique insight into vast amounts of data concerning advertiser bids and publisher inventory.

66.     Separate and apart from the products relevant to web display advertising, products in a roughly analogous—but distinct—ecosystem interact to effectuate purchases and sales of ads displayed within mobile device applications ("**in-app display**" advertising).  Similar to publishers on the open web, developers of mobile device applications (e.g., a gaming app built for smartphones and tablets) generate revenue by selling their ad inventory.  But the type of inventory they sell is quite different, as is the type of product they use.  To sell and maximize the yield from their in-app ad space, developers use a specialized inventory management system called an "**in app mediation**" tool, which connects to multiple sources of advertiser demand for in-app impressions.  As each eligible in-app impression becomes available, the mediation tool automatically solicits bids from those sources and selects the winners.  The main demand sources are known as "**in-app networks**," which act as intermediaries that trade in-app inventory on their own account.  Instead of using exchanges to connect developers and advertisers in real-time transactions, in-app networks buy ad inventory from developers and resell to advertisers.

67.     Meta's in-app network is called Facebook Audience Network or "**FAN**."  Meta previously used the label to describe both its in-app network and its web display network, but FAN has since exited the web display network market, so the label now refers only to Meta's in-app

network.  FAN is the closest competitor of Google's AdMob in-app network in the in-app network market.

**B.     The Introduction of Header Bidding Threatened Google's Monopoly on Ad Servers**

68.     Google exercises substantial power in multiple web and in-app display markets. With regard to web display advertising, Google has monopoly power in the markets for ad servers, exchanges, and ad buying tools for small advertisers.  Regarding in-app display markets, Google has market power in the market for in-app mediation.  In each of these markets, Google has abused its power to suppress competition, and has used its control over the chokepoints between publishers and advertisers to extract monopoly profits.

69.     The origins of Google's display advertising monopolies trace back to its 2008 acquisition of DoubleClick, which operated the leading ad server, DoubleClick for Publishers  or "**DFP**."  Through DFP, Google served as the middleman between publishers and exchanges. Google effectively turned DFP—previously a clearinghouse of impression inventory that relied on price competition—into a chokepoint through which it could exclusively control access to the must-have demand of hundreds of thousands of advertisers.  Google accomplished this by coercively tying its DFP ad server to its "**AdX**" exchange—the only exchange where publishers could access bids from advertisers that used Google's monopoly ad buying tool.  More particularly, Google began to restrict the ability of publishers using rival ad servers to trade through AdX, allowing only publishers that license DFP to receive competitive live bids from AdX.  Unable to compete with Google's coercive tactics, all of Google's most important rivals in the once-competitive market for ad servers have exited the market.  Google then used its newfound hold on publisher ad servers to foreclose competition from rival exchanges and buying tools.  Its ability to do this stemmed from the fact that a publisher using an ad server necessarily relinquishes significant control of the management and sales process to the ad server.

70.     Around 2015, in an attempt to inject competition in the exchange market dominated by Google, a new innovation called "**header bidding**" was devised.  Header bidding created a clever technical workaround for publishers to circumvent Google's anticompetitive ad serving

programs.  This new method became known as header bidding because it uses a snippet of code embedded in a webpage's "header" section to run real-time auctions amongst competing non-Google exchanges before (or even without) the publisher's ad server inviting Google's own exchange, AdX, to bid.

71.     When a user visited a page, the code enabled publishers to direct a user's browser to solicit live, competitive bids from multiple exchanges before Google's ad server, DFP, could prevent them from doing so by running a program called "Dynamic Allocation."  Competition from header bidding decreased the anticompetitive effects of Dynamic Allocation and Google's auction manipulation programs.

72.     With header bidding, publishers were finally able to benefit from direct competition among exchanges by routing their ad inventory for sale simultaneously on multiple exchanges. Unsurprisingly, this increase in exchange competition enabled publishers to solicit higher winning bids for their impressions; as a result, many publishers began to use header bidding.  Advertisers also began migrating to header bidding in droves, as it increased their access to ad inventory, which they could bid on and purchase without suffering the monopoly fees Google extracted from auctions already slanted in Google's favor.

73.     Google quickly realized that this innovation substantially threatened its exchange's ability to demand a very large—19 to 22 percent—cut on all advertising transactions.  In Google's own words, header bidding was an "existential threat."  During one internal debate, a Google employee proposed a "nuclear option" of reducing Google's exchange fees down to zero.  A second employee captured Google's ultimate aim of destroying header bidding altogether, noting in response that the problem with simply competing on price is that it "doesn't kill HB [header bidding]."  Google decided to respond to this threat with a series of anticompetitive tactics.

74.     Google's first major tactic was to introduce a product marketed as "**Exchange Bidding**," whereby Google purported to address publishers' clear preference for exchange competition that header bidding facilitated.  With Exchange Bidding, Google permitted some rival exchanges to submit live, competitive bids into Google's ad server.  But other aspects of the program reveal that Exchange Bidding was designed to undermine competition.  First, it

1    diminishes rival exchanges' ability to return competitive bids by further decreasing their ability to

2    identify users associated with the impressions up for auction.  Second, it causes otherwise-winning

3    bids from rival exchanges to lose to AdX by imposing an additional fee on impressions sold

4    through a rival exchange.  Third, it requires publishers to route their inventory through AdX, even

5    when they would not otherwise do so.  Finally, it gives Google special visibility into rival

6    exchanges' bids, which Google then uses to further suppress competition.

7            75.    Google made efforts to kill header bidding in its incipiency and coerce publishers

8    into Exchange Bidding.  Google made adjustments to DFP to advantage AdX and other exchanges

9    participating in Exchange Bidding so that they could trade ahead of rivals that use header bidding.

10   Google deceived publishers and exchanges to forego header bidding.  Google crippled publishers'

11   ability to measure the efficiency of exchanges in header bidding, and Google used caps to limit

12   publishers' ability to use header bidding.  Google punished publishers for using header bidding by

13   cutting traffic to their content.

14           C.     Meta Considered Adopting Header Bidding to Compete with Google

15           76.    In March 2017, Facebook publicly announced that it would submit bids from FAN

16   to open web publishers using header bidding, via partnerships with technology providers such as

17   Amazon Publisher Services, Amazon's header bidding code library that facilitated implementation

18   of header bidding by open web publishers.  By doing so, Facebook would enable publishers and

19   advertisers to bypass substantial fees imposed by Google's ad server and exchange.  Thus,

20   Facebook's use of header bidding promised to increase revenue paid to publishers and lower prices

21   ultimately paid by advertisers.

22           77.    But header bidding was not just a threat to Google's fees in the short term.  Google

23   also feared that Facebook's support of header bidding posed a longer-term threat to Google's

24   publisher ad server monopoly.  If a significant number of buyers banded together to bid through

25   header bidding, Google feared they could "disintermediate" Google and cause it to "lose [its] must-

26   call status."  Google executives outlined that Google's priorities for 2017 included stopping

27   Facebook from supporting header bidding.  In a company presentation, one Google executive

28   outlined the "top priorities" for 2017, writing:  "Need to fight off the existential threat posed by

1   Header Bidding and FAN.  This is my personal #1 priority.  If we do nothing else, this need[s] to

2   [be] an all hand[s] on deck approach."

3          78.     The wider industry also thought Facebook was prepared to challenge Google's ad

4   server monopoly.   The same day as Facebook's March 2017 header bidding announcement,

5   industry publication *AdAge* wrote that Facebook was poised to execute a "digital advertising coup

6   against rival Google and its DoubleClick empire."  A *Business Insider* headline the same day read:

7   "Facebook made an unprecedented move to partner with ad tech companies—including Amazon—

8   to take on Google."  Google started monitoring Facebook's initiative in header bidding.  According

9   to metrics posted in Facebook's public blog, Facebook was helping publishers use header bidding

10  to achieve two to three times more yield per impression and increase some third-party publishers'

11  revenue by as much as 10 to 30 percent.   As part of its internal monitoring efforts, Google

12  referenced this blog post in an email circulated amongst the management team.

13         79.     Internal Google documents show that one of Google's strategies for killing header

14  bidding was to induce Facebook, Amazon, and other industry participants to end their support for

15  the new technology.  In an October 5, 2016 presentation to senior Google executives, a Google

16  employee expressed concern about Amazon, Criteo, and Facebook enabling the growth of header

17  bidding, stating "to stop these guys from doing HB we probably need to consider something more

18  aggressive."  The presentation plainly asserted that Google's "goal/mandate" was to "[f]orestall

19  major industry investment in HB & HB wrapper infrastructure."  Google hoped to deprive header

20  bidding of scale and industry adoption, for the express purpose of protecting its own monopolistic

21  position.

22         80.     Facebook understood these stakes as well.   Internal Facebook communications

23  indicate that Facebook's March 2017 announcement was intended to signal Facebook's

24  willingness to support header bidding.  Facebook knew that Google would see its participation in

25  header bidding as a major threat.   Evidently, Facebook was executing a planned long-term

26  strategy—"18 month 'header bidding' strategy to minimize "[the Exchange Bidding] tax"—by

27  threatening to expose the hidden costs Google charges publishers.

28

1
2

    **D.**    **Meta Entered an Agreement with Google Not To Introduce Header Bidding in Exchange for Benefits in Meta's Pricing**

3    81.    Google and Facebook entered into formal negotiations shortly thereafter.  Both
4 sides recognized that Facebook's leverage came from its critical role in supporting header bidding.
5 As a Facebook document from February 2, 2017 memorialized, "What Google wants:  To kill
6 header bidding (us baptizing their product will help significantly)."   Elsewhere, Facebook
7 employees summarized an earlier meeting between the parties discussing header bidding and
8 Exchange Bidding ("EBDA"), "We discussed the EBDA product they're building.  Both parties
9 (FB and G) were candid about why header bidding exists and that EBDA's sole reason for
10 existence is to kill it."  In an October 30, 2017 email, a senior Facebook executive discussed the
11 proposed Google-Facebook agreement and explained to another Facebook executive, "they want
12 this deal to kill header bidding."  Google put the matter just as bluntly, explaining internally in
13 2017 that the goal of partnering with Facebook would be to "protect" Google's "leadership
14 position in 3P [third party] ad buying/selling."  To that end, the endgame with Facebook was to
15 "collaborate when necessary to maintain status quo."  The "status quo," in this case, was an
16 unlawfully obtained ad server monopoly and an ad exchange charging many multiples over the
17 competition.

18    82.    As negotiations proceeded, Google began to accept that Facebook's price for
19 abandoning header bidding would require Google to share some of the auction advantages it had
20 previously taken for itself.  In an August 9, 2018, internal Google presentation, one slide averred
21 that if Google could not "avoid competing with FAN" in the trade for third-party inventory, then
22 it would instead collaborate with Facebook to "build a moat."  Google thus preferred to share a
23 slice of its monopoly profits with a potential entrant rather than risk reducing its monopoly power.

24    83.    The prospect of cooperating rather than competing with Google was enticing for
25 Facebook too.  As internal Facebook documents reveal, Facebook believed that partnering with
26 Google was "relatively cheap compared to build/buy and compete in zero-sum ad tech game."
27 Facebook identified "build/buy ad tech" as the Company's second-best option but noted that
28 entering the market would have required "huge [engineering] and services investment, and

21
AMENDED COMPLAINT (CASE NO. 4:22-cv-01470-YGR)

1   patience for sales cycle."  Compared to the time and expense of building a new technology and

2   competing on the merits, entering an unlawful deal with Google *not* to do those things was an

3   attractive option.

4       84.    Facebook's Chief Operating Officer Defendant Sandberg was explicit that "[t]his

5   is a big deal strategically" in an email thread that included Facebook CEO Defendant Zuckerberg.

6   When the economic terms had taken their form, the team sent an email addressed directly to CEO

7   Zuckerberg:  "We're nearly ready to sign and need your approval to move forward."  Facebook

8   CEO Zuckerberg wanted to meet with COO Sandberg and his other executives before making a

9   decision.

10      85.    The ultimate outcome of these negotiations was a September 2018 Google-

11  Facebook agreement signed by Philipp Schindler, Senior Vice-President and head of Google

12  advertising sales and operations, and Defendant Sandberg Facebook's Chief Operating Officer and

13  member of Facebook's Board of Directors, who herself was one-time head of Google advertising.

14  Google CEO Sundar Pichai also personally signed off on the terms of the deal.

15      86.    Google internally used the code phrase "Jedi Blue" to refer to the 2018 Google-

16  Facebook agreement (the "Jedi Blue Agreement").  Google kept this code phrase secret.  Google

17  does not use code words to refer uniquely to any other Exchange Bidding agreement.  With the

18  addition of networks, Google renamed Exchange Bidding to "**Open Bidding**."

19      87.    The opening of the September 2018 Google-Facebook agreement is as follows:

20

21

22                                                      **CONFIDENTIAL**                    facebook
                                                                                            Legal

23

24                                    **Network Bidding Agreement**

25      This Network Bidding Agreement (this "**Agreement**") is entered into by Google LLC and Google
        Ireland Limited (collectively, "**Google**") and Facebook, Inc. and Facebook Ireland Limited
26      (collectively, "**Facebook**") as of the Effective Date (as defined below). This Agreement governs
        Facebook's participation in the Network Bidding Pilot program and any successor services
27      (collectively, the "**Program**").  Any use of the term "including" in the Agreement will mean

28

AMENDED COMPLAINT (CASE NO. 4:22-cv-01470-YGR)

88.     In the end, with the Jedi Blue Agreement Google secured its core objective—the end of Facebook's active support for header bidding.  Google ensured that Facebook would not—and, economically, could not—return to support header bidding by imposing significant minimum spend requirements running to hundreds of millions of dollars a year.  As a result of the agreement, Facebook curtailed its header bidding initiatives and instead bid through Google's tools.  In return, Google agreed to give Facebook a leg up in the web and in-app auctions it conducted on behalf of publishers and developers.  In an internal Google memo titled "FAN deal discussion," Google memorialized that "FAN requires special deal terms, but it is worth it to cement our value."

> 1.     **Google Gave Facebook a Leg up in Publishers' and Developers' Auctions in Return for Facebook Backing Off from Header Bidding**

89.     Google promised Facebook a number of special advantages in publishers' and developers' auctions to induce Facebook to shift from routing bids through header bidding to routing bids through Google's web ad server and in-app mediation tools.

90.     The first was price.  Traditionally, Google only permitted networks to buy on AdX as Authorized Buyers for a 20 percent fee.  With the introduction of Network Bidding, Google began charging ad networks a 10 percent fee.  But in the Jedi Blue Agreement, Google gave Facebook a significant further concession.  The exact fee owed to Google depends on the volume of impressions Facebook purchases from publishers, and Facebook expected its volume would trigger the lowest possible rate.  Internally, Facebook treated the deal as offering a five percent fee—a 50 percent discount.  Because auction winners are selected based on highest bid after fees, this special, Facebook-only discount allows Facebook to win auctions even when it submits a lower gross bid than its competitors.

91.     Google also provided Facebook with a speed advantage.  Google subjects other marketplaces competing for publishers' inventory in Exchange Bidding to 160 millisecond timeouts.  Competitors have actively complained that 160ms is not enough time to recognize users in auctions and return bids before they are excluded.  By comparison, Google nearly doubled timeouts for Facebook, extending them to 300 milliseconds.  These longer timeouts granted by Google were designed to aid FAN in winning more auctions.

92.     A third advantage was direct billing.  Google further induced Facebook to help Google "kill HB" by letting Facebook have direct billing and contractual relationships with publishers.  This term was advantageous to Facebook because Google prohibits other exchanges and networks in Exchange Bidding from having such direct relationships.  In fact, Google's policies with other exchanges and networks in this regard are so strict that Google has prohibited marketplaces from even discussing pricing with web publishers.  The inability to discuss pricing and terms constrains marketplaces' ability to operate and compete.  One advertising competitor compared Google's business term to a "gag order."

93.     A fourth advantage was more information.  On top of special pricing, longer timeouts, and a direct billing relationship exception, Google further induced Facebook to help it shut down competition from header bidding by informing Facebook which impressions are likely targeted to spam (e.g., impressions targeted to bots, rather than humans).  Facebook does not have to pay for those impressions.  Other networks have asked Google for the same information, but Google has refused.  Accordingly, Facebook now has a further leg up over the competition in Google-run auctions:  Facebook knows which impressions sold through Google are fake and worthless.

94.     A fifth advantage was improved match rates.  In the Jedi Blue Agreement, Google promised to use "commercially reasonable efforts" to help Facebook's network recognize the identity of users in publishers' and developers' auctions.  The parties agreed to benchmark "match rate" commitments, i.e., the percent of users Facebook could identify in auctions over the percent of bid requests received.  Google promised Facebook an 80 percent match rate in auctions for in-app inventory and a 60 percent match rate in auctions for web inventory (excluding users browsing with Safari).

95.     Indeed, since signing the agreement, Google and Facebook have been working closely in an ongoing manner to help Facebook recognize users in auctions and bid and win more often.  For example, Google and Facebook have integrated their software development kits (SDKs) so that Google can pass Facebook data for user ID cookie matching.  The companies also have been working together to improve Facebook's ability to recognize users using browsers with

AMENDED COMPLAINT (CASE NO. 4:22-cv-01470-YGR)

blocked cookies, on Apple devices, and on Apple's Safari browser.  For instance, according to an April 2, 2019 discussion between Facebook employees, Facebook was having trouble matching users of Apple's Safari browser.  Google shared that Facebook's match rates were about the same that Google saw for other auction participants.  Facebook employees noted, however, that Google was ready to "initiate a detailed discussion with Product and Legal to allow FB to collect signals on the client (using a JavaScript) and G passing it to the bid request."  These efforts gave Facebook an information advantage over all other auction participants, unparalleled except for the information advantages of Google itself.

96.    A sixth advantage was restricting Google's use of Facebook bid data.  Google provided Facebook special treatment when it came to Google using Facebook's inside information to beat Facebook in auctions.  In entering the agreement, Facebook was wary that Google would use information about Facebook's bids to manipulate auctions.  As a result, Facebook was explicit in demanding that Google be prohibited from using Facebook's bid data for the purpose of advantaging itself.  Dan Rose, Facebook Vice President of Partnerships, explained in an email to Mark Zuckerberg that "The deal we've negotiated gives us protections against Google using our data."  This was a stark departure from Google's usual practices of spying and trading based on other bidders' past behavior.

97.    A screenshot of contractual terms that prohibit Google from trading using Facebook's inside information (e.g., information about Facebook's bids) appears as follows:

6.5.   **Additional Restrictions on Google's use of Bid Response Data.**  Google will not use Bid Response Data to: (a) transfer or otherwise disclose in Real-Time such Bid Response Data to any Google system other than the system conducting the auction for the applicable Ad Inventory; (b) adjust or otherwise influence in Real-Time the bid response of another bidder (including Google) in the auction for the applicable Ad Inventory; (c) adjust or otherwise influence in Real-Time the computation of any price floor, price reserve, or other pricing parameter for the applicable Ad Inventory; (d) reverse engineer, or otherwise derive the underlying algorithms, strategies, models, or approach of Facebook's bidding logic (e.g., Google will not use Bid Response Data to improve Google's own bidding strategy as a bidder); or (e) associate any Bid Response Data (including any bid amounts) with any data related to Ads or Creatives (other than for the purposes set forth in second sentence of Section 6.4 or (d) of the first sentence of Section 2.1(e)). Notwithstanding the foregoing, the immediately preceding sentence does not apply to the following data, as long as such data is not preferentially shared with DoubleClick Bid Manager or the Google Display Network as compared to all other bidders or other demand sources in an auction: (a) the amount of the second-highest bid (which may be disclosed to the winning bidder or other demand source) or (b) the amount of the highest bid (which may be disclosed to all bidders or other demand sources in the same auction).  Google may retain event-level Bid Response Data for no longer than 18 months, except for certain event-level Bid Response Data (e.g., buyer identity, bid price, trading location, time stamp, etc.) which may be kept indefinitely as required by Google's reasonable and standard business practice solely for archival and record-keeping purposes (e.g., financial reporting, audit purposes, or dispute resolution).

98.    Google not only kept these special advantages for Facebook secret, but also continues to actively misrepresent the terms on which it conducts publishers' auctions.  Google publicly markets on its website that "All participants in the unified auction, including Authorized Buyers and third-party yield partners, compete equally for each impression on a net basis."  That is patently false, at least because Google gave all these undisclosed advantages to Facebook through Jedi Blue.

99.    Google uses its ad server monopoly to withhold relevant information about inventory from rival buyers, while using the same monopoly to copiously gather information about those buyers' behavior so that Google's can trade ahead.  But in the Jedi Blue Agreement, Google agreed to put these tactics aside for the benefit of the one tech behemoth poised to seriously challenge Google's power.  In exchange for Facebook ending its support of header bidding, Google cooperated with Facebook and gave Facebook the kind of access to publishers' inventory that header bidding promised to give to everyone.  Rather than risk losing its monopoly profits, Google simply cut Facebook in.

2.  **Google and Facebook Agreed To Limit Their Competitive Bidding for**
    **Developers' In-App Inventory**

100.    Although the Jedi Blue Agreement originally contemplated that FAN would bid on impressions for both web and in-app display, FAN effectively left the market for web display advertising in 2020.  As operative today, the Jedi Blue Agreement primarily applies to the auctions Google conducts on behalf of developers to sell their in-app inventory.  Within these auctions, Google and Facebook have not only given themselves special advantages unavailable to other buyers, but also have *agreed to limit their competitive bidding as between each other*.  They have done this by fixing a minimum share of impressions that Facebook will win in developers' auctions.  This hard limit on contractually acceptable auction outcomes predictably increases Google's market power and depresses prices paid to developers.

101.    The auction manipulation scheme turns on three, interrelated provisions of the Jedi Blue Agreement.  First, Google and Facebook agreed to work together so that Facebook could identify the end user for at least 80 percent of auctions conducted by Google.  Second, they agreed that Facebook would use "commercially reasonable efforts" to bid on at least 90 percent of those auctions in which Facebook recognizes the end user.  Third, Google and Facebook agreed that Facebook would win at least 10 percent of all such auctions in which Facebook bid.  In combination, these terms established an agreement for Facebook to win at least 7.2 percent of all in-app impressions sold by developers in Google-run auctions.  And Facebook could take its contractually agreed share of auction wins up to 10 percent, simply by identifying more users or submitting more frequent bids.

102.    These terms set boundaries on the extent of Google and Facebook's competition, much as if they had established a traditional buying cartel.  As the companies themselves recognize, Google and Facebook are ostensibly direct, horizontal competitors in the in-app network market and compete to purchase in-app inventory from developers.  An impression bought by Google's ad network is one that cannot be bought by Facebook's ad network, and vice versa.  And Google and Facebook are the two largest bidders in this market.  When developers sell their in-app impressions in auctions run by Google, Google's own AdMob network wins more

1   impressions than anyone else—over 50 percent around the time Google signed the Jedi Blue

2   Agreement.  Facebook's FAN is number two, winning more impressions than any other non-

3   Google buyer.  As Google described its counterparty internally, "FAN is the largest competitive

4   network across formats."

