LATHAM & WATKINS LLP
Elizabeth L. Deeley (CA Bar No. 230798)
 elizabeth.deeley@lw.com
Melanie M. Blunschi (CA Bar No. 234264)
 melanie.blunschi@lw.com
Nicholas Rosellini (CA Bar No. 316080)
 nick.rosellini@lw.com
505 Montgomery Street, Suite 2000
San Francisco, CA 94111
Telephone: +1.415.391.0600

Andrew B. Clubok (*pro hac vice*)
 andrew.clubok@lw.com
Susan E. Engel (*pro hac vice*)
 susan.engel@lw.com
555 Eleventh Street, N.W., Suite 1000
Washington, D.C. 20004-1304
Telephone: +1.202.637.2200

*Attorneys for Defendants Meta Platforms, Inc., Mark Zuckerberg, David Wehner, and Sheryl Sandberg*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### OAKLAND DIVISION

PLUMBERS AND STEAMFITTERS
LOCAL 60 PENSION TRUST, Individually
and on Behalf of All Others Similarly
Situated,

                                 Plaintiffs,

        v.

META PLATFORMS, INC., MARK
ZUCKERBERG, DAVID WEHNER, and
SHERYL SANDBERG,

                                 Defendants.

Case No. 4:22-cv-01470-YGR

**DEFENDANTS' NOTICE OF MOTION AND MOTION TO DISMISS THE AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT**

Date:   February 28, 2023
Time:   2:00 p.m.
Court:  Courtroom 1, 4th Floor
Judge:  Hon. Yvonne Gonzalez Rogers

LATHAM&WATKINSLLP
ATTORNEYS AT LAW
SAN FRANCISCO

DEFENDANTS' MOT. TO DISMISS AM.
COMPLAINT
CASE NO. 4:22-cv-01470-YGR

## NOTICE OF MOTION AND MOTION TO DISMISS

**TO PLAINTIFFS AND TO THEIR ATTORNEYS OF RECORD:**

PLEASE TAKE NOTICE that on February 28, 2023, at 2:00 p.m. in Courtroom 1 of the United States District Court for the Northern District of California, located at 1301 Clay Street, Oakland, California, Defendants Meta Platform, Inc. ("Meta"), Mark Zuckerberg, David Wehner, and Sheryl Sandberg ("Individual Defendants," collectively with Meta "Defendants") will and hereby do move for an order dismissing Plaintiffs' Amended Complaint for Violations of the Federal Securities Laws ("AC"), Dkt. 55. Plaintiffs have already voluntarily dismissed all claims alleged against Susan Li. Dkt. 59.

This motion is made pursuant to Federal Rules of Civil Procedure 8(a), 9(b), 12(b)(1), and 12(b)(6), on the grounds that each of the causes of action in the AC fails to state a claim as a matter of law.

This motion is based on this Notice of Motion and Motion to Dismiss, the Memorandum of Points and Authorities, Defendants' Request for Judicial Notice, and the declaration of Melanie M. Blunschi enclosed therewith, the pleadings and papers on file in this action, the arguments of counsel, and any other matter that the Court may properly consider.

### STATEMENT OF RELIEF SOUGHT

Meta seeks an order pursuant to Federal Rule of Civil Procedure 12(b)(6) dismissing this action for failure to state a claim upon which relief can be granted.

DATED:  October 18, 2022

LATHAM & WATKINS LLP

By:  /s/ *Andrew B. Clubok*
  Andrew B. Clubok (*pro hac vice*)
   andrew.clubok@lw.com
  Susan E. Engel (*pro hac vice*)
   susan.engel@lw.com
  555 Eleventh Street, N.W., Suite 1000
  Washington, D.C. 20004-1304
  Telephone: +1.202.637.2200

  Elizabeth L. Deeley (CA Bar No. 230798)
   elizabeth.deeley@lw.com
  Melanie M. Blunschi (CA Bar No. 234264)
   melanie.blunschi@lw.com

Nicholas Rosellini (CA Bar No. 316080)
 nick.rosellini@lw.com
505 Montgomery Street, Suite 2000
San Francisco, CA 94111
Telephone: +1.415.391.0600

*Attorneys for Defendants Meta Platforms, Inc.,*
*Mark Zuckerberg, David Wehner, and Sheryl*
*Sandberg*

DEFENDANTS' MOT. TO DISMISS AM.
COMPLAINT
CASE NO. 4:22-cv-01470-YGR

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

## **TABLE OF CONTENTS**

I.     INTRODUCTION ..................................................................................................... 1

II.    BACKGROUND ...................................................................................................... 3

    A.    Legal Background ....................................................................................... 3

        1.    Claims Under Section 10(b) And Rule 10b-5 .................................. 3
        2.    Claims Under Section 14(a) And Rule 14a-9 ................................. 5

    B.    Factual Background .................................................................................... 6

        1.    Allegations Related To The Antitrust Suit Against Google ............. 6
        2.    Allegations Related To iOS Privacy Changes ................................. 8
        3.    Allegations Related To The Reels Introduction ............................... 9
        4.    Allegations Related To Sandberg's Conduct .................................. 11

III.   LEGAL STANDARD .............................................................................................. 12

IV.   ARGUMENT ........................................................................................................ 12

    A.    The Antitrust-Related Allegations Must Be Dismissed .......................... 13

        1.    Plaintiffs Fail To Plead A False Or Misleading Statement ............ 13
        2.    These Allegations Have A Fundamental Timing Problem .............. 15
        3.    Plaintiffs Also Fail To Plead A Predicate Antitrust
            Violation ....................................................................................... 16

    B.    The Allegations About iOS Privacy Changes Must Be Dismissed .......... 16

        1.    Plaintiffs Fail To Plead A False Or Misleading Statement ............ 16
        2.    Plaintiffs Fail To Plead Loss Causation ........................................ 18

    C.    The Allegations About The Reels Introduction Must Be Dismissed ........ 19

        1.    Plaintiffs Fail To Plead A False Or Misleading Statement ............ 19
        2.    Plaintiffs Fail To Plead Loss Causation ........................................ 20

    D.    The Allegations About Sandberg's Conduct Must Be Dismissed ........... 20

        1.    Plaintiffs' Section 14(a) Claim Fails ............................................. 20
        2.    Plaintiffs' Section 10(b) Claim Fails ............................................ 22

    E.    There Is No Strong Inference Of Scienter ............................................... 22

        1.    Plaintiffs Have No Cogent Theory Of Scienter ............................. 23
        2.    Plaintiffs' Formulaic Scienter Allegations Are
            Unconvincing ............................................................................... 24

V.    CONCLUSION ..................................................................................................... 25

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

i

DEFENDANTS' MOT. TO DISMISS AM.
COMPLAINT
CASE NO. 4:22-cv-01470-YGR

1

## TABLE OF AUTHORITIES

2

**Page(s)**

3

**CASES**

4

*In re Apollo Grp. Inc. Sec. Litig.,*

5
   509 F. Supp. 2d 837 (D. Ariz. 2007) .........................................................................5

6

*Basic Inc. v. Levinson,*
   485 U.S. 224 (1988) ........................................................................................................3

7

8

*In re BofI Holding, Inc. Sec. Litig.,*
   977 F.3d 781 (9th Cir. 2020) ...........................................................................4, 5, 15, 20

9

*In re Bristol-Myers Squibb Sec. Litig.,*

10
   312 F. Supp. 2d 549 (S.D.N.Y. 2004) ...................................................................23

11

*Brody v. Transitional Hosps. Corp.,*
   280 F.3d 997 (9th Cir. 2002) ...................................................................4, 13, 14

12

*City of Miami Fire Fighters' & Police Officers' Ret. Tr. v. CVS Health Corp.,*

13
   46 F.4th 22 (1st Cir. 2022) ...........................................................................14

14

*In re Convergent Techs. Sec. Litig.,*

15
   948 F.2d 507 (9th Cir. 1991) ...........................................................................17

16

*Costabile v. Natus Med. Inc.,*
   293 F. Supp. 3d 994 (N.D. Cal. 2018) ...................................................................15

17

*Cowin v. Bresler,*

18
   741 F.2d 410 (D.C. Cir. 1984) ...........................................................................5, 21

19

*Desaigoudar v. Meyercord,*

20
   223 F.3d 1020 (9th Cir. 2000) ...........................................................................5, 21, 22

21

*Doyun Kim v. Advanced Micro Devices, Inc.,*
   2019 WL 2232545 (N.D. Cal. May 23, 2019) ...................................................................22

22

*Dura Pharms., Inc. v. Broudo,*

23
   544 U.S. 336 (2005) ........................................................................................................3

24

*Eclectic Properties E., LLC v. Marcus & Millichap Co.,*

25
   751 F.3d 990 (9th Cir. 2014) ...........................................................................22

26

*Edward J. Goodman Life Income Tr. v. Jabil Cir., Inc.,*
   594 F.3d 783 (11th Cir. 2010) ...........................................................................6, 21

27

*In re Eventbrite, Inc. Sec. Litig.,*

28
   2020 WL 2042078 (N.D. Cal. Apr. 28, 2020) ...................................................................18

LATHAM&WATKINSᴸᴸᴾ
ATTORNEYS AT LAW
SAN FRANCISCO

ii

DEFENDANTS' MOT. TO DISMISS AM.
COMPLAINT
CASE NO. 4:22-cv-01470-YGR

*In re Facebook Inc. Sec. Litig.*,
   405 F. Supp. 3d 809 (N.D. Cal. 2019) ...................................................................................16

*In re Facebook, Inc. Sec. Litig.*,
   477 F. Supp. 3d 980 (N.D. Cal. 2020) ...................................................................................13

*Gamm v. Sanderson Farms, Inc.*,
   944 F.3d 455 (2d Cir. 2019) ...................................................................................................16

*Gen. Elec. Co. by Levit v. Cathcart*,
   980 F.2d 927 (3d Cir. 1992) ...................................................................................................21

*Golub v. Gigamon Inc.*,
   372 F. Supp. 3d 1033 (N.D. Cal. 2019) .................................................................................21

*Grigsby v. BofI Holding, Inc.*,
   979 F.3d 1198 (9th Cir. 2020) ..........................................................................................5, 15

*High Tek USA, Inc. v. Heat & Control, Inc.*,
   2012 WL 2979051 (N.D. Cal. July 18, 2012) ........................................................................16

*Hulliung v. Bolen*,
   548 F. Supp. 2d 336 (N.D. Tex. 2008) .................................................................................21

