**POMERANTZ LLP**
Jeremy A. Lieberman (pro hac vice)
Austin P. Van (pro hac vice)
600 Third Avenue, 20th Floor
New York, NY 10016
Telephone: (212) 661-1100
jalieberman@pomlaw.com
avan@pomlaw.com

Jennifer Pafiti (SBN 282790)
1100 Glendon Avenue, 15th Floor
Los Angeles, California 90024
Telephone: (310) 405-7190
jpafiti@pomlaw.com

*Counsel for Lead Plaintiffs*

*Additional Counsel on Signature Page*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### OAKLAND DIVISION

| | |
|---|---|
| PLUMBERS AND STEAMFITTERS LOCAL 60 PENSION TRUST, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>META PLATFORMS, INC., MARK ZUCKERBERG, DAVID WEHNER, SHERYL SANDBERG, and SUSAN LI,<br><br>Defendants. | CASE NO.  4:22-cv-01470-YGR<br><br>**OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THE AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**<br><br>**CLASS ACTION**<br><br>Hon. Yvonne Gonzalez Rogers |

# TABLE OF CONTENTS

I.   INTRODUCTION ................................................................................................. 1

II.  FACTUAL BACKGROUND ............................................................................... 4

    A.   Meta Misled Investors About the Material Impact of Apple's iOS Changes ........ 4

    B.   Meta Misled Investors About the Impact of Its Transition to Reels ..................... 5

    C.   Meta Misstated and Omitted Defendant Sandberg's "Other Benefits" ................ 6

    D.   Meta Failed to Disclose Its Jedi Blue Agreement with Google ............................ 7

III. LEGAL STANDARDS ........................................................................................ 8

    A.   Section 10(b) of the Exchange Act ....................................................................... 8

        1.   Material Misrepresentation or Omission ................................................... 8

        2.   Loss Causation ........................................................................................... 9

        3.   Scienter ...................................................................................................... 9

    B.   Section 14(a) and Rule 14-9(a) ............................................................................. 9

IV.  META MISLED INVESTORS ABOUT THE MATERIAL IMPACT OF IOS ........... 10

    A.   The AC Adequately Pleads Misleading Statements ........................................... 10

    B.   The AC Adequately Pleads Loss Causation ....................................................... 16

    C.   The AC Adequately Pleads Scienter ................................................................... 17

V.   META MISELD INVESTORS ABOUT ITS TRANSITION TO REELS ................... 18

    A.   The AC Adequately Pleads Misleading Statements ........................................... 18

    B.   The AC Adequately Pleads Loss Causation ....................................................... 20

    C.   The AC Adequately Pleads Scienter ................................................................... 21

VI.  META MISLED INVESTORS ABOUT DEFENDANT SANDBERG'S BENEFITS .. 22

    A.   The AC Adequately Pleads a Section 14(a) Violation ........................................ 22

        1.   The AC Adequately Pleads Misleading Statements and Omissions ........ 22

        2.   The AC Adequately Pleads an Essential Link ......................................... 23

    B.   The AC Adequately Pleads a Section 10(b) Violation ....................................... 24

1                      1.     The AC Adequately Pleads Misleading Statements and Omissions........ 24

2                      2.     The AC Adequately Pleads Loss Causation ............................................ 25

3                      3.     The AC Adequately Pleads Scienter ....................................................... 25

VII.    META FAILED TO DISCLOSE ITS JEDI BLUE AGREEMENT WITH GOOGLE .. 26

        A.     The AC Adequately Pleads Misleading Statements and Omissions.................... 26

        B.     The AC Adequately Pleads Loss Causation ....................................................... 29

        C.     The AC Adequately Pleads Scienter................................................................. 30

VIII.   CONCLUSION........................................................................................................ 30

**TABLE OF ABBREVIATIONS**

| | |
|---|---|
| **AC or Amended Complaint** | Amended Complaint for Violations of the Federal Securities Laws (August 2, 2022) (Dkt. 55) |
| **Class Period** | January 28, 2021 to June 9, 2022 |
| **Company** | Meta Platforms, Inc. |
| **Competition Half-Truths** | Defendants' misleading statements alleged at AC ¶¶ 223, 233, 241, 251, 261 |
| **Defendants** | Meta Platforms, Inc., Mark Zuckerberg, David Wehner and Sheryl Sandberg |
| **EC** | European Commission |
| **FE** | former employee |
| **Individual Defendants** | Mark Zuckerberg, David Wehner and Sheryl Sandberg |
| **Jedi Blue Agreement** | 2018 agreement referenced in ¶¶ 86-87 of the Amended Complaint |
| **Lead Plaintiffs** | Menorah Mivtachim Insurance Ltd., Menorah Mivtachim Pensions and Gemel Ltd., The Phoenix Insurance Company Ltd. and The Phoenix Provident Pension Fund Ltd. |
| **Material Impact Misstatements** | Defendants' misleading statements alleged at AC ¶¶ 245, 255 |
| **Meta** | Meta Platforms, Inc. |
| **Motion** | Defendants' Notice of Motion and Motion to Dismiss the Amended Complaint; Memorandum of Points and Authorities in Support (October 18, 2022) (Dkt. 61) |
| **Plaintiffs** | Menorah Mivtachim Insurance Ltd., Menorah Mivtachim Pensions and Gemel Ltd., The Phoenix Insurance Company Ltd. and The Phoenix Provident Pension Fund Ltd. |
| **PSLRA** | Private Securities Litigation Reform Act of 1995 (15 U.S. Code § 78u–4) |
| **Q1 2021** | first quarter ended March 31, 2021 |
| **Q2 2021** | second quarter ended June 30, 2021 |
| **Q3 2021** | third quarter ended September 30, 2021 |
| **Q4 2021** | fourth quarter ended December 31, 2021 |
| **Revenue Impact Misrepresentations** | Defendants' misrepresentations that Apple's iOS changes had not yet "significantly impact[ed]" Meta's advertising revenue (Amended Complaint ¶¶ 245, 255) |
| **Sandberg Benefits Misstatements** | Defendants' misleading statements alleged at AC ¶¶ 231, 265) |
| **SEC** | United States Securities and Exchange Commission |
| **Targeting Misrepresentations** | Defendants' misrepresentations that Apple's iOS changes had not yet "materially and adversely affected" Meta's "targeting and measurement capabilities" (Amended Complaint ¶¶ 245, 255) |

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Alphabet Sec. Litig., R.I. v. Alphabet, Inc.*,
1 F.4th 687 (9th Cir. 2021) ........................................................................................9

*Berson v. Applied Signal Tech., Inc.*,
527 F.3d 982 (9th Cir. 2008) ...........................................................................8, 17, 21

*Brendon v. Allegiant Travel Co.*,
412 F. Supp. 3d 1244 (D. Nev. 2019) .......................................................................29

*Castellano v. Young & Rubicam, Inc.*,
257 F.3d 171 (2d Cir. 2001)........................................................................................27

*Craig Frazier Design, Inc. v. Zimmerman Agency LLC*,
No. 10-CV-1094 (SBA), 2010 WL 3790656 (N.D. Cal. Sep. 27, 2010)...................8

*Davis v. Yelp, Inc.*,
No. 18-CV-00400-EMC, 2021 WL 4923359 (N.D. Cal. Sept. 17, 2021) ...............25

*Dura Pharms., Inc. v. Broudo*,
544 U.S. 336 (2005)....................................................................................................9

*Fecht v. Price Co.*,
70 F.3d 1078 (9th Cir. 1995) ......................................................................................8

*Hughes v. Dempsey-Tegeler & Co.*,
534 F.2d 156 (9th Cir. 1976) .....................................................................................13

*In re Apple Sec. Litig.*,
No. 19-cv-02033-YGR, 2020 WL 2857397 (N.D. Cal. June 2, 2020)...............26, 27

*In re Atossa Genetics Inc. Sec. Litig.*,
868 F.3d 784 (9th Cir. 2017) .................................................................................8, 12

*In re BofI Holding, Inc. Sec. Litig.*,
977 F.3d 781 (9th Cir. 2020) ......................................................................................9

*In re Daou Sys.*,
411 F.3d 1006 (9th Cir. 2005) ..........................................................................9, 20, 25

*In re Galena Biopharma, Inc. Sec. Litig.*,
117 F. Supp. 3d 1145 (D. Or. 2015) .........................................................................26

*In re Gilead Scis. Sec. Litig.*,
536 F.3d 1049 (9th Cir. 2008) ....................................................................................8

*In re Google Digital Advert. Antitrust Litig.*,
No. 21-CV-6841, 2022 WL 4226932 (S.D.N.Y. Sept. 13, 2022)......................................28, 29

*In re Gupta Corp. Sec. Litig.*,
900 F. Supp. 1217 (N.D. Cal. 1994) ..........................................................................12, 13, 16

*In re Hot Topic, Inc. Sec. Litig.*,
No. CV 13–02939 (SJO), 2014 WL 7499375 (C.D. Cal. May 2, 2014) ..................................9

*In re LendingClub Sec. Litig.*,
254 F. Supp. 3d 1107 (N.D. Cal. 2017) ................................................................................26

*In re Maxim Integrated Prod., Inc., Deriv. Lit.*,
574 F. Supp. 2d 1046 (N.D. Cal. 2008) ................................................................................24

*In re NVIDIA Corp. Sec. Litig.*,
768 F.3d 1046 (9th Cir. 2014) ..............................................................................................27

*In re Quality Sys.*,
865 F.3d 1130 (9th Cir. 2017) ........................................................................................10, 18

*In re Syntex Corp. Sec. Litig.*,
95 F.3d 922 (9th Cir. 1996) ............................................................................................8, 13

*In re Tesla Sec. Litig.*,
477 F. Supp. 3d 903 (N.D. Cal. 2020) ..................................................................................29

*In re Twitter, Inc. Sec. Litig.*,
506 F. Supp. 3d 867 (N.D. Cal. 2020) ..................................................................................11

*In re Vivendi, S.A. Sec. Litig.*,
838 F.3d 223 (2d Cir. 2016)..................................................................................................27

*In re Wells Fargo & Co. S'holder Derivative Litig.*,
282 F. Supp. 3d 1074 (N.D. Cal. 2017) ................................................................................23

*Kearns v. Ford Motor Co.*,
567 F.3d 1120 (9th Cir. 2009) ..............................................................................................23

*Khoja v. Orexigen Therapeutics, Inc.*,
899 F.3d 988 (9th Cir. 2018) ..................................................................................................8

*Knollenberg v. Harmonic, Inc.*,
152 F. App'x 674 (9th Cir. 2005) ............................................................................................9

*Loos v. Immersion Corp.*,
762 F.3d 880 (9th Cir. 2014) ................................................................................................29

*Maiman v. Talbott,*
    No. SACV 09-0012 AG (ANx), 2010 U.S. Dist. LEXIS 142712 (C.D. Cal.
    Aug. 9, 2010) ...................................................................................................9

*Matrixx Initiatives, Inc. v. Siracusano,*
    563 U.S. 27 (2011)..........................................................................................28

