LATHAM & WATKINS LLP
Elizabeth L. Deeley (CA Bar No. 230798)
  *elizabeth.deeley@lw.com*
Melanie M. Blunschi (CA Bar No. 234264)
  *melanie.blunschi@lw.com*
Nicholas Rosellini (CA Bar No. 316080)
  *nick.rosellini@lw.com*
505 Montgomery Street, Suite 2000
San Francisco, CA 94111
Telephone: +1.415.391.0600

Andrew B. Clubok (*pro hac vice*)
  *andrew.clubok@lw.com*
Susan E. Engel (*pro hac vice*)
  *susan.engel@lw.com*
555 Eleventh Street, N.W., Suite 1000
Washington, D.C. 20004-1304
Telephone: +1.202.637.2200

*Attorneys for Defendants Meta Platforms, Inc., Mark Zuckerberg, David Wehner, and Sheryl Sandberg*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### OAKLAND DIVISION

| | |
|---|---|
| PLUMBERS AND STEAMFITTERS LOCAL 60 PENSION TRUST, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiffs,<br><br>v.<br><br>META PLATFORMS, INC., MARK ZUCKERBERG, DAVID WEHNER, and SHERYL SANDBERG,<br><br>Defendants. | Case No. 4:22-cv-01470-YGR<br><br>**DEFENDANTS' REPLY IN SUPPORT OF MOTION TO DISMISS THE AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**<br><br>Date:  [Vacated]<br>Time:  2:00 p.m.<br>Court:  Courtroom 1, 4th Floor<br>Judge:  Hon. Yvonne Gonzalez Rogers |

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

DEFENDANTS' REPLY ISO MOT. TO DISMISS AM.
COMPLAINT
CASE NO. 4:22-cv-01470-YGR

# TABLE OF CONTENTS

I.      INTRODUCTION ........................................................................................... 1

II.     ARGUMENT .................................................................................................. 2

    A.     The GNBA Allegations Must Be Dismissed ......................................... 2

        1.     Judge Castel's Dismissal Order Forecloses These
            Allegations .......................................................................... 2

        2.     Plaintiffs' Falsity Theories Are Meritless, Forfeited, or
            Both...................................................................................... 2

        3.     Plaintiffs Have No Answer To The Timing Problem ................. 4

    B.     The Allegations About iOS Privacy Changes Must Be Dismissed ...... 5

        1.     Plaintiffs Do Not Plead A False Or Misleading Statement....... 5

        2.     Plaintiffs Do Not Plead Loss Causation................................... 8

    C.     The Allegations About The Reels Introduction Must Be Dismissed.... 8

        1.     Plaintiffs Do Not Plead A False Or Misleading Statement....... 8

        2.     Plaintiffs Do Not Plead Loss Causation................................. 10

    D.     The Allegations About Sandberg's Compensation Must Be
       Dismissed........................................................................................... 11

        1.     Plaintiffs' Allegations Lack The Requisite Particularity ........ 11

        2.     The Section 14(a) Claim Fails For Additional Reasons ......... 14

    E.     There Is No Strong Inference Of Scienter ........................................... 15

        1.     Plaintiffs Misconstrue The Scienter Standard........................ 15

        2.     Plaintiffs' Scienter Theory Is Fundamentally Flawed ............ 16

        3.     No Set Of Allegations Raises A Strong Inference Of
            Scienter ............................................................................. 17

III.    CONCLUSION............................................................................................. 20

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

1

## <u>TABLE OF AUTHORITIES</u>

2

**Page(s)**

3

### CASES

4
*Adams v. Standard Knitting Mills, Inc.*,
5
    623 F.2d 422 (6th Cir. 1980) ............................................................................................. 15

6
*Bell Atlantic Corp. v. Twombly*,
    550 U.S. 544 (2007) ....................................................................................................... 13
7

8
*Benavidez v. Cnty. of San Diego*,
    993 F.3d 1134 (9th Cir. 2021) ......................................................................................... 14

9
*Berson v. Applied Signal Tech., Inc.*,
10
    527 F.3d 982 (9th Cir. 2008) ........................................................................................... 19

11
*Boykin v. K12, Inc.*,
    54 F.4th 175 (4th Cir. 2022) .................................................................................... 18, 19
12

13
*Brody v. Transitional Hosps. Corp.*,
    280 F.3d 997 (9th Cir. 2002) ............................................................................................. 6

14
*Castro v. ABM Indus., Inc.*,
15
    325 F.R.D. 332 (N.D. Cal. 2018) (Gonzalez Rogers, J.) ............................................ 3, 11

16
*Cowin v. Bresler*,
    741 F.2d 410 (D.C. Cir. 1984) ........................................................................................ 15
17

18
*Eclectic Properties E., LLC v. Marcus & Millichap Co.*,
    751 F.3d 990 (9th Cir. 2014) ........................................................................................... 13

19
*Fecht v. Price Co.*,
20
    70 F.3d 1078 (9th Cir. 1995) ............................................................................................. 6

21
*Gamm v. Sanderson Farms, Inc.*,
    944 F.3d 455 (2d Cir. 2019) .............................................................................................. 2
22

23
*Grigsby v. BofI Holding, Inc.*,
    979 F.3d 1198 (9th Cir. 2020) ........................................................................................... 4

24
*Hastey v. Welch*,
25
    449 F. Supp. 3d 1053 (D. Kan. 2020) ............................................................................ 15

26
*In re Alphabet, Inc. Sec. Litig.*,
    1 F.4th 687 (9th Cir. 2021) ............................................................................................. 16
27

28
*In re Apple Sec. Litig.*,
    2020 WL 2857397 (N.D. Cal. June 2, 2020) .............................................................. 3, 4

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

ii

DEFENDANTS' REPLY ISO MOT. TO DISMISS AM.
COMPLAINT
CASE NO. 4:22-cv-01470-YGR

*In re Century Aluminum Co. Sec. Litig.,*
    729 F.3d 1104 (9th Cir. 2013) ................................................................. 13

*In re Galena Biopharma, Inc. Sec. Litig.,*
    117 F. Supp. 3d 1145 (D. Or. 2015) ........................................................... 4

*In re Maxim Integrated Prod., Inc., Deriv. Lit.,*
    574 F. Supp. 2d 1046 (N.D. Cal. 2008) .................................................... 15

*In re NVIDIA Corp. Sec. Litig.,*
    768 F.3d 1046 (9th Cir. 2014) ..................................................... 10, 16, 18

*In re Oracle Corp. Sec. Litig.,*
    627 F.3d 376 (9th Cir. 2010) ............................................................. 19, 20

*In re Paypal Holdings, Inc. S'holder Deriv. Litig.,*
    2018 WL 466527 (N.D. Cal. Jan. 18, 2018) .............................................. 15

*In re Quality Sys. Sec. Litig.,*
    865 F.3d 1130 (9th Cir. 2017) ................................................................. 17

*In re Rigel Pharms., Inc. Sec. Litig.,*
    697 F.3d 869 (9th Cir. 2012) ................................................................... 16

*In re Silicon Graphics Inc. Sec. Litig.,*
    183 F.3d 970 (9th Cir. 1999) ..................................................................... 7

*Kasilingam v. Stitch Fix, Inc.,*
    2022 WL 10966359 (9th Cir. Oct. 19, 2022) (unpublished) ...................... 9

*Kearns v. Ford Motor Co.,*
    567 F.3d 1120 (9th Cir. 2009) ................................................................. 11

*Loos v. Immersion Corp.,*
    762 F.3d 880 (9th Cir. 2014) ..................................................................... 5

*Nguyen v. Endologix, Inc.,*
    962 F.3d 405 (9th Cir. 2020) ..................................................... 14, 18, 19

*No. 84 Emp.-Teamster Joint Council Pension Tr. Fund v. Am. W. Holding Corp.,*
    320 F.3d 920 (9th Cir. 2003) ................................................................... 16

*Petrie v. Elec. Game Card, Inc.,*
    2011 WL 13130015 (C.D. Cal. Oct. 19, 2011) ......................................... 16

*Plumber & Steamfitters Loc. 773 Pension Fund v. Danske Bank A/S,*
    11 F.4th 90 (2d Cir. 2021) ...................................................................... 12