5      103.   Despite ostensibly competing directly to purchase in-app impressions from

6   developers, Google and Facebook agreed to limit their competition by an agreement establishing

7   the minimum share of developers' auctions that were to be won by Facebook and, implicitly, the

8   maximum share of developers' auctions that were to be won by Google.  The expected effect of a

9   side-deal like this between rival buyers is to depress the prices paid to developers.  To achieve this

10  goal, it is irrelevant whether the colluding buyers set a minimum, a maximum, or a precise target;

11  *any* such agreement between rivals interferes with the usual price-setting and inventory allocation

12  mechanisms of the free market.  Compared to a bidder unprotected by collusion, a participant in a

13  buying cartel can bid less aggressively without the same risk of losing share.  So too here:

14  Facebook and Google can each bid low, knowing that the other will follow the move, lowering

15  prices for the colluding buyers while preserving their pre-agreed allocation of auction victories.

16  The agreement terms assure that Facebook will bid high enough to win the minimum percent quota,

17  irrespective of how high or low others might bid.

18     104.   The fact that Google's mediation tool is trusted to run these auctions on behalf of

19  developers does not change the horizontal nature of this agreement to limit competition.  It only

20  makes the scheme more robust.  Ordinarily, when two bidders conspire to manipulate auction

21  outcomes, they face a risk that some third, non-conspiring bidder will spoil the scheme by

22  submitting a truly competitive bid.  Bringing the auction house itself into the scheme reduces that

23  risk, since the auction house can take steps to disadvantage outside bidders by withholding

24  information, giving them less time to bid, or charging them higher bidder fees—precisely as

25  Google has done to other prospective bidders.  In this way, the anticompetitive terms of Jedi Blue

26  are mutually reinforcing.  By setting a win rate *and* excluding rival bidders, Facebook and Google

27  not only limited the terms of competition between each other, but also insulated their scheme from

28  outside competition.

105.    Although Google's mediation tool oversees the process necessary to conduct these auctions, Google itself does not sell in them.  The Jedi Blue Agreement applies only to third-party developer inventory—thereby excluding any impressions that would be displayed on Google or Facebook's own properties.  Google's mediation tool does not function as a wholesaler or market maker.  Prior to an auction, Google does not take title or otherwise bear the risk of a particular impression going unsold.  Rather, it conducts these auctions *on behalf of* developers, who are sellers in both substance and form.  It is developers—not Google—who stand to receive a direct economic benefit from higher auction prices.  Google and Facebook's ad networks are buyers in these auctions.  They stand to receive a direct economic benefit from lower auction prices.  The predictable effect of an agreement fixing share between them is to lower prices paid to developers, compared to a world in which the auction's two largest bidders compete without restraint.

106.    Internal Facebook documents suggest that the auction manipulation terms of Jedi Blue have yielded precisely this result.  For example, one Facebook study in 2019 found that Facebook's bids for in-app impressions won more frequently in Google-run auctions than they did on any other platform.  At the same time, the average price Facebook paid per in-app impression was *lower* in Google-run auctions than it was on any other platform.  This would be a puzzling result, to say the least, if Facebook faced the same competition for inventory across auction houses.  Yet it is an entirely predictable result when a buying cartel depresses prices and allocates the inventory within Google-run auctions.

107.    In addition to suppressing prices paid to developers, the auction manipulation terms of Jedi Blue can reduce competition on the output side too—that is, the market in which in-app ad networks resell impressions to advertisers.  After all, Facebook and Google do not typically bid in developers' auctions to promote their own products and services.  Rather, their primary reason for bidding in these auctions is to resell the resulting inventory to advertisers, usually at undisclosed margins.  Google acknowledged this head-to-head resale competition at the time it entered the Jedi Blue Agreement, noting that a downside of giving Facebook preferential treatment in Google-run auctions was "cannibalization" of Google's own ad network because advertisers would be more tempted to "buy the same inventory via FB."

108.   Facebook and Google's coordinated buying reduces competition in this downstream market by simultaneously guaranteeing Facebook a minimum share of the resale business and insulating both firms from effective competition by rival ad networks.   Without access to the in-app impressions sold by developers, a competing ad network would have nothing to resell to advertisers.   And because Facebook and Google did not manipulate the outcomes of some backwater auction house, but the auction house in which more than 60 percent of all indirect in-app impressions are sold, their collusive scheme gave them the power to exclude rival networks and raise the prices at which Facebook and Google resold in-app impressions to advertisers.

109.   Enabling Facebook to bid in Google-run auctions did not require a secret agreement to pre-determine the outcomes of those auctions.   It would have been straightforward to write a network bidding agreement without minimum bid and win rate terms, thereby leaving auction outcomes to be determined by competition rather than collusion.   Indeed, Facebook *itself* has entered a number of network bidding agreements with other mediation tools without such terms.   Though some of these agreements include dollar-denominated minimum spending requirements (as does Jedi Blue), none of them promise Facebook an ongoing, specified share of developers' impressions.   And while Facebook and Google surely prefer the reduced prices paid to publishers as a result of their collusion, a naked auction manipulation scheme such as this can offer no procompetitive benefits.

110.   Given the choice, no rational developer would choose to have its auctions rigged by the market's two largest buyers.   So, Facebook and Google swore themselves to secrecy about the terms of their agreement and have not generally disclosed their secret match-rate, bid-rate, or win-rate agreements to either developers or other auction participants.   They have had plenty of opportunity to do so:  implementing the Jedi Blue Agreement requires both Google and Facebook to update and re-execute their respective agreements with the app developers whose advertising inventory they hope to purchase.   When encouraging developers to update to the latest version of their respective bidding agreements, Facebook and Google obfuscate the true motive for the contract changes, which say nothing about the auction manipulation terms of Jedi Blue.   Google uses the promise of competitive bidding between Facebook and Google's ad networks as an

AMENDED COMPLAINT (CASE NO. 4:22-cv-01470-YGR)

1  inducement for developers to sign new contracts, when in fact Jedi Blue secretly limits the terms

2  of the competition between those two bidders.

3         111.    Google also advertises the ability to accept Facebook bids as a feature of its

4  mediation tool and has used the promise of competitive bidding by rival ad networks as a lure to

5  further increase its share of the in-app mediation market. But this is a classic bait and switch.

6  Rather than robust competition between Facebook and Google's ad networks, an app developer

7  adopting Google's mediation tool gets a form of sham competition between those supposed rivals,

8  one that is constrained by secret terms in Jedi Blue.  And once a developer has adopted Google's

9  mediation tool, the costs of switching to a different tool are substantial.  Doing so would require

10  rewriting source code, implementing a new tool, and testing that tool's compatibility with various

11  ad networks.  For the very large number of developers who have adopted Google's mediation

12  tool—representing more than *half* of all applications featuring any advertising—Google now has

13  an ability to impose anticompetitive and collusive terms that developers never would have

14  accepted in advance.

15         112.    Facebook and Google's Jedi Blue Agreement violated federal and state antitrust

16  laws, including Sections 1 and 2 of the Sherman Act (15 U.S.C. §§ 1, 2), as well as state laws

17  against deceptive trade practices.  Given the scope and extent of this cooperation between rivals,

18  Google and Facebook were mindful that their agreement would invite antitrust scrutiny.  They

19  discussed, negotiated, and memorialized how they would cooperate with one another should a

20  government entity in the United States or overseas start to investigate the agreement under antitrust

21  laws.  By its terms, the Jedi Blue Agreement permits the parties to terminate the agreement in the

22  event of regulatory inquiries, material document requests, a formal antitrust investigation, or a

23  commenced antitrust action.  If neither party invokes those termination options, the agreement

24  permits termination "immediately" after either party exhausts its right to appeal.  The agreement

25  also requires the parties to coordinate antitrust defenses, such that Facebook must approve any and

26  all of Google's arguments relating to their illegal agreement.  The word "antitrust" is mentioned

27  no fewer than twenty times throughout the Jedi Blue Agreement.

28

113.    The portion of the Jedi Blue Agreement specifying regulatory and antitrust cooperation appears as follows:

**7. Regulatory Cooperation.**

   7.1.    To the extent permitted by applicable law, and subject to Section 7.2 below, each of Google and Facebook agrees to use its reasonable best efforts to:

   (a) cooperate and assist each other in responding to any Antitrust Action, Data Protection Action, or any inquiry or investigation relating to the Agreement by any Governmental Authority, and in defending the Agreement against any Antitrust Action, Data Protection Action, or any inquiry or investigation relating to the Agreement by any Governmental Authority;

   (b) promptly and fully inform the other Party of any Governmental Communication relating to the Agreement (provided that, to the extent appropriate, any Party may designate such information as attorneys' or outside counsel only);

   (c) allow the other Party a reasonable time to review and consider in good faith the views of the other with respect to any Governmental Communication (**provided that**, to the extent appropriate, any Party may designate such information as attorneys' or outside counsel only);

   (d) not advance arguments in connection with any Antitrust Action, Data Protection Action, or any inquiry or investigation relating to the Agreement by any Governmental Authority (other than litigation between the Parties) over the objection of the other Party that would reasonably be likely to have a substantial adverse effect on that other Party; and

   (e) consult with the other Party in advance, to the extent practicable, and give the other Party and its counsel reasonable notice and, to the extent not prohibited by law or the relevant Governmental Authority, an opportunity to attend and participate in any meeting or discussion with any Governmental Authority relating to any Antitrust Action, Data Protection Action, or any inquiry or investigation relating to the Agreement by any Governmental Authority.

114.    Perhaps anticipating antitrust enforcement actions, Facebook and Google drafted Jedi Blue to suggest that their agreed bid and win rates were duties owed by Facebook, not Google. But other provisions in the agreement penalized Google if Facebook failed to obtain its promised win rate, so both parties had contractual incentives to ensure that developers' inventory was divided according to plan.  In any event, it is irrelevant which party technically held the contractual obligation to hold up the auction-allocation scheme.  Facebook and Google's agreement as to the

AMENDED COMPLAINT (CASE NO. 4:22-cv-01470-YGR)

minimum share of auctions Facebook was expected to win would be just as pernicious if the contract had described their "Win Rate" as a non-enforceable "commitment in spirit," or if Facebook's COO Defendant Sandberg and Google SVP Philipp Schindler had only orally agreed to these terms.  Likewise, even if Facebook and Google were to strike the bid and win rate terms from their contract tomorrow, their prior meeting of the minds would hardly disappear—the two largest bidders, Facebook and Google, secretly colluded to manipulate auctions, allocate developers' inventory, and suppress prices.

**E.      Meta Repeatedly Told Investors That It Faced Significant Competition from Google, Yet Failed To Disclose That They Were Secretly Colluding**

115.    Even though Meta was actively collaborating with Google to manipulate the ad server and other markets, Meta repeatedly listed Google as its primary competitor.  Specifically, Meta repeatedly stated that it "face[d] significant competition in every aspect of [its] business, including . . .  companies that . . . enable marketers to reach their . . . audiences, including . . . Google."  For example, on January 28, 2021, Meta filed an Annual Report on Form 10-K with the SEC, reporting the Company's financial and operating results for the quarter and year ended December 31, 2020 (the "January 28, 2021 10-K"), in which Meta stated:

> We face significant competition in every aspect of our business, including, but not limited to, companies that facilitate the ability of users to share, communicate, and discover content and information online or enable marketers to reach their existing or prospective audiences, including for example, Google . . . .

116.    In fact, the opposite was true.  Meta did not "face significant competition in every aspect of [its] business" in which it purported to compete with Google—Meta had entered an anticompetitive agreement with Google that reduced the competition between them.  Moreover, this statement was misleading in the absence of a disclosure of this extensive agreement between Meta and Google and its content.

117.    Meta made the same or substantially the same statement in each of its quarterly and annual reports filed with the SEC in 2021 and 2022.

**F.**     **Lawsuits Filed by Numerous State Attorneys General Reveal the Truth That Google and Facebook Collaborated**

118.     On December 16, 2020 Texas Attorney General Ken Paxton filed a 10-state lawsuit in federal court in Texas, alleging that Google violated multiple federal and state antitrust and consumer protection laws, including by entering into an anticompetitive agreement with Meta. The complaint alleged that the Jedi Blue Agreement included an agreement that Facebook would not use header bidding or build its own header bidding solution but would instead use Open Bidding.  In exchange, Google would give Facebook preferential rates and other anticompetitive advantages.  Arkansas, Idaho, Indiana, Kentucky, Mississippi, Missouri, North Dakota, South Dakota, and Utah all joined Texas in the lawsuit.

119.     On December 22, 2020, *The Wall Street Journal* published an article titled, "Google, Facebook Agreed to Team Up Against Possible Antitrust Action, Draft Lawsuit Says." The article reported facts from an unredacted version of a complaint filed by the Attorney General of Texas, including among other things that, based on the Attorney General investigation, Facebook and Google had entered into an undisclosed agreement in which Facebook agreed not to compete with Google's online advertising tools in return for special treatment when it used them.  The article stated that Facebook and Google had agreed to "cooperate and assist one another" if they ever faced an investigation into their pact to work together in online advertising.

120.     On March 15, 2021, a redacted amended complaint was filed in the lawsuit, adding Alaska, Florida, Montana, Nevada, and Puerto Rico to the states suing Google.  The amended complaint filed by the states alleged that Google and Facebook "discussed, negotiated, and memorialized how they would cooperate with one another" in the event of a government probe of that agreement.

121.     On April 6, 2021, Google filed an answer to the amended complaint, in which Google admitted that it had entered a "network bidding agreement," and that it had been signed by senior Facebook and Google executives, including Facebook Chief Operating Officer, Defendant Sheryl Sandberg and Google Senior Vice President and Chief Business Officer Philipp Schindler. The answer also admitted that the previously secret deal struck by Google and Facebook in 2018

required Facebook to use "commercially reasonable efforts" to bid on at least 90 percent of the bid requests it got from Google, with Facebook committed to spend at least $500 million a year in Google's Ad Manager or AdMob advertising auctions by the fourth year of the agreement. Facebook would be required to make its best efforts to achieve a "win rate" of at least 10 percent of the auctions it participated in, Google acknowledged in the new filing.

122.    On August 4, 2021, the states filed a redacted second amended complaint in the lawsuit.  On October 22, 2021, an unredacted second amended complaint was filed in the lawsuit after a New York federal judge held that much of the antitrust suit could be unsealed.  The unredacted complaint contained a wide range of internal documents revealing that the theories of harm were strongly supported by internal evidence.  As one Google employee explained internally, Google deliberately designed the unlawful agreement with Facebook to avoid competition, and consequently harmed publishers.  Internal Facebook communications revealed that Facebook executives fully understood why Google wanted to cut a deal with them:  "they want this deal to kill header bidding."  According to documents cited in the complaint, Facebook "believed strongly" that partnering with Google was "relatively cheap compared to build/buy and compete in zero-sum ad tech game."

123.    On November 12, 2021, a redacted third amended complaint was filed in the lawsuit.  On January 14, 2022, the unredacted third amended complaint was filed.  The third amended complaint newly alleged that Defendant Zuckerberg was on an email thread discussing his need for approval of the Jedi Blue Agreement.  Facebook employees working on the deal emailed Mark Zuckerberg, Facebook's founder and chief executive, saying, "We're nearly ready to sign and need your approval to move forward."  Defendant Sandberg was "explicit that 'this is a big deal strategically'" in a 2018 email thread about the deal that included Defendant Zuckerberg.

124.    Each of these announcements partly revealed the scope of the partnership between Meta and Google and uncovered the extent to which Meta had misled investors in emphasizing its competitive relationship with Google.  Meta's stock price dropped significantly on each of these announcements, as detailed below in Part XI.

VI.    **META MISLED INVESTORS TO BELIEVE THAT META'S COO,**
       **DEFENDANT SANDBERG, WAS NOT RECEIVING IMPROPER ADDITIONAL**
       **BENEFITS IN THE FORM OF PERSONAL ASSISTANCE**

125.    During the Class Period, Meta misled investors regarding Defendant Sandberg's use of corporate resources for personal benefit to support her personal foundation, write and promote her second book, plan her wedding, and kill unflattering news stories about persons with whom she had a personal relationship.

A.    **Meta's Code of Conduct Prohibits Use of Company Personnel for Personal**
      **Use Where Not Authorized**

126.    Meta's board of directors adopted a Code of Conduct, effective June 7, 2021, which outlines the principles and standards that all officers, directors, and employees acting on behalf of the Company must follow (the "Code of Conduct").  All Meta personnel are expected to uphold the principles and follow the requirements of this Code of Conduct.  Potential violations of the Code of Conduct may result in internal investigations or audits.  Violations of the Code of Conduct may result in disciplinary action, up to and including termination of employment or assignment and if necessary, referral to law enforcement.

127.    To avoid conflicts of interest, the Code of Conduct prohibits officers, directors, and employees as well as their personal connections or family members" from "receiv[ing] a personal benefit from [their] position at Meta."

128.    Potential conflicts of interest should be discussed with the Compliance team and a conflict review request should be submitted via the Company's online tool.  A failure to submit a conflict review request or adhere to any guidance provided by the Conflicts Committee who reviews such requests may result in disciplinary action, up to and including termination.

129.    On February 3, 2022, Meta filed an Annual Report on Form 10-K with the SEC, reporting the Company's financial and operating results for the quarter and year ended December 31, 2021 (the "February 3, 2022 10-K").  The February 3, 2022 10-K incorporated the Code of Conduct by reference, stating "Our board of directors has adopted a Code of Conduct applicable

1    to all officers, directors, and employees, which is available on our website (investors.fb.com) under

2    'Leadership & Governance.'"

3        **B.    Defendant Sandberg Repeatedly Received Personal Benefits Unrelated to**

4               **Her Job, Including Assistance with Her Personal Book, Assistance in**

5               **Planning Her Wedding, and Assistance in Private Matters**

6        130.   The allegations in this section are based in substantial part on investigative

7    reporting conducted by *The Wall Street Journal* based on sources with personal knowledge of the

8    matters.[7]  Lead Plaintiffs have taken steps to confirm that *The Wall Street Journal*'s reporting is

9    based on reports from individuals with personal knowledge of the matters, including by

10   interviewing a co-author of part of the reporting, *The Wall Street Journal* employee Keach Hagey,

11   who confirmed that the Journal has a "stringent" fact review process.

12       131.   As reported by *The Wall Street Journal* based on sources with personal knowledge

13   of the matter, before and throughout the Class Period, including in 2021 and 2022, Defendant

14   Sandberg, Meta's COO, repeatedly used Company resources for undisclosed personal benefit,

15   including assistance to support her personal foundation, writing her personal book, planning her

16   wedding, and squashing adverse personal news stories, all of which were unrelated to her job at

17   Meta.  Sandberg announced she was stepping down from her role in the Company as Chief

18   Operating Officer after fourteen years in early June 2022.

19       132.   In 2016 and 2019, Sandberg worked with a team that included Facebook employees

20   as well as paid outside advisers to develop and enact a strategy to persuade the digital edition of

21   the *Daily Mail*, called *MailOnline*, not to report on a story that would have revealed the existence

22   of a temporary restraining order against her then-boyfriend, Activision Blizzard Inc.'s Chief

23   Executive Officer Bobby Kotick ("Kotick").  The team worked to suppress the story both in 2016,

24

25   _____

26   [7] *See* Ben Fritz, Keach Hagey, Kirsten Grind and Emily Glazer, *Meta's Sheryl Sandberg Pressured Daily Mail to Drop Bobby Kotick Reporting*, The Wall Street Journal (Apr. 21, 2022), available at https://www.wsj.com/articles/sandberg-facebook-kotick-activision-blizzard-daily-mail-11650549074; Deepa Seetharaman and Emily Glazer, *Meta Scrutinizing Sheryl Sandberg's Use of Facebook Resources Over Several Years*, The Wall Street Journal (June 10, 2022), available at https://www.wsj.com/articles/meta-scrutinizing-sheryl-sandbergs-use-of-facebook-resources-over-several-years-11654882829.

27

28

1    when the couple began dating, and in 2019, when the couple were breaking up.  Ms. Sandberg

2    contacted *MailOnline* in both years.

3          133.    In 2016, discussions about how to dissuade *MailOnline* from publishing an article

4    about the restraining order included Defendant Sandberg, Mr. Kotick, multiple Facebook

5    employees other than Defendant Sandberg, Activision employees, and outside public-relations

6    advisers and lawyers in the U.S. and U.K., according to people with knowledge of the

7    conversations, as reported by *The Wall Street Journal*.  The group discussed what information they

8    believed the Mail had obtained and whether they could persuade the publication's leadership that

9    Mr. Kotick had been wrongfully accused, according to one of the participants in the conversation.

10   According to individuals familiar with Mr. Kotick's comments, Mr. Kotick has stated that

11   Defendant Sandberg threatened the *MailOnline* in 2016 by saying that such an article against

12   Kotick, if published, could damage the news organization's business relationship with Facebook.

13   Executives at Facebook have asserted that any intervention by Defendant Sandberg over a news

14   article, no matter what her specific words were, could well be perceived as a threat, given the

15   social-media giant's power over web traffic and Sandberg's own power and influence.

16         134.    Indeed, in 2016, Martin Clarke, then editor-in-chief of the *MailOnline*, told

17   employees that he had heard from Defendant Sandberg and that the publication would not be

18   running an article about the restraining order, according to a person familiar with the incident, as

19   reported by *The Wall Street Journal*.

20         135.    Defendant Sandberg and her team continued their strategy to suppress any story

21   about a restraining order against Kotick in 2019.  At that time, *MailOnline* was again looking into

22   the matter.  Defendant Sandberg emailed Jonathan Harmsworth, Viscount Rothermere, the great-

23   grandson of the *Daily Mail*'s founder and chairman of its parent company, to express concerns

24   about the potential article.  Harmsworth referred the matter to then editor-in-chief Clarke.

25   Mr. Clarke and Defendant Sandberg exchanged emails in 2019.  Defendant Sandberg's team

26   including Facebook employees successfully suppressed this personal story, as *MailOnline* never

27   published a story on the restraining order against Kotick.

28

136.     Notably, during their three-year relationship, from 2016 up to and including 2019, Mr. Kotick and Defendant Sandberg regularly tapped employees at one another's companies for public-relations advice, according to individuals close to the couple at the time, as reported by *The Wall Street Journal*.  Moreover, in an ongoing capacity, including but not only in connection with the 2016 and 2019 attempts to address the potential *MailOnline* article about Kotick, Defendant Sandberg benefitted from work by Meta employees on some of her personal public relations, according to people familiar with the matter, as reported by *The Wall Street Journal*.