*Jasin v. Vivus, Inc.*,
   2016 WL 1570164 (N.D. Cal. Apr. 19, 2016) .......................................................................15

*Kelley v. Rambus, Inc.*,
   384 F. App'x 570 (9th Cir. 2010) ..........................................................................................21

*Knollenberg v. Harmonic, Inc.*,
   152 F. App'x 674 (9th Cir. 2005) ..........................................................................................21

*Lloyd v. CVB Fin. Corp.*,
   811 F.3d 1200 (9th Cir. 2016) .....................................................................................4, 5, 15

*Loos v. Immersion Corp.*,
   762 F.3d 880 (9th Cir. 2014) .................................................................................................15

*Macomb Cnty. Employees' Ret. Sys. v. Align Tech., Inc.*,
   39 F.4th 1092 (9th Cir. 2022) ..................................................................................................4

*Maguire Fin., LP v. PowerSecure Int'l, Inc.*,
   876 F.3d 541 (4th Cir. 2017) ...................................................................................................5

*Mauss v. Nuvavsive, Inc.*,
   2014 WL 6980441 (S.D. Cal. Dec. 9, 2014)..........................................................................16

*McGovney v. Aerohive Networks*,
   367 F. Supp. 3d 1038 (N.D. Cal. 2019) ................................................................17, 19, 20

LATHAM & WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

iii

DEFENDANTS' MOT. TO DISMISS AM.
COMPLAINT
CASE NO. 4:22-cv-01470-YGR

*Metzler Inv. GMBH v. Corinthian Colleges, Inc.*,
  540 F.3d 1049 (9th Cir. 2008) ...........................................................................23

*Nguyen v. Endologix, Inc.*,
  962 F.3d 405 (9th Cir. 2020) ..................................................................5, 23, 24

*In re NVIDIA Corp. Sec. Litig.*,
  768 F.3d 1046 (9th Cir. 2014) .............................................................4, 5, 23, 24

*Or. Pub. Emps. Ret. Fund v. Apollo Grp. Inc.*,
  774 F.3d 598 (9th Cir. 2014) .............................................................4, 12, 13, 18

*In re Oracle Corp. Sec. Litig.*,
  627 F.3d 376 (9th Cir. 2010) ...........................................................................24

*In re Paypal Holdings, Inc. S'holder Deri. Litig.*,
  2018 WL 466527 (N.D. Cal. Jan. 18, 2018) .....................................................5, 21

*Plumber & Steamfitters Local 773 Pension Fund v. Danske Bank A/s*,
  11 F.4th 90 (2d Cir. 2021) ...........................................................................15, 16

*Plumley v. Sempra Energy*,
  847 F. App'x 426 (9th Cir. 2021) ......................................................................24

*Police Ret. Sys. of St. Louis v. Intuitive Surgical, Inc.*,
  759 F.3d 1051 (9th Cir. 2014) ..........................................................................13

*Prodanova v. H.C. Wainwright & Co., LLC*,
  993 F.3d 1097 (9th Cir. 2021) ............................................................................5

*In re Rigel Pharms., Inc. Sec. Litig.*,
  697 F.3d 869 (9th Cir. 2012) .......................................................................12, 24

*Ronconi v. Larkin*,
  253 F.3d 423 (9th Cir. 2001) ......................................................................4, 20, 23

*Rubke v. Capitol Bancorp Ltd*,
  551 F.3d 1156 (9th Cir. 2009) ....................................................................4, 15, 22

*In re Silicon Graphics Inc. Sec. Litig.*,
  183 F.3d 970 (9th Cir. 1999), *superseded by statute on other grounds as recognized in In re Quality Sys., Inc. Sec. Litig.*, 865 F.3d 1130 (9th Cir. 2017)..................18

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
  551 U.S. 308 (2007).................................................................................12, 22, 23

*Thant v. Karyopharm Therapeutics Inc.*,
  43 F.4th 214 (1st Cir. 2022).............................................................................13

LATHAM&WATKINSᴸᴸᴾ
ATTORNEYS AT LAW
SAN FRANCISCO

iv

DEFENDANTS' MOT. TO DISMISS AM.
COMPLAINT
CASE NO. 4:22-cv-01470-YGR

*United States v. Alexander*,
    725 F.3d 1117 (9th Cir. 2013) ...................................................................................14

*Weston Family Partnership LLLP v. Twitter, Inc.*,
    29 F.4th 611 (9th Cir. 2022) ....................................................................4, 12, 14, 21

*Yates v. Mun. Mortg. & Equity, LLC*,
    744 F.3d 874 (4th Cir. 2014) ....................................................................................25

*Zucco Partners, LLC v. Digimarc Corp.*,
    552 F.3d 981 (9th Cir. 2009) ................................................................3, 5, 23, 25

## STATUTES

15 U.S.C. § 78j(b) ..............................................................................................................3

15 U.S.C. § 78n(a) .............................................................................................................3

15 U.S.C. § 78u-4(b)(1)(B) ..............................................................................................12

15 U.S.C. § 78u-4(b)(2)(A) .........................................................................................12, 22

## RULES

Fed. R. Civ. P. 8(a) ..........................................................................................................22

Fed. R. Civ. P. 9(b) .........................................................................................12, 16, 21, 22

## REGULATIONS

17 C.F.R. § 240.10b-5 ......................................................................................................3, 4

17 C.F.R. § 240.14a-9 ........................................................................................................3

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

v

DEFENDANTS' MOT. TO DISMISS AM.
COMPLAINT
CASE NO. 4:22-cv-01470-YGR

1  **MEMORANDUM OF POINTS AND AUTHORITIES**

2  **I.    INTRODUCTION**

3      Plaintiffs' Amended Complaint ("AC") pivots from their initial fraud theories and launches

4  scattershot attacks on 23 different statements across four distinct areas.  Considered individually

5  or as a whole, none of Plaintiffs' attacks states any claim for securities fraud.

6      On February 2, 2022, Defendant Meta Platforms, Inc. announced that—for the first time in

7  nearly two decades—its number of daily active users had declined from a prior quarter.  The

8  Company also announced that it expected revenue headwinds and forecasted lower revenue *growth*

9  than expected for 2022.  That day, Meta's stock price fell by more than 25%, reducing its market

10  capitalization by some $200 billion.  Disappointed investors promptly sued Meta, its CEO Mark

11  Zuckerberg, CFO David Wehner, and COO Sheryl Sandberg.[1]  The initial complaint claimed that

12  Defendants made a dozen misleading statements, but Plaintiffs have now abandoned those

13  challenges.  Instead, the AC assails all-new statements and cobbles together four sets of factual

14  allegations—relating to an allegedly anticompetitive agreement with Google, the impact of

15  Apple's iOS privacy changes, the impact of Meta's introduction of a new video product called

16  Reels, and Sandberg's compensation disclosures.  The disconnected nature of the allegations

17  makes clear that Plaintiffs have no theory that states any claim under the securities laws.  The fact

18  of a stock drop may show that some disclosed (and obvious) risks of doing business materialized—

19  including that user growth would not forever continue its historical upward climb.  But that only

20  confirms the truth of Meta's disclosures; it does not state a claim for securities fraud.

21      Three sets of allegations assert claims solely under Section 10(b) of the Securities and

22  Exchange Act of 1934.  The first alleges that Defendants misled investors about a supposedly

23  anticompetitive agreement with Google.  But Plaintiffs copy-and-pasted their allegations from an

24  antitrust complaint filed against Google (not Meta) by a group of state Attorneys General, led by

25  the Texas Attorney General.  The Southern District of New York has since ***dismissed*** that

26  complaint in all relevant parts.  And even apart from that dismissal, Plaintiffs still fail to state a

27

28  _____

[1] Plaintiffs initially named as a defendant Susan Li, who is currently Meta's VP of Finance, but on October 4, 2022, Plaintiffs voluntarily dismissed the claims against Li.  *See* Dkt 59.

1   claim because everything Defendants said in Meta's SEC filings about competition with Google

2   was true, and nothing was made false or misleading by the agreement.  Moreover, the Google

3   agreement had already been publicly identified in the antitrust lawsuit and news reporting in

4   December 2020.  Defendants had no duty to repeat that information.

5       Plaintiffs' second set of 10(b) allegations flat out ignores what Defendants actually said

6   about the impact of iOS privacy changes on Meta's business.  Plaintiffs fault Defendants for

7   implying that the iOS privacy changes had not yet impacted Meta's business, but the challenged

8   risk disclosures expressly stated that iOS *had* already done so.  Plaintiffs also complain about the

9   omission of words like "significantly" or "materially" in certain clauses of the challenged

10  statements.  But the absence of those adverbs cannot make the statements actionable, especially

11  given that Wehner stated during the earnings call that Meta was not "suggesting" that it was "not

12  seeing any material impact" from the iOS privacy changes. Ex. 12 at 6.[2]  Plaintiffs' attempt to use

13  the February 2, 2022 earnings announcement as a corrective disclosure is also misleading—far

14  from describing an impact that had already occurred in 2021, Wehner made clear that the $10

15  billion figure estimated the impact of the iOS changes to Meta's 2022 *forecast*.

16      Plaintiffs' third set of Section 10(b) allegations, related to Meta's introduction of Reels,

17  claims that Defendants misleadingly described Reels' impact on Meta's business.  But Plaintiffs

18  again fail to plead any particular facts supporting their speculation of an undisclosed negative

19  impact.  As a corrective disclosure, they merely point to Meta's projection of lower growth in ad

20  impressions in Q1 of 2022 than in Q4 of 2021.  But that disclosure said nothing about Reels

21  supposedly hurting ad impressions earlier, in the first three quarters of 2021.  Indeed, Plaintiffs'

22  speculation of an earlier adverse impact does not even attempt to account for the chronology of

23  Reels: Reels was not launched on Facebook (it was initially launched just on Instagram) until the

24  very end of Q3 on September 29, 2021.  In any event, Meta's risk disclosures explicitly told

25  investors that launching new products had shifted users away from more established products, and

26  Defendants repeatedly told investors that Reels was like other new products in this regard.

27

28  _____

[2]  All exhibits are to the Blunschi declaration, unless otherwise noted.