*McCormick v. Fund Am. Cos.,*
    26 F.3d 869 (9th Cir. 1994) ...........................................................................27

*No. 84 Emp.-Teamster Joint Council Pension v. Am. W. Holding Corp.,*
    320 F.3d 920 (9th Cir. 2003) ....................................................................17, 30

*Police & Fire Ret. Sys. of Detroit v. Crane,*
    87 F. Supp. 3d 1075 (N.D. Cal. 2015) ...........................................................18

*Schueneman v. Arena Pharm. Inc.,*
    840 F.3d 698 (9th Cir. 2016) .......................................................................8, 27

*Siracusano v. Matrixx Initiatives, Inc.,*
    585 F.3d 1167 (9th Cir. 2009) ...................................................................11, 18

*Stratte-Mcclure v. Stanley,*
    776 F.3d 94 (2d Cir. 2015).............................................................................27

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.,*
    551 U.S. 308 (2007)............................................................................9, 18, 26

*United States v. Jenkins,*
    633 F.3d 788 (9th Cir. 2011) .........................................................................14

*United States v. Laurienti,*
    611 F.3d 530 (9th Cir. 2010) .........................................................................27

*United States v. Smith,*
    155 F.3d 1051 (9th Cir. 1998) .......................................................................14

*WPP Lux. Gamma Three Sarl v. Spot Runner, Inc.,*
    655 F.3d 1039 (9th Cir. 2011) .......................................................................27

**Statutes**

15 U.S.C. §78j(b) ........................................................................................3, 8, 24

15 U.S.C. §78u-4 ..........................................................................................3, 8, 9

PSLRA ..............................................................................................................23

**Rules**

Fed. R. Civ. P. 8 ................................................................................................23

Fed. R. Civ. P. 9(b) ............................................................................................23

**Other Authorities**

17 C.F.R. §229.105 ............................................................................................27

17 C.F.R. § 229.303(b)(2) ..................................................................................27

17 C.F.R. § 229.402(c)(2)(ix) ............................................................................22

17 C.F.R. § 240.10b-5 ........................................................................................27

17 C.F.R. § 240.14a .....................................................................................*passim*

SEC, Staff Accounting Bulletin No. 99, 64 FR 45150-01 (1999) ..............12, 13, 14, 16

## I.       INTRODUCTION

Meta is among the largest and most scrutinized companies in the world.  Given Meta's size, investors correctly recognize that each word uttered by Meta has been carefully parsed by lawyers, and consequently, the most sophisticated research analysts in the world similarly parse each word Meta utters for its implications for the value of the Company.  During the Class Period, Meta faced uncertainty about fundamental aspects of its business, such as how and whether it would adapt to privacy changes from Apple that affected Meta's primary revenue source, and whether it could transition successfully to a more modern, short-form video content platform.  Accordingly, during this period, investors' already intense scrutiny of Meta's precise words became even more heightened.  Like all publicly traded companies, Meta is duty bound to inform investors about the state of its business and attendant risks in a manner that does not mislead the investing public.  During the Class Period, Defendants catastrophically failed in fulfilling this obligation.  In its SEC filings, Defendants repeatedly and unmistakably misled investors about four critical aspects of Meta's business.

*First*, Defendants directly implied that the impact of Apple's iOS privacy changes on Meta's business was not yet *material*.  In the context of assuring investors on conference calls that Meta was actively taking steps to "mitigate" the impact of the iOS changes, and that the impact was "manageable," Defendants directly implied in their SEC filings that the impact of the iOS changes was indeed not yet *material*, and would only become material in the future if Meta's mitigation efforts were not successful.  That statement, the only statement the Company made in its SEC fillings addressing the impact, was blatantly false—the iOS changes severely impacted the Company's targeting and measurement capabilities by Q2 2021 at the latest (when the Company was still making these misstatements), and the Company later disclosed that this ongoing loss in targeting and measurement capabilities was having a devastating impact on its revenues.  Indeed, the author of an internal paper addressing the impact has stated as much.

In response, Defendants argue that other statements by the Company somehow made clear that the impact of the iOS changes was material.  Before even addressing those statements, Defendants' argument faces the insurmountable problem that Meta's stock dropped by an

historically unprecedented 26% upon the Company's first disclosure that the impact of the iOS changes was material.  Expert analysts were completely caught off guard by the material impact of Apple's iOS changes on Meta's business, and stated, for example, that the impact was "much bigger" than they had believed.  In any event, Defendants are flatly mistaken—in not a single statement did Meta ever state or imply that the impact of the iOS changes was *material*. Defendants also wrongly dispute the falsity of some of their misstatements, but they do not even contest the falsity of their key misstatements concerning the material impact of the iOS changes on Meta's *targeting and measurement capabilities*.

*Second*, Meta misled investors to believe that its transition from old content formats like pictures to its new short-form video format Reels was not negatively impacting its business, when in fact it was.  While users view fewer ad impressions per hour spent watching Reels, users spend more total hours watching Reels.  The only place Defendants ever addressed whether this tradeoff was having a net negative impact on the Company was in its SEC filings, where Defendants directly and repeatedly implied that the transition to Reels was not yet having a negative impact. Unlike Defendants' statements implying that Apple's iOS privacy changes were not *materially* impacting its business, here, Defendants statements implied that Meta's transition to Reels was not negatively impacting its business *at all*.

Defendants argue primarily that Meta never disclosed that Reels had had a negative impact on the Company in the first two quarters of its introduction.  Defendants are mistaken.  In multiple statements in Q4 2021, the Company made clear that the impact of Reels was negative from the start, stating for example, that "in the beginning" of the transition to a new format, the new format creates a "headwind for revenue."  Defendants' alternative view of the facts in the AC, that the impact of Reels was somehow positive for two quarters, then for some reason turned negative, apart from being nonsensical, is inconsistent with these clear statements by Defendants themselves in Q4 2021.

*Third*, in the Company's 2021 and 2022 proxy statements, Defendants misled investors by failing to include among Defendant Sandberg's "other benefits" that she had received extensive personal assistance from Meta employees on numerous matters, including planning her wedding,

supporting her personal foundation, and burying a news story adverse to her ex-boyfriend, conduct for which she is being investigated by Meta. These misstatements violated both Section 14(a) and Section 10(b) of the Exchange Act. Left with little else to argue against such clear violations, Defendants complain generally that the allegations of Sandberg's misconduct are not as detailed as they would like. The AC's pages of allegations, including all the details of multiple articles from *The Wall Street Journal*, are more than adequate under any applicable pleading standard.

*Fourth*, Defendants misled investors by stating that they faced "significant competition in every aspect of their business . . . including Google" when in fact, under the terms of an undisclosed agreement with Google, code-named "Jedi Blue," Meta effectively faced no competition in its purchasing of ad impressions through Google's Exchange Bidding. Defendants trumpet a recent holding that Meta's Jedi Blue Agreement did not violate antitrust laws, but they fail to recognize that this is not an antitrust case—Meta's misstatements to investors concealing an agreement that was highly likely to (and ultimately did) raise antitrust scrutiny were misleading regardless of whether the Agreement ultimately was found to violate antitrust laws.

*Finally*, the primary hurdle to pleading securities law violations under the PSLRA, scienter, is effortlessly cleared in this case. Defendants repeatedly admitted that they knew the material impact of the iOS privacy changes on their business when they stated that the impact they were observing was in line with their expectations. Defendants admitted that they knew about the negative impact of Reels on their business because they explained that the transition to Reels was a strategic decision that they recognized all along would create short-term headwinds. Defendant Sandberg unquestionably knew about her own use of Meta employees for personal ends. And Defendants Sandberg and Zuckerberg signed and were personally involved in negotiating the Jedi-Blue Agreement. Defendants' meritless scienter arguments, that knowledge does not support scienter, appear to be little more than half-hearted attempts to distract from these dispositive considerations.

Defendants' many misstatements mutually reinforce the conclusion, not that this case somehow lacks merit for seeking to redress them, but that Meta has a chronic problem of misleading investors. So profound was the difference between the picture of Meta that Defendants

1   painted for investors and the truth, that upon revelation of that truth, investors lost hundreds of

2   billions of dollars.  These losses were not due to some external shock or the materialization of a

3   disclosed risk, and they had little if anything to do with a miniscule change in active users.  They

4   occurred because Defendants blatantly misled the most sophisticated investors in the world about

5   fundamental aspects of their business.  Investors are entitled to have a jury decide as much.

6   **II.      FACTUAL BACKGROUND**

7         **A.      Meta Misled Investors About the Material Impact of Apple's iOS Changes**

8        Meta's revenues come almost entirely from advertising, and Meta largely relies on Apple's

9   iOS mobile operating system to access the target market for its advertisers.  AC ¶¶ 156-58.

10  Beginning in 2Q 2021, Apple introduced a new version of iOS with updated privacy settings that

11  prevented Meta from accessing most of the information about users that it had previously used to

12  make ads targeted to those users and to measure the effectiveness of ads.  Accordingly, Apple's

13  privacy changes to iOS greatly hindered Meta's targeting and measurement capabilities and made

14  the platform far less attractive for advertisers.  AC ¶¶ 159-66.

15       Meta recognized early on that Apple's iOS privacy changes would materially impact

16  Meta's targeting and measurement capabilities and its revenues.  AC ¶¶ 167-84.  Meta conducted

17  extensive internal studies on the impact of the iOS privacy changes.  AC ¶ 174.  Apple's iOS

18  privacy changes were introduced in Q2 2021 and immediately had a material impact on Meta's

19  targeting and measurement capabilities and its revenues, as a former employee who wrote a paper

20  on the subject has confirmed.  AC ¶¶ 173-74.  Meta studied the impact, and stated in each of Q2,

21  Q3 and Q4 that the impact was "in line with [its] expectations."  AC ¶¶ 309-15.  Meta made clear

22  that nearly all of the impact of the iOS changes on its targeting and measurement capabilities was

23  felt by Q3 because the vast majority of iOS users had installed the new privacy changes by that

24  quarter.  AC ¶¶ 178, 181, 186.  Despite this knowledge, Meta repeatedly declined to tell investors

25  that the iOS privacy changes were having a material impact on business, or to characterize the

26  extent of the drop.  The *only* statement Meta made in its SEC filings about the impact directly

27  implied that the impact was not material.  AC ¶¶ 176, 183.  Instead, Meta repeatedly told investors

28

1  that they were taking steps to mitigate the impact, and that the impact was "manageable," which

2  reinforced the implication in Meta's SEC filings that the impact was not material.  AC ¶¶ 167-84.

3      On February 2, 2022, analysts were stunned when Meta finally revealed that its mitigation

4  efforts were not working and that Apple's iOS privacy changes were having a material adverse

5  impact on Meta's measurement and targeting capabilities—to such a degree that they would reduce

6  Meta's 2022 revenues by $10 billion.  AC ¶¶ 185-86.  These admissions, together with the

7  disclosures concerning Reels described below, caused a 26% drop in Meta's value in one day—in

8  absolute terms, the largest single-day drop in value of a U.S. company in history.  AC ¶ 187.  The

9  most sophisticated stock analysts in the world, such as J.P Morgan, were completely caught off

10  guard by Meta's announcement of the impact, stating, "We believe the iOS headwind of ~$10B

11  this year is . . . much bigger than expected."  *See* Ex. 2 to Van Decl. at 1.