*Prodanova v. H.C. Wainwright & Co., LLC,*
    993 F.3d 1097 (9th Cir. 2021) .......................................................... 16, 17

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

iii

DEFENDANTS' REPLY ISO MOT. TO DISMISS AM.
COMPLAINT
CASE NO. 4:22-cv-01470-YGR

*Ronconi v. Larkin*,
    253 F.3d 423 (9th Cir. 2001) .......................................................................................... 1, 9

*Rubke v. Capitol Bancorp Ltd.*,
    551 F.3d 1156 (9th Cir. 2009) .......................................................................................... 11

*Swanson v. Weil*,
    2012 WL 4442795 (D. Colo. Sept. 26, 2012)................................................................... 15

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
    551 U.S. 308 (2007)........................................................................................................... 15

*Virginia Bankshares, Inc. v. Sandberg*,
    501 U.S. 1083 (1991)......................................................................................................... 15

*Webb v. Solarcity Corp.*,
    884 F.3d 844 (9th Cir. 2018) ............................................................................................ 16

*Weston Family P'ship LLLP v. Twitter, Inc.*,
    29 F.4th 611 (2022)................................................................................................... 6, 8, 9

*WPP Luxembourg Gamma Three Sarl v. Spot Runner, Inc.*,
    655 F.3d 1039 (9th Cir. 2011) .......................................................................................... 17


**RULES**

Fed. R. Civ. P. 8(a) ................................................................................................................... 13

Fed. R. Civ. P. 9(b) ........................................................................................................... *passim*


**OTHER AUTHORITIES**

64 FR 45150-01 (1999) No. 99.................................................................................................. 6

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

DEFENDANTS' REPLY ISO MOT. TO DISMISS AM.
COMPLAINT
CASE NO. 4:22-cv-01470-YGR

## I.    INTRODUCTION

Plaintiffs' opposition confirms what is really going on here:  Plaintiffs are working backwards from significant stock declines experienced by a very large company in the hope that *something* will survive dismissal—giving Plaintiffs settlement leverage based on the sheer size of Meta's monetary exposure, rather than the legal merit of Plaintiffs' allegations.  This Court should reject that impermissible effort to plead "[f]raud by hindsight."  *Ronconi v. Larkin*, 253 F.3d 423, 430 n.12 (9th Cir. 2001) (citation omitted).  This action should be dismissed in full.

While the AC led with claims based on alleged antitrust violations, Plaintiffs now bury those allegations in the last few pages of their opposition.  Plaintiffs' scarce defense of their former lead theory is not surprising, as Judge Castel's decision to dismiss the antitrust lawsuit against Google based on the GNBA with Meta forecloses Plaintiffs' claims, and Plaintiffs offer no reason to think he erred.  On top of that, Plaintiffs fail to show that Meta's high-level statements about competition are even actionable, let alone false or misleading.  And every single fact on which Plaintiffs rely was known to investors before Defendants made the challenged statements.

Plaintiffs' theory about the iOS privacy changes is that, by omitting the adverb "materially" from a statement candidly disclosing negative effects, Defendants somehow duped investors, despite providing accurate financial data.  And Plaintiffs say this even though the very revelations that they say operated as a "corrective disclosure" and triggered a stock drop used the *exact same* adverb-free phrasing.  Plaintiffs' self-refuting account is only the tip of the iceberg when it comes to dispositive problems with their iOS allegations.

Plaintiffs' Reels allegations claim that Defendants had a duty to disclose an alleged negative impact from Reels because the challenged statements implied that no such impact existed.  But the statements said nothing about Reels; they addressed the tradeoffs involved with *any* product launch.  What Defendants *did* say about Reels was appropriately circumspect and, indeed, unchallenged here.  Plaintiffs also do not back up their speculation of a negative business effect.

As for Sandberg's compensation, Plaintiffs' allegations are meritless.  Meta had no duty to disclose unadjudicated allegations of misconduct, and the AC nowhere describes what specific actions by Meta employees were supposedly improper or explains how any statement was

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

DEFENDANTS' REPLY ISO MOT. TO DISMISS AM. COMPLAINT
CASE NO. 4:22-cv-01470-YGR

1   materially misleading.  That dooms both the Section 10(b) and Section 14(a) claims.  Further,

2   Plaintiffs' primary defense of their Section 14(a) claim rests on the mistaken assertion that

3   shareholders elected Sandberg as Meta's COO (the role from which she resigned), when in truth

4   shareholders elected her as a director (a role in which she still serves).

5       On top of all this, Plaintiffs' lawsuit should be dismissed for the separate and independent

6   reason that there is no strong inference of scienter.  Plaintiffs are wrong to claim that knowledge

7   of undisclosed facts is enough.  Mere knowledge is not the standard.  Instead, Plaintiffs' allegations

8   must demonstrate that Defendants deliberately misled investors or acted with severe recklessness

9   towards a danger of doing so—and this inference must be at least as compelling as innocent

10  explanations for Defendants' alleged conduct.  As to all four sets of allegations, the innocent

11  inference is light-years more compelling than Plaintiffs' flimsy (and often baffling) story.

12  **II.    ARGUMENT**

13      **A.    The GNBA Allegations Must Be Dismissed**

14      Plaintiffs' antitrust-related allegations are meritless for three independent reasons.

15              **1.    Judge Castel's Dismissal Order Forecloses These Allegations**

16      Plaintiffs do not meaningfully dispute Judge Castel's analysis—and rejection—of the

17  antitrust claims filed against Google based on the GNBA.  Rather, they say (at 28 n.16) their case

18  "in no way turn[s] on" an "antitrust violation."  Not so.  Plaintiffs copy-and-pasted *from an*

19  *antitrust suit*, and their theory rests on the nondisclosure of an allegedly anticompetitive

20  agreement.  That is a textbook example of a securities claim based on alleged "nondisclosure of

21  illegal activity."  *Gamm v. Sanderson Farms, Inc.*, 944 F.3d 455, 458 (2d Cir. 2019).

22      Rule 9(b) thus requires Plaintiffs to plead with particularity "the underlying allegations of

23  illegal antitrust conspiracy."  *Id.*  They cannot do that for the reasons Judge Castel explained,

24  including that the GNBA does not restrict Meta's use of header bidding and actually promotes

25  competition.  Mot. at 13.  Judge Castel's sound analysis is reason enough for dismissal here.

26              **2.    Plaintiffs' Falsity Theories Are Meritless, Forfeited, or Both**

27      Plaintiffs' opposition focuses almost exclusively on **Statements 1, 6, 10, 15, and 20,** which

28  informed investors in SEC filings that Meta "face[s] significant competition in every aspect of our

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

2

DEFENDANTS' REPLY ISO MOT. TO DISMISS AM.
COMPLAINT
CASE NO. 4:22-cv-01470-YGR

1  business" from Google and other rivals.  Those challenges are just as meritless as their attacks on

2  **Statements 2, 4, 7, 9, 11, 14, 16, 19, and 21**, which Plaintiffs scarcely defend.

3         To begin, as Defendants explained, a statement noting that a multi-national company faces

4  "significant competition" is simply too vague to support a claim.  Mot. 13.  Plaintiffs counter

5  (at 27) that their challenge "does not turn on the modifier 'significant," and their opposition raises

6  (at 27-28) a new theory that the GNBA ensured Meta "effectively faced no competition at all"—

7  from anyone—"in its purchasing of ad impressions through Google's Exchange Bidding."[1]  But

8  even if **Statements 1, 6, 10, 15, and 20** were potentially actionable, the AC's own allegations

9  refute Plaintiffs' new falsity theory.  The AC does not allege that no one bids against Meta on

10  Google's exchange or that Meta wins every bid it submits.  On the contrary, the AC presumes that

11  Meta bids against competitors, just with certain advantages.  It alleges that the GNBA provides

12  that Meta will win just "10 percent of all such auctions in which [Meta] bid"—not 100 percent.

13  AC ¶ 101.  And the plain terms of the GNBA "promote[]" bidding competition anyway.  Ex. 5 at

14  32.[2]  Plaintiffs' new zero-competition theory has no basis in the AC, much less in fact.