137.     Mr. Kotick and a spokeswoman for Meta have made statements denying that Sandberg threatened the *Daily Mail* organization, but neither have denied that Defendant Sandberg used Company resources to address this personal matter and other personal public relations matters.

138.     Sandberg used Meta resources to write and promote her second book, "Option B: Facing Adversity, Building Resilience, and Finding Joy."  Sandberg's first book, "Lean In: Women, Work, and the Will to Lead," a book on women in the workplace, sold millions of copies and gained Sandberg fame and notoriety, landing her on magazine covers and television shows. Meta staff assisted Defendant Sandberg during both of her book tours.

139.     Prior to and throughout the Class Period, Sandberg also used corporate resources, including Facebook employees, to support her personal foundation, according to people knowledgeable about the matter, as reported by *The Wall Street Journal*.  In 2013, Defendant Sandberg founded LeanIn.Org (also known as Lean In Foundation), a 501(c)(3) nonprofit organization named after her first book.  In 2016, Sandberg renamed the foundation the Sheryl Sandberg & Dave Goldberg Family foundation after her late husband.  The foundation is unaffiliated with Meta and has previously been criticized by former employees for focusing on promoting Sandberg personally.

140.     Likewise, Sandberg used corporate resources to help her plan her wedding to fiancé Tom Bernthal, CEO and Co-President of the consulting agency Kelton Global.  Assistance in planning Sandberg's wedding was a personal benefit unrelated to her position at Meta.

141.    In general, at all relevant times, it was not uncommon for Meta employees even to benefit Defendant Sandberg by providing help with tasks for her family, according to people knowledgeable about the matter, as reported by *The Wall Street Journal*.

142.    Sandberg's use of Company resources to support her foundation, promote and write her second book, and plan her wedding prompted an internal investigation by Meta, initiated in the fall of 2021.  The Company had previously initiated a separate investigation into her violation of the Code of Conduct by using corporate resources to pressure the *Daily Mail*, and the two investigations were merged.  Meta did not publicly disclose either investigation.

143.    Sandberg's use of Company resources for personal matters was not permitted by Facebook.  Indeed, Sandberg violated the Code of Conduct by exploiting her position at Meta for both her own personal benefit and the benefit of her ex-boyfriend, Kotick.

144.    While the Company made extensive disclosures about Defendant Sandberg's use of corporate resources for certain personal matters—namely, security and use of private aircraft—the Company failed to disclose Sandberg's improper use of corporate resources for the other personal matters described above.

145.    Meta employees collectively spent multiple business days in each year from 2018 to 2021 assisting Defendant Sandberg on personal matters unrelated to her employment at Meta.  The monetary value of the personal benefits Sandberg received from the use of Facebook employee time during each of the years 2018, 2019, 2020 and 2021 was greater than $10,000 in each of those years.  The median worker at Meta earned more than $240,000 per year in 2019, and comparable amounts in each year from 2018 to 2021.  Most Meta employees received at least 28 days of paid vacation in each year from 2018-2021 and worked approximately 227 days per year each of those years.

146.    Meta is continuing to conduct an internal investigation of Defendant Sandberg's improper use of Company resources for personal benefit, according to people knowledgeable about the matter, as reported by *The Wall Street Journal*.  Meta is investigating her conduct stretching back several years, and the investigation involves a broad review of Sandberg's use of Meta's resources and specifically covers her use of Meta employees and resources for her wedding

1  planning, for work on her book, for work on her foundation, and for addressing the *MailOnline*'s

2  potential article about her boyfriend, as described above.

3      **C.      Defendants Sandberg Signed Multiple Proxy Statements that Failed to List**

4          **Her Personal Benefits among the Perquisites and Additional Benefits She**

5          **Received**

6      147.    The SEC has disclosure requirements for executive and director compensation,

7  designed to facilitate shareholder understanding.   Instruction 4 to Item 402 of Regulation S-K

8  requires, "If the total value of all perquisites and personal benefits is $10,000 or more for any

9  named executive officer, then each perquisite or personal benefits, regardless of its amount, must

10 be identified by type . . . .  Perquisites and other personal benefits shall be valued on the basis of

11 the aggregate incremental cost to the registrant."  17 CFR § 229.402(c)(2)(ix).

12     148.    On April 8, 2021, Meta filed a Proxy Statement on Schedule 14A (the "April 8,

13 2021 Proxy Statement").  The April 8, 2021 Proxy Statement disclosed compensation awarded to,

14 earned by, or paid to each of the named executive officers for services rendered for the years ended

15 December 31, 2021, 2020, and 2019.  The April 8, 2021 Proxy Statement reported a salary in 2021

16 for Sandberg of $954,615, a bonus of $849,447, stock awards of $22,169,902, and "All Other

17 Compensation" in the amount of $11,274,937.  The Company disclosed that:

18          The amounts reported include approximately $8,981,973, $7,646,560, and
            $4,370,631 in 2021, 2020, and 2019, respectively, for costs related to personal
19          security for Ms. Sandberg at her residences and during personal travel pursuant to
            Ms. Sandberg's overall security program; and approximately $2,292,964,
20          $872,413, and $1,316,468 in 2021, 2020, and 2019, respectively, for costs related
            to personal usage of private aircraft.
21
22     149.    Sandberg, a named executive officer, received significant perquisites and personal

23 benefits well in excess of $10,000 relating to her personal security and personal travel.   Yet

   Sandberg also received valuable personal benefits, including the use of Meta employees, for
24
   personal matters related to writing and promoting her book, supporting her personal foundation,
25
   planning her wedding, and maintaining her personal reputation, none of which were identified or
26
   valued in the April 8, 2021 Proxy Statement.
27

28

1    150.    Information about Sandberg's use of Company resources for personal benefit was

2    highly material to investors.  As *The Wall Street Journal* has noted, "[t]he reputation . . . of

3    Ms. Sandberg h[as] long been seen as inextricably linked to the company's success."  Meta itself

4    routinely notes in its Annual Reports on SEC Form 10-K that "[w]e receive a high degree of media

5    coverage around the world" and "unfavorable media coverage negatively affects our business."

6    Meta's success depends in significant part on users' perception of Meta and its leaders, including

7    most prominently Defendants Zuckerberg and Sandberg.  Accordingly, investors cared deeply

8    about improper conduct of any kind on the part of Defendants Zuckerberg and Sandberg that might

9    taint the Company's reputation or image.  Additionally, failure to adequately disclose Sandberg's

10   use of corporate resources for personal matters may result in SEC violations that likewise could

11   be harmful to the Company's reputation and image, and result in fines or other penalties.

12       D.    *The Wall Street Journal* **Revealed the Truth that Sandberg Had Failed to**

13            **Disclose these Perquisites that Violated Company Policy**

14   151.    On April 21, 2022, *The Wall Street Journal* published an article titled, "Meta's

15   Sheryl Sandberg Pressured Daily Mail to Drop Bobby Kotick Reporting."  The article reported

16   that Sandberg faced internal scrutiny at Meta over two occasions in which she pressed the U.K.

17   tabloid, the *Daily Mail*, to shelve a potential article about her then-boyfriend, Kotick, as described

18   above.

19   152.    The truth about Sandberg's misuse of Company resources was not known to the

20   public until *The Wall Street Journal* published its findings.

21   153.    On June 10, 2022, *The Wall Street Journal* published an article titled, "Meta

22   Scrutinizing Sheryl Sandberg's Use of Facebook Resources Over Several Years."  The article

23   reported that Meta was investigating Defendant Sandberg's use of corporate resources for personal

24   expenses, including the writing of her personal book, supporting her personal foundation, and

25   planning her wedding going back several years.

26   154.    This internal investigation began as early as the fall of 2021 and a number of

27   employees had been interviewed as part of the investigation, yet Meta failed to disclose the

28

1    investigation and the truth only became known to the public when *The Wall Street Journal*

2    published its findings.

3        155.    Each of these revelations partly revealed Meta's fraud, and Meta's stock dropped

4    precipitously upon each of these revelations, as detailed below in Part XI.

5    **VII.    META MISLED INVESTORS TO BELIEVE THAT THE IMPACT OF IOS**

6    **CHANGES ON ITS BUSINESS WAS NOT MATERIAL**

7        **A.    Meta's Reliance on Apple's iOS Platform**

8        156.    iOS (formerly iPhone OS or iPhone Operating System) is a mobile operating

9    system created and developed by Apple Inc. ("Apple") exclusively for use on Apple's mobile

10   devices, including its smartphone, the iPhone.  iOS is the world's second-most widely installed

11   mobile operating system, after Android.

12       157.    As Meta's revenues come almost entirely from advertising, and as Meta relies on

13   Apple to access much of the target market for its advertisers, Meta's business relies heavily on

14   Apple's permitting it to run its Family of Apps on Apple iOS and permitting Meta to make its

15   Family of Apps available on Apple's online app store, the App Store.

16       158.    Meta recognizes that its business depends in large part on these permissions from

17   Apple.  In Meta's comments to the National Telecommunications and Information

18   Administration's "Developing a Report on Competition in the Mobile App Ecosystem" docket,

19   Meta acknowledged, "Meta's ability to innovate its products and services and even reach its

20   customers is determined, and in some cases, significantly limited, by the most popular mobile

21   operating systems, such as Apple's iOS."  Meta further stated that "iOS devices comprise about

22   60% of smartphones in the United States."

23       **B.    Apple Announced Changes to Its iOS Privacy Settings**

24       159.    In June 2020, Apple decided to grant users more control over their privacy and the

25   data associated with their activity on their iPhones and other devices.  In that month, Apple

26   announced that it would roll out a host of changes to iOS.  These changes would prevent Meta's

27   Family of Apps from accessing personal information Meta had used for years to allow advertisers

28

1    to identify target customers accurately and efficiently and to measure the success of their

2    advertising campaigns.

3        160.    Accordingly, with iOS 14, Apple introduced App Tracking Transparency ("ATT")

4    which allowed iPhone users to opt-out of permitting apps, like Meta's Family of Apps, to track

5    their internet behavior.  With the introduction of ATT, when users open an app after installing

6    iOS 14, they are greeted with a pop-up window that asks, "Allow [App Name] to track your

7    activity across other companies' apps and websites?"  Users may then choose "Ask App Not to

8    Track" or "Allow."

9        161.    When "Ask App Not to Track" is selected, Apple disables the app from using

10   Apple's identifier for advertisers ("IDFA").  An IDFA is a random string of letters and numbers

11   assigned to Apple devices like iPads and iPhones used by advertisers to identify users and track

12   their activity across apps and websites.  Advertisers use IDFAs to deliver personalized, targeted

13   advertising.  When asked not to track, iOS communicates to the app developer that a user does not

14   want their information to be tracked and shared with anyone in any way.  Once this setting has

15   been selected, apps may no longer leverage data collected on untracked iOS devices beyond what

16   they may observe within their own ecosystem.

17       162.    If apps continue to track once this setting has been enabled, Apple may bar the

18   offenders from its App Store.  Apple also codified its terminology regarding user data to ensure

19   all developers use the same language in their App Tracking Transparency.  Developers must

20   disclose their apps' privacy practices to remain on the App Store.

21       163.    ATT was rolled out in late April 2021.  ATT upended the mobile ad industry by

22   abruptly cutting off one of its primary data streams.  As explained above, app tracking is important

23   to advertisers because they use this information to deliver ads relevant to users' interests.  The

24   more advertisers know about users, the more precisely they may target advertising to users, and

25   the more valuable those ads become.

26       164.    The iOS changes impacted Meta's business in two important ways—they impacted

27   Meta's ad targeting and measuring capabilities.  Permitting users to opt not to allow apps to track

28   them lowered the number of users that can be tracked, as many users will opt not to allow tracking.

1  As a result, advertisers had less data to use to target users.  The loss of data about user activity also

2  decreased the accuracy with which advertisers can measure web conversions—actions that a

3  prospective customer takes to further interact with a business or product in a valuable way such as

4  making a purchase, signing up to receive emails, or visiting a webpage.  Losing the ability to track

5  a customer's web journey meant that companies also could no longer distinguish between new and

6  repeat traffic.

7       165.    Apple's iOS privacy changes forced Meta to attempt to find new ways to offer ad

8  targeting and measurement with less data.

9       166.    During the Class Period, Meta informed investors that it was taking numerous steps

10  to mitigate the impact of Apple's iOS privacy changes.  These efforts included, inter alia, requiring

11  less data in targeted ad campaigns; purportedly building other data sources that advertisers could

12  make use of; having more onsite conversion opportunities for advertisers; implementing

13  "aggregated events management," which would allow Meta and its advertisers to make use of

14  aggregated ad-campaign-level data for users who opted out of being tracked once the iOS changes

15  were implemented; closing a supposed "underreporting gap" to identify a supposedly more robust

16  and more accurate return on investment for advertisers; and automation to allow advertisers to

17  leverage machine learning to find audiences for targeted ad campaigns.  Meta also tested pop-ups

18  inside the Facebook app on iPhones and iPads to encourage users to accept tracking.  The prompts

19  attempted to persuade users to allow tracking by stating they would receive more personalized ads

20  and "support businesses that rely on ads to reach customers."  The Company also ran a video ad

21  campaign with the slogan "Good Ideas Deserve to Be Found," ending with the statement,

22  "Personalized Ads help good ideas get found."

23  **C.    Meta Acknowledged that Apple's iOS Privacy Changes Would Create**

24  **"Headwinds," but Directly Implied that the Impact Was Not Currently**

25  **Material When It Was**

26       167.    Throughout the Class Period, Meta acknowledged that Apple's iOS privacy

27  changes would create "headwinds," but repeatedly downplayed the impact of the changes in

28  statements made to investors and then directly implied in its SEC filings that the impact was not

currently material.  However, by the second quarter of 2021, the Company's statement implying no material impact was not accurate—by the second quarter of 2021, Apple's iOS privacy changes were materially impacting Meta's targeting and measurement capabilities and its revenues and profits.  Defendants failed to tell investors that the changes could not be successfully mitigated and would materially hurt the ad business until February 2, 2022, when they admitted to a staggering $10 billion impact.

### 1.    First Quarter 2021

168.    On March 2, 2021, Defendants Sandberg and Wehner spoke on behalf of Meta at the 2021 Morgan Stanley Technology, Media and Telecom Conference.  There, Defendant Wehner made clear that Meta was closely watching the introduction of Apple's iOS privacy changes, that the rate of adoption of the iOS was predictable, and that Meta already had considered ways to mitigate the impact.  Defendant Wehner stated:

> We're going to be watching when this actually launches, we expect it to be in Q1, so later in March.  And then there's going to be the question of what's the pace of upgrades to iOS 14, which is a little bit more known because we're able to sort of monitor the pace of other updates in the past.  We'll be obviously looking at what the opt-in rates are there.  We're looking at things like a pre-prompt to provide additional context of what we're doing and why we're doing it and why it benefits the user.  So, all of those things will be part of how we kind of assess what the impact for the business is going to be.

> But we do expect this to be an impact to the business and to impact our growth rates as we go into – further into 2020.  And so that's factored into the outlook that I gave on the Q4 call.  On the mitigation front, I think there's a few different things, obviously going on. One is, this is a broad platform wide change.  It doesn't just affect Facebook.  It affects everybody in the ecosystem.  And so there's going to be a relative effect and that relative effect is not clear yet.

169.    On or about March 18, 2021, Defendant Zuckerberg appeared on Josh Constine's PressClub where he discussed Meta's business.  On this program, Defendant Zuckerberg greatly downplayed concerns about the impact of Apple's iOS privacy changes.  He stated that "I'm confident that we're gonna be able to manage through that situation" and dismissively suggested that the changes only "might make some kind of headwind."   Defendant Zuckerberg even suggested the changes might *positively* impact the Company's business.  Defendant Zuckerberg stated:

> "When it comes to, the iOS 14 changes, for example, and their impact on our business, I think the reality is that I'm confident that we're gonna be able to manage

through that situation.  And we'll be in a good position.  I think it's possible that we may even be in a stronger position."

[. . .]

I mean I think that there's been a lot of people have focused on the iOS 14 ad changes and whether that's going to be an impact for our business, for example, and, it might make some kind of headwind.  The reality is we make changes in our products all the time that, try to prioritize health and wellbeing across the services that reduce our revenue.  So over the long-term, the iOS 14 business changes are actually not the biggest concern I have with Apple.

170.    On April 28, 2021, Meta held a conference call with investors to discuss financial results from the first quarter of 2021.  During this call, Defendant Sandberg made clear that the Company was actively engaged in efforts to mitigate the impact of the iOS privacy changes and stated: "We're rebuilding meaningful elements of our ad tech so that our system continues to perform when we have access to less data in the future."  On the same call, in response to an analyst's question about the iOS update, Defendant Wehner likewise suggested that the impact was merely "manageable" and that the Company was "making encouraging progress" on "solutions" to the iOS ATT changes.  Defendant Wehner stated:

"[T]he impact on our own business, we think, will be manageable.  We continue to expect it will be a headwind for the remainder of the year, but we're making encouraging progress . . . on our own solutions to help advertisers navigate these changes."

171.    On the April 28, 2021 conference call, Wehner also stated that "in addition to these mitigations, we're also just seeing very strong overall ad demand, which is contributing to a more positive outlook for 2021."

## 2.    Second Quarter 2021

172.    ATT was rolled out in late April 2021.  ATT was quickly adopted by iPhone users and quickly impacted Meta's business.  On June 3, 2021, Apple reported that 90% of all iPhones introduced in the last four years had updated to iOS 14 and 85% of all iPhones had updated to iOS 14.

173.    According to a former employee ("FE1"), Meta began to see a material drop in revenue due to the iOS privacy changes in the second quarter of 2021.  FE1 started work at Meta in July 2015 as a Senior Product Support Analyst.  In January 2016, FE1 shifted to a role as Product

1   Support Lead, and in October 2016, FE1 became a Client Solutions Manager before being

2   promoted to Senior Client Solutions Manager in January 2018.  FE1 left Meta in January 2022.

3   FE1 worked out of the Company's headquarters in Menlo Park, California.  As a Senior Product

4   Support Analyst, FE1 identified project risks and set up alarm alerts based on product bug reports.

5   As a Product Support Lead, FE1 worked to launch new products and helped build a new Facebook

6   Concierge team to resolve engineering and other issues.  FE1's Client Solutions roles involved

7   "managing Apple and Google ads relationships."  FE1 reported to Industry Manager—Technology

8   and Telecommunications Noah Choi, who reported to Director, Head of Industry—Technology,

9   Mobile and Connectivity Jonathan Kratz.  Kratz in turn reported to Director, Technology Mobility

10  and Connectivity—Global Marketing Solutions Stephanie Latham, who reported to VP, Global

11  Marketing Solutions Nada Stirratt and VP, Global Business Group Carolyn Everson.  Stirratt in

12  turn reported to Chief Revenue Officer David Fischer, who reported either directly to or was two

13  levels below Chief Operating Officer Sheryl Sandberg.

14       174.    According to FE1, Meta learned about the planned iOS privacy changes in late

15  2019, about six to eight months before Apple announced them publicly in June 2020.  FE1 was

16  tasked with writing a brief detailing the planned iOS privacy changes and the anticipated revenue

17  implications on Meta's advertising with Apple, Google, Intel, Microsoft, and other tech accounts.

18  This brief, titled approximately "Impact of iOS 14"  (the "iOS Brief") in the form of a Google

19  Doc, was likely sent to Defendant Sandberg and VP, Global Business Group, Carolyn Everson.

20  The iOS Brief was emailed to VP, Global Marketing Solutions, Nada Stirratt.  The iOS Brief was

21  rolled up into a larger brief on the anticipated impact of the iOS privacy changes.  FE1 confirmed

22  that Meta began to see a material drop in revenue due to the iOS privacy changes in the second

23  quarter of 2021.  Among other issues, the iOS Brief discussed the "ideas of which advertisers

24  would be dropping spend."  Meta's "signal match" rates for advertisers—or the rate at which its

25  computers were able to match users and look for similar users—were projected to decrease by

26  about 65% due to the iOS privacy changes.

27       175.    On July 28, 2021, Meta held a conference call with investors to discuss financial

28  results from the second quarter of 2021.  Defendants continued to downplay the impact of Apples'

iOS privacy changes by emphasizing their mitigation efforts and suggesting that the impact of ATT would be manageable.  For example, Defendant Li spoke about supposed "mitigation" efforts Meta was undertaking to counteract any negative impact Apple's iOS privacy changes would have on Meta's advertising business and stated that Meta's "aggregated events management" was a mitigation effort that "has definitely mitigated some of the impact" of the Apple iOS changes.

176.    On July 29, 2021, Meta filed a Quarterly Report on Form 10-Q with the SEC, reporting the Company's financial and operating resulting for the quarter ended June 30, 2021 (the "2Q21 10-Q").  The 2Q21 10-Q stated:

> [M]obile operating system and browser providers, such as Apple and Google, have announced product changes as well as future plans to limit the ability of websites and application developers to collect and use these signals to target and measure advertising.  For example, in April 2021, Apple made certain changes to its products and data use policies in connection with changes to its iOS 14 operating system that reduce our and other iOS developers' ability to target and measure advertising, which may in turn reduce the budgets marketers are willing to commit to us and other advertising platforms.

> [. . .]

> These developments have limited our ability to target and measure the effectiveness of ads on our platform and negatively impacted our advertising revenue, and *if we are unable to mitigate these developments as they take further effect in the future, our targeting and measurement capabilities will be materially and adversely affected*, which would in turn significantly impact our future advertising revenue growth.

(Emphasis added.)

177.    This statement materially false and misleading because it directly implied that Meta's "targeting and measurement capabilities" had not yet been "materially and adversely affected" by Apple's iOS  privacy changes, and that those changes had not yet "significantly impact[ed]" Meta's "advertising revenue growth.  In fact, as explained above, by the time this statement was made, Meta's "targeting and measurement capabilities" already had been "materially and adversely affected" by Apple's iOS  privacy changes, and those changes already had "significantly impact[ed]" Meta's "advertising revenue growth."

### 3.  Third Quarter 2021

178.    On October 25, 2021, Meta held a conference call with investors to discuss financial results from the third quarter of 2021.  On that call, Defendant Sandberg noted that the Company was experiencing the impact of Apple's iOS privacy changes:

> We started to see that impact in Q2, but adoption on the consumer side ramped up by late June, so it hit critical mass in Q3.  As a result, we've encountered two challenges.  One is that the accuracy of our ads targeting decreased, which increased the cost of driving outcomes for our advertisers.  And the other is that measuring those outcomes became more difficult.

179.    Yet again, Defendants pivoted and continued to reassure the market that Meta was taking action to mitigate the impact of ATT on the Company's business.  For example, Defendant Sandberg discussed Meta's advertising business and stated that Meta recently disclosed that it believed it was "underreporting iOS web conversions."  That is, "real world conversions" arising out of advertising with Meta, "like sales and app installs, are higher than what's being reported for many advertisers, especially small advertisers.  We're making good progress fixing this."