1    Plaintiffs' remaining set of allegations, related to alleged personal assistance that Sandberg

2    received from Meta employees, is equally flawed.  The thrust of these allegations challenges two

3    proxy statements under Section 14(a) of the Act.  But under Section 14(a), it is not enough that

4    purportedly undisclosed information allegedly affected shareholder votes.  Instead, the proxy

5    misstatement must be an "essential link" in obtaining authorization for a corporate action that

6    causes losses *in the future*.  These proxies cannot have authorized purportedly improper assistance

7    that occurred before the proxies were issued.  And any supposed misfeasance that occurred

8    afterwards is too attenuated from Sandberg's election as a Director as a matter of law.  As for

9    Plaintiffs' Section 10(b) claim about Sandberg's remarks to a CNBC host, Plaintiffs plead no facts

10   contradicting the fact that Sandberg resigned as Meta's Chief Operating Officer (while remaining

11   a Director) to "do something else" with her life and focus on philanthropy.

12   There is more.  Plaintiffs also had to plead facts giving rise to a strong inference that

13   Defendants acted with scienter—that is, with the intent to deceive investors or with deliberate

14   recklessness.  But Plaintiffs have no coherent theory of scienter, and their formulaic allegations do

15   not move the needle.  The Amended Complaint should be dismissed.

16   **II.    BACKGROUND**

17        **A.    Legal Background**

18        Plaintiffs bring most of their claims under Section 10(b) of the Securities and Exchange

19   Act of 1934, 15 U.S.C. § 78j(b), and SEC Rule 10b-5, 17 C.F.R. § 240.10b-5.  They also bring a

20   claim related to Sandberg under Section 14(a), 15 U.S.C. § 78n(a), and Rule 14a-9, 17 C.F.R.

21   § 240.14a-9.  These two claims have overlapping elements but differ in key respects.[3]

22        **1.    Claims Under Section 10(b) And Rule 10b-5**

23        Private lawsuits under Section 10(b) and Rule 10b-5 are meant "to protect investors against

24   manipulation of stock prices" by company insiders, *Basic Inc. v. Levinson*, 485 U.S. 224, 230

25   (1988), "not to provide investors with broad insurance against market losses," *Dura Pharms., Inc.*

26   *v. Broudo*, 544 U.S. 336, 345 (2005).  To separate plaintiffs who were wrongly misled (and who

27

28   [3]  The Section 20(a) claims rise and fall with Plaintiffs' ability to show a "primary violation" of
     Section 10(b) or 14(a).  *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 990 (9th Cir. 2009).

1    may deserve relief) from those merely attempting to recoup market losses (who do not), plaintiffs

2    must "adequately plead six elements: (1) a material misrepresentation or omission; (2) made with

3    scienter; (3) in connection with the purchase or sale of a security; (4) reliance on the

4    misrepresentation or omission; (5) economic loss; and (6) loss causation." *In re BofI Holding, Inc.*

5    *Sec. Litig.*, 977 F.3d 781, 786 (9th Cir. 2020).  Three of those elements are at issue here.

6         **Material misrepresentation or omission.**  Section 10(b) and Rule 10b-5 "do not require

7    real-time business updates or complete disclosure of all material information whenever a company

8    speaks on a particular topic."  *Weston Family Partnership LLLP v. Twitter, Inc.*, 29 F.4th 611, 615

9    (9th Cir. 2022).  Rather, those provisions simply prohibit "mak[ing] any untrue statement of a

10   material fact" or "omit[ting] to state a material fact necessary in order to make the statements

11   made, in the light of the circumstances under which they were made, not misleading."  17 CFR

12   § 240.10b-5.  To be actionable, a statement must therefore be "capable of objective verification,"

13   *Or. Pub. Emps. Ret. Fund v. Apollo Grp. Inc.*, 774 F.3d 598, 606 (9th Cir. 2014), and demonstrably

14   "false at the time" it was made, *Ronconi v. Larkin*, 253 F.3d 423, 431 (9th Cir. 2001).  *See also*

15   *Macomb Cnty. Employees' Ret. Sys. v. Align Tech., Inc.*, 39 F.4th 1092, 1099 (9th Cir. 2022).  And

16   a true statement of verifiable fact can be actionable only if it omits information in a way that, given

17   what was said, "affirmatively create[s] an impression of a state of affairs that differs in a material

18   way from the one that actually exists."  *Brody v. Transitional Hosps. Corp.*, 280 F.3d 997, 1006

19   (9th Cir. 2002).[4]  Companies have no duty to disclose "information already in the public domain."

20   *Rubke v. Capitol Bancorp Ltd*, 551 F.3d 1156, 1162-63 (9th Cir. 2009) (citation omitted).

21        **Loss causation.**   A securities-fraud plaintiff must also show that "the defendant's

22   misstatement, as opposed to some other fact, foreseeably caused the plaintiff's loss."  *Lloyd v. CVB*

23   *Fin. Corp.*, 811 F.3d 1200, 1210 (9th Cir. 2016).  This burden "is typically satisfied by allegations

24   that the defendant revealed the truth through 'corrective disclosures' which 'caused the company's

25

26   ⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯

     [4]  The Ninth Circuit has already rejected Plaintiffs' assertion that *other* regulations—*i.e.*, Item 105
27   and Item 303—impose a more stringent "duty to disclose for purposes of Section 10(b) and Rule
     10b-5."  *In re NVIDIA Corp. Sec. Litig.*, 768 F.3d 1046, 1056 (9th Cir. 2014); *see* AC ¶¶ 271-74.
28   And the AC cites no authority for the facially implausible assertion that a share repurchase program
     required Meta "to disclose all material adverse information in its possession."  AC ¶ 270.

1   stock price to drop.'" *Id.* at 1209.  But a corrective disclosure must "reveal new information to the

2   market." *BofI*, 977 F.3d at 794; *accord Grigsby v. BofI Holding, Inc.*, 979 F.3d 1198, 1205 (9th

3   Cir. 2020).

4        **Scienter.**  Scienter is "a mental state embracing intent to deceive, manipulate, or defraud."

5   *Nguyen v. Endologix, Inc.*, 962 F.3d 405, 414 (9th Cir. 2020).  That means the defendant must

6   have acted "either intentionally or with deliberate recklessness." *Id.* (quoting *Zucco Partners, LLC*

7   *v. Digimarc Corp.*, 552 F.3d 981, 991 (9th Cir. 2009)).  This standard is demanding, and it focuses

8   on the defendant's intentions vis-à-vis the market.  For intentional conduct, the defendant must

9   have "intentionally misled" investors, not merely had "knowledge" of certain facts.  *In re NVIDIA*

10  *Corp. Sec. Litig.*, 768 F.3d at 1056-57; *accord Maguire Fin., LP v. PowerSecure Int'l, Inc.*, 876

11  F.3d 541, 548 (4th Cir. 2017); *In re Apollo Grp. Inc. Sec. Litig.*, 509 F. Supp. 2d 837, 843 (D. Ariz.

12  2007).  And deliberate recklessness requires "an extreme departure from the standards of ordinary

13  care" that creates "a danger of misleading [investors] that is either known to the defendant or is so

14  obvious that the actor must have been aware of it." *Prodanova v. H.C. Wainwright & Co., LLC*,

15  993 F.3d 1097, 1106 (9th Cir. 2021) (emphasis omitted).  Ordinary recklessness about a

16  statement's truth or completeness does not suffice.  *See id.*

17       **2.    Claims Under Section 14(a) And Rule 14a-9**

18       Section 14(a) and Rule 14a-9 have a narrower focus: They prohibit false or misleading

19  assertions in proxy statements, which are disclosures made before shareholder votes on corporate

20  matters.  These provisions were "designed to 'prevent management or others from obtaining

21  authorization for corporate action by means of deceptive or inadequate disclosure.'" *Desaigoudar*

22  *v. Meyercord*, 223 F.3d 1020, 1024 (9th Cir. 2000) (citation omitted).  Thus, Section 14(a)

23  demands that the misstatement be "an essential link in the accomplishment of the proposed

24  transaction." *Id.* at 1022.  So even if there was "a reduction in [stock] price" due to "a misleading

25  proxy statement," a Section 14(a) claim fails unless the loss was the "result of the corporate action

26  authorized by the proxy statement." *Cowin v. Bresler*, 741 F.2d 410, 428 (D.C. Cir. 1984); *accord*

27  *In re Paypal Holdings, Inc. S'holder Deri. Litig.*, 2018 WL 466527, at *4 (N.D. Cal. Jan. 18, 2018).

28  Put another way, the voted-on "transaction at issue must be the source of the plaintiff's injury."

1    *Edward J. Goodman Life Income Tr. v. Jabil Cir., Inc.*, 594 F.3d 783, 796 (11th Cir. 2010).

2    **B.    Factual Background**

3    Plaintiffs seek to represent a class of investors who bought Meta stock during the Class

4    Period, which spans January 28, 2021 through June 9, 2022.  Their sprawling AC raises four sets

5    of allegations, three under Section 10(b) and one focused on Section 14(a).

6    **1.    Allegations Related To The Antitrust Suit Against Google**

7    Plaintiffs' first set of allegations "are based in substantial part on the Third Amended

8    Complaint filed in" the *Google* lawsuit.  That is an understatement: the AC parrots that pleading's

9    factual allegations verbatim.  *Compare* AC ¶¶ 62-114, *with* Ex. 4 ¶¶ 16-26, 414-50.

10   The *Google* case was filed against Google (not Meta) on December 16, 2020, over six

11   weeks *before* the Class Period began.  AC ¶ 118.  The original *Google* complaint publicly alleged

12   "an anticompetitive agreement" between Meta and Google ("Google Network Bidding

13   Agreement" or "GNBA"), providing that Meta "would not use header bidding"—a "technical

14   workaround" enabling ad publishers "to run real-time auctions" for ads without Google—in

15   exchange for "anticompetitive advantages." *Id.* ¶¶ 70, 118.  Specifically, the *Google* complaint

16   accused Google of giving Meta "information advantages, speed advantages, and other

17   prioritizations," allocating "auction wins to [Meta], [and] subverting the free operation of supply

18   and demand" for online ads.  Ex. 1 ¶ 194; *see* AC ¶¶ 89-95, 103.  And it alleged that this supposed

19   effort to "kill" header bidding was "planned" and "signed at the highest-level."  Ex. 1 ¶¶ 13-14,

20   171, 197; *see* AC ¶¶ 75, 79, 81.

21   Plaintiffs also rely on a Wall Street Journal article released on December 22, 2020—still

22   more than a month before the Class Period began—which reported additional details gleaned from

23   an unredacted copy of the *Google* complaint.  AC ¶ 119; Ex. 6 at 1.  The article reported that

24   Sandberg signed, and Zuckerberg approved, the GNBA.  *Id.* at 2-3.  It reiterated that the GNBA

25   allegedly guaranteed that Meta would "win a fixed percent of [ad] auctions." *Id.* at 2.  And if the

26   GNBA triggered antitrust scrutiny, the article added, Google and Meta agreed "to cooperate and

27   assist each other." *Id* at 1.