12      **B.      Meta Misled Investors About the Impact of Its Transition to Reels**

13      Meta's most significant emerging competitor is TikTok, an app that shows highly engaging

14  short-form videos.  AC ¶¶ 192-93.  In response to this competition, on August 5, 2020, Meta

15  introduced a similar short-form video format called "Reels" on Instagram.  AC ¶¶ 196, 199.  Meta

16  introduced ads on Reels in June 2021.  AC ¶ 197.

17      Meta's introduction of Reels, and its shift in content from older picture and text formats to

18  a short-form video format, involved a tradeoff.  On the one hand, users spend more hours overall

19  viewing short-form videos with Reels than they do looking at older content formats with pictures

20  and text.  On the other hand, due to the short-form video format of Reels, in which ads are displayed

21  only between videos, Meta displays fewer ads per hour on Reels than per hour on older formats in

22  which ads may be placed between pictures or text that a user may scroll through quickly.  Crucially,

23  whether Meta's shift from older content formats to Reels caused a positive or negative impact *on*

24  *net* for Meta's results of operations cannot be inferred merely from the fact that Reels monetizes

25  at a lower rate, i.e., that Meta displays fewer ads per hour on Reels than on other formats.  As users

26  spend more time on Reels than on older formats, the introduction of Reels may well have increased

27  the total number of ads viewed by users.  For example, if previously users spent per week on

28  average one hour on older formats and viewed twenty ads per hour (twenty ads per week), yet

1  spent three hours on Reels and viewed ten ads per hour (thirty ads per week), the introduction of

2  Reels would have positively impacted ad impressions and revenue.

3          The only statement Meta made in its SEC filing addressing the impact of Reels directly

4  implied that the shift to Reels was not adversely affecting Meta's business and results of

5  operations.  AC ¶¶ 203-15.  In every other communication with investors in which Meta discussed

6  its transition to Reels, Meta at no point stated or implied whether the transition was negatively

7  impacting its business.  AC ¶¶ 202-15.  Investors were left with only the Company's statement in

8  its SEC filings implying the transition was not having a negative impact.  All the while, however,

9  Meta was well aware that the Company would suffer losses initially in transitioning to Reels, as

10 Meta later revealed its transition strategy involved short-term losses for long-term gains.

11 AC ¶¶ 217-19, 318.  Meta finally announced on February 2, 2022 that the transition to Reels was

12 creating a "headwind" that was negatively impacting the Company's business.  When investors

13 learned for the first time that the transition to Reels would require a period of losses, Meta's stock

14 collapsed.  AC ¶¶ 216-21.  Indeed, analysts such as Morgan Stanley were shocked by Reels'

15 negative impact on growth, stating, "revenue guide was ~6% below us, with FB talking to

16 headwinds from impressions/time shifting toward video surfaces like Reels."  *See* Ex. 1 to Van

17 Decl. at 1.

18          C.      **Meta Misstated and Omitted Defendant Sandberg's "Other Benefits"**

19          Defendant Sandberg, Meta's COO, repeatedly used Company resources for undisclosed

20 personal benefit, including assistance to support her personal foundation, writing her personal

21 book, planning her wedding, and quashing adverse personal news stories.  AC ¶¶ 130-46.  For

22 example, in 2016 and 2019, Defendant Sandberg and multiple Facebook employees formed a team

23 to address an adverse new story against Sandberg's then boyfriend, Activision Blizzard Inc.'s CEO

24 Bobby Kotick.  AC ¶¶ 132-33.  The team  discussed what damaging information they believed the

25 U.K. publication *MailOnline* had obtained against Kotick, and whether they could persuade the

26 publication's leadership that Kotick had been wrongfully accused.  *Id*.  The team successfully

27 suppressed this personal story both years.   AC ¶ 135.   Moreover, during their three-year

28

relationship, from 2016 up to and including 2019, Kotick regularly used Facebook employees for public-relations advice.  AC ¶ 136.

In its April 9, 2021 and April 8, 2022 Proxy Statements, Meta made extensive disclosures about Defendant Sandberg's use of corporate resources for personal matters such as security and use of private aircraft, but the Company failed to disclose Sandberg's improper use of corporate resources for the personal matters described above.  AC ¶ 144.  Defendant Sandberg knew that she was receiving personal benefits from Meta other than those disclosed in the Company's annual proxy filings with the SEC because Sandberg knew about her own actions.  AC ¶¶ 307-08.

When *The Wall Street Journal* published multiple articles revealing Sandberg's misuse of corporate resources for personal expenses, AC ¶¶ 151-55, Meta's stock dropped precipitously. AC ¶¶ 298-303.  Sandberg resigned from her role as COO in early June 2022.  AC ¶ 131.

### D.      Meta Failed to Disclose Its Jedi Blue Agreement with Google

In September 2018, Meta entered into an anticompetitive agreement with Google, internally dubbed "Jedi Blue" by Google (the "Jedi Blue Agreement").  AC ¶¶ 81-88.  The agreement benefitted Google by effectively discouraging Meta from endorsing "header bidding" that would threaten Google's broader revenues.  AC ¶¶ 81-82, 88.  In return, the Jedi Blue Agreement gave Meta decisive pricing and timing advantages over competitors in its purchasing of ad impressions through Google's Exchange Bidding, and so Meta faced *de minimis*, if any, competition in that critical aspect of its business.  AC ¶¶ 89-106.  Nevertheless, Defendants repeatedly told investors that the Company "face[d] significant competition in every aspect of [its] business, including . . . Google."  AC ¶¶ 115-17.  Defendants Sandberg and Zuckerberg clearly knew that Meta did not face significant competition from Google in every aspect of its business because they were personally familiar with the Jedi Blue Agreement.  AC ¶ 84.  Sandberg personally helped negotiate the Jedi Blue Agreement and discussed the deal with Zuckerberg, who approved it.  *Id*.  Defendant Sandberg signed the Agreement.  AC ¶ 85.  Moreover, Defendants themselves recognized that the Jedi Blue Agreement was likely to give rise to antitrust scrutiny. AC ¶¶ 112-14.

1        On April 11, 2021, *The Wall Street Journal* published an article revealing that Meta had

2  admitted to the existence of the Jedi Blue Agreement, and upon that revelation and related

3  disclosures, Meta's share price fell significantly.  AC ¶¶ 283-84.

4  **III.    LEGAL STANDARDS**

5        On a 12(b)(6) motion, the court "accept[s] the Plaintiffs' allegations as true and construe[s]

6  them in the light most favorable to Plaintiffs." *In re Atossa Genetics Inc. Sec. Litig*., 868 F.3d 784,

7  793 (9th Cir. 2017).  "[T]he purpose of a 12(b)(6) motion to dismiss is to test the sufficiency of

8  the complaint, not to decide its merits[.]" *Craig Frazier Design, Inc. v. Zimmerman Agency LLC*,

9  No. 10-CV-1094 (SBA), 2010 WL 3790656, at *6 (N.D. Cal. Sep. 27, 2010).  When ruling on a

10  motion to dismiss a securities case, any "skepticism is best reserved for later stages of the

11  proceedings when the plaintiff's case can be rejected on evidentiary grounds." *In re Gilead Scis.*

12  *Sec. Litig.*, 536 F.3d 1049, 1057 (9th Cir. 2008).

13       **A.    Section 10(b) of the Exchange Act**

14        Of the six elements of a claim under Section 10(b), Defendants' Motion addresses only

15  three:  (1) a material misrepresentation or omission by the defendant; (2) scienter; and (3) loss

16  causation. *See Schueneman v. Arena Pharm. Inc*., 840 F.3d 698, 704 (9th Cir. 2016).

17           **1.    Material Misrepresentation or Omission**

18        A statement is misleading "if it would give a reasonable investor the 'impression of a state

19  of affairs that differs in a material way from the one that actually exists.'" *Berson v. Applied Signal*

20  *Tech., Inc.*, 527 F.3d 982, 985 (9th Cir. 2008).  Falsity may be adequately alleged by "'specify[ing]

21  . . . each statement alleged to have been misleading, . . . the reason or reasons why the statement

22  is misleading, and . . . stat[ing] with particularity all facts on which that belief is formed.'" *Khoja*

23  *v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 1008 (9th Cir. 2018); 15 U.S.C. § 78u-4(b)(1)(B).

24  Unless "the adequacy of the disclosure . . . is so obvious that reasonable minds [could] not differ,"

25  the question of "[w]hether a statement is misleading and whether adverse facts were adequately

26  disclosed . . . should be left to the trier of fact." *In re Syntex Corp. Sec. Litig*., 95 F.3d 922, 926

27  (9th Cir. 1996) (quoting *Fecht v. Price Co.,* 70 F.3d 1078, 1081 (9th Cir. 1995).

28

### 2.     Loss Causation

Plaintiffs face a minimal bar in pleading loss causation.  To plead loss causation, Plaintiffs need only "provide enough factual content to give the defendant 'some indication of the loss and the causal connection that the plaintiff has in mind,'" which "should not prove burdensome." *In re BofI Holding, Inc. Sec. Litig.*, 977 F.3d 781, 794 (9th Cir. 2020) (quoting *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 347 (2005)) (cited by Defendants); *In re Daou Sys.*, 411 F.3d 1006, 1026 (9th Cir. 2005) (same).

### 3.     Scienter

A complaint adequately pleads scienter if it pleads with particularity "facts giving rise to a strong inference that the defendant acted with the required state of mind."  15 U.S.C. § 78u-4(b)(2)(A); *Alphabet Sec. Litig., R.I. v. Alphabet, Inc.*, 1 F.4th 687, 701 (9th Cir. 2021).  The inference of scienter "need not be irrefutable . . . or even the most plausible," and no "smoking-gun" is required.  *See Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 324 (2007).  A "strong inference" is merely one that is "cogent and at least as compelling as any opposing inference one could draw from the facts alleged."  *Id.*  That is, "a tie goes to the Plaintiff." *Maiman v. Talbott*, No. SACV 09-0012 AG (ANx), 2010 WL 11421950, at *5 (C.D. Cal. Aug. 9, 2010) (quotations omitted).   Allegations showing "actual access to the disputed information" . . . support[] a strong inference of scienter." *Alphabet Sec. Litig.*, 1 F.4th at 706.

### B.     Section 14(a) and Rule 14-9(a)

A plaintiff may state a claim under Section 14(a) by alleging that:  "(1) a proxy statement contained a material misrepresentation or omission which (2) caused the plaintiff injury and (3) that the proxy solicitation itself, rather than the particular defect in the solicitation materials, was an essential link in the accomplishment of the transaction."  *In re Hot Topic, Inc. Sec. Litig.*, No. CV 13–02939 (SJO), 2014 WL 7499375, at *4 (C.D. Cal. May 2, 2014).  No allegations of scienter are required to plead a claim under Section 14(a)—merely negligence suffices.  *See Knollenberg v. Harmonic, Inc.*, 152 F. App'x 674, 682 (9th Cir. 2005) ("Negligence is sufficient to support a claim for a violation of Section 14(a).")