15         Plaintiffs have forfeited their remaining challenges, which are in any event meritless.  In a

16  conclusory footnote, Plaintiffs say (at 26 n.13) that Meta also "misled investors by providing the

17  reasons for its advertising revenue growth and success" (**Statements 4, 9, 14, and 19**) and "by

18  stating that its 'advertising revenues c[ould] also be adversely affected by a number of other

19  factors'" (**Statements 2, 7, 11, 16, and 21**), while "failing to list" the GNBA in those statements.

20  Plaintiffs do not respond *at all* to the numerous fatal flaws with both allegations.  *See* Mot. 13-14.

21  Plaintiffs' (non-)response is "not fully developed" and their challenges are thus forfeited.  *Castro*

22  *v. ABM Indus., Inc.*, 325 F.R.D. 332, 335 n.3 (N.D. Cal. 2018) (Gonzalez Rogers, J.).

23         What little Plaintiffs do say (at 26 n.13) shows that their claims fail on the merits, too.  *In re*

---

[1]  Plaintiffs' opposition abandons—and therefore forfeits—the AC's falsity theory that these statements were instead misleading because "Meta had entered an anticompetitive agreement with Google to limit the competition *between them*," AC ¶ 224 (emphasis added), as part of an effort "to kill header bidding," *id.* ¶ 81.  That theory doesn't work:  Not only does the GNBA allow Meta's use of header bidding and promote competition, but the statements clearly do not say that Meta faces competition *from Google* in every aspect of its business.  Mot. at 13.

[2]  All exhibits are to the Blunschi declaration, Dkt. 61-1, unless otherwise noted.  Plaintiffs do not dispute that this Court can and should consider all exhibits attached thereto.

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

3

DEFENDANTS' REPLY ISO MOT. TO DISMISS AM.
COMPLAINT
CASE NO. 4:22-cv-01470-YGR

*Apple Sec. Litig.*, 2020 WL 2857397 (N.D. Cal. June 2, 2020), merely held that someone who "touts specific factors driving [historical] results" must "disclose negative information related to *those factors*." *Id.* at *10 (emphasis added). But here the issue is whether facially non-exhaustive lists of risks and growth drivers should *also* have included *another* item. And *In re Galena Biopharma, Inc. Sec. Litig.*, 117 F. Supp. 3d 1145 (D. Or. 2015), simply held that a company could be liable for saying "why its stock price might fluctuate," while concealing a scheme to "manipulat[e] the stock price" up and down. *Id.* at 1181. Nothing like that is alleged here.

### 3.    Plaintiffs Have No Answer To The Timing Problem

Plaintiffs' antitrust-related allegations are also meritless because all relevant facts about the GNBA were publicly known *before* Defendants made the challenged statements, which precludes a showing of both falsity and loss causation. Mot. at 15-16. Plaintiffs' opposition ignores falsity and joins issue only on loss causation. Nothing it says there is persuasive.

First, Plaintiffs argue (at 29) that an April 11, 2021 news article revealed to investors "for the first time" that the GNBA existed because Google's "answer" in the *Google* lawsuit "formally admitted" that fact. But no reasonable investor could have doubted the GNBA's existence after the original *Google* complaint was filed on December 16, 2020. The case was highly publicized and brought by ten state Attorneys General who represented that they had "[s]creenshot[s]" of the GNBA. Ex. 1 ¶¶ 191, 196. It would be shocking if these public servants had sued based on a made-up contract. Google's answer was mere "confirmatory information." *Grigsby v. BofI Holding, Inc.*, 979 F.3d 1198, 1205 (9th Cir. 2020).

Second, Plaintiffs contend (at 29) that a January 14, 2022 article disclosed for the first time that "Google wanted to 'kill' header bidding." That is incorrect. The original *Google* complaint publicly alleged exactly that—that Google wanted the GNBA to "kill header bidding." *E.g.*, Ex. 1 ¶¶ 197, 265. And regardless, as explained, Plaintiffs have forfeited any argument that **Statements 1, 6, 10, 15, and 20** supposedly failed to disclose that this contract between Google and Meta "limit[ed] the competition *between them*." AC ¶ 224 (emphasis added); *see supra* at 3 n.1.

Third, Plaintiffs claim (at 29-30) that the European Commission's investigation announcement revealed that the GNBA could raise antitrust scrutiny. That, too, is wrong. Again,

LATHAM&WATKINSLLP
ATTORNEYS AT LAW
SAN FRANCISCO

4

DEFENDANTS' REPLY ISO MOT. TO DISMISS AM.
COMPLAINT
CASE NO. 4:22-cv-01470-YGR

1  *ten* State Attorneys General brought an *antitrust* case based, in part, on the GNBA, which is clearly

2  antitrust scrutiny.  So the only new information revealed by this announcement was the fact of the

3  investigation itself.  But Plaintiffs concede (at 30) that they do "not allege a failure to disclose the

4  EC's investigation."  And the "announcement of an investigation, without more, is insufficient to

5  establish loss causation."  *Loos v. Immersion Corp.*, 762 F.3d 880, 890 (9th Cir. 2014).[3]

6  **B.    The Allegations About iOS Privacy Changes Must Be Dismissed**

7  Plaintiffs' opposition lays bare their iOS theory:  The omission of the word "materially"

8  from statements disclosing existing negative effects, issued contemporaneously with concededly

9  accurate earnings data, somehow duped investors and caused Meta's stock to drop.  That theory is

10 fanciful on its face and must be rejected.

11 **1.    Plaintiffs Do Not Plead A False Or Misleading Statement**

12 Plaintiffs' opposition clarifies (at 10-11) that their challenge to **Statements 12 and 17** rests

13 on a game of compare/contrast wordplay regarding undisputedly accurate disclosures.  These

14 statements warned that: (i) the iOS privacy changes "have limited our ability to target and measure

15 the effectiveness of ads on our platform and negatively impacted our advertising revenue," and

16 (ii) "if we are unable to mitigate these developments as they take further effect in the future, our

17 targeting and measurement capabilities will be materially and adversely affected, which would in

18 turn significantly impact our future advertising revenue growth."  Plaintiffs rely (at 10-11) on the

19 omission of the word "materially" in the first sentence, claiming that without this qualifier, Meta's

20 past-tense disclosures that iOS privacy changes "have limited" aspects of its ads business *and*

21 "negatively impacted" revenue misleadingly reassured investors about the scale of those effects.

22 No reasonable investor would have believed that the *absence* of the word "materially" from

23 Meta's retrospective disclosure meant that the revenue impact from the iOS privacy changes was

24 necessarily immaterial.  For starters, as Plaintiffs concede (at 13), Wehner and Li made clear that

25 Meta "was declining to characterize the extent or materiality of the impact" to date from the iOS

26 privacy changes—and letting the hard numbers speak for themselves.  Zuckerberg and Sandberg

---

[3]  The Commission announced on December 19, 2022 that it was closing the GNBA investigation for lack of evidence of wrongdoing.  *See* European Commission, Daily News 19/12/22, https://ec.europa.eu/commission/presscorner/detail/en/mex_22_7832 (last visited Feb. 14, 2023).

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

5

DEFENDANTS' REPLY ISO MOT. TO DISMISS AM.
COMPLAINT
CASE NO. 4:22-cv-01470-YGR

1    also repeatedly warned about negative effects on Meta's targeting capabilities and ad revenues.

2    Mot. at 8-9, 17.  Nothing Defendants said "affirmatively create[d]" an impression that the impact

3    on Meta's targeting capabilities and ad revenues was not material.  *Brody v. Transitional Hosps.*

4    *Corp.*, 280 F.3d 997, 1006 (9th Cir. 2002).  That alone is dispositive.

5         Furthermore, Plaintiffs do not dispute (at 14) that the adverb "significantly" is too vague

6    to support a claim for securities fraud—but they ask the Court to treat "materially" differently.

7    Two problems.  First, in **Statements 12 and 17**, Meta did not use the word "materially" to

8    characterize the potential future effects on *revenue* (as distinct from targeting capabilities); they

9    used the word "significantly."  So Plaintiffs have conceded that they have no viable theory of

10   falsity regarding the revenue portion of these challenged statements.  Second, the adverb

11   "materially"—or more precisely, the absence of that adverb—is likewise too "vague" to be

12   actionable.  Plaintiffs' assertion (at 14) that "material" means "information that would make a

13   difference in the minds of reasonable investors" is circular and proves the point.  That definition

14   is just as "incapable of objective verification" as the word itself.  *Weston Family P'ship LLLP v.*

15   *Twitter, Inc.*, 29 F.4th 611, 621 (2022).