180.    Defendant Zuckerberg stated that "we expect we'll be able to navigate these headwinds [related to iOS] over time with investments that we're already making today."  Later on that same call, Zuckerberg also stated:

> As Apple's changes make e-commerce and customer acquisition less effective on the web, solutions that allow businesses to set up shop right inside our apps will become increasingly attractive and important to them.  We've built solutions like ads that can dynamically point to either a business's website or their Shop on our platforms depending on what will perform better for them, and that will help more businesses navigate this challenging environment.

181.    Defendant Wehner also stated on this call that "on the iOS question as it relates to Q4 versus Q3, the bulk of iOS 14 updates were completed as we entered Q3, which contributed to the step up in the impact from Q2 to Q3.  Since iOS 14 is now widely adopted, we don't expect a similar step up in Q4."

182.    While the Company acknowledged on its conference call that it had experienced an impact from Apple's iOS privacy changes in the second and third quarters of 2021, the Company at no point stated or implied that the iOS privacy changes had had a *material* impact on its business.

1   To the contrary, the Company's statements broadly suggested that the impact amounted to

2   manageable, immaterial headwinds that the Company was successfully taking steps to mitigate.

3       183.    Moreover, in its SEC filings, Meta once again directly implied that the impact of

4   Apple's iOS privacy changes was not having a material impact on its business.  On October 26,

5   Meta filed a Quarterly Report on Form 10-Q with the SEC, reporting the Company's financial and

6   operating resulting for the quarter ended September 30, 2021 (the "3Q21 10-Q").  In the 3Q21 10-

7   Q, Meta stated:

> Our advertising revenue in the third quarter of 2021 was negatively impacted by
> marketer reaction to targeting and measurement challenges associated with iOS
> changes.  *If we are unable to mitigate these developments as they take further effect*
> *in the future, our targeting and measurement capabilities will be materially and*
> *adversely affected, which would in turn significantly impact our future advertising*
> *revenue growth.*

(Emphasis added.)

12      184.    This statement was also materially false and misleading because it directly implied

13  that Meta's "targeting and measurement capabilities" had not yet been "materially and adversely

14  affected" by Apple's iOS  privacy changes, and that those changes had not yet "significantly

15  impact[ed]" Meta's "advertising revenue growth," when in fact, by the end of the third quarter of

16  2021, Meta's "targeting and measurement capabilities" already had been "materially and adversely

17  affected" by Apple's iOS  privacy changes, and those changes already had "significantly

18  impact[ed]" Meta's "advertising revenue growth."

19      **D.    Meta Disclosed the Truth that the Impact of Apple's iOS Privacy Changes**
            **Had Been Highly Material**

21      185.    On February 2, 2022, Meta held a conference call with investors to discuss its

22  financial results for the fourth quarter of 2021.  On that call, Defendants finally revealed that

23  Apple's iOS privacy changes had in fact been having a massive, material adverse impact on Meta's

24  measurement and targeting capabilities, and so had had a material adverse impact on Meta's

25  revenues and profits from its ad sales.

26      186.    Specifically, Defendant Wehner stated that "we believe the impact of iOS overall

27  as a headwind on our business in 2022 is on the order of $10 billion, so it's a pretty significant

28

headwind for our business."  Accordingly, the impact of Apple's iOS privacy changes on Meta's profit was approximately $2.5 billion in each quarter, including the third quarter of 2021, in which ATT and Apple's iOS privacy changes had been implemented and adopted by most of the users who were going to adopt them.  As 85% of users had adopted Apple's iOS privacy changes by June 1, 2021, the impact of Apple's iOS privacy changes on Meta was material by that date at the latest.  Defendant Zuckerberg stated that "we're rebuilding a lot of our ads infrastructure so we can continue to grow and deliver high-quality personalized ads." Defendant Sandberg admitted that Defendants were "working to try and improve things, for example by making progress in closing the underreporting gap for iOS web conversions, and by introducing tools like [Meta's] Aggregated Events Measurement solution to deliver better insights for advertisers.  These efforts will help to mitigate some of the challenges, but we expect the overall targeting and measurement headwinds to moderately increase from Apple's changes and from regulatory changes in Q1 and throughout 2022."

187.    These admissions caused over 26% of Meta's market capitalization to be wiped out in one day, as the value of Meta's common stock sank over $85 a share, and other drops represented partial materializations of related risks Meta had concealed, as detailed below in Part XI.

## VIII.   META MISLED INVESTORS TO BELIEVE THAT ITS TRANSITION TO REELS WAS NOT IMPACTING ITS RESULTS OF OPERATIONS

### A.    Meta's Competition from TikTok

188.    TikTok is a mobile app owned by Chinese company ByteDance.  TikTok is the second iteration of Musical.ly, an app identical to TikTok in many ways, which launched in August of 2014.  ByteDance acquired Musical.ly for around $1 billion in November 2017.  The following year, all Musical.ly accounts were automatically migrated to the TikTok app and Musical.ly ceased to exist.

189.    TikTok hosts a variety of short-form user videos, from genres like pranks, stunts, tricks, jokes, dance, and entertainment with durations from 15 seconds to ten minutes.  TikTok users film vertical videos and may upload their own audio and sounds to pair with the video.  When

AMENDED COMPLAINT (CASE NO. 4:22-cv-01470-YGR)

watching content, TikTok keeps its users engaged by immediately playing a new video after the previous one has ended, creating a scroll of content.

190.    By showing users only one, full-screen video at a time, TikTok can track users' specific interests, honing its recommendations.  For example, if a user swipes up to move to the next video before the current one finished playing, that is a signal of disinterest.  If a user shares a video or watches it multiple times, that is a signal of interest.

191.    TikTok's algorithm differs from that Facebook used to use for its News Feed content by recommending videos from across the platform rather than prioritizing content from the accounts that users already follow, adding to the feeling for users that anyone may "go viral" at any time.  In this way, TikTok's algorithm also enables it to identify its users' interests and align its feed with more content along those lines more accurately.

192.    TikTok's growth has been rapid.  In September 2018, TikTok surpassed Facebook, Instagram, YouTube, and Snapchat in monthly installs in the App Store.  In 2021, TikTok landed its billionth user four years after it launched globally and in just half the time it took Facebook to reach that milestone.  TikTok is the only non-Facebook app to have reached 3 billion downloads in app stores.  TikTok is particularly liked by younger users.  Studies show that TikTok has a larger number of "Gen Z" users who access their accounts at least once a month in the United States than Instagram.

193.    TikTok's revenue has grown equally rapidly.  TikTok's ad revenue is expected to triple this year to $11.64 billion from $3.88 billion in 2021, surpassing Twitter and Snapchat combined.

**B.    Meta's Transition to Reels To Compete Against TikTok**

194.    Meta's Family of Apps and the TikTok app compete against each other for user engagement time and advertising revenues.

195.    Given the rise of TikTok, Meta recognized several years ago that it needed to develop a similar app with TikTok's highly engaging format to compete effectively against TikTok.  Meta's first attempt to compete with TikTok was a knock-off app called "Lasso" in

1    November 2018 that allowed users to share short videos with soundtracks.  Meta shuttered the

2    unsuccessful Lasso in early 2020 after operating it for just 18 months.

3        196.    On August 5, 2020, Instagram launched Instagram Reels globally.  As explained

4    above, Reels is a function in the Instagram app very similar to TikTok that allows users to create,

5    view and share short, 15- or 30-second videos or "Reels" on Instagram.

6        197.    On June 16, 2021, Instagram launched Reels ads, which are full screen, vertical ads

7    that play interspersed between user-generated Reels.

8        198.    Meta has invested significant resources in bringing the Reels platform up to speed

9    in its competition with TikTok.  On July 14, 2021, Defendant Zuckerberg announced plans to pay

10   content creators more than $1 billion by the end of the following year through new bonus

11   programs.  This decision was a direct response to TikTok's own actions.  Previously, in July 2020,

12   TikTok announced a $200 million fund, called the TikTok Creator Fund, to help creators on the

13   platform supplement their earnings and produce more content.

14       199.    Rather than compete with TikTok in just one app, Meta made the choice to compete

15   in two separate apps—Instagram and Facebook.  On September 29, 2021, Facebook announced

16   the launch of Reels on Facebook for iOS and Android in the U.S.

17   **C.    Meta Acknowledged That Its Introduction of Reels Would Shift Engagement**

18        **from Stories to Reels, but Stated That Reels Increased Overall Engagement,**

19        **and Implied That This Shift Was Not Currently Impacting Its Results of**

20        **Operations**

21       200.    Monetization of short-form video such as Reels through advertising is more

22   difficult than through Meta's traditional revenue sources, such as Facebook's News Feed.  In News

23   Feed, many ads may be interspersed between user-generated content that is viewed when the user

24   scrolls down the feed, and a user may view the ads effectively in the process of scrolling through

25   that content without significantly interrupting the user experience.  Short-form video

26   advertisements are longer and fit more awkwardly in a scroll of user-generated content.

27   Accordingly, fewer ad impressions are available to be sold on a short-form video format.

28

201.    On the other hand, Reels and other short-form video formats are more engaging than News Feed or Instagram photographs—on average, users spend more time viewing short-form video content, particularly in the format of Reels or TikTok, than they do viewing text or photos on Facebook News Feed or Instagram.  Indeed, Reels is so engaging that many users have shifted their engagement from older formats in Meta's Family of Apps, such as Facebook News Feed or Instagram photos, to Reels.  In this way, Reels is partly "cannibalizing" user engagement in older content formats in Meta's Family of Apps.  However, Meta believes that engagement with short-form video on Reels increases overall user engagement with Meta's content.

202.    Accordingly, Meta's introduction and promotion of Reels involves an important tradeoff that the Company must balance—by promoting Reels, the Company is increasing overall user engagement (i.e., increasing the total amount of time users spend on Meta's Family of Apps), but the Company is also shifting some user engagement from platforms that are easier to monetize to a platform that is harder to monetize.  Crucially, whether Meta's shift from older content formats in Meta's Family of Apps to Reels caused a positive or negative impact on net for Meta's results of operations could never be inferred from the nature of the transition alone.  Whether Meta's transition to Reels would have a net positive or negative impact on the Company's business could not be determined simply by knowing that Reels was harder to monetize, because Reels is also more engaging—even if users view fewer ads per hour on Reels than on older content formats, users may spend more total hours viewing ads on Reels, such that the total number of ads viewed by users may be greater on net with the introduction of Reels.

203.    During the Class Period, Meta acknowledged that Meta's shift in focus from older content formats in Meta's Family of Apps to Reels would shift some user engagement from formats that were easier to monetize to a new format that was harder to monetize, but Meta directly and repeatedly implied that this shift was not adversely affecting Meta's business and results of operations.

204.    On Meta's April 28, 2021 conference call to discuss results from the first quarter of 2021, Justin Post of Bank of America asked, "Could you comment on what you're seeing with

overall engagement? And as people use these new platforms, is it growing, time spent and other factors?"

205. Defendant Wehner responded:

> [W]e're seeing really strong engagement on video, particularly internationally. And that's—we're pleased with that. [. . .] *Reels is starting to get traction on – and doing well on Instagram*. Now *video currently has relatively fewer impressions on a time spent basis*. So that's playing into the engagement trends as well. And then finally, I would say, we are seeing competition in News Feed from both our own video products and also other products as well. So that's factoring into it.

(Emphasis added.)

206. Similarly, on Meta's July 28, 2021 conference call to discuss results from the second quarter of 2021, Defendant Zuckerberg stated:

> Video in particular is becoming the primary way that people use our products and express themselves. I know this is a theme we've been talking about for a few years now, but we've been executing on this for a while and video has steadily become more important in our products. Video now accounts for almost half of all time spent on Facebook. *Reels is already the largest contributor to engagement growth on Instagram.* [. . .] [A]s it becomes the majority of engagement across our services in the coming years, we're going to continue to focus on this.

(Emphasis added.)

207. On the same call, Defendant Sandberg stated:

> I can talk about video ads. So *we're seeing very strong growth in video monetization across* Watch, Feed, *Reels*. And we think we're continually getting better at monetizing video, *but they are still monetizing at lower rates versus Feed Stories, but we have a lot here*. We have 2 billion people watching in-stream ad eligible videos per month.

(Emphasis added.)

208. Then on Meta's July 28, 2021 follow-up conference call, Ron Josey with JMP Securities asked:

> Dave, I wanted to follow up on just Reels, either details on usage or monetization approach. [. . .] Mark's comments saying it's the largest contributor of engagement on—engagement growth on Instagram is pretty impressive. So any insights on Reels, monetization, or usage would be super helpful as we think about, you know, newer products launching and monetization.

209. Defendant Wehner replied:

> Yeah, I mean, Reels is going well. [. . .] And then on the ads front, you know, ads are now available to all advertisers and in almost all markets where Reels is live. It's still very early on the advertising front, but we think this should be a good ad format.

210.     These comments left unclear whether the net impact of the transition to Reels was having a positive or negative impact on the Company's results of operations.  While the Company noted that Reels "currently has relatively fewer impressions on a time spent basis," the Company also noted that "Reels is already the largest contributor to engagement growth on Instagram."  At no point did the Company clarify whether the transition to Reels, with an increase in engagement but lower monetization rate, was on net having a negative or positive impact on the Company's business.

211.     However, that ambiguity was resolved in the Company's quarterly report on SEC Form 10-Q for the second quarter of 2021, which stated in its discussion of risks:

> We also may introduce new features or other changes to existing products, or introduce new stand-alone products, that attract users away from properties, formats, or use cases where we have more proven means of monetization, such as News Feed.  In addition, as we focus on growing users and engagement across our family of products, from time to time these efforts have reduced, and may in the future reduce, engagement with one or more products and services in favor of other products or services that we monetize less successfully or that we are not growing as quickly.  *These decisions may adversely affect our business and results of operations* and may not produce the long-term benefits that we expect.

(Emphasis added.)

212.     In this statement, Meta informed investors that any adverse impact on its business and results of operations from its introduction of, and transition to, Reels was merely possible, such that no such adverse impact had yet occurred.

213.     On Meta's October 25, 2021 conference call to discuss results from the third quarter of 2021, Defendant Zuckerberg again noted, "Reels is already the primary driver of engagement growth on Instagram."  Then on the same call, an analyst from Cowen asked, "Given the rise of Reels, is it cannibalizing engagement on the other Instagram services?"  In response, Defendant Wehner stated:

> Whenever we launch new experiences, this was true with Stories, it was true with Facebook Watch.  It's—you're always going to see some amount of shifting of people's time and attention to the new areas.

> And we do think that, that benefits the experience overall, and we think that makes the overall experience more engaging over time.  And we do think that it's—we're able to with Reels drive incremental engagement with Instagram and Facebook. So that's why we're investing to do that.

214.    Here again, the Company's comments left unclear whether the net impact of the transition to Reels was having a positive or negative impact on the Company's results of operations.  While the Company noted that, with the introduction of Reels, there was "some amount of shifting of people's time and attention" from older formats to Reels, the Company explained that "we're able to with Reels drive incremental engagement with Instagram and Facebook."  At no point did the Company clarify whether the increase in total engagement that came with the transition to Reels outweighed the lower monetization rate of that engagement, and so failed to clarify in these comments whether the transition to Reels was on net having a negative or positive impact on the Company's business.

215.    However, the Company's quarterly report on SEC Form 10-Q for the third quarter of 2021 again resolved this ambiguity.  There, the Company again stated only that its decision to transition to Reels "may adversely affect our business and results of operations," and so informed investors that any adverse impact on its business and results of operations from its transition to Reels was merely possible and had not yet occurred.

### D.    Meta Discloses the Truth that the Shift to Reels Is Negatively Impacting Its Results of Operations

216.    On February 2, 2022, Meta held a conference call to discuss its results from the fourth quarter of 2021.  On that call, Meta revealed for the first time, in multiple statements, that its transition to Reels was, on net, having a negative impact on the Company's business and results of operations.

217.    Defendant Zuckerberg stated:

[W]e are in the middle of a transition on our own services towards short-form video like Reels.  So as more activity shifts towards this medium, we're replacing some time in News Feed and other higher monetizing surfaces.  *So as a result of* both competition and *this shift to short-form video* as well as our focus on serving young adults over optimizing overall engagement, *we're going to continue to see some pressure on impression growth in the near term*.

(Emphasis added.)

218.    Later, Defendant Zuckerberg added:

And what these transitions have all had in common from desktop feed to mobile feed, feed to Stories and not to Reels, is in the beginning our ads system and business are not as tuned for the new format, so *as the engagement of the new things*

58

AMENDED COMPLAINT (CASE NO. 4:22-cv-01470-YGR)

*starts to replace some of the engagement of the old thing, it creates a near-term headwind for revenue.*

[. . .]

[W]e think it's definitely the right thing to lean into this and to push us hard to *grow Reels* as quickly as possible and not hold on the brakes at all, even though it *may create some near-term slower growth* than we would have wanted.

(Emphasis added.)

219.    On the same call Defendant Wehner stated:

So we're confident in our ability to monetize [Reels] over time, but *right now, there's* relatively few ads in Stories—sorry, *relatively few ads in Reels today. So it's definitely something from an impression growth and monetization perspective is going to be a headwind.*

(Emphasis added.)

220.    In these statements, investors learned for the first time that the introduction of Reels was having an adverse impact on Meta's business and results of operations—it was on net negatively impacting "impression growth" and "revenue."  That is, investors learned that any increase in impressions as a result of an increase in the total hours spent viewing ads gained by introducing Reels did not offset the decrease in impressions resulting from the viewers spending more time on a format that offered fewer ads per hour than Meta's older content formats, so the introduction of Reels was negatively impacting total impressions viewed, and with that, total revenue.

221.    These revelations caused Meta's share price to drop precipitously, causing enormous losses to Plaintiffs, as detailed below in Part XI.

## IX.    DEFENDANTS' FALSE AND MISLEADING STATEMENTS

222.    Plaintiffs allege that the statements within this section were knowingly and materially false and misleading and/or omitted to disclose material information of which Defendants were aware or were reckless in not knowing.  These statements artificially inflated or maintained the price of Meta's publicly traded common stock and operated as a fraud or deceit on all persons and entities that purchased common stock during the Class Period.

A.   **Defendants' False and Misleading Statements in 2021**

1.   **January 28, 2021**

223.   On January 28, 2021, Meta filed an Annual Report on Form 10-K with the SEC, reporting the Company's financial and operating results for the quarter and year ended December 31, 2020 (the "January 28, 2021 10-K").  In that document, Meta stated:

> We face significant competition in every aspect of our business, including, but not limited to, companies that facilitate the ability of users to share, communicate, and discover content and information online or enable marketers to reach their existing or prospective audiences, including for example, Google . . . .

224.   The statement in ¶ 223 was materially false and misleading because Meta did not "face significant competition in every aspect of [its] business" in which it purported to compete with Google—Meta had entered an anticompetitive agreement with Google to limit the competition between them.  The statement in ¶ 223 was also materially misleading because it omitted to disclose the details of this agreement between Meta and Google.

225.   In the January 28, 2021 10-K, Meta also stated:

> *Our advertising revenue can also be adversely affected by a number of other factors, including*:
>
> • decreases in user engagement, including time spent on our products;
>
> • our inability to continue to increase user access to and engagement with our products;
>
> • product changes or inventory management decisions we may make that change the size, format, frequency, or relative prominence of ads displayed on our products or of other unpaid content shared by marketers on our products;
>
> • our inability to maintain or increase marketer demand, the pricing of our ads, or both;
>
> • our inability to maintain or increase the quantity or quality of ads shown to users;
>
> • changes to third-party policies that limit our ability to deliver, target, or measure the effectiveness of advertising, including changes by mobile operating system and browser providers such as Apple and Google;
>
> • adverse government actions or legislative, regulatory, or other legal developments relating to advertising, including developments that may impact our ability to deliver, target, or measure the effectiveness of advertising;
>
> • user behavior or product changes that may reduce traffic to features or products that we successfully monetize, including as a result of increased usage of the Stories format or our messaging products;

• reductions of advertising by marketers due to our efforts to implement or enforce advertising policies that protect the security and integrity of our platform;

• the availability, accuracy, utility, and security of analytics and measurement solutions offered by us or third parties that demonstrate the value of our ads to marketers, or our ability to further improve such tools;

• loss of advertising market share to our competitors, including if prices to purchase our ads increase or if competitors offer lower priced, more integrated, or otherwise more effective products;

• limitations on our ability to operate material portions of our business in Europe as a result of European regulators, courts, or legislative bodies determining that our reliance on SCCs or other legal bases we rely upon to transfer user data from the European Union to the United States is invalid;

• changes in our marketing and sales or other operations that we are required to or elect to make as a result of risks related to complying with foreign laws or regulatory requirements or other government actions;

• decisions by marketers to reduce their advertising as a result of adverse media reports or other negative publicity involving us, our user data practices, our advertising metrics or tools, content on our products, our efforts to implement or enforce policies relating to content on our products (including as a result of decisions or recommendations from the independent Oversight Board), developers with mobile and web applications that are integrated with our products, or other companies in our industry;

• reductions of advertising by marketers due to objectionable content made available on our products by third parties, questions about our user data practices, concerns about brand safety or potential legal liability, or uncertainty regarding their own legal and compliance obligations (for example, a number of marketers announced that they paused advertising with us in July 2020 due to concerns about content on our products);

• the effectiveness of our ad targeting or degree to which users opt out of the use of data for ads, including as a result of product changes and controls that we have implemented or may implement in the future in connection with the GDPR, ePrivacy Directive, California Consumer Privacy Act (CCPA), other laws, regulations, or regulatory actions, or otherwise, that impact our ability to use data for advertising purposes;

• the degree to which users cease or reduce the number of times they engage with our ads;

• changes in the way advertising on mobile devices or on personal computers is measured or priced;

• the success of technologies designed to block the display of ads or ad measurement tools;

• changes in the composition of our marketer base or our inability to maintain or grow our marketer base; and

• the impact of macroeconomic conditions, whether in the advertising industry in

1    general, or among specific types of marketers or within particular geographies.

2    (Emphasis added.)

3        226.    The statements in ¶ 225 were materially false and misleading because Meta's

4    advertising revenue could also be materially adversely affected by the alteration or termination of

5    Meta's 2018 Jedi Blue Agreement with Google.   The statements in ¶ 225 were also materially

6    misleading because they omitted to disclose the details of this agreement between Meta and

7    Google.

8        227.    In the January 28, 2021 10-K, Meta also stated:

9        We also may introduce new features or other changes to existing products, or
         introduce new stand-alone products, that attract users away from properties,
10       formats, or use cases where we have more proven means of monetization.   For
         example, we previously introduced the Stories format, which we do not currently
11       monetize at the same rate as News Feed.   In addition, as we focus on growing users
         and engagement across our family of products, from time to time *these efforts have*
12       *reduced, and may in the future reduce, engagement with one or more products and*
         *services in favor of other products or services that we monetize less successfully* or
13       that are not growing as quickly.   *These decisions may adversely affect our business*
         *and results of operations* and may not produce the long-term benefits that we
14       expect.