28   Since the filing of Plaintiffs' AC, those allegations have all been flatly rejected as a matter

1    of law.  On September 13, 2022, Judge Castel (S.D.N.Y) dismissed the *Google* lawsuit in all

2    relevant parts, holding that the plaintiffs had "not plausibly alleged" that the GNBA is "an unlawful

3    restraint of trade."  Ex. 5 at 3.  Judge Castel reasoned that the GNBA "do[es] not expressly or by

4    reasonable implication refer to or restrict [Meta]'s use of header bidding"—and in fact expressly

5    preserves Meta's ability to use header bidding.  *Id.* at 21 (noting that "[b]y its express terms, [the

6    GNBA] 'does not restrict Facebook from developing or enhancing a product or service that

7    competes with . . . [Google's] Program without Google's Information.") (quoting GNBA ¶ 2.4(e)).

8    The advantages Google offered, moreover, "are consistent with a firm seeking to secure the

9    business of a very large potential customer by offering it favorable terms."  *Id.* at 25.  The "win-

10   rate provision" merely "ensures that [Meta] submits competitive bids, not throwaway ones," and

11   thus "*promote[s]* rather than harm[s] competition."  *Id.* at 31 (emphasis added).  And even though

12   the *Google* plaintiffs "neatly set out" a section devoted to showing market harm—which is not

13   reproduced in the AC here—Judge Castel held that they did "not plausibly allege any

14   anticompetitive effects."  *Id.* at 32.

15         Nonetheless, Plaintiffs persist in their Google-related challenge to three sets of statements.

16   All of these statements were made after the *Google* lawsuit was publicly filed and the Wall Street

17   Journal reported on it.  *First*, Plaintiffs argue that the supposedly anticompetitive GNBA

18   contradicts the oft-stated remark in Meta's SEC filings that Meta "face[s] significant competition

19   in every aspect of our business, including, but not limited to, companies that . . . enable marketers

20   to reach their existing or prospective audiences, including for example, Google, Apple, YouTube,

21   Tencent, Snap," and others.  *E.g.*, Ex. 8 at 7; *see* AC ¶¶ 223-24, 233-34, 241-42, 251-52, 261-62

22   (**Statements 1, 6, 10, 15, 20**).  *Second*, Plaintiffs contend that non-exhaustive lists of risk factors

23   to Meta's business—saying that risks "includ[ed]" things like "loss of advertising market share to

24   our competitors" and adverse "regulatory" action—were misleading because they did not specify

25   that "revenue could *also* be materially adversely affected by the alteration or termination" of the

26   GNBA.  AC ¶¶ 225-26, 235-36, 243-44, 253-54, 263-64 (**Statements 2, 7, 11, 16, 21**) (emphasis

27   added).  *Third*, Plaintiffs assert that statements reporting "advertising revenue success and growth"

28   were "mainly caused by a recovery from declines in advertising demand due to the COVID-19

1    pandemic" were misleading for not saying that this success "was *also* due in significant part to"

2    the GNBA.  *Id.* ¶¶ 239-40, 249-50, 259-60 (**Statements 9, 14, 19**) (emphasis added); *id.* ¶¶ 229-

3    30 (**Statement 4**) (statement that much of revenue increase "was driven by" non-GNBA causes).

4    Plaintiffs further argue that Meta had "to disclose the details of [the GNBA]."  *E.g.*, *id.* ¶ 224.

5         As corrective disclosures, Plaintiffs point to news stories reiterating that: (i) the GNBA

6    "guaranteed [Meta] would both bid in and win a fixed percentage of ad auctions," (ii) high-level

7    executives approved the GNBA, and (iii) Google wanted to "kill" header bidding.  *Id.* ¶¶ 283, 289-

8    90.  Plaintiffs also cite (iv) a March 11, 2022 "press release" in which "the European Commission

9    announced that it had opened a formal investigation" into the GNBA.  *Id.* ¶ 294.

10        **2.    Allegations Related To iOS Privacy Changes**

11        Plaintiffs' second set of Section 10(b) claims concern changes that Apple made to privacy

12   settings on iOS, the operating system that runs on the iPhone.  In June 2020, Apple announced that

13   iOS 14 would "allow[] iPhone users to opt-out of permitting apps, like Meta's Family of Apps, to

14   track their internet behavior," which "impacted Meta's ad targeting and measuring capabilities."

15   AC ¶ 159-60, 164.  These changes were "rolled out in late April 2021."  *Id.* ¶ 163.

16        Defendants repeatedly warned investors that these iOS privacy changes would negatively

17   impact Meta's business.  On March 2, 2021, nearly two months before the iOS changes were

18   released, Wehner warned that Meta "expect[ed]" there "to be an impact to the business."  *Id.* ¶ 168.

19   The significance of the impact, he noted, would depend on "the pace of upgrades to iOS 14" and

20   iOS user "opt-in rates" to the new settings, as well as the "relative effect" among industry players.

21   *Id.*  But as he and Zuckerberg noted, the prospect of a business "headwind" was real.  *Id.* ¶¶ 168-

22   69.  Indeed, Wehner reiterated on Meta's April 28, 2021 Q1 earnings call that Meta "expect[ed]"

23   the privacy changes to "be a headwind" for at least "the remainder of the year."  *Id.* ¶ 170.  And

24   on the July 28, 2021 Q2 earnings call, Meta warned that it: (i) was "see[ing] an impact" from iOS

25   changes, (ii) "saw the impact grow throughout the [second] quarter," Ex. 12 at 6-7, and (iii)

26   "continue[d] to expect increased ad targeting headwinds in 2021" from the "iOS updates,"

27   including "a more significant impact in the third quarter."  Ex. 11 at 8.  And when asked whether

28   Meta was saying it was "not seeing any material impact" from the iOS privacy changes, Wehner

1    answered "No"—and Susan Li reiterated that Meta was "not suggesting that at all."  Ex. 12 at 6.

2         The next day, in its Q2 Form 10-Q, Meta said that the iOS changes "have limited our ability

3    to target and measure the effectiveness of ads on our platform and negatively impacted our

4    advertising revenue."  AC ¶ 245.  And Meta warned that, "if we are unable to mitigate these

5    developments as they take further effect in the future, our targeting and measurement capabilities

6    will be materially and adversely affected, which would in turn significantly impact our future

7    advertising revenue growth."  *Id.*  (**Statement 12**).  Plaintiffs claim that this second sentence

8    warning about future negative effects—despite the first sentence noting past negative effects—

9    "implied that Meta's 'targeting and measurement capabilities'" and its "advertising revenue

10   growth" had "not yet [been] 'significantly impact[ed].'"  *Id.* ¶ 246.

11        At Meta's October 25, 2021 Q3 earnings call, Defendants reiterated that the iOS changes

12   were having, and would continue to have, adverse effects.  Zuckerberg, for instance, observed that

13   the Company "did experience revenue headwinds this quarter" from "Apple's changes."  Ex. 13

14   at 1.  Sandberg told investors that "[w]e've been open about the fact that there were headwinds

15   coming—and we've experienced that in Q3," with the "biggest" impact coming from "Apple's

16   iOS 14 changes."  *Id.* at 5.  Wehner said that the iOS changes "clearly ha[ve] been" quite

17   "disruptive."  Ex. 14 at 2.  And in its Q3 Form 10-Q, Meta reiterated that the changes "limited our

18   ability to target and measure the effectiveness of ads" and "negatively impacted" revenue.  Ex. 25

19   at 56; *see* AC ¶ 255 (**Statement 17**).  Yet Plaintiffs again assail warnings of continued effects as

20   "impl[ying]" that Meta had "not yet [been] 'significantly impact[ed].'"  *Id.* ¶ 256.

21        As a corrective disclosure, Plaintiffs cite Meta's February 2, 2022 earnings announcement,

22   which they allege conveyed "weak Q4 2021 financial results" and "disappointing 2022 revenue

23   guidance."  *Id.* ¶ 292.  Sandberg said that, "[a]s we described last quarter," Meta had "faced

24   headwinds as a result of Apple's iOS changes" that would "moderately increase" going forward.

25   Ex. 16 at 5.  And Wehner noted that "we believe the impact of iOS overall as a headwind on our

26   business in 2022 is on the order of $10 billion."  AC ¶ 186.

27        **3.    Allegations Related To The Reels Introduction**

28        Plaintiffs' next challenge concerns Reels, a short-form video product that Meta launched

DEFS.' MOT. TO DISMISS AM. COMPLAINT
CASE NO. 4:22-cv-01470-YGR

1    on Instagram (but not Facebook) on August 5, 2020.  AC ¶ 196.  Plaintiffs allege that Reels

2    "increase[d] overall user engagement" but "shift[ed] some user engagement from [products] that

3    are easier to monetize" to one that is "harder to monetize," *id.* ¶ 202, at least in its nascent stages.

4          Defendants warned investors about risks that came with Reels.  On Meta's April 28, 2021

5    Q1 earnings call, Wehner observed that Reels was getting "strong engagement" on Instagram, but

6    cautioned that video products offer "fewer impressions on a time spent basis"—*i.e.*, users see ads

7    less frequently, as compared to other features like New Feed.  *Id.* ¶ 205.  Wehner also noted that

8    Reels and other video products created "competition" for users' attention, *id.*, and he warned of

9    resulting "softness" on "the impression front," Ex. 19 at 14.  In fact, "Reels ads"—"full screen,

10    vertical ads that play interspersed between user-generated Reels"—did not launch on Instagram

11    until June 16, 2021.  AC ¶ 197.  During the July 28, 2021 Q2 earnings call, Sandberg said that

12    Reels on Instagram was "still monetizing at lower rates."  *Id.* ¶ 207.  Reels did not launch on

13    Facebook until the end of Q3, on September 29, 2021.  *Id.* ¶ 199.  On Meta's October 25, 2021 Q3

14    earnings call, Wehner again noted that "new experiences" like Reels generate "some amount of

15    shifting of people's time and attention."  *Id.* ¶ 213.  And he reiterated that, while Meta was "just

16    starting to roll out ads in Instagram" for Reels and hadn't yet "gotten to a monetization point with

17    Reels on Facebook," Ex. 13 at 9-10, "we do think" Reels is worth "investing" in because it could

18    "drive incremental engagement with Instagram and Facebook," *id.* at 18.