## IV.    META MISLED INVESTORS ABOUT THE MATERIAL IMPACT OF IOS

### A.    The AC Adequately Pleads Misleading Statements

In the context of telling investors that the impact of Apple's iOS privacy changes was "manageable" and that the Company was taking steps to "mitigate" any impact, Defendants explicitly misled investors in Meta's SEC filings about the material impact of these changes on Meta's business (Defendants' "Material Impact Misstatements").  AC at ¶¶ 245, 255.  In its Q2 and Q3 2021 Forms 10-Q, Meta stated, concerning the iOS privacy change developments:

> [1] These developments have limited our ability to target and measure the effectiveness of ads on our platform and negatively impacted our advertising revenue, [2] and if we are unable to mitigate these developments as they take further effect in the future, *our targeting and measurement capabilities will be materially and adversely affected*, which would in turn significantly impact our future advertising revenue growth.

(Emphasis added.)    These Misstatements contained two independently actionable misrepresentations—they implied that Apple's iOS privacy changes had not yet "*materially* and adversely affected" Meta's "targeting and measurement capabilities" (the "Targeting Misrepresentations"), and that the changes had not yet "significantly impact[ed]" Meta's advertising revenue (the "Revenue Impact Misrepresentations").

The Misstatements implied these falsehoods in at least two distinct ways.  *First*, the company *contrasted* the current state of affairs in clause [1] with a potential future state of affairs in clause [2], and expressly distinguished the former from the latter by stating that as the developments "take further effect in the future," the effect could be *material*.  The Company made clear that "if they were unable to mitigate these developments," the current state of affairs would *change*—the impact would become material—and so unmistakably implied that the current impact was not yet material.  *See In re Quality Sys.*, 865 F.3d 1130, 1144 (9th Cir. 2017) (statement is misleading if it "affirmatively create[s] an impression of a state of affairs that differ[s] in a material way from the one that actually exist[s].")  *Second*, and independently, the Company implied in clause [2] alone that the risk of a *material* adverse effect from the iOS privacy changes was merely hypothetical.  Defendants stated that "*if we are unable to mitigate these developments as they take further effect in the future, our targeting and measurement capabilities will be materially and*

1  *adversely affected*," and so implied that that risk of a material impact had not yet come to fruition.[1]

2  *See In re Twitter, Inc. Sec. Litig.*, 506 F. Supp. 3d 867, 883 (N.D. Cal. 2020) (Gonzalez-Rogers,

3  J.) (quoting *Siracusano v. Matrixx Initiatives, Inc.*, 585 F.3d 1167, 1181 (9th Cir. 2009), 527 F.3d

4  at 986 (9th Cir. 2008)) ("when . . . risks have already materialized, disclosing them 'in the abstract'

5  while omitting that they have 'already come to fruition' is misleading").

6        Meta's Targeting Misrepresentations were misleading because, contrary to what those

7  statements directly implied, at the time of the misstatements on July 29, 2021 and October 26,

8  2021, Apple's iOS privacy changes already had had a material impact on Meta's targeting and

9  measurement capabilities.  Eighty-five percent of iPhone "users had *adopted* [i.e., opted into]

10  Apple's iOS privacy changes by June 1, 2021," AC ¶ 186 (emphasis added), so very nearly the

11  full, ongoing impact of the iOS privacy changes on Meta's targeting and measurement capabilities

12  had arrived by that date.  This 85% reduction of iPhone targeting and measurement capabilities by

13  June 1, 2021 clearly were material to investors because Meta's iPhone advertising business

14  depended on those capabilities. AC ¶ 53; ECF No. 61-9 at 17.  Moreover, Meta's mitigation efforts

15  had little effect.  AC ¶ 186; *see* ECF No. 61-18 at 4.  Similarly, Meta's Revenue Impact

16  Misrepresentations were misleading because the statements implied that Apple's iOS privacy

17  changes had not yet had a material impact on Meta's revenues, when in fact, by the time of the

18  Misstatements, those change already had had such a material impact, as explained below, *infra*

19  Part IV(A).

20        Defendants rightly do not dispute in their Motion that the phrasing of the Material Impact

21  Misstatements did not imply that the iOS changes had had no material impact on the Company,

22  and so focus their arguments elsewhere.  Defendants *first* search high and low for statements prior

23  to February 2, 2022 in which they claim to have informed the market that the impact of the iOS

24  changes was material.  Mot. at 17-18.  Even before reaching these statements, Defendants'

25  argument faces the insurmountable problem that when Defendants first announced the financial

---

[1] In the same two ways, Meta also implied that the iOS privacy changes had not yet "significantly impact[ed Meta's] future advertising revenue growth."

OPPOSITION TO DEFENDANTS' MOTION TO DISMISS (CASE NO. 4:22-cv-01470-YGR)

impact of the changes (an impact only modestly above the SEC's threshold for materiality[2]), Meta's stock dropped by an historic 26%.  AC ¶¶ 292-93.  J.P. Morgan wrote, for example, that the impact was "much bigger than expected."  Ex. 2 to Van Decl. at 1.  Investors clearly had no idea that the impact of the changes was material.

In any event, in *not one* of these statements did Defendants ever state or imply that the impact of the iOS changes on Meta's business was *material*.  Defendants argue that clause [1] of the Material Impact Misstatements "said exactly what Plaintiffs claim was omitted," Mot. at 17, but Defendants ignore that clause [1], unlike clause [2], glaringly omitted to state that the changes already had made a "*material*" impact on Meta's targeting and measurement capabilities.

Defendants similarly argue that Meta noted on earnings calls that Apple's iOS privacy changes had negatively impacted Meta's advertising revenue, Mot. at 17, but in fact, Meta expressly declined on those calls to comment on the *extent* or *materiality* of the impact. Defendants point first to an exchange between Susan Li and an analyst:

> Q:  Are you suggesting that you're not seeing any material impact at all to your ad revenue, maybe help quantify that?  [. . .]  I mean, do you think you'll lose a few percentage points of growth here?  Or how do you view that?  [. . .]
>
> Li:  No, sorry, I'm not suggesting that at all.  We certainly see an impact.  [. . .] [T]here is definitely an impact, although I don't think we've quantified that.

Far from implying that Meta had experienced a *material* impact, Li declined to repeat that operative term in the question and stated only that Meta had experienced "an impact."  Her responding "no" to the question, "[a]re you suggesting that you're not seeing any material impact at all," in no way implied that Meta was indeed experiencing a material impact.  Read in any light, and certainly in the light most favorable to Plaintiffs, *In re Atossa*, 868 F.3d at 793, she was stating that, while Meta had experienced some impact, her comment was not meant to address the extent of that impact.  In any event, any ambiguity in what she meant was clearly resolved when she

---

[2] Even if Meta's 2022 revenue had been projected in February 2, 2022 not to have increased at all in 2022, and so to have been $117,929,000,000, ECF No. 61-25 at 64, the $10 billion impact of iOS changes in 2022 would have amounted to an impact of approximately 8.5%, modestly higher than the SEC's general 5% threshold for materiality.  SEC, Staff Accounting Bulletin No. 99, 64 FR 45150-01 (1999); *see In re Gupta Corp. Sec. Litig.*, 900 F. Supp. 1217, 1231 (N.D. Cal. 1994).

1  explained in the same breath that she "d[id]n't think [Meta had ] quantified that," directly implying

2  she was declining to characterize the extent or materiality of the impact.

3       Similarly, Defendants Zuckerberg and Sandberg's statements that Meta had experienced

4  revenue "headwinds" did nothing to imply that those headwinds were *material*, as Meta routinely

5  used the terms "headwind" and "tailwind" to refer to numerically immaterial impacts as well.  *See,*

6  *e.g.*, ECF No. 61-17 at 6 (Q4 2021 Earnings Call Tr.) (immaterial impact of $307 million or 0.91%

7  called a "headwind"); ECF No. 61-14 at 7 (Q3 2021 Earnings Call Tr.) (immaterial impact of $259

8  million or 0.89% called a "tailwind").  Defendant Sandberg's statement on the Q3 2021 earnings

9  call, ECF No. 61-14 at 5, that Meta would have seen positive quarter-over-quarter growth absent

10  Apple's iOS privacy changes likewise did not inform investors that the changes were material, as

11  Meta missed positive quarter-over-quarter growth by only $304 million, and that impact amounted

12  to only about 0.25% of Meta's annual revenues in 2021 of $117,929,000,000—nowhere near the

13  generally accepted 5% threshold for materiality established in SEC guidelines and caselaw.  *See*

14  SEC, Staff Accounting Bulletin No. 99, 64 FR 45150-01 (1999); *In re Gupta*, 900 F. Supp. at 1231

15  (N.D. Cal. 1994).  That impact is likewise nowhere near the magnitude of the $10 billion impact

16  the Company later announced that the privacy changes would have on its 2022 revenues.[3]

17  AC ¶ 186.

18       Indeed, not only did Defendants never state or imply that the impact of the iOS changes

19  was already material, but Defendants also repeatedly suggested, even apart from the Material

20  Impact Misstatements, that the iOS changes were not a major concern.  Defendants repeatedly

21  stated that they were taking steps to "mitigate" any impact, that the situation was "manageable,"

22  and that the Company was "making encouraging progress" on "solutions" to the iOS changes.

23  AC ¶¶ 167-84.  The Material Impact Misstatements must be considered in this context, which

24  makes those Misstatements all the more plainly misleading.  *See In re Syntex Corp.*, 95 F.3d at 929.

25

26  [3] Indeed, even if *counterfactually* Defendants had clearly stated somewhere outside of their SEC
    filings that the impact of iOS would be material (they did not come close to doing so), their

27  Material Impact Misstatements in their SEC filings would still have been misleading and would
    still be actionable because the Company's contradictory information would have created doubt
    and inflated Meta's share price.  *See Hughes v. Dempsey-Tegeler & Co.*, 534 F.2d 156, 176 (9th

28  Cir. 1976) ("even in the context of complete disclosure, a misrepresentation may cause the person
    to whom it is addressed to discount the other information available to him").

*Second*, Defendants assert that "no reasonable investor could have believed that the iOS changes were having an insignificant impact given Meta's fulsome disclosures."  Mot. at 17-18. The opposite is demonstrably true.  As noted above, expert analysts were so completely caught off guard by Meta's announcement on February 2, 2021 of the impact of Apple's iOS changes that Meta's share price dropped by an historic 26%.  AC ¶ 5.  Analysts at J.P. Morgan, for example, expressly noted that the impact was "much bigger than expected."  Ex. 2 to Van Decl. at 1.