16        The SEC bulletin Plaintiffs cite for the notion that a 5% revenue effect is necessarily

17   material refutes their position.  It warns that the 5% figure is just "a 'rule of thumb'" used "as an

18   initial step in assessing materiality" of a misstated financial figure—and that "reliance on this or

19   any percentage or numerical threshold" has "no basis" in "the law."  SEC, Staff Accounting

20   Bulletin No. 99, 64 FR 45150-01 (1999).  Likewise, the Ninth Circuit has held that materiality

21   "requires delicate assessments of the inferences a 'reasonable shareholder' would draw from a

22   given set of facts."  *Fecht v. Price Co.*, 70 F.3d 1078, 1080 (9th Cir. 1995).  It was not fraud for

23   Meta to decline from trying to make those "delicate assessments" itself and, instead, to disclose

24   accurate financial data, while warning of potential future effects.

25        The reality is that the supposedly misleading phrasing in **Statements 12 and 17**—*i.e.*,

26   using adverbs in the forward-looking statement but not in the backward-looking one—is industry

27   standard.  Rightly so.  The backward-looking statements were accompanied by hard financial data

28   about the company's past performance, making it unnecessary (and potentially unhelpful) to add

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

6

DEFENDANTS' REPLY ISO MOT. TO DISMISS AM.
COMPLAINT
CASE NO. 4:22-cv-01470-YGR

1   vague color commentary with modifiers like "materially." Plaintiffs nowhere dispute the accuracy

2   of the data included in Meta's disclosures. In contrast, the point of the forward-looking statements

3   that Plaintiffs challenge was to warn about "[c]ertain factors [that] may have a *material* adverse

4   effect on our business," where uncertain future effects cannot yet be reflected in the historic

5   financial data. *E.g.*, Ex. 21 at 49 (emphasis added). Indeed, the February 3, 2022 Form 10-K that

6   Plaintiffs cite as disclosing the supposed "truth" used *identical* adverb-free phrasing. Mot. at 18.

7   Plaintiffs cannot have it both ways: Phrasing that was concededly not misleading in their

8   corrective disclosure cannot simultaneously be misleading in the challenged statements.

9       Even if there were some basis to find the absence of an adverb misleading, Plaintiffs'

10  challenge would still fail for lack of particularized allegations about the *scale* of the then-existing

11  revenue or targeting effects in Q2 or Q3 2021. While they point (at 14) to the AC's allegation that

12  "85% of all iPhones had updated to iOS 14" by June 3, 2021, AC ¶ 172, this does *not* mean that

13  85% had *also* opted into the new privacy settings—*i.e.*, that *every single* iPhone user who updated

14  to iOS 14 made the same settings decision. *See* Mot. at 18 n.6. At any rate, Plaintiffs plead no

15  facts suggesting that the revenue effects caused by less available data would be immediate.

16  Advertisers do not adjust their behavior instantaneously, and the "relative effect" on companies in

17  the mobile advertising "ecosystem" would take time to play out. AC ¶ 168. Given that revenue

18  lag, Plaintiffs try (at 14) to break off the portions of **Statements 12 and 17** focused on targeting

19  capabilities. But they plead no particularized facts contradicting those statements—which

20  themselves informed investors that the iOS privacy changes had "limited" Meta's targeting

21  capabilities. *See* AC ¶¶ 245, 254.

22      FE1 does not rescue Plaintiffs on either point. FE1 purported to know only about Q2 and

23  Q3 revenue effects, not targeting effects. And while Plaintiffs insist (at 15) that FE1 "was in an

24  optimal position to know" the specifics of the claimed revenue drop, FE1 apparently provided

25  none, given that the AC does not contain any. That lack of specificity flunks Rule 9(b). *See In re*

26  *Silicon Graphics Inc. Sec. Litig.*, 183 F.3d 970, 985 (9th Cir. 1999). And FE1, a low-level

27  employee who was not in finance, just wrote a snippet of a "larger brief on the anticipated impact

28  of the iOS privacy changes" focused solely on Meta's "tech accounts." AC ¶¶ 173-74. That is a

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

7

DEFENDANTS' REPLY ISO MOT. TO DISMISS AM.
COMPLAINT
CASE NO. 4:22-cv-01470-YGR

far cry from being in a position to know about contemporaneous, company-wide revenue effects.

### 2. Plaintiffs Do Not Plead Loss Causation

Plaintiffs also fail to establish loss causation, because they lack allegations showing that the February 2, 2022 earnings announcement revealed (supposedly) concealed business impacts from Q2 and Q3 2021. Plaintiffs' opposition insists (at 15-16) that Wehner's projection of a $10 billion revenue headwind for 2022 meant that Meta experienced an equal or greater impact in 2021. But he simply didn't say that. AC ¶ 186. And as explained, Plaintiffs' allegations suggest that revenue effects would lag behind the adoption of the new iOS settings. *Supra* at 7.

To salvage their challenge, Plaintiffs again try (at 16) to break off the parts of **Statements 12 and 17** related to targeting capabilities. But the maneuver leaves them without any corrective disclosure to support loss causation. Wehner's February 2, 2022 statements were about future revenues, and Plaintiffs point to no other purported "truth" that was revealed about the 2021 effects on Meta's targeting capabilities. Plaintiffs assert (at 16) that Meta told investors that the "effect of the iOS privacy changes on Meta's targeting and measurement capabilities had fully arrived by Q3 2021." But Meta disclosed this on October 25, 2021, *before* making **Statement 17**. AC ¶ 181. It cannot serve as a corrective disclosure. And if Plaintiffs are also relying on the revelation that 85% of iPhones had installed iOS 14 by June 2021, Meta disclosed that figure nearly two months *before* making **Statement 12**, AC ¶ 172—so it can't be a corrective disclosure either.

### C. The Allegations About The Reels Introduction Must Be Dismissed

Plaintiffs have no viable argument for why a risk disclosure about the inherent risks with product launches in general was somehow a misleading statement about Reels in particular.

### 1. Plaintiffs Do Not Plead A False Or Misleading Statement

Plaintiffs' opposition makes clear (at 19) that their real complaint about Reels is that Defendants did not "clarify" whether "Reels was having a net positive or negative impact on the Company's business." But Defendants did "not have an obligation to offer an instantaneous update" about Reels' impact given what their statements actually said. *Twitter*, 29 F.4th at 620.

Plaintiffs' entire Reels argument proceeds (at 18) on the assumption that **Statements 3, 8, 13, and 18** "impl[ied] that Meta's transition" to Reels "was, *on net*, not having a negative impact

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

8

DEFENDANTS' REPLY ISO MOT. TO DISMISS AM.
COMPLAINT
CASE NO. 4:22-cv-01470-YGR

1    on the Company's results of operations." That is incorrect. These statements did not say one way

2    or the other how the nascent Reels rollout was affecting Meta's business. *See* Mot. at 20. And

3    they certainly did not endorse Plaintiffs' convoluted "on net" theory (at 19) that users could have

4    been seeing *more* ads on Reels than they otherwise would have on Meta products. Rather, the

5    statements warned that Meta may "introduce new stand-alone products" that "attract users away

6    from [products] where we have more proven means of monetization," and advised that, "from time

7    to time these efforts have reduced, and may in the future reduce, engagement with one or more

8    products and services in favor of other products or services that we monetize less successfully."

9    That language "only generally describe[s]" the risks inherent in product launches across the board,

10   without saying anything specific to the Reels introduction. *Kasilingam v. Stitch Fix, Inc.*, 2022

11   WL 10966359, at *2 (9th Cir. Oct. 19, 2022) (unpublished). So whether or not Reels negatively

12   affected ad impressions or revenue during Q2 and Q3, a negative impact is "not inconsistent with

13   the [challenged] statements." *Ronconi*, 253 F.3d at 434.