15   (Emphasis added.)

16       228.    The statements in ¶ 227 were materially false and misleading—by the time of the

17   statement, Meta's decision to introduce its product Reels, which increased overall user engagement

18   across Meta's family of apps but could not be monetized as easily as other products or services,

19   already had, on net, "adversely affect[ed] [Meta's] business and results of operations," so Meta's

20   statement that such an effect was merely possible was misleading.

21       229.    In the January 28, 2021 10-K, Meta also stated:

22       *2020 Compared to 2019*.   Revenue in 2020 increased $15.27 billion, or 22%,
         compared to 2019.   The increase was mostly due to an increase in advertising
23       revenue as a result of an increase in the number of ads delivered, partially offset by
         a decrease in the average price per ad.
24
         In 2020, the number of ads delivered increased by 34%, as compared with
25       approximately 33% in 2019.   The increase in the ads delivered was driven by an
         increase in the number and frequency of ads displayed across our products, and an
26       increase in users.   In 2020, the average price per ad decreased by 10%, as compared
         with a decrease of approximately 5% in 2019.   The decrease in average price per
27       ad during the year ended December 31, 2020 was primarily driven by a decrease in
         advertising demand globally during the first two quarters of 2020 due to the
28       COVID-19 pandemic and, to a lesser extent, by an increasing proportion of the

number of ads delivered as Stories ads and in geographies that monetize at lower rates.

In the near-term, we anticipate that future advertising revenue growth will be determined primarily by several factors: the extent to which we continue to see increasing advertising demand in connection with the shift of commerce from offline to online, as well as increased consumer demand for purchasing products as opposed to services, as a result of the COVID-19 pandemic; the status of the economic recovery from the slowdown caused by the COVID-19 pandemic and the magnitude of fiscal stimulus; and the extent to which changes to the regulatory environment and third-party mobile operating systems and browsers result in limitations on our ad targeting and measurement tools.

230.    The statements in ¶ 229 were materially false and misleading because Meta's advertising revenue success and growth was also due in significant part to Meta's 2018 Jedi Blue Agreement with Google.  The statements in ¶ 229 were also materially misleading because they omitted to disclose the details of this agreement between Meta and Google.

### 2.    April 9, 2021

231.    On or about April 9, 2021, Meta filed a Proxy Statement on Schedule 14A with the SEC in which the Company included, in a section titled, "Perquisites and Other Benefits," a table presenting the total compensation awarded to, earned by, or paid to each of the named executive officers for services rendered.  In addition to "Salary," "Bonus" and "Stock Awards," the table listed "All Other Compensation" to Defendant Sandberg as "$7,646,560, $4,370,631, and $2,914,831 in 2020, 2019, and 2018, respectively, for costs related to personal security for Ms. Sandberg at her residences and during personal travel pursuant to Ms. Sandberg's overall security program; and approximately $872,413, $1,316,468, and $908,677 in 2020, 2019, and 2018, respectively, for costs related to personal usage of private aircraft."

232.    The statements in ¶ 231 were materially false and misleading because Defendant Sandberg received significant "Other Benefits" beyond personal security and private aircraft usage throughout the Class Period in the form of personal assistance on personal matters.  The statements in ¶ 231 were also materially misleading because they omitted to state that Defendant Sandberg received significant "Other Benefits" beyond personal security and private aircraft usage throughout the Class Period in the form of personal assistance on personal matters.

1

### 3. April 29, 2021

2      233.    On April 29, 2021, Meta filed its Quarterly Report on Form 10-Q with the SEC,

3  reporting the Company's financial and operating results for the first quarter ended March 31, 2021

4  (the "1Q21 10-Q").  In that document, Meta stated:

5          We face significant competition in every aspect of our business, including, but not
           limited to, companies that facilitate the ability of users to share, communicate, and
6          discover content and information online or enable marketers to reach their existing
           or prospective audiences, including for example, Google . . . .

7

8      234.    The statement in ¶ 233 was materially false and misleading because Meta did not

9  "face significant competition in every aspect of [its] business" in which it purported to compete

10 with Google—Meta had entered an anticompetitive agreement with Google that reduced the

11 competition between them.  The statement in ¶ 233 was also materially misleading because it failed

12 to disclose the details of this agreement between Meta and Google.

      235.    In the 1Q21 10-Q, Meta also stated:

13 *Our advertising revenue can also be adversely affected by a number of other*
   *factors, including*:

14

15 • decreases in user engagement, including time spent on our products;

16 • our inability to continue to increase user access to and engagement with our
     products;

17

18 • product changes or inventory management decisions we may make that change
     the size, format, frequency, or relative prominence of ads displayed on our products
     or of other unpaid content shared by marketers on our products;

19

20 • our inability to maintain or increase marketer demand, the pricing of our ads, or
     both;

21 • our inability to maintain or increase the quantity or quality of ads shown to users;

22 • changes to third-party policies that limit our ability to deliver, target, or measure
     the effectiveness of advertising, including changes by mobile operating system and
23   browser providers such as Apple and Google;

24 • adverse government actions or legislative, regulatory, or other legal developments
     relating to advertising, including developments that may impact our ability to
25   deliver, target, or measure the effectiveness of advertising;

26 • user behavior or product changes that may reduce traffic to features or products
     that we successfully monetize, including as a result of increased usage of the Stories
27   format or our messaging products;

28 • reductions of advertising by marketers due to our efforts to implement or enforce
     advertising policies that protect the security and integrity of our platform;

• the availability, accuracy, utility, and security of analytics and measurement solutions offered by us or third parties that demonstrate the value of our ads to marketers, or our ability to further improve such tools;

• loss of advertising market share to our competitors, including if prices to purchase our ads increase or if competitors offer lower priced, more integrated, or otherwise more effective products;

• limitations on our ability to operate material portions of our business in Europe as a result of European regulators, courts, or legislative bodies determining that our reliance on SCCs or other legal bases we rely upon to transfer user data from the European Union to the United States is invalid;

• changes in our marketing and sales or other operations that we are required to or elect to make as a result of risks related to complying with foreign laws or regulatory requirements or other government actions;

• decisions by marketers to reduce their advertising as a result of adverse media reports or other negative publicity involving us, our user data practices, our advertising metrics or tools, content on our products, our efforts to implement or enforce policies relating to content on our products (including as a result of decisions or recommendations from the independent Oversight Board), developers with mobile and web applications that are integrated with our products, or other companies in our industry;

• reductions of advertising by marketers due to objectionable content made available on our products by third parties, questions about our user data practices, concerns about brand safety or potential legal liability, or uncertainty regarding their own legal and compliance obligations (for example, a number of marketers announced that they paused advertising with us in July 2020 due to concerns about content on our products);

• the effectiveness of our ad targeting or degree to which users opt out of the use of data for ads, including as a result of product changes and controls that we have implemented or may implement in the future in connection with the GDPR, ePrivacy Directive, California Consumer Privacy Act(CCPA), other laws, regulations, or regulatory actions, or otherwise, that impact our ability to use data for advertising purposes;

• the degree to which users cease or reduce the number of times they engage with our ads;

• changes in the way advertising on mobile devices or on personal computers is measured or priced;

• the success of technologies designed to block the display of ads or ad measurement tools;

• changes in the composition of our marketer base or our inability to maintain or grow our marketer base; and

• the impact of macroeconomic conditions, whether in the advertising industry in general, or among specific types of marketers or within particular geographies.

(Emphasis added.)

236.    The statement in ¶ 235 was materially false and misleading because Meta's advertising revenue could also be materially adversely affected by the alteration or termination of Meta's 2018 Jedi Blue Agreement with Google.   The statement in ¶ 235 was also materially misleading because it omitted to disclose the details of this agreement between Meta and Google.

237.    In the 1Q21 10-Q, Meta also stated:

> We also may introduce new features or other changes to existing products, or introduce new stand-alone products, that attract users away from properties, formats, or use cases where we have more proven means of monetization.  For example, we previously introduced the Stories format, which we do not currently monetize at the same rate as News Feed.  In addition, as we focus on growing users and engagement across our family of products, from time to time *these efforts have reduced, and may in the future reduce, engagement with one or more products and services in favor of other products or services that we monetize less successfully* or that are not growing as quickly.  *These decisions may adversely affect our business and results of operations* and may not produce the long-term benefits that we expect.

(Emphasis added.)

238.    The statements in ¶ 237 were materially false and misleading—by the time of the statement, Meta's decision to introduce its product Reels, which increased overall user engagement across Meta's Family of Apps but could not be monetized as easily as other products or services, already had, on net, "adversely affect[ed] [Meta's] business and results of operations," so Meta's statement that such an effect was merely possible was misleading.

239.    In the 1Q21 10-Q, Meta also stated:

> Revenue in the three months ended March 31, 2021 increased $8.43 billion, or 48%, compared to the same period in 2020.  The increase was mostly due to an increase in advertising revenue as a result of increases in the average price per ad and the number of ads delivered.
>
> During the three months ended March 31, 2021, the average price per ad increased by 30%, as compared with a decrease of approximately 16% in the same period in 2020.  The increase in average price per ad during the three months ended March 31, 2021 was mainly caused by a recovery from declines in advertising demand due to the COVID-19 pandemic that started in the first quarter of 2020.  Additionally, overall advertising demand increased, as compared to the same period in 2020, across our ad products and in all regions in part due to increasing consumer demand for purchasing products relative to services, as well as the shift of commerce from offline to online.  During the three months ended March 31, 2021, the number of ads delivered increased by 12%, as compared with an increase of approximately 39% in the same period in 2020.  The increase in the ads delivered was driven by increases in users and in the number and frequency of ads displayed across our products.
>
> In the near-term, we anticipate that future advertising revenue growth will be

determined primarily by price, which will be influenced by the extent to which we continue to see increasing advertising demand as the effects of the COVID-19 pandemic subside and the related economic recovery progresses, as well as the extent to which changes to the regulatory environment and third-party mobile operating systems and browsers result in limitations on our ad targeting and measurement tools.

240.   The statements in ¶ 239 were materially false and misleading because Meta's advertising revenue success and growth was also due in significant part to Meta's 2018 Jedi Blue Agreement with Google.  The statements in ¶ 239 were also materially misleading because they omitted to disclose the details of this agreement between Meta and Google.

### 4.    July 29, 2021

241.   On July 29, 2021, Meta filed a Quarterly Report on Form 10-Q with the SEC, reporting the Company's financial and operating resulting for the quarter ended June 30, 2021 (the "2Q21 10-Q").  The 2Q21 10-Q stated:

We face significant competition in every aspect of our business, including, but not limited to, companies that facilitate the ability of users to share, communicate, and discover content and information online or enable marketers to reach their existing or prospective audiences, including for example, Google . . . .

242.   The statement in ¶ 241 was materially false and misleading because Meta did not "face significant competition in every aspect of [its] business" in which it purported to compete with Google—Meta had entered an anticompetitive agreement with Google that reduced the competition between them.  The statement in ¶ 241 was also materially misleading because it failed to disclose the details of this agreement between Meta and Google.

243.   In the 2Q21 10-Q, Meta also stated:

*Our advertising revenue can also be adversely affected by a number of other factors, including*:

• decreases in user engagement, including time spent on our products;

• our inability to continue to increase user access to and engagement with our products;

• product changes or inventory management decisions we may make that change the size, format, frequency, or relative prominence of ads displayed on our products or of other unpaid content shared by marketers on our products;

• our inability to maintain or increase marketer demand, the pricing of our ads, or both;

• our inability to maintain or increase the quantity or quality of ads shown to users;

• changes to third-party policies that limit our ability to deliver, target, or measure the effectiveness of advertising, including changes by mobile operating system and browser providers such as Apple and Google;

• adverse government actions or legislative, regulatory, or other legal developments relating to advertising, including developments that may impact our ability to deliver, target, or measure the effectiveness of advertising;

• user behavior or product changes that may reduce traffic to features or products that we successfully monetize, including as a result of increased usage of the Stories format or our messaging products;

• reductions of advertising by marketers due to our efforts to implement or enforce advertising policies that protect the security and integrity of our platform;

• the availability, accuracy, utility, and security of analytics and measurement solutions offered by us or third parties that demonstrate the value of our ads to marketers, or our ability to further improve such tools;

• loss of advertising market share to our competitors, including if prices to purchase our ads increase or if competitors offer lower priced, more integrated, or otherwise more effective products;

• limitations on our ability to operate material portions of our business in Europe as a result of European regulators, courts, or legislative bodies determining that our reliance on SCCs or other legal bases we rely upon to transfer user data from the European Union to the United States is invalid;

• changes in our marketing and sales or other operations that we are required to or elect to make as a result of risks related to complying with foreign laws or regulatory requirements or other government actions;

• decisions by marketers to reduce their advertising as a result of adverse media reports or other negative publicity involving us, our user data practices, our advertising metrics or tools, content on our products, our efforts to implement or enforce policies relating to content on our products (including as a result of decisions or recommendations from the independent Oversight Board), developers with mobile and web applications that are integrated with our products, or other companies in our industry;

• reductions of advertising by marketers due to objectionable content made available on our products by third parties, questions about our user data practices, concerns about brand safety or potential legal liability, or uncertainty regarding their own legal and compliance obligations (for example, a number of marketers announced that they paused advertising with us in July 2020 due to concerns about content on our products);

• the effectiveness of our ad targeting or degree to which users opt out of the use of data for ads, including as a result of product changes and controls that we have implemented or may implement in the future in connection with the GDPR, ePrivacy Directive, California Consumer Privacy Act(CCPA), other laws, regulations, or regulatory actions, or otherwise, that impact our ability to use data for advertising purposes;

AMENDED COMPLAINT (CASE NO. 4:22-cv-01470-YGR)

• the degree to which users cease or reduce the number of times they engage with our ads;

• changes in the way advertising on mobile devices or on personal computers is measured or priced;

• the success of technologies designed to block the display of ads or ad measurement tools;

• changes in the composition of our marketer base or our inability to maintain or grow our marketer base; and

• the impact of macroeconomic conditions, whether in the advertising industry in general, or among specific types of marketers or within particular geographies.

(Emphasis added.)

244.   The statement in ¶ 243 was materially false and misleading because Meta's advertising revenue could also be materially adversely affected by the alteration or termination of Meta's 2018 Jedi Blue Agreement with Google.   The statement in ¶ 243 was also materially misleading because it omitted to disclose the details of this agreement between Meta and Google.

245.   The 2Q21 10-Q also stated:

[M]obile operating system and browser providers, such as Apple and Google, have announced product changes as well as future plans to limit the ability of websites and application developers to collect and use these signals to target and measure advertising.   For example, in April 2021, Apple made certain changes to its products and data use policies in connection with changes to its iOS 14 operating system that reduce our and other iOS developers' ability to target and measure advertising, which may in turn reduce the budgets marketers are willing to commit to us and other advertising platforms.

[. . .]

These developments have limited our ability to target and measure the effectiveness of ads on our platform and negatively impacted our advertising revenue, and *if we are unable to mitigate these developments as they take further effect in the future, our targeting and measurement capabilities will be materially and adversely affected*, which would in turn significantly impact our future advertising revenue growth.

(Emphasis added.)

246.   The statement in ¶ 245 was materially false and misleading because it directly implied that Meta's "targeting and measurement capabilities" had not yet been "materially and adversely affected" by Apple's iOS privacy changes, and that those changes had not yet "significantly impact[ed]" Meta's "advertising revenue growth," when in fact, at the time of the

statement, Meta's "targeting and measurement capabilities" already had been "materially and adversely affected" by Apple's iOS privacy changes, and those changes already had "significantly impact[ed]" Meta's "advertising revenue growth."

247.    In the 2Q21 10-Q, Meta also stated:

> We also may introduce new features or other changes to existing products, or introduce new stand-alone products, that attract users away from properties, formats, or use cases where we have more proven paths of monetization, such as News Feed.  In addition, as we focus on growing users and engagement across our family of products, from time to time *these efforts have reduced, and may in the future reduce, engagement with one or more products and services in favor of other products or services that we monetize less successfully* or that we are not growing as quickly.  *These decisions may adversely affect our business and results of operations* and may not produce the long-term benefits that we expect.

(Emphasis added.)

248.    The statements in ¶ 247 were materially false and misleading—by the time of the statement, Meta's decision to introduce its product Reels, which increased overall user engagement across Meta's Family of Apps but could not be monetized as easily as other products or services, already had, on net, "adversely affect[ed] [Meta's] business and results of operations," so Meta's statement that such an effect was merely possible was misleading.

249.    In the 2Q21 10-Q, Meta also stated:

> Revenue in the three and six months ended June 30, 2021 increased $10.39 billion, or 56%, and $18.83 billion, or 52%, respectively, compared to the same periods in 2020.  The increases were mostly driven by an increase in advertising revenue as a result of increases in both the average price per ad and the number of ads delivered.
>
> During the three and six months ended June 30, 2021, the average price per ad increased by 47% and 39%, respectively, as compared with decreases of approximately 21% and 19%, respectively, in the same periods in 2020.  The increase in average price per ad during the three and six months ended June 30, 2021was mainly caused by a recovery from declines in advertising demand due to the onset of the COVID-19 pandemic in the first two quarters of 2020.  Additionally, overall advertising demand increased, as compared to the same periods in 2020, across our ad products and in all regions in part due to the continued shift of commerce from offline to online.  During the three and six months ended June 30, 2021, the number of ads delivered increased by 6% and 9%, respectively, as compared with an increase of approximately 40% in each of the same periods in 2020.  The increase in the ads delivered was driven by an increase in the number and frequency of ads displayed across our products, and an increase in users. In the near-term, we anticipate that future advertising revenue growth will be determined primarily by price.

AMENDED COMPLAINT (CASE NO. 4:22-cv-01470-YGR)

250.    The statements in ¶ 249 were materially false and misleading because Meta's advertising revenue success and growth was also due in significant part to Meta's 2018 Jedi Blue Agreement with Google.  The statements in ¶ 249 were also materially misleading because they omitted to disclose the details of this agreement between Meta and Google.

### 5.    October 26, 2021

251.    On October 26, Meta filed a Quarterly Report on Form 10-Q with the SEC, reporting the Company's financial and operating resulting for the quarter ended September 30, 2021 (the "3Q21 10-Q").  In the 3Q21 10-Q, Meta stated:

> We face significant competition in every aspect of our business, including, but not limited to, companies that facilitate the ability of users to share, communicate, and discover content and information online or enable marketers to reach their existing or prospective audiences, including for example, Google . . . .

252.    The statement in ¶ 251 was materially false and misleading because Meta did not "face significant competition in every aspect of [its] business" in which it purported to compete with Google—Meta had entered an anticompetitive agreement with Google that reduced the competition between them.  The statement in ¶ 251 was also materially misleading because it omitted to disclose the details of this agreement between Meta and Google.

253.    In the 3Q21 10-Q, Meta also stated:

> *Our advertising revenue can also be adversely affected by a number of other factors, including*:
>
> • decreases in user engagement, including time spent on our products;
>
> • our inability to continue to increase user access to and engagement with our products;
>
> • product changes or inventory management decisions we may make that change the size, format, frequency, or relative prominence of ads displayed on our products or of other unpaid content shared by marketers on our products;
>
> • our inability to maintain or increase marketer demand, the pricing of our ads, or both;
>
> • our inability to maintain or increase the quantity or quality of ads shown to users;
>
> • changes to third-party policies that limit our ability to deliver, target, or measure the effectiveness of advertising, including changes by mobile operating system and browser providers such as Apple and Google;
>
> • adverse government actions or legislative, regulatory, or other legal developments relating to advertising, including developments that may impact our ability to

deliver, target, or measure the effectiveness of advertising;

• user behavior or product changes that may reduce traffic to features or products that we successfully monetize, including as a result of increased usage of the Stories format or our messaging products;

• reductions of advertising by marketers due to our efforts to implement or enforce advertising policies that protect the security and integrity of our platform;

• the availability, accuracy, utility, and security of analytics and measurement solutions offered by us or third parties that demonstrate the value of our ads to marketers, or our ability to further improve such tools;

• loss of advertising market share to our competitors, including if prices to purchase our ads increase or if competitors offer lower priced, more integrated, or otherwise more effective products;

• limitations on our ability to operate material portions of our business in Europe as a result of European regulators, courts, or legislative bodies determining that our reliance on SCCs or other legal bases we rely upon to transfer user data from the European Union to the United States is invalid;

• changes in our marketing and sales or other operations that we are required to or elect to make as a result of risks related to complying with foreign laws or regulatory requirements or other government actions;

• decisions by marketers to reduce their advertising as a result of adverse media reports or other negative publicity involving us, our user data practices, our advertising metrics or tools, content on our products, our efforts to implement or enforce policies relating to content on our products (including as a result of decisions or recommendations from the independent Oversight Board), developers with mobile and web applications that are integrated with our products, or other companies in our industry;

• reductions of advertising by marketers due to objectionable content made available on our products by third parties, questions about our user data practices, concerns about brand safety or potential legal liability, or uncertainty regarding their own legal and compliance obligations (for example, a number of marketers announced that they paused advertising with us in July 2020 due to concerns about content on our products);

• the effectiveness of our ad targeting or degree to which users opt out of the use of data for ads, including as a result of product changes and controls that we have implemented or may implement in the future in connection with the GDPR, ePrivacy Directive, California Consumer Privacy Act(CCPA), other laws, regulations, or regulatory actions, or otherwise, that impact our ability to use data for advertising purposes;

• the degree to which users cease or reduce the number of times they engage with our ads;

• changes in the way advertising on mobile devices or on personal computers is measured or priced;

• the success of technologies designed to block the display of ads or ad

measurement tools;

• changes in the composition of our marketer base or our inability to maintain or grow our marketer base; and

• the impact of macroeconomic conditions, whether in the advertising industry in general, or among specific types of marketers or within particular geographies.

(Emphasis added.)

254.    The statement in ¶ 253 was materially false and misleading because Meta's advertising revenue could also be materially adversely affected by the alteration or termination of Meta's 2018 Jedi Blue Agreement with Google.   The statement in ¶ 253 was also materially misleading because it omitted to disclose the details of this agreement between Meta and Google.

255.    In the 3Q21 10-Q, Meta stated:

Our advertising revenue in the third quarter of 2021 was negatively impacted by marketer reaction to targeting and measurement challenges associated with iOS changes. *If we are unable to mitigate these developments as they take further effect in the future, our targeting and measurement capabilities will be materially and adversely affected, which would in turn significantly impact our future advertising revenue growth.*

(Emphasis added.)