19          Notwithstanding these caveats, Plaintiffs attack a related risk disclosure repeated in four

20    SEC filings, all issued in the early days of Reels' launch on Instagram.  *See* AC ¶¶ 227, 237, 247,

21    257 (**Statements 3, 8, 13, 18**).  The disclosure warned that Meta "may introduce new [products]

22    where we have more proven means of monetization."  *E.g.*, AC ¶ 227.  It further cautioned that,

23    "from time to time these efforts have reduced, and may in the future reduce, engagement with one

24    or more products and services in favor of other products or services that we monetize less

25    successfully"—which, in turn, "may adversely affect our business and results of operations."  *Id.*

26    Plaintiffs assert that these statements were misleading because the statements supposedly said it

27    "was merely possible" that Reels would adversely affect Meta's business, but Reels allegedly

28    "already had" done so "by the time" the statements were made.  *E.g.*, *id.* ¶ 228.

1    For a corrective disclosure, Plaintiffs turn back to the February 2, 2022 earnings

2  announcement.  *Id.* ¶ 292.  They note that, on the day's investor call, Zuckerberg said that, partly

3  "as a result" of  the "shift to short-form video" on Reels, "we're going to continue to see some

4  pressure on [ad] impression growth in the near term"—and "it may create some near-term slower

5  growth" in ad revenue.  *Id.* ¶¶ 217-18.

6                          **4.      Allegations Related To Sandberg's Conduct**

7    Plaintiffs' final set of allegations focuses on Section 14(a), but also tacks on a Section 10(b)

8  claim.  This set concerns Sandberg's purported use of corporate resources for personal purposes.

9    For the Section 14(a) claim, Plaintiffs assert that two proxy statements made misleading

10  statements about Sandberg's compensation.  *See* AC ¶¶ 359-72.  Plaintiffs cite an April 9, 2021

11  proxy statement that "listed 'All Other Compensation' to Defendant Sandberg" as "costs related

12  to personal security" and "usage of private aircraft." *Id.* ¶ 231 (**Statement 5**).  Plaintiffs assert that

13  this "omitted to state" that Sandberg also purportedly received "assistance on personal matters."

14  *Id.* ¶ 232.  Plaintiffs mount a similar challenge to an April 8, 2022 proxy that likewise listed

15  security and private aircraft usage as "All Other Compensation," but not purported assistance on

16  personal matters.  *Id.* ¶¶ 265-66 (**Statement 22**).

17    Plaintiffs allege that the purported personal assistance came to light in two Wall Street

18  Journal articles.  AC ¶¶ 298-99, 302-03.  The first, from April 21, 2022, reported that, while

19  "[w]orking with a team that included [Meta] employees as well as paid outside advisers" in 2016,

20  Sandberg "developed a strategy to persuade the Daily Mail not to report" an unflattering (and later

21  recanted) accusation against her ex-boyfriend, Bobby Kotick.  Ex. 26 at 1; *see* AC ¶ 132.  These

22  "public-relations advisers, both inside and outside [Meta]," worried that the "story would reflect

23  negatively on her reputation."  Ex. 26 at 1.  The article also reported that Sandberg "contacted" the

24  Daily Mail three years later—and that Meta had "started a review of Ms. Sandberg's actions" in

25  fall 2021.  *Id.*; *see* AC ¶¶ 135, 154.

26    The second article, published on June 10, 2022, reported that, besides the Kotick matter,

27  Meta was reviewing "work [Meta] employees did to support [Sandberg's] foundation" and "her

28  second book."  Ex. 10 at 1; *see* AC ¶ 153.  The Wall Street Journal had "previously reported" that

1    the review also involved Sandberg's alleged "use of corporate resources to plan her coming

2    wedding," but now made clear that those allegations were "a small piece of the investigation."

3    Ex. 10 at 1-2; *see* AC ¶ 153.  The article confirmed that the review "played no role in her decision

4    to leave the company." Ex. 10 at 2.

5            Plaintiffs' Section 10(b) claim appears to challenge solely a June 1, 2022 statement that

6    Sandberg made to a CNBC television host, which was then relayed to viewers.  AC ¶ 267

7    (**Statement 23**).  The host said that Sandberg resigned from Meta after over 14 years as COO "to

8    do something else with her life and to focus on her philanthropy." *Id.*  Plaintiffs contend that this

9    "omitted to state that her leaving was motivated in part by concerns about Meta's internal

10   investigation," *id.* ¶ 268—despite the June 10 report that the investigation played "no role" in her

11   decision, Ex. 10 at 2.  Sandberg remains on Meta's board.  Ex. 24 at 116.

12   **III.    LEGAL STANDARD**

13           Federal Rule of Civil Procedure 9(b) and the Private Securities Litigation Reform Act

14   ("PSLRA") impose "demanding pleading requirements" in this case.  *In re Rigel Pharms., Inc.*

15   *Sec. Litig.*, 697 F.3d 869, 876 (9th Cir. 2012).  Under Rule 9(b), Plaintiffs must "state with

16   particularity the circumstances constituting fraud." Fed. R. Civ. P. 9(b).  That burden demands

17   precise, particularized allegations about the "who, what, when, where, and how," *Twitter*, 29 F.4th

18   at 619, on "all elements" of Plaintiffs' claims, *Or. Pub. Emps.*, 774 F.3d at 605.  Under the PSLRA,

19   Plaintiffs must also "specify each statement alleged to have been misleading" and the "reasons

20   why." 15 U.S.C. § 78u-4(b)(1)(B).  And they must "state with particularity facts giving rise to a

21   strong inference" of scienter.  *Id.* § 78u-4(b)(2)(A).  This requirement is particularly demanding:

22   the inference of scienter "must be more than merely plausible or reasonable—it must be "cogent

23   and at least as compelling as any opposing inference of nonfraudulent intent." *Tellabs, Inc. v.*

24   *Makor Issues & Rights, Ltd.*, 551 U.S. 308, 314 (2007).

25   **IV.    ARGUMENT**

26           All four sets of allegations must be dismissed because Plaintiffs fail to plead with

27   particularity a misstatement of material fact, loss causation, or both.  In addition, there is no strong

28   inference of scienter.  Each of these shortcomings independently justifies dismissal.

### A.  The Antitrust-Related Allegations Must Be Dismissed

Plaintiffs' allegations related to the GNBA fail for multiple reasons.  Plaintiffs fail to allege an actionable misstatement.  Their own allegations demonstrate that the market was aware of the GNBA (and all relevant allegations about it) before any of the challenged statements were made.  And Plaintiffs fail to plead with particularity any predicate antitrust violation, as Judge Castel held.

### 1.  Plaintiffs Fail To Plead A False Or Misleading Statement

Relying on (now discredited) allegations of antitrust violations against Google, Plaintiffs attempt to spin a tale of securities fraud against Meta.  But the story falls apart on page one—because Plaintiffs fail to show that anything Defendants said was objectively "untrue" or contained an "omission" that "affirmatively create[d]" a misleading impression.  *Brody*, 280 F.3d at 1006.

Start with Plaintiffs' assertion that the GNBA contradicts **Statements 1, 6, 10, 15, and 20**, which informed investors in SEC filings that Meta "face[s] significant competition in every aspect of our business" from numerous competitors, "including for example, Google, Apple, YouTube, Tencent, Snap," and others.  *E.g.*, Ex 8 at 7; AC ¶ 223.  That challenge is untenable.  For one, the phrase "significant competition" is simply too vague and standardless to support a claim.  *See Or. Pub. Emps.*, 774 F.3d at 606 (phrase "significant events" was "vague" and "would not induce the reliance of a reasonable investor"); *Thant v. Karyopharm Therapeutics Inc.*, 43 F.4th 214, 223 (1st Cir. 2022) ("significant step"); *In re Facebook, Inc. Sec. Litig.*, 477 F. Supp. 3d 980, 1023 (N.D. Cal. 2020) ("significant sales gains").  For another, Defendants did not say that Meta faces significant competition *from Google* in *every* aspect of its business.  Google was one of several companies included in an extensive list of competitors—crucial "context" that Plaintiffs improperly omit.  *Police Ret. Sys. of St. Louis v. Intuitive Surgical, Inc.*, 759 F.3d 1051, 1060 (9th Cir. 2014).  Even as to Google, Judge Castel found that the GNBA *promotes* competition.  Ex. 5 at 32.  And the AC admits that Meta and Google engage in vigorous "head-to-head resale competition" in reselling ads "inventory to advertisers"—not to mention myriad other areas where they are rivals.  AC ¶ 107.

Plaintiffs also challenge risk disclosures in **Statements 2, 7, 11, 16, and 21**, which warned investors that Meta's "advertising revenue can also be adversely affected by a number of other

factors, *including*" things like "loss of advertising market share to our competitors" and adverse "regulatory" action.  *E.g.*, Ex. 8 at 15-16 (emphasis added); AC ¶ 225.  Plaintiffs claim that this proactive effort to caution investors was fraudulent because Meta did not speculate that *if the* GNBA were "alter[ed] or terminat[ed]," then "revenue could *also* be materially adversely affected."  *E.g.*, AC ¶ 226 (emphasis added).  Off the bat, Plaintiffs' allegations flunk Rule 9(b) because they lack any facts explaining how the possible alteration or termination of GNBA could have "materially" affected ad revenue.  *Id.*  At any rate, Meta warned about "loss of advertising market share" and "regulatory" action (which Plaintiffs say could have led to the GNBA's termination).  *Id.* ¶¶ 112, 225.  And even if this list of risk factors were incomplete for not speculating about the GNBA's future, Section 10(b) prohibits only statements that "mislead," "not statements that are incomplete."  *Brody*, 280 F.3d at 1006.  Plus, the list was "preceded by the word 'including,'" making clear it was "illustrative rather than exhaustive."  *United States v. Alexander*, 725 F.3d 1117, 1120 (9th Cir. 2013).