*Third*, Defendants argue that the adverb "significantly" is too "vague" to be actionable. Mot. at 18.  Yet Defendants rightly do not attempt to argue that the key term in the Material Impact Misstatements, namely "materially," is vague.   "Material" is a term of art well known to sophisticated investors and would clearly be understood, in the context of legal filings with the SEC, as having a meaning consistent with the SEC's use of that term, namely, to describe information that would make a difference in the minds of reasonable investors.[4]  *See United States v. Jenkins*, 633 F.3d 788, 802 (9th Cir. 2011) (quoting *United States v. Smith*, 155 F.3d 1051 (9th Cir. 1998)) (statement is material if "a reasonable investor would have considered it useful or significant"); SEC, Staff Accounting Bulletin No. 99, 64 FR 45150-01 (1999) (fact is "material" if there is "a substantial likelihood that a reasonable person would consider it important").

*Finally*, Defendants argue that the AC does not adequately allege that the Material Impact Misstatements were false when made because the AC does not adequately allege the "then-existing revenue effects" of the iOS changes.  Mot. at 18.  Yet Defendants rightly do not even dispute that the AC adequately alleges the falsity of the independently actionable Targeting Misrepresentation, which does not turn on revenue allegations.  The Complaint clearly alleges that Apple's iOS privacy changes effectively blocked Meta's access to the data on which its critical targeting and measurement capabilities relied, and that by June 1, 2021 "85% of users had adopted Apple's iOS privacy changes." ¶ 186.  Moreover, the Company admitted on February 2, 2021 that its mitigation

---

[4] Moreover, the term "significantly" in the context of the Material Impact Misstatements is also not vague as it appears as a synonym to the term of art "material."  Defendants argue that the February 3, 2022 Form 10-K contained the same language, Mot. at 18, but the Amended Complaint alleges that statements by Defendant Wehner on a conference call on that date that the iOS privacy changes impacted the Company's business by $10 billion served as a corrective disclosure of the Company's misstatements in its Forms 10-K.

efforts had done little to limit the effect of the iOS privacy changes on Meta's targeting and measurement capabilities.  AC ¶ 186; *see* ECF No. 61-18 at 4.  These facts adequately allege the falsity of the Material Impact Misstatements, even if (counterfactually) the AC contained no allegations concerning revenue at all.

With respect to the Revenue Impact Misrepresentation, Defendants argue that the statements by FE1 unambiguously declaring that the iOS privacy changes had materially impacted Meta's advertising revenue by Q2 2021 are insufficient to allege as much, because, according to Defendants, the AC lacks allegations explaining why FE1 had this knowledge.  Mot. at 18.  Not so.  FE1 was in an optimal position to know that about this material drop because FE1 "was tasked with writing a brief detailing . . . the anticipated revenue implications" of the iOS privacy changes.  AC ¶ 173.

In any event, the falsity of the Revenue Misrepresentation is also evident from Defendant Wehner's statement in Q4 2021 that "the impact of iOS overall as a headwind" in 2022 would be approximately "$10 billion," which he termed "a pretty significant headwind."  AC ¶ 186.  The relative impact of the iOS changes on Meta's revenue, if anything, only would have decreased in 2022, as approximately the full ongoing impact on revenue was felt by Q3 2021 AC ¶¶ 178, 181, 186, and thereafter Meta was trying to mitigate the impact, AC ¶¶ 168, 170, 175, 179.  As the Company admitted the impact of iOS changes for 2022 would be a "pretty significant" $10 billion, and as the relative impact of those changes on Meta's business in Q3 and Q4 2021 was equal to or greater than the relative impact in 2022, it follows that the relative impact of iOS changes in Q3 and Q4 2021 was likewise "pretty significant," i.e., of a similarly material relative magnitude.[5]

---

[5] Indeed, the minimum quantitative impact on revenue is calculable and material.  Meta disclosed that its projected revenue growth for Q1 2022 was 3-11% year-over-year, and the Company gave reasons to expect revenue growth to be *lower* in 2022 than in 2021 given that year-over-year comparisons for the first half of the year would be made with periods prior to the iOS changes (in addition to various headwinds).  *See* ECF No.61-17 at 8.  Even assuming, contrary to its statements, that Meta projected revenue growth to be the *same* in 2022 as it was in 2021, and so projected 2022 revenue to increase at a rate of 37% year-over year, *id*. at 6, Meta's revenue would have been projected to be $161,562,730,000 in 2022.  Accordingly, even under the most extreme assumption about the Company's projected revenue that remains consistent with its statements implying lower 2022 growth, the Company's projected impact of $10,000,000,000 on its revenue would equal a headwind of 6.189% on revenues of $161,562,730,000.  An ongoing headwind of at least 6.189%

**B.** **The AC Adequately Pleads Loss Causation**

The truth concealed by the Material Impact Misstatements was revealed on February 2, 2021 when, among other things, Defendant Wehner revealed that "the impact of iOS overall as a headwind" in 2022 was approximately "$10 billion," which amounted to "a pretty significant headwind." AC ¶ 292. This statement revealed the falsity of the Targeting Misrepresentations. It revealed that the impact of the iOS privacy changes on Meta's targeting and measurement capabilities was material because the privacy changes had limited those capabilities enough to cause a material impact on Meta's business results. Meta had informed investors that approximately the full ongoing impact of the iOS privacy changes had arrived by Q3 2021 and had remained constant or decreased through mitigation efforts thereafter. *See, e.g.*, AC ¶ 181 ("the bulk of iOS 14 updates were completed as we entered Q3" so "we don't expect a similar step up in Q4"); *see also* ¶¶ 166, 170, 178, 181, 186. Accordingly, Meta's revelation that the iOS privacy changes were materially impacting Meta's targeting and measurement capabilities in 2022 likewise revealed that they had materially impacted those capabilities from Q3 2021 at the latest. Wehner's statement also revealed the falsity of the Revenue Misrepresentations because it revealed that the changes had had a material impact on Meta's revenues since Q3 2021 at the latest, as explained above. *See supra* note 5.

Defendants rightly do not argue that the AC fails to plead loss causation with respect to the Targeting Misrepresentations. Mot. at 18-19. Defendants argue that the AC fails to plead loss causation with respect to the Revenue Misrepresentations because, according to them, Defendant Wehner's statement of the impact of the iOS privacy changes on Meta's 2022 revenues revealed nothing about the effect of those changes on Meta's revenues in prior quarters. Mot. at 18-19. Yet given that the ongoing effect of the iOS privacy changes on Meta's targeting and measurement capabilities had fully arrived by Q3 2021, Wehner's statement of the impact of iOS privacy changes on 2022 revenues revealed that the impact of those changes in prior quarters had likewise been material, as explained above. *See supra* note 5.

---

on Meta's quarterly 2021 revenues was material under the generally accepted threshold for materiality of 5%. *See* SEC, Staff Accounting Bulletin No. 99, 64 FR 45150-01 (1999); *In re Gupta*, 900 F. Supp. at 1231.

1    **C.    The AC Adequately Pleads Scienter**

2    Defendants knew that the impact of Apple's iOS privacy changes was material by Q2 2021

3    at the latest, and so knew that the Material Impact Misstatements were misleading.  Both before

4    and after the introduction of Apple's iOS privacy changes, Defendants—including Defendant

5    Wehner personally—assured investors that the impact of Apple's iOS privacy changes was in line

6    with Meta's expectations.  AC  ¶¶ 309-16.  Accordingly, the Company repeatedly admitted that it

7    had conducted internal studies calculating the impact of Apple's iOS privacy changes on Meta's

8    business, and that the results of these studies were known to the CFO.  These studies, personally

9    drafted by FE1, AC ¶¶ 174, 316, as well as Meta's own subsequent disclosures on February 2,

10   2022, AC ¶¶ 185-187, confirm that the iOS privacy changes had a material impact in targeting and

11   measurement capabilities and revenues by Q2 2021.  The core operations inference further

12   supports scienter because the privacy changes dramatically impacted Meta's core business—it

13   would be "absurd to suggest" that management lacked knowledge of the impact.[6]  *Berson*,

14   527 F.3d at 989.

15   Defendants argue that the theory of scienter advanced in the AC is nonsensical because,

16   according to Defendants, the AC alleges in effect that Meta "pointlessly conceal[ed] negative

17   effects of the iOS privacy changes for a time, only to face inevitable fallout later on.[7]  Mot. at 23.

18   Not so.  The AC amply alleges that Defendants hoped to mitigate the impact of the iOS privacy

19

20   [6] Contrary to Defendants' suggestion, Mot. at 24, the core operations inference charges Defendants only with knowing information so "prominent" that it would be "absurd to suggest" they did not
21   know it, *Berson*, 527 F.3d at 989, information like the impact of iOS that required Meta to make fundamental changes to its core advertising business, AC ¶¶ 328-30.

22   [7] Defendants also appear to argue either that Defendants' repeated admissions that the impact of
23   the iOS changes was in line with their expectations somehow did not show that they knew the impact of those iOS changes, or that knowledge that a statement is misleading does not support a
24   strong inference of scienter.  Mot. at 25 ("So what?").  If the former, Defendants refuse to accept the obvious.  If the latter, Defendants refuse to accept black-letter law.  *See, e.g.*, *No. 84 Emp.-*
25   *Teamster Joint Council Pension v. Am. W. Holding Corp*., 320 F.3d 920, 942 (9th Cir. 2003) (scienter adequately pleaded where "allegations . . . raise[d] a strong inference that Defendants
26   knew that the . . . problems were ongoing and, thus, that the statements made . . . were false").
     Likewise, Defendants admissions that the impact of the iOS changes was in line with their
27   expectations, *see, e.g.*, AC ¶¶ 311-13, were admissions that Defendants knew what that impact was and had formed numerical expectations about it, regardless of whether the ultimate impact
28   was on the higher or lower end of those expectations.

changes.  AC ¶¶ 168, 175-76, 183, 186.  Had Meta been able to mitigate the impact effectively, Meta might have largely escaped the fallout from the iOS privacy changes by reassuring investors in Q4 2021 that going forward the impact of the privacy changes would be immaterial.  In any event, the AC need not plead motive at all to adequately plead scienter—Defendants' knowledge of the falsity of their misstatements is sufficient.[8]  *See Tellabs*, 551 U.S. at 325.

## V.   META MISELD INVESTORS ABOUT ITS TRANSITION TO REELS

### A.   The AC Adequately Pleads Misleading Statements

During the Class Period, Defendants misled investors by implying that Meta's transition from focusing users on text and photos to short-form videos in Reels was, *on net*, not having a negative impact on the Company's results of operations, when in fact it was.  In its Q2 and Q3 2021 Forms 10-Q, Meta made the following statements (the "Reels Effect Misstatements"):

> We also may introduce new features or other changes to existing products, or introduce new stand-alone products, that attract users away from properties, formats, or use cases where we have more proven means of monetization, such as News Feed.  In addition, as we focus on growing users and engagement across our family of products, from time to time these efforts have reduced, and may in the future reduce, engagement with one or more products and services in favor of other products or services that we monetize less successfully or that we are not growing as quickly.  *These decisions may adversely affect our business and results of operations* and may not produce the long-term benefits that we expect.