14        Meta rightly remained circumspect about "the oft-tortuous path of product development"

15   when it came to Reels, *Twitter*, 29 F.4th at 620—not least because, as Plaintiffs recognize, Reels

16   could have both positive and negative impacts on revenues in its early stages of monetization. But

17   Plaintiffs assert (at 19) that Reels involved a zero-sum tradeoff between being "more engaging"

18   than Meta's "older content formats" like News Feed (i.e., users "spend more total hours viewing

19   ads on Reels") but "harder to monetize" than those existing formats in the short term (i.e., "users

20   view fewer ads per hour on Reels"). That is wrong. According to the AC, Meta "was transitioning

21   to Reels to compete with TikTok," a rival app. AC ¶ 13. That allegation suggests that Reels could

22   draw "engagement time and advertising revenue" away *from TikTok*, not just cannibalize Meta's

23   other offerings. *Id.* ¶ 194. And because Reels is, as Plaintiffs concede (at 19), "more engaging,"

24   users may spend time on Reels that they otherwise would have spent on *many* other apps, video

25   games, or even television. So based on Plaintiffs' own allegations, whenever Reels draws users

26   away from TikTok or other activities, there is no "tradeoff" for Meta; Reels is a net win. *Id.* ¶ 202.

27        To be sure, Reels *also* came with a risk of "shifting user engagement" to Reels not from

28   TikTok or other activities, but instead "from [Meta] platforms that are easier to monetize" than

LATHAM&WATKINS<sup>LLP</sup>
ATTORNEYS AT LAW
SAN FRANCISCO

9

DEFENDANTS' REPLY ISO MOT. TO DISMISS AM.
COMPLAINT
CASE NO. 4:22-cv-01470-YGR

Reels.  *Id*.  But Defendants warned investors of precisely this potential, cautioning that: (i) Reels was "monetizing at lower rates" than existing features, *id.* ¶ 207; (ii) Reels was "compet[ing]" with Meta's existing products, *id.* ¶¶ 205, 213; and (iii) the "shift to video" was creating "some softness" "[o]n the impression front," Ex. 19 at 14.  Defendants also described Reels as a "long-term" investment, Ex. 11 at 10, making clear their hope that Reels would help the business *in the long term*, not necessarily in the immediate future.  Plaintiffs acknowledge (at 19, 20 n.9) that these Reels-specific statements did not say how the product was then performing—let alone suggest a "net" positive impact—and rightfully do not challenge any of them.

Given all this, Defendants properly stayed silent on Reels' net revenue impact in its early stages, while "investigat[ing]" it as the product grew on Instagram and launched on Facebook.  *In re NVIDIA Corp. Sec. Litig.*, 768 F.3d 1046, 1056 (9th Cir. 2014).  During that process, Defendants highlighted the risks involved with new product launches and issued accurate financial reports.  That approach made good sense given the chronology here.  Recall that Reels launched on Instagram on August 5, 2020, and initially did not include ads.  AC ¶¶ 196-97.  As Plaintiffs concede (at 20 n.9), investors thus knew "any engagement in Reels at that time necessarily negatively impacted ad impressions" if it came at the expense of engagement with a monetized Meta product.  Plaintiffs have accordingly waived any challenge to **Statements 3 and 8**, which were made before Reels ads launched on Instagram at the end of Q2, on June 16, 2021.  But recall that Reels did not launch *at all* on Facebook until the end of Q3, on September 29, 2021—and likewise did not initially contain ads.  That further undercuts Plaintiffs' claim (at 18) that Defendants represented that Reels was not running in the red over the near-term.  And regardless, as explained below, Plaintiffs fail to plead particularized facts showing that Reels was harming Meta's business.

### 2.    Plaintiffs Do Not Plead Loss Causation

Plaintiffs have no viable corrective disclosure to support loss causation.  Their loss causation argument rests (at 20-21) on the February 2, 2022 earnings announcement, which they say disclosed that Reels had been hurting ad impressions and revenues during Q2 and Q3 of 2021.  But those comments addressed Q4 2021 and 2022—not Q1, Q2, or Q3 2021.  *See* Mot. at 20.

LATHAM&WATKINS<sup>LLP</sup>
ATTORNEYS AT LAW
SAN FRANCISCO

10

DEFENDANTS' REPLY ISO MOT. TO DISMISS AM.
COMPLAINT
CASE NO. 4:22-cv-01470-YGR

1    Plaintiffs' attempt to manufacture statements covering Q2 or Q3 (since they waived all challenges

2    through Q1) doesn't work.  Take Zuckerberg's statement that "what these [product] transitions

3    have all had in common" is "*in the beginning* our ads system and business are not as tuned for the

4    new format," which "creates a near-term headwind." Ex. 16 at 11 (emphasis added).  That general

5    statement does not address Reels' effect in Q2 or Q3.  In fact, Zuckerberg explicitly said that, as

6    of February 2, 2022, "we're closer to the beginning" of the Reels introduction.  So "the beginning"

7    for Reels included Q4, which is what he was clearly discussing.  *Id.* at 18.  Zuckerberg's remark

8    that "we're going to continue to see some pressure on impression growth in the near term" likewise

9    referenced Q4 and 2022—when Reels launched on Facebook, *without any ads*.  *Id.* at 2.  He said

10   nothing about Q2 or Q3 2021, or Plaintiffs' "on net" theory.

### D.    The Allegations About Sandberg's Compensation Must Be Dismissed

12        Plaintiffs' fourth set of allegations are as meritless as the rest.  To start, their opposition

13   nowhere addresses Sandberg's June 1, 2022 remarks to a CNBC host and has thus forfeited any

14   challenge to **Statement 23**.  *See Castro*, 325 F.R.D. at 335 n.3.  As for **Statements 5 and 22**,

15   Plaintiffs' opposition clarifies (at 22-24) that the AC asserts both Section 10(b) and Section 14(a)

16   claims based only on the proxy statements.  That clarification puts beyond doubt that Rule 9(b)'s

17   particularity requirement applies not just to Plaintiffs' Section 10(b) claim, but also their

18   Section 14(a) claim—because the AC "employs the exact same factual allegations" for each and

19   thus clearly "sounds in fraud." *Rubke v. Capitol Bancorp Ltd.*, 551 F.3d 1156, 1161 (9th Cir.

20   2009); Mot. at 21-22 & n.8.  Both claims fail because the AC lacks the "high degree of

21   meticulousness" that Rule 9(b) requires and instead relies on vague unadjudicated allegations of

22   impropriety.[4]  Plaintiffs' Section 14(a) claim also fails because there is no actionable link between

23   the proxy statements and the alleged loss-causing corporate action.

### 1.    Plaintiffs' Allegations Lack The Requisite Particularity

25        Plaintiffs claim (at 22) that the proxy statements misled investors by not disclosing

26   additional compensation Sandberg supposedly received through use of Meta personnel for

---

[4]  *Kearns v. Ford Motor Co.*, 567 F.3d 1120 (9th Cir. 2009), *supports* applying Rule 9(b) across
the board—since Plaintiffs' decision to bring a Section 10(b) claim confirms that these allegations
"aver fraud," despite not using "the word 'fraud'" as to the Section 14(a) claim.  *Id.* at 1124.

LATHAM&WATKINS<sup>LLP</sup>
ATTORNEYS AT LAW
SAN FRANCISCO

11

DEFENDANTS' REPLY ISO MOT. TO DISMISS AM.
COMPLAINT
CASE NO. 4:22-cv-01470-YGR

personal ends.  They rely on an April 2022 press report alleging an *investigation* into Sandberg's conduct, but Defendants had no "duty to disclose uncharged, unadjudicated wrongdoing." *Plumber & Steamfitters Loc. 773 Pension Fund v. Danske Bank A/S*, 11 F.4th 90, 98 (2d Cir. 2021).  Plaintiffs also lack any particularized allegations suggesting that any investigation rendered the proxy statements materially false or misleading.  They do not allege that it resulted in any change to Sandberg's reported compensation, much less any material change.  Indeed, as to materiality, Plaintiffs' only allegation is a conclusory statement that the value of the alleged personal assistance was worth at least $10,000, AC ¶ 149.  This falls far short, given that Sandberg's disclosed compensation was tens of millions of dollars annually.  *See* Ex. 7 at 51; Ex. 9 at 52.  Furthermore, Plaintiffs critically undermine (at 24) their own falsity theory by claiming that, if Sandberg *were* found to have received improper personal assistance, she would just "repay" Meta for those services out of pocket.