256.    The statements in ¶ 255 were materially false and misleading because they directly implied that Meta's "targeting and measurement capabilities" had not yet been "materially and adversely affected" by Apple's iOS privacy changes, and that those changes had not yet "significantly impact[ed]" Meta's "advertising revenue growth," when in fact, at the time of the statement, Meta's "targeting and measurement capabilities" already had been "materially and adversely affected" by Apple's iOS privacy changes, and those changes already had "significantly impact[ed]" Meta's "advertising revenue growth.

257.    In the 3Q21 10-Q, Meta also stated:

We also may introduce new features or other changes to existing products, or introduce new stand-alone products, that attract users away from properties, formats, or use cases where we have more proven means of monetization, such as News Feed.  In addition, as we focus on growing users and engagement across our family of products, from time to time *these efforts have reduced, and may in the future reduce, engagement with one or more products and services in favor of other products or services that we monetize less successfully* or that we are not growing as quickly.  *These decisions may adversely affect our business and results of operations* and may not produce the long-term benefits that we expect.

1    (Emphasis added.)

2        258.    The statements in ¶ 257 were materially false and misleading—by the time of the

3    statement, Meta's decision to introduce its product Reels, which increased overall user engagement

4    across Meta's Family of Apps but could not be monetized as easily as other products or services,

5    already had, on net, "adversely affect[ed] [Meta's] business and results of operations," so Meta's

6    statement that such an effect was merely possible was misleading.

7        259.    In the 3Q21 10-Q, Meta also stated:

8        Revenue in the three and nine months ended September 30, 2021 increased $7.54
         billion, or 35%, and $26.36 billion, or 46%, respectively, compared to the same
9        periods in 2020.  The increases were mostly driven by an increase in advertising
         revenue as a result of increases in both the average price per ad and the number of
10       ads delivered.

11       During the three and nine months ended September 30, 2021, the average price per
         ad increased by 22% and 32%, respectively, as compared with decreases of
12       approximately 9% and 16%, respectively, in the same periods in 2020.   The
         increase in average price per ad during the three and nine months ended September
13       30, 2021 was mainly caused by a recovery from declines in advertising demand due
         to the onset of the COVID-19 pandemic in 2020.  During the three and nine months
14       ended September 30, 2021, the number of ads delivered increased by 9% in both
         periods as compared with approximately 35% and 38%,respectively, in the same
15       periods in 2020.  The increase in the ads delivered was driven by an increase in
         users and the number and frequency of ads displayed across our products.  We
16       anticipate that future advertising revenue growth will be driven by a combination
         of price and the number of ads delivered.

17
         260.    The statements in ¶ 259 were materially false and misleading because Meta's
18
     advertising revenue success and growth was also due in significant part to Meta's 2018 Jedi Blue
19
     Agreement with Google.  The statements in ¶ 259 were also materially misleading because they
20
     omitted to disclose the details of this agreement between Meta and Google.
21
         **B.      Defendants' False and Misleading Statements in 2022**
22
             **1.      February 3, 2022**
23
         261.    On February 3, 2022, Meta filed an Annual Report on Form 10-K with the SEC,
24
     reporting the Company's financial and operating results for the quarter and year ended December
25
     31, 2021 (the "February 3, 2022 10-K").  The February 3, 2022 10-K stated:
26
         We face significant competition in every aspect of our business, including, but not
27       limited to, companies that facilitate the ability of users to share, communicate, and
         discover content and information online or enable marketers to reach their existing
28       or prospective audiences, including for example, Alphabet . . . .

                                                    74

262.    The statement in ¶ 261 was materially false and misleading because Meta did not "face significant competition in every aspect of [its] business" in which it purported to compete with Alphabet—Meta had entered an anticompetitive agreement with Alphabet (*i.e.*, Google) that reduced the competition between them.   The statement in ¶ 261 was also materially misleading because it omitted to disclose the details of this agreement between Meta and Google.

263.    In the February 3, 2022 10-K, Meta also stated:

*Our advertising revenue can also be adversely affected by a number of other factors, including*:

• decreases in user engagement, including time spent on our products;

• our inability to continue to increase user access to and engagement with our products;

• product changes or inventory management decisions we may make that change the size, format, frequency, or relative prominence of ads displayed on our products or of other unpaid content shared by marketers on our products;

• our inability to maintain or increase marketer demand, the pricing of our ads, or both;

• our inability to maintain or increase the quantity or quality of ads shown to users;

• changes to third-party policies that limit our ability to deliver, target, or measure the effectiveness of advertising, including changes by mobile operating system and browser providers such as Apple and Google;

• adverse government actions or legislative, regulatory, or other legal developments relating to advertising, including developments that may impact our ability to deliver, target, or measure the effectiveness of advertising;

• user behavior or product changes that may reduce traffic to features or products that we successfully monetize, including as a result of increased usage of the Stories format or our messaging products;

• reductions of advertising by marketers due to our efforts to implement or enforce advertising policies that protect the security and integrity of our platform;

• the availability, accuracy, utility, and security of analytics and measurement solutions offered by us or third parties that demonstrate the value of our ads to marketers, or our ability to further improve such tools;

• loss of advertising market share to our competitors, including if prices to purchase our ads increase or if competitors offer lower priced, more integrated, or otherwise more effective products;

• limitations on our ability to operate material portions of our business in Europe as a result of European regulators, courts, or legislative bodies determining that our reliance on SCCs or other legal bases we rely upon to transfer user data from the European Union to the United States is invalid;

• changes in our marketing and sales or other operations that we are required to or elect to make as a result of risks related to complying with foreign laws or regulatory requirements or other government actions;

• decisions by marketers to reduce their advertising as a result of adverse media reports or other negative publicity involving us, our user data practices, our advertising metrics or tools, content on our products, our efforts to implement or enforce policies relating to content on our products (including as a result of decisions or recommendations from the independent Oversight Board), developers with mobile and web applications that are integrated with our products, or other companies in our industry;

• reductions of advertising by marketers due to objectionable content made available on our products by third parties, questions about our user data practices, concerns about brand safety or potential legal liability, or uncertainty regarding their own legal and compliance obligations (for example, a number of marketers announced that they paused advertising with us in July 2020 due to concerns about content on our products);

• the effectiveness of our ad targeting or degree to which users opt out of the use of data for ads, including as a result of product changes and controls that we have implemented or may implement in the future in connection with the GDPR, ePrivacy Directive, California Consumer Privacy Act(CCPA), other laws, regulations, or regulatory actions, or otherwise, that impact our ability to use data for advertising purposes;

• the degree to which users cease or reduce the number of times they engage with our ads;

• changes in the way advertising on mobile devices or on personal computers is measured or priced;

• the success of technologies designed to block the display of ads or ad measurement tools;

• changes in the composition of our marketer base or our inability to maintain or grow our marketer base; and

• the impact of macroeconomic conditions, whether in the advertising industry in general, or among specific types of marketers or within particular geographies.

(Emphasis added.)

264.    The statement in ¶ 263 was materially false and misleading because Meta's advertising revenue could also be materially adversely affected by the alteration or termination of Meta's 2018 Jedi Blue Agreement with Google.   The statement in ¶ 263 was also materially misleading because it omitted to disclose the details of this agreement between Meta and Google.

**2.    April 8, 2022**

265.    On or about April 8, 2022, Meta filed a Proxy Statement on Schedule 14A with the SEC in which the Company included, in a section titled, "Perquisites and Other Benefits," a table presenting the total compensation awarded to, earned by, or paid to each of the named executive officers for services rendered.  In addition to "Salary," "Bonus" and "Stock Awards," the table listed "All Other Compensation" to Defendant Sandberg as $8,981,973, $7,646,560, and $4,370,631 in 2021, 2020, and 2019, respectively, for costs related to personal security for Ms. Sandberg at her residences and during personal travel pursuant to Ms. Sandberg's overall security program; and approximately $2,292,964, $872,413, and $1,316,468 in 2021, 2020, and 2019, respectively, for costs related to personal usage of private aircraft.

266.    The statements in ¶ 265 were materially false and misleading because Defendant Sandberg received significant "Other Benefits" beyond personal security and private aircraft usage throughout the Class Period in the form of personal assistance on personal matters.  The statements in ¶ 265 were also materially misleading because they omitted to state that Defendant Sandberg received significant "Other Benefits" beyond personal security and private aircraft usage throughout the Class Period in the form of personal assistance on personal matters.

**3.    June 1, 2022**

267.    On June 1, 2022, CNBC news anchor Julia Boorstin relayed on 'Closing Bell: Overtime' statements made to her on a phone call that day by Meta COO, Defendant Sheryl Sandberg, in an interview Sandberg knew and intended would be made public:

> She stressed to me this decision is very much about her decision to do something else with her life and to focus on her philanthropy and does not have anything to do with some of the challenges meta is facing right now in terms of the advertising slowdown or some of the regulatory overhang she's had, some of the testimony she's had to do.  This is really because this is a job she's been in for 14 years, she thought she was going to do it for five years.  When I pressed her on some of the challenges the company has been dealing with she said, quote, the job has been the honor and privilege of a lifetime.  It's a job that I love, but it's not a job that you can do and also do other things.  She said she very much wants to focus on helping women, and says this is a time that is more important than ever to focus on helping women both in—something she's been focused on both in the U.S. and around the world.[8]

---

[8] https://www.cnbc.com/video/2022/06/01/sandberg-says-decision-to-leave-about-focusing-on-philanthropy.html.

268.    Sandberg's statements in ¶ 267 were materially false and misleading because Sandberg omitted to state that her leaving was motivated in part by concerns about Meta's internal investigation of her improper use of company resources.

## X.    DUTY TO DISCLOSE ADVERSE FACTS

269.    In addition to Meta's general duty to disclose all material facts necessary in order to make its statements made, in the light of the circumstances under which they were made, not misleading, Meta had additional duties to disclose the adverse facts pleaded in this Complaint.

### A.    Share Repurchase Program

270.    In January 2017, Meta's board of directors commenced a share repurchase program of Meta's Class A common stock that does not have an expiration date.  Meta's board of directors authorized an additional $25 billion in in share repurchases in January 2021 and authorized an additional $50 billion in share repurchases in October 2021.  As a result of this share repurchase program and Meta's active decisions to increase the amounts authorized to be purchased, under SEC Rule 10b5-1, Meta was required to disclose all material information in its possession as of January 2021 and October 2021, and at all other relevant times at which the Company was repurchasing its own shares.  Meta failed to disclose all material adverse information in its possession as pleaded in this Complaint in January 2021 and October 2021, and at all other relevant times during the Class Period.

### B.    Regulation S-K Item 105

271.    Meta's annual and quarterly reports filed with the SEC were subject to the disclosure requirements of Item 105 of Regulation S-K, 17 C.F.R. §229.105, which governs disclosure of risk factors and requires, among other things, that an issuer to "provide under the caption 'Risk Factors' a discussion of the material factors that make [the securities] speculative or risky."

272.    Defendants violated their disclosure duties imposed by Item 105 of Regulation S-K, 17 C.F.R. §229.105 by failing to disclose the material risks that (1) Meta and Google had entered into a critical agreement, the 2018 Jedi Blue Agreement, that either party could terminate if the Companies faced antitrust scrutiny due to the agreement, (2) that Meta faced antitrust scrutiny,

negative publicity, and other negative repercussions from disclosure of the Jedi Blue Agreement. Defendants also violated their disclosure duties imposed by Item 105 of Regulation S-K, 17 C.F.R. §229.105 by failing to disclose the material risk that Defendant Sandberg's use of Company resources for undisclosed personal reasons could become publicly known and result in harms to the Company, including reputational harm and negative publicity.

### C.     Regulation S-K Item 303

273.     Meta's annual and quarterly reports filed with the SEC were subject to the disclosure requirements of Item 303 of Regulation S-K, among other things, that requires disclosure of "any known trends or uncertainties that have had or that are reasonably likely to have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations."  17 C.F.R. § 229.303(b)(2).  Companies must also disclose events that the registrant knows will "cause a material change in the relationship between costs and revenues" and "any unusual or infrequent events or transactions or any significant economic changes that materially affected the amount of reported income from continuing operations and, in each case, indicate the extent to which income was so affected."  17 C.F.R. § 229.303(b)(2).

274.     In violation of Item 303, Meta's annual and quarterly reports during the Class Period failed to disclose the known trend that Meta's effort to direct engagement away from Facebook's "Stories" and elsewhere to its lower-margin "Reels" video function was having a material adverse impact on its business and financial results.  Meta had a duty to disclose these material adverse trends under Item 303 of Regulation S-K, yet failed to do so.

## XI.     LOSS CAUSATION

275.     Defendants' wrongful conduct, as alleged herein, directly and proximately caused the economic loss suffered by Plaintiffs and the Classes.

276.     Class members unknowingly and in reliance upon Defendants' materially false or misleading statements and/or omissions purchased Meta common stock at artificially inflated prices.  But for Defendants' misrepresentations, omissions, and fraudulent scheme, Lead Plaintiffs and other Class members would not have purchased Meta stock at the artificially inflated prices at which it traded during the Class Period.

277.    The price of the Company's securities fell precipitously as the artificial inflation caused by Defendants' unlawful conduct exited Meta's stock price, causing investors' losses.

278.    The declines in Meta's stock price during this period, including the declines summarized below, are directly attributable to the market absorbing information that corrected and/or reflected the materialization of risks concealed by Defendants' material misrepresentations or omissions.

279.    As a result of their purchases of Meta common stock during the Class Period, Lead Plaintiffs and the other Class members suffered economic loss (*i.e.*, damages) under the federal securities laws.  Defendants' materially false and misleading statements had the intended effect and caused Meta common stock to trade at artificially inflated levels throughout the class Period.

280.    By concealing from investors the adverse facts detailed herein, Defendants presented a misleading picture of Meta's business.  As the truth about the Company and the extent of the fraud was revealed to the market, the price of Meta common stock fell significantly.  These declines removed the inflation from Meta common stock, causing real economic loss to investors who had purchased Meta common stock during the Class Period.

281.    Each decline in the price of Meta common stock, as detailed below, was a direct or proximate result of the nature of extent of Defendants' fraudulent misrepresentations and/or omissions being revealed to investors and the market.

282.    The economic loss, *i.e.*, damages, suffered by Lead Plaintiffs and the other Class members was a direct result of Defendants' fraudulent scheme to artificially inflate the price of Meta common stock and the subsequent significant decline in the value of Meta common stock when Defendants' prior misrepresentations and other fraudulent conduct were revealed.

**A.    April 11, 2021**

283.    On April 11, 2021, *The Wall Street Journal* published an article titled, "Google's Secret 'Project Bernanke' Revealed in Texas Antitrust Case."[9]  The article stated that newly released and unredacted documents filed in the Jedi Blue Lawsuit showed that Google ran a secret

---

[9] Jeff Horwitz and Keach Hagey, *Google's Secret 'Project Bernanke' Revealed in Texas Antitrust Case*, The Wall Street Journal (Apr. 11, 2021), available at https://www.wsj.com/articles/googles-secret-project-bernanke-revealed-in-texas-antitrust-case-11618097760.

AMENDED COMPLAINT (CASE NO. 4:22-cv-01470-YGR)

1   project called "Project Bernanke" that relied on bidding data collected from advertisers using its
2   ad exchange to benefit the company's own ad system.  Because Google had exclusive information
3   about what other ad buyers were willing to pay, it could compete against rival ad-buying tools and
4   pay publishers less on its winning bids for ad inventory.  The report revealed additional details
5   about the Jedi Blue deal between Google and Facebook that guaranteed Facebook would both bid
6   in and win a fixed percentage of ad auctions.  The unredacted documents showed that the Jedi Blue
7   Agreement was signed by, among other individuals, Defendant Sandberg.

8   284.   As a direct and proximate result of this partial corrective disclosure and/or
9   materialization of foreseeable risks concealed by Defendants' fraud, the price of Meta common
10  stock fell $2.70 per share, or 0.86% between April 12, 2021 and April 13, 2021 to close at $309.76
11  per share on April 13, 2021.  Specifically, Meta's share price fell $0.92, or 0.29% on April 12,
12  2021, and $1.78 per share, or 0.57% on April 13, 2021

13  **B.    July 28, 2021**

14  285.   On July 28, 2021, Meta held a conference call to discuss its financial results for the
15  second quarter of 2021.  Meta's weak financial results and outlook were a partial materialization
16  of the concealed risks that the Company's business was being adversely affected by its transition
17  of user engagement from News Feed and Stories to Reels and that Apple's iOS privacy changes
18  were materially affecting the Company's operations.

19  286.   As a direct and proximate result of this partial corrective disclosure and/or
20  materialization of foreseeable risks concealed by Defendants' fraud, the price of Meta common
21  stock fell $14.96 per share, or 4.01%, to close at $358.32 per share on July 29, 2021.

22  **C.    October 25, 2021**

23  287.   On October 25, 2021, Meta held a conference call to discuss its financial results for
24  the third quarter of 2021.  Meta's weak financial results and outlook were a partial materialization
25  of the concealed risks that the Company's business was being adversely affected by its transition
26  of user engagement from News Feed and Stories to Reels and that Apple's iOS privacy changes
27  were materially affecting the Company's operations.

28

288.    As a direct and proximate result of this partial corrective disclosure and/or materialization of foreseeable risks concealed by Defendants' fraud, the price of Meta common stock fell $12.88 per share, or 3.92%, to close at $315.81 per share on October 26, 2021.

**D.    January 18, 2022**

289.    On January 14, 2022, *The New York Times* published an article titled, "Google Chief Executive Signed Off on Deal at Center of Antitrust Case, States Say."[10]  The article revealed information from a newly unredacted portion of the Jedi Blue Lawsuit, and stated that Sundar Pichai, Google's chief executive since "personally signed off on the terms of the deal."

290.    Another newly public portion of the document quotes a February 2017 "Facebook document" that says Google wanted to "kill" the competing system and that Facebook "baptizing their product will help significantly."  Facebook employees working on the deal emailed Defendant Zuckerberg, saying, "We're nearly ready to sign and need your approval to move forward."  Zuckerberg's name was redacted from the lawsuit, but his title was not.

291.    As a direct and proximate result of this partial corrective disclosure and/or materialization of foreseeable risks concealed by Defendants' fraud, the price of Meta common stock fell $13.75 per share, or 4.14%, to close at $318.15 per share on January 18, 2022.

**E.    February 2, 3, 4, 7 & 8, 2022**

292.    On February 2, 2022, Meta released weak Q4 2021 financial results and provided disappointing 2022 revenue guidance.  During the related earnings call, Defendants revealed that Apple's iOS privacy changes were materially and adversely impacting Meta's advertising business.  Defendant Wehner stated that "we believe the impact of iOS overall as a headwind on our business in 2022 is on the order of $10 billion, so it's a pretty significant  headwind for our business."  Defendant Zuckerberg stated that "we're rebuilding a lot of our ads infrastructure so we can continue to grow and deliver high-quality personalized ads."  Defendants also attributed its weak results and guidance were due in part to the adverse impact of its transition of user engagement from News Feed and Stories to Reels.

---

[10] David McCabe, *Google Chief Executive Signed Off on Deal at Center of Antitrust Case, States Say*, The New York Times (Jan. 14, 2022), available at https://www.nytimes.com/2022/01/14/technology/sundar-pichai-google-facebook-antitrust.html.

AMENDED COMPLAINT (CASE NO. 4:22-cv-01470-YGR)

293.    As a direct and proximate result of this news and other similar stories, risks or truth concealed by, or effects associated with Meta's fraud were revealed, or materialized, and as a result, the price of Meta common stock Meta's stock collapsed $102.82 per share between February 3 and February 8, 2022, wiping out over 31% of Meta's market capitalization and devastating Plaintiffs and the proposed Class, to close at $220.18 per share on February 8, 2022. Specifically, Meta's share price fell $85.24, or 26.39% on February 3, 2022, $0.67, or 0.28% on February 4, 2022, $12.18, or 5.14% on February 7, 2022, and $4.73, or 2.1% on February 8, 2022.

### F.    March 11, 2022

294.    On March 11, 2022, the European Commission issued a press release titled, "Antitrust: Commission Opens Investigation into Possible Anticompetitive Conduct by Google and Meta, in Online Display Advertising."[11]  In that release, the European Commission announced that it had opened a formal investigation to assess whether the Jedi Blue Agreement may have breached European Union competition rules.

295.    As a direct and proximate result of this partial corrective disclosure and/or materialization of foreseeable risks concealed by Defendants' fraud, the price of Meta common stock fell $7.60 per share, or 3.89%, to close at $187.61 per share on March 11, 2022.

### G.    April 20, 2022

296.    On April 20, 2022, Cleveland Research released an analysis indicating that current-quarter business had tanked based on a slowdown in e-commerce efforts due to iOS privacy changes and low adoption of Reels and a breakdown in targeting share loss to rivals such as TikTok.[12]

297.    As a direct and proximate result of this partial corrective disclosure and/or materialization of foreseeable risks concealed by Defendants' fraud, the price of Meta common stock fell $16.89 per share, or 7.77%, to close at $200.42 per share on April 20, 2021.

---

[11] Press Release, European Commission, Antitrust: Commission Opens Investigation into Possible Anticompetitive Conduct by Google and Meta, in Online Display Advertising (Mar. 11, 2022), available at https://ec.europa.eu/commission/presscorner/detail/en/ip_22_1703.

[12] Jason Aycock, *Meta Platforms Slides as Firm's Checks Say Current Quarter Slowing Worse than Q1*, Seeking Alpha (Apr. 20, 2022), available at https://seekingalpha.com/news/3824854-meta-platforms-slides-as-firms-checks-say-current-quarter-slowing-worse-than-q1.

**H.    April 21, 2022**

298.    On April 21, 2022, *The Wall Street Journal* published an article titled, "Meta's Sheryl Sandberg Pressured Daily Mail to Drop Bobby Kotick Reporting."[13]  In that article, it was reported that Defendant Sandberg "is facing internal scrutiny over two occasions in which she pressed a U.K. tabloid to shelve a potential article about her then-boyfriend, Activision Blizzard Inc. Chief Executive Bobby Kotick."

299.    As a direct and proximate result of this partial corrective disclosure and/or materialization of foreseeable risks concealed by Defendants' fraud, the price of Meta common stock fell $12.35 per share, or 6.16%, to close at $188.07 per share on April 21, 2021.

**I.    June 1, 2022**

300.    On May 28, 2022, Sheryl Sandberg informed Meta of her decision to resign from her position as Chief Operating Officer of the Company after a transition period.

301.    As a direct and proximate result of this partial corrective disclosure and/or materialization of foreseeable risks concealed by Defendants' fraud, the price of Meta common stock fell $6.49 per share, or 3.34%, to close at $188.64 per share on June 1, 2021.