Similar problems plague Plaintiffs' challenge to **Statements 9, 14, and 19**, which said that Meta's "advertising revenue success and growth" was "*mainly* caused by a recovery from declines in advertising demand due to the COVID-19 pandemic."  *E.g.*, AC ¶ 239 (emphasis added).  Plaintiffs' speculation that this "success and growth was also due in significant part to" the GNBA has zero facts to support it.  *E.g.*, *id.* ¶ 240.  But regardless, the statements did not say that economic recovery following the COVID-19 downturn was the *sole* cause of revenue gains or purport to list every contributing factor.  Defendants could "speak selectively" about the main drivers of revenue growth in this way, so long as they did "not paint a misleading picture."  *Twitter*, 29 F.4th at 615.  Plaintiffs nowhere dispute that the revenue gains were "primarily driven by" recovery from the COVID-19 downturn.  *City of Miami Fire Fighters' & Police Officers' Ret. Tr. v. CVS Health Corp.*, 46 F.4th 22, 33 (1st Cir. 2022) (rejecting similar challenge).  What Defendants said, then, was "consistent with the more detailed explanation" that Plaintiffs claim Defendants "should have included."  *Brody*, 280 F.3d at 1007.[5]

---

[5]  Plaintiffs challenge to **Statement 4**—which said merely that a revenue "increase was *mostly* due to" non-GNBA causes—fails for the same reasons.  AC ¶ 229 (emphasis added).

1      Last, Plaintiffs maintain that all of these statements were misleading for not "disclos[ing]

2  the details of the" GNBA.  *E.g.*, AC ¶ 224.  That is wrong.  Plaintiffs do not and cannot explain

3  how failing to disclose "granular detail" about the GNBA affirmatively "created an 'impression of

4  a state of affairs that differ[ed] in a material way from the one that actually exists.'"  *Costabile v.*

5  *Natus Med. Inc.*, 293 F. Supp. 3d 994, 1012 (N.D. Cal. 2018) (citation omitted).  Any contrary

6  conclusion would require companies to walk through individual contracts clause-by-clause, which

7  "would overwhelm the market."  *Jasin v. Vivus, Inc.*, 2016 WL 1570164, at *13 (N.D. Cal. Apr.

8  19, 2016).

9          **2.**     **These Allegations Have A Fundamental Timing Problem**

10      Plaintiffs' claims related to the GNBA fail for another reason:  All relevant facts about the

11  GNBA were publicly known *before* Defendants made the challenged statements.  Plaintiffs thus

12  cannot establish falsity because Meta had no duty to disclose information "already in the public

13  domain."  *Rubke*, 551 F.3d at 1162-63.  And they cannot show loss causation because a corrective

14  disclosure must "reveal new information to the market."  *BofI*, 977 F.3d at 794.

15      Plaintiffs' theory appears to be that Class Period news reports revealed three "additional

16  details" about the GNBA that (they say) should have been disclosed by Defendants: (i) Meta was

17  allegedly guaranteed to win a fixed percentage of ad auctions, (ii) Sandberg signed and Zuckerberg

18  approved the deal, and (iii) "Google wanted to 'kill'" header bidding.  AC ¶¶ 283, 290.  But all of

19  this was mere "confirmatory information."  *Grigsby*, 979 F.3d at 1205.  The *Google* complaint

20  publicly alleged on December 16, 2020 that: (i) Google "allocated a portion of publishers' auction

21  wins to [Meta]," Ex. 1 ¶ 194, (ii) the GNBA was signed and approved "at the highest-level," *id.*

22  ¶¶ 13-14, and (iii) the agreement was meant to "kill header bidding," *id.* at 63.  *See* AC ¶ 118.  The

23  December 22, 2020 Wall Street Journal article reiterated the same points.  Ex. 6 at 2-3.  As far as

24  Defendants can tell, the only new information that came out during the Class Period was that the

25  European Commission was investigating the GNBA.  AC ¶ 294.  But the "announcement of an

26  investigation, without more, is insufficient to establish loss causation."  *Loos v. Immersion Corp.*,

27  762 F.3d 880, 890 (9th Cir. 2014); *see Lloyd*, 811 F.3d at 1210.  And the securities laws do not

28  require companies to announce investigations before the authorities do.  *See Plumber &*

1    *Steamfitters Local 773 Pension Fund v. Danske Bank A/s*, 11 F.4th 90, 98-99 (2d Cir. 2021); *In re*

2    *Facebook Inc. Sec. Litig.*, 405 F. Supp. 3d 809, 836 (N.D. Cal. 2019).

### 3. Plaintiffs Also Fail To Plead A Predicate Antitrust Violation

4    Plaintiffs' copy-and-pasted antitrust allegations also fail to adequately plead that the

5    supposedly concealed antitrust violations ever existed, as Judge Castel held in the *Google* lawsuit.

6    Because Plaintiffs claim that Defendants' "statements were rendered false or misleading

7    through the nondisclosure of illegal activity," Rule 9(b) requires them to plead with particularity

8    "the underlying allegations of illegal antitrust conspiracy." *Gamm v. Sanderson Farms, Inc.*, 944

9    F.3d 455, 458 (2d Cir. 2019); *accord Mauss v. Nuvavsive, Inc.*, 2014 WL 6980441, at *7 (S.D.

10   Cal. Dec. 9, 2014). "In other words, [they] must specify what law or standard the defendant

11   violated and how the alleged violation occurred." *Plumber & Steamfitters*, 11 F.4th at 99.

12   Plaintiffs' antitrust allegations, copied verbatim from the *Google* lawsuit, fall short of that

13   high bar. Case-in-point: Judge Castel's thorough decision holding that the *Google* complaint did

14   "not plausibly allege[]" any "unlawful restraint of trade." Ex. 5 at 3. That ruling was correct.

15   While the plaintiffs here and there *say* that Meta agreed not to adopt header-bidding, the GNBA

16   does not say that, either "expressly or by reasonable implication." *Id.* at 21. The advantages that

17   Google offered Meta were textbook examples of offering "favorable terms" to "a very large

18   potential customer." *Id.* at 25. And the win-rate provision "promote[s]" competition by ensuring

19   that Meta "submits competitive bids," without "predetermin[ing] the outcome of any auction" or

20   otherwise "distort[ing]" bidding. *Id.* at 31. None of that suggests collusive conduct. It follows

21   that Plaintiffs' copycat allegations must be dismissed. And since Plaintiffs "simply borrow[]

22   from" those federal law allegations, claimed violations of as-yet unnamed state laws "fail[] as

23   well." *High Tek USA, Inc. v. Heat & Control, Inc.*, 2012 WL 2979051, at *6 (N.D. Cal. July 18,

24   2012) (Gonzalez Rogers, J.).

### B. The Allegations About iOS Privacy Changes Must Be Dismissed

26   Plaintiffs' second set of allegations—about the iOS changes—is equally meritless.

### 1. Plaintiffs Fail To Plead A False Or Misleading Statement

28   Plaintiffs challenge risk disclosures from July 29, 2021 (**Statement 12**) and October 26,

1    2021 (**Statement 17**), where Meta warned that "[i]f we are unable to mitigate [the iOS

2    developments as they take further effect in the future, our targeting and measurement capabilities

3    will be materially and adversely affected, which would in turn significantly impact our future

4    advertising revenue growth." AC ¶¶ 245, 255.  Plaintiffs say that these warnings were misleading

5    because they "directly implied" that the iOS privacy changes "had not yet 'significantly

6    impact[ed]' Meta's" advertising capabilities and revenue growth during the first three quarters of

7    2021, "when in fact" the changes allegedly had done so already. *Id.* ¶¶ 246, 256.

8         Nonsense.  In the preceding sentence of the challenged risk disclosure, Meta told investors

9    that the iOS privacy changes "have limited"—past tense—"our ability to target and measure the

10   effectiveness of ads on our platform" and "negatively impacted"—again, past tense—"our

11   advertising revenue." *Id.* ¶¶ 245, 255.  And the challenged portions of these statements warned of

12   "further effect[s]," making clear that the risk was a continuation of existing harms. *Id.*  Defendants

13   thus said "exactly" what Plaintiffs "claim [was] omitted"—that the iOS privacy changes had

14   *already* limited Meta's targeting and measurement capabilities and *already* negatively impacted

15   revenues. *McGovney v. Aerohive Networks*, 367 F. Supp. 3d 1038, 1056 (N.D. Cal. 2019).

16        More than that, Zuckerberg, Sandberg, and Wehner all emphasized on earnings calls then-

17   existing detrimental effects on Meta's ads business.  At the end of Q2, Wehner and Li disclaimed

18   any "suggest[ion]" that Meta was "not seeing any material impact" from the iOS changes.  Ex. 12

19   at 6.  At the end of Q3, Zuckerberg told investors that Meta "*did* experience revenue headwinds"

20   from "Apple's changes," while warning that those headwinds would continue.  Ex. 13 at 1

21   (emphasis added).  Sandberg noted that Meta had "experienced" business "headwinds"—and

22   "would have seen positive quarter-over-quarter revenue growth" if "it wasn't for Apple's iOS14

23   changes." *Id.* at 5.  And Plaintiffs nowhere dispute the accuracy of the hard numbers in Meta's

24   quarterly financial reports.  "No investor, in the face of these substantive disclosures, could

25   reasonably conclude that [Meta] had surmounted all obstacles" presented by the iOS changes.

26   *In re Convergent Techs. Sec. Litig.*, 948 F.2d 507, 516 (9th Cir. 1991).  These disclosures make

27   the pleading defect incurable.

28        To the extent Plaintiffs' gripe is that Meta did not include modifiers like "significantly" or

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

"materially" in past-tense clauses about negative revenue effects, it is meritless.  No reasonable investor could have believed that the iOS changes were having an insignificant impact given Meta's fulsome disclosures.  And Meta did not need to include adverbs that are too "vague" for their absence to be actionable.  *See, e.g.*, *Or. Pub. Emps.*, 774 F.3d at 606 (adjective "significant" was "vague" and "would not induce the reliance of a reasonable investor"); *In re Eventbrite, Inc. Sec. Litig.*, 2020 WL 2042078, at *14 (N.D. Cal. Apr. 28, 2020) (similar).  Indeed, the February 3, 2022 Form 10-K that Plaintiffs cite as a corrective disclosure revealing the supposed "truth" used identical language, without adverbs.  Ex. 24 at 17; AC ¶ 292.

In any event, Plaintiffs' sole support for their accusation that Defendants misled investors about the scale of then-existing revenue effects comes from one confidential witness.  FE1 said that "Meta began to see a material drop in revenue due to the iOS privacy changes in the second quarter of 2021."  AC ¶ 316.  But no facts suggest why FE1, who was concededly *six* rungs below any individual defendant and not in the finance department, would know this.  *Id.* ¶ 173.  And regardless, FE1 provides no specifics about the alleged Q2 drop.[6]  *Id.* ¶¶ 174, 316.  That is inadequate.  *See In re Silicon Graphics Inc. Sec.  Litig.*, 183 F.3d 970, 985 (9th Cir. 1999), *superseded by statute on other grounds as recognized in In re Quality Sys., Inc. Sec. Litig.*, 865 F.3d 1130, 1146 (9th Cir. 2017).