(Emphasis added.)  These Misstatements were misleading because they directly implied that, while there was a risk that Meta's decision to introduce a "new feature[]" "may adversely affect [Meta's] business and results of operations," that risk had not yet materialized.  *See, e.g.*, *Siracusano v. Matrixx Initiatives, Inc*., 585 F.3d 1167, 1181 (9th Cir. 2009).  In fact, by the time of the Reels Effect Misstatements, Meta's decision to introduce Reels already had had, overall, an adverse effect on Meta's business.  The Company first disclosed this fact on February 2, 2022, when Meta held a conference call in which it revealed that its transition to Reels was, from its introduction, having a net negative impact on Meta's business and results of operations.  AC ¶¶ 216-20.

---

[8] Contrary to Defendants' argument, Mot. at 23, the size of Defendants' stock sales "reinforce[]" the inference of scienter.  *In re Quality Sys.*, 865 F.3d 1130, 1146 (9th Cir. 2017).  The value of Zuckerberg's sales increased by 32%, and Wehner sold roughly 20% of his shares.  AC ¶¶ 321-22, 324.  In any event, stock sales need not be alleged at all to allege scienter adequately.  *See Police & Fire Ret. Sys. of Detroit v. Crane*, 87 F. Supp. 3d 1075, 1086 (N.D. Cal. 2015).

1    In their Motion, Defendants argue that the Reels Effect Misstatements disclosed "exactly"

2  what the AC alleges they omitted.  Mot. at 19.  Defendants fail to understand the theory of falsity

3  alleged in the AC, so their Motion fails altogether to respond to it.  As the AC explains:

> Whether Meta's transition to Reels would have a net positive or negative impact on the Company's business could not be determined simply by knowing that Reels was harder to monetize, because Reels is also more engaging—even if users view fewer ads per hour on Reels than on older content formats, users may spend more total hours viewing ads on Reels, such that the total number of ads viewed by users may be greater on net with the introduction of Reels.

AC ¶ 202.  At *no point* outside of the Reels Effect Misstatements did the Company ever clarify by

statement or implication whether Meta's transition to Reels was having a net positive or negative

impact on the Company's business.

    Every one of Defendants' attempts to find such a statement fails.  Mot. at 19.  Meta's

statement that launching new products "ha[s] reduced . . . engagement with [existing] products"

with "more proven means of monetization" did nothing to inform investors about whether the

transition to Reels *on net* was negatively impacting the Company's results of operations—Meta

also informed investors that Reels was more engaging than older formats, so increased

engagement, even with a "means of monetization" with less of a proven track record than older

ones, could well have had a net positive impact on the Company's results.

    Likewise, Defendants' statement that Reels was "compet[ing]" with, and "shifting"

engagement from, Meta's existing products likewise did nothing to inform investors about whether

the transition to Reels *on net* was negatively impacting Meta's business.  Mot. at 19.  This shifting

engagement and internal competition could well have benefitted Meta's business on net because

it was a shift to a product that engaged users for longer periods of time.  The statement that Reels

was "monetizing at lower rates" was simply a statement of the well-disclosed fact that users view

fewer ads per hour on Reels than on older formats; this statement gave no indication of whether,

given that users spend more time on Reels than on older formats, users were viewing more ads

overall with the introduction of Reels.  *Finally*, Defendants' statement that Reels was a "long term"

investment says nothing about whether Reels was at that time negatively or positively impacting

19

1  Meta's business—the comment suggested only that Meta saw the importance of Reels as

2  increasing over time as users transitioned to short-form video.[9]  *See* AC ¶¶ 188-93, 195, 198, 209.

3      Defendants also assert that the Reels Effect Misstatements "did not say one way or another

4  whether . . . Reels . . . was affecting ad impressions or revenues," so Defendants argue that a

5  negative impact from Reels on either metric is "not inconsistent with the [challenged] statements."

6  Mot. at 20.  Defendants' premise is mistaken—as explained above, *supra* Part V(A), the Reels

7  Effect Misstatements clearly implied that the introduction of Reels had not "adversely affect[ed]

8  [Meta's] business and results of operations," when in fact by Q2 2021 it already had.  Contrary to

9  Defendants' assertion, the AC pleads numerous statements by Meta executives that demonstrate

10 that by Q2 2021, Reels was indeed having a negative net impact on Meta's results of operations,

11 *see* AC ¶¶ 216-20,  as explained further in the following section, *infra* Part V(B).

12     **B.    The AC Adequately Pleads Loss Causation**

13     During an earnings call on February 2, 2022, the Company revealed for the first time that,

14 contrary to the clear implication of the Reels Effect Misstatements, the transition to Reels was on

15 net adversely impacting the Company's business and results of operations.  AC ¶¶ 216-20.  For

16 example, Defendant Zuckerberg stated, "in the beginning . . . as the engagement of the new things

17 starts to replace some of the engagement of the old thing, *it creates a near-term headwind for*

18 *revenue.*"  *Id.* at ¶ 218.  Upon this revelation, investors suffered historically unprecedented losses.

19 AC ¶ 5.  These allegations straightforwardly plead "the causal connection that the plaintiff has in

20 mind."  *In re Daou Sys.*, 411 F.3d 1006, 1026 (9th Cir. 2005).

21     Defendants argue that the February 2, 2022 earnings call did not correct the Reels Effect

22 Misstatements because, according to Defendants, the statements made during that call concerned

---

23 [9] Defendants statement that the "shift to video" was creating "some softness" in "impression

24 growth" was made in Q1 2021, prior to the introduction of any ads to Reels. Mot. at 19.  When

   that statement was made, there were no ad impressions on Reels, so any engagement in Reels at

25 that time necessarily negatively impacted ad impressions.  After the introduction of ads in Reels

   in Q2 2021, Meta made no statements outside of the Reels Effect Misstatements about whether ad

26 impressions *on net* were improved or harmed by the introduction of Reels until the corrective

   disclosures on February 2, 2021.  Accordingly, while the Q2 and Q3 Reels Effect Misstatements,

27 AC ¶¶ 247, 257, issued after the introduction of ads on Reels, remain wholly actionable, Plaintiffs

28 concede that the comparable Q1 2021 statement, AC ¶ 237, made prior to the introduction of Reels

   ads, was mistakenly included as a misleading statement in the AC.

only Q4 2021, and so could not have informed investors that the introduction of Reels ads in Q2 and Q3 had negatively impacted Meta's business.  Mot. 19-20.  Defendants are mistaken.  The AC pleads that the introduction of Reels ads had a net negative impact on the Company's revenues from the beginning.  AC ¶¶ 13, 217-19.  As Zuckerberg stated:  "*in the beginning* our ads system and business are not as tuned for the new format, so as the engagement of the new things starts to replace some of the engagement of the old thing, it creates a near-term headwind . . . ." AC ¶ 218.  Zuckerberg also stated that "we're going *to continue* to see some pressure on impression growth in the near term," implying that the negative impact from Reels had been ongoing and was continuing.  AC ¶ 217.  Nothing in the AC or referenced by Defendants supports Defendants' implausible alternative story that Reels somehow positively impacted Meta for two quarters, then shifted to negatively impacting Meta for the "near term" beginning in Q4.

### C.     The AC Adequately Pleads Scienter

Defendants knew that the transition to Reels was negatively impacting Meta's business during the Class period and so knew that the Reels Effect Misstatements were misleading.  Defendants made statements making clear that they understood that the impact of the transition initially would be negative, but that they were investing in Reels strategically to realize benefits in the future.  AC ¶¶ 217-19, 318.  As noted above, on February 2, 2022, Defendant Zuckerberg stated, "in the beginning our ads system and business are not as tuned for the new format, so as the engagement of the new things starts to replace some of the engagement of the old thing, it creates a near-term headwind for revenue."  AC ¶ 218.  On the same call, Defendant Zuckerberg acknowledged, "[W]e think it's definitely the right thing to lean into this and to push us hard to grow Reels as quickly as possible and not hold on the brakes at all, even though it may create some near-term slower growth than we would have wanted."  *Id*.  Moreover, as the transition to Reels was a strategic decision made at the highest levels that directly impacted Meta's core advertising business, the core operations inference further supports the inference of scienter—it would be "absurd to suggest" that management lacked knowledge of the impact of this company-altering transition.  *See Berson*, 527 F.3d at 989.

1    Defendants argue that the theory of scienter advanced in the AC with respect to the Reels

2  Effect Misstatements is also nonsensical because, according to Defendants, there was no reason

3  for Meta to hold back on disclosing the negative impact of Reels if such disclosure was inevitable

4  down the road.  Mot. at 24.  Yet such a disclosure was not inevitable.  Defendants believed Reels

5  would eventually have a positive impact on Meta's business.  AC ¶¶ 217-19, 318.  Meta could

6  have waited until Reels were positively impacting its business to comment on that impact and so

7  have avoided any comment about a negative revenue impact during the transition.   Yet the

8  Company did speak and falsely implied that Reels was not negatively impacting the company's

9  revenue.

10    Defendants also argue that their statements that the introduction of Reels created a near-

11  term headwind for revenue "echoed what Defendants had told investors all along."  Mot. at 25.

12  As explained in detail above, *supra* Part V(A), Defendants are wrong to suggest that they had, at

13  any point prior to February 2, 2022, stated or implied to investors that Reels was having a negative

14  impact on Meta's business, yet their argument is nevertheless a noteworthy admission that, even

15  in their own view, Defendants *knew* "all along" that the initial impact of Reels was negative.  *Id.*

16  **VI.    META MISLED INVESTORS ABOUT DEFENDANT SANDBERG'S BENEFITS**

17      **A.    The AC Adequately Pleads a Section 14(a) Violation**

18          **1.    The AC Adequately Pleads Misleading Statements and Omissions**

19    In Meta's April 9, 2021 and April 8, 2022 Proxy Statements, Defendants misled investors

20  by listing the "Perquisites and Other Benefits" and "All Other Compensation" paid to Defendant

21  Sandberg, yet failing to disclose, as required by law, *see* 17 CFR § 229.402(c)(2)(ix), that among

22  the other benefits that Sandberg had received was extensive personal assistance on a variety of

23  personal matters.  AC ¶¶ 231, 265 ("Sandberg Benefits Misstatements").  Sandberg used corporate

24  resources to support her personal foundation, AC ¶ 139, to write and promote her second book,

25  AC ¶ 138, to plan her wedding, AC ¶ 140, and to bury unflattering news stories about persons with

26  whom she had a personal relationship, AC ¶¶ 130-37.