More fundamentally still, Plaintiffs' factual allegations are hopelessly vague in violation of Rule 9(b).  Although Plaintiffs recognize (at 23) that their allegations must detail "the who, what, when, where, and how of the misconduct charged," their top-line defense of the AC gives the game away.  Plaintiffs argue (at 23) that they "specify exactly what statements were misleading, who made them, where and when they were made, and how they are misleading"— that is, Plaintiffs claim to have pled facts detailing what Defendants *said*.  But they do not claim to have detailed anything Meta employees supposedly *did* to make the statements misleading.  The AC does not say what specific assistance was provided, by whom, or how it allegedly crossed the line from coordination on P.R. matters to a personal benefit that was not integrally and directly related to Sandberg's performance of her duties as COO.  Without those supporting facts, Plaintiffs cannot establish that the proxy statements misstated Sandberg's earnings.

Start with the Kotick matter.  The AC alleges that "Sandberg worked with a team that included [Meta] employees as well as paid outside advisers to develop and enact a strategy to persuade" a media outlet "not to report on" a since-recanted accusation against Kotick "both in 2016" and "in 2019."  AC ¶ 132.  But Plaintiffs do not address the fact that (as Defendants explained) the article on which these allegations rely reported that the team worked together only

LATHAM&WATKINS^LLP
ATTORNEYS AT LAW
SAN FRANCISCO

12

DEFENDANTS' REPLY ISO MOT. TO DISMISS AM.
COMPLAINT
CASE NO. 4:22-cv-01470-YGR

1    in 2016, not in 2019.  *See* Mot. at 21.  And because neither proxy statement disclosed Sandberg's

2    2016 earnings, allegations about 2016 are irrelevant.  The AC also alleges that "Sandberg and her

3    team" tried to persuade the media outlet not to revisit the Kotick story in 2019, but then cites only

4    "emails" sent by Sandberg herself, not any action taken by Meta employees.  *Id.* ¶ 135.

5          Even under the baseline pleading standard established in *Bell Atlantic Corp. v. Twombly*,

6    550 U.S. 544, 557 (2007), these sparse allegations "are consistent with" the "innocent alternative"

7    explanation that Meta employees and Sandberg's own outside advisers coordinated on a media

8    strategy to protect her concededly important reputation.  *Eclectic Properties E., LLC v. Marcus &*

9    *Millichap Co.*, 751 F.3d 990, 998-99 (9th Cir. 2014); *see* AC ¶ 150.  The AC has no specific factual

10   allegations suggesting anything other than such coordination.  So the factual allegations missing

11   from the AC are not, as Plaintiffs insist (at 23), "minor details."  They are the crux of this case.

12   And their absence flunks even Rule 8(a)'s more forgiving standard, to say nothing of Rule 9(b)'s

13   heightened requirements.  *See Eclectic Properties*, 751 F.3d at 998-99; *In re Century Aluminum*

14   *Co. Sec. Litig.*, 729 F.3d 1104, 1108 (9th Cir. 2013).

15         The AC's allegations about Sandberg's book, foundation, and wedding are even skimpier:

16   Plaintiffs cite (at 23) only one conclusory paragraph in the AC for each.  On Sandberg's book, the

17   AC vaguely asserts that "Sandberg used Meta resources to write and promote her book," with zero

18   supporting factual allegations about the who, what, where, when, and how of that alleged use of

19   Meta resources.  AC ¶ 138.  On her foundation, the AC says that "Sandberg also used corporate

20   resources, including [Meta] employees, to support her personal foundation, according to people

21   knowledgeable about the matter," again with zero supporting facts.  *Id.* ¶ 139.  And on Sandberg's

22   wedding, the AC again just nakedly asserts that "Sandberg used corporate resources to help her

23   plan her wedding to fiancé Tom Bernthal."  *Id.* ¶ 140.  That's it.  The news articles on which

24   Plaintiffs rely are equally short on concrete descriptions of the allegedly inappropriate assistance

25   (which is presumably why the AC musters nothing more than perfunctory accusations).  *See*

26   Exs. 10, 26.  All of that is patently inadequate under Rule 9(b)—indeed, even under Rule 8(a).

27   Furthermore, even if one accepted these conclusory allegations, a best-selling book, a reputable

28   charitable foundation, and a high-profile wedding are important P.R. matters for which it would

1    be appropriate for Meta personnel to coordinate with Sandberg's personal P.R. advisers.

2         Plaintiffs fall back on the assertion (at 23) that the AC provides sufficient notice "to defend

3    against" their allegations, which Plaintiffs say satisfies Rule 9(b). That is wrong twice over. First,

4    the AC's conclusory allegations do *not* provide notice of what specific assistance was supposedly

5    personal in nature. Second, Rule 9(b) is *also* meant to "deter[] plaintiffs from using complaints as

6    a 'pretext for the discovery of unknown wrongs' while protecting defendants and the courts from

7    the costs associated with these complaints." *Benavidez v. Cnty. of San Diego*, 993 F.3d 1134, 1145

8    (9th Cir. 2021) (citation omitted). That deterrent purpose, which Plaintiffs ignore (at 22-23), is

9    important here, where there is a special need "to halt early on securities litigation that lacks merit

10   or is even abusive." *Nguyen v. Endologix, Inc.*, 962 F.3d 405, 414 (9th Cir. 2020).

11         **2.    The Section 14(a) Claim Fails For Additional Reasons**

12         Plaintiffs' failure to plead sufficient facts regarding Sandberg's alleged conduct warrants

13   dismissal of Plaintiffs' Section 10(b) claim and their Section 14(a) claim on falsity and materiality

14   grounds. But the Section 14(a) claim additionally fails because Plaintiffs' allegations do not meet

15   the essential-link requirement. Mot. at 5, 21. Plaintiffs do not dispute that any allegedly improper

16   assistance cannot have been authorized by a proxy statement issued after the alleged assistance

17   occurred. *See* Mot. at 21. Nor do they dispute that the alleged subsequent misfeasance was merely

18   incident to her election as a director and therefore inactionable under Section 14(a). *See id.*

19   Instead, their opposition raises two alternative—and equally meritless—theories.

20         *First*, Plaintiffs describe (at 24-25) their "primar[y]" essential-link theory as asserting that

21   "the alleged loss-causing corporate action was the election of Sandberg as COO" and the

22   subsequent revelation of "a scandal concerning undisclosed benefits," which caused her to

23   "resign[] from her position as COO," which in turn caused a stock drop. *See* AC ¶¶ 300-03. That

24   theory rests on multiple false premises. The proxy statements did not concern Sandberg's election

25   *as COO*. They concerned her election *as a director*, and she continues to serve in that role to this

26   day. Ex. 7 at 15; Ex. 9 at 63. Plaintiffs also plead no particularized facts showing that her decision

27   to resign as COO—but stay on as a director—was driven by the vague accusations in the AC,

28   especially since Plaintiffs' own sources reported that they played "no role" in her decision. Ex. 10

LATHAM&WATKINS^LLP
ATTORNEYS AT LAW
SAN FRANCISCO

14

DEFENDANTS' REPLY ISO MOT. TO DISMISS AM.
COMPLAINT
CASE NO. 4:22-cv-01470-YGR

at 2. And Sandberg's (partial) resignation aside, bad press about an elected director's prior conduct is, like any subsequent misfeasance, "only incident to the election of directors" and "not actionable under Section 14(a)." *Cowin v. Bresler*, 741 F.2d 410, 428 (D.C. Cir. 1984). Plus, Plaintiffs fail to establish any plausible connection between Sandberg's (partial) resignation and a stock drop.