**J.    June 10, 2022**

302.    On June 10, 2022, *The Wall Street Journal* published an article titled, "Meta Scrutinizing Sheryl Sandberg's Use of Facebook Resources Over Several Years."

303.    As a direct and proximate result of this partial corrective disclosure and/or materialization of foreseeable risks concealed by Defendants' fraud, the price of Meta common stock fell $8.43 per share, or 4.58%, to close at $175.57 per share on June 10, 2022.

**XII.    ADDITIONAL SCIENTER ALLEGATIONS**

304.    The Individual Defendants acted with scienter in that they knew or recklessly disregarded that the public statements listed in Part IX *supra*, were materially misleading when made, and knowingly or recklessly participated or acquiesced in the issuance or dissemination of

---

[13] Ben Fritz, Keach Hagey, Kirsten Grind and Emily Glazer, *Meta's Sheryl Sandberg Pressured Daily Mail to Drop Bobby Kotick Reporting,* The Wall Street Journal (Apr. 21, 2022), available at https://www.wsj.com/articles/sandberg-facebook-kotick-activision-blizzard-daily-mail-11650549074.

1    such statements.  In addition to the facts alleged above, Defendants' scienter is further evidenced

2    by the following facts.

3            **A.**      **Defendants Zuckerberg and Sandberg Discussed, and Defendant Sandberg**

4                       **Signed, the 2018 "Jedi Blue" Agreement with Google**

5          305.    Defendants Zuckerberg and Sandberg knew that Meta did not face significant

6    competition from Google in every aspect of their business that overlapped because they knew that

7    Meta entered the Company's 2018 Jedi Blue Agreement with Google not to introduce header

8    bidding in exchange for sharing in the benefits of Google's monopoly in the ad server and other

9    markets.  As explained above, Defendant Sandberg personally helped negotiate the Jedi Blue

10   Agreement with Google.  She personally discussed the deal with Defendant Zuckerberg and urged

11   him to approve it because she felt it was "a big deal strategically."  The team that negotiated the

12   deal sent Zuckerberg an email telling him, "We're nearly ready to sign and need your approval to

13   move forward."  Defendant Zuckerberg personally approved, and Defendant Sandberg personally

14   signed, the 2018 Jedi Blue Agreement.

15         306.    Defendants Zuckerberg and Sandberg's knowledge may be imputed to Meta.

16           **B.**      **Defendant Sandberg Knew About Her Personal Use of Company Resources**

17         307.    Defendant Sandberg knew that she was receiving personal benefits from Meta other

18   than those disclosed in the Company's annual proxy filings with the SEC because Defendant

19   Sandberg knew about her own actions.  As explained above, Defendant Sandberg personally

20   directed employees and used company resources to help her plan her wedding, write her personal

21   book, assist with her personal foundation, and kill an unflattering news story about her ex-

22   boyfriend.

23         308.    Defendant Sandberg's knowledge may be imputed to Meta.

24

25

26

27

28

AMENDED COMPLAINT (CASE NO. 4:22-cv-01470-YGR)

**C.**   **The Company, Including Defendant CFO Wehner, Repeatedly Informed Investors that the Impact of Apple's iOS Changes Were in Line with the Company's Expectations**

309.   Even before the introduction of Apple's iOS privacy changes, Meta noted that it would calculate the impact of Apple's iOS privacy changes on its business.  Speaking at the 2021 Morgan Stanley Technology, Media and Telecom Conference, Defendant Wehner stated:

> We're going to be watching when this actually launches, we expect it to be in Q1, so later in March.  And then there's going to be the question of what's the pace of upgrades to iOS 14, which is a little bit more known because we're able to sort of monitor the pace of other updates in the past.  We'll obviously looking at what the opt-in rates are there.

310.   After the introduction of Apple's iOS privacy changes, at multiple points during the Class Period, Defendants assured investors that the impact of Apple's iOS privacy changes was in line with the Company's expectations, as detailed below.  Accordingly, the Company repeatedly admitted that it had conducted internal studies calculating the impact of Apple's iOS privacy changes on Meta's business.  Moreover, Meta's CFO Wehner was clearly aware of these studies and their results because he commented on them repeatedly and referred to them to assure investors that the impact of Apple's iOS privacy changes on Meta's business was in line with the Company's expectations.

311.   On July 28, 2021, Meta held a conference call with investors to discuss the Company's financial results for the second quarter of 2021.  On that call, Defendant Wehner, Meta's CFO, assured investors that "the impact from the ATT changes [have] really generally been in line with [Meta's] expectations."

312.   On a July 28, 2021 follow-up call to the July 28, 2021 conference call, Defendant Li stated:

> I think the impact of ATT has been really quite close on almost all of the dimensions that we look at when we think about kind of the iOS adoption curve, the impact post opt-out to ARPU.  Those have all been quite similar to the early projections that we had that we kind of had factored into our Q1 and Q2 guidance.  So I think – so that's really been pretty constant.

313.   On October 25, 2021, Meta held a follow-up conference call with investors to discuss the Company's financial results for the third quarter of 2021.  On that follow-up call,

Defendant Li assured investors that "We had a range of expected impact from the ATT changes and ultimately what we've seen is in that range but it's really on the higher end of what we had expected."

314.   On February 2, 2022, Meta held a conference call with investors to discuss the Company's financial results for the fourth quarter of 2021.  On that call, Defendant Wehner stated:

> On iOS 14, we saw the revenue impact with iOS 14—sorry, iOS just in general, in Q4, and that was in line with our expectations and similar to the Q3 headwind. [. . .] And we believe the impact of iOS overall as a headwind on our business in 2022 is on the order of $10 billion, so it's a pretty significant headwind for our business.

315.   Defendants Wehner and Li's knowledge may be imputed to Meta.

316.   Moreover, as explained above, *supra* Part VII, FE1 has confirmed that Meta began to see a material drop in revenue due to the iOS privacy changes in the second quarter of 2021, and that Defendants were aware of this drop.  According to FE1, Meta learned about the planned iOS privacy changes in late 2019, about six to eight months before Apple announced them publicly in June 2020.  FE1 was tasked with writing a brief detailing the planned iOS privacy changes and the anticipated revenue implications on Meta's advertising with Apple, Google, Intel, Microsoft, and other tech accounts.  This brief, titled approximately "Impact of iOS 14" (the "iOS Brief") in the form of a Google Doc, was likely sent to Defendant Sandberg and VP, Global Business Group, Carolyn Everson.  The iOS Brief was transmitted via email to VP, Global Marketing Solutions, Nada Stirratt.  The iOS Brief was rolled up into a larger brief on the anticipated impact of the iOS privacy changes.  FE1 confirmed that Meta began to see a material drop in revenue due to the iOS privacy changes in the second quarter of 2021.  Among other issues, the iOS Brief discussed the "ideas of which advertisers would be dropping spend."  Meta's "signal match" rates for advertisers—or the rate at which its computers were able to match users and look for similar users—were projected to decrease by about 65% due to the iOS privacy changes.

**D.    Defendants Repeatedly Discussed the Impact of the Transition to Reels on User Engagement and Incorporated the Impact of the Transition into the Company's Guidance**

317.    For instance, on October 25, 2021, Meta held a conference call with investors to discuss its financial results from the third quarter of 2021.  On that call, in response to an analyst question, Defendant Wehner stated, in relevant part:

> Whenever we launch new experiences, this was true with Stories, it was true with Facebook Watch.  It's – you're always going to see some amount of shifting of people's time and attention to the new areas.

> And we do think that, that benefits the experience overall, and we think that makes the overall experience more engaging over time.  And we do think that it's -- we're able to with Reels drive incremental engagement with Instagram and Facebook.  So that's why we're investing to do that.

318.    Defendants made similar statements demonstrating their knowledge of the impact of the Company's transition to Reels on user engagement throughout the Class Period.   On February 2, 2022, Defendant Wehner reassured investors that "As the engagement of the new thing starts to replace some of the engagement in the old thing, it creates a near-term headwind for revenue, but it's not – that part, at this point, now is not that big of a concern for us."  On the same call, Defendant Zuckerberg acknowledged, "[W]e think it's definitely the right thing to lean into this and to push us hard to grow Reels as quickly as possible and not hold on the brakes at all, even though it may create some near-term slower growth than we would have wanted."

319.    Defendants' repeated assurances to investors that the focus on Reels did not negatively impact the Company's business and results of operations demonstrate that they either knew that Meta's focus on Reels was cannibalizing its revenue from Stories or were reckless in not knowing.  In either scenario, there is a strong inference that Defendants made these statements with scienter.

**E.    Defendants Wehner and Zuckerberg Enriched Themselves Through Large Sales of Inflated Meta Stock During the Class Period**

320.    Defendant Wehner made numerous large sales of shares during the Class Period.  Some of these sales were made pursuant to a Section 10b5-1 plan, but some were not.

321.    On May 15, 2021, Defendant Wehner sold 12,316 shares of Meta stock for $3,891,117.04, and on August 15, 2021, Defendant Wehner sold 12,319 shares of Meta stock for $4,474,014.42.  These sales of shares were not made pursuant to a Section 10b5-1 plan.

322.    Defendant Wehner made numerous large sales of shares during the Class Period pursuant to a Section 10b5-1 plan.  On March 19, 2021, Defendant Wehner sold 678 shares of Meta Stock for $196,613.22; on May 19, 2021, Defendant Wehner sold 9,607 shares of Meta stock for $2,918,894.81; on August 18, 2021, Defendant Wehner sold 9,607 shares of Meta stock for $3,421,052.70; on November 15, 2021, Defendant Wehner sold 14,658 shares of Meta stock for $4,996,765.62; on November 17, 2021, Defendant Wehner sold 9,607 shares of Meta stock for $3,306,921.54; on February 25, 2022, Defendant Wehner sold 13,304 shares of Meta stock for $2,896,280.80; on May 15, 2022, Defendant Wehner sold 14,778 shares of Meta stock for $2,935,206.36.

323.    Defendant Zuckerberg also made numerous large sales of shares during the Class Period pursuant to a Section 10b5-1 plan, as reflected in the following table.

| Date of Sale | Shares Sold | Proceeds |
| --- | --- | --- |
| January 29, 2021 | 47,362 | $12,936,842.84 |
| January 29, 2021 | 44,750 | $11,579,796.22 |
| February 1, 2021 | 44,750 | $11,647,785.10 |
| February 2, 2021 | 44,750 | $11,947,830.06 |
| February 3, 2021 | 44,750 | $11,947,957.80 |
| February 4, 2021 | 44,750 | $11,883,484.40 |
| February 5, 2021 | 44,750 | $11,989,295.23 |
| February 8, 2021 | 44,750 | $11,932,220.17 |
| February 9, 2021 | 44,750 | $12,095,888.67 |
| February 10, 2021 | 44,750 | $12,102,762.19 |
| February 11, 2021 | 44,750 | $12,093,091.50 |
| February 12, 2021 | 44,750 | $12,061,176.83 |
| February 16, 2021 | 47,344 | $12,983,756.95 |
| February 17, 2021 | 44,750 | $12,178,443.24 |
| February 18, 2021 | 44,750 | $12,016,940.80 |
| February 19, 2021 | 44,750 | $11,806,557.90 |
| February 22, 2021 | 44,750 | $11,661,237.94 |
| February 23, 2021 | 44,750 | $11,763,440.35 |

| Date of Sale | Shares Sold | Proceeds |
|---|---|---|
| February 24, 2021 | 44,750 | $11,773,202.36 |
| February 25, 2021 | 44,750 | $11,633,753.16 |
| February 26, 2021 | 44,750 | $11,696,783.74 |
| March 1, 2021 | 44,750 | $11,713,716.78 |
| March 2, 2021 | 44,750 | $11,805,009.41 |
| March 3, 2021 | 44,750 | $11,529,102.63 |
| March 4, 2021 | 44,750 | $11,595,421.37 |
| March 5, 2021 | 44,750 | $11,646,588.97 |
| March 8, 2021 | 44,750 | $11,674,799.15 |
| March 9, 2021 | 44,750 | $11,863,109.41 |
| March 10, 2021 | 44,750 | $11,879,490.78 |
| March 11, 2021 | 44,750 | $14,272,953.41 |
| March 12, 2021 | 51,996 | $11,934,267.39 |
| March 15, 2021 | 44,750 | $12,478,905.89 |
| March 16, 2021 | 45,758 | $15,730,615.23 |
| March 17, 2021 | 56,250 | $15,774,768.69 |
| March 18, 2021 | 56,250 | $15,854,537.47 |
| March 19, 2021 | 56,250 | $16,211,639.34 |
| March 22, 2021 | 56,250 | $16,582,017.28 |
| March 23, 2021 | 56,250 | $16,548,102.47 |
| March 24, 2021 | 56,250 | $16,151,719.12 |
| March 25, 2021 | 56,250 | $15,844,767.73 |
| March 26, 2021 | 56,250 | $15,818,023.42 |
| March 29, 2021 | 56,250 | $16,254,648.84 |
| March 30, 2021 | 56,250 | $16,285,539.98 |
| March 31, 2021 | 56,250 | $16,540,762.86 |
| April 1, 2021 | 56,250 | $17,638,267.37 |
| April 5, 2021 | 56,250 | $20,892,848.99 |
| April 6, 2021 | 68,000 | $20,911,789.34 |
| April 7, 2021 | 68,000 | $21,129,604.43 |
| April 8, 2021 | 68,000 | $21,232,454.13 |
| April 9, 2021 | 68,000 | $21,237,941.36 |
| April 12, 2021 | 68,000 | $21,104,420.54 |
| April 13, 2021 | 68,000 | $21,220,529.55 |
| April 14, 2021 | 68,000 | $20,699,826.01 |
| April 15, 2021 | 68,000 | $20,923,741.28 |
| April 16, 2021 | 68,000 | $20,797,111.60 |
| April 19, 2021 | 68,000 | $20,615,521.35 |
| April 20, 2021 | 68,000 | $20,460,656.70 |
| April 21, 2021 | 68,000 | $20,380,646.27 |

AMENDED COMPLAINT (CASE NO. 4:22-cv-01470-YGR)

| Date of Sale | Shares Sold | Proceeds |
|---|---|---|
| April 22, 2021 | 68,000 | $19,260,533.22 |
| April 23, 2021 | 68,000 | $20,402,129.22 |
| April 26, 2021 | 68,000 | $20,618,045.95 |
| April 27, 2021 | 68,000 | $20,664,414.12 |
| April 28, 2021 | 68,000 | $20,922,191.19 |
| April 29, 2021 | 68,000 | $22,212,641.39 |
| April 30, 2021 | 68,000 | $22,194,434.02 |
| May 3, 2021 | 68,000 | $22,041,304.96 |
| May 4, 2021 | 68,000 | $21,478,801.18 |
| May 5, 2021 | 68,000 | $21,599,402.10 |
| May 6, 2021 | 68,000 | $21,546,300.97 |
| May 7, 2021 | 68,000 | $21,800,070.22 |
| May 10, 2021 | 68,000 | $20,944,130.02 |
| May 11, 2021 | 68,000 | $20,680,413.42 |
| May 12, 2021 | 68,000 | $15,910,033.27 |
| May 13, 2021 | 52,700 | $16,115,475.45 |
| May 14, 2021 | 52,700 | $16,115,475.45 |
| May 17, 2021 | 52,700 | $16,115,475.45 |
| May 18, 2021 | 52,700 | $16,537,923.65 |
| May 19, 2021 | 52,700 | $16,325,477.32 |
| May 20, 2021 | 52,700 | $16,727,893.78 |
| May 22, 2021 | 52,700 | $16,745,628.23 |
| May 24, 2021 | 52,700 | $17,075,451.90 |
| May 25, 2021 | 52,700 | $17,259,170.81 |
| May 27, 2021 | 52,700 | $25,547,588.86 |
| May 28, 2021 | 77,300 | $24,781,661.91 |
| June 1, 2021 | 74,969 | $21,968,296.44 |
| June 2, 2021 | 66,698 | $20,805,115.31 |
| June 3, 2021 | 63,105 | $17,166,889.43 |
| June 4, 2021 | 52,700 | $25,519,371.82 |
| June 7, 2021 | 77,300 | $25,809,033.87 |
| June 8, 2021 | 77,300 | $25,844,452.85 |
| June 9, 2021 | 77,300 | $25,751,791.30 |
| June 11, 2021 | 77,300 | $25,556,561.25 |
| June 14, 2021 | 77,300 | $25,859,314.17 |
| June 15, 2021 | 77,300 | $26,045,687.37 |
| June 16, 2021 | 77,300 | $25,785,054.07 |
| June 17, 2021 | 77,300 | $25,908,126.40 |
| June 18, 2021 | 77,300 | $25,693,696.04 |
| June 21, 2021 | 77,300 | $25,604,218.80 |

AMENDED COMPLAINT (CASE NO. 4:22-cv-01470-YGR)

| Date of Sale | Shares Sold | Proceeds |
|---|---|---|
| June 22, 2021 | 77,300 | $25,937,189.61 |
| June 23, 2021 | 77,300 | $26,364,791.37 |
| June 24, 2021 | 77,300 | $26,544,351.16 |
| June 25, 2021 | 77,300 | $26,381,954.13 |
| June 28, 2021 | 77,300 | $26,706,486.44 |
| June 29, 2021 | 77,300 | $27,183,121.70 |
| June 30, 2021 | 77,300 | $26,965,074.33 |
| July 1, 2021 | 77,300 | $27,115,236.20 |
| July 1, 2021 | 77,300 | $27,115,236.20 |
| July 2, 2021 | 77,300 | $27,379,308.72 |
| July 6, 2021 | 77,300 | $27,291,290.63 |
| July 7, 2021 | 77,300 | $27,244,245.68 |
| July 8, 2021 | 77,300 | $26,705,088.81 |
| July 9, 2021 | 77,300 | $26,985,777.86 |
| July 12, 2021 | 77,300 | $27,240,485.70 |
| July 13, 2021 | 77,300 | $27,256,801.78 |
| July 14, 2021 | 77,300 | $27,013,527.85 |
| July 15, 2021 | 77,300 | $26,530,463.92 |
| July 16, 2021 | 77,300 | $26,433,022.35 |
| July 19, 2021 | 77,300 | $26,021,528.94 |
| July 20, 2021 | 77,300 | $26,280,526.26 |
| July 21, 2021 | 77,300 | $26,603,801.48 |
| July 22, 2021 | 77,300 | $26,970,400.94 |
| July 23, 2021 | 77,300 | $28,460,717.22 |
| July 26, 2021 | 77,300 | $28,749,062.00 |
| July 27, 2021 | 77,300 | $28,425,545.90 |
| July 28, 2021 | 77,300 | $28,806,889.16 |
| July 29, 2021 | 77,300 | $27,781,778.27 |
| July 30, 2021 | 77,300 | $27,584,969.16 |
| August 2, 2021 | 77,300 | $27,336,443.49 |
| August 3, 2021 | 77,300 | $27,094,394.11 |
| August 4, 2021 | 77,300 | $27,559,554.69 |
| August 5, 2021 | 77,300 | $27,901,120.39 |
| August 6, 2021 | 77,300 | $28,061,842.57 |
| August 9, 2021 | 77,300 | $28,012,575.69 |
| August 10, 2021 | 77,300 | $27,924,368.70 |
| August 11, 2021 | 77,300 | $27,811,431.47 |
| August 12, 2021 | 77,300 | $27,899,521.22 |
| August 13, 2021 | 77,300 | $28,055,444.35 |
| August 16, 2021 | 77,300 | $28,040,786.83 |

AMENDED COMPLAINT (CASE NO. 4:22-cv-01470-YGR)

| Date of Sale | Shares Sold | Proceeds |
|---|---|---|
| August 17, 2021 | 77,300 | $27,831,934.42 |
| August 18, 2021 | 77,300 | $27,649,962.12 |
| August 19, 2021 | 77,300 | $27,437,913.27 |
| August 20, 2021 | 77,300 | $27,631,268.37 |
| August 23, 2021 | 77,300 | $28,116,050.77 |
| August 24, 2021 | 77,300 | $28,279,314.23 |
| August 25, 2021 | 77,300 | $28,481,505.70 |
| August 26, 2021 | 77,300 | $28,336,002.62 |
| August 27, 2021 | 77,300 | $28,654,250.95 |
| August 30, 2021 | 77,300 | $29,140,613.59 |
| August 31, 2021 | 77,300 | $29,389,616.86 |
| September 1, 2021 | 77,300 | $29,554,786.08 |
| September 2, 2021 | 77,300 | $29,109,543.64 |
| September 3, 2021 | 77,300 | $29,060,321.51 |
| September 7, 2021 | 77,300 | $29,314,864.56 |
| September 8, 2021 | 77,300 | $29,201,420.60 |
| September 9, 2021 | 77,300 | $29,256,984.46 |
| September 10, 2021 | 77,300 | $29,452,176.16 |
| September 13, 2021 | 77,300 | $29,097,526.18 |
| September 14, 2021 | 77,300 | $29,123,394.97 |
| September 15, 2021 | 77,300 | $28,718,138.50 |
| September 16, 2021 | 77,300 | $28,710,870.73 |
| September 17, 2021 | 77,300 | $28,358,185.27 |
| September 20, 2021 | 77,300 | $27,429,824.62 |
| September 21, 2021 | 77,300 | $27,659,845.90 |
| September 22, 2021 | 77,300 | $26,617,528.74 |
| September 23, 2021 | 77,300 | $26,791,961.32 |
| September 24, 2021 | 77,300 | $27,020,502.83 |
| September 27, 2021 | 77,300 | $27,178,122.65 |
| September 28, 2021 | 77,300 | $26,450,043.37 |
| September 29, 2021 | 77,300 | $26,393,921.66 |
| September 30, 2021 | 77,300 | $26,355,062.62 |
| October 1, 2021 | 77,300 | $26,485,561.69 |
| October 4, 2021 | 59,304 | $19,432,978.01 |
| October 5, 2021 | 77,300 | $25,662,554.37 |
| October 6, 2021 | 77,300 | $25,615,269.71 |
| October 7, 2021 | 75,761 | $25,336,767.34 |
| October 8, 2021 | 77,193 | $25,575,759.38 |
| October 11, 2021 | 57,750 | $18,965,663.28 |
| October 12, 2021 | 52,700 | $16,910,332.16 |

AMENDED COMPLAINT (CASE NO. 4:22-cv-01470-YGR)

| Date of Sale | Shares Sold | Proceeds |
|---|---|---|
| October 13, 2021 | 52,700 | $17,119,525.57 |
| October 14, 2021 | 52,900 | $17,378,799.52 |
| October 15, 2021 | 52,700 | $17,107,556.77 |
| October 18, 2021 | 77,300 | $25,742,220.21 |
| October 19, 2021 | 77,300 | $26,265,666.14 |
| October 20, 2021 | 77,300 | $26,356,574.10 |
| October 21, 2021 | 77,300 | $26,359,469.94 |
| October 22, 2021 | 52,700 | $17,054,088.37 |
| October 25, 2021 | 52,700 | $17,127,111.08 |
| October 26, 2021 | 52,900 | $16,868,158.95 |
| October 27, 2021 | 52,700 | $16,595,838.18 |
| October 28, 2021 | 52,700 | $29,976,377.99 |
| October 29, 2021 | 52,700 | $17,046,369.58 |
| November 1, 2021 | 72,046 | $23,822,465.25 |
| November 2, 2021 | 61,070 | $20,092,499.51 |
| November 3, 2021 | 77,300 | $25,463,481.92 |
| November 4, 2021 | 77,300 | $25,910,066.12 |
| November 5, 2021 | 77,300 | $26,447,294.47 |
| November 8, 2021 | 77,300 | $26,366,705.35 |

324.    Defendant Zuckerberg's aggregate stock sales during the 498-day Class Period were $1,592,871,008.49, while during the 498 days prior to the Class Period, his aggregate stock sales were $1,208,777,115.27.   Accordingly, Defendant Zuckerberg increased his stock sales during the Class Period.