### 2.    Plaintiffs Fail To Plead Loss Causation

Plaintiffs' attempt to use Meta's February 2, 2022 earnings announcement to fill in the gaps and serve as a corrective disclosure is brazenly misleading.  Citing Wehner's remark about a $10 billion revenue "headwind," Plaintiffs divide by four and claim the impact was "$2.5 billion in each quarter" *of 2021*.  AC ¶¶ 10, 186.  But Wehner was projecting a headwind "in 2022," not quantifying a past impact for 2021.  *Id.*  Plaintiffs jump from Wehner's forecast of a $10 billion impact in 2022 to an unsupported assertion that the impact "was" $10 billion in 2021.  *Id.*  But that's not what Wehner said.  Indeed, on the earnings call, an analyst asked Wehner to "give a little color" to the "$10 billion headwind," and Wehner explained, "we're just estimating what we think

---

[6]  While Plaintiffs allege that "85% of all iPhones had updated to iOS" by "June 3, 2021," *id.* ¶ 172, that does not mean that 85% of iPhones had *also* opted into the new iOS settings, *id.* ¶ 186.

1    is the overall impact" of the iOS privacy changes to "our 2022 revenue forecast." Ex. 16 at 15.

2          **C.     The Allegations About The Reels Introduction Must Be Dismissed**

3          Plaintiffs' allegations about Reels, which once again try to transmogrify proactive risk

4    disclosures into acts of securities fraud, are equally baseless.

5              **1.     Plaintiffs Fail To Plead A False Or Misleading Statement**

6          Plaintiffs challenge four risk disclosures (**Statements 3, 8, 13, 18**) cautioning that Meta

7    may "introduce new stand-alone products" that "attract users away from [products] where we have

8    more proven means of monetization," and advised that, "from time to time these efforts have

9    reduced, and may in the future reduce, engagement with one or more products and services in favor

10   of other products or services that we monetize less successfully." AC ¶¶ 227, 237, 247, 257. Meta

11   added that such "decisions may adversely affect our business and results of operations and may

12   not produce the long-term benefits that we expect." *Id.*  Plaintiffs assert that these caveats misled

13   investors by saying that adverse effects from Reels were "merely possible," when (or so Plaintiffs

14   claim) Reels "already had, on net," caused such adverse effects. *Id.* ¶¶ 228, 238, 248, 258.

15         Plaintiffs' theory does not withstand scrutiny.  Again, the challenged statements informed

16   investors that launching new products "ha[s] reduced . . . engagement with [existing] products"

17   with more "proven means of monetization." *Id.* ¶¶ 227, 237, 247, 257.  From Q1 onwards,

18   Defendants disclosed to investors that Reels was "compet[ing]" with Meta's existing products. *Id.*

19   ¶¶ 205, 213.  And while Meta was "seeing really strong engagement on video," Defendants warned

20   in Q1 that the overall "shift to video" was creating "some softness" "[o]n the impression front"

21   because video was not as well monetized as older features, like Newsfeed. Ex. 19 at 14; AC ¶ 205.

22   Defendants repeated in Q2 and Q3 that Reels was "monetizing at lower rates," AC ¶ 207, and it

23   was "shifting" engagement from other more established products, *id.* ¶ 213.  And they emphasized

24   that Reels was a "long-term" investment.  Ex. 11 at 10; *see* Ex. 13 at 13.  So any claim that

25   Defendants failed to disclose the risks associated with Reels would fail—because that is "exactly"

26   what they disclosed. *McGovney*, 367 F. Supp. 3d at 1056.

27         Given that reality, Plaintiffs are left to speculate that Reels had *already*, "on net," harmed

28   ad impressions and revenue growth during the first three quarters of 2021.  AC ¶¶ 228, 238, 248,

258.  That speculation is off the mark.  Because the challenged risk disclosures did not say one way or another whether or how Reels in particular was affecting ad impressions or revenues, a drop in either is "not inconsistent with the [challenged] statements" and thus cannot support a claim.  *Ronconi*, 253 F.3d at 434.[7]  Regardless, Plaintiffs plead no particularized facts in support.  *See McGovney*, 367 F. Supp. at 1057 (rejecting similar allegation).  FE1 purported to know about "a material drop in revenue due to the iOS privacy changes," AC ¶ 316, not the Reels introduction.  And Plaintiffs' claims of an adverse impact dating back to Q1 do not grapple with the reality that Reels did not launch on Facebook until late Q3.  *Id.* ¶ 199.

### 2.   Plaintiffs Fail To Plead Loss Causation

Plaintiffs have no viable corrective disclosure—because they do not allege anything that "correct[ed]" the challenged statements.  *BofI*, 977 F.3d at 790.  While Plaintiffs claim that the February 2, 2022 earnings announcement informed investors "for the first time" that Reels negatively affected Meta's business during Q1, Q2, and Q3 of 2021, AC ¶¶ 220, 292, the statements they cite concerned Q4 or 2022, not the first three quarters of 2021.  *See* Ex. 16 at 1-2 (Zuckerberg statement referencing Meta's "Q4 results," cited in AC ¶ 217); *id.* at 11 (Zuckerberg statement noting expectation for "near-term slower growth" for 2022, cited in AC ¶ 318); *id.* at 10 (Wehner statement that Reels "is going to be a headwind" in 2022, cited in AC ¶ 219).  Zuckerberg also repeated on that same supposedly "corrective" earnings call that he believed Reels "will grow" overall engagement, *id.* at 12, just as Wehner had previously opined in Q3, that "we're able to with Reels drive incremental engagement with Instagram and Facebook," AC ¶ 213.

### D.   The Allegations About Sandberg's Conduct Must Be Dismissed

Plaintiffs' Section 14(a) and Section 10(b) claims concerning Sandberg's alleged use of corporate resources fare no better than their other allegations.

### 1.   Plaintiffs' Section 14(a) Claim Fails

Plaintiffs assert that proxy statements issued on April 9, 2021 (**Statement 5**) and April 8,

---

[7]  Contrary to Plaintiffs' intimation, AC ¶ 202, Defendants did not suggest that Reels would *boost* ad impressions or revenues from day one.  Indeed, investors knew that Reels ads did not launch on Instagram until late in Q2—and that Reels did not launch on Facebook *at all* until late in Q3. *Id.* ¶¶ 197, 199.

2022 (**Statement 22**) were misleading for not disclosing supposed personal assistance that Sandberg allegedly received on corporate matters.  AC ¶¶ 231-32, 265-66.  This Section 14(a) claim fails for three reasons.

First, it misunderstands how Section 14(a) claims work.  To satisfy the essential link-requirement, Plaintiffs must show that their alleged losses were the "result of the corporate action authorized by the proxy statement."  *Cowin*, 741 F.2d at 428.  That means Plaintiffs had to allege that the "proxy statement[s]" here "directly authorize[d] the loss-generating corporate action"— that is, the allegedly improper assistance Sandberg received.  *Paypal*, 2018 WL 466527, at *4. Which is not possible.  Any such assistance necessarily occurred *before* the challenged proxy statement—and proxies cannot authorize action taken "before those proxy statements were released."  *Kelley v. Rambus, Inc.*, 384 F. App'x 570, 573 (9th Cir. 2010); *accord Hulliung v. Bolen*, 548 F. Supp. 2d 336, 341 (N.D. Tex. 2008).  And although the proxies addressed in part Sandberg's reelection as a director, any "subsequent" misfeasance was "only an incident to the election of directors" and thus "not actionable under section 14(a)."  *Cowin*, 741 F.2d at 428; *accord Goodman Life*, 594 F.3d at 797; *Gen. Elec. Co. by Levit v. Cathcart*, 980 F.2d 927, 933 (3d Cir. 1992); *Paypal*, 2018 WL 466527, at *4.

Second, Plaintiffs fail to plead particularized facts showing that Sandberg received personal assistance that should have been disclosed.  To begin, Rule 9(b) applies because Plaintiffs' Section 14(a) claim alleges knowing misconduct and thus "clearly sounds in fraud," notwithstanding the AC's contrary assertion.  *Desaigoudar*, 223 F.3d at 1022 & n.5; *see* AC ¶ 307. And the "PSLRA['s] pleading requirements apply to claims brought under Section 14(a)" of all stripes.  *Knollenberg v. Harmonic, Inc.*, 152 F. App'x 674, 682 (9th Cir. 2005); *accord Golub v. Gigamon Inc.*, 372 F. Supp. 3d 1033, 1045 (N.D. Cal. 2019).  But neither their complaint (nor the articles it relies on) lay out the "who, what, when, where, and how" of the purported personal assistance. *Twitter*, 29 F.4th at 619.  The AC speaks vaguely about "a team that included [Meta] employees as well as paid outside advisers" in 2016 and 2019, but does not say who they were or what role they played, AC ¶ 132.  Indeed, the news article on which the AC relies said that the team worked together only in 2016, not 2019.  Ex. 26 at 2-3.  The AC is even less detailed about

1   how Meta employees allegedly "assisted" Sandberg during "her book tours," "support[ed] her

2   personal foundation," and helped "plan her wedding."  AC ¶¶ 138-40.  All this is a far cry from

3   the "high degree of meticulousness" that Rule 9(b) requires.  *Desaigoudar*, 223 F.3d at 1022.[8]

4                      **2.      Plaintiffs' Section 10(b) Claim Fails**

5              Plaintiffs' Section 10(b) claim about Sandberg's June 1, 2022 statement to a CNBC host

6   (**Statement 23**) is even more deeply flawed.  The AC has no facts contradicting Sandberg's remark

7   that her resignation from Meta was about wanting "to do something else with her life and to focus

8   on her philanthropy," AC ¶ 267—which was clearly puffery—or otherwise backing up the

9   conclusory assertion that she was "motivated in part by concerns about Meta's internal

10  investigation," *id.* ¶ 268.  On the contrary, the June 10, 2022 Wall Street Journal article on which

11  Plaintiffs rely reported that Meta's review "played *no role* in [Sandberg's] decision to leave."

12  Ex. 10 at 2 (emphasis added).  Because that article "neither revealed new information" about

13  Sandberg's motivation, "nor contradicts [her] earlier statements," Plaintiffs have failed to establish

14  both (i) a false or misleading statement, and (ii) a corrective disclosure for loss-causation purposes.

15  *Doyun Kim v. Advanced Micro Devices, Inc.*, 2019 WL 2232545, at *9 (N.D. Cal. May 23, 2019).