27    Defendants argue that the AC fails to allege "particularized facts showing that Sandberg

28  received assistance that should have been disclosed."  Mot. at 21.  The particularity requirement

1   of Rule 9(b) extends only so far as necessary to satisfy its animating principle, namely, "that the

2   circumstances constituting the alleged fraud" be 'specific enough to give defendants notice of the

3   particular misconduct . . . so that they can defend against the charge and not just deny that they

4   have done anything wrong.'"  *Kearns v. Ford Motor Co.*, 567 F.3d 1120, 1124 (9th Cir. 2009)

5   (quoting *Bly–Magee v. California*, 236 F.3d 1014, 1019 (9th Cir.2001).  Under Rule 9(b) and the

6   PSLRA, "allegations of 'fraud must be accompanied by the who, what, when, where, and how of

7   the misconduct charged.'"[10]  *Id.*  Here, Plaintiffs specify exactly what statements were misleading,

8   who made them, where and when they were made, and how they are misleading, and so satisfy the

9   requirements of Rule 9(b) and the PSLRA in spades.  *See id.*  The allegations in the AC that

10   Sandberg received undisclosed personal assistance from Meta employees on her book tour and in

11   planning her wedding clearly show that Sandberg failed to disclose "other benefits" of her

12   employment.  Defendants fail to explain what additional detail they feel is missing from these

13   allegations that would be necessary "to give defendants notice of the particular misconduct" that

14   is alleged to be fraudulent, namely the misleading statements and the reasons they were

15   misleading.  *Kearns*, 567 F.3d at 1124.  The pages of detailed allegations in the AC alleging that

16   Sandberg used Meta employees to bury an unflattering story about her ex-boyfriend are likewise

17   clearly adequate.  AC ¶¶ 131-37.  The minor details Defendants do specifically request, such as

18   names of the individual Meta employees who were on the team that assisted Sandberg in 2016 and

19   2019, are not necessary "to give defendants notice of the particular misconduct" adequate to defend

20   against it.  *Kearns*, 567 F.3d at 1124.

21            **2.**      **The AC Adequately Pleads an Essential Link**

22        Plaintiffs may satisfy the essential link requirement of Section 14(a) by alleging that "the

23   proxy statement at issue directly authorize[d] the loss-generating corporate action."  *In re Wells*

24   *Fargo & Co. S'holder Derivative Litig.*, 282 F. Supp. 3d 1074, 1104 (N.D. Cal. 2017).  Here, the

25   loss-generating corporate actions were the election of Defendant Sandberg as COO and the

26

27   _____

[10] Rule 8 pleading standards apply to a Section 14(a) claim because fraud is "not an essential
28   element of a claim" and the AC does not aver fraud with respect to it.  *See Kearns v. Ford Motor*
*Co.*, 567 F.3d 1120, 1124 (9th Cir. 2009).  In any event, the allegations of the AC have no trouble
meeting the requirements of Rule 9(b).

1    approval of her compensation package The Proxy Statements authorized the election of an

2    individual as COO and her compensation package on the false premise that she had not received

3    undisclosed personal benefits.  In fact, shareholders unknowingly elected an individual who had

4    indeed received such undisclosed benefits, and approved her compensation package without being

5    aware that she had received these undisclosed benefits. Shareholders are entitled (among other

6    things) to the difference between the value of Meta with a liability-free individual as COO, and

7    the value of Meta with a COO tainted by a scandal concerning undisclosed benefits.  *See In re*

8    *Maxim Integrated Prod., Inc., Deriv. Lit*., 574 F. Supp. 2d 1046, 1066 (N.D. Cal. 2008) (election

9    of officers actionable under Section 14(a)).

10   Defendants argue that the AC fails to satisfy the essential link requirement because the loss

11   generating corporate action authorized by the Proxy Statements was, in their view, the improper

12   assistance Sandberg received, which they claim occurred prior to the proxy votes at issue.  Mot.

13   at 21.  Defendants mistake which corporate action authorized by the Proxy Statements is alleged

14   in the AC to have caused losses—the alleged loss-causing corporate action was the election of

15   Sandberg as COO and separately, approval of a compensation package for her that was not reduced

16   to repay prior benefits she wrongly received.  Defendants also argue that Sandberg's conduct as

17   COO after her election is not actionable because it was not loss-causing corporate action authorized

18   by the Proxy Statements.  Again, Defendants misconstrue the alleged loss-causing corporate

19   action—the action of appointing Sandberg and approving her compensation package, not any

20   subsequent actions by Sandberg, caused Plaintiffs' losses.  Plaintiffs' losses resulted primarily

21   from the election of a COO with an undisclosed scandal and the revelation of that scandal.  Those

22   losses in no way depend on anything that COO did following her election.

23       **B.    The AC Adequately Pleads a Section 10(b) Violation**

24           **1.    The AC Adequately Pleads Misleading Statements and Omissions**

25   As explained above, *supra* Part VI(A)(1), the AC adequately pleads misleading

26   statements and omission in the Proxy Statements with respect to Defendant Sandberg's conduct.

27

28

## 2.      The AC Adequately Pleads Loss Causation

In a series of disclosures, including articles by *The Wall Street Journal* on April 21, 2022 and June 10, 2022 detailing Defendant Sandberg's undisclosed corporate benefits, and an announcement on June 1, 2022 that Sandberg was resigning from her position as COO, the truth concealed by the Sandberg Benefits Misstatements was revealed, causing losses.  AC ¶¶ 298-303. These allegations are more than sufficient to give Defendants "some indication of the loss and the causal connection that the plaintiff has in mind."  *In re Daou Sys.*, 411 F.3d 1006, 1026 (9th Cir. 2005).

Defendants do not dispute that Plaintiffs have adequately pleaded loss causation for every one of these dates.[11]  Defendants dispute only that one of the bases for the falsity of the Sandberg Benefits Misstatements, her use of corporate resources to plan her wedding, was revealed prior to the last disclosure date, June 10, 2022, when *The Wall Street Journal* revealed that Sandberg was using corporate resources for personal benefits beyond her wedding planning, such as for personal assistance of her family members.  Mot. at 22 n.8; AC ¶ 141.  Yet the disclosures on April 21, 2022 and June 1, 2022 revealed that Sandberg was using corporate resources for personal ends, and so were partial revelations of the truth that she was using those resources for other matters as well, such as the matters revealed in the June 10, 2022 article.

## 3.      The AC Adequately Pleads Scienter

There is no genuine doubt that Defendant Sandberg knew that she was receiving personal benefits from Meta other than those disclosed in Meta's annual proxy filings because Defendant Sandberg knew about her own actions.  AC ¶ 307.  As explained above, Defendant Sandberg personally directed Meta employees, and used company resources, to help her plan her wedding,

---

[11] To the extent Defendants mean to argue that the June 1, 2022 corrective disclosure was not a partial revelation of the truth of the Sandberg Benefits Misstatements, Mot. at 22, they are wrong—Sandberg's June 1, 2022 resignation was a materialization of the concealed risk that she would resign due in part to backlash concerning her undisclosed corporate benefits.  Her self-serving denial that her resignation was related to her being investigated is implausible—the Court and jurors applying common sense may reasonably infer that Meta's investigation of her misconduct impacted her resignation decision.  *See Davis v. Yelp, Inc.*, No. 18-CV-00400-EMC, 2021 WL 4923359, at *14 (N.D. Cal. Sept. 17, 2021) ("At best, [] self-serving testimony creates a genuine factual issue appropriate for a trier of fact.")

1    write her personal book, assist with her personal foundation, and kill an unflattering news story

2    about her ex-boyfriend. *Id.*

3          Defendants argue that the Court may reasonably infer that Sandberg believed personal

4    assistance benefits like wedding planning were not "other benefits" of her job, but rather an integral

5    part of it, and therefore believed that it need not have been disclosed as a benefit.  Mot. at 24.  This

6    inference is facially implausible, and it is all the more implausible given Sandberg's own

7    statements—Sandberg disclosed other personal benefits (e.g., security and private jet travel) and

8    stated that they were "other compensation" received due to her "high visibility," yet failed to

9    disclose other personal benefits such as wedding planning that Defendants claim Sandberg

10   received for the same reason.[12]  ECF No. 61-10 at 52-53; ECF No. 61-8 at 51-52.  In any event,

11   the inference that Sandberg understood these highly personal benefits to be "other benefits" of her

12   job is "at least as compelling" as the inference that she somehow failed to grasp this.  *See Tellabs*,

13   551 U.S. at 324.

14   **VII.   META FAILED TO DISCLOSE ITS JEDI BLUE AGREEMENT WITH GOOGLE**

15          **A.    The AC Adequately Pleads Misleading Statements and Omissions**

16          During the Class Period, Meta misled investors by failing to disclose that it had entered

17   into an agreement with its primary 'competitor' Google (the "Jedi Blue Agreement") that Meta

18   itself recognized was highly likely to raise antitrust scrutiny (as it ultimately did when discovered).

19   Meta misled investors by making sweeping statements that it faced "significant competition" in

20   "every aspect of [its] business" when in fact this was only a half-truth.[13]  AC ¶¶ 223, 233, 241,

21   _____

22   [12] Defendants' inference also ignores that Meta's Code of Conduct, which all Meta personnel are
     expected to uphold, expressly prohibited Defendant Sandberg from "receiv[ing] a personal benefit

23   from [her] position at Meta."  AC ¶¶ 126-29.

     [13] In addition, Meta misled investors by providing the reasons for its advertising revenue growth

24   and success yet failing to list the Jedi Blue Agreement as among those reasons.  AC ¶¶ 229, 239,
     249, 259; *see, e.g.*, *In re Apple Sec. Litig.*, No. 19-cv-02033-YGR, 2020 WL 2857397, at *10 (N.D.

25   Cal. June 2, 2020) ("where a party . . . touts specific factors driving those results, it is obligated to
     disclose negative information related to those factors"); *In re LendingClub Sec. Litig.*, 254 F. Supp.

26   3d 1107, 1118 (N.D. Cal. 2017) (same).  Similarly, Meta misled investors by stating that its
     "advertising revenue c[ould] also be adversely affected by a number of other factors" yet failing

27   to list the termination of the Jedi Blue Agreement among them.  AC ¶¶ 225, 235, 243, 253, 263.
     *See, e.g.*, *In re Galena Biopharma, Inc. Sec. Litig.*, 117 F. Supp. 3d 1145, 1180 (D. Or. 2015).

28

251, 261 (the "Competition Half-Truths").  While Meta may have faced significant competition in *some aspects* of its business, Meta manifestly did not face significant competition in those "aspect[s] of its business" with which it had an express agreement with Google giving Meta decisive advantages in pricing and timing over all competition—most notably, its purchasing of ad impressions through Google's Exchange Bidding.  AC ¶¶ 89-114.  Telling such "half-truths violates Rule 10b-5.  *See United States v. Laurienti*, 611 F.3d 530, 539 (9th Cir. 2010) ("Rule 10b-5 . . . prohibits the telling of material half-truths . . . ."); *In re Vivendi, S.A. Sec. Litig.*, 838 F.3d 223, 258 (2d Cir. 2016) ("once a company speaks on an issue or topic, there is a duty to tell the whole truth"); *In re Apple Sec. Litig.*, No. 19-cv-02033-YGR, 2020 WL 2857397, at *10 (N.D. Cal. June 2, 2020) (quoting *Schueneman v. Arena Pharms., Inc*., 840 F.3d 698, 706 (9th Cir. 2016)) ("a party may be obligated to disclose additional 'adverse information that cuts against the positive information' if it chooses to tout the positive . . . .").[14]

Defendants argue that the adjective "significant" is "too vague and standardless to support a claim."  Mot. at 13.  Yet the misleading nature of Defendants' half-truth statement that it faced "competition" in "every aspect of its business" does not turn on the modifier "significant."  With the decisive advantages it gained through the Jedi Blue Agreement, Meta effectively faced no

---

Defendants argue that the AC fails to plead facts showing that the Jedi Blue Agreement was a reason for Meta's advertising success or that termination of the Agreement would adversely affect Meta's advertising revenue.  Mot. at 14.  In fact, the AC extensively alleges the material benefits of the Jedi Blue Agreement for Meta's advertising business.  AC ¶¶ 89-114.