*Second*, Plaintiffs point (at 24) to the "approval of a compensation package for [Sandberg] that was not reduced to repay prior benefits she wrongly received," asserting that Meta would have been better off financially if Sandberg had reimbursed Meta for any personal assistance. That argument is just another way of saying that Plaintiffs suffered losses because the assistance cost Meta money *before* the proxy statements issued—which doesn't work. Worse, shareholders did *not* approve a compensation package in 2021, Ex. 9 at 50, and the 2022 "say on pay" vote was "non-binding," Ex. 7 at 60, meaning it cannot be an *essential* link. *See Virginia Bankshares, Inc. v. Sandberg*, 501 U.S. 1083, 1085 (1991) (Section 14(a) liability turns on votes that were "legally required to authorize the [loss-causing] action"); *Hastey v. Welch*, 449 F. Supp. 3d 1053, 1064 (D. Kan. 2020); *Swanson v. Weil*, 2012 WL 4442795, at *9 n.7 (D. Colo. Sept. 26, 2012).[5]

### E.    There Is No Strong Inference Of Scienter

Plaintiffs cannot get around the other independent basis for dismissal: Innocent explanations for Defendants' alleged conduct are far more "compelling" than any possible inference of scienter.[6] *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 314 (2007).

#### 1.    Plaintiffs Misconstrue The Scienter Standard

Throughout their opposition, Plaintiffs assert that mere knowledge of undisclosed facts is

---

[5] That makes this case very different from *In re Maxim Integrated Prod., Inc., Deriv. Lit.*, 574 F. Supp. 2d 1046 (N.D. Cal. 2008). Because the *Maxim* shareholders unwittingly approved "stock option plans" that "divert[ed] company assets to [the directors] by backdating options," the voted-on compensation there (backdated stock options) itself "caused harm to the company." *Id.* at 1066. Here, by contrast, the voted-on compensation (*i.e.*, Sandberg's salary, stock options, aircraft usage, and personal security) did *not* cause Plaintiffs' claimed losses. *Maxim* is thus "distinguishable," because it "involved directors accused of backdating stock options" that were directly voted on and approved by shareholders, not merely of doing something improper before or after their election that was not disclosed to shareholders. *In re Paypal Holdings, Inc. S'holder Deriv. Litig.*, 2018 WL 466527, at *4 (N.D. Cal. Jan. 18, 2018).

[6] Plaintiffs cite (at 9) a non-binding decision stating that Section 14(a) does not require scienter. That is incorrect, *see Adams v. Standard Knitting Mills, Inc.*, 623 F.2d 422, 428 (6th Cir. 1980), especially where, as here, a Section 14(a) claim sounds in fraud.

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

15

DEFENDANTS' REPLY ISO MOT. TO DISMISS AM.
COMPLAINT
CASE NO. 4:22-cv-01470-YGR

1    enough for scienter. Specifically, they claim (at 17, 21, 25, 30) to have pled scienter just because

2    the AC alleges that: (i) "Zuckerberg and Sandberg were wholly familiar with the [GNBA]";

3    (ii) "Defendants knew that the impact of Apple's iOS privacy changes was material by Q2 2021";

4    (iii) "Defendants knew that the transition to Reels was negatively impacting Meta's business

5    during the Class period"; and (iv) Sandberg "knew about her own actions." All of that is incorrect.

6        "The important issue" for scienter "is 'not whether defendants had knowledge of certain

7    undisclosed facts,'" but instead whether they "knew or should have known that their failure to

8    disclose those facts 'present[ed] a danger of misleading.'" *Petrie v. Elec. Game Card, Inc.*, 2011

9    WL 13130015, at *7 (C.D. Cal. Oct. 19, 2011) (citation omitted); *accord In re Alphabet, Inc. Sec.

10   Litig.*, 1 F.4th 687, 705 (9th Cir. 2021). That is why the Ninth Circuit affirmed dismissal in *In re

11   NVIDIA*, where the complaint "plausibly allege[d] knowledge" of an undisclosed manufacturing

12   problem but did "*not* plausibly allege that [the defendants] intentionally misled investors, or acted

13   with deliberate recklessness, by not disclosing the problem sooner." 768 F.3d at 1056-57

14   (emphasis added); *see In re Rigel Pharms., Inc. Sec. Litig.*, 697 F.3d 869, 883 (9th Cir. 2012)

15   (similar). Plaintiffs cannot establish scienter merely by alleging knowledge of undisclosed facts.[7]

16              **2.    Plaintiffs' Scienter Theory Is Fundamentally Flawed**

17       The core problem with Plaintiffs' scienter allegations is that Defendants had no motive to

18   deceive investors. Difficult as it is in any case to adequately plead scienter under the PSLRA, "the

19   lack of a plausible motive" allegation in particular "makes it much less likely that a plaintiff can

20   show a strong inference of scienter." *Prodanova v. H.C. Wainwright & Co., LLC*, 993 F.3d 1097,

21   1108 (9th Cir. 2021). Mere "routine corporate objectives," like the desire "to boost the company's

22   profitability and stock prices," do not count as a plausible motive. *Webb v. Solarcity Corp.*, 884

23   F.3d 844, 856 (9th Cir. 2018) (citation omitted). Instead, motive allegations must be "specific" to

24   the defendants in an individual case, not shared by profit-seeking companies across the board. *Id.*

25   Such a particularized motive should not be hard to spot—"for example, someone inside a company

26

---

27   [7] *No. 84 Emp.-Teamster Joint Council Pension Tr. Fund v. Am. W. Holding Corp.*, 320 F.3d 920
     (9th Cir. 2003), does not suggest that knowledge of omitted facts *alone* is sufficient to support
28   scienter. The decision's holistic scienter analysis also addressed, among other things, whether the
     defendants had a motive to mislead investors. *See id.* at 937-45.

DEFENDANTS' REPLY ISO MOT. TO DISMISS AM.
COMPLAINT
CASE NO. 4:22-cv-01470-YGR

1   stands to gain a substantial profit by engaging in deceptive behavior, such as selling shares before

2   the company discloses negative information." *Prodanova*, 993 F.3d at 1107.

3         Plaintiffs' opposition scarcely disputes that the AC contains no allegations of the sort,

4   except to baldly assert in a footnote (at 18 n.8) that the "size" of Zuckerberg and Wehner's Class

5   Period sales—Sandberg didn't make any—somehow supports an inference of scienter.   Not so.

6   Plaintiffs do not dispute that all of Zuckerberg and Wehner's sales were made pursuant to a 10b5-1

7   trading plan or to satisfy tax obligations. Mot. at 23.  And again, nothing in the AC suggests that

8   these sales were abnormal or suspicious given those defendants' prior trading history.  *Id.*

9   Plaintiffs are thus wrong to suggest (at 18 n.8) that this case resembles *In re Quality Sys. Sec.*

10  *Litig.*, 865 F.3d 1130 (9th Cir. 2017), where the defendant made a "massive and uncharacteristic

11  sale" of his stock "near the apogee of the [company's] stock price" and "shortly before the stock

12  went into a steep decline." *Id.* at 1146.  In fact, Plaintiffs' allegations *refute* any suggestion that

13  Defendants had a motive to inflate Meta's stock.  As Plaintiffs emphasize (at 27 n.14), Meta

14  authorized $75 billion in stock *repurchases* during the Class Period.[8]  *See* AC ¶ 270.  It would

15  make no sense for Defendants to deliberately inflate Meta's stock price, only to pay that inflated

16  price when repurchasing stock.  That is a recipe for losing money, not making it.

### 3.    No Set Of Allegations Raises A Strong Inference Of Scienter

18        Plaintiffs try to manufacture a story of scienter for each of their four sets of allegations, but

19  the innocent account for each is far more compelling.

20        **Antitrust Allegations.**  Regarding the GNBA, Plaintiffs rely primarily (at 30) on their

21  allegation that Zuckerberg and Sandberg were "wholly familiar with" the GNBA.  But mere

22  knowledge of the GNBA does *not* demonstrate scienter.  In addition, the GNBA was one of

23  countless important contracts to Meta, and its existence (and all relevant facts about it) had been

24  publicly revealed when Defendants made **Statements 1, 6, 10, 15, and 20**. Mot. at 23.  The point

25  is not, as Plaintiffs assert (at 30), that the GNBA was immaterial.  What matters is that the

---

[8]  Plaintiffs acquired their stock on the open market, not from Meta as part of the repurchase program.  AC ¶ 19.  Because Plaintiffs are not bringing "insider trading claims," the repurchase program has no bearing on Defendants' disclosure obligations vis-à-vis Plaintiffs.  *WPP Luxembourg Gamma Three Sarl v. Spot Runner, Inc.*, 655 F.3d 1039, 1055 (9th Cir. 2011).