F.    **Core Operations**

1.    **Meta's 2018 Jedi Blue Agreement with Google Concerned Its Core Operation**

325.    As explained above, Meta's core operations concern the sale of ads:  Meta's sales of ads accounted for substantially all of Meta's revenue and operating profits throughout the Class Period.  Indeed, the Company admitted in its public earnings reports, "We generate substantially all of our revenue from advertising."  During the Class Period, ad sales were responsible for 98% of Meta's operating profits.

326.    Meta's 2018 Jedi Blue Agreement concerned these core operations.  Meta's 2018 Jedi Blue Agreement with Google gave Meta preferential rates and priority choice of prime ad

placements in return for the Company's supporting Google's ad system and not using header bidding.

327.    As Meta's ad sales were Meta's core operations, the Individual Defendants, and through them Meta, would have had robust knowledge of how Meta's agreement with Google provided Defendants with preferential rates and priority choice of prime ad placements to boost those sales, and knew about or recklessly disregarded that Meta was obligated to disclose its anticompetitive agreement with Google.  Indeed, Defendants Zuckerberg and Sandberg personally discussed and approved the 2018 Jedi Blue Agreement, as explained above.

### 2.    Apple's iOS Changes Directly Affected Meta's Core Operations.

328.    As Meta's sales of ads accounted for substantially all of Meta's revenue and operating profits throughout the Class Period, Apple's iOS privacy changes directly affected Meta's core operations.

329.    The Company admitted as much throughout the Class Period.  For example, in the Company's 2Q 2021 Form 10-Q, the Company explained:

> Our advertising revenue is dependent on targeting and measurement tools that incorporate data signals from user activity on websites and services that we do not control, and changes to the regulatory environment, third-party mobile operating systems and browsers, and our own products have impacted, and we expect will continue to impact, the availability of such signals, which will adversely affect our advertising revenue.

330.    Because Meta's ad sales were part of Meta's core operations, the Individual Defendants, and through them Meta, would have had robust knowledge of the impact of Apple iOS privacy changes on those sales, and knew about or recklessly disregarded the negative impact Apple's iOS privacy changes would have on the Company's operations.

### 3.    Meta's Transition to Reels Directly Affected Its Core Operations.

331.    Similarly, Meta's transition to Reels directly affected Meta's core operations because it directly impacted the revenue Meta received from its sale of ads, which accounts for substantially all of Meta's revenue and operating profits throughout the Class Period.  As explained above, Meta's transition to Reels increased user engagement, but shifted user attention from older platforms, like News Feed and Stories, with higher per-hour ad impression rate, to Reels, which

1  had a lower per-hour ad impression rate.  This shift directly affected Meta's ad sales—Meta's core

2  operations.

3       332.  Because Meta's ad sales were part of Meta's core operations, the Individual

4  Defendants, and through them Meta, would have had robust knowledge of how Meta's transition

5  to Reels directly affected those sales, and knew about or recklessly disregarded that Reels was

6  cannibalizing its revenue from Stories.

7  **XIII.   CLASS ACTION ALLEGATIONS**

8       333.  Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil

9  Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise

10  acquired Sunrun securities publicly traded on the NASDAQ during the Class Period (the "Class"),

11  and were damaged upon the revelation of the alleged corrective disclosure.  Excluded from the

12  Class are Defendants, the officers and directors of the Company, at all relevant times, members of

13  their immediate families and their legal representatives, heirs, successors or assigns and any entity

14  in which Defendants have or had a controlling interest.

15       334.  The members of the Class are so numerous that joinder of all members is

16  impracticable.  Throughout the Class Period, Meta securities were actively traded on the

17  NASDAQ.  While the exact number of Class members is unknown to Plaintiffs at this time and

18  can be ascertained only through appropriate discovery, Plaintiffs believe that there are hundreds

19  or thousands of members in the proposed Class.  Record owners and other members of the Class

20  may be identified from records maintained by the Company or its transfer agent and may be

21  notified of the pendency of this action by mail, using the form of notice similar to that customarily

22  used in securities class actions.

23       335.  Plaintiffs' claims are typical of the claims of the members of the Class as all

24  members of the Class are similarly affected by Defendants' wrongful conduct in violation of

25  federal law that is complained of herein.

26       336.  Plaintiffs will fairly and adequately protect the interests of the members of the Class

27  and have retained counsel competent and experienced in class and securities litigation.  Plaintiffs

28  have no interests antagonistic to or in conflict with those of the Class.

337.   Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

- •   whether the federal securities laws were violated by Defendants' acts as alleged in this Complaint;

- •   whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the financial condition, business, operations, and management of the Company;

- •   whether Defendants' public statements to the investing public during the Class Period omitted material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading;

- •   whether the Individual Defendants caused the Company to issue false and misleading SEC filings and public statements during the Class Period;

- •   whether Defendants acted knowingly or recklessly in issuing false and misleading SEC filings and public statements during the Class Period;

- •   whether the prices of Meta securities during the Class Period were artificially inflated because of the Defendants' conduct alleged in this Complaint; and

- •   whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

338.   A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

339.   Plaintiffs will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

- •   Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

97

1    •    the omissions and misrepresentations were material;

2    •    Meta securities are traded in efficient markets;

3    •    the Company's securities were liquid and traded with moderate to heavy volume

4         during the Class Period;

5    •    the Company traded on the NASDAQ, and was covered by multiple analysts;

6    •    the misrepresentations and omissions alleged would tend to induce a reasonable

7         investor to misjudge the value of the Company's securities; and

8    •    Plaintiffs and members of the Class purchased and/or sold Meta securities between

9         the time the Defendants failed to disclose or misrepresented material facts and the

10        time the true facts were disclosed, without knowledge of the omitted or

11        misrepresented facts.

12        340.    Based upon the foregoing, Plaintiffs and the members of the Class are entitled to a

13   presumption of reliance upon the integrity of the market.

14        341.    Alternatively, Plaintiffs and the members of the Class are entitled to the

15   presumption of reliance established by the *Supreme Court in Affiliated Ute Citizens of the State of*

16   *Utah v. United States*, 406 U.S. 128, 92 S. Ct. 2430 (1972), as Defendants omitted material

17   information in their Class Period statements in violation of a duty to disclose such information, as

18   detailed above.

19   **XIV.    NO SAFE HARBOR**

20        342.    The statutory safe harbor provided for forward-looking statements under certain

21   circumstances does not apply to any of the allegedly false statements pleaded in this Complaint.

22   The statements alleged to be false and misleading herein all relate to then-existing facts and

23   conditions.   In addition, to the extent certain of the statements alleged to be false may be

24   characterized as forward looking, they were not identified as "forward-looking statements" when

25   made, and there were no meaningful cautionary statements identifying important factors that could

26   cause actual results to differ materially from those in the purportedly forward-looking statements.

27   In the alternative, to the extent that the statutory safe harbor is determined to apply to any forward-

28   looking statements pleaded herein, Defendants are liable for those false forward-looking

1    statements because at the time each of those forward-looking statements was made, the speaker

2    had actual knowledge that the forward-looking statement was materially false or misleading,

3    and/or the forward-looking statement was authorized or approved by an executive officer of Meta

4    who knew that the statement was false when made.

5    **XV.    COUNT ONE**

6    **For Violation of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated**

7    **Thereunder (Against All Defendants)**

8        343.    Plaintiffs repeat and reallege each and every allegation contained above as if fully

9    set forth herein.

10       344.    This Count is asserted against the Company and the Individual Defendants and is

11   based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated

12   thereunder by the SEC.

13       345.    During the Class Period, the Company and the Individual Defendants, individually

14   and in concert, directly or indirectly, disseminated or approved the false statements specified

15   above, which they knew or deliberately disregarded were misleading in that they contained

16   misrepresentations and failed to disclose material facts necessary in order to make the statements

17   made, in light of the circumstances under which they were made, not misleading.

18       346.    The Company and the Individual Defendants violated §10(b) of the 1934 Act and

19   Rule 10b-5 in that they:

20       •       employed devices, schemes and artifices to defraud;

21       •       made untrue statements of material facts or omitted to state material facts necessary

22               in order to make the statements made, in light of the circumstances under which

23               they were made, not misleading; or

24       •       engaged in acts, practices and a course of business that operated as a fraud or deceit

25               upon Plaintiffs and others similarly situated in connection with their purchases of

26               Sunrun securities during the Class Period.

27       347.    The Company and the Individual Defendants acted with scienter in that they knew

28   that the public documents and statements issued or disseminated in the name of the Company were

99

AMENDED COMPLAINT (CASE NO. 4:22-cv-01470-YGR)

1   materially false and misleading; knew that such statements or documents would be issued or
2   disseminated to the investing public; and knowingly and substantially participated or acquiesced
3   in the issuance or dissemination of such statements or documents as primary violations of the
4   securities laws.  These Defendants by virtue of their receipt of information reflecting the true facts
5   of the Company, their control over, and/or receipt and/or modification of the Company's allegedly
6   materially misleading statements, and/or their associations with the Company which made them
7   privy to confidential proprietary information concerning the Company, participated in the
8   fraudulent scheme alleged herein.

9       348.   Individual Defendants, who are the senior officers and/or directors of the Company,
10  had actual knowledge of the material omissions and/or the falsity of the material statements set
11  forth above, and intended to deceive Plaintiffs and the other members of the Class, or, in the
12  alternative, acted with reckless disregard for the truth when they failed to ascertain and disclose
13  the true facts in the statements made by them or other personnel of the Company to members of
14  the investing public, including Plaintiffs and the Class.

15      349.   As a result of the foregoing, the market price of Meta securities was artificially
16  inflated during the Class Period.  In ignorance of the falsity of the Company's and the Individual
17  Defendants' statements, Plaintiffs and the other members of the Class relied on the statements
18  described above and/or the integrity of the market price of Sunrun securities during the Class
19  Period in purchasing Meta securities at prices that were artificially inflated as a result of the
20  Company's and the Individual Defendants' false and misleading statements.

21      350.   Had Plaintiffs and the other members of the Class been aware that the market price
22  of Meta securities had been artificially and falsely inflated by the Company's and the Individual
23  Defendants' misleading statements and by the material adverse information which the Company's
24  and the Individual Defendants did not disclose, they would not have purchased Sunrun securities
25  at the artificially inflated prices that they did, or at all.

26      351.   As a result of the wrongful conduct alleged herein, Plaintiffs and other members of
27  the Class have suffered damages in an amount to be established at trial.

28

352.    By reason of the foregoing, the Company and the Individual Defendants have violated Section 10(b) of the 1934 Act and Rule 10b-5 promulgated thereunder and are liable to the Plaintiffs and the other members of the Class for substantial damages which they suffered in connection with their purchases of Sunrun securities during the Class Period.

## XVI.   COUNT TWO

**For Violation of Section 20(a) of the Exchange Act (Against the Individual Defendants)**

353.    Plaintiffs repeat and reallege each and every allegation above as if fully set forth herein.

354.    During the Class Period, the Individual Defendants participated in the operation and management of the Company, and conducted and participated, directly and indirectly, in the conduct of the Company's business affairs.  Because of their senior positions, they knew the adverse non-public information regarding the Company's business practices.

355.    As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to the Company's financial condition and results of operations, and to correct promptly any public statements issued by the Company which had become materially false or misleading.

356.    Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which the Company disseminated in the marketplace during the Class Period. Throughout the Class Period, the Individual Defendants exercised their power and authority to cause the Company to engage in the wrongful acts complained of herein.  The Individual Defendants, therefore, were "controlling persons" of the Company within the meaning of Section 20(a) of the Exchange Act.  In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of Sunrun securities.

357.    Each of the Individual Defendants, therefore, acted as a controlling person of the Company.  By reason of their senior management positions and/or being directors of the Company, each of the Individual Defendants had the power to direct the actions of, and exercised the same to cause, the Company to engage in the unlawful acts and conduct complained of herein.  Each of

the Individual Defendants exercised control over the general operations of the Company and possessed the power to control the specific activities which comprise the primary violations about which Plaintiffs and the other members of the Class complain.

358.    By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by the Company.

**XVII.  COUNT THREE**

**For Violations of Section 14(a)of the Securities Exchange Act of 1934 and SEC Rule 14a–9**

**(Against All Defendants)**

359.    Plaintiffs repeat and re allege each and every allegation contained in the foregoing paragraphs as if fully set forth herein, except the allegations in those subsections specified to relate solely to Plaintiffs' claims under Section 10(b) and 20(a) of the Exchange Act.

360.    This claim does not sound in fraud.  For the purposes of this claim, Plaintiffs expressly exclude and disclaim any allegation that could be construed as alleging or sounding in fraud or intentional or reckless misconduct.  This claim is based solely on negligence.

361.    This claim is brought against all Defendants pursuant to Section 14(a) of the Exchange Act (15 U.S.C. § 78n(a)) and Rule 14a 9 promulgated thereunder (17 C.F.R. § 240.14a 9), on behalf of all shareholders of Meta who held shares of Meta Class A common stock as of April 9, 2021 or April 8, 2022 and were entitled to vote at the Meta annual shareholders meeting on either May 26, 2021 or May 25, 2022.

362.    Defendants' statements issued to solicit shareholder approval of the election of directors and of the compensation of named executive officers, including the April 9, 2021 and April 8, 2022 Proxy Statements, and the documents incorporated therein, contained statements that, at the time and in light of the circumstances under which they were made, were false and misleading with respect to material facts, and omitted to state material facts necessary in order to make the statements therein not false or misleading.

363.    Defendants named in this Count were required to, but did not accurately, update these statements between dissemination of these documents and the shareholder votes on May 26, 2021 and May 25, 2022.

1    364.    Defendants named in this Count, jointly and severally, solicited and/or permitted

2    use of their names in solicitations contained in the Proxy Statements and other proxy solicitation

3    materials.

4    365.    By means of the Proxy Statements and documents attached thereto or incorporated

5    by reference therein and other proxy solicitation materials, Defendants sought to secure Plaintiffs'

6    and other Class members' approval of the election of directors and of the compensation of named

7    executive officers, including Sheryl Sandberg, and solicited proxies from Plaintiffs and other

8    members of the Class.

9    366.    Each Defendant named in this Count acted negligently in making inaccurate

10   statements of material facts, and/or omitting material facts required to be stated in order to make

11   those statements not misleading.  Defendants were required to ensure that the April 9, 2021 and

12   April 8, 2022 Proxy Statements and all other proxy solicitation materials fully and fairly disclosed

13   all material facts to allow an investor to make an informed investment decision.  These Defendants

14   also acted negligently in failing to update the April 9, 2021 and April 8, 2022 Proxy Statements.

15   367.    The solicitations described herein were essential links in the accomplishment of the

16   election of directors and of the compensation of named executive officers, including Sheryl

17   Sandberg.

18   368.    Plaintiffs and other members of the Class eligible to vote on the election of directors

19   and the compensation of named executive officers, including Sheryl Sandberg, were misled by

20   Defendants' false and misleading statements and omissions, were denied the opportunity to make

21   a fully informed decision in voting on the election of directors and the compensation of named

22   executive officers and were damaged as a direct and proximate result of the untrue statements and

23   omissions set forth herein.

24   369.    The false and misleading statements and omissions in the April 9, 2021 and April

25   8, 2022 Proxy Statements and other proxy solicitation materials are material in that a reasonable

26   stockholder would consider them important in deciding how to vote on the election of directors

27   and the compensation of named executive officers.  In addition, a reasonable investor would view

28   a full and accurate disclosure as significantly altering the total mix of information made available

in the April 9, 2021 and April 8, 2022 Proxy Statements, additional proxy solicitation materials, and in other information reasonably available to stockholders.

370. The untrue statements and omissions as set forth above proximately caused foreseeable losses to Plaintiffs and other members of the Class.

371. This claim is brought within the applicable statute of limitations.

372. By reason of the foregoing, the Defendants violated Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a), and Rule 14a 9 promulgated thereunder, 17 C.F.R. § 240.14a 9.

## XVIII. COUNT FOUR

### For Violations of Section 20(a) of the Exchange Act in Connection with the Proxy Claims

### (Against the Individual Defendants)

373. Plaintiffs repeat and re allege each and every allegation contained in the foregoing paragraphs as if fully set forth herein, except the allegations in those subsections specified to relate solely to Plaintiffs' claims under Section 10(b) and 20(a) of the Exchange Act.

374. This claim does not sound in fraud. For the purposes of this claim, Plaintiffs expressly exclude and disclaim any allegation that could be construed as alleging or sounding in fraud or intentional or reckless misconduct. This claim is based solely on negligence.

375. This Count is asserted against the Individual Defendants and is based upon Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a).

376. The Individual Defendants acted as controlling persons of Meta within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their high-level positions and their ownership and contractual rights, participation in, and/or awareness of the Company's operations and intimate knowledge of the false financial statements filed by the Company with the SEC and disseminated to the investing public, the Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which Plaintiffs contend are false and misleading. The Individual Defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public filings, and other statements

1    alleged by Plaintiffs to be misleading prior to and/or shortly after these statements were issued and

2    had the ability to prevent the issuance of the statements or cause the statements to be corrected.

3          377.    In particular, the Individual Defendants had direct and supervisory involvement in

4    the day-to-day operations of the Company and, therefore, had the power to control or influence

5    the particular transactions giving rise to the securities violations as alleged herein, and exercised

6    the same.  The Individual Defendants also signed the April 9, 2021 and April 8, 2022 Proxy

7    Statements, and solicited approval of the election of directors and the compensation of named

8    executive officers, including Sheryl Sandberg.

9          378.    As set forth above, Meta and the Individual Defendants each violated Section 14(a)

10   of the Exchange Act, 15 U.S.C. § 78n(a), and Rule 14a-9 promulgated thereunder, 17 C.F.R.

11   § 240.14a-9 by their acts and omissions as alleged in this Complaint.  By virtue of their position

12   as controlling persons, the Individual Defendants are liable pursuant to Section 20(a) of the

13   Exchange Act.  As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs and

14   other members of the Class suffered damages in connection with their purchases of the Company's

15   securities during the Class Period.

16         379.    The solicitations described herein were essential links in the accomplishment of the

17   election of directors and the compensation of named executive officers, including Sheryl

18   Sandberg.

19         380.    Plaintiffs and other members of the Class eligible to vote on the election of directors

20   and the compensation of named executive officers, including Sheryl Sandberg were misled by

21   Defendants' false and misleading statements and omissions, were denied the opportunity to make

22   a fully informed decision in voting on the election of directors and the compensation of named

23   executive officers and were damaged as a direct and proximate result of the untrue statements and

24   omissions set forth herein.

25         381.    The false and misleading statements and omissions in the April 9, 2021 and April

26   8, 2022 Proxy Statements and other proxy solicitation materials are material in that a reasonable

27   stockholder would consider them important in deciding how to vote on the election of directors

28   and the compensation of named executive officers, including Sheryl Sandberg.  In addition, a

reasonable investor would view a full and accurate disclosure as significantly altering the total mix of information made available in the April 9, 2021 and April 8, 2022 Proxy Statements, additional proxy solicitation materials, and in other information reasonably available to stockholders.

382. The untrue statements and omissions as set forth above proximately caused foreseeable losses to Plaintiffs and other members of the Class.

383. This claim is brought within the applicable statute of limitations.

384. By reason of the foregoing, the Individual Defendants violated Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a).

## XIX.   PRAYER FOR RELIEF

385. WHEREFORE, Plaintiffs demands judgment against Defendants as follows:

A.   Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiffs as the Class representatives;

B.   Requiring Defendants to pay damages sustained by Plaintiffs and the Class by reason of the acts and transactions alleged in this Complaint;

C.   Awarding Plaintiffs and the other members of the Class prejudgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

D.   Awarding such other and further relief as this Court may deem just and proper.

## XX.   JURY DEMAND

386. Plaintiffs hereby demand a trial by jury in this Action.

Dated:  August 2, 2022

Respectfully submitted,

**POMERANTZ LLP**

*/s/ Jeremy A. Lieberman*
Jeremy A. Lieberman (admitted *pro hac vice*)
Austin P. Van (admitted *pro hac vice*)
600 Third Avenue, 20th Floor
New York, New York 10016
Telephone:  (212) 661-1100
Facsimile:  (917) 463-1044
E-mail:  jalieberman@pomlaw.com

1                                   avan@pomlaw.com

2                                   Jennifer Pafiti (SBN 282790)

3                                   1100 Glendon Avenue, 15th Floor
Los Angeles, California  90024

4                                   Telephone:  (310) 405 7190
Facsimile:  (917) 463 1044

5                                   jpafiti@pomlaw.com

6                                   Orly Guy
Eitan Lavie

7                                   HaShahar Tower
Ariel Sharon 4, 34th Floor

8                                   Givatayim, Israel 5320047
Telephone: +972 (0) 3 624 0240

9                                   Facsimile: +972 (0) 3 624 0111
E-mail:  oguy@pomlaw.com

10                                 eitan@pomlaw.com

11                                 *Attorneys for Lead Plaintiffs*

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

AMENDED COMPLAINT (CASE NO. 4:22-cv-01470-YGR)

1

## CERTIFICATE OF SERVICE

2       I, Austin P. Van, hereby certify that a true and correct duplicate copy of the foregoing

3   Amended Class Action Complaint for Violations of the Federal Securities Laws was filed

4   electronically on August 2, 2022.  Notice of this filing will be sent by e-mail to all parties by

5   operation of the Court's electronic filing system or by mail to anyone unable to accept electronic

6   filing as indicated on the Notice of Electronic Filing.  Parties may access this filing through the

7   Court's CM/ECF System.

8                                       */s/ Austin P. Van*

9                                       Austin P. Van

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

AMENDED COMPLAINT (CASE NO. 4:22-cv-01470-YGR)