16          **E.      There Is No Strong Inference Of Scienter**

17             Plaintiffs' failure to adequately allege scienter provides yet another independent basis for

18  dismissing this lawsuit.  Again, to plead scienter under the PSLRA, Plaintiffs must "state with

19  particularity facts giving rise to a strong inference that the defendant acted with [scienter]," 15

20  U.S.C. § 78u-4(b)(2)(A)—that is, with "a mental state embracing intent to deceive, manipulate, or

21  defraud," *Tellabs*, 551 U.S. at 319.  This stringent standard demands a "comparative inquiry" that

22  weighs the strength of Plaintiffs' scienter theory against innocent explanations for the conduct

23

24  ───────────────

    [8]  To the extent Plaintiffs also assert a Section 10(b) claim based on these "exact same factual

25  allegations," it confirms the claim "sounds in fraud"—and fails for lack of particularized
    allegations.  *Rubke*, 551 F.3d at 1161.  Plaintiffs also have not pled loss causation regarding alleged

26  wedding assistance, as it was "previously reported" before the June 10, 2022 article cited by
    Plaintiffs.  *See* Ex. 10 at 1-2.  All of these allegations, moreover, flunk even Rule 8(a)'s baseline

27  pleading standard because the sparse facts "presented are consistent with" an "innocent
    alternative" explanation.  *Eclectic Properties E., LLC v. Marcus & Millichap Co.*, 751 F.3d 990,

28  998-99 (9th Cir. 2014).  Coordination on Sandberg's public-facing activities protected her
    "reputation," which was concededly vital to Meta's "success."  AC ¶ 150.

1    alleged.  *Id.* at 323-24.  If the innocent explanation is "more plausible," the case "cannot go

2    forward."  *Nguyen*, 962 F.3d at 419.  Here, the innocent explanation is far more plausible.

3                **1.    Plaintiffs Have No Cogent Theory Of Scienter**

4        The facts alleged here do not suggest fraudulent intent.  The mere fact that Plaintiffs

5    "allege[] knowledge" of the GNBA cannot support an inference that Defendants "intentionally

6    misled investors, or acted with deliberate recklessness."  *NVIDIA*, 768 F.3d at 1056-57.

7    Defendants had good reason not to address the GNBA, much less discuss it in detail.  Meta is a

8    multinational company that has countless agreements.  The challenged statements—which discuss

9    competitors, business risks, and growth drivers across sprawling global operations—necessarily

10   spoke at a higher level of generality than any one contract.  *See supra* at 13-14.  Plus, the GNBA

11   was *already* publicly known before the Class Period.  *See supra* at 15.  Repeating what investors

12   already knew would have been downright odd.

13       Plaintiffs' theory of scienter regarding the iOS privacy changes "does not make a whole

14   lot of sense."  *Nguyen*, 962 F.3d at 415.  Plaintiffs accuse Meta of pointlessly concealing negative

15   effects of the iOS privacy changes for a time, only to face "inevitable fallout" later on.  *Id.*  But

16   this theory has no "legs" because Plaintiffs' allegations do not and cannot show that Defendants

17   "sought to profit from this scheme in the interim, such as by selling off their stock" strategically.

18   *Id.*  The AC does not allege that Sandberg sold any stock during the Class Period.  AC ¶¶ 320-24.

19   It also concedes that all of Zuckerberg's sales, and all but two of Wehner's, were made "according

20   to [a] pre-determined 10b5-1 trading plan," which does not support scienter.  *Metzler Inv. GMBH*

21   *v. Corinthian Colleges, Inc.*, 540 F.3d 1049, 1067 n.11 (9th Cir. 2008); *see* AC ¶¶ 322-23.

22   Wehner's other two sales were made to satisfy "tax withholding" requirements, *see* Ex. 22 at 1-2;

23   Ex. 23 at 1-2, which doesn't either, *see In re Bristol-Myers Squibb Sec. Litig.*, 312 F. Supp. 2d

24   549, 561 (S.D.N.Y. 2004).  And regardless, nothing in the AC suggests that these trades were

25   "dramatically out of line with [their] prior trading practices" and made "at times calculated to

26   maximize the personal benefit from undisclosed inside information."  *Ronconi*, 253 F.3d at 435;

27   *see Zucco*, 552 F.3d at 1005 (noting that "plaintiffs must provide 'a meaningful trading history'"

28   to support scienter).

1    Likewise, it would make no sense for Defendants to conceal a known negative revenue

2  effect from Reels, only to confront (supposedly) "inevitable fallout" within months. *Nguyen*, 962

3  F.3d at 415.   The far more compelling inference is that Defendants reasonably waited to

4  "investigat[e]" and accurately determine Reels' revenue effect as the product grew on Instagram

5  and launched on Facebook, *NVIDIA*, 768 F.3d at 1065, while highlighting the tradeoffs involved

6  in the short term and issuing accurate financial reports.

7    Plaintiffs' sparse allegations related to Sandberg's allegation do not evince any nefarious

8  intentions, either.   As explained, the few facts alleged suggest only that Sandberg's advisers and

9  Meta employees worked together to maintain Sandberg's public image, something concededly

10  vital to Meta's prospects. *See supra* at 21-22 & n.8.   At minimum, then, there was a "reasonable

11  basis" to believe at the time that Meta employees' role in those efforts did not need to be disclosed

12  as compensation. *In re Oracle Corp. Sec. Litig.*, 627 F.3d 376, 390 (9th Cir. 2010).   And again,

13  the mere fact that Sandberg "had knowledge" of this coordination scarcely shows that she

14  "believed that they were misrepresenting" her compensation to investors. *Rigel*, 697 F.3d at 883.

15    **2.    Plaintiffs' Formulaic Scienter Allegations Are Unconvincing**

16    Lacking any cogent scienter theory, Plaintiffs pull a few pages from the playbook used in

17  nearly every securities fraud case.   Their arguments are as lacking in merit as they are in originality.

18    **Core operations.**   Plaintiffs contend that, because the GNBA, the iOS changes, and the

19  Reels transition "concerned" Meta's core operations—*i.e.*, its advertising business—Defendants

20  acted with scienter. AC ¶¶ 325-32.   Not so.   Plaintiffs "cannot prevail by simply incanting [a core

21  operations] theory." *Plumley v. Sempra Energy*, 847 F. App'x 426, 431 (9th Cir. 2021).   And by

22  their flawed logic, Defendants would be charged with knowing everything about Meta's massive

23  advertising operation simply because advertising is critical to Meta's business.   No case holds *that*.

24  But even if these conclusory core operations allegations were anything more than make-weight,

25  they would do nothing to fix the fundamental flaws discussed above. *See supra* at 22-24.

26    **Confidential witness.**   Plaintiffs cite one confidential witness ("FE1"), but to no avail.

27  FE1 was at least six rungs below any individual Defendant in the company hierarchy, AC ¶¶ 173,

28  and is not alleged to have personally interacted with any of them, *see id.* at ¶¶ 173-74, 316.   FE1

thus lacks "personal knowledge" about the Defendants' mental states. *Zucco*, 552 F.3d at 995. On top of that, FE1 concededly said nothing about the GNBA, Sandberg's alleged conduct, or the Reels transition. *See* AC ¶¶ 173-74, 316. And even as to iOS, FE1 just baldly asserts that "Meta began to see a material drop in revenue due to the iOS privacy changes in [Q2] of 2021," *id.*, without any specifics to back up that assertion. *See supra* at 18.

  **Defendants' "admissions."** Plaintiffs also assert that Defendants made admissions regarding the iOS privacy changes and the Reels transition. On the iOS privacy changes, the AC claims that Meta "assured investors that the impact of Apple's iOS privacy changes was in line with the Company's expectations." AC ¶ 310; *see id.* ¶¶ 311-14. So what? Again, Defendants repeatedly warned investors about the "headwinds" created by the iOS privacy changes, while emphasizing that the changes had "negatively impacted" revenue starting in Q2 of 2021. *See supra* at 17. And Plaintiffs nowhere dispute that the effects of the iOS privacy changes were "in line" with "the higher end" of Meta's expectations. AC ¶¶ 311, 313. None of that shows Defendants acted with an intent to deceive.

  So too for Reels. Plaintiffs cite remarks from Wehner and Zuckerberg on February 2, 2022 that: (i) "you're always going to see some amount of shifting of people's time and attention to the new" feature, (ii) "[a]s the engagement of the new thing starts to replace some of the engagement in the old thing, it creates a near-term headwind for revenue," and (iii) "it's definitely the right thing to lean into [Reels]," "even though it may create some near-term slower growth." AC ¶¶ 317-18. Again, so what? Those statements echoed what Defendants had told investors all along—*i.e.*, that like other new products, Reels came with a short-term tradeoff between higher engagement and lower monetization, relative to existing products. *See supra* at 19. And with more information in February 2022, they again warned about a near-term drag on revenue growth, while expressing a belief that it would be worth the long-term gain. Ex. 16 at 5, 10, 14; *see* AC ¶ 13. These candid assessments show that Defendants were "endeavoring in good faith to inform" investors, not deceive them. *Yates v. Mun. Mortg. & Equity, LLC*, 744 F.3d 874, 888 (4th Cir. 2014).

## V.   CONCLUSION

  For all these reasons, this action should be dismissed.

1    Dated: October 18, 2022            LATHAM & WATKINS LLP

2                                       By:   */s/ Andrew B. Clubok*
                                              Andrew B. Clubok (pro hac vice)
3                                             andrew.clubok@lw.com
                                             Susan E. Engel (pro hac vice)
4                                             susan.engel@lw.com
                                             555 Eleventh Street, N.W., Suite 1000
5                                             Washington, D.C. 20004-1304
                                             Telephone: +1.202.637.2200
6

7                                             Elizabeth L. Deeley (CA Bar No. 230798)
                                              elizabeth.deeley@lw.com
8                                             Melanie M. Blunschi (CA Bar No. 234264)
                                              melanie.blunschi@lw.com
9                                             Nicholas Rosellini (CA Bar No. 316080)
                                              nick.rosellini@lw.com
10                                            505 Montgomery Street, Suite 2000
                                             San Francisco, CA 94111
11                                            Telephone: +1.415.391.0600

12

13

14                                            *Attorneys for Defendants Meta Platforms, Inc.,*
                                             *Mark Zuckerberg, David Wehner, and Sheryl*
15                                            *Sandberg*

16

17

18

19

20

21

22

23

24

25

26

27

28