[14] Even absent any statements, Meta had a duty to disclose all material information in its possession while it was actively involved in making stock repurchases from shareholders.  AC ¶ 270.  "A corporate issuer in possession of material nonpublic information, must, like other insiders in the same situation, disclose that information to its shareholders or refrain from trading with them." *McCormick v. Fund Am. Cos*., 26 F.3d 869, 877 (9th Cir. 1994); *WPP Lux. Gamma Three Sarl v. Spot Runner, Inc*., 655 F.3d 1039, 1056 (9th Cir. 2011) (same); *see Castellano v. Young & Rubicam, Inc*., 257 F.3d 171, 179 (2d Cir. 2001).  This duty applies "[w]hen the issuer itself wants to [either] buy or sell its own securities."  *McCormick*, 26 F.3d at 877.  Defendants also had a duty to disclose the material risks concealed by the Competition Half-Truths and the Sandberg Benefits Misstatements under S-K Item 105, 17 C.F.R. §229.105, as well as a duty to disclose the known adverse trend concealed by the Reels Effect Misstatements and Material Impact Misstatements under S-K Item 303, 17 C.F.R. § 229.303(b)(2); *see Stratte-Mcclure v. Stanley*, 776 F.3d 94, 103-04 (2d Cir. 2015).  While the Ninth Circuit disagrees with the Second Circuit concerning disclosure duties under S-K Items 105 and 303, *In re NVIDIA Corp. Sec. Litig*., 768 F.3d 1046, 1056 (9th Cir. 2014), Plaintiffs preserve this argument in the event of an appeal.

competition at all in its purchasing of ad impressions through Google's Exchange Bidding. AC ¶¶ 89-114.   Accordingly, reasonable investors reading the term "significant" to mean "something more than *de minimis*," or even to be meaningless, would still have been misled.[15] *Next*, Defendants argue that the Competition Half-Truths did not state that Meta faced significant competition "from Google in every aspect of its business." Mot. at 13.  Yet the Competition Half-Truths are not misleading for that reason—they are misleading because Meta did not face significant competition in at least one major aspect of its business, its purchasing of ad impressions through Google's Exchange Bidding.

*Finally*, Defendants argue that Judge Castel's holding that the Jedi Blue Agreement promoted competition somehow shows that the Competition Half-Truths were not misleading.[16] Mot. at 13 (citing *In re Google Digit. Advert. Antitrust Litig.*, No. 21-CV-6841, 2022 WL 4226932, at *1 (S.D.N.Y. Sept. 13, 2022) ("*In re Google*")).   Yet that finding does not even address the question at issue here—whether there was any material aspect of Meta's business in which it did not face significant competition.   Meta told at best only a half-truth in declaring that it faced significant competition in its purchasing of ad impressions through Google's Exchange Bidding, and no finding in Judge Castel's opinion suggests otherwise.[17]

---

[15] Defendants also argue that requiring Meta to disclose "granular detail" about its contracts would "overwhelm the market."  Mot. at 15.  Yet the AC does not allege, and the law did not require, Meta to disclose all such "granular details," only to disclose the material way in which it did not face significant competition in every aspect of its business.  Material facts, by definition, are those that will not "'bury the shareholders in an avalanche of trivial information."  *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 38 (2011).

[16] While Plaintiffs respectfully disagree with Judge Castel's decision, this is not an antitrust case—Plaintiffs' claims in no way turn on any allegation that Defendants' conduct constituted an illegal antitrust violation.  The Competition Half-Truths were misleading because Meta told only a half-truth in declaring that it faced significant competition in its purchasing of ad impressions through Google's Exchange Bidding, regardless of whether that lack of competition constituted an antitrust violation.  Separately, Defendants rightly do not challenge the materiality of the Competition Half-Truths—they were material because investors wanted to know that Meta had entered into an agreement that was highly likely to raise antitrust scrutiny, even if the agreement ultimately were found not to violate antitrust laws.

[17] Defendants argue that Meta and Google faced "head-to-head resale competition," Mot. at 13, but resale is a distinct aspect of Meta's business from its purchasing of ad impressions.

28

### B.      The AC Adequately Pleads Loss Causation

On three dates, the truth concealed by Defendants' Competition Half-Truths was revealed to the market.  On April 11, 2021, *The Wall Street Journal* newly revealed the contents of previously sealed documents filed by Google in *In re Google*, including Google's answer to the amended complaint in that matter, in which Google formally admitted for the first time that it had entered a "network bidding agreement" with Meta.  AC ¶ 283.  On January 14, 2022, *The Wall Street Journal* revealed newly unredacted quotations from Google documents stating, for example, that Google wanted to "kill" header bidding, details that made it more likely that this agreement would raise antitrust scrutiny.  AC ¶ 290.  Finally, on March 11, 2022, the European Commission ("EC") opened a formal investigation concerning the Jedi Blue Agreement.   The EC's announcement on March 11, 2022 was a partial realization of the undisclosed risk that Meta would face antitrust scrutiny for the Jedi Blue Agreement.

Defendants argue that the April 11, 2021 and January 14, 2022 articles revealed no new information to the market because, according to Defendants, all information revealed in those articles already had been revealed.  Mot. at 15.  Defendants are mistaken.  Among other things, the April 11, 2021 article newly revealed Google's formal *admission* that it had entered an agreement with Meta and so revealed that this agreement was factual rather than merely alleged. The January 14, 2022 article likewise *quoted* internal documents from Meta, and so newly revealed that the antitrust allegations were based on concrete documents rather than lawyerly speculation.

Separately, Defendants argue that the EC's announcement of its investigation of Meta on March 11, 2022, "without more, is insufficient to establish loss causation."  Mot. at 15 (quoting *Loos v. Immersion Corp*., 762 F.3d 880, 890 (9th Cir. 2014).  Yet here, unlike in *Loos*, there is "more."  The court in *Loos* expressly recognized that disclosures apart from the announcement of an investigation that confirm that the allegations have a factual basis may adequately support loss causation, as District Courts have found.  *Id*.; *see In re Tesla Sec. Litig.*, 477 F. Supp. 3d 903, 934 (N.D. Cal. 2020); *Brendon v. Allegiant Travel Co*., 412 F. Supp. 3d 1244, 1264 (D. Nev. 2019) (announcement of a government investigation paired with a news report establish loss causation). Here, news reports and documents uncovered from a government investigation show that the EC's

investigation had a concrete factual basis.  Also, contrary to Defendants' argument, Mot. at 15-16, the AC does not allege a failure to disclose the EC's investigation, but rather a failure to disclose a critical agreement with Google that was likely to raise antitrust scrutiny, including EC investigation.

## C.   The AC Adequately Pleads Scienter

There is likewise no question that Defendants Zuckerberg and Sandberg were wholly familiar with the Jedi Blue Agreement with Google, and so knew that Meta did not face significant competition in at least one major aspect of its business, namely, its purchasing of ad impressions through Google's Exchange Bidding.  Defendant Sandberg personally helped negotiate the Jedi Blue Agreement with Google, and she personally discussed the deal with Defendant Zuckerberg and urged him to approve it because she felt it was "a big deal strategically," AC ¶¶ 84-85. Zuckerberg approved, and Sandberg signed, the Agreement.  *Id*.

Defendants argue, again, that Defendants' knowledge of facts showing a statement is misleading "cannot support an inference that Defendants" acted with scienter.  Mot. at 23.  It is black letter law that knowledge of such facts gives rise to a strong inference of scienter.  *See, e.g.*, *Am. W. Holding Corp*., 320 F.3d at 942.  Defendants also argue that they could not have knowingly failed to disclose the Jedi Blue Agreement because, in a multi-national corporation, the Agreement was not material.  Defendants' argument is an argument against the materiality of the Company's misstatements and omissions, not against Defendants' scienter.  In any event, Defendants are mistaken—the Jedi Blue Agreement was not a run-of-the-mill agreement but rather was "a big deal strategically" for Meta, as Defendant Sandberg stated, and required the personal approval of the CEO, Defendant Zuckerberg.  AC ¶ 84.  Indeed, Meta treated the Jedi Blue Agreement internally as offering, among other things, a fifty percent discount on Google's auction fees. AC ¶ 90.  Defendants are also mistaken that the Agreement was publicly known before the Class Period—Meta did not admit to the existence of this Agreement until April 2021.  AC ¶ 121.

## VIII.   CONCLUSION

Defendants' Motion should be denied.

1   Dated:  December 30, 2022

2                                        Respectfully submitted,

    **POMERANTZ LLP**

3   */s/ Jeremy A. Lieberman*
    */s/ Austin P. Van*
4   Jeremy A. Lieberman (admitted *pro hac vice*)
    Austin P. Van (admitted *pro hac vice*)
5   600 Third Avenue, 20th Floor
    New York, New York 10016
6   Telephone:  (212) 661-1100
    Facsimile:  (917) 463-1044
7   E-mail:  jalieberman@pomlaw.com
    avan@pomlaw.com
8
    Jennifer Pafiti (SBN 282790)
9   1100 Glendon Avenue, 15th Floor
    Los Angeles, California  90024
10  Telephone:  (310) 405 7190
    Facsimile:  (917) 463 1044
11  jpafiti@pomlaw.com

12  Orly Guy
    Eitan Lavie
13  HaShahar Tower
    Ariel Sharon 4, 34th Floor
14  Givatayim, Israel 5320047
    Telephone: +972 (0) 3 624 0240
15  Facsimile: +972 (0) 3 624 0111
    E-mail:  oguy@pomlaw.com
16  eitan@pomlaw.com

17  *Attorneys for Lead Plaintiffs*

18

19

20

21

22

23

24

25

26

27

28

OPPOSITION TO DEFENDANTS' MOTION TO DISMISS (CASE NO. 4:22-cv-01470-YGR)

1

**CERTIFICATE OF SERVICE**

2      I, Austin P. Van, hereby certify that a true and correct duplicate copy of the foregoing

3   Amended Class Action Complaint for Violations of the Federal Securities Laws was filed

4   electronically on December 30, 2022.  Notice of this filing will be sent by e-mail to all parties by

5   operation of the Court's electronic filing system or by mail to anyone unable to accept electronic

6   filing as indicated on the Notice of Electronic Filing.  Parties may access this filing through the

7   Court's CM/ECF System.

8                                    */s/ Austin P. Van*
                                    Austin P. Van
9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

OPPOSITION TO DEFENDANTS' MOTION TO DISMISS (CASE NO. 4:22-cv-01470-YGR)