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

17

DEFENDANTS' REPLY ISO MOT. TO DISMISS AM.
COMPLAINT
CASE NO. 4:22-cv-01470-YGR

1    statements' high level of generality and the GNBA's prior disclosure gave Defendants good reason

2    not to address the GNBA. That innocent explanation is much more cogent and compelling than

3    Plaintiffs' story that Defendants deliberately duped investors by not telling them things they

4    already knew in broad-strokes statements about Meta's global operations.

5           **iOS Allegations.** Plaintiffs' scienter theory regarding the iOS changes still makes no

6    sense. Plaintiffs only explanation (at 17-18) for why Defendants would temporarily conceal the

7    iOS impact, only to come clean shortly afterwards, is that "Defendants hoped to mitigate the

8    impact of the iOS privacy changes" and "escape[] the fallout" from then-existing business harms.

9    That same argument could be made in any case. In *Nguyen*, for example, the plaintiffs could have

10   said that the defendants were just holding out hope that they could overcome "problems" with their

11   product before disclosing them. 962 F.3d at 415. And in *In re NVIDIA*, the plaintiffs *did* make a

12   defendants-were-stalling argument, claiming that a company "delayed disclosure of [technological

13   problems] until it had prepared replacement" products. 768 F.3d at 1060. The Ninth Circuit

14   rejected that contention, *even though* "the coincidence" of the disclosure's timing there "arouse[d]

15   suspicion." *Id.* at 1061. Plaintiffs allege nothing coincidental or suspicious about the timing of

16   Defendants' iOS disclosures during the February 2, 2022 earnings announcement.

17         What Defendants actually said in **Statements 12 and 17** further eviscerates Plaintiffs'

18   conspiratorial scienter allegations regarding iOS. Again, it is now clear that Plaintiffs complain

19   merely about the lack of the adverb "materially" in a backward-looking sentence warning investors

20   about negative impacts from the iOS privacy changes. If Defendants "aimed to inflate [Meta's]

21   share price at all costs," they "could have chosen far less ambiguous language than [they] did."

22   *Boykin v. K12, Inc.*, 54 F.4th 175, 186 (4th Cir. 2022). And Defendants surely would not have

23   explicitly told investors *not* to interpret these or any other statements as suggesting that the

24   then-existing impact was immaterial. So here too, the innocent narrative is far more compelling:

25   Omitting adverbs from retrospective statements is standard practice, as shown by the February 2,

26   2022 Form 10-K's use of identical adverb-free phrasing.

27         It is no answer for Plaintiffs to say (at 17) that "Defendants knew that the impact of Apple's

28   iOS privacy changes was material by Q2 2021 at the latest." Even if that fact were adequately

LATHAM&WATKINS^LLP
ATTORNEYS AT LAW
SAN FRANCISCO

18

DEFENDANTS' REPLY ISO MOT. TO DISMISS AM.
COMPLAINT
CASE NO. 4:22-cv-01470-YGR

pled, it would not be enough for scienter. As for Plaintiffs' reference (at 17) to Wehner's July 28, 2021 statement that the impact "was in line with Meta's expectations," that too is no answer because Plaintiffs plead no facts suggesting that "in line with Meta's expectations" meant that the impact was material (whatever Plaintiffs understand that vague term to mean). Meta also had no obligation to "reveal [its] internal projections." *In re Oracle Corp. Sec. Litig.*, 627 F.3d 376, 391 (9th Cir. 2010). That is especially true here given the lag between adoption of the new iOS settings and any downstream effects—and the fact that FE1 was in no position to know about contemporaneous revenue effects across Meta's business, as distinct from internal projections about the potential impact on Meta's "tech accounts." *Supra* at 7-8. Furthermore, without any particularized facts showing that the Q2 and Q3 impact was not just material but "devastating," Plaintiffs' reliance on the core operations theory is misplaced. *Berson v. Applied Signal Tech., Inc.*, 527 F.3d 982, 987 (9th Cir. 2008).

**Reels Allegations.** Plaintiffs' scienter theory regarding the Reels allegations is meritless for similar reasons. Plaintiffs' speculative assertion (at 22) that Defendants "could have waited until Reels were positively impacting its business to comment on that impact" has the same clear flaws as their analogous argument about iOS. And again, if Defendants really "aimed to inflate [Meta's] share price" based on misleading statements about Reels, they would "have chosen" language that specifically addressed Reels. *K12, Inc.*, 54 F.4th at 186. But they did not; **Statements 3, 8, 13, and 18** addressed only product launches generally. A supposed scheme to mislead investors using these generic statements is simply too subtle to be "plausible, much less convincing." *Nguyen*, 962 F.3d at 416 (citation omitted).

As explained, Plaintiffs' are also wrong to assert (at 21) that mere knowledge that "Reels was negatively impacting Meta[]" would establish scienter. Regardless, Zuckerberg's February 2, 2022 statements said nothing about Reels' net effect in Q2 or Q3, and instead discussed what happened in Q4. *Supra* at 10-11. Even if it were otherwise, Plaintiffs lack particularized facts showing that a negative impact from Reels was known *at the time*, rather than discovered later with the benefit of more information. Plus, as with iOS, nothing suggests that Reels' Q2 and Q3 impact was sufficiently devastating for the core operations theory to apply.

**Sandberg Allegations.** Plaintiffs claim to have shown scienter (at 25) because "Defendant Sandberg knew that she was receiving personal benefits from Meta." That is wrong for several reasons. Even if Sandberg knew about P.R. assistance from Meta personnel, Plaintiffs' reliance on after-the-fact media speculation about an unresolved inquiry does *not* show that, when the proxy statements issued, Sandberg knew of any danger of materially misleading investors by not disclosing the purported assistance as personal earnings. If anything, the media speculation merely suggested a chance that Sandberg would *reimburse* Meta for any benefits deemed in hindsight not to be integrally and directly related to her duties as COO—which in no way indicates that anyone intended to misstate her compensation *at the time*.

Regardless, as explained, Plaintiffs' allegations suggest only that Meta personnel coordinated with Sandberg's own advisors on P.R. matters to protect her concededly important "reputation." AC ¶ 150; *supra* at 12-14. Plaintiffs are wrong to say (at 26) that coordination regarding a best-selling book, renowned foundation, and a high-profile wedding are similar to a security entourage or private jet usage. The former shows cooperation between employees paid by Meta and private advisors paid by Sandberg on high-profile matters with the potential to impact Sandberg's public standing and Meta's reputation. By contrast, the latter are personal protections or conveniences that do not require a coordinated P.R. strategy. So there was *at least* a "reasonable basis" for tracing the line drawn in the proxy statements. *In re Oracle*, 627 F.3d at 390. There is no strong inference of scienter.

## III.    CONCLUSION

For all these reasons, this action should be dismissed.

Dated: February 14, 2023                    LATHAM & WATKINS LLP

By:   */s/ Andrew B. Clubok*
      Andrew B. Clubok (pro hac vice)
       andrew.clubok@lw.com
      Susan E. Engel (pro hac vice)
       susan.engel@lw.com
      555 Eleventh Street, N.W., Suite 1000
      Washington, D.C. 20004-1304
      Telephone: +1.202.637.2200

LATHAM & WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

20

DEFENDANTS' REPLY ISO MOT. TO DISMISS AM.
COMPLAINT
CASE NO. 4:22-cv-01470-YGR

1

2          Elizabeth L. Deeley (CA Bar No. 230798)
             elizabeth.deeley@lw.com
3          Melanie M. Blunschi (CA Bar No. 234264)
             melanie.blunschi@lw.com
4          Nicholas Rosellini (CA Bar No. 316080)
             nick.rosellini@lw.com
5          505 Montgomery Street, Suite 2000
           San Francisco, CA 94111
6          Telephone: +1.415.391.0600

7

8

9          *Attorneys for Defendants Meta Platforms, Inc.,*
           *Mark Zuckerberg, David Wehner, and Sheryl*
10         *Sandberg*

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

21

DEFENDANTS' REPLY ISO MOT. TO DISMISS AM.
COMPLAINT
CASE NO. 4:22-cv-01470-YGR