1

**POMERANTZ LLP**
Jeremy A. Lieberman (pro hac vice)
Austin P. Van (pro hac vice)
600 Third Avenue, 20th Floor
New York, NY 10016
Telephone: (212) 661-1100
jalieberman@pomlaw.com
avan@pomlaw.com

Jennifer Pafiti (SBN 282790)
1100 Glendon Avenue, 15th Floor
Los Angeles, California 90024
Telephone: (310) 405-7190
jpafiti@pomlaw.com

*Counsel for Lead Plaintiffs*

*Additional Counsel on Signature Page*

2

3

4

5

6

7

8

9

10

11

**UNITED STATES DISTRICT COURT**

12

**NORTHERN DISTRICT OF CALIFORNIA**

13

**OAKLAND DIVISION**

14

15

PLUMBERS AND STEAMFITTERS
LOCAL 60 PENSION TRUST, Individually
and on Behalf of All Others Similarly
Situated,

                    Plaintiff,

          v.

META PLATFORMS, INC., MARK
ZUCKERBERG, DAVID WEHNER,
SHERYL SANDBERG, and SUSAN LI,

                    Defendants.

16

17

18

19

20

21

22

CASE NO.  4:22-cv-01470-YGR

**SECOND AMENDED COMPLAINT FOR
VIOLATIONS OF THE FEDERAL
SECURITIES LAWS**

**CLASS ACTION**

**DEMAND FOR JURY TRIAL**

Hon. Yvonne Gonzalez Rogers

23

24

25

26

27

28

1

## TABLE OF CONTENTS

2

I.      INTRODUCTION ................................................................................................. 1

II.     JURISDICTION AND VENUE ........................................................................... 6

III.    PARTIES ............................................................................................................. 7

        A.      Lead Plaintiffs .......................................................................................... 7

        B.      Defendants ................................................................................................ 7

                1.      Corporate Defendant ..................................................................... 7

                2.      Individual Defendants .................................................................... 7

IV.     META COMPANY BACKGROUND ................................................................. 8

        A.      Meta's Businesses .................................................................................... 8

                1.      Family of Apps ............................................................................. 8

                2.      Reality Labs .................................................................................. 9

        B.      Meta's History ......................................................................................... 9

                1.      Facebook, Inc. ............................................................................... 9

                2.      Facebook Inc.'s Transition to Meta .............................................. 9

                3.      Introduction of "Stories" ............................................................. 10

                4.      Introduction of "Reels" ............................................................... 10

        C.      Advertising Revenue Is Vital to Meta's Business ............................... 11

V.      META MISLED INVESTORS TO BELIEVE THAT THE IMPACT OF IOS
        CHANGES ON ITS BUSINESS WAS NOT MATERIAL ........................... 13

        A.      Meta's Reliance on Apple's iOS Platform............................................ 13

        B.      Apple Announced Changes to Its iOS Privacy Settings ..................... 13

        C.      Meta Acknowledged that Apple's iOS Privacy Changes Would Create "Some
                Kind of Headwind," but Directly Implied that the Impact Was Not Currently
                Material When It Was ............................................................................. 16

                1.      First Quarter 2021 ....................................................................... 17

                2.      Second Quarter 2021................................................................... 18

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

3.   Third Quarter 2021 ............................................................... 23

D.   Contrary to Meta's Representations, Apple's iOS Changes Had a Material Impact on Meta's Targeting and Measurement Capabilities, and on Meta's Revenues and Financial Performance, by Q2 2021 at the Latest ................................................. 26

1.   Apple's iOS Changes Had a Material Impact on Meta's *Targeting and Measurement Capabilities* by Q2 2021 at the Latest ................................ 26

2.   Apple's iOS Changes Had a Material Impact on Meta's *Revenues* by Q3 2020 at the Latest ................................................. 30

E.   Defendants Knew the Impact of the iOS Changes Were Material Because They Repeatedly Informed Investors that the Impact of Apple's iOS Changes Were in Line with the Company's Expectations ............................................. 37

F.   Meta Disclosed the Truth that the Impact of Apple's iOS Privacy Changes Had Been Highly Material, and Investors Were Stunned ........................................... 38

VI.   META MISLED INVESTORS TO BELIEVE THAT META'S COO, DEFENDANT SANDBERG, WAS NOT RECEIVING IMPROPER ADDITIONAL BENEFITS IN THE FORM OF PERSONAL ASSISTANCE ............................................. 41

A.   Meta's Code of Conduct Prohibits Use of Company Personnel for Personal Use Where Not Authorized .......................................................... 41

B.   Defendant Sandberg Repeatedly Received Personal Benefits Unrelated to Her Job, Including Assistance with Her Personal Book, Assistance in Planning Her Wedding, and Assistance in Private Matters ..................................... 42

C.   Defendant Sandberg Signed Multiple Proxy Statements that Failed to List Her Personal Benefits among the Perquisites and Additional Benefits She Received 50

D.   The Proxy Statements that Misrepresented Defendant Sandberg's Compensation Directly Authorized Her Election as Director ..................................... 51

E.   Defendant Sandberg Knew About Her Personal Use of Company Resources .... 51

F.   *The Wall Street Journal* Revealed the Truth that Sandberg Had Failed to Disclose these Perquisites that Violated Company Policy .................................. 52

VII.   META MISLED INVESTORS TO BELIEVE THAT ITS TRANSITION TO REELS WAS NOT IMPACTING ITS RESULTS OF OPERATIONS ..................................... 53

A.   Meta's Competition from TikTok .......................................................... 53

B.   Meta's Transition to Reels To Compete Against TikTok ................................. 54

C.   Meta Acknowledged That Its Introduction of Reels Would Shift Engagement from Stories to Reels, but Stated That Reels Increased Overall Engagement, and

ii

Implied That This Shift Was Not Currently Impacting Its Results of Operations 54

D.   Defendants Knew that the Transition to Reels Was Negatively Impacting Meta's Business Because Defendants Repeatedly Discussed the Impact of the Transition to Reels on User Engagement and Incorporated the Impact of the Transition into the Company's Guidance ................................................................ 60

E.   Meta Disclosed the Truth that the Shift to Reels Is Negatively Impacting Its Results of Operations, and Investors Expressed Surprise ................................ 61

VIII.   DEFENDANTS' FALSE AND MISLEADING STATEMENTS ................................ 63

A.   Defendants' False and Misleading Statements in 2021 ..................... 63

1.   April 9, 2021 ................................................................ 63

2.   July 28-29, 2021 ......................................................... 64

3.   October 25-26, 2021 ................................................... 67

B.   Defendants' False and Misleading Statements in 2022 ..................... 70

1.   April 8, 2022 ............................................................... 70

IX.   DUTY TO DISCLOSE ADVERSE FACTS ................................................ 70

A.   Share Repurchase Program ...................................................... 70

B.   Regulation S-K Item 105 ......................................................... 71

C.   Regulation S-K Item 303 ......................................................... 71

X.   LOSS CAUSATION ............................................................................ 72

A.   July 28, 2021 ........................................................................ 73

B.   October 25, 2021 ................................................................... 73

C.   February 2, 3, 4, 7 & 8, 2022 ................................................. 73

D.   April 21, 2022 ...................................................................... 75

E.   June 1, 2022 ......................................................................... 75

F.   June 10, 2022 ....................................................................... 76

XI.   ADDITIONAL SCIENTER ALLEGATIONS ............................................. 76

A.   Defendants Wehner and Zuckerberg Enriched Themselves Through Large Sales of Inflated Meta Stock During the Class Period ......................................... 77

B.     Core Operations ................................................................. 82

     1.     Apple's iOS Changes Directly Affected Meta's Core Operations. ......... 82

     2.     Meta's Transition to Reels Directly Affected Its Core Operations.......... 83

XII.     CLASS ACTION ALLEGATIONS ............................................... 83

XIII.     NO SAFE HARBOR ........................................................ 86

XIV.     COUNT ONE.............................................................. 86

XV.     COUNT TWO ............................................................. 88

XVI.     COUNT THREE ........................................................... 89

XVII.     COUNT FOUR ............................................................ 91

XVIII.     PRAYER FOR RELIEF ..................................................... 93

XIX.     JURY DEMAND .......................................................... 94

Lead Plaintiffs Menorah Mivtachim Insurance Ltd., Menorah Mivtachim Pensions and Gemel Ltd., The Phoenix Insurance Company Ltd., and The Phoenix Provident Pension Fund Ltd. (collectively, "Plaintiffs" or "Lead Plaintiffs") on behalf of a class of all persons or entities who purchased or otherwise acquired Meta Platforms, Inc. ("Meta" or the "Company") common stock between April 9, 2021 and June 9, 2022, inclusive (the "Class Period") and were damaged as a result,[1] bring this Second Amended Complaint for Violations of the Federal Securities Laws (the "Complaint") against Meta and several of Meta's senior executives—Chief Executive Officer Mark Zuckerberg, Chief Financial Officer David Wehner, Chief Operating Officer Sheryl Sandberg, and Vice President of Finance Susan Li (collectively, "Individual Defendants," and together with Meta, "Defendants").

Lead Plaintiffs' claims are based on personal knowledge as to their own acts, and on information and belief as to all other matters, based upon, among other things, a review and analysis of:   (1) reports and documents filed by Meta with the Securities and Exchange Commission ("SEC"); (2) reports issued by analysts covering or concerning Meta and its business; (3) press releases, news articles, transcripts, videos, and other public statements issued by or about Meta, its business, and the Individual Defendants, including articles by *The Wall Street Journal*; (4) an investigation conducted by Lead Plaintiffs' attorneys and their agents, including interviews with former Meta employees; and (5) other publicly available information concerning Meta, its business, and the allegations in this Complaint.  Lead Plaintiffs believe that substantial additional evidentiary support exists for the allegations in this Complaint.

## I.    INTRODUCTION

1.    This is a federal securities class action (the "Action") on behalf of a class of persons or entities that acquired the securities of Meta between April 9, 2021 and June 9, 2022, both dates inclusive, seeking to recover damages and to obtain other remedies for Defendants' violations of the Securities Exchange Act of 1934.

---

[1] Excluded from the Class are Defendants, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

2. Meta is a social media company that operates in two segments, "Family of Apps" and "Reality Labs." The Family of Apps segment's products include Facebook, Instagram, Messenger, and WhatsApp. The Reality Labs segment provides augmented and virtual reality hardware, software, and content. The Company was formerly known as Facebook, Inc. and rebranded as Meta Platforms, Inc. in October 2021. Meta's revenue derives almost entirely from selling ads to businesses.

3. Meta has grown to be so large that its size and influence is genuinely difficult to imagine. Almost half of the world's inhabitants regularly uses one or more of Meta's products for social interaction. If Meta's revenue were a national GDP, Meta would rank higher than two-thirds of all countries.

4. In important ways, Meta is so large it believes it can write its own rules. Meta's titanic power appears to have left the Company with the belief that U.S. laws that apply to ordinary companies do not apply in the same way to Meta. In the past decade, Meta has repeatedly violated U.S. laws and regulations, suffered punishments, and then violated those laws and regulations again.[2] It is the rare quarter in which Meta is not the subject of a major controversy stemming from its law-bending conduct.

5. Most importantly for the purposes of this Action, Meta appears to believe it can regularly bend U.S. securities laws prohibiting materially false and misleading statements. Given its size, Meta is among the most scrutinized companies in the world. Investors correctly recognize that each word uttered by Meta has been carefully parsed by lawyers, and consequently, the most sophisticated research analysts in the world similarly parse each word Meta utters for its implications for the value of the Company. Given the attention paid by Meta's leadership and by investors alike to each word Meta utters, Meta simply does not make misstatements or misleading omissions to the investing public accidentally.

---

[2] *See, e.g.*, Press Release, Federal Trade Commission, *FTC Imposes $5 Billion Penalty and Sweeping New Privacy Restrictions on Facebook* (July 24, 2019), https://www.ftc.gov/news-events/news/press-releases/2019/07/ftc-imposes-5-billion-penalty-sweeping-new-privacy-restrictions-facebook.

SECOND AMENDED COMPLAINT (CASE NO. 4:22-cv-01470-YGR)

6. And yet, during the Class Period, Meta repeatedly made statements and omissions about central aspects of its business that were blatantly misleading. So stark was the difference between the picture of the Company that Meta painted for investors and the truth, that when the true state of the Company was partly revealed, Meta's share price fell 26% in a single day on February 2, 2022—in absolute terms, the largest single-day drop in value of a U.S. Company in history. In their published statements expressing shock and surprise and in their starkly revised valuations, investors left no doubt that they were profoundly misled by Meta's statements about its business.

7. Throughout the Class Period, Meta misled investors about three aspects of its business.

8. *First*, Meta misled investors by directly implying that changes to Apple's iOS privacy settings were not materially impacting the Company's business, when in fact they were. In April 2021, Apple introduced a new operating system for the iPhone smartphone, iOS 14, in which Apple updated its privacy settings to permit users to opt-out of privacy protections that largely prevented apps like Facebook and Instagram from accessing information about the users' activities. Meta had been using this information to allow advertisers to target customers most likely to engage with those advertisers' products and services and to measure the success of their ad campaigns. Apple's iOS privacy changes hindered Meta's and advertisers' target and measurement capabilities, which in turn made Meta's platforms far less attractive spaces for advertising.

9. During 2021, Meta discussed the Apple iOS privacy changes with investors on several occasions, but the Company misleadingly downplayed the significance of the changes and assured investors that the changes were "manageable" and that the Company was taking numerous steps to "mitigate" the impact of the changes on the Company's business. Indeed, the Company misleadingly told investors that one of the two major challenges it faced from iOS was an underreporting gap from web conversions, and assured investors that the Company could reduce that gap by half by the end of 2021. Moreover, in its quarterly reports on Form 10-Q, every word of which is painstakingly scrutinized by the hundreds of sophisticated analysts globally covering

1   Meta's valuation, Meta directly implied that Apple's iOS privacy changes were not materially
2   impacting the Company's targeting and measurement capabilities and were not materially
3   impacting the Company's financial results.  Those statements were blatantly misleading because
4   such a material adverse impact was not merely a future possibility—it had already occurred by the
5   second quarter of 2021.  As the Company made clear in multiple statements in February 2022,
6   Apple's privacy changes were materially impacting the Company's business by the second quarter
7   of 2021—they were costing the Company approximately $10 billion annually.  Former employees
8   have confirmed that the iOS privacy changes were reducing Meta's revenue by approximately 4%
9   in Q2 2021, and by more than 5% in Q3 and Q4 2021, and decreased Meta's net income by
10  approximately 6.7% in Q2 2021 and by more than 9% in Q3 and Q4 2021.  A former employee
11  has also confirmed that the iOS changes were reducing Meta's "signal match rate," a measure of
12  the Company's targeting and measurement capabilities, by a staggering 40%.  Moreover, in
13  February 2022, the Company admitted that while it had reduced its underreporting gap in web
14  conversions by approximately half, that gap was, contrary to its prior misstatements, only "a very
15  small slice of the overall revenue landscape."  Here again, there is no question that the Company
16  knew that the impact of Apple's privacy changes was materially impacting the Company's
17  business.  Defendant CFO Wehner stated in each quarter following the introduction of the privacy
18  changes that the impact from the changes on the Company's business was "in line" with what the
19  Company had calculated—an indisputable admission by Meta's CFO that the Company had
20  calculated the impact of Apple's iOS privacy changes on its business, and that the impact was
21  known to the Company's highest executives.  *See infra* Part V.

22      10.    *Second*, Meta repeatedly concealed from investors that Meta's second-in-
23  command, COO Defendant Sheryl Sandberg, was routinely using Company resources for personal
24  matters.

25      11.    Sandberg used a team of Meta employees to develop a strategy to prevent the U.K.
26  newspaper *Daily Mail*, and its online version, from publishing a story that would have been
27  damaging to her ex-boyfriend, Bobby Kotick.  In 2016, a strategy group that included Facebook
28  employees discussed what information they believed the *Daily Mail* had obtained and whether

they could persuade the publication's leadership that Kotick had been wrongfully accused, according to one of the participants in the conversation. Again in 2019, Sandberg and her team continued their strategy to suppress any story about a restraining order against Kotick and were successful, as a story on the restraining order was never published by the *Daily Mail*. During this period, Kotick regularly tapped employees at Meta for public-relations advice.

12.     Sandberg likewise used Meta employees in editing her personal books, "Option B: Facing Adversity, Building Resilience, and Finding Joy," and "Lean In: Women, Work, and the Will to Lead." Sandberg has expressly admitted to this assistance: in the acknowledgements sections of her books, she lists numerous Meta employees who provided various forms of assistance in tasks that, by their nature, amounted to many hours of free assistance.

13.     Defendant Sandberg also used Meta employees in such highly personal matters as planning her wedding and helping with her family's foundation.

14.     U.S. Securities laws and regulations detail exactly what executives in publicly traded companies must disclose in SEC proxy filings about the benefits they receive. Benefits of greater than $10,000 must be disclosed, and the assistance Sandberg received on the above matters clearly surpassed that value. Accordingly, Defendant Sandberg had a duty to disclose, yet refused to disclose, that she was using Meta employees for purposes that had nothing to do with her employment at Meta. There is likewise no question that Sandberg knew about these misrepresentations—Sandberg was clearly aware of her own actions in using Meta employees for personal projects. *See infra* Part VI.

15.     *Third*, Meta misled investors to believe that its transition from its older content platforms, like Instagram Home Feed, to short-form video format, called "Reels," was not adversely impacting its business, when in fact it was. Meta has traditionally been most successful in selling ads in Instagram Home Feed and Facebook's News Feed, where ads can easily be placed frequently between user-generated text and photos. However, as the Company has recognized, Meta now faces significant competition from the app TikTok, which allows users to create and scroll through short-form videos. To compete with TikTok, in 2020 Meta launched Reels, a platform within Instagram that copies TikTok's short-form video format.

1 16. Reels is objectively more engaging than Instagram Home Feed, Facebook News

2 Feed and Meta's other older content platforms—users on average spend more hours in total on

3 Reels than on other platforms.  However, given the short-form video format, ads cannot be

4 interspersed as frequently in Reels as on older platforms.  Accordingly, while users spend more

5 hours on Reels, they view fewer ads per hour than on other Meta platforms.  In this way, Meta's

6 transition from News Feed and older formats for Reels involves a tradeoff—in transitioning to

7 Reels, users spend more total hours on Meta's apps, but view fewer ads per hour.  Whether this

8 tradeoff has a net positive or negative impact on Meta's ad business overall turns on whether the

9 total ads viewed by users increases or decreases with the transition to Reels.

10 17. Meta made clear to investors that it was transitioning to Reels to compete with

11 TikTok and that this transition would involve the tradeoff described above.  However, in its

12 conference calls and in its highly scrutinized quarterly reports on Form 10-Q, Meta directly and

13 repeatedly implied that the transition was having no adverse effect on Meta's business or results

14 of operations.  Here as well, there is simply no doubt that the Company knew about this impact—

15 when finally revealing the negative impact of the transition, Defendants CEO Zuckerberg and CFO

16 Wehner made clear that the transition had been undertaken pursuant to careful strategic calculation

17 that recognized short-term losses would be suffered for long-term gains.  *See infra* Part VII.

18 18. Meta's misrepresentations violated the U.S. securities laws and caused many

19 billions of dollars of losses to investors.  The Class is entitled to recover those losses.

20 **II.** **JURISDICTION AND VENUE**

21 19. The claims asserted herein arise under Sections 10(b), 14(a) and 20(a) of the

22 Securities Exchange Act of 1924 (the "Exchange Act"), 15 U.S.C. §§ 78j(b), 78n(a) and 78t(a),

23 and Rules 10b-5(a), (b), and (c) and 14a-9 promulgated thereunder by the SEC, 17 C.F.R.

24 §§ 240.10b-5, 240.14a-9.

25 20. This Court has jurisdiction over the subject matter of this action pursuant to

26 28 U.S.C. §§ 1331 and 1337, and Section 27 of the Exchange Act, 15 U.S.C. § 78aa.

27 21. Venue is proper in this District pursuant to § 27 of the Exchange Act and 28 U.S.C.

28 § 1391(b)-(c) because Meta's headquarters are located in this District, the Company conducts

1    substantial business in this District, and many of the acts and practices complained of in this

2    Complaint occurred in substantial part in this Judicial District.

3         22.    In connection with the acts, conduct, and other wrongs alleged in this Complaint,

4    Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce,

5    including, but not limited to, the United States mail, interstate telephone communications, and the

6    facilities of the national securities exchange.

7    **III.   PARTIES**

8         **A.    Lead Plaintiffs**

9         23.    Plaintiffs Menorah Mivtachim Insurance Ltd., Menorah Mivtachim Pensions and

10   Gemel Ltd., The Phoenix Insurance Company Ltd., and The Phoenix Provident Pension Fund Ltd.,

11   as set forth in the certifications attached as Exhibit C to the Declaration of Jennifer Pafiti (ECF

12   No. 17-2), incorporated in this Complaint by reference, acquired Meta securities at artificially

13   inflated prices during the Class Period and suffered damages as a result.

14        **B.    Defendants**

15             **1.    Corporate Defendant**

16        24.    Defendant Meta is incorporated in Delaware, and its principal executive offices are

17   located at 1601 Willow Road, Menlo Park, California 94025.  The Company's common stock is

18   listed on the NASDAQ under the ticker symbol "META."   Meta was previously known as

19   "Facebook, Inc." but rebranded itself as "Meta Platforms, Inc." on or about October 28, 2021.  The

20   Company's common stock was formerly listed on the NASDAQ under the ticker symbol "FB,"

21   which had been used since its initial public offering in 2012 and began trading on the NASDAQ

22   under the ticker symbol "META" on June 9, 2022.

23             **2.    Individual Defendants**

24        25.    Defendant Mark Zuckerberg ("Zuckerberg") is, and was during the Class Period,

25   Meta's Chief Executive Officer.

26        26.    Defendant David Wehner ("Wehner") is, and was during the Class Period, Meta's

27   Chief Financial Officer.

28

27.     Defendant Sheryl Sandberg ("Sandberg") is, and was during the Class Period, Meta's Chief Operating Officer.

28.     Defendant Susan Li ("Li") is, and was during the Class Period, a Vice President of Finance at Meta.

29.     Defendants Zuckerberg, Wehner, Sandberg and Li are collectively referred to in this Complaint as the "Individual Defendants."  Defendant Meta and the Individual Defendants are collectively referred to in this Complaint as "Defendants."

## IV.     META COMPANY BACKGROUND

### A.     Meta's Businesses

#### 1.     Family of Apps

30.     Meta's "Family of Apps" refers to its Facebook, Instagram, Messenger, and WhatsApp products.  For its Family of Apps, Meta "generate[s] substantially all of [its] revenue from selling advertising placements to marketers."  This revenue is generated by displaying ad products on Facebook, Instagram, Messenger, and third-party affiliated websites or mobile applications.

31.     Facebook is an online social media and social networking service.  Through a Facebook account, users may post content about their own lives and interests, and view content that their connections have posted.  Facebook uses a feature called News Feed, a constantly updated, personally customized scroll of photos and links to news stories, to push content to its users.  News Feed is the primary mechanism through which users are exposed to content on Facebook, and Facebook uses an algorithm to control what content appears in each user's News Feed.

32.     Instagram allows users to share photos, videos, and private messaging as well as connect and shop from businesses.  Instagram uses a similar feature to Facebook's News Feed, called Instagram Feed.

33.     Messenger is a messaging application for users to connect with friends, family, groups, and businesses across platforms and devices through chat, audio, and video calls.

34.     WhatsApp is a messaging application used by people and businesses around the world.

35.     Through this Family of Apps, Meta provides multiple services that permit cross-platform activities.

### 2.     Reality Labs

36.     Facebook Reality Labs drives innovation through AR/VR related consumer hardware, software, and content.  Reality Labs' revenue, only 2% of Meta's annual revenue, is generated from the delivery of consumer hardware products.

### B.     Meta's History

### 1.     Facebook, Inc.

37.     Defendant Zuckerberg launched Facebook in February of 2004 with a group of fellow Harvard University classmates.  At its start, Facebook connected Harvard University students with one another.

38.     Soon after its founding, Facebook expanded rapidly.  Facebook became widely available to the public in 2006 and has been the world's dominant social network platform since around 2011.

39.     In 2012, Facebook acquired Instagram, a photo and video sharing app, for $1 billion.  Instagram has grown to be a major component of Meta's business and the primary platform for Meta's Reels feature.

40.     Facebook acquired WhatsApp, a secure messaging app, in 2014 for approximately $19 billion.

### 2.     Facebook Inc.'s Transition to Meta

41.     On October 28, 2021, Defendant Zuckerberg announced that Facebook would be rebranding as Meta, bringing together its Family of Apps and technologies under one brand. Multiple sources have opined that the Company rebranded as Meta in part to distance itself from the many controversies it faced, including regulatory criticism.[3]  The timing of the rebranding

---

[3] Mike Isaac, *Facebook Renames Itself Meta*, N.Y. Times (Oct. 28, 2021), available at https://www.nytimes.com/2021/10/28/technology/facebook-meta-name-change.html.

9

occurred as the Company grappled with some of the most intense scrutiny in its history from regulators and the public over Meta's role in amplifying political misinformation and its alleged knowledge of its harmful effects on teenagers' well-being.[4]

42.    The corporate structure of the Company did not change with its transition to Meta, but starting with the fourth quarter of 2021, the Company began reporting two separate operating segments:  Family of Apps and Reality Labs.  The Company also started trading under a new stock ticker, META, on June 9, 2022.

43.    Today, Meta operates the world's largest family of social networking sites, accessed by more than 3.5 billion users.

### 3.    Introduction of "Stories"

44.    On August 2, 2016, Instagram launched Instagram Stories, a feature that lets users share multiple photos and videos that appear together in a slideshow and disappear after 24 hours.  Stories appear in a bar at the top of a user's Instagram feed.  Advertisers may run ads on Instagram Stories which are immersed seamlessly into a user's Stories viewing experience.

### 4.    Introduction of "Reels"

45.    On August 5, 2020, Instagram launched Instagram Reels, a new way to create and view short videos on Instagram.  Reels consist of short videos with audio, effects, and other creative tools to share with followers and friends within the Instagram app.  Reels are viewed as full-screen videos that users may scroll through one at a time.  Reels may be viewed in the Reels or Discover page of the Instagram app, and a user does not have to follow the user who posted to be recommended a Reel.  Meta launched Reels primarily to compete with the highly successful app TikTok owned by the Chinese company ByteDance.  Reels mimics TikTok's format.

46.    On June 16, 2021, Instagram launched ads on Reels.  The ads appear as full screen vertical videos interspersed between individual Reels.

---

[4] Alexandra S. Levine, *Facebook Changes Its Name to 'Meta' Amid Backlash to Whistleblower Revelations*, Politico (Oct. 28, 2021), available at https://www.politico.com/news/2021/10/28/facebook-meta-whistleblower-517449;  Barbara Ortutay, *In the middle of a crisis, Facebook Inc. renames itself Meta*, AP News (Oct. 28, 2021), available at https://apnews.com/article/facebook-meta-mark-zuckerberg-technology-business-5ad543ab7780caae435935f0aca9fac6.

47.     Reels was instantly a hit with Instagram users.  On July 28, 2021, during a conference call with investors to discuss financial results from the second quarter of 2021 (the "July 28, 2021 Investor Call"), Defendant Zuckerberg acknowledged, "Reels is already the largest contributor to engagement growth on Instagram.  Across all forms of video, short-form video like Reels is growing especially quickly."

48.     On September 29, 2021, Facebook announced the launch of Reels on Facebook for iOS and Android in the U.S.  On Facebook, Reels are located in the News Feed or in Groups and may be engaged with by users through comments or sharing with friends.

49.     From its introduction, Reels has primarily been used by users of Instagram rather than Facebook.  From January 2021 to December 2022, Instagram Reels recorded an average engagement rate [how many people interacted with it versus how many people saw it] reaching up to 0.93%, while on Facebook during the same period, video post types recorded an engagement rate of 0.17% on average.  As Susan Li acknowledged on Meta's Q2 2022 investor follow-up call, "I think Reels certainly has been a bigger presence on Instagram."

**C.     Advertising Revenue Is Vital to Meta's Business**

50.     Meta's revenues come almost entirely from selling ads to businesses for display within Meta's Family of Apps.  According to the Company's public earnings reports, "We generate substantially all of our revenue from advertising."  Approximately 98% of Meta's annual revenue during the Class Period came from advertising, as illustrated in the following table.

SECOND AMENDED COMPLAINT (CASE NO. 4:22-cv-01470-YGR)

| | Revenue for Year Ended December 31, (dollars in millions)[5] | | |
|---|---|---|---|
| | **2021** | **2020** | **2019** |
| **Advertising** | 114,934 | 84,169 | 69,655 |
| **Other Revenue** | 721 | 657 | 541 |
| **Family of Apps** | 115,655 | 84,826 | 70,196 |
| **Reality Labs** | 2,274 | 1,139 | 501 |
| **Total Revenue** | 117,929 | 85,965 | 70,697 |

51.     In particular, a large portion of Meta's revenue derives from selling ads seen on iPhones.  Meta uses data obtained about its users by tracking their activities.  Meta has stated:

> Our advertising revenue is dependent on targeting and measurement tools that incorporate data signals from user activity on websites and services that we do not control . . . .

52.     While there are several ways in which personal social networking could be monetized, Meta monetizes its products by mining its users' personal data and selling advertising that can be targeted to those users based on that personal data.

53.     This practice has been highly profitable for Meta.  Advertisers pay billions of dollars to display their ads to specific sets of Meta users.  Meta serves up these "audiences" using algorithms that analyze the vast quantity of data that the Company collects on its users.  This allows advertisers to target different campaigns and messages to different groups of users.

54.     Meta collects user data in multiple ways.  When users use Facebook, they can choose to share things about themselves like their age, gender, hometown, or friends.  They may click or like posts, pages, or articles.  Meta uses this information to understand users' interests to show them relevant ads.  Advertisers may also buy Meta customer information so they may reach those individuals on Facebook.  Meta also may track users across other websites and services like the various apps users also have on their mobile devices.

---

[5] *See* Meta's Annual Report on Form 10-K filed with the SEC on February 3, 2022.

SECOND AMENDED COMPLAINT (CASE NO. 4:22-cv-01470-YGR)

## V.  META MISLED INVESTORS TO BELIEVE THAT THE IMPACT OF IOS CHANGES ON ITS BUSINESS WAS NOT MATERIAL

### A.  Meta's Reliance on Apple's iOS Platform

55.  iOS (formerly iPhone OS or iPhone Operating System) is a mobile operating system created and developed by Apple Inc. ("Apple") exclusively for use on Apple's mobile devices, including its smartphone, the iPhone.  iOS is the world's second-most widely installed mobile operating system, after Android.

56.  As Meta's revenues come almost entirely from advertising, and as Meta relies on Apple to access much of the target market for its advertisers, Meta's business relies heavily on Apple's permitting it to run its Family of Apps on Apple iOS and permitting Meta to make its Family of Apps available on Apple's online app store (the "App Store").

57.  Meta recognizes that its business depends in large part on these permissions from Apple.  In Meta's comments to the National Telecommunications and Information Administration's "Developing a Report on Competition in the Mobile App Ecosystem" docket, Meta acknowledged, "Meta's ability to innovate on its products and services and even reach its customers is determined, and in some cases, significantly limited, by the most popular mobile operating systems, such as Apple's iOS."  Meta further stated that "iOS devices comprise about 60% of smartphones in the United States."

### B.  Apple Announced Changes to Its iOS Privacy Settings

58.  In June 2020, Apple decided to grant users more control over their privacy and the data associated with their activity on their iPhones and other devices.  In that month, Apple announced that it would roll out a host of changes to iOS.  These changes would prevent Meta's Family of Apps from accessing personal information Meta had used for years to allow advertisers to identify target customers accurately and efficiently and to measure the success of their advertising campaigns.

59.  Accordingly, with iOS 14, Apple introduced App Tracking Transparency ("ATT") which allowed iPhone users to opt-out of permitting apps, like Meta's Family of Apps, to track their internet behavior.  With the introduction of ATT, when users open an app after installing

iOS 14, they are greeted with a pop-up window that asks, "Allow [App Name] to track your activity across other companies' apps and websites?"  Users may then choose "Ask App Not to Track" or "Allow."

60.     When "Ask App Not to Track" is selected, Apple disables the app from using Apple's identifier for advertisers ("IDFA").  An IDFA is a random string of letters and numbers assigned to Apple devices like iPads and iPhones used by advertisers to identify users and track their activity across apps and websites.  Advertisers use IDFAs to deliver personalized, targeted advertising.  When asked not to track, iOS communicates to the app developer that a user does not want their information to be tracked and shared with anyone in any way.  Once this setting has been selected, apps may no longer leverage data collected on untracked iOS devices beyond what they may observe within their own ecosystem.

61.     If apps continue to track once this setting has been enabled, Apple may bar the offenders from its App Store.  Apple also codified its terminology regarding user data to ensure all developers use the same language in their App Tracking Transparency.  Developers must disclose their apps' privacy practices to remain on the App Store.

62.     ATT was rolled out in late April 2021.  ATT upended the mobile ad industry by abruptly cutting off one of its primary data streams.  As explained above, app tracking is important to advertisers because they use this information to deliver ads relevant to users' interests.  The more advertisers know about users, the more precisely they may target advertising to users, and the more valuable those ads become.

63.     The iOS changes impacted Meta's business in two important ways—they impacted Meta's ad targeting and measuring capabilities.  Permitting users to opt not to allow apps to track them lowered the number of users that can be tracked, as many users will opt not to allow tracking. As a result, advertisers had less data to use to target users.  The loss of data about user activity also decreased the accuracy with which advertisers can measure web conversions—actions that a prospective customer takes to further interact with a business or product in a valuable way such as making a purchase, signing up to receive emails, or visiting a webpage.  Losing the ability to track

a customer's web journey meant that companies also could no longer distinguish between new and repeat traffic, further lowering the value of Meta's advertisements.

64.     The actual impact of the iOS privacy changes on Meta's targeting and measurement capabilities are calculable by calculating "signal match rates." The signal match rate is the number of users out of a user population interacting with an ad for which Meta can receive information about whether the user's actions triggered the advertiser's "signal." The "signal match rate" is calculated as the number of users for which Meta can receive that information divided by the total user population interacting with the ad. "Signals" are actions taken by consumers while online that offer clues about intent that can be used to assess the efficacy of ads. Signals include, for example, landing on an advertiser's homepage after clicking on an ad, moving a product to a cart for purchase, or purchase of an advertised product. The signal match rate is a numerical measure of how well Meta can measure the effectiveness of an advertisement, and in turn the extent to which Meta can provide information to advertisers to target users similarly likely to be affected by the advertisement. In short, the signal match rate is a numerical measure of Meta's targeting and measurement capabilities.

65.     Apple's iOS privacy changes forced Meta to attempt to find new ways to offer ad targeting and measurement with less data.

66.     During the Class Period, Meta informed investors that it was taking numerous steps to mitigate the impact of Apple's iOS privacy changes. These efforts included, inter alia, building other data sources that advertisers could make use of, having more onsite conversion opportunities for advertisers, and automation to allow advertisers to leverage machine learning to find audiences for targeted ad campaigns.

67.     Meta also told investors that it planned to use "aggregated events management" to mitigate the impact of the iOS privacy changes. Meta claimed that this "aggregated events management" would allow Meta and its advertisers to make use of aggregated ad-campaign-level data for users who opted out of being tracked once the iOS changes were implemented. During Meta's 2Q 2021 investor follow-up call on July 28, 2021 (the "July 28, 2021 Investor Follow-Up

Call"), Defendant Li described how the Company's aggregated events management would work, stating:

> I gave an example earlier of aggregated events management. And that lets us receive aggregated campaign-level data for opted out users. So if you can imagine for, like, an opted in user, previously maybe you'd gotten the data like, "This purchase took place on Nike.com, made by user X, for X product, for Y price, at what time," now they've opted out. And so with AEM, you sort of get, under a campaign level, for some sort of products in some price range at some point in the last 48 hours, a purchase took place which follows, following an ad click on Facebook at some point in the last seven days. So you sort of get a delayed, aggregated version of the data, which, while obviously [is] not as performant as real-time data, has definitely mitigated some of the impact.

68.   Meta also stated that it could mitigate the impact of Apple's iOS privacy changes by closing an "underreporting gap" of the number of customers whose viewing of an ad "converted" into a sale, app installation, or other targeted activity on an advertiser's website.   As Defendant Sandberg explained on Meta's 3Q 2021 investor conference call:

> On measurement, as we wrote in a recent blog post, we believe we are underreporting iOS web conversions.  This means real world conversions, like sales and app installs, are higher than what's being reported for many advertisers, especially small advertisers.  We're making good progress fixing this.  We think we'll be able to address more than half of the underreporting by the end of this year.

69.   Meta also tested pop-ups inside the Facebook app on iPhones and iPads to encourage users to accept tracking.  The prompts attempted to persuade users to allow tracking by stating they would receive more personalized ads and "support businesses that rely on ads to reach customers."  The Company also ran a video ad campaign with the slogan "Good Ideas Deserve to Be Found," ending with the statement, "Personalized Ads help good ideas get found."

**C.**     **Meta Acknowledged that Apple's iOS Privacy Changes Would Create "Some Kind of Headwind," but Directly Implied that the Impact Was Not Currently Material When It Was**

70.   Throughout the Class Period, Meta acknowledged that Apple's iOS privacy changes would create "headwinds," but repeatedly downplayed the impact of the changes in statements made to investors and then directly implied in its SEC filings that the impact was not currently material.  However, by the second quarter of 2021, the Company's statement implying no material impact was not accurate—by the second quarter of 2021, Apple's iOS privacy changes

16

were materially impacting Meta's targeting and measurement capabilities and its revenues and profits. Defendants failed to tell investors that the changes could not be successfully mitigated and would materially hurt the ad business until February 2, 2022, when they admitted that the iOS privacy changes, which had been adopted by the vast majority of users by the second quarter of 2021, had been having a severe impact on Meta's targeting and measurement capabilities, and its revenues and profits since at least that quarter, when the Company admitted that the changes would cause a headwind of $10 billion in 2022.

### 1.     First Quarter 2021

71.     On March 2, 2021, Defendants Sandberg and Wehner spoke on behalf of Meta at the 2021 Morgan Stanley Technology, Media and Telecom Conference. There, Defendant Wehner made clear that Meta was closely watching the introduction of Apple's iOS privacy changes, that the rate of adoption of the iOS changes was predictable, and that Meta already had considered ways to mitigate the impact. Defendant Wehner stated:

> We're going to be watching when this actually launches, we expect it to be in Q1, so later in March. And then there's going to be the question of what's the pace of upgrades to iOS 14, which is a little bit more known because we're able to sort of monitor the pace of other updates in the past. We'll be obviously looking at what the opt-in rates are there. We're looking at things like a pre-prompt to provide additional context of what we're doing and why we're doing it and why it benefits the user. So, all of those things will be part of how we kind of assess what the impact for the business is going to be.

> But we do expect this to be an impact to the business and to impact our growth rates as we go into—further into 2020. And so that's factored into the outlook that I gave on the Q4 call. On the mitigation front, I think there's a few different things, obviously going on. One is, this is a broad platform wide change. It doesn't just affect Facebook. It affects everybody in the ecosystem. And so there's going to be a relative effect and that relative effect is not clear yet.

72.     On or about March 18, 2021, Defendant Zuckerberg appeared on Josh Constine's PressClub where he discussed Meta's business. On this program, Defendant Zuckerberg greatly downplayed concerns about the impact of Apple's iOS privacy changes. He stated that "I'm confident that we're gonna be able to manage through that situation" and dismissively suggested that the changes only "might make some kind of headwind." Defendant Zuckerberg even suggested the changes might *positively* impact the Company's business. Defendant Zuckerberg stated:

When it comes to, the iOS 14 changes, for example, and their impact on our business, I think the reality is that I'm confident that we're gonna be able to manage through that situation.  And we'll be in a good position.  I think it's possible that we may even be in a stronger position.

[. . .]

I mean I think that there's been a lot of people [that] have focused on the iOS 14 ad changes and whether that's going to be an impact for our business, for example, and, it might make some kind of headwind.  The reality is we make changes in our products all the time that[] try to prioritize health and wellbeing across the services that reduce our revenue.  So over the long-term, the iOS 14 business changes are actually not the biggest concern I have with Apple.

73.     On April 28, 2021, Meta held a conference call with investors to discuss financial results from the first quarter of 2021 (the "April 28, 2021 Investor Call").  During this call, Defendant Sandberg made clear that the Company was actively engaged in efforts to mitigate the impact of the iOS privacy changes and stated: "We're rebuilding meaningful elements of our ad tech so that our system continues to perform when we have access to less data in the future."  On the same call, in response to an analyst's question about the iOS update, Defendant Wehner likewise suggested that the impact was "manageable" and that the Company was "making encouraging progress" on "solutions" to the iOS ATT changes.  Defendant Wehner stated:

[T]he impact on our own business, we think, will be manageable.  We continue to expect it will be a headwind for the remainder of the year, but we're making encouraging progress . . . on our own solutions to help advertisers navigate these changes.

74.     On the April 28, 2021 Investor Call, Wehner also stated that "in addition to these mitigations, we're also just seeing very strong overall ad demand, which is contributing to a more positive outlook for 2021."

**2.     Second Quarter 2021**

75.     ATT was rolled out in late April 2021.  As explained below, ATT was quickly adopted by iPhone users and quickly had a severe impact on Meta's business.  According to multiple sources, by the start of June 2021, approximately 85% of iOS users had adopted (i.e., accepted and implemented) Apple's iOS 14 privacy changes.  As detailed in Section V.D below, the widespread adoption of the iOS privacy changes by Meta's customers caused an immediate and material impact both on Meta's targeting and measurement capabilities and on its advertising

revenues and net income, a fact that was never disclosed to investors.

76. On the July 28, 2021 Investor Follow-Up Call to discuss Meta's 2Q 2021 results, Defendants continued to downplay the impact of Apples' iOS privacy changes by emphasizing their mitigation efforts and suggesting that the impact of ATT would be manageable. For example, Defendant Li spoke about supposed "mitigation" efforts Meta was undertaking to counteract any negative impact Apple's iOS privacy changes would have on Meta's advertising business. Li stated in particular that Meta's "aggregated events management" was a mitigation effort that "has definitely mitigated some of the impact" of the Apple iOS changes:

> So if you can imagine for, like, an opted in user, previously maybe you'd gotten the data like, "This purchase took place on Nike.com, made by user X, for X product, for Y price, at what time," now they've opted out. And so with AEM [aggregated events management], you sort of get, under a campaign level, for some sort of products in some price range at some point in the last 48 hours, a purchase took place which follows, following an ad click on Facebook at some point in the last seven days. So *you sort of get a delayed, aggregated version of the data, which*, while obviously [is] not as performant as real-time data, has *definitely mitigated some of the impact*.

(Emphasis added.)

77. On the July 28, 2021 Investor Call, the Company also misleadingly assured investors that the impact of the iOS changes on the company was "in line with expectations." Investors would have read this statement in the context of the previous statements Meta had made about the impact, namely that the impact was "manageable," and as explained below, not "material." For example, Defendant Wehner stated:

> Yes. Yes. Thanks, John. On the iOS changes, really very much in line with expectations on things like opt-in rates. So I would say, overall, the impact has been in line with our expectations. So, not a huge surprise there. We're not fully rolled out with those changes, but Q3 will have had the impact more or less of those being fully rolled out.

78. Similarly, on the July 28, 2021 Investor Follow-Up Call, Defendant Li misleadingly assured investors that the impact of the iOS changes was "really quite close" to the Company's expectations. She also misleadingly stated that Meta's mitigation efforts, including its aggregated events measurement tool, were making the impact "in line" with expectations. As the Company had previously stated that it believed the iOS impact was manageable, these statements likewise misled investors to believe that the impact of the iOS changes was manageable and not material.

1   On the specific – I'm not sure I know exactly what all the specific consent flow
    changes are. In general, the **-- I think the impact of ATT has been really quite close**
2   **on almost all of the dimensions that we look at** when we think about kind of the
    iOS adoption curve, the opt-in rate, the impact post opt-out to ARPU. **Those have**
3   **all been quite similar to the early projections that we had that we kind of had**
    **factored into our Q1 and Q2 guidance. So I think -- so that's really been pretty**
4   **consistent. And I think in the landscape we're at now, effectively we're looking**
    **at the sort of primary buckets of mitigations.** There's -- obviously, there's
5   conversion to API which allows advertisers to share data for the opted in users over
    server side channels. And then we also have the Aggregated Events Measurement
6   tool that's allowing us to receive aggregated campaign-level data for opted out
    users. **And so I think the impact kind of to – to our revenue ecosystem has been**
7   **pretty in line with how we expected those would perform**.

8   (Emphasis added.)

9       79.     On July 29, 2021, Meta filed a Quarterly Report on Form 10-Q with the SEC,

10  reporting the Company's financial and operating resulting for the quarter ended June 30, 2021 (the

11  "2Q21 10-Q"). The 2Q21 10-Q stated:

12      [M]obile operating system and browser providers, such as Apple and Google, have
        announced product changes as well as future plans to limit the ability of websites
13      and application developers to collect and use these signals to target and measure
        advertising.  For example, in April 2021, Apple made certain changes to its
14      products and data use policies in connection with changes to its iOS 14 operating
        system that reduce our and other iOS developers' ability to target and measure
15      advertising, which may in turn reduce the budgets marketers are willing to commit
        to us and other advertising platforms.
16
        [. . .]
17
        These developments have limited our ability to target and measure the effectiveness
18      of ads on our platform and negatively impacted our advertising revenue, and *if we*
        *are unable to mitigate these developments as they take further effect in the future,*
19      *our targeting and measurement capabilities will be materially and adversely*
        *affected*, which would in turn significantly impact our future advertising revenue
20      growth.

21  (Emphasis added.)

22      80.     This statement was materially false and misleading because it directly implied that

23  Meta's "targeting and measurement capabilities" had not yet been "materially and adversely

24  affected" by Apple's iOS privacy changes, and that those changes had not yet "significantly

25  impact[ed]" Meta's "advertising revenue growth."  In fact, as explained in detail below, by the

26  time this statement was made, Meta's "targeting and measurement capabilities" already had been

27  "materially and adversely affected" by Apple's iOS privacy changes.  By Q2 2021, Meta's signal

28  match rate, a measure of its targeting and measurement capabilities, had decreased by 40%.

Likewise, as explained below, Apple's iOS privacy changes already had "significantly impact[ed]" Meta's "advertising revenue growth"—the changes decreased Meta's advertising revenue in Q2 2021 by approximately 4%, and decreased Meta's advertising revenue in Q3 and Q4 by greater than 5%. The changes likewise decreased Meta's net income by approximately 6.7% in Q2 2021 and by more than 9% in Q3 and Q4 2021. The iOS changes decreased the year-over-year change in advertising revenue in Q2 2021 from 62% to 56%, and in Q3 2021 from 40% to 33%, resulting in a negative impact of approximately 11% on Meta's Q2 2021 advertising revenue growth rate and a negative impact of approximately 21% on Meta's Q3 2021 advertising revenue growth rate.

81.     The term "material" as used in this statement in Defendants' Form 10-Q SEC filing has a clearly defined meaning given by the SEC. Defendants made this statement in the section "Risk Disclosures" of their SEC filing, and that section was drafted to satisfy the requirements of SEC Regulation S-K Item 105 (17 CFR § 229.105 "Risk factors"). That regulation requires that "Where appropriate, provide under the caption 'Risk Factors' a discussion of the ***material*** factors that make an investment in the registrant or offering speculative or risky." 17 CFR § 229.105(a) (emphasis added). The regulation specifically defines the term "material" as follows:

> The term "material," when used to qualify a requirement for the furnishing of information as to any subject, limits the information required to those matters as to which an average prudent investor ought reasonably to be informed before buying or selling any security of the particular company.

17 CFR § 270.8b-2(g).

82.     This definition of the term material tracks the legal definition of material in federal securities law as well as the definition of that term as used in the investing and accounting community—a fact is material if there is a substantial likelihood that a reasonable person would consider it important in making an investment decision.

83.     When the term "material" applies to a numerical quantity, the SEC has given guidance that a threshold of 5% is a reasonable rule of thumb for assessing numerical materiality:

> The use of a percentage as a numerical threshold, such as 5%, may provide the basis for a preliminary assumption that—without considering all relevant circumstances—a deviation of less than the specified percentage with respect to a particular item on the registrant's financial statements is unlikely to be material.

The staff has no objection to such a "rule of thumb" as an initial step in assessing materiality.[6]

84.     Likewise, in the investing and accounting communities, as a rule of thumb, an amount is presumptively material if it has an impact on a company's key business metrics of more than 5%.  For example, academic articles have surveyed this rule of thumb, and described it as follows:

> Working materiality levels or quantitative estimates of materiality generally are based on the 5% rule, which holds that reasonable investors would not be influenced in their investment decisions by a fluctuation in net income of 5% or less.  Nor would the investor be swayed by a fluctuation or series of fluctuations of less than 5% in income statement line items, as long as the net change was less than 5%.  This theory has been and remains the fundamental concept behind working materiality estimates today.[7]

85.     Notably, the SEC has made clear that even misstatements below 5% are nevertheless material where, as here, they mask a trend impacting earnings and are otherwise qualitatively important.  "[T]he staff believes that there are numerous circumstances in which misstatements below 5% could well be material. Qualitative factors may cause misstatements of quantitatively small amounts to be material. [. . .] Among the considerations that may well render material a quantitatively small misstatement of a financial statement item are [. . .] whether the misstatement masks a change in earnings or other trends . . . ."  Relevant to the determination are "not only the size of the misstatement but also the significance of the segment information to the financial statements taken as a whole."[8]

86.     Indeed, Meta investors demonstrated that they understand the term "material" to convey a useful meaning that is broadly understood.  On the July 28, 2021 Investor Follow-Up Call for 2Q 2021, an investor specifically asked Defendant Wehner whether the company was suggesting that the Company was experiencing no "material" impact to its ad revenue.  In responding, Defendant Wehner did not complain that he did not understand what was being

---

[6]  SEC, Staff Accounting Bulletin No. 99, 64 FR 45150-01 (1999), available at https://www.sec.gov/interps/account/sab99.htm.

[7] James Brody Vorhes, *The New Importance of Materiality*, J. of Accountancy (May 1, 2005), available at https://www.journalofaccountancy.com/issues/2005/may/thenewimportanceofmateriality.html.

[8] SEC, Staff Accounting Bulletin No. 99, 64 FR 45150-01 (1999).

asked—to the contrary, his response, and the response of Susan Li, made clear that they understood the term to convey definite meaning within the investor community and the context of an SEC quarterly report conference call:

> Q:     Maybe if you could just go a little deeper, if you would, please, the changes to iOS. Are you suggesting that you're not seeing any material impact at all to your ad revenue, maybe help quantify that?
>
> Wehner:     No.
>
> Q:     I mean, do you think you'll lose a few percentage points of growth here? Or how do you view that?
>
> Li:     No, sorry, I'm not suggesting that at all. We certainly see an impact. It's just the impact is very much in-line with what we had expected sort of going into iOS 14.5 being rolled out.
>
> So that's been factored into—I think accurately into our Q1 and Q2 guidance that we had given and now into our performance. But there is definitely an impact, although I don't think we've quantified that.

87.     Meta's weak financial results and outlook were a partial revelation, and a partial materialization of the concealed risk, that Apple's iOS privacy changes were materially affecting the Company's operations.  As a direct and proximate result of this partial corrective disclosure and/or materialization of foreseeable risks concealed by Defendants' fraud, the price of Meta common stock fell $14.96 per share, or 4.01%, to close at $358.32 per share on July 29, 2021.

### 3.     Third Quarter 2021

88.     On October 25, 2021, Meta held a conference call with investors to discuss financial results from the third quarter of 2021 (the "October 25, 2021 Investor Call").  On that call, Defendant Sandberg noted that the Company was experiencing an impact of Apple's iOS privacy changes:

> We started to see that impact in Q2, but adoption on the consumer side ramped up by late June, so it hit critical mass in Q3.  As a result, we've encountered two challenges.  One is that the accuracy of our ads targeting decreased, which increased the cost of driving outcomes for our advertisers.  And the other is that measuring those outcomes became more difficult.

89.     Yet again, Defendants pivoted and continued to reassure the market that Meta was taking actions to mitigate the impact of ATT on the Company's business.  Most prominently, Defendant Sandberg discussed as one of "two challenges" the "measuring" of outcomes.  Sandberg

then suggested that Meta's measurement problem concerned "underreporting iOS web conversions," and assured investors that Meta could address "more than half of the underreporting by the end of this year [2021]":

> On measurement, as we wrote in a recent blog post, we believe we are underreporting iOS web conversions. This means real world conversions, like sales and app installs, are higher than what's being reported for many advertisers, especially small advertisers. We're making good progress fixing this. We think we'll be able to address more than half of the underreporting by the end of this year.

90.     Later on the same call, Defendant Sandberg directly stated that Meta faced "two big challenges" from Apple's iOS changes, targeting and measurement, and stated that Meta could effectively address more than half of the measurement "big challenge" by the end of the year:

> There are two big challenges coming from this iOS changes. The one is targeting and one is measurement. I'm taking the second one first. On measurement, we think we can address more than half of that underreporting by the end of the year . . . .

91.     Similarly, on the follow-up conference call with investors the same day (the "October 25, 2021 Investor Follow-Up Call"), Defendant Li assured investors that the impact of iOS was within the Company's "expected" range, and at the same time misleadingly suggested to investors that the central reason for the large impact was underreporting of website conversions, a problem she assured investors Meta was focused on mitigating:

> We had a range of expected impact from the [ATT] changes and ultimately what we've seen is in that range but it's really on the higher end of what we had expected, and I think the underreporting of web conversions has really been a bigger issue than we expected, but it's something that we're very focused on helping to through better modeling techniques.

92.     These statements by Sandberg and Li that Meta believed it could resolve the majority of one of Meta's "two big challenges" from iOS misled investors to believe that Meta's mitigation efforts were likely to be successful in preventing ATT from having a material impact on Meta's targeting and measurement capabilities and revenues.

93.     Moreover, Defendants' statement that the impact of the iOS changes was in the range of what the Company had expected again must be read in the context of the Company's prior statements that the impact of iOS was expected to be "manageable" and not "material." In this context, Defendants statements that the iOS impact was in the expected "range" misled investors

24

to believe that the iOS changes were still a "manageable" problem that would not have a "material" impact on the Company's business.

94.     Additional statements on these calls reinforced this impression.  On the October 25, 2021 Investor Call, Defendant Zuckerberg stated that "we expect we'll be able to navigate these headwinds [related to iOS] over time with investments that we're already making today."  Later on that same call, Zuckerberg also stated:

> As Apple's changes make e-commerce and customer acquisition less effective on the web, solutions that allow businesses to set up shop right inside our apps will become increasingly attractive and important to them.  We've built solutions like ads that can dynamically point to either a business's website or their Shop on our platforms depending on what will perform better for them, and that will help more businesses navigate this challenging environment.

95.     Defendant Wehner also stated on this call that "on the iOS question as it relates to Q4 versus Q3, the bulk of iOS 14 updates were completed as we entered Q3, which contributed to the step up in the impact from Q2 to Q3.  Since iOS 14 is now widely adopted, we don't expect a similar step up in Q4."

96.     While the Company acknowledged on its conference call that it had experienced an impact from Apple's iOS privacy changes in the second and third quarters of 2021, the Company at no point stated or implied that the iOS privacy changes had had a *material* impact on its business.  To the contrary, the Company's statements broadly suggested that the impact amounted to manageable, immaterial headwinds that the Company was successfully taking steps to mitigate.

97.     In its SEC filings, Meta once again directly implied that the impact of Apple's iOS privacy changes was not having a material impact on its business.  On October 26, 2021, Meta filed a Quarterly Report on Form 10-Q with the SEC, reporting the Company's financial and operating resulting for the quarter ended September 30, 2021 (the "3Q21 10-Q").  In the 3Q21 10-Q, Meta stated:

> [O]ur advertising revenue in the third quarter of 2021 was negatively impacted by marketer reaction to targeting and measurement challenges associated with iOS changes.  *If we are unable to mitigate these developments as they take further effect in the future, our targeting and measurement capabilities will be materially and adversely affected, which would in turn significantly impact our future advertising revenue growth.*

(Emphasis added.)

25

98.     This statement was materially false and misleading because it directly implied that Meta's "targeting and measurement capabilities" had not yet been "materially and adversely affected" by Apple's iOS privacy changes, and that those changes had not yet "significantly impact[ed]" Meta's "advertising revenue growth."  In fact, as explained below, by the time this statement was made, Meta's "targeting and measurement capabilities" already had been "materially and adversely affected" by Apple's iOS privacy changes.  By Q3 2021, Meta's signal match rate, a measure of its targeting and measurement capabilities, had been decreased by 40%.  Likewise, as explained below, Apple's iOS privacy changes already had "significantly impact[ed]" Meta's "advertising revenue growth"—the changes decreased Meta's advertising revenue in Q3 by greater than 5%.

99.     Meta's weak financial results and outlook were a partial revelation, and a partial materialization of the concealed risk, that Apple's iOS privacy changes were materially affecting the Company's operations.  As a direct and proximate result of Meta's partial corrective disclosure and/or materialization of foreseeable risks concealed by Defendants' fraud, the price of Meta common stock fell $12.88 per share, or 3.92%, to close at $315.81 per share on October 26, 2021.

**D.      Contrary to Meta's Representations, Apple's iOS Changes Had a Material Impact on Meta's Targeting and Measurement Capabilities, and on Meta's Revenues and Financial Performance, by Q2 2021 at the Latest**

**1.      Apple's iOS Changes Had a Material Impact on Meta's *Targeting and Measurement Capabilities* by Q2 2021 at the Latest**

100.     Upon its introduction in Q2 2021, ATT was quickly adopted by the vast majority of iPhone users and immediately had a material adverse impact on Meta's targeting and measurement capabilities.  On the October 25, 2021 Investor Call, Defendant Wehner expressly confirmed that "the bulk of iOS 14 updates were completed as we entered Q3" and that "iOS 14 is now widely adopted."  Defendant Sandberg likewise confirmed on the October 25, 2021 Investor Call that "adoption on the consumer side ramped up by late June" and "hit critical mass in Q3."  Multiple former employees below confirm that approximately 85% of Apple iPhone users had adopted iOS's new privacy settings by June 2021.

1                a.     *Former Employees Acknowledge that Apple's iOS Changes Were*

2                     *Widely Adopted and Immediately Had a Material Impact on*

3                     *Meta's Targeting and Measurement Capabilities by Q2 2021*

101.    Given the widespread adoption of the iOS privacy changes, the impact of these changes on Meta's targeting and measurement capabilities was immediate and material, as former employees have acknowledged.  A former employee ("FE1") has confirmed that the iOS privacy changes immediately and materially impacted Meta's targeting and measurement capabilities. FE1 started to work at Meta in July 2015 as a Senior Product Support Analyst.  In January 2016, FE1 shifted to a role as Product Support Lead, and in October 2016, FE1 became a Client Solutions Manager before being promoted to Senior Client Solutions Manager in January 2018.  FE1 left Meta in January 2022.  FE1 worked out of the Company's headquarters in Menlo Park, California. As a Senior Product Support Analyst, FE1 identified project risks and set up alarm alerts based on product bug reports.  As a Product Support Lead, FE1 worked to launch new products and helped build a new Facebook Concierge team to resolve engineering and other issues.  FE1's Client Solutions roles involved "managing Apple and Google ads relationships."  FE1 reported to Industry Manager—Technology and Telecommunications Noah Choi, who reported to Director, Head of Industry—Technology, Mobile and Connectivity Jonathan Kratz.  Kratz in turn reported to Director, Technology Mobility and Connectivity—Global Marketing Solutions Stephanie Latham, who reported to VP, Global Marketing Solutions Nada Stirratt and VP, Global Business Group Carolyn Everson.  Stirratt in turn reported to Chief Revenue Officer David Fischer, who reported directly to Chief Operating Officer Sheryl Sandberg.

102.    FE1 was tasked with writing a brief detailing the planned iOS privacy changes and the anticipated revenue implications on Meta's advertising with Apple, Google, Intel, Microsoft, and other tech accounts.  FE1 stated that this brief, titled approximately "Impact of iOS 14" (the "iOS Impact Brief") in the form of a Google Doc, was emailed directly to VP, Global Marketing Solutions Nada Stirratt, two levels below Defendant Sandberg in June 2020.  FE1 confirmed that his iOS Impact Brief was incorporated into a larger memorandum on the impact of iOS and that that memorandum was sent to Defendant Sandberg, also in or around June 2020.  FE1 confirmed

1   that the iOS Impact Brief FE1 sent to VP Stirratt was not a draft and that the content of his

2   contribution was not substantively modified when incorporated in the larger memorandum sent to

3   Defendant Sandberg.

4          103.    FE1 confirmed that approximately 85% of Apple iPhone users had adopted iOS's

5   new privacy settings by June 2021, and that the iOS privacy changes immediately and materially

6   impacted Meta's targeting and measurement capabilities upon their adoption.   FE1 precisely

7   quantified the projected and actual impact of the iOS privacy changes on Meta's targeting and

8   measurement capabilities, which according to FE1, are calculable by calculating signal match

9   rates.  As explained above, the signal match rate is the number of users out of a user population

10  interacting with an ad for which Meta can receive information about whether the user's actions

11  triggered the advertiser's "signal."  The "signal match rate" is calculated as the number of users

12  for which Meta can receive that information divided by the total user population interacting with

13  the ad.   The signal match rate is a numerical measure of how well Meta can measure the

14  effectiveness of an advertisement, and in turn the extent to which Meta can provide information to

15  advertisers to target users similarly likely to be affected by the advertisement.  According to FE1,

16  Meta's signal match rates for advertisers were projected to decrease by about 65% due to the iOS

17  privacy changes.  When the iOS changes were introduced, the actual decrease in signal match rates

18  was an equally staggering 40%, according to FE1.  FE1 learned these figures from a team in Meta's

19  data science division, which had been tasked with calculating the numerical impact of Apple's iOS

20  changes on Meta's signal match rates.  The data science team conveyed these figures to FE1 and

21  his colleagues to assist them in their assessments of the iOS impact.  FE1 explained that the impact

22  of the iOS changes on Meta's business correlated with the user adoption rates of those changes.

23  According to FE1, a decrease in signal match rates of 40% was highly material; FE1 agreed that

24  by "material," FE1 meant that the decrease was so large as to be highly important in the mind of a

25  reasonable investor when making decisions about investing in Meta.  Specifically, according to

26  FE1, a decrease in signal match rates of 40% was so massive that this decrease caused most

27  advertisers not to increase their ad spend with Meta during this period on platforms affected by the

28  iOS changes (i.e., the vast majority of Meta's business).

1    104.    A former employee ("FE2") confirmed that approximately 85% of Apple iPhone

2  users had adopted iOS's new privacy settings by June 2021.  FE2 worked for Meta from August

3  2010 to February 2023 as a Local Business Consultant, Client Partner—Restaurants and Client

4  Partner—Emerging Disruptors.  FE2 initially worked out of Meta's office in Austin, TX and later

5  moved to the Company's offices in New York City, NY.  FE2 stated that he learned of the adoption

6  rate through internal product managers at Meta who generated estimates about the adoption rate

7  of the iOS privacy changes.  FE2 stated that Meta was able to generate this estimate using data

8  from Meta's own software development kit or "SDK" that was installed on Meta users' iPhones.

9                              b.    *Defendants Belatedly Admitted in their Statements that Apple's*

10                                   *iOS Changes Had a Material Impact on Meta's Targeting and*

11                                   *Measurement Capabilities by Q2 2021*

12    105.    Indeed, Susan Li eventually admitted that the Company was experiencing a

13  "significant" adverse impact on its targeting and measurement capabilities prior to Q4 2021.  On

14  the February 2, 2022 follow-up call with investors (the "February 2, 2022 Investor Follow-Up

15  Call") to discuss Q4 2021 results, Li stated, "There are ***still significant targeting and***

16  ***measurement headwinds*** that we are facing," implying that the "significant targeting and

17  measurement headwinds" did not begin in Q4, but rather were "still" continuing from at least Q3.

18  (Emphasis added).

19                              c.    *The Revenue Impact of Apple's iOS Changes in 2022 Shows that*

20                                   *Apple's iOS Changes Had a Material Impact on Meta's Targeting*

21                                   *and Measurement Capabilities by Q2 2021*

22    106.    Defendants' February 2, 2022 revelation by Defendant Wehner on the February 2,

23  2022 earnings call with investors (the "February 2, 2022 Investor Call") that the impact of the iOS

24  changes on Meta's 2022 revenues would be $10 billion also shows that the impact of the iOS

25  privacy changes on Meta's targeting and measurement capabilities had been material, and indeed

26  severe.  As explained above, ATT and Apple's iOS privacy changes had been implemented and

27  adopted by most of the users who were going to adopt them by Q2 2021—85% of users had

28  adopted Apple's iOS privacy changes by June 1, 2021.  As Defendant Sandberg admitted on the

October 25, 2021 Investor Call, the adoption of iOS ramped up by June 2021 and so hit a "critical mass" around that time.  Therefore, by the end of Q2 2021, approximately the full damage to Meta's targeting and measurement capabilities from the iOS changes had been sustained.  That sustained damage to Meta's targeting and measurement capabilities was material, at a minimum, if, at any point in the future, that loss of capability would cause Meta's financial results to suffer materially.  Sure enough, as Defendant Wehner admitted in his February 2, 2022 disclosure, the sustained damage to Meta's targeting and measurement capabilities caused Meta's financial results to suffer materially in 2022.  Therefore, the damage to Meta's targeting and measurement capabilities sustained by June 1, 2021 was material—Apple's iOS changes had caused a material adverse impact on Meta's targeting and measurement capabilities by June 1, 2021.

> **2.  Apple's iOS Changes Had a Material Impact on Meta's *Revenues* by Q3 2020 at the Latest**
>
> a. *Former Employees Acknowledge that Apple's iOS Changes Were Widely Adopted and Immediately Had a Material Impact on Meta's Revenues by Q2 2021*

107.  Former employees have confirmed that Apple's iOS privacy changes had materially impacted Meta's business and revenues by Q2 2021.  According to FE1, Meta learned about the planned iOS privacy changes in late 2019, about six to eight months before Apple announced them publicly in June 2020.  As explained above, FE1 was tasked with writing a brief detailing the planned iOS privacy changes and the anticipated revenue implications on Meta's advertising with Apple, Google, Intel, Microsoft, and other tech accounts.  FE1 confirmed, based on FE1's knowledge acquired in working on this brief and related tasks, that Meta began to see a material drop in revenue due to the iOS privacy changes in the second quarter of 2021.  According to FE1, the iOS privacy changes caused a drop of approximately 4% in advertising revenues by the end of Q2, 2021, and caused a drop of greater than 5% in Q3 and Q4 2021.  FE1 learned this information in party through assessing the revenue impact of the iOS changes on FE1's business vertical and in assessing whether the actual impact aligned with the predicted impact.  FE1 learned of the broader impact of the iOS changes on Meta through discussing with his colleagues how

those changes impacted the remaining business vertical at Meta.  According to FE1, the impact on FE1's colleagues' verticals was similar to, and in the case of e-commerce greater than, the impact on the tech advertiser vertical—the impact was approximately 4% in advertising revenues by the end of Q2, 2021, and a drop of greater than 5% in Q3 and Q4 2021.  FE1 stated, "I know that all of the verticals were providing similar reports to senior leadership."  According to FE1, these impacts were in line with the Company's projections included in the larger iOS Impact Brief FE1 wrote in part.  FE1 again confirmed that his iOS Impact Brief was incorporated into a larger memorandum and that that memorandum was sent to Defendant Sandberg.  FE1 confirmed that the iOS Impact Brief FE1 sent to VP Stirratt was not a draft and that its content was not substantively modified when incorporated in the larger memorandum sent to Defendant Sandberg.

108.    Another former Meta employee, ("FE3"), confirmed that Meta conducted an extensive analysis of the projected impact of Apple's iOS changes on Meta's targeting and measurement capabilities, including the degree of loss of signal information, and on Meta's financial results, including its revenues.  FE3 worked for Meta from August 2019 to October 2021 with the titles, successively, Product Marketing Manager—Ads Targeting; Product Marketing Manager—Ads Signals and Delivery; and Product Marketing Manager, New Facebook Experiences.  FE3 worked in San Francisco and reported to a Product Marketing Manager Lead, who in turn reported to a Director of Product Marketing, who reported to other executives of the Company.  According to FE3, FE3 learned about Meta's analysis of the impact of iOS changes on Meta's targeting and measurement capabilities as a member of the product marketing section of the Ads Signals team, where "this was our product."  FE3 participated in weekly product team calls on which the analysis was discussed, though FE3 did not personally conduct the analysis.  FE3 stated that Meta's analysis of the iOS impact began prior to December 2020.

109.    A final former employee ("FE4") further confirms the accounts of FE1, FE2, and FE3.  FE4 confirmed that the iOS privacy changes "definitely" had an impact of greater than 5% of Meta's revenue from technology-focused advertisers.  FE4 worked for Meta from October 2019 to April 2022 as a Client Partner, a sales role in which FE4 worked with large clients that advertised with Meta, specifically technology-focused clients.  FE4 worked out of Meta's office in New York

City, NY and reported to Director, Head of Industry—Technology, Mobile, and Connectivity
Jonathan Kratz, who reported to Director—Advertising Partnerships—Technology, Mobility &
Connectivity Stephanie Latham. Latham reported to Vice President of Global Marketing Solutions
Nada Stirratt. According to FE4, FE4 learned that "the vast majority" of technology-focused
advertisers decreased ad spending with Meta as the iOS 14 privacy changes took effect in Q3 2021,
based on numbers that FE4 saw in reports shared during monthly team meetings led by Latham
and occasionally attended by Stirratt. During these meetings, FE4 stated they would "go over
vertical performance, vertical attainment to target, go through key accounts," including accounts
that were "growing" or "lagging." FE4 estimated that he likely first saw these types of numbers—
showing that "the vast majority" of technology-focused advertisers were decreasing ad spending—
in July or August 2021. According to FE4, the impact was especially significant with "direct-
response" focused clients like Amazon, for example, whose goal was converting users directly into
sales, and that some advertisers, such as Verizon, stopped advertising with Meta altogether. FE4
stated that as the privacy changes took effect and started having an impact on Meta's advertising
business, sales staff were "missing quotas year over year" and growth was "stagnant or slightly
down" and it became clear that "the momentum of the previous few years had stalled out or started
to backslide." Recognizing this, Meta started offering "relief" to sales staff, such as by "removing
floors" that had been in place to trigger incentives payouts, according to FE4. FE4 stated that CEO
Mark Zuckerberg addressed employee questions about the impact of the iOS privacy changes
during weekly or biweekly "Ask Mark" video sessions. FE4 also confirmed that 85% of users had
adopted the iOS privacy changes by Q2 2021, which according to FE4, Meta had been tracking
internally via third-party companies like Statista or Insider Intelligence.

110. FE2 likewise confirmed that the financial impact of the iOS privacy changes
became severe by Q3 2021. By Q3 2021, FE2, other client partners with whom FE2 interacted,
and entire partner client teams with which FE2 was familiar, started missing their sales goals. This
was particularly true for client partners working with clients in the areas of e-commerce, gaming,
apps and any retail with online sales. Together, according to FE2, these types of clients made up
most of Meta's advertising clients. FE2 estimated that clients decreased their ad spending by 20-

30% on average from Q2 2021 to Q3 2021.  Other clients simply "paused" their advertising, i.e., stopped advertising with Meta entirely, after the iOS privacy changes went into effect.  According to FE2, by Q3 2021, FE2 and the other client partners went from hitting or exceeding their quarterly sales goals to "not even hitting" their "floor" threshold, which was 80% of the sales goal.  The problems continued in Q4 2021—the entire sales group to which FE2 belonged missed its goals by "close to 10%" in Q4 2021.  According to FE2, Q3 2021 was the first time in his career that FE2 and his colleagues were not hitting their numbers.

111.    FE2 estimated, based on information about client teams missing their goals, that the iOS changes negatively impacted Meta's total advertising revenues by 10-15% in Q3 2021, and stated that this estimate was "somewhat conservative."  FE2 stated he was "very confident" that the iOS privacy changes had a negative impact of 5% or greater on Meta's advertising revenue in Q3 2021.

112.    FE1's statement that Apple's iOS changes on Meta's revenues decreased revenues 4% in Q2 2021, and FE1 and FE2's statements that the changes decreased revenues by greater than 5% in Q3 and Q4 2021, indicate that these changes had an even greater impact on Meta's net income and other measures, including growth rate.  As shown in Exhibit A to this complaint, prepared by a certified public accountant, the 4% decrease in revenue in Q2 2021 from Apple's iOS changes caused a manifestly material 6.7% decrease in net income in Q2 2021.  Similarly, the 5% decrease in revenue in Q3 2021 from Apple's iOS changes caused a manifestly material 9.6% decrease in net income in Q3 2021.  Together, the iOS changes decreased Meta's net income in 2021 by a material 6.7%.  The iOS changes decreased the year-over-year change in advertising revenue in Q2 2021 from 62% to 56%, and in Q3 2021 from 40% to 33%, resulting in a negative impact of approximately 11% on Meta's Q2 2021 advertising revenue growth rate and a negative impact of approximately 21% on Meta's Q3 2021 advertising revenue growth rate.  An explanation for the preparation of these figures, by a certified public accountant, appears as Exhibit B to this complaint.

b.    *Defendants Admitted in their Statements that Apple's iOS Changes Had a Material Impact on Meta's Revenues by Q2 2021*

113.     Defendants' own statements make clear that Apple's iOS changes caused a material impact on Meta's revenues by Q3 2021 at the latest.  On calls with investors on February 2, 2022, Defendant Wehner repeatedly admitted that the iOS changes had had a material impact on the Company's revenue and business in Q3 and Q4 of 2021.  For example, on the February 2, 2022 Investor Follow-Up Call, Wehner stated, "the iOS 14.5 rollout – which was most significant, which was mid last year – . . . *really impacted our growth rates in Q3 and Q4*."  (Emphasis added.)  This statement is a direct admission that the iOS rollout materially impacted Meta's business in Q3 and Q4 of 2021.  Likewise, on the February 2, 2022 Investor Call, Defendant Wehner referenced the "*big iOS 14 headwinds*" in the second half of 2021.  (Emphasis added.)  Defendants had never previously characterized the iOS 14 headwinds as "big" or otherwise previously characterized them as being material.

114.     Also on Meta's February 2, 2022 Investor Call for 4Q 2021, Defendant Wehner stated:

> On iOS, we saw the revenue impact with iOS 14 – sorry, iOS just in general, *in Q4*, and that was in line with our expectations and *similar to the Q3 headwind*.
>
> [. . .]
>
> And we believe the impact of iOS overall as a headwind on our business in 2022 is on the order of $10 billion, so it's a pretty significant headwind for our business. And we're seeing that impact in a number of verticals.  E-commerce was an area where we saw *a meaningful slowdown in growth in Q4*.  And similarly, we've seen other areas like gaming be challenged.
>
> [. . .]
>
> [W]e know that e-commerce is one of the most impacted verticals from iOS restrictions.

(Emphasis added.)

115.     In these statements, Wehner expressly admitted that the headwind in Q3 was "similar to" the headwind in Q4, and that the headwind in Q4 included, first and foremost, "a meaningful slowdown in growth" in e-commerce, "one of the most impacted verticals from iOS restrictions."  Accordingly, in these statements, Wehner admits that Meta experienced a "meaningful slowdown" in growth in Q3 from the iOS restrictions.  Again, Defendants had never

1    previously characterized the slowdown in growth from iOS restrictions as "meaningful" or

2    otherwise previously characterized the slowdown as being material.

3        116.    Also in these statements, Wehner directly implied that the magnitude of the impact

4    of the iOS changes of $10 billion for 2022 was comparable to the current magnitude of the impact

5    of the iOS changes the Company already experienced in the second half of 2021.  Wehner stated,

6    about the $10 billion impact, "*we're seeing that impact* in a number of verticals.  E-commerce

7    was an area where *we saw a meaningful slowdown in growth in Q4*.  And similarly, *we've seen*

8    *other areas* like gaming *be challenged*."  (Emphasis added.)  By describing the $10 billion impact

9    as a continuation of the trend of meaningful slowdown that the Company was already seeing across

10   "a number of verticals," including expressly "in Q4," which was "similar to the Q3 headwind,"

11   Wehner made clear that the trend expressed in the $10 billion impact in 2022 was not newly

12   appearing in 2022—the Company had been experiencing similar slowdown in at least Q3 and Q4.

13       117.    On the same investor calls, Defendant Wehner separately confirmed that the iOS

14   changes had had a material impact on Meta's financial results in Q3 and Q4 2021, and that the

15   magnitude of the $10 billion impact of ATT in 2022 was a continuation of a comparable impact in

16   the second half of 2021, when he repeatedly stated that year-over-year performance comparisons

17   between Q1/Q2 2021 and Q1/Q2 2022 would be difficult, while *the comparison between Q3/Q4*

18   *2021 and Q3/Q4 2022 would not similarly be difficult*.  For example, on the February 2, 2022

19   Investor Call, Defendant Wehner stated,

20       [T]he changes made with iOS 14.5 . . . really *started to have an impact more*
         *seriously* on the business *in the second half of last year*.  So I think that lapping
21       effect is going to be *very pronounced* in the *first half* of the year where we're
         lapping periods that didn't have that impact.  So that's where we're going to see the
22       biggest impact from the lapping.

23   (Emphasis added.)

24   Similarly on the February 2, 2022 Investor Call, Defendant Wehner stated,

25       On iOS 14, we saw the revenue impact with iOS 14 -- sorry, iOS just in general, in
         Q4, and that was in line with our expectations and similar to the Q3 headwind.  But
26       obviously, as we go into 2022, we're going to be lapping a period in which in Q1
         and Q2, those headwinds were not in place in the year ago period. So that definitely
27       makes for *a tough comp* in the *first half* of the year.

28   (Emphasis added.)

1    Likewise, on the February 2, 2022 Investor Follow-Up Call, Wehner stated, "[T]he point that those

2    headwinds will be **particularly strong** as it relates to year-over-year growth in the **first half of the**

3    **year** is correct."

4        118.    That the performance comparisons between Q1/Q2 2021 and Q1/Q2 2022 would

5    be "a tough comp" due to the iOS changes, while the comparison between Q3/Q4 2021 and Q3/Q4

6    2022 would not similarly be tough, shows that the impact of the iOS changes in Q3/Q4 2021 was

7    material and similar in magnitude to the projected magnitude of the impact on Q3/Q4 2022.  Put

8    differently, were Meta not to have experienced a material impact on its performance in Q3/Q4

9    2021 from iOS, the comparison between Q3/Q4 2021 and Q3/Q4 2022 would be just as "tough."

10              c.    *The Revenue Impact of Apple's iOS Changes in 2022 Shows that*

11                   *Apple's iOS Changes Had a Material Impact on Meta's Revenues*

12                   *by Q2 2021*

13       119.    Additionally, the Company's statements about its historic and projected revenue,

14    combined with its statement that the impact of the iOS changes in 2022 would be $10 billion,

15    together imply that the minimum quantitative impact on revenue was material.  Meta disclosed

16    that its projected revenue growth for Q1 2022 was 3-11% year-over-year, and the Company gave

17    reasons to expect revenue growth to be lower in 2022 than in 2021 given that year-over-year

18    comparisons for the first half of the year would be made with periods prior to the iOS changes (in

19    addition to various headwinds).  *See* ECF No. 61-17 at 8.  Even assuming, contrary to its

20    statements, that Meta projected revenue growth to be the same in 2022 as it was in 2021, and so

21    projected 2022 revenue to increase at a rate of 37% year-over year, Meta's revenue would have

22    been projected to be $161,562,730,000 in 2022.  Accordingly, even under the most extreme

23    assumption about the Company's projected revenue that remains consistent with its statements

24    implying lower 2022 growth, the Company's projected impact of $10,000,000,000 on its revenue

25    would equal a headwind of 6.189% on revenues of $161,562,730,000, and an even greater

26    percentage impact on net income.  An ongoing headwind of at least 6.189% on Meta's quarterly

27    2021 revenues and net income was material under SEC's and accountants' rule-of-thumb threshold

28    for materiality of 5%.  *See* SEC, Staff Accounting Bulletin No. 99, 64 FR 45150-01 (1999).  These

1   calculations align neatly with, and reinforce, FE1's statement that the impact of the iOS changes

2   of Meta's revenues in Q3 and Q4 was greater than 5%.

3        **E.**     **Defendants Knew the Impact of the iOS Changes Were Material Because**

4                   **They Repeatedly Informed Investors that the Impact of Apple's iOS Changes**

5                   **Were in Line with the Company's Expectations**

6        120.    Even before the introduction of Apple's iOS privacy changes, Meta noted that it

7   would calculate the impact of Apple's iOS privacy changes on its business.  Speaking at the 2021

8   Morgan Stanley Technology, Media and Telecom Conference, Defendant Wehner stated:

9           We're going to be watching when this actually launches, we expect it to be in Q1,
    so later in March.  And then there's going to be the question of what's the pace of

10          upgrades to iOS 14, which is a little bit more known because we're able to sort of
    monitor the pace of other updates in the past.  We'll be obviously looking at what

11          the opt-in rates are there.

12       121.    After the introduction of Apple's iOS privacy changes, at multiple points during

13  the Class Period, Defendants assured investors that the impact of Apple's iOS privacy changes

14  was in line with the Company's expectations, as detailed below.  Accordingly, the Company

15  repeatedly admitted that it had conducted internal studies calculating the impact of Apple's iOS

16  privacy changes on Meta's business.  Moreover, Meta's CFO Wehner was clearly aware of these

17  studies and their results because he commented on them repeatedly and referred to them to assure

18  investors that the impact of Apple's iOS privacy changes on Meta's business was in line with the

19  Company's expectations.

20       122.    On the July 28, 2021 Investor Call to discuss the Company's financial results for

21  the second quarter of 2021, Defendant Wehner, Meta's CFO, assured investors that "the impact

22  from the ATT changes [have] really generally been in line with [Meta's] expectations."

23       123.    On the July 28, 2021 Investor Follow-Up Call, Defendant Li stated:

24          I think the impact of ATT has been really quite close on almost all of the dimensions
    that we look at when we think about kind of the iOS adoption curve, the impact

25          post opt-out to ARPU.  Those have all been quite similar to the early projections
    that we had that we kind of had factored into our Q1 and Q2 guidance.  So I think

26          – so that's really been pretty constant.

27

28

124.    On the October 25, 2021 Investor Follow-Up Call to discuss the Company's financial results for the third quarter of 2021, Defendant Li assured investors that the impact of iOS was within the Company's expected range:

> [W]e had a range of expected impact from the [ATT] changes and ultimately what we've seen is in that range but it's really on the higher end of what we had expected . . . .

125.    On the February 2, 2022 Investor Call, Defendant Wehner stated:

> On iOS 14, we saw the revenue impact with iOS 14—sorry, iOS just in general, in Q4, and that was in line with our expectations and similar to the Q3 headwind. [. . .] And we believe the impact of iOS overall as a headwind on our business in 2022 is on the order of $10 billion, so it's a pretty significant headwind for our business.

126.    Defendants Wehner and Li's knowledge may be imputed to Meta.

127.    Moreover, as explained above, *supra* Part V.D, FE1 has confirmed that Meta began to see a material drop in revenue due to the iOS privacy changes in the second quarter of 2021, and that Defendants were aware of this drop.  FE1 confirmed that a combined brief assessing the predicted impact of the iOS changes on Meta's targeting and measurement revenues was sent to Defendant Sandberg, among other recipients, in or around June 2020.  FE1 confirmed that the actual impact of the iOS changes that materialized was in line with the predicted impact and was greater than 5% of revenues beginning in Q3 2021 at the latest and greater than 4% of revenues (and so greater than 5% of net income) by Q2 2021.

### F.    Meta Disclosed the Truth that the Impact of Apple's iOS Privacy Changes Had Been Highly Material, and Investors Were Stunned

128.    Prior to February 2022, while Meta had noted that Apple's iOS changes were having "an impact," without characterizing the magnitude or significance of that impact, Meta had never previously stated or implied that the impact of Apple's iOS changes on Meta's targeting and measurement capabilities and revenues was material or significant or "big."

129.    On February 2, 2022, Meta held the February 2, 2022 Investor Call and Investor Follow-Up Call with investors to discuss its financial results for the fourth quarter of 2021.  On February 3, 2022, Meta released its Annual Report for 2021 on Form 10-K.  As explained above, in these communications, Defendants finally revealed, in multiple statements, that Apple's iOS

38

privacy changes had in fact been having a massive, material adverse impact on Meta's measurement and targeting capabilities, and a material adverse impact on Meta's revenues and profits from its ad sales.

130.    For example, as explained above, on the February 2, 2022 Investor Follow-Up Call, Wehner stated, "the iOS 14.5 rollout – which was most significant, which was mid last year – . . . *really impacted our growth rates in Q3 and Q4*."  (Emphasis added.)  Likewise, as noted above, on the February 2, 2022 Investor Call, Defendant Wehner stated that "we believe the impact of iOS overall as a headwind on our business in 2022 is on the order of $10 billion, so it's a pretty significant headwind for our business."  The disclosure that the iOS changes would negatively impact Meta's business by $10 billion in 2022 revealed that Meta had misled investors about the impact of the iOS changes both on (1) Meta's targeting and measurement capabilities and (2) on Meta's revenues, as explained above.

131.    Also on the February 2, 2022 Investor Follow-Up Call, Defendant Li stated, "There are *still significant targeting and measurement headwinds* that we are facing," implying that the "significant targeting and measurement headwinds" did not begin in Q4, but rather were "still" continuing from at least Q3.  (Emphasis added.)

132.    Defendant Li likewise revealed for the first time that, while the Company's did mitigate "half" of the underreporting gap in web conversions, this gap was not one of the "big" challenges from the iOS changes, but rather "a very small slice of the overall . . . revenue landscape":

> [T]hat particular sort of underreporting gap we called out, we did succeed in closing approximately half of it, but it was really a very specific area that we were underreporting, and it was a very small slice of the overall—the overall revenue landscape.

133.    These admissions caused over 26% of Meta's market capitalization to be wiped out in one day, as the value of Meta's common stock sank over $85 a share, and other drops represented partial materializations of related risks Meta had concealed, as detailed below in Part X.

134.    As confirmation that Meta had thoroughly misled investors about the materiality of the impact of the iOS changes on Meta's targeting and measurement capabilities and revenues, the

most sophisticated stock analysts in the world were completely caught off guard by Meta's announcement of the impact. J. P. Morgan's Meta analysts wrote, "We believe the *iOS headwind* of ~$10B this year is . . . *much bigger than expected*." (Emphasis added.) Indeed, J.P. Morgan's analysts expressly stated that they believed Meta's description of the iOS impact as "manageable" had led him to believe that the impact was not on the order of $10 billion per year.

> Through 4Q, we were optimistic that FB was making tangible progress in recovering lost signal stemming from the iOS ad changes. However, we believe management's tone around iOS impact has deteriorated, and *what was once described as "manageable" now appears to be a $10B revenue headwind in 2022*.

(Emphasis added.)

135.    Analysts from Morgan Stanley stated, concerning "IDFA (measurement and attribution)" that "the headwinds are not finished blowing . . . and *they are stronger than we appreciated*" (alteration in original) (emphasis added).

136.    An Evercore ISI analyst reported that the "*magnitude & duration of [Meta's] headwinds*" were "*greater than we had anticipated.*" (Emphasis added.)

137.    Analysts' predictions, which they had generated assuming an immaterial impact from iOS privacy changes, were completely off for that reason. A MKM Partners' analyst reported that Meta's "1Q guidance *(surprisingly and) clearly below our/Street expectations*" citing to "Y/Y comps, *iOS related headwinds*, and engagement mix-shift towards under-monetized surface areas [Reels] as key reasons for weak guidance." (Emphasis added.)

138.    Analysts at Bank of America stated, "[g]uidance was a *surprise*, *with bigger than expected impact from* Reels transition and *iOS headwinds*." (Emphasis added.) The analysts specifically stated that "Facebook will face an est. $10bn of '22 IDFA related pressure (potentially up to 15% of iOS revenues), which accounts for vast majority of the $5bn revenue cut in our model."

139.    An RBC Capital Markets analyst report stated that the outlook was "meaningfully below expectations, on . . . ATT/IDFA headwinds" and that "*Apple signal loss (ATT/IDFA) is proving to be a bigger headwind than expected* with a $10B impact on overall 2022 ad revenues."

1 (Emphasis added.)  The analyst expressly added, "we think FB is in the ***penalty box*** until 2H at
2 the earliest ***given the disappointing management of investor expectations***."  (Emphasis added.)

3 **VI.**   **META MISLED INVESTORS TO BELIEVE THAT META'S COO,**
4        **DEFENDANT SANDBERG, WAS NOT RECEIVING IMPROPER ADDITIONAL**
5        **BENEFITS IN THE FORM OF PERSONAL ASSISTANCE**

6       140.   During the Class Period, Meta misled investors regarding Defendant Sandberg's
7 use of corporate resources for personal benefit to support her personal foundation, write and
8 promote her second book, plan her wedding, and kill unflattering news stories about persons with
9 whom she had a personal relationship.   Under Instruction 4 to Item 402 of Regulation S-K,
10 Sandberg was required to disclose these benefits (because their value exceeded $10,000), but she
11 did not.  Accordingly, statements of her compensation were inaccurate and misleading.  These
12 misstatements of Sandberg's compensation were material, not primarily because of the dollar value
13 of the undisclosed benefits, but because the personal benefits received were prohibited under
14 Meta's Code of Conduct, and so exposed Meta to public criticism and Sandberg to Company
15 investigation and sanctions.  The statements were also material because they were untruths that
16 Sandberg's conduct had led the Company to disseminate, subjecting the Company itself to
17 sanctions and scrutiny.

18       **A.**   **Meta's Code of Conduct Prohibits Use of Company Personnel for Personal**
19            **Use Where Not Authorized**

20       141.   Meta's board of directors adopted a Code of Conduct, effective June 7, 2021, which
21 outlines the principles and standards that all officers, directors, and employees acting on behalf of
22 the Company must follow (the "Code of Conduct").  All Meta personnel are expected to uphold
23 the principles and follow the requirements of this Code of Conduct.  Potential violations of the
24 Code of Conduct may result in internal investigations or audits.  Violations of the Code of Conduct
25 may result in disciplinary action, up to and including termination of employment or assignment
26 and if necessary, referral to law enforcement.

27

28

142.    To avoid conflicts of interest, the Code of Conduct prohibits officers, directors, and employees as well as their "personal connections or family members" from "receiv[ing] a personal benefit from [their] position at Meta."

143.    Potential conflicts of interest should be discussed with the Compliance team and a conflict review request should be submitted via the Company's online tool.  A failure to submit a conflict review request or adhere to any guidance provided by the Conflicts Committee who reviews such requests may result in disciplinary action, up to and including termination.

144.    On February 3, 2022, Meta filed its Annual Report (the "February 3, 2022 10-K") reporting the Company's financial and operating results for the quarter and year ended December 31, 2021.  The February 3, 2022 10-K incorporated the Code of Conduct by reference, stating "Our board of directors has adopted a Code of Conduct applicable to all officers, directors, and employees, which is available on our website (investors.fb.com) under 'Leadership & Governance.'"

**B.      Defendant Sandberg Repeatedly Received Personal Benefits Unrelated to Her Job, Including Assistance with Her Personal Book, Assistance in Planning Her Wedding, and Assistance in Private Matters**

145.    The allegations in this section are based in substantial part on investigative reporting conducted by *The Wall Street Journal* based on sources with personal knowledge of the matters.[9]  Lead Plaintiffs have taken steps to confirm that *The Wall Street Journal*'s reporting is based on reports from individuals with personal knowledge of the matters, including by interviewing a co-author of part of the reporting, *The Wall Street Journal* employee Keach Hagey, who confirmed that the Journal has a "stringent" fact review process.

146.    As reported by *The Wall Street Journal* based on sources with personal knowledge of the matter, before and throughout the Class Period, including in 2021 and 2022, Defendant

---

[9] *See* Ben Fritz, Keach Hagey, Kirsten Grind and Emily Glazer, *Meta's Sheryl Sandberg Pressured Daily Mail to Drop Bobby Kotick Reporting*, Wall St. J. (Apr. 21, 2022), available at https://www.wsj.com/articles/sandberg-facebook-kotick-activision-blizzard-daily-mail-11650549074; Deepa Seetharaman and Emily Glazer, *Meta Scrutinizing Sheryl Sandberg's Use of Facebook Resources Over Several Years*, Wall St. J. (June 10, 2022), available at https://www.wsj.com/articles/meta-scrutinizing-sheryl-sandbergs-use-of-facebook-resources-over-several-years-11654882829.

1  Sandberg, Meta's COO, repeatedly used Company resources for undisclosed personal benefit,

2  including assistance to support her personal foundation, write her personal book, plan her wedding,

3  and squash adverse personal news stories, all of which were unrelated to her job at Meta.  Sandberg

4  announced she was stepping down from her role in the Company as Chief Operating Officer after

5  fourteen years in early June 2022.

6  147.    In 2016 and 2019, Sandberg worked with a team that included Facebook employees

7  as well as paid outside advisers to develop and enact a strategy to persuade the digital edition of

8  the *Daily Mail*, called *MailOnline*, not to report on a story that would have revealed the existence

9  of a temporary restraining order against her then-boyfriend, Activision Blizzard Inc.'s Chief

10  Executive Officer Bobby Kotick.  The team worked to suppress the story both in 2016, when the

11  couple began dating, and in 2019, when the couple were breaking up.  Ms. Sandberg contacted

12  *MailOnline* in both years.

13  148.    In 2016, discussions about how to dissuade *MailOnline* from publishing an article

14  about the restraining order included Defendant Sandberg, Mr. Kotick, multiple Facebook

15  employees other than Defendant Sandberg, Activision employees, and outside public-relations

16  advisers and lawyers in the U.S. and U.K., according to people with knowledge of the

17  conversations, as reported by *The Wall Street Journal*.  The group discussed what information they

18  believed the *Daily Mail* had obtained and whether they could persuade the publication's leadership

19  that Mr. Kotick had been wrongfully accused, according to one of the participants in the

20  conversation.  According to individuals familiar with Mr. Kotick's comments, Mr. Kotick has

21  stated that Defendant Sandberg threatened the *MailOnline* in 2016 by saying that such an article

22  against Mr. Kotick, if published, could damage the news organization's business relationship with

23  Facebook.  Executives at Facebook have asserted that any intervention by Defendant Sandberg

24  over a news article, no matter what her specific words were, could well be perceived as a threat,

25  given the social-media giant's power over web traffic and Sandberg's own power and influence.

26  149.    Indeed, in 2016, Martin Clarke, then editor-in-chief of the *MailOnline*, told

27  employees that he had heard from Defendant Sandberg and that the publication would not be

28

43

SECOND AMENDED COMPLAINT (CASE NO. 4:22-cv-01470-YGR)

1 running an article about the restraining order, according to a person familiar with the incident, as

2 reported by *The Wall Street Journal*.

3     150.     Defendant Sandberg and her team continued their strategy to suppress any story

4 about a restraining order against Mr. Kotick in 2019. At that time, *MailOnline* was again looking

5 into the matter. Defendant Sandberg emailed Jonathan Harmsworth, Viscount Rothermere, the

6 great-grandson of the *Daily Mail*'s founder and chairman of its parent company, to express

7 concerns about the potential article. Harmsworth referred the matter to then editor-in-chief Clarke.

8 Mr. Clarke and Defendant Sandberg exchanged emails in 2019. Defendant Sandberg's team,

9 including Facebook employees, successfully suppressed this personal story, as *MailOnline* never

10 published a story on the restraining order against Mr. Kotick.

11     151.     Notably, during their three-year relationship, from 2016 up to and including 2019,

12 Mr. Kotick and Defendant Sandberg regularly tapped employees at one another's companies for

13 public-relations advice, according to individuals close to the couple at the time, as reported by *The*

14 *Wall Street Journal*. Moreover, in an ongoing capacity, including but not only in connection with

15 the 2016 and 2019 attempts to address the potential *MailOnline* article about Mr. Kotick,

16 Defendant Sandberg benefitted from work by Meta employees on some of her personal public

17 relations, according to people familiar with the matter, as reported by *The Wall Street Journal*.

18     152.     Mr. Kotick and a spokeswoman for Meta have made statements denying that

19 Sandberg threatened the *Daily Mail* organization, but neither have denied that Defendant Sandberg

20 used Company resources to address this personal matter and other personal public relations

21 matters.

22     153.     Sandberg used Meta resources to write and promote her second book, "Option B:

23 Facing Adversity, Building Resilience, and Finding Joy," published in April 2017. Sandberg's

24 first book, "Lean In: Women, Work, and the Will to Lead," a book on women in the workplace,

25 sold millions of copies and gained Sandberg fame and notoriety, landing her on magazine covers

26 and television shows. Meta staff assisted Defendant Sandberg during both of her book tours.

27 Under the "Acknowledgments" section in both of her books, Sandberg gives thanks to these

28 specific company employees. These individuals are listed in the below chart, together with their

position at Meta held in whole or in part during the time periods when Sandberg was drafting and promoting her books, and their approximate compensation ranges estimated based on the best available information, including public job post data for the same or comparable positions:

| Name | Title | Salary |
|---|---|---|
| Camille Hart | Executive Assistant to Defendant Sandberg | Range $115,003 to $189,000 |
| Chris Cox | Chief Product Officer | Range $421,385 to $893,846 |
| Mike Schroepfer | Chief Technology Officer | Range $753,846 to $823,846 |
| Elliot Schrage | VP of Communications and Public Policy | Range $437,000 to $460,000 |
| David Ebersman | Chief Financial Officer | Range $295,833 to $511,863 |
| Ted Ullyot | General Counsel | $275,000 |
| Libby Leffler | Chief of Staff to Defendant Sandberg | Range $149,000 to $270,000 |
| Charlton Gholson | Director, Strategic Partnerships | Range $229,000 to $295,000 |
| Kelly Hoffman | Executive Assistant | Range $115,003 to $189,000 |
| Anikka Fragodt | Executive Assistant to Defendant Zuckerberg | Range $115,003 to $189,000 |
| Eric Antonow | VP of Product Marketing | Range $133,000 to $473,000 |
| David Fischer | Chief Revenue Officer and VP of Marketing | Range $228,885 to $284,423 |
| Lori Goler | Head of HR, People | Range $165,000 to $259,000 |
| Dan Rose | VP of Partnerships | Average salary $439,000 |
| Marne Levine | Chief Business Officer | $729,808 |
| Kirsten Nevill-Manning | Senior Director, People Operations | Range $111,000 to $164,000 |
| Molly Graham | Director of Mobile | $224,119 |
| Maxine Williams | Chief Diversity Officer | Range $267,953 to $368,313 |
| Brandee Barker | Director of Global Communications and Policy | Range $209,000 to $272,000 |
| Sarah Feinberg | Director, Policy Communications | Range $209,000 to $272,000 |
| Debbie Frost | VP of Global Communications and Public Affairs | Range $437,000 to $460,000 |

| Name | Title | Salary |
|------|-------|--------|
| Ashley Zandy | Senior Director, Reality Labs Communications; Senior Director, Communications; Chief of Staff Global Business Group; Head of Marketing, Emerging Markets; Manager, Europe, Middle East & Africa Communications; and Corporate Communications | Range $131,000 to $200,000 |
| Chamath Palihapitiya | VP of Platform and Monetization; VP of User Growth, Mobile and International | Range $437,000 to $460,000 |
| Liz Bourgeois | Manager and Director of Communications | Range $209,000 to $272,000 |
| Anne Kornblut | VP, Global Product Content Operations; Strategic Communications | Range $131,000 to $200,000 |
| Lachlan Mackenzie | Executive Communications Manager | Range $146,000 to $205,000 |
| Clarice Cho | Data Analyst | Range $98,000 to $154,000 |
| Andrea Saul | VP, Public Affairs; Director of Policy Communications | Range $209,000 to $272,000 |
| Tessa Lyons-Laing | VP of Product Management; Business Lead (Chief of Staff) to Defendant Sandberg | Range $149,000 to $270,000 |
| Dan Levy | VP and Product Group Lead; VP of Small Business | Range $437,000 to $460,000 |
| Katie Mitic | Director, Platform & Mobile at Facebook | Range $219,000 to $285,000 |
| Susan Gonzales | Director of Community Engagement | Range $243,000 to $312,000 |
| Don Graham | Board of Directors | N/A |
| Joel Kaplan | VP of Global Public Policy | Range $437,000 to $460,000 |
| Rousseau Kazi | Leader of Product Management | Range $197,000 to $270,000 |
| Schuyler Milender | Director, Demand Management and AI Applications; Business Lead (Chief of Staff) to Defendant Sandberg | Range $149,000 to $270,000 |
| Grace Song | Client Solutions Manager | Range $107,000 to $171,000 |

154.     These acknowledgements show that Meta employees collectively spent many hours assisting Sandberg in drafting her books.  Sandberg credits these company employees, among others, with providing significant work on her book that, by the nature of the tasks, would have

46

taken many hours.  Presumably, to receive an acknowledgment, each individual above spent at a minimum several hours assisting Sandberg.  For example, in the acknowledgements section of her book "Option B: Facing Adversity, Building Resilience, and Finding Joy," Sandberg thanked a number of Meta employees for "read[ing] drafts" of the book and providing "feedback."  These individuals are listed below, with their position at Meta and compensation estimated based on the best available information, including job post data for the same or comparable positions.

> Many friends and colleagues read drafts and gave honest feedback. We are grateful for their time and their suggestions:  . . . Susan Gonzales [Director of Community Engagement, salary range:  $243,000 to $312,000], Don Graham [Member, Board of Directors], . . . Joel Kaplan [VP of Global Public Policy, salary range:  $437,000 to $460,000], Rousseau Kazi [Leader of Product Management, salary range: $197,000 to $270,000], . . . Schuyler Milender [Director, Demand Management and AI Applications; Business Lead (Chief of Staff) to Defendant Sandberg, salary range:  $149,000 to $270,000].

Defendant Sandberg thanked each of the above Meta employees for reading plural "drafts." Option B is 240 pages, and approximately 60,000 words.  The average adult reader reads about 250 words per minute.[10]  Therefore, each of these five employees likely spent on average at least four hours reading each draft, spending at least 4 hours each, in addition to further time spend providing feedback.  Assuming the other 32 acknowledged individuals likewise contributed at least four hours each to Sandberg's book efforts, the acknowledgments section indicates that Meta employees spent a minimum of 148 hours assisting Sandberg with her personal books.

155.    These book acknowledgements are flat admissions by Sandberg that she received Facebook employee assistance in writing and promoting her personal books.

156.    *The Wall Street Journal* noted that Meta's investigation of Sandberg covers her use of Company employees in writing and promoting her book.

157.    Prior to and throughout the Class Period, Sandberg also used corporate resources, including Facebook employees, to support her personal foundation, according to people knowledgeable about the matter, as reported by *The Wall Street Journal*.  In 2013, Defendant Sandberg founded LeanIn.Org (also known as Lean In Foundation), a 501(c)(3) nonprofit organization named after her first book.  In 2016, Sandberg renamed the foundation the Sheryl

---

[10] *See* https://www.readinglength.com/book/isbn-1524732680.

Sandberg & Dave Goldberg Family foundation after her late husband.  The foundation is unaffiliated with Meta and has previously been criticized by former employees for focusing on promoting Sandberg personally.

158.    Likewise, Sandberg used corporate resources to help her plan her wedding to fiancé Tom Bernthal, CEO and Co-President of the consulting agency Kelton Global.  Assistance in planning Sandberg's wedding was a personal benefit unrelated to her position at Meta.

159.    In general, at all relevant times, it was not uncommon for Meta employees even to benefit Defendant Sandberg by providing help with tasks for her family, according to people knowledgeable about the matter, as reported by *The Wall Street Journal*.

160.    Sandberg's use of Company resources to support her foundation, promote and write her second book, and plan her wedding prompted an internal investigation by Meta, initiated in the fall of 2021.  The Company had previously initiated a separate investigation into her violation of the Code of Conduct by using corporate resources to pressure the *Daily Mail*, and the two investigations were merged.  Meta did not publicly disclose either investigation.

161.    Sandberg's use of Company resources for personal matters was not permitted by Facebook.  Indeed, Sandberg violated the Code of Conduct by exploiting her position at Meta for both her own personal benefit and the benefit of her ex-boyfriend, Mr. Kotick.

162.    While the Company made extensive disclosures about Defendant Sandberg's use of corporate resources for certain personal matters—namely, security and use of private aircraft— the Company failed to disclose Sandberg's improper use of corporate resources for the other personal matters described above.

163.    In addition to the value of the assistance described above that Sandberg received on her books, Meta employees collectively spent multiple business days in each year from 2018 to 2021 assisting Defendant Sandberg on personal matters unrelated to her employment at Meta. The monetary value of the personal benefits Sandberg received from the use of Facebook employee time during each of the years 2018, 2019, 2020 and 2021 was greater than $10,000 in each of those years.  The median worker at Meta earned more than $240,000 per year in 2019, and comparable amounts in each year from 2018 to 2021.  Most Meta employees received at least 28 days of paid

48

1  vacation in each year from 2018 to 2021 and worked approximately 227 days per year each of

2  those years.  Accordingly, the median hourly pay for Meta employees was approximately $132

3  during this period.  The value of the assistance Sandberg acknowledged she received on her books

4  alone—calculated above to be a minimum of 148 hours of Meta employee time—is greater than

5  $10,000 assuming the employees received on average the median Meta compensation.

6        164.    Meta is continuing to conduct an internal investigation of Defendant Sandberg's

7  improper use of Company resources for personal benefit, according to people knowledgeable about

8  the matter, as reported by *The Wall Street Journal*.  Meta is investigating her conduct stretching

9  back several years, and the investigation involves a broad review of Sandberg's use of Meta's

10 resources and specifically covers her use of Meta employees and resources for her wedding

11 planning, for work on her book, for work on her foundation, and for addressing the *MailOnline*'s

12 potential article about her boyfriend, as described above.

13       165.    Notably, in its reporting on Sandberg described above, *The Wall Street Journal*

14 reported that individuals with knowledge of the matters stated that Sandberg actually used

15 Company resources for personal benefit, not merely that Meta was investigating Sandberg for

16 using Company resources for personal benefit.  Specifically, on April 21, 2022, *The Wall Street*

17 *Journal* reported:

18        *Working with a team that included Facebook* and Activision *employees* as well as
         paid outside advisers, Ms. Sandberg and Mr. Kotick developed a strategy to
19        persuade the Daily Mail not to report on the restraining order, first when they began
         dating in 2016 and again around the time they were breaking up in 2019 . . . .

20
21 (Emphasis added.)

22 This reporting made clear that Ms. Sandberg used a team of Facebook employees to address

23 Mr. Kotick's personal problems, not merely that Meta was investigating whether such use

24 occurred.

25       166.    Likewise, on June 10, 2022, *The Wall Street Journal* reported:

26        Facebook staff assisted Ms. Sandberg during both of her book tours and in the
         acknowledgments of Option B, she thanked many employees for their assistance in
27        putting the book together. It was also not uncommon for Facebook staffers to help
         Ms. Sandberg with work involving her foundation and sometimes assist with tasks
28        for her family, according to people close to the matter.

This reporting likewise made clear that Ms. Sandberg actually used Facebook staff to assist her with drafting her personal book and during her book tours, and that she actually used Facebook staffers to help with her foundation and family-member tasks, not merely that she was being investigated for such conduct.

167.   Indeed, Ms. Sandberg herself did not deny using Company resources to plan her wedding, and tacitly suggested she in fact did—as reported in a June 10, 2022 article in *The Wall Street Journal*, her spokeswoman stated only that, "Sheryl did not *inappropriately* use company resources in connection with the planning of her wedding."  (Emphasis added.)

168.   Accordingly, this Complaint likewise alleges not merely that Meta was investigating Sandberg for using Company resources for personal benefit, but also that Sandberg actually used Company resources for personal benefit.

**C.     Defendant Sandberg Signed Multiple Proxy Statements that Failed to List Her Personal Benefits among the Perquisites and Additional Benefits She Received**

169.   The SEC has disclosure requirements for executive and director compensation, designed to facilitate shareholder understanding.  Instruction 4 to Item 402 of Regulation S-K requires, "If the total value of all perquisites and personal benefits is $10,000 or more for any named executive officer, then each perquisite or personal benefits, regardless of its amount, must be identified by type. . . .  Perquisites and other personal benefits shall be valued on the basis of the aggregate incremental cost to the registrant."  17 CFR § 229.402(c)(2)(ix).

170.   On April 8, 2022, Meta filed a Proxy Statement on Schedule 14A (the "April 8, 2022 Proxy Statement").  The April 8, 2022 Proxy Statement disclosed compensation awarded to, earned by, or paid to each of the named executive officers for services rendered for the years ended December 31, 2021, 2020, and 2019.  The April 8, 2022 Proxy Statement reported a salary in 2021 for Sandberg of $954,615, a bonus of $849,447, stock awards of $22,169,902, and "All Other Compensation" in the amount of $11,274,937.  The Company disclosed that:

> The amounts reported include approximately $8,981,973, $7,646,560, and $4,370,631 in 2021, 2020, and 2019, respectively, for costs related to personal security for Ms. Sandberg at her residences and during personal travel pursuant to Ms. Sandberg's overall security program; and approximately $2,292,964,

$872,413, and $1,316,468 in 2021, 2020, and 2019, respectively, for costs related to personal usage of private aircraft.

171.    Sandberg, a named executive officer, received significant perquisites and personal benefits well in excess of $10,000 relating to her personal security and personal travel.  Yet Sandberg also received valuable personal benefits, including the use of Meta employees, for personal matters related to writing and promoting her book, supporting her personal foundation, planning her wedding, and maintaining her personal reputation, none of which were identified or valued in the April 8, 2021 Proxy Statement.

172.    Information about Sandberg's use of Company resources for personal benefit was highly material to investors.  Investors cared deeply about improper conduct of any kind on the part of Defendants Zuckerberg and Sandberg that might taint the Company's reputation or image. Additionally, failure to adequately disclose Sandberg's use of corporate resources for personal matters may result in SEC violations that likewise could be harmful to the Company's reputation and image, and result in fines or other penalties.

**D.    The Proxy Statements that Misrepresented Defendant Sandberg's Compensation Directly Authorized Her Election as Director**

173.    The April 9, 2021 Proxy Statement and April 8, 2022 Proxy Statement directly authorized the election of Defendant Sandberg as a Director of Meta.  Had Meta disclosed Sandberg's improper conduct, including her improper use of Company resources, and her causing Meta to issue false and misleading Proxy Statements regarding her compensation, Sandberg would not have been re-elected as a Director of Meta.

**E.    Defendant Sandberg Knew About Her Personal Use of Company Resources**

174.    Defendant Sandberg knew that she was receiving personal benefits from Meta other than those disclosed in the Company's annual proxy filings with the SEC because Defendant Sandberg knew about her own actions.  As explained above, Defendant Sandberg personally directed employees and used Company resources to help her plan her wedding, write her personal book, assist with her personal foundation, and kill an unflattering news story about her ex-boyfriend.

175.     Defendant Sandberg's knowledge may be imputed to Meta.

**F.**     ***The Wall Street Journal* Revealed the Truth that Sandberg Had Failed to Disclose these Perquisites that Violated Company Policy**

176.     On April 21, 2022, *The Wall Street Journal* published an article titled, "Meta's Sheryl Sandberg Pressured Daily Mail to Drop Bobby Kotick Reporting."[11]   The article reported facts concerning two occasions in which Sandberg pressed the U.K. tabloid, the *Daily Mail*, to shelve a potential article about her then-boyfriend, Mr. Kotick, as described above.

177.     As a direct and proximate result of this partial corrective disclosure and/or materialization of foreseeable risks concealed by Defendants' fraud, the price of Meta common stock fell $12.35 per share, or 6.16%, to close at $188.07 per share on April 21, 2022.

178.     The truth about Sandberg's misuse of Company resources was not known to the public until *The Wall Street Journal* published its findings.

179.     On May 28, 2022, Sheryl Sandberg informed Meta of her decision to resign from her position as Chief Operating Officer of the Company after a transition period.

180.     As a direct and proximate result of this partial corrective disclosure and/or materialization of foreseeable risks concealed by Defendants' fraud, the price of Meta common stock fell $6.49 per share, or 3.34%, to close at $188.64 per share on June 1, 2022.

181.     On June 10, 2022, *The Wall Street Journal* published an article titled, "Meta Scrutinizing Sheryl Sandberg's Use of Facebook Resources Over Several Years."[12]   The article reported that Meta was investigating Defendant Sandberg's use of corporate resources for personal expenses, including the writing of her personal book, supporting her personal foundation, and planning her wedding going back several years.

---

[11] Ben Fritz, Keach Hagey, Kirsten Grind and Emily Glazer, *Meta's Sheryl Sandberg Pressured Daily Mail to Drop Bobby Kotick Reporting*, Wall St. J. (Apr. 21, 2022), available at https://www.wsj.com/articles/sandberg-facebook-kotick-activision-blizzard-daily-mail-11650549074.

[12] Deepa Seetharaman and Emily Glazer, *Meta Scrutinizing Sheryl Sandberg's Use of Facebook Resources Over Several Years*, Wall St. J. (June 10, 2022), available at https://www.wsj.com/articles/meta-scrutinizing-sheryl-sandbergs-use-of-facebook-resources-over-several-years-11654882829.

182.     This internal investigation began as early as the fall of 2021 and a number of employees had been interviewed as part of the investigation, yet Meta failed to disclose the investigation and the truth only became known to the public when *The Wall Street Journal* published its findings.

183.     As a direct and proximate result of this partial corrective disclosure and/or materialization of foreseeable risks concealed by Defendants' fraud, the price of Meta common stock fell $8.43 per share, or 4.58%, to close at $175.57 per share on June 10, 2022.

## VII.     META MISLED INVESTORS TO BELIEVE THAT ITS TRANSITION TO REELS WAS NOT IMPACTING ITS RESULTS OF OPERATIONS

### A.     Meta's Competition from TikTok

184.     TikTok is a mobile app owned by Chinese company ByteDance.  TikTok was introduced, under a different name, in 2014.

185.     TikTok hosts a variety of short-form user videos, from genres like pranks, stunts, tricks, jokes, dance, and entertainment with durations from 15 seconds to ten minutes.  TikTok users film vertical videos and may upload their own audio and sounds to pair with the video.  When watching content, TikTok keeps its users engaged by immediately playing a new video after the previous one has ended, creating a scroll of content.  By showing users only one full-screen video at a time, TikTok can track users' specific interests, honing its recommendations.

186.     TikTok's growth has been rapid.  In September 2018, TikTok surpassed Facebook, Instagram, YouTube, and Snapchat in monthly installs in the App Store.  In 2021, TikTok landed its billionth user four years after it launched globally and in just half the time it took Facebook to reach that milestone.  TikTok is the only non-Facebook app to have reached 3 billion downloads in app stores.  TikTok, like Instagram, is particularly liked by younger users.

187.     TikTok's revenue has grown equally rapidly.  TikTok's ad revenue is expected to triple this year to $11.64 billion from $3.88 billion in 2021, surpassing Twitter and Snapchat combined.

**B.      Meta's Transition to Reels To Compete Against TikTok**

188.    Meta's Family of Apps and the TikTok app compete against each other for user engagement time and advertising revenues.

189.    Given the rise of TikTok, Meta recognized several years ago that it needed to develop a similar app with TikTok's highly engaging format to compete effectively against TikTok.

190.    On August 5, 2020, Meta launched Reels on Instagram globally.  As explained above, Reels is a function in the Instagram app very similar to TikTok that allows users to create, view and share short, 15- or 30-second videos or "Reels" on Instagram.

191.    On June 16, 2021, Meta launched ads on Reels on Instagram, which are full screen, vertical ads that play interspersed between user-generated Reels.

192.    Meta has invested significant resources in bringing the Reels platform up to speed in its competition with TikTok.  On July 14, 2021, Defendant Zuckerberg announced plans to pay content creators more than $1 billion by the end of the following year through new bonus programs.  This decision was a direct response to TikTok's own actions.  Previously, in July 2020, TikTok announced a $200 million fund, called the TikTok Creator Fund, to help creators on the platform supplement their earnings and produce more content.

**C.      Meta Acknowledged That Its Introduction of Reels Would Shift Engagement from Stories to Reels, but Stated That Reels Increased Overall Engagement, and Implied That This Shift Was Not Currently Impacting Its Results of Operations**

193.    Monetization of short-form video such as Reels through advertising is more difficult than through Meta's traditional revenue sources, such as Instagram's Home tab.  In the Home feed, many ads may be interspersed between user-generated content that is viewed when the user scrolls down the feed, and a user may view the ads effectively in the process of scrolling through that content without significantly interrupting the user experience.  Short-form video advertisements are longer and fit more awkwardly in a scroll of user-generated content.  Accordingly, fewer ad impressions are available to be sold on a short-form video format.

194.    On the other hand, Reels and other short-form video formats are more engaging than Instagram photographs—on average, users spend more time viewing short-form video content, particularly in the format of Reels or TikTok, than they do viewing text or photos on Instagram.  Indeed, Reels is so engaging that many users have shifted their engagement from older formats in Meta's Family of Apps, such as Instagram photos and Facebook News Feed, to Reels. In this way, Reels is partly "cannibalizing" user engagement in older content formats in Meta's Family of Apps.  However, Meta believes that engagement with short-form video on Reels increases overall user engagement with Meta's content.

195.    Accordingly, Meta's introduction and promotion of Reels involves an important tradeoff that the Company must balance—by promoting Reels, the Company is increasing overall user engagement (i.e., increasing the total amount of time users spend on Meta's Family of Apps), but the Company is also shifting some user engagement from platforms that are easier to monetize to a platform that is harder to monetize.  Crucially, whether Meta's shift from older content formats in Meta's Family of Apps to Reels caused a positive or negative impact on net for Meta's results of operations could never be inferred from the nature of the transition alone.  Whether Meta's transition to Reels would have a net positive or negative impact on the Company's business could not be determined simply by knowing that Reels was harder to monetize, because Reels is also more engaging—even if users view fewer ads per hour on Reels than on older content formats, users may spend more total hours viewing ads on Reels, such that the total number of ads viewed by users may be greater on net with the introduction of Reels.

196.    During the Class Period, Meta acknowledged that Meta's shift in focus from older content formats in Meta's Family of Apps to Reels would shift some user engagement from formats that were easier to monetize to a new format that was harder to monetize, but Meta directly and repeatedly implied that this shift was not adversely affecting Meta's business and results of operations.

197.    On Meta's April 28, 2021 Investor Call to discuss results from the first quarter of 2021, Justin Post of Bank of America asked, "Could you comment on what you're seeing with

overall engagement?  And as people use these new platforms, is it growing, time spent and other factors?"

198.    Defendant Wehner responded:

[W]e're seeing really strong engagement on video, particularly internationally. And that's—we're pleased with that.  [. . .]  *Reels is starting to get traction on – and doing well on Instagram.*  Now video currently has relatively fewer impressions on a time spent basis.  So that's playing into the engagement trends as well.  And then finally, I would say, we are seeing competition in News Feed from both our own video products and also other products as well.  So that's factoring into it.

(Emphasis added.)

199.    Similarly, on Meta's July 28, 2021 Investor Call to discuss results from the second quarter of 2021, Defendant Zuckerberg stated:

Video in particular is becoming the primary way that people use our products and express themselves.  I know this is a theme we've been talking about for a few years now, but we've been executing on this for a while and video has steadily become more important in our products.  Video now accounts for almost half of all time spent on Facebook.  *Reels is already the largest contributor to engagement growth on Instagram.*  [. . .]  [A]s it becomes the majority of engagement across our services in the coming years, we're going to continue to focus on this.

(Emphasis added.)

200.    However, on the same call, Defendant Sandberg went a step further, and told only a half-truth in stating that Meta was "seeing very strong growth in video monetization across . . . Reels," because in fact, Reels was negatively impacting the Company's financial results overall:

I can talk about video ads.  So *we're seeing very strong growth in video monetization across* Watch, Feed, *Reels*.  And we think we're continually getting better at monetizing video, but they are still monetizing at lower rates versus Feed Stories, but we have a lot here.  We have 2 billion people watching in-stream ad eligible videos per month.

(Emphasis added.)

201.    Defendant Wehner compounded Sandberg's misleading statement and likewise created the impression that Reels was "going well" and having an overall positive impact on the Company.  Then on Meta's July 28, 2021 Investor Follow-Up Call, Ron Josey with JMP Securities asked:

Dave, I wanted to follow up on just Reels, either details on usage or monetization approach.  [. . .]  Mark's comments saying it's the largest contributor of engagement on—engagement growth on Instagram is pretty impressive.  So any insights on Reels, monetization, or usage would be super helpful as we think about, you know, newer products launching and monetization.

202.    Defendant Wehner replied:

Yeah, I mean, *Reels is going well*.  [. . .]  And then on the ads front, you know, *ads are now available to all advertisers* and in almost all markets where Reels is live. It's still very early on the advertising front, but *we think this should be a good ad format*.

(Emphasis added.)

203.    These comments misleadingly suggested that the transition to Reels was having a positive impact on the Company's results of operations.  At no point did the Company tell the whole truth that the transition to Reels, with an increase in engagement but lower monetization rate, was on net having a negative impact on the Company's business.

204.    Indeed, in the Company's quarterly report on SEC Form 10-Q for the second quarter of 2021, filed July 28, 2021, the Company *directly implied* Reels was not having an adverse effect on its business and results of operations.  The Company stated, in its discussion of risks:

We also may introduce new features or other changes to existing products, or introduce new stand-alone products, that attract users away from properties, formats, or use cases where we have more proven levels of monetization, such as News Feed.  In addition, as we focus on growing users and engagement across our family of products, from time to time these efforts have reduced, and may in the future reduce, engagement with one or more products and services in favor of other products or services that we monetize less successfully or that we are not growing as quickly.  *These decisions may adversely affect our business and results of operations* and may not produce the long-term benefits that we expect.

(Emphasis added.)

205.    In this statement, Meta informed investors that any adverse impact on its business and results of operations from its introduction of, and transition to, Reels was merely possible, such that no such adverse impact had yet occurred.  Defendants made this statement on July 28, 2021, about *six weeks* after the introduction of ads on Reels on June 16, 2021, so at this point, the statement indicated that the transition to Reels was not causing an overall adverse impact on Meta's business and results of operations.

206.    On Meta's October 25, 2021 Investor Call to discuss results from the third quarter of 2021, Defendant Zuckerberg again noted, "Reels is already the primary driver of engagement growth on Instagram."  Then on the same call, an analyst from Cowen asked, "Given the rise of Reels, is it cannibalizing engagement on the other Instagram services?"  In response, Defendant

Wehner stated:

> Whenever we launch new experiences, this was true with Stories, it was true with Facebook Watch.  It's—you're always going to see some amount of shifting of people's time and attention to the new areas.
>
> And we do think that, that benefits the experience overall, and we think that makes the overall experience more engaging over time.  And we do think that it's—*we're able to with Reels drive incremental engagement with Instagram and Facebook. So that's why we're investing to do that.*

(Emphasis added.)

207.    Here again, the Company created the misleading impression that the transition to Reels was having a net positive impact on the Company's results of operations.  The Company explained that "we're able to with Reels drive incremental engagement with Instagram and Facebook," and explained that "that's why we're investing to do that," suggesting that the increase in total engagement that came with the transition to Reels outweighed the lower monetization rate of that engagement.

208.    Indeed, once again, the Company's quarterly report on SEC Form 10-Q for the third quarter of 2021, filed October 26, 2021, about **four and a half months** after the introduction of ads on Instagram Reels on June 16, 2021, **directly implied** that the transition to Reels was not adversely affecting the Company's business and results of operations:

> We also may introduce new features or other changes to existing products, or introduce new stand-alone products, that attract users away from properties, formats, or use cases where we have more proven means of monetization, such as News Feed.  In addition, as we focus on growing users and engagement across our family of products, from time to time these efforts have reduced, and may in the future reduce, engagement with one or more products and services in favor of other products or services that we monetize less successfully or that we are not growing as quickly.  *These decisions may adversely affect our business and results of operations* and may not produce the long-term benefits that we expect.

(Emphasis added.)

209.    Here again, the Company stated only that its decision to transition to Reels "may adversely affect our business and results of operations," and so informed investors that any adverse impact on its business and results of operations from its transition to Reels was merely possible and had not yet occurred.

210.    Notably, reasonable investors would have understood these statements in Meta's risk disclosures in its Forms 10-Q for Q2 and Q3 2021 to refer specifically to Reels.  The only "new feature [added] to existing products" that Meta described in 2021 as cannibalizing user engagement from other platforms was Reels.  While using different phrasing, Meta specifically mentioned in conference calls with investors that the introduction of Reels would "reduce engagement with one or more products and services in favor of other products or services that we monetize less successfully"—Meta made clear that the introduction of Reels was cannibalizing engagement in News Feed.  For example, on Meta's April 28, 2021 Investor Call, Defendant Wehner stated:

> Reels is starting to get traction on -- and doing well on Instagram.  [. . .] [W]e are seeing competition in News Feed from . . . our own video products . . . .

Likewise, as noted above, on Meta's October 25, 2021 Investor Call, Defendant Wehner fielded a question specifically addressing such cannibalization from Reels: "Given the rise of Reels, is it cannibalizing engagement on the other Instagram services?"  Defendant Wehner responded, specifically concerning Reels:

> Whenever we launch new experiences . . . you're always going to see some amount of shifting of people's time and attention to the new areas.

211.    Accordingly, Reels was the only new product introduced during the Class Period to which Meta's statements applied or that Meta described in this way—Meta did not make any similar statements in its calls during the Class Period to investors about any other new product introductions during that period.

212.    Indeed, Meta later ***admitted*** that this paragraph applied specifically to Reels in its February 3, 2022 Form 10-K, in which Meta modified this same paragraph to include an ***express reference to Reels***.  That paragraph read:

> We also may introduce new features or other changes to existing products, or introduce new stand-alone products, that attract users away from properties, formats, or use cases where we have more proven means of monetization, such as our feed products. In addition, as we focus on growing users and engagement across our family of products, from time to time these efforts have reduced, and may in the future reduce, engagement with one or more products and services in favor of other products or services that we monetize less successfully or that are not growing as quickly. ***For example, we plan to continue to promote Reels, which we do not currently monetize at the same rate as our feed or Stories products.*** These decisions may adversely affect our business and results of operations and may not

1    produce the long-term benefits that we expect.

2    (Emphasis added.)

3    213.    Meta's weak financial results and outlook announced on or around October 25,

4    2021 were a partial materialization of the concealed risks that the Company's business was being

5    adversely affected by its transition of user engagement from News Feed and Stories to Reels.  As

6    a direct and proximate result of this partial corrective disclosure and/or materialization of

7    foreseeable risks concealed by Defendants' fraud, the price of Meta common stock fell $12.88 per

8    share, or 3.92%, to close at $315.81 per share on October 26, 2021.

9    **D.    Defendants Knew that the Transition to Reels Was Negatively Impacting**

10   **Meta's Business Because Defendants Repeatedly Discussed the Impact of the**

11   **Transition to Reels on User Engagement and Incorporated the Impact of the**

12   **Transition into the Company's Guidance**

13   214.    Defendants made statements demonstrating their knowledge of the impact of the

14   Company's transition to Reels on user engagement.   On the February 2, 2022 Investor Call,

15   Defendant Wehner reassured investors that "As the engagement of the new thing starts to replace

16   some of the engagement in the old thing, it creates a near-term headwind for revenue, but it's not—

17   that part, at this point, now is not that big of a concern for us."   On the same call, Defendant

18   Zuckerberg acknowledged, "[W]e think it's definitely the right thing to lean into this and to push

19   us hard to grow Reels as quickly as possible and not hold on the brakes at all, even though it may

20   create some near-term slower growth than we would have wanted."

21   215.    Defendants' repeated assurances to investors that the focus on Reels did not

22   negatively impact the Company's business and results of operations demonstrate that they either

23   knew that Meta's focus on Reels was cannibalizing its revenue from Stories or were reckless in

24   not knowing.  In either scenario, there is a strong inference that Defendants made these statements

25   with scienter.

26

27

28

E.     **Meta Disclosed the Truth that the Shift to Reels Is Negatively Impacting Its Results of Operations, and Investors Expressed Surprise**

216.     On February 3, 2022, Meta filed an Annual Report on Form 10-K with the SEC, reporting the Company's financial and operating results for the quarter and year ended December 31, 2021.  In the February 3, 2022 10-K, the Company admitted for the first time in an SEC filing that its transition to Reels was negatively impacting its advertising revenue.  The Company stated:

> User growth and engagement were also impacted by a number of other factors in the second half of 2021. For example, competitive products and services have reduced some users' engagement with our products and services, and in response to competitive pressures, *we have introduced new features such as Reels, which is growing in usage but is not currently monetized at the same rate as our feed or Stories products*. We also saw a deceleration in our community growth rates as the size of our community continued to increase. In addition, we experienced year-over-year declines in ad impressions delivered in the United States & Canada region. ***These trends adversely affected advertising revenue growth in the second half of 2021*** and we expect will continue to affect our advertising revenue growth in the foreseeable future.

(Emphasis added.)

217.     The day before, on February 2, 2022, Meta held the February 2, 2022 Investor Call to discuss its results from the fourth quarter of 2021.  On that call, Meta likewise revealed, for the first time, in multiple statements, that its transition to Reels was, on net, having a negative impact on the Company's business and results of operations.  The full context of these statements appears in the complete transcript of the February 2, 2022 Investor Call, incorporated in this Complaint by reference.

218.     Defendant Zuckerberg stated:

> [W]e're in the middle of a transition on our own services towards short-form video like Reels.  So as more activity shifts towards this medium, we're replacing some time in News Feed and other higher monetizing surfaces.  *So as a result of* both competition and *this shift to short-form video* as well as our focus on serving young adults over optimizing overall engagement, *we're going to continue to see some pressure on impression growth in the near term.*

(Emphasis added.)

219.     Later, Defendant Zuckerberg added:

> And what these transitions have all had in common from desktop feed to mobile feed, feed to Stories and not to Reels, is in the beginning our ads system and business are not as tuned for the new format, so *as the engagement of the new things starts to replace some of the engagement of the old thing, it creates a near-term headwind for revenue.*

1

[. . .]

2

[W]e think it's definitely the right thing to lean into this and to push us hard to *grow*
*Reels* as quickly as possible and not hold on the brakes at all, even though it *may*
*create some near-term slower growth* than we would have wanted.

3

4

(Emphasis added.)

5

220.    On the same call Defendant Wehner stated:

6

So we're confident in our ability to monetize [Reels] over time, but *right now*,
*there's* relatively few ads in Stories—sorry, *relatively few ads in Reels today. So*
*it's definitely something from an impression growth and monetization perspective*
*is going to be a headwind.*

7

8

9

(Emphasis added.)

10

221.    In these statements, investors learned for the first time that the introduction of Reels

11

was having an adverse impact on Meta's business and results of operations—it was on net

12

negatively impacting "impression growth" and "revenue."  That is, investors learned that any

13

increase in impressions as a result of an increase in the total hours spent viewing ads gained by

14

introducing Reels did not offset the decrease in impressions resulting from the viewers spending

15

more time on a format that offered fewer ads per hour than Meta's older content formats, so the

16

introduction of Reels was negatively impacting total impressions viewed, and with that, total

17

revenue.

18

222.    These revelations caused Meta's share price to drop precipitously.  As a direct and

19

proximate result of this news and other similar stories, risks or truth concealed by, or effects

20

associated with Meta's fraud were revealed, or materialized, and as a result, the price of Meta

21

common stock Meta's stock collapsed $102.82 per share between February 3 and February 8,

22

2022, wiping out over 31% of Meta's market capitalization and devastating Plaintiffs and the

23

proposed Class, to close at $220.18 per share on February 8, 2022.  Specifically, Meta's share

24

price fell $85.24, or 26.39% on February 3, 2022, $0.67, or 0.28% on February 4, 2022, $12.18,

25

or 5.14% on February 7, 2022, and $4.73, or 2.1% on February 8, 2022.

26

223.    Analysts noted that their forecasts for Meta were completely off in part due to the

27

Company's statements about the impact of its transition to Reels.  For example, a MKM Partners'

28

analyst reported that Meta's "1Q guidance *(surprisingly and) clearly below our/Street*

1    *expectations*" citing to "Y/Y comps, iOS related headwinds, and ***engagement mix-shift towards***

2    ***under-monetized surface areas [Reels] as key reasons for weak guidance*.**"  (Emphasis added.)

3    Similarly, analysts at Bank of America stated, "[g]uidance was a ***surprise***, *with **bigger than***

4    ***expected impact from Reels transition*** and iOS headwinds."  (Emphasis added.)

5    **VIII.   DEFENDANTS' FALSE AND MISLEADING STATEMENTS**

6          224.   Plaintiffs allege that the statements within this section were knowingly and

7    materially false and misleading and/or omitted to disclose material information of which

8    Defendants were aware or were reckless in not knowing.  These statements artificially inflated or

9    maintained the price of Meta's publicly traded common stock and operated as a fraud or deceit on

10   all persons and entities that purchased common stock during the Class Period.

11         **A.   Defendants' False and Misleading Statements in 2021**

12              **1.   April 9, 2021**

13         225.   On or about April 9, 2021, Meta filed a Proxy Statement on Schedule 14A with the

14   SEC (the "April 9, 2021 Proxy Statement") in which the Company included, in a section titled,

15   "Perquisites and Other Benefits," a table presenting the total compensation awarded to, earned by,

16   or paid to each of the named executive officers for services rendered.  In addition to "Salary,"

17   "Bonus" and "Stock Awards," the table listed "All Other Compensation" to Defendant Sandberg

18   as "$7,646,560, $4,370,631, and $2,914,831 in 2020, 2019, and 2018, respectively, for costs

19   related to personal security for Ms. Sandberg at her residences and during personal travel pursuant

20   to Ms. Sandberg's overall security program; and approximately $872,413, $1,316,468, and

21   $908,677 in 2020, 2019, and 2018, respectively, for costs related to personal usage of private

22   aircraft."

23         226.   The statements in ¶ 225 were materially false and misleading because Defendant

24   Sandberg received significant "Other Benefits" beyond personal security and private aircraft usage

25   throughout the Class Period in the form of personal assistance on personal matters.  The statements

26   in ¶ 225 were also materially misleading because they omitted to state that Defendant Sandberg

27   received significant "Other Benefits" beyond personal security and private aircraft usage

28   throughout the Class Period in the form of personal assistance on personal matters.

### 2.   July 28-29, 2021

227.   On Meta's July 28, 2021 Investor Call to discuss its financial results for 2Q 2021, in response to a question, "just curious if your view on ATT has changed over the past three months at all," Defendant Wehner stated:

> In terms of your question on ATT, so the impact from the ATT changes has really generally been in line with our expectation.

Likewise, on the July 28, 2021 Investor Call, an investor asked, "On the iOS changes, any color on the op-in rates for Facebook and Instagram?  Are they kind of in line, better or worse than your expectations at this point?"  In response, Defendant Wehner stated:

> On the iOS changes, really very much in line with expectations on things like opt-in rates. So I would say, overall, the impact has been in line with our expectations. So, not a huge surprise there.

228.   The statements in ¶ 227 were materially false and misleading because Defendant Wehner had previously stated, on the prior 1Q 2021 investor conference call, that Defendants expected that "the impact on our own business [from the iOS privacy changes] will be manageable," yet in fact, by 2Q 2021, Apple's iOS privacy changes were having a severely adverse impact on Meta's targeting and measurement capabilities and its advertising revenues and growth, so the impact of Apple's iOS privacy changes were not "in line" with Wehner's expectation that the changes were "manageable"—they were worse.

229.   Also on the July 28, 2021 Investor Call, Defendant Sandberg stated:

> I can talk about video ads.  So *we're seeing very strong growth in video monetization across* Watch, Feed, *Reels*.  And we think we're continually getting better at monetizing video, but they are still monetizing at lower rates versus Feed Stories, but we have a lot here.  We have 2 billion people watching in-stream ad eligible videos per month.

(Emphasis added.)

230.   The statements in ¶ 229 were materially false and misleading because the statement that Meta was "seeing very strong growth in video monetization across . . . Reels" was only a half-truth—in fact, the Company's transition to Reels was negatively impacting the Company's financial results overall.

231.   On the July 28, 2021 Investor Follow-Up Call, Defendant Li stated:

> In general, the -- I think the impact of ATT has been really quite close on almost

64

SECOND AMENDED COMPLAINT (CASE NO. 4:22-cv-01470-YGR)

1
2
3
4
5
6

all of the dimensions that we look at when we think about kind of the iOS adoption curve, the opt-in rate, the impact post opt-out to ARPU. Those have all been quite similar to the early projections that we had that we kind of had factored into our Q1 and Q2 guidance. So I think -- so that's really been pretty consistent. And I think in the landscape we're at now, effectively we're looking at the sort of primary buckets of mitigations. There's -- obviously, there's conversion to API which allows advertisers to share data for the opted in users over server side channels. And then we also have the Aggregated Events Measurement tool that's allowing us to receive aggregated campaign-level data for opted out users. And so I think the impact kind of to – to our revenue ecosystem has been pretty in line with how we expected those would perform.

7

Defendant Wehner amplified Defendant Li's statement as follows:

8
9
10
11

And I think there's always the opportunity, I mean, given the -- Apple is obviously -- and Google with Android, they have a lot of power as platform providers. And so I think there's always an opportunity or risk, and we call that out clearly in our risk factors, of them changing things. So we have to continually monitor this and see if there's any changes coming and then, you know, update everyone accordingly. But at least so far, like Susan said, it's been largely in-line.

12
13
14
15
16
17
18
19
20
21

232.    The statements in ¶ 231 were materially false and misleading because: (1) Defendant Wehner had previously stated, on the prior 1Q 2021 investor conference call, that Defendants expected that "the impact on our own business [from the iOS privacy changes] will be manageable," yet in fact, by 2Q 2021, Apple's iOS privacy changes were having a severely adverse impact on Meta's targeting and measurement capabilities and its advertising revenues and growth, so the impact of Apple's iOS privacy changes were not "in line" with Meta's expectation that the changes were "manageable"—they were worse; (2) the statements failed to tell the whole truth that Meta's "buckets of mitigations" were not preventing the iOS privacy changes from having a severely adverse impact on Meta's targeting and measurement capabilities and its advertising revenues and growth.

22
23

233.    Also on the July 28, 2021 Investor Follow-Up Call, Ron Josey with JMP Securities asked:

24
25
26

Dave, I wanted to follow up on just Reels, either details on usage or monetization approach. [. . .] Mark's comments saying it's the largest contributor of engagement on—engagement growth on Instagram is pretty impressive. So any insights on Reels, monetization, or usage would be super helpful as we think about, you know, newer products launching and monetization.

27

Defendant Wehner replied:

28

Yeah, I mean, *Reels is going well*. It's still obviously early in its launch, but we've now rolled it out to 80 markets since launching it about a year ago.

1  [. . .]

2  And then on the ads front, you know, *ads are now available to all advertisers* and
   in almost all markets where Reels is live.  It's still very early on the advertising
3  front, but *we think this should be a good ad format*.

4  (Emphasis added.)

5  234.    The statements in ¶ 233 by Defendant Wehner were materially false and misleading

6  because the statements "Reels is going well" and "we think this should be a good ad format"

7  misleadingly suggested that the transition to Reels was having a positive impact on the Company's

8  financial results.  The statements in ¶ 233 by Defendant Wehner were also materially false and

9  misleading because they omitted to state that the transition to Reels was having a net negative

10  impact on the Company's financial results.

11  235.    On July 29, 2021, Meta filed a Quarterly Report on Form 10-Q with the SEC,

12  reporting the Company's financial and operating resulting for the quarter ended June 30, 2021.

13  The 2Q21 10-Q stated:

14  [M]obile operating system and browser providers, such as Apple and Google, have
   announced product changes as well as future plans to limit the ability of websites
15  and application developers to collect and use these signals to target and measure
   advertising.  For example, in April 2021, Apple made certain changes to its
16  products and data use policies in connection with changes to its iOS 14 operating
   system that reduce our and other iOS developers' ability to target and measure
17  advertising, which may in turn reduce the budgets marketers are willing to commit
   to us and other advertising platforms.

18  [. . .]

19
   These developments have limited our ability to target and measure the effectiveness
20  of ads on our platform and negatively impacted our advertising revenue, and *if we
   are unable to mitigate these developments as they take further effect in the future,
21  our targeting and measurement capabilities will be materially and adversely
   affected*, which would in turn significantly impact our future advertising revenue
22  growth.

23  (Emphasis added.)

24  236.    The statement in ¶ 235 was materially false and misleading because it directly

25  implied that Meta's "targeting and measurement capabilities" had not yet been "materially and

26  adversely affected" by Apple's iOS privacy changes, and that those changes had not yet

27  "significantly impact[ed]" Meta's "advertising revenue growth."  In fact, by the time this statement

28  was made, Meta's "targeting and measurement capabilities" already had been "materially and

adversely affected" by Apple's iOS privacy changes.  By Q2 2021, Meta's signal match rate, a measure of its targeting and measurement capabilities, had been decreased by 40%.  Likewise, Apple's iOS privacy changes already had "significantly impact[ed]" Meta's "advertising revenue growth"—the changes decreased Meta's advertising revenue in Q2 2021 by approximately 4%, and decreased Meta's advertising revenue in Q3 and Q4 by greater than 5%.  The changes had decreased Meta's net income by approximately 6.7% in Q2 2021 and by more than 9% in Q3 and Q4 2021.  These statements were all the more misleading given Meta's prior and contemporaneous statements that the iOS impact was "manageable," that the resulting impact was "in line with expectations," and that the Company was actively taking successful steps to mitigate the impact of the iOS changes.

237.    In the 2Q21 10-Q, Meta also stated:

> We also may introduce new features or other changes to existing products, or introduce new stand-alone products, that attract users away from properties, formats, or use cases where we have more proven means of monetization, such as News Feed.  In addition, as we focus on growing users and engagement across our family of products, from time to time *these efforts have reduced, and may in the future reduce, engagement with one or more products and services in favor of other products or services that we monetize less successfully* or that we are not growing as quickly.  *These decisions may adversely affect our business and results of operations* and may not produce the long-term benefits that we expect.

(Emphasis added.)

238.    The statements in ¶ 237 were materially false and misleading—by the time of the statement, Meta's decision to introduce its product Reels, which increased overall user engagement across Meta's Family of Apps but could not be monetized as easily as other products or services, already had, on net, "adversely affect[ed] [Meta's] business and results of operations," so Meta's statement that such an effect was merely possible was misleading.

### 3.    October 25-26, 2021

239.    On the October 25, 2021 Investor Call, Defendant Sandberg stated:

> There are two big challenges coming from this iOS changes.  The one is targeting and one is measurement.  I'm taking the second one first.  On measurement, we think we can address more than half of that underreporting by the end of the year . . . .

240.     The statements in ¶ 239 were materially false and misleading because (1) the statement created the impression that Meta was solving a significant part—one of the two "big challenges" coming from the iOS changes by addressing "more than half" of that underreporting, when in fact, Meta's underreporting of web conversions was only a "very small slice of the overall . . . revenue landscape," so its addressing those web conversions did not materially mitigate the impact of the iOS changes; and (2) the statements omitted that the Company's mitigation efforts would not prevent the iOS changes from having a material impact on the Company's revenue and net income.

241.     On the October 25, 2021 Investor Follow-Up Call, Defendant Li stated:

> We had a range of expected impact from the [ATT] changes and ultimately what we've seen is in that range but it's really on the higher end of what we had expected, and I think the underreporting of web conversions has really been a bigger issue than we expected, but it's something that we're very focused on helping to through better modeling techniques.

242.     The statements in ¶ 241 were materially false and misleading because (1) Defendant Wehner had previously stated, on the prior 1Q 2021 investor conference call, that Defendants expected that "the impact on our own business [from the iOS privacy changes] will be manageable," yet in fact, by 3Q 2021, Apple's iOS privacy changes were having a material, adverse impact on Meta's targeting and measurement capabilities and its advertising revenues and growth, so the impact of Apple's iOS privacy changes were not consistent with, or "in the range" of Meta's expectation that the changes were "manageable"—they were worse; (2) the statements gave the misleading impression that the iOS impact largely concerned Meta's underreporting of web conversions and that Meta could effectively address that underreporting, and so gave the misleading impression that Meta could effectively mitigate the impact of the iOS changes to make them immaterial.

243.     On October 26, 2021, Meta filed a Quarterly Report on Form 10-Q with the SEC, reporting the Company's financial and operating resulting for the quarter ended September 30, 2021.  In the 3Q21 10-Q, Meta stated:

> [O]ur advertising revenue in the third quarter of 2021 was negatively impacted by marketer reaction to targeting and measurement challenges associated with iOS changes.  *If we are unable to mitigate these developments as they take further effect in the future, our targeting and measurement capabilities will be materially and*

*adversely affected, which would in turn significantly impact our future advertising revenue growth.*

(Emphasis added.)

244.    The statement in ¶ 243 were materially false and misleading because it directly implied that Meta's "targeting and measurement capabilities" had not yet been "materially and adversely affected" by Apple's iOS privacy changes, and that those changes had not yet "significantly impact[ed]" Meta's "advertising revenue growth."  In fact, by the time this statement was made, Meta's "targeting and measurement capabilities" already had been "materially and adversely affected" by Apple's iOS privacy changes.  By Q3 2021, Meta's signal match rate, a measure of its targeting and measurement capabilities, had been decreased by 40%.  Likewise, Apple's iOS privacy changes already had "significantly impact[ed]" Meta's "advertising revenue growth"—the changes decreased Meta's advertising revenue in Q3 by greater than 5%.  These statements were all the more misleading given Meta's prior and contemporaneous statements that the iOS impact was "manageable," that the resulting impact was "in line with expectations," and that the Company was actively taking successful steps to mitigate the impact of the iOS changes.

245.    In the 3Q21 10-Q, Meta also stated:

We also may introduce new features or other changes to existing products, or introduce new stand-alone products, that attract users away from properties, formats, or use cases where we have more proven means of monetization, such as News Feed. In addition, as we focus on growing users and engagement across our family of products, from time to time *these efforts have reduced, and may in the future reduce, engagement with one or more products and services in favor of other products or services that we monetize less successfully* or that we are not growing as quickly.  *These decisions may adversely affect our business and results of operations* and may not produce the long-term benefits that we expect.

(Emphasis added.)

246.    The statements in ¶ 245 were materially false and misleading—by the time of the statement, Meta's decision to introduce its product Reels, which increased overall user engagement across Meta's Family of Apps but could not be monetized as easily as other products or services, already had, on net, "adversely affect[ed] [Meta's] business and results of operations," so Meta's statement that such an effect was merely possible was misleading.

69

**B.     Defendants' False and Misleading Statements in 2022**

**1.     April 8, 2022**

247.    On or about April 8, 2022, Meta filed a Proxy Statement on Schedule 14A with the SEC in which the Company included, in a section titled, "Perquisites and Other Benefits," a table presenting the total compensation awarded to, earned by, or paid to each of the named executive officers for services rendered.  In addition to "Salary," "Bonus" and "Stock Awards," the table listed "All Other Compensation" to Defendant Sandberg as $8,981,973, $7,646,560, and $4,370,631 in 2021, 2020, and 2019, respectively, for costs related to personal security for Ms. Sandberg at her residences and during personal travel pursuant to Ms. Sandberg's overall security program; and approximately $2,292,964, $872,413, and $1,316,468 in 2021, 2020, and 2019, respectively, for costs related to personal usage of private aircraft.

248.    The statements in ¶ 247 were materially false and misleading because Defendant Sandberg received significant "Other Benefits" beyond personal security and private aircraft usage throughout the Class Period in the form of personal assistance on personal matters.  The statements in ¶ 247 were also materially misleading because they omitted to state that Defendant Sandberg received significant "Other Benefits" beyond personal security and private aircraft usage throughout the Class Period in the form of personal assistance on personal matters.

**IX.     DUTY TO DISCLOSE ADVERSE FACTS**

249.    In addition to Meta's general duty to disclose all material facts necessary in order to make its statements made, in light of the circumstances under which they were made, not misleading, Meta had additional duties to disclose the adverse facts pleaded in this Complaint.

**A.     Share Repurchase Program**

250.    In January 2017, Meta's board of directors commenced a share repurchase program of Meta's Class A common stock that does not have an expiration date.  Meta's board of directors authorized an additional $25 billion in share repurchases in January 2021 and authorized an additional $50 billion in share repurchases in October 2021.  As a result of this share repurchase program and Meta's active decisions to increase the amounts authorized to be purchased, under SEC Rule 10b5-1, Meta was required to disclose all material information in its possession as of

1    January 2021 and October 2021, and at all other relevant times at which the Company was

2    repurchasing its own shares.  Meta failed to disclose all material adverse information in its

3    possession as pleaded in this Complaint in January 2021 and October 2021, and at all other relevant

4    times during the Class Period.

5           **B.    Regulation S-K Item 105**

6           251.    Meta's annual and quarterly reports filed with the SEC were subject to the

7    disclosure requirements of Item 105 of Regulation S-K, 17 C.F.R. §229.105, which governs

8    disclosure of risk factors and requires, among other things, that an issuer "provide under the caption

9    'Risk Factors' a discussion of the material factors that make [the securities] speculative or risky."

10          252.    Defendants violated their disclosure duties imposed by Item 105 of Regulation S-K,

11   17 C.F.R. §229.105 by failing to disclose the material risk that Defendant Sandberg's use of

12   Company resources for undisclosed personal reasons could become publicly known and result in

13   harms to the Company, including reputational harm and negative publicity.

14          **C.    Regulation S-K Item 303**

15          253.    Meta's annual and quarterly reports filed with the SEC were subject to the

16   disclosure requirements of Item 303 of Regulation S-K, among other things, that requires

17   disclosure of "any known trends or uncertainties that have had or that are reasonably likely to have

18   a material favorable or unfavorable impact on net sales or revenues or income from continuing

19   operations."  17 C.F.R. § 229.303(b)(2)(ii).  Companies must also disclose events that the

20   registrant knows will "cause a material change in the relationship between costs and revenues"

21   and "any unusual or infrequent events or transactions or any significant economic changes that

22   materially affected the amount of reported income from continuing operations and, in each case,

23   indicate the extent to which income was so affected."  17 C.F.R. § 229.303(b)(2)(i)-(ii).

24          254.    In violation of Item 303, Meta's annual and quarterly reports during the Class

25   Period failed to disclose the known trends that (1) Apple's iOS privacy changes were likely to

26   have, and were having, a material adverse impact on Meta's targeting and measurement

27   capabilities and its advertising revenues and growth; and (2) Meta's effort to direct engagement

28   away from Facebook's "Stories" and elsewhere to its lower-margin "Reels" video function was

having a material adverse impact on its business and financial results.  Meta had a duty to disclose these material adverse trends under Item 303 of Regulation S-K, yet failed to do so.

## X.    LOSS CAUSATION

255.    Defendants' wrongful conduct, as alleged herein, directly and proximately caused the economic loss suffered by Plaintiffs and the Classes.

256.    Class members unknowingly and in reliance upon Defendants' materially false or misleading statements and/or omissions purchased Meta common stock at artificially inflated prices.  But for Defendants' misrepresentations, omissions, and fraudulent scheme, Lead Plaintiffs and other Class members would not have purchased Meta stock at the artificially inflated prices at which it traded during the Class Period.

257.    The price of the Company's securities fell precipitously as the artificial inflation caused by Defendants' unlawful conduct exited Meta's stock price, causing investors' losses.

258.    The declines in Meta's stock price during this period, including the declines summarized below, are directly attributable to the market absorbing information that corrected and/or reflected the materialization of risks concealed by Defendants' material misrepresentations or omissions.

259.    As a result of their purchases of Meta common stock during the Class Period, Lead Plaintiffs and the other Class members suffered economic loss (*i.e.*, damages) under the federal securities laws.  Defendants' materially false and misleading statements had the intended effect and caused Meta common stock to trade at artificially inflated levels throughout the Class Period.

260.    By concealing from investors the adverse facts detailed herein, Defendants presented a misleading picture of Meta's business.  As the truth about the Company and the extent of the fraud was revealed to the market, the price of Meta common stock fell significantly.  These declines removed the inflation from Meta common stock, causing real economic loss to investors who had purchased Meta common stock during the Class Period.

261.    Each decline in the price of Meta common stock, as detailed below, was a direct or proximate result of the nature and extent of Defendants' fraudulent misrepresentations and/or omissions being revealed to investors and the market.

262.    The economic loss, *i.e.*, damages, suffered by Lead Plaintiffs and the other Class members was a direct result of Defendants' fraudulent scheme to artificially inflate the price of Meta common stock and the subsequent significant decline in the value of Meta common stock when Defendants' prior misrepresentations and other fraudulent conduct were revealed.

**A.    July 28, 2021**

263.    On July 28, 2021, Meta held a conference call to discuss its financial results for the second quarter of 2021.  Meta's weak financial results and outlook were a partial materialization of the concealed risk that Apple's iOS privacy changes were materially affecting the Company's operations.

264.    As a direct and proximate result of this partial corrective disclosure and/or materialization of foreseeable risks concealed by Defendants' fraud, the price of Meta common stock fell $14.96 per share, or 4.01%, to close at $358.32 per share on July 29, 2021.

**B.    October 25, 2021**

265.    On October 25, 2021, Meta held a conference call to discuss its financial results for the third quarter of 2021.  Meta's weak financial results and outlook were a partial materialization of the concealed risks that the Company's business was being adversely affected by its transition of user engagement from News Feed and Stories to Reels and that Apple's iOS privacy changes were materially affecting the Company's operations.

266.    As a direct and proximate result of this partial corrective disclosure and/or materialization of foreseeable risks concealed by Defendants' fraud, the price of Meta common stock fell $12.88 per share, or 3.92%, to close at $315.81 per share on October 26, 2021.

**C.    February 2, 3, 4, 7 & 8, 2022**

267.    On February 2, 2022 and February 3, 2022, Meta released weak Q4 2021 financial results and provided disappointing 2022 revenue guidance.  In the related earnings calls, Defendants revealed, in multiple statements detailed above, that Apple's iOS privacy changes were materially and adversely impacting Meta's advertising business.

268.    For example, on the February 2, 2022 Investor Follow-Up Call, Wehner stated, "the iOS 14.5 rollout – which was most significant, which was mid last year – . . . ***really impacted our***

73

*growth rates in Q3 and Q4*." (Emphasis added.) Likewise, on the February 2, 2022 Investor Call, Defendant Wehner stated that "we believe the impact of iOS overall as a headwind on our business in 2022 is on the order of $10 billion, so it's a pretty significant headwind for our business." The disclosure that the iOS changes would negatively impact Meta's business by $10 billion in 2022 revealed that Meta had misled investors about the impact of the iOS changes both on (1) Meta's targeting and measurement capabilities and (2) on Meta's revenues, as explained above.

269.     On the February 2, 2022 Investor Follow-Up Call, Defendant Li stated, "There are *still significant targeting and measurement headwinds* that we are facing," implying that the "significant targeting and measurement headwinds" did not begin in Q4, but rather were "still" continuing from at least Q3. (Emphasis added.) Defendant Li likewise revealed for the first time that, while the Company did mitigate "half" of the underreporting gap in web conversions, this gap was not one of the "big" challenges from the iOS changes, but rather "a very small slice of the overall . . . revenue landscape."

270.     In the Company's 2021 10-K, filed February 3, 2022, the Company admitted for the first time in an SEC filing that its transition to Reels was negatively impacting its advertising revenue. The Company stated:

> User growth and engagement were also impacted by a number of other factors in the second half of 2021. For example, competitive products and services have reduced some users' engagement with our products and services, and in response to competitive pressures, *we have introduced new features such as Reels, which is growing in usage but is not currently monetized at the same rate as our feed or Stories products.* We also saw a deceleration in our community growth rates as the size of our community continued to increase. In addition, we experienced year-over-year declines in ad impressions delivered in the United States & Canada region. *These trends adversely affected advertising revenue growth in the second half of 2021* and we expect will continue to affect our advertising revenue growth in the foreseeable future.

(Emphasis added.)

271.     Similarly, on the Company's February 2, 2022 Investor Call, Defendants revealed that the introduction of Reels was having an adverse impact on Meta's business and results of operations by explaining that the transition to Reels created a "near term headwind" for revenue. For example, Defendant Zuckerberg stated:

> [I]n the beginning our ads system and business are not as tuned for the new format, so as the engagement of the new things starts to replace some of the engagement of

the old thing, it **creates a near-term headwind for revenue**.

(Emphasis added.)  Similarly, Defendant Wehner stated:

> [T]here's relatively few ads . . . in Reels today.  So it's definitely something **from an impression growth** and monetization **perspective is going to be a headwind**.

(Emphasis added.)

272.   As a direct and proximate result of this news and other similar stories, risks or truth concealed by, or effects associated with Meta's fraud were revealed, or materialized, and as a result, the price of Meta stock collapsed $102.82 per share between February 3 and February 8, 2022, wiping out over 31% of Meta's market capitalization and devastating Plaintiffs and the proposed Class, to close at $220.18 per share on February 8, 2022.  Specifically, Meta's share price fell $85.24, or 26.39% on February 3, 2022, $0.67, or 0.28% on February 4, 2022, $12.18, or 5.14% on February 7, 2022, and $4.73, or 2.1% on February 8, 2022.

**D.   April 21, 2022**

273.   On April 21, 2022, *The Wall Street Journal* published an article titled, "Meta's Sheryl Sandberg Pressured Daily Mail to Drop Bobby Kotick Reporting."[13]  In that article, it was reported that Defendant Sandberg "is facing internal scrutiny over two occasions in which she pressed a U.K. tabloid to shelve a potential article about her then-boyfriend, Activision Blizzard Inc. Chief Executive Bobby Kotick."  The article revealed extensive information about Sandberg's inappropriate use of Company resources to address this personal matter, as detailed above.

274.   As a direct and proximate result of this partial corrective disclosure and/or materialization of foreseeable risks concealed by Defendants' fraud, the price of Meta common stock fell $12.35 per share, or 6.16%, to close at $188.07 per share on April 21, 2022.

**E.   June 1, 2022**

275.   On May 28, 2022, Sheryl Sandberg informed Meta of her decision to resign from her position as Chief Operating Officer of the Company after a transition period.  Sandberg's

---

[13] Ben Fritz, Keach Hagey, Kirsten Grind and Emily Glazer, *Meta's Sheryl Sandberg Pressured Daily Mail to Drop Bobby Kotick Reporting*, Wall St. J. (Apr. 21, 2022), available at https://www.wsj.com/articles/sandberg-facebook-kotick-activision-blizzard-daily-mail-11650549074.

1   decision to resign was a partial materialization of the concealed risk that she and Meta would face

2   fallout as a result of her inappropriate use of Company resources for personal reasons and Meta's

3   misrepresenting her compensation accordingly in its SEC filings.

4   276.   As a direct and proximate result of this partial corrective disclosure and/or

5   materialization of foreseeable risks concealed by Defendants' fraud, the price of Meta common

6   stock fell $6.49 per share, or 3.34%, to close at $188.64 per share on June 1, 2022.

7   **F.     June 10, 2022**

8   277.   On June 10, 2022, *The Wall Street Journal* published an article titled, "Meta

9   Scrutinizing Sheryl Sandberg's Use of Facebook Resources Over Several Years," which revealed

10   further facts concerning Sandberg's inappropriate use of Company resources for personal

11   projects.[14]   For example, the article disclosed information from sources stating that Ms. Sandberg

12   had used Facebook staff to assist her with drafting her personal book and during her book tours,

13   and that she used Facebook staffers to help with her foundation and family-member tasks.   The

14   article also contained a response by Sandberg to the allegations, in which Sandberg denied only

15   that her use of Company resources to plan her wedding was inappropriate, not that she had used

16   Company resources for that purpose.

17   278.   As a direct and proximate result of this partial corrective disclosure and/or

18   materialization of foreseeable risks concealed by Defendants' fraud, the price of Meta common

19   stock fell $8.43 per share, or 4.58%, to close at $175.57 per share on June 10, 2022.

20   **XI.     ADDITIONAL SCIENTER ALLEGATIONS**

21   279.   The Individual Defendants acted with scienter in that they knew or recklessly

22   disregarded that the public statements listed in Part VIII *supra*, were materially misleading when

23   made, and knowingly or recklessly participated or acquiesced in the issuance or dissemination of

24   such statements.   In addition to the facts alleged above, Defendants' scienter is further evidenced

25   by the following facts.

26   _____

27   [14] Deepa Seetharaman and Emily Glazer, *Meta Scrutinizing Sheryl Sandberg's Use of Facebook Resources Over Several Years*, Wall St. J. (June 10, 2022), available at

28   https://www.wsj.com/articles/meta-scrutinizing-sheryl-sandbergs-use-of-facebook-resources-over-several-years-11654882829.

**A.** **Defendants Wehner and Zuckerberg Enriched Themselves Through Large Sales of Inflated Meta Stock During the Class Period**

280.   Defendant Wehner made numerous large sales of shares during the Class Period. Some of these sales were made pursuant to a Section 10b5-1 plan, but some were not.

281.   On May 15, 2021, Defendant Wehner sold 12,316 shares of Meta stock for $3,891,117.04, and on August 15, 2021, Defendant Wehner sold 12,319 shares of Meta stock for $4,474,014.42.  These sales of shares were not made pursuant to a Section 10b5-1 plan.

282.   Defendant Wehner made numerous large sales of shares during the Class Period pursuant to a Section 10b5-1 plan.  On March 19, 2021, Defendant Wehner sold 678 shares of Meta Stock for $196,613.22; on May 19, 2021, Defendant Wehner sold 9,607 shares of Meta stock for $2,918,894.81; on August 18, 2021, Defendant Wehner sold 9,607 shares of Meta stock for $3,421,052.70; on November 15, 2021, Defendant Wehner sold 14,658 shares of Meta stock for $4,996,765.62; on November 17, 2021, Defendant Wehner sold 9,607 shares of Meta stock for $3,306,921.54; on February 25, 2022, Defendant Wehner sold 13,304 shares of Meta stock for $2,896,280.80; on May 15, 2022, Defendant Wehner sold 14,778 shares of Meta stock for $2,935,206.36.

283.   Defendant Zuckerberg also made numerous large sales of shares during the Class Period pursuant to a Section 10b5-1 plan, as reflected in the following table.

| Date of Sale | Shares Sold | Proceeds |
| --- | --- | --- |
| January 29, 2021 | 47,362 | $12,936,842.84 |
| January 29, 2021 | 44,750 | $11,579,796.22 |
| February 1, 2021 | 44,750 | $11,647,785.10 |
| February 2, 2021 | 44,750 | $11,947,830.06 |
| February 3, 2021 | 44,750 | $11,947,957.80 |
| February 4, 2021 | 44,750 | $11,883,484.40 |
| February 5, 2021 | 44,750 | $11,989,295.23 |
| February 8, 2021 | 44,750 | $11,932,220.17 |
| February 9, 2021 | 44,750 | $12,095,888.67 |
| February 10, 2021 | 44,750 | $12,102,762.19 |
| February 11, 2021 | 44,750 | $12,093,091.50 |
| February 12, 2021 | 44,750 | $12,061,176.83 |

| Date of Sale | Shares Sold | Proceeds |
| --- | --- | --- |
| February 16, 2021 | 47,344 | $12,983,756.95 |
| February 17, 2021 | 44,750 | $12,178,443.24 |
| February 18, 2021 | 44,750 | $12,016,940.80 |
| February 19, 2021 | 44,750 | $11,806,557.90 |
| February 22, 2021 | 44,750 | $11,661,237.94 |
| February 23, 2021 | 44,750 | $11,763,440.35 |
| February 24, 2021 | 44,750 | $11,773,202.36 |
| February 25, 2021 | 44,750 | $11,633,753.16 |
| February 26, 2021 | 44,750 | $11,696,783.74 |
| March 1, 2021 | 44,750 | $11,713,716.78 |
| March 2, 2021 | 44,750 | $11,805,009.41 |
| March 3, 2021 | 44,750 | $11,529,102.63 |
| March 4, 2021 | 44,750 | $11,595,421.37 |
| March 5, 2021 | 44,750 | $11,646,588.97 |
| March 8, 2021 | 44,750 | $11,674,799.15 |
| March 9, 2021 | 44,750 | $11,863,109.41 |
| March 10, 2021 | 44,750 | $11,879,490.78 |
| March 11, 2021 | 44,750 | $14,272,953.41 |
| March 12, 2021 | 51,996 | $11,934,267.39 |
| March 15, 2021 | 44,750 | $12,478,905.89 |
| March 16, 2021 | 45,758 | $15,730,615.23 |
| March 17, 2021 | 56,250 | $15,774,768.69 |
| March 18, 2021 | 56,250 | $15,854,537.47 |
| March 19, 2021 | 56,250 | $16,211,639.34 |
| March 22, 2021 | 56,250 | $16,582,017.28 |
| March 23, 2021 | 56,250 | $16,548,102.47 |
| March 24, 2021 | 56,250 | $16,151,719.12 |
| March 25, 2021 | 56,250 | $15,844,767.73 |
| March 26, 2021 | 56,250 | $15,818,023.42 |
| March 29, 2021 | 56,250 | $16,254,648.84 |
| March 30, 2021 | 56,250 | $16,285,539.98 |
| March 31, 2021 | 56,250 | $16,540,762.86 |
| April 1, 2021 | 56,250 | $17,638,267.37 |
| April 5, 2021 | 56,250 | $20,892,848.99 |
| April 6, 2021 | 68,000 | $20,911,789.34 |
| April 7, 2021 | 68,000 | $21,129,604.43 |
| April 8, 2021 | 68,000 | $21,232,454.13 |
| April 9, 2021 | 68,000 | $21,237,941.36 |
| April 12, 2021 | 68,000 | $21,104,420.54 |
| April 13, 2021 | 68,000 | $21,220,529.55 |

SECOND AMENDED COMPLAINT (CASE NO. 4:22-cv-01470-YGR)

| Date of Sale | Shares Sold | Proceeds |
|---|---|---|
| April 14, 2021 | 68,000 | $20,699,826.01 |
| April 15, 2021 | 68,000 | $20,923,741.28 |
| April 16, 2021 | 68,000 | $20,797,111.60 |
| April 19, 2021 | 68,000 | $20,615,521.35 |
| April 20, 2021 | 68,000 | $20,460,656.70 |
| April 21, 2021 | 68,000 | $20,380,646.27 |
| April 22, 2021 | 68,000 | $19,260,533.22 |
| April 23, 2021 | 68,000 | $20,402,129.22 |
| April 26, 2021 | 68,000 | $20,618,045.95 |
| April 27, 2021 | 68,000 | $20,664,414.12 |
| April 28, 2021 | 68,000 | $20,922,191.19 |
| April 29, 2021 | 68,000 | $22,212,641.39 |
| April 30, 2021 | 68,000 | $22,194,434.02 |
| May 3, 2021 | 68,000 | $22,041,304.96 |
| May 4, 2021 | 68,000 | $21,478,801.18 |
| May 5, 2021 | 68,000 | $21,599,402.10 |
| May 6, 2021 | 68,000 | $21,546,300.97 |
| May 7, 2021 | 68,000 | $21,800,070.22 |
| May 10, 2021 | 68,000 | $20,944,130.02 |
| May 11, 2021 | 68,000 | $20,680,413.42 |
| May 12, 2021 | 68,000 | $15,910,033.27 |
| May 13, 2021 | 52,700 | $16,115,475.45 |
| May 14, 2021 | 52,700 | $16,115,475.45 |
| May 17, 2021 | 52,700 | $16,115,475.45 |
| May 18, 2021 | 52,700 | $16,537,923.65 |
| May 19, 2021 | 52,700 | $16,325,477.32 |
| May 20, 2021 | 52,700 | $16,727,893.78 |
| May 22, 2021 | 52,700 | $16,745,628.23 |
| May 24, 2021 | 52,700 | $17,075,451.90 |
| May 25, 2021 | 52,700 | $17,259,170.81 |
| May 27, 2021 | 52,700 | $25,547,588.86 |
| May 28, 2021 | 77,300 | $24,781,661.91 |
| June 1, 2021 | 74,969 | $21,968,296.44 |
| June 2, 2021 | 66,698 | $20,805,115.31 |
| June 3, 2021 | 63,105 | $17,166,889.43 |
| June 4, 2021 | 52,700 | $25,519,371.82 |
| June 7, 2021 | 77,300 | $25,809,033.87 |
| June 8, 2021 | 77,300 | $25,844,452.85 |
| June 9, 2021 | 77,300 | $25,751,791.30 |
| June 11, 2021 | 77,300 | $25,556,561.25 |

SECOND AMENDED COMPLAINT (CASE NO. 4:22-cv-01470-YGR)

| Date of Sale | Shares Sold | Proceeds |
|---|---|---|
| June 14, 2021 | 77,300 | $25,859,314.17 |
| June 15, 2021 | 77,300 | $26,045,687.37 |
| June 16, 2021 | 77,300 | $25,785,054.07 |
| June 17, 2021 | 77,300 | $25,908,126.40 |
| June 18, 2021 | 77,300 | $25,693,696.04 |
| June 21, 2021 | 77,300 | $25,604,218.80 |
| June 22, 2021 | 77,300 | $25,937,189.61 |
| June 23, 2021 | 77,300 | $26,364,791.37 |
| June 24, 2021 | 77,300 | $26,544,351.16 |
| June 25, 2021 | 77,300 | $26,381,954.13 |
| June 28, 2021 | 77,300 | $26,706,486.44 |
| June 29, 2021 | 77,300 | $27,183,121.70 |
| June 30, 2021 | 77,300 | $26,965,074.33 |
| July 1, 2021 | 77,300 | $27,115,236.20 |
| July 1, 2021 | 77,300 | $27,115,236.20 |
| July 2, 2021 | 77,300 | $27,379,308.72 |
| July 6, 2021 | 77,300 | $27,291,290.63 |
| July 7, 2021 | 77,300 | $27,244,245.68 |
| July 8, 2021 | 77,300 | $26,705,088.81 |
| July 9, 2021 | 77,300 | $26,985,777.86 |
| July 12, 2021 | 77,300 | $27,240,485.70 |
| July 13, 2021 | 77,300 | $27,256,801.78 |
| July 14, 2021 | 77,300 | $27,013,527.85 |
| July 15, 2021 | 77,300 | $26,530,463.92 |
| July 16, 2021 | 77,300 | $26,433,022.35 |
| July 19, 2021 | 77,300 | $26,021,528.94 |
| July 20, 2021 | 77,300 | $26,280,526.26 |
| July 21, 2021 | 77,300 | $26,603,801.48 |
| July 22, 2021 | 77,300 | $26,970,400.94 |
| July 23, 2021 | 77,300 | $28,460,717.22 |
| July 26, 2021 | 77,300 | $28,749,062.00 |
| July 27, 2021 | 77,300 | $28,425,545.90 |
| July 28, 2021 | 77,300 | $28,806,889.16 |
| July 29, 2021 | 77,300 | $27,781,778.27 |
| July 30, 2021 | 77,300 | $27,584,969.16 |
| August 2, 2021 | 77,300 | $27,336,443.49 |
| August 3, 2021 | 77,300 | $27,094,394.11 |
| August 4, 2021 | 77,300 | $27,559,554.69 |
| August 5, 2021 | 77,300 | $27,901,120.39 |
| August 6, 2021 | 77,300 | $28,061,842.57 |

SECOND AMENDED COMPLAINT (CASE NO. 4:22-cv-01470-YGR)

| Date of Sale | Shares Sold | Proceeds |
|---|---|---|
| August 9, 2021 | 77,300 | $28,012,575.69 |
| August 10, 2021 | 77,300 | $27,924,368.70 |
| August 11, 2021 | 77,300 | $27,811,431.47 |
| August 12, 2021 | 77,300 | $27,899,521.22 |
| August 13, 2021 | 77,300 | $28,055,444.35 |
| August 16, 2021 | 77,300 | $28,040,786.83 |
| August 17, 2021 | 77,300 | $27,831,934.42 |
| August 18, 2021 | 77,300 | $27,649,962.12 |
| August 19, 2021 | 77,300 | $27,437,913.27 |
| August 20, 2021 | 77,300 | $27,631,268.37 |
| August 23, 2021 | 77,300 | $28,116,050.77 |
| August 24, 2021 | 77,300 | $28,279,314.23 |
| August 25, 2021 | 77,300 | $28,481,505.70 |
| August 26, 2021 | 77,300 | $28,336,002.62 |
| August 27, 2021 | 77,300 | $28,654,250.95 |
| August 30, 2021 | 77,300 | $29,140,613.59 |
| August 31, 2021 | 77,300 | $29,389,616.86 |
| September 1, 2021 | 77,300 | $29,554,786.08 |
| September 2, 2021 | 77,300 | $29,109,543.64 |
| September 3, 2021 | 77,300 | $29,060,321.51 |
| September 7, 2021 | 77,300 | $29,314,864.56 |
| September 8, 2021 | 77,300 | $29,201,420.60 |
| September 9, 2021 | 77,300 | $29,256,984.46 |
| September 10, 2021 | 77,300 | $29,452,176.16 |
| September 13, 2021 | 77,300 | $29,097,526.18 |
| September 14, 2021 | 77,300 | $29,123,394.97 |
| September 15, 2021 | 77,300 | $28,718,138.50 |
| September 16, 2021 | 77,300 | $28,710,870.73 |
| September 17, 2021 | 77,300 | $28,358,185.27 |
| September 20, 2021 | 77,300 | $27,429,824.62 |
| September 21, 2021 | 77,300 | $27,659,845.90 |
| September 22, 2021 | 77,300 | $26,617,528.74 |
| September 23, 2021 | 77,300 | $26,791,961.32 |
| September 24, 2021 | 77,300 | $27,020,502.83 |
| September 27, 2021 | 77,300 | $27,178,122.65 |
| September 28, 2021 | 77,300 | $26,450,043.37 |
| September 29, 2021 | 77,300 | $26,393,921.66 |
| September 30, 2021 | 77,300 | $26,355,062.62 |
| October 1, 2021 | 77,300 | $26,485,561.69 |
| October 4, 2021 | 59,304 | $19,432,978.01 |

SECOND AMENDED COMPLAINT (CASE NO. 4:22-cv-01470-YGR)

| Date of Sale | Shares Sold | Proceeds |
|---|---|---|
| October 5, 2021 | 77,300 | $25,662,554.37 |
| October 6, 2021 | 77,300 | $25,615,269.71 |
| October 7, 2021 | 75,761 | $25,336,767.34 |
| October 8, 2021 | 77,193 | $25,575,759.38 |
| October 11, 2021 | 57,750 | $18,965,663.28 |
| October 12, 2021 | 52,700 | $16,910,332.16 |
| October 13, 2021 | 52,700 | $17,119,525.57 |
| October 14, 2021 | 52,900 | $17,378,799.52 |
| October 15, 2021 | 52,700 | $17,107,556.77 |
| October 18, 2021 | 77,300 | $25,742,220.21 |
| October 19, 2021 | 77,300 | $26,265,666.14 |
| October 20, 2021 | 77,300 | $26,356,574.10 |
| October 21, 2021 | 77,300 | $26,359,469.94 |
| October 22, 2021 | 52,700 | $17,054,088.37 |
| October 25, 2021 | 52,700 | $17,127,111.08 |
| October 26, 2021 | 52,900 | $16,868,158.95 |
| October 27, 2021 | 52,700 | $16,595,838.18 |
| October 28, 2021 | 52,700 | $29,976,377.99 |
| October 29, 2021 | 52,700 | $17,046,369.58 |
| November 1, 2021 | 72,046 | $23,822,465.25 |
| November 2, 2021 | 61,070 | $20,092,499.51 |
| November 3, 2021 | 77,300 | $25,463,481.92 |
| November 4, 2021 | 77,300 | $25,910,066.12 |
| November 5, 2021 | 77,300 | $26,447,294.47 |
| November 8, 2021 | 77,300 | $26,366,705.35 |

284.    Defendant Zuckerberg's aggregate stock sales during the 498-day Class Period were $1,592,871,008.49, while during the 498 days prior to the Class Period, his aggregate stock sales were $1,208,777,115.27.   Accordingly, Defendant Zuckerberg increased his stock sales during the Class Period.

**B.      Core Operations**

**1.      Apple's iOS Changes Directly Affected Meta's Core Operations.**

285.    As Meta's sales of ads accounted for substantially all of Meta's revenue and operating profits throughout the Class Period, Apple's iOS privacy changes directly affected Meta's core operations.

286.    The Company admitted as much throughout the Class Period.  For example, in the Company's 2Q 2021 Form 10-Q, the Company explained:

> Our advertising revenue is dependent on targeting and measurement tools that incorporate data signals from user activity on websites and services that we do not control, and changes to the regulatory environment, third-party mobile operating systems and browsers, and our own products have impacted, and we expect will continue to impact, the availability of such signals, which will adversely affect our advertising revenue.

287.    Because Meta's ad sales were part of Meta's core operations, the Individual Defendants, and through them Meta, would have had robust knowledge of the impact of Apple iOS privacy changes on those sales, and knew about or recklessly disregarded the negative impact Apple's iOS privacy changes would have on the Company's operations.

### 2.    Meta's Transition to Reels Directly Affected Its Core Operations.

288.    Similarly, Meta's transition to Reels directly affected Meta's core operations because it directly impacted the revenue Meta received from its sale of ads, which accounts for substantially all of Meta's revenue and operating profits throughout the Class Period.  As explained above, Meta's transition to Reels increased user engagement, but shifted user attention from older platforms, like News Feed and Stories, with higher per-hour ad impression rate, to Reels, which had a lower per-hour ad impression rate.  This shift directly affected Meta's ad sales—Meta's core operations.

289.    Because Meta's ad sales were part of Meta's core operations, the Individual Defendants, and through them Meta, would have had robust knowledge of how Meta's transition to Reels directly affected those sales, and knew about or recklessly disregarded that Reels was cannibalizing its revenue from Stories.

## XII.    CLASS ACTION ALLEGATIONS

290.    Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired Meta securities publicly traded on the NASDAQ during the Class Period (the "Class"), and were damaged upon the revelation of the alleged corrective disclosure.  Excluded from the Class are Defendants, the officers and directors of the Company, at all relevant times, members of

1 their immediate families and their legal representatives, heirs, successors or assigns and any entity

2 in which Defendants have or had a controlling interest.

3     291.    The members of the Class are so numerous that joinder of all members is

4 impracticable.   Throughout the Class Period, Meta securities were actively traded on the

5 NASDAQ.  While the exact number of Class members is unknown to Plaintiffs at this time and

6 can be ascertained only through appropriate discovery, Plaintiffs believe that there are hundreds

7 or thousands of members in the proposed Class.  Record owners and other members of the Class

8 may be identified from records maintained by the Company or its transfer agent and may be

9 notified of the pendency of this action by mail, using the form of notice similar to that customarily

10 used in securities class actions.

11     292.    Plaintiffs' claims are typical of the claims of the members of the Class as all

12 members of the Class are similarly affected by Defendants' wrongful conduct in violation of

13 federal law that is complained of herein.

14     293.    Plaintiffs will fairly and adequately protect the interests of the members of the Class

15 and have retained counsel competent and experienced in class and securities litigation.  Plaintiffs

16 have no interests antagonistic to or in conflict with those of the Class.

17     294.    Common questions of law and fact exist as to all members of the Class and

18 predominate over any questions solely affecting individual members of the Class.  Among the

19 questions of law and fact common to the Class are:

20         •      whether the federal securities laws were violated by Defendants' acts as alleged in

21            this Complaint;

22         •      whether statements made by Defendants to the investing public during the Class

23            Period misrepresented material facts about the financial condition, business,

24            operations, and management of the Company;

25         •      whether Defendants' public statements to the investing public during the Class

26            Period omitted material facts necessary to make the statements made, in light of the

27            circumstances under which they were made, not misleading;

28

SECOND AMENDED COMPLAINT (CASE NO. 4:22-cv-01470-YGR)

- whether the Individual Defendants caused the Company to issue false and misleading SEC filings and public statements during the Class Period;

- whether Defendants acted knowingly or recklessly in issuing false and misleading SEC filings and public statements during the Class Period;

- whether the prices of Meta securities during the Class Period were artificially inflated because of the Defendants' conduct alleged in this Complaint; and

- whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

295.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

296.    Plaintiffs will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

- Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

- the omissions and misrepresentations were material;

- Meta securities are traded in efficient markets;

- the Company's securities were liquid and traded with moderate to heavy volume during the Class Period;

- the Company traded on the NASDAQ, and was covered by multiple analysts;

- the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities; and

- Plaintiffs and members of the Class purchased and/or sold Meta securities between the time the Defendants failed to disclose or misrepresented material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts.

297.    Based upon the foregoing, Plaintiffs and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

298.    Alternatively, Plaintiffs and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information, as detailed above.

## XIII.   NO SAFE HARBOR

299.    The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. The statements alleged to be false and misleading herein all relate to then-existing facts and conditions.   In addition, to the extent certain of the statements alleged to be false may be characterized as forward looking, they were not identified as "forward-looking statements" when made, and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. In the alternative, to the extent that the statutory safe harbor is determined to apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the speaker had actual knowledge that the forward-looking statement was materially false or misleading, and/or the forward-looking statement was authorized or approved by an executive officer of Meta who knew that the statement was false when made.

## XIV.   COUNT ONE

### For Violation of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder (Against All Defendants)

300.    Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

301.    This Count is asserted against the Company and the Individual Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

302.     During the Class Period, the Company and the Individual Defendants, individually and in concert, directly or indirectly, disseminated or approved the false statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

303.     The Company and the Individual Defendants violated §10(b) of the 1934 Act and Rule 10b-5 in that they:

•       employed devices, schemes and artifices to defraud;

•       made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

•       engaged in acts, practices and a course of business that operated as a fraud or deceit upon Plaintiffs and others similarly situated in connection with their purchases of Meta securities during the Class Period.

304.     The Company and the Individual Defendants acted with scienter in that they knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the securities laws.  These Defendants by virtue of their receipt of information reflecting the true facts of the Company, their control over, and/or receipt and/or modification of the Company's allegedly materially misleading statements, and/or their associations with the Company which made them privy to confidential proprietary information concerning the Company, participated in the fraudulent scheme alleged herein.

305.     Individual Defendants, who are the senior officers and/or directors of the Company, had actual knowledge of the material omissions and/or the falsity of the material statements set forth above, and intended to deceive Plaintiffs and the other members of the Class, or, in the alternative, acted with reckless disregard for the truth when they failed to ascertain and disclose

1    the true facts in the statements made by them or other personnel of the Company to members of

2    the investing public, including Plaintiffs and the Class.

3           306.    As a result of the foregoing, the market price of Meta securities was artificially

4    inflated during the Class Period.  In ignorance of the falsity of the Company's and the Individual

5    Defendants' statements, Plaintiffs and the other members of the Class relied on the statements

6    described above and/or the integrity of the market price of Meta securities during the Class Period

7    in purchasing Meta securities at prices that were artificially inflated as a result of the Company's

8    and the Individual Defendants' false and misleading statements.

9           307.    Had Plaintiffs and the other members of the Class been aware that the market price

10   of Meta securities had been artificially and falsely inflated by the Company's and the Individual

11   Defendants' misleading statements and by the material adverse information which the Company's

12   and the Individual Defendants did not disclose, they would not have purchased Meta securities at

13   the artificially inflated prices that they did, or at all.

14          308.    As a result of the wrongful conduct alleged herein, Plaintiffs and other members of

15   the Class have suffered damages in an amount to be established at trial.

16          309.    By reason of the foregoing, the Company and the Individual Defendants have

17   violated Section 10(b) of the 1934 Act and Rule 10b-5 promulgated thereunder and are liable to

18   the Plaintiffs and the other members of the Class for substantial damages which they suffered in

19   connection with their purchases of Meta securities during the Class Period.

20   **XV.    COUNT TWO**

21   **For Violation of Section 20(a) of the Exchange Act (Against the Individual Defendants)**

22          310.    Plaintiffs repeat and reallege each and every allegation above as if fully set forth

23   herein.

24          311.    During the Class Period, the Individual Defendants participated in the operation

25   and management of the Company, and conducted and participated, directly and indirectly, in the

26   conduct of the Company's business affairs.  Because of their senior positions, they knew the

27   adverse non-public information regarding the Company's business practices.

28

312.    As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to the Company's financial condition and results of operations, and to correct promptly any public statements issued by the Company which had become materially false or misleading.

313.    Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which the Company disseminated in the marketplace during the Class Period. Throughout the Class Period, the Individual Defendants exercised their power and authority to cause the Company to engage in the wrongful acts complained of herein.   The Individual Defendants, therefore, were "controlling persons" of the Company within the meaning of Section 20(a) of the Exchange Act.   In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of Meta securities.

314.    Each of the Individual Defendants, therefore, acted as a controlling person of the Company.  By reason of their senior management positions and/or being directors of the Company, each of the Individual Defendants had the power to direct the actions of, and exercised the same to cause, the Company to engage in the unlawful acts and conduct complained of herein.  Each of the Individual Defendants exercised control over the general operations of the Company and possessed the power to control the specific activities which comprise the primary violations about which Plaintiffs and the other members of the Class complain.

315.    By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by the Company.

## XVI.    COUNT THREE

**For Violations of Section 14(a)of the Securities Exchange Act of 1934 and SEC Rule 14a–9**

**(Against All Defendants)**

316.    Plaintiffs repeat and re allege each and every allegation contained in the foregoing paragraphs as if fully set forth herein, except the allegations in those subsections specified to relate solely to Plaintiffs' claims under Section 10(b) and 20(a) of the Exchange Act.

317.    This claim does not sound in fraud.  For the purposes of this claim, Plaintiffs expressly exclude and disclaim any allegation that could be construed as alleging or sounding in fraud or intentional or reckless misconduct.  This claim is based solely on negligence.

318.    This claim is brought against all Defendants pursuant to Section 14(a) of the Exchange Act (15 U.S.C. § 78n(a)) and Rule 14a 9 promulgated thereunder (17 C.F.R. § 240.14a 9), on behalf of all shareholders of Meta who held shares of Meta Class A common stock as of April 9, 2021 or April 8, 2022 and were entitled to vote at the Meta annual shareholders meeting on either May 26, 2021 or May 25, 2022.

319.    Defendants' statements issued to solicit shareholder approval of the election of directors and of the compensation of named executive officers, including the April 9, 2021 and April 8, 2022 Proxy Statements, and the documents incorporated therein, contained statements that, at the time and in light of the circumstances under which they were made, were false and misleading with respect to material facts, and omitted to state material facts necessary in order to make the statements therein not false or misleading.

320.    Defendants named in this Count were required to, but did not accurately, update these statements between dissemination of these documents and the shareholder votes on May 26, 2021 and May 25, 2022.

321.    Defendants named in this Count, jointly and severally, solicited and/or permitted use of their names in solicitations contained in the Proxy Statements and other proxy solicitation materials.

322.    By means of the Proxy Statements and documents attached thereto or incorporated by reference therein and other proxy solicitation materials, Defendants sought to secure Plaintiffs' and other Class members' approval of the election of directors and of the compensation of named executive officers, including Sheryl Sandberg, and solicited proxies from Plaintiffs and other members of the Class.

323.    Each Defendant named in this Count acted negligently in making inaccurate statements of material facts, and/or omitting material facts required to be stated in order to make those statements not misleading.  Defendants were required to ensure that the April 9, 2021 and

90

April 8, 2022 Proxy Statements and all other proxy solicitation materials fully and fairly disclosed all material facts to allow an investor to make an informed investment decision.  These Defendants also acted negligently in failing to update the April 9, 2021 and April 8, 2022 Proxy Statements.

324.    The solicitations described herein were essential links in the accomplishment of the election of directors and of the compensation of named executive officers, including Sheryl Sandberg.

325.    Plaintiffs and other members of the Class eligible to vote on the election of directors and the compensation of named executive officers, including Sheryl Sandberg, were misled by Defendants' false and misleading statements and omissions, were denied the opportunity to make a fully informed decision in voting on the election of directors and the compensation of named executive officers and were damaged as a direct and proximate result of the untrue statements and omissions set forth herein.

326.    The false and misleading statements and omissions in the April 9, 2021 and April 8, 2022 Proxy Statements and other proxy solicitation materials are material in that a reasonable stockholder would consider them important in deciding how to vote on the election of directors and the compensation of named executive officers.  In addition, a reasonable investor would view a full and accurate disclosure as significantly altering the total mix of information made available in the April 9, 2021 and April 8, 2022 Proxy Statements, additional proxy solicitation materials, and in other information reasonably available to stockholders.

327.    The untrue statements and omissions as set forth above proximately caused foreseeable losses to Plaintiffs and other members of the Class.

328.    This claim is brought within the applicable statute of limitations.

329.    By reason of the foregoing, the Defendants violated Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a), and Rule 14a 9 promulgated thereunder, 17 C.F.R. § 240.14a 9.

## XVII.  COUNT FOUR

### For Violations of Section 20(a) of the Exchange Act in Connection with the Proxy Claims

### (Against the Individual Defendants)

330.     Plaintiffs repeat and re allege each and every allegation contained in the foregoing paragraphs as if fully set forth herein, except the allegations in those subsections specified to relate solely to Plaintiffs' claims under Section 10(b) and 20(a) of the Exchange Act.

331.     This claim does not sound in fraud.  For the purposes of this claim, Plaintiffs expressly exclude and disclaim any allegation that could be construed as alleging or sounding in fraud or intentional or reckless misconduct.  This claim is based solely on negligence.

332.     This Count is asserted against the Individual Defendants and is based upon Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a).

333.     The Individual Defendants acted as controlling persons of Meta within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their high-level positions and their ownership and contractual rights, participation in, and/or awareness of the Company's operations and intimate knowledge of the false financial statements filed by the Company with the SEC and disseminated to the investing public, the Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which Plaintiffs contend are false and misleading.  The Individual Defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public filings, and other statements alleged by Plaintiffs to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

334.     In particular, the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.  The Individual Defendants also signed the April 9, 2021 and April 8, 2022 Proxy Statements and solicited approval of the election of directors and the compensation of named executive officers, including Sheryl Sandberg.

335.     As set forth above, Meta and the Individual Defendants each violated Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a), and Rule 14a-9 promulgated thereunder, 17 C.F.R. § 240.14a-9 by their acts and omissions as alleged in this Complaint.  By virtue of their position

as controlling persons, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act.  As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs and other members of the Class suffered damages in connection with their purchases of the Company's securities during the Class Period.

336.    The solicitations described herein were essential links in the accomplishment of the election of directors and the compensation of named executive officers, including Sheryl Sandberg.

337.    Plaintiffs and other members of the Class eligible to vote on the election of directors and the compensation of named executive officers, including Sheryl Sandberg were misled by Defendants' false and misleading statements and omissions, were denied the opportunity to make a fully informed decision in voting on the election of directors and the compensation of named executive officers and were damaged as a direct and proximate result of the untrue statements and omissions set forth herein.

338.    The false and misleading statements and omissions in the April 9, 2021 and April 8, 2022 Proxy Statements and other proxy solicitation materials are material in that a reasonable stockholder would consider them important in deciding how to vote on the election of directors and the compensation of named executive officers, including Sheryl Sandberg.  In addition, a reasonable investor would view a full and accurate disclosure as significantly altering the total mix of information made available in the April 9, 2021 and April 8, 2022 Proxy Statements, additional proxy solicitation materials, and in other information reasonably available to stockholders.

339.    The untrue statements and omissions as set forth above proximately caused foreseeable losses to Plaintiffs and other members of the Class.

340.    This claim is brought within the applicable statute of limitations.

341.    By reason of the foregoing, the Individual Defendants violated Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a).

## XVIII. PRAYER FOR RELIEF

342.    WHEREFORE, Plaintiffs demands judgment against Defendants as follows:

A.    Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiffs as the Class representatives;

B.    Requiring Defendants to pay damages sustained by Plaintiffs and the Class by reason of the acts and transactions alleged in this Complaint;

C.    Awarding Plaintiffs and the other members of the Class prejudgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

D.    Awarding such other and further relief as this Court may deem just and proper.

## XIX.   JURY DEMAND

343.    Plaintiffs hereby demand a trial by jury in this Action.

Dated:  September 18, 2023                    Respectfully submitted,

**POMERANTZ LLP**

*/s/ Jeremy A. Lieberman*
Jeremy A. Lieberman (admitted *pro hac vice*)
Austin P. Van (admitted *pro hac vice*)
600 Third Avenue, 20th Floor
New York, New York 10016
Telephone:  (212) 661-1100
Facsimile:  (917) 463-1044
E-mail:  jalieberman@pomlaw.com
avan@pomlaw.com

Jennifer Pafiti (SBN 282790)
1100 Glendon Avenue, 15th Floor
Los Angeles, California 90024
Telephone:  (310) 405 7190
Facsimile:  (917) 463 1044
jpafiti@pomlaw.com

Orly Guy
Eitan Lavie
HaShahar Tower
Ariel Sharon 4, 34th Floor
Givatayim, Israel 5320047
Telephone: +972 (0) 3 624 0240
Facsimile: +972 (0) 3 624 0111
E-mail:  oguy@pomlaw.com
eitan@pomlaw.com

*Attorneys for Lead Plaintiffs*

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**CERTIFICATE OF SERVICE**

I, Jeremy A. Lieberman, hereby certify that a true and correct duplicate copy of the foregoing Second Amended Class Action Complaint for Violations of the Federal Securities Laws was filed electronically on September 18, 2023.  Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing.  Parties may access this filing through the Court's CM/ECF System.

*/s/ Jeremy A. Lieberman*
Jeremy A. Lieberman

# EXHIBIT A

**Meta Platforms, Inc. Securities Litigation**

iOS 14.5 Update Impact Summary

| (In millions, except per share amounts) | Q2 2021 Pro-Forma Results | Q2 2021 Adj. to Account for Advertising Revenue Decline | Q2 2021 Reported Results | Q2 2021 Reported v. Pro-Forma | Q3 2021 Pro-Forma Results | Q3 2021 Adj. to Account for Advertising Revenue Decline | Q3 2021 Reported Results | Q3 2021 Reported v. Pro-Forma | Q4 2021 Pro-Forma Results | Q4 2021 Adj. to Account for Advertising Revenue Decline | Q4 2021 Reported Results | Q4 2021 Reported v. Pro-Forma | 2021 Pro-Forma Results | 2021 Adj. to Account for Advertising Revenue Decline | 2021 Reported Results | 2021 Reported v. Pro-Forma |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Advertising revenue | $ 29,771 | $(1,191) -4.0% | $ 28,580 | 4.2% | $ 29,764 | $(1,488) -5.0% | $ 28,276 | 5.3% | $ 34,357 | $(1,718) -5.0% | $ 32,639 | 5.3% | $ 119,331 | $ (4,397) -3.7% | $ 114,934 | 3.8% |
| *Y-O-Y Change* | *62%* | | *56%* | *11.6%* | *40%* | | *33%* | *21.1%* | *26%* | | *20%* | *31.5%* | *42%* | | *37%* | *14.3%* |
| Other revenue | 497 | | 497 | | 734 | | 734 | | 1,032 | | 1,032 | | 2,995 | | 2,995 | |
| **Total revenue** | **$ 30,268** | **$(1,191) –3.9%** | **$ 29,077** | **4.1%** | **$ 30,498** | **$(1,488) –4.9%** | **$ 29,010** | **5.1%** | **$ 35,389** | **$(1,718) –4.9%** | **$ 33,671** | **5.1%** | **$ 122,326** | **$ (4,397) –3.6%** | **$ 117,929** | **3.7%** |
| *Y-O-Y Change* | *62%* | | *56%* | *11.5%* | *42%* | | *35%* | *19.7%* | *26%* | | *20%* | *30.7%* | *42%* | | *37%* | *13.8%* |
| Costs and expenses: | | | | | | | | | | | | | | | | |
| Cost of revenue | 5,620 | (221) | 5,399 | 4.1% | 6,067 | (296) | 5,771 | 5.1% | 6,672 | (324) | 6,348 | 5.1% | 23,490 | (841) | 22,649 | 3.7% |
| Research and development | 6,096 | | 6,096 | | 6,316 | | 6,316 | | 7,046 | | 7,046 | | 24,655 | | 24,655 | |
| Marketing and sales | 3,392 | (133) | 3,259 | 4.1% | 3,736 | (182) | 3,554 | 5.1% | 4,611 | (224) | 4,387 | 5.1% | 14,455 | (412) | 14,043 | 2.9% |
| General and admin. | 1,956 | | 1,956 | | 2,946 | | 2,946 | | 3,305 | | 3,305 | | 9,829 | | 9,829 | |
| Total costs and expenses | 17,064 | (354) | 16,710 | 2.1% | 19,065 | (478) | 18,587 | 2.6% | 21,634 | (548) | 21,086 | 2.6% | 72,429 | (1,253) | 71,176 | 1.8% |
| *Y-O-Y Change* | *34%* | | *31%* | | *42%* | | *38%* | | *41%* | | *38%* | | *36%* | | *34%* | |
| **Income from operations** | **13,204** | **(837)** | **12,367** | **6.8%** | **11,433** | **(1,010)** | **10,423** | **9.7%** | **13,755** | **(1,170)** | **12,585** | **9.3%** | **49,897** | **(3,144)** | **46,753** | **6.7%** |
| *Operating margin* | *44%* | | *43%* | | *37%* | | *36%* | | *39%* | | *37%* | | *41%* | | *40%* | |
| Interest and other income, net | 146 | | 146 | | 142 | | 142 | | 117 | | 117 | | 531 | | 531 | |
| Income before provision for income taxes | 13,350 | (837) | 12,513 | 6.7% | 11,575 | (1,010) | 10,565 | 9.6% | 13,872 | (1,170) | 12,702 | 9.2% | 50,428 | (3,144) | 47,284 | 6.6% |
| Provision for income taxes | 2,261 | (142) | 2,119 | 6.7% | 1,502 | (131) | 1,371 | 9.6% | 2,640 | (223) | 2,417 | 9.2% | 8,440 | (526) | 7,914 | 6.6% |
| Net income | $ 11,089 | $ (695) | $ 10,394 | 6.7% | $ 10,073 | $ (879) | $ 9,194 | 9.6% | $ 11,232 | $ (947) | $ 10,285 | 9.2% | $ 41,988 | $(2,618) | $ 39,370 | 6.6% |
| Diluted EPS | $ 3.85 | $ (0.24) | $ 3.61 | 6.7% | $ 3.52 | $ (0.31) | $ 3.22 | 9.6% | $ 4.01 | $ (0.34) | $ 3.67 | 9.2% | $ 14.69 | $ (0.92) | $ 13.77 | 6.6% |

# EXHIBIT B

**Meta Platforms, Inc. Securities Litigation**
**Procedures Performed to Quantify iOS 14.5 Update Impact Summary**

According to former employees ("FEs"), the iOS privacy changes caused a drop of approximately 4% in advertising revenues by the end of Q2, 2021, and a drop of greater than 5% in Q3 and Q4 2021.  Assuming these declines are relative to a budget or target revenue, it is possible to quantify these changes and determine what Meta's reported results would have been "but for" the aforementioned declines in revenue.  For purposes of these calculations, it is assumed that the Q2 revenue declined by 4% for the entire quarter (rather than by the end of the quarter) and Q3 and Q4 2021 revenue declined by 5% (rather than greater than 5%).

Q2 2021

Meta's revenue consists of <u>advertising revenue</u> and <u>other revenue</u>.[1]

|  | Three Months Ended June 30, | |
|---|---|---|
|  | 2021 | 2020 |
| Advertising | $ 28,580 | $ 18,321 |
| Other revenue | 497 | 366 |
| Total revenue | $ 29,077 | $ 18,687 |

Assuming advertising revenue declined by 4% during the quarter, the reported advertising revenue of $28,580 represents 96% of budgeted or targeted advertising revenue.  Therefore, 100% of advertising revenue would have been $29,771 ($28,580 / 0.96 = $29,771).  This amount is reflected in the "Pro-Forma Results" column.  The difference (i.e., the decline in advertising revenue due to the iOS update) of $1,191 is shown in the "Adj. to Account for Advertising Revenue Decline" column.[2]

As shown in the "Reported v. Pro-Forma" column, the difference between reported advertising revenue and pro-forma advertising revenue represents 4.2% of the reported advertising revenue (or 4.1% of the reported total revenue).

---

[1] Q2 2021 Form 10-Q, page 14.
[2] Stated differently, a 4% decline in advertising revenue of $29,771 equals $1,191.

Certain expenses, such as <u>cost of revenue</u> and <u>marketing and sales expenses</u>, are expected to vary with changes in revenue.[3]  Meta's Q2 2021 Form 10-Q disclosed the following relationships between these expense categories and revenue (percentages rounded to whole numbers):[4]

*Cost of revenue*

| | Three Months Ended June 30, | | | | Six Months Ended June 30, | | | |
|---|---|---|---|---|---|---|---|---|
| | 2021 | | 2020 | % change | 2021 | | 2020 | % change |
| | | *(in millions, except for percentages)* | | | | | | |
| Cost of revenue | $ 5,399 | $ | 3,829 | 41 % | $ 10,530 | $ | 7,288 | 44 % |
| Percentage of revenue | | 19% | 20% | | | 19% | 20% | |

\* \* \*

*Marketing and sales*

| | Three Months Ended June 30, | | | | Six Months Ended June 30, | | | |
|---|---|---|---|---|---|---|---|---|
| | 2021 | | 2020 | % change | 2021 | | 2020 | % change |
| | | *(in millions, except for percentages)* | | | | | | |
| Marketing and sales | $ 3,259 | $ | 2,840 | 15 % | $ 6,102 | $ | 5,627 | 8 % |
| Percentage of revenue | | 11% | 15% | | | 11% | 15% | |

Using these relationships, it is possible to predict what these expenses would have been if total revenue was $1,191 higher.  Specifically, the cost of revenue would have been $221 (or 4.1%) higher, which represents 18.6% of the change in total revenue ($1,191 x 0.186 = $221) and marketing and sales expenses would have been $133 (or 4.1%) higher, which represents 11.2% of the change in total revenue ($1,191 x 0.112 = $133).

Because a change in revenue would not be expected to cause a change in other operating expenses or in the interest and other income, Meta's income from operations and pre-tax income would have been $837 higher.

---

[3] As described in the 2021 Form 10-K, page 63, "cost of revenue consists primarily of expenses associated with the delivery and distribution of our products. These include expenses related to the operation of our data centers and technical infrastructure, such as depreciation expense from servers, network infrastructure and buildings, as well as payroll and related expenses which include share-based compensation for employees on our operations teams, and energy and bandwidth costs. Cost of revenue also includes costs associated with partner arrangements, including traffic acquisition costs and credit card and other fees related to processing customer transactions; RL cost of products sold; and content costs. … Marketing and sales expenses consist primarily of marketing and promotional expenses and payroll and related expenses which include share-based compensation for our employees engaged in sales, sales support, marketing, business development, and customer service functions. Our marketing and sales expenses also include professional services such as content reviewers to support our community and product operations."

[4] Q2 2021 Form 10-Q, page 39.

Utilizing the Company's Q2 2021 effective tax rate of 16.9%,[5] the additional pre-tax income would have caused Meta to incur an additional tax expense of $142 ($837 * 0.169 = $142), thus resulting in additional net income (after taxes) of $695 or $0.24 per diluted share.[6]

Consequently, as shown in the "Pro-Forma Results" column, Meta's Q2 2021 total revenue and net income would have been $30,268 (or 4.1% higher) and $11,089 (or 6.7% higher), respectively, "but for" a decline in sales caused by iOS privacy changes.

The Management's Discussion and Analysis of Financial Condition and Results of Operations ("MD&A") section of the Q2 2021 Form 10-Q includes a summary of financial results.[7] The various measurements included in the financial summary are disclosed presumably because management views them to be important indicators of Meta's performance.  The materiality of the advertising revenue decline can also be demonstrated by changes that would need to be made to this disclosure to report the Q2 2021 pro-forma financial results:[8]

### *Financial results:*

- Revenue was $30.27 billion, up 62% year-over-year, and advertising revenue was $29.77 billion, up 62% year-over-year.
- Total costs and expenses were $17.06 billion, up 34% year-over-year.
- Income from operations was $13.2 billion, and operating margin was 44%.
- Net income was $11.09 billion, with diluted earnings per share of $3.85.
- Capital expenditures, including principal payments on finance leases, were $4.74 billion.
- Effective tax rate was 17%.
- Cash and cash equivalents and marketable securities were $64.08 billion as of June 30, 2021.
- Headcount was 63,404 as of June 30, 2021, an increase of 21% year-over-year.

---

[5] Calculated by dividing reported $2,119 provision for income taxes by the pre-tax income of $12,513.  See income statement on page 8 and disclosure of the effective tax rate (rounded to whole number) on page 27 of the Q2 2021 Form 10-Q.

[6] Weighted-average shares used to compute diluted earnings per share during Q2 2021 was 2,877, see Q2 2021 Form 10-Q, page 8.  $695 / 2,877 = $0.24.

[7] Q2 2021 Form 10-Q, page 27.

[8] See the iOS 14.5 Update Impact Summary schedule.

Q3 2021

Meta's revenue consists of <u>advertising revenue</u> and <u>other revenue</u>.[9]

| | | Three Months Ended September 30, | | |
| --- | --- | --- | --- | --- |
| | | 2021 | | 2020 |
| Advertising | $ | 28,276 | $ | 21,221 |
| Other revenue | | 734 | | 249 |
| Total revenue | $ | 29,010 | $ | 21,470 |

Assuming advertising revenue declined by 5% during the quarter, the reported advertising revenue of $28,276 represents 95% of budgeted or targeted advertising revenue. Therefore, 100% of advertising revenue would have been $29,764 ($28,276 / 0.95 = $29,764). This amount is reflected in the "Pro-Forma Results" column. The difference (i.e., the decline in advertising revenue due to the iOS update) of $1,488 is shown in the "Adj. to Account for Advertising Revenue Decline" column.[10]

As shown in the "Reported v. Pro-Forma" column, the difference between reported advertising revenue and pro-forma advertising revenue represents 5.3% of the reported advertising revenue (or 5.1% of the reported total revenue).

Certain expenses, such as <u>cost of revenue</u> and <u>marketing and sales expenses</u>, are expected to vary with changes in revenue.[11]  Meta's Q3 2021 Form 10-Q disclosed the following relationships between these expense categories and revenue (percentages rounded to whole numbers):[12]

---

[9] Q3 2021 Form 10-Q, page 14.

[10] Stated differently, a 5% decline in advertising revenue of $29,764 equals $1,488.

[11] As described in the 2021 Form 10-K, page 63, "cost of revenue consists primarily of expenses associated with the delivery and distribution of our products. These include expenses related to the operation of our data centers and technical infrastructure, such as depreciation expense from servers, network infrastructure and buildings, as well as payroll and related expenses which include share-based compensation for employees on our operations teams, and energy and bandwidth costs. Cost of revenue also includes costs associated with partner arrangements, including traffic acquisition costs and credit card and other fees related to processing customer transactions; RL cost of products sold; and content costs. … Marketing and sales expenses consist primarily of marketing and promotional expenses and payroll and related expenses which include share-based compensation for our employees engaged in sales, sales support, marketing, business development, and customer service functions. Our marketing and sales expenses also include professional services such as content reviewers to support our community and product operations."

[12] Q3 2021 Form 10-Q, page 40.

*Cost of revenue*

| | Three Months Ended September 30, | | % change | Nine Months Ended September 30, | | % change |
|---|---|---|---|---|---|---|
| | 2021 | 2020 | | 2021 | 2020 | |
| | *(in millions, except for percentages)* | | | | | |
| Cost of revenue | $ 5,771 | $ 4,194 | 38 % | $ 16,301 | $ 11,482 | 42 % |
| Percentage of revenue | 20% | 20% | | 19% | 20% | |

\* \* \*

*Marketing and sales*

| | Three Months Ended September 30, | | % change | Nine Months Ended September 30, | | % change |
|---|---|---|---|---|---|---|
| | 2021 | 2020 | | 2021 | 2020 | |
| | *(in millions, except for percentages)* | | | | | |
| Marketing and sales | $ 3,554 | $ 2,683 | 32 % | $ 9,656 | $ 8,310 | 16 % |
| Percentage of revenue | 12% | 12% | | 11% | 14% | |

Using these relationships, it is possible to predict what these expenses would have been if total revenue was $1,488 higher.  Specifically, the cost of revenue would have been $296 (or 5.1%) higher, which represents 19.9% of the change in total revenue ($1,488 x 0.199 = $296) and marketing and sales expenses would have been $182 (or 5.1%) higher, which represents 12.3% of the change in total revenue ($1,488 x 0.123 = $182).

Because a change in revenue would not be expected to cause a change in other operating expenses or in the interest and other income, Meta's income from operations and pre-tax income would have been $1,010 higher.

Utilizing the Company's Q3 2021 effective tax rate of 13.0%,[13] the additional pre-tax income would have caused Meta to incur an additional tax expense of $131 ($1,010 * 0.13 = $131), thus resulting in additional net income (after taxes) of $879 or $0.31 per diluted share.[14]

Consequently, as shown in the "Pro-Forma Results" column, Meta's Q3 2021 total revenue and net income would have been $30,498 (or 5.1% higher) and $10,073 (or 9.6% higher), respectively, "but for" a decline in sales caused by iOS privacy changes.

The Management's Discussion and Analysis of Financial Condition and Results of Operations ("MD&A") section of the Q3 2021 Form 10-Q includes a summary of financial results.[15] The various measurements included in the financial summary are disclosed presumably because management views them to be important indicators of Meta's performance.  The materiality of

---

[13] Calculated by dividing reported $1,371 provision for income taxes by the pre-tax income of $10,565.  See income statement on page 8 and disclosure of the effective tax rate (rounded to whole number) on page 28 of the Q3 2021 Form 10-Q.

[14] Weighted-average shares used to compute diluted earnings per share during Q3 2021 was 2,859, see Q3 2021 Form 10-Q, page 8.  $879 / 2,859 = $0.31.

[15] Q3 2021 Form 10-Q, page 28.

the advertising revenue decline can also be demonstrated by changes that would need to be made to this disclosure to report the Q2 2021pro-forma financial results:[16]

### *Financial results:*

- Revenue was $30.50 billion, up 42% year-over-year, and advertising revenue was $29.76 billion, up 40% year-over-year.
- Total costs and expenses were $19.07 billion, up 42% year-over-year.
- Income from operations was $11.43 billion, and operating margin was 37%.
- Net income was $10.07 billion, with diluted earnings per share of $3.52.
- Capital expenditures, including principal payments on finance leases, were $4.54 billion.
- Effective tax rate was 13%.
- Cash and cash equivalents and marketable securities were $58.08 billion as of September 30, 2021.
- Headcount was 68,177 as of September 30, 2021, an increase of 20% year-over-year.

---

[16] See the iOS 14.5 Update Impact Summary schedule.

Q4 2021

Beginning in Q4 2021, Meta reported its financial results based on two reportable segments, Family of Apps (FoA), which includes Facebook, Instagram, Messenger, WhatsApp and other services and Reality Labs (RL), which includes augmented and virtual reality related consumer hardware, software and content.  Meta's underlined advertising revenue was included in the FoA segment:[17]

**Segment Information**

*(In millions)*

*(Unaudited)*

| | Three Months Ended | | | | | Year Ended December 31, | | |
|---|---|---|---|---|---|---|---|---|
| | December 31, 2021 | September 30, 2021 | June 30, 2021 | March 31, 2021 | December 31, 2020 | 2021 | 2020 | 2019 |
| Revenue: | | | | | | | | |
| Advertising | $ 32,639 | $ 28,276 | $ 28,580 | $ 25,439 | $ 27,187 | $114,934 | $ 84,169 | $ 69,655 |
| Other revenue | 155 | 176 | 192 | 198 | 168 | 721 | 657 | 541 |
| Family of Apps | 32,794 | 28,452 | 28,772 | 25,637 | 27,355 | 115,655 | 84,826 | 70,196 |
| Reality Labs | 877 | 558 | 305 | 534 | 717 | 2,274 | 1,139 | 501 |
| Total revenue | $ 33,671 | $ 29,010 | $ 29,077 | $ 26,171 | $ 28,072 | $117,929 | $ 85,965 | $ 70,697 |

Assuming advertising revenue declined by 5% during the quarter, the reported advertising revenue of $32,639 represents 95% of budgeted or targeted advertising revenue.  Therefore, 100% of advertising revenue would have been $34,357 ($32,639 / 0.95 = $34,357).  This amount is reflected in the "Pro-Forma Results" column.  The difference (i.e., the decline in advertising revenue due to the iOS update) of $1,718 is shown in the "Adj. to Account for Advertising Revenue Decline" column.[18]

As shown in the "Reported v. Pro-Forma" column, the difference between reported advertising revenue and pro-forma advertising revenue represents 5.3% of the reported advertising revenue (or 5.1% of the reported total revenue).

Certain expenses, such as cost of revenue and marketing and sales expenses, are expected to vary with changes in revenue.[19]  Using the ratios between reported cost of revenue to reported revenue

---

[17] February 2, 2022 Earnings Release, page 2.

[18] Stated differently, a 5% decline in advertising revenue of $34,357 equals $1,718.

[19] As described in the 2021 Form 10-K, page 63, "cost of revenue consists primarily of expenses associated with the delivery and distribution of our products. These include expenses related to the operation of our data centers and technical infrastructure, such as depreciation expense from servers, network infrastructure and buildings, as well as payroll and related expenses which include share-based compensation for employees on our operations teams, and energy and bandwidth costs. Cost of revenue also includes costs associated with partner arrangements, including traffic acquisition costs and credit card and other fees related to processing customer transactions; RL cost of products sold; and content costs. … Marketing and sales expenses consist primarily of marketing and promotional expenses and payroll and related expenses which include share-based compensation for our employees engaged in sales, sales support, marketing, business development, and customer service functions. Our marketing and sales expenses also

of 18.9% and <u>marketing and sales expenses</u> to reported revenue of 13.0%, respectively, it is possible to predict what these expenses would have been if total revenue was $1,718 higher. Specifically, the cost of revenue would have been $324 (or 5.1%) higher, which represents 18.9% of the change in total revenue ($1,718 x 0.189 = $324) and marketing and sales expenses would have been $224 (or 5.1%) higher, which represents 13.0% of the change in total revenue ($1,718 x 0.13 = $224).

Because a change in revenue would not be expected to cause a change in other operating expenses or in the interest and other income, Meta's income from operations and pre-tax income would have been $1,170 higher.

Utilizing the Company's Q4 2021 effective tax rate of 19.0%,[20] the additional pre-tax income would have caused Meta to incur an additional tax expense of $223 ($1,170 * 0.19 = $223), thus resulting in additional net income (after taxes) of $947 or $0.34 per diluted share.[21]

Consequently, as shown in the "Pro-Forma Results" column, Meta's Q4 2021 total revenue and net income would have been $35,389 (or 5.1% higher) and $11,232 (or 9.2% higher), respectively, "but for" a decline in sales caused by iOS privacy changes.

February 2, 2022 earnings release includes financial highlights for the fourth quarter and full year 2021:[22]

**Fourth Quarter and Full Year 2021 Financial Highlights**

| *In millions, except percentages and per share amounts* | Three Months Ended December 31, | | Year-over-Year % Change | Year Ended December 31, | | Year-over-Year % Change |
|---|---|---|---|---|---|---|
| | 2021 | 2020 | | 2021 | 2020 | |
| Total revenue | $ 33,671 | $ 28,072 | 20 % | $ 117,929 | $ 85,965 | 37 % |
| Total costs and expenses | 21,086 | 15,297 | 38 % | 71,176 | 53,294 | 34 % |
| Income from operations | $ 12,585 | $ 12,775 | (1)% | $ 46,753 | $ 32,671 | 43 % |
| *Operating margin* | *37 %* | *46 %* | | *40 %* | *38 %* | |
| Provision for income taxes | $ 2,417 | $ 1,836 | 32 % | $ 7,914 | $ 4,034 | 96 % |
| *Effective tax rate* | *19 %* | *14 %* | | *17 %* | *12 %* | |
| Net income | $ 10,285 | $ 11,219 | (8)% | $ 39,370 | $ 29,146 | 35 % |
| Diluted earnings per share (EPS) | $ 3.67 | $ 3.88 | (5)% | $ 13.77 | $ 10.09 | 36 % |

The various measurements are included in the financial highlights because presumably management views them to be important indicators of Meta's performance.  The materiality of the advertising revenue decline can also be demonstrated by how these disclosures are impacted

---

include professional services such as content reviewers to support our community and product operations."

[20] Calculated by dividing reported $2,417 provision for income taxes by pre-tax income of $12,702.  See income statement on page 8 of the February 2, 2022 earnings release.

[21] Weighted-average shares used to compute diluted earnings per share during Q4 2021 was 2,799, see February 2, 2022 Earnings Release, page 8.  $947/ 2,799 = $0.34.

[22] February 2, 2022 Earnings Release, page 1.

by the decline in revenues which are summarized in the iOS 14.5 Update Impact Summary schedule.

Full Year 2021

The impact of a decline in advertising revenue on Meta's 2021 reported revenue and cost of revenue is calculated by adding up the Q2 – Q4 pro-forma adjustments.

Meta's 2021 Form 10-K, disclosed that its marketing and sales expenses included $2.99 billion of advertising expenses.[23]  Advertising expenses would not be expected to change due to a decline in advertising revenue caused by iOS privacy changes.  Therefore, the impact of a decline in revenue on marketing and sales expenses for the full year should be calculated after adjusting marketing and sales expenses for advertising expenses:

| | |
|---|---|
| Reported 2021 marketing and sales expenses[24] | $ 14,043 |
| Advertising expenses | (  2,990) |
| Adjusted 2021 marketing and sales expenses | $ 11,053 |
| | |
| Reported 2021 total revenue[25] | $117,929 |

Ratio of adjusted marketing and sales to reported revenue = 9.4%

The total decline in advertising revenue for full year 2021 (based on the sum of declines estimated for each quarter) equals $4,397 ($1,191 + $1,488 + $1,718 = $4,397).  If sales were $4,397 higher, Meta's marketing and sales expenses for the full year would have been $412 higher ($4,397 * .094 = $412).

The impact of a decline in advertising revenue on 2021 net income and diluted EPS should be calculated by using the effective tax rate for the full year of 16.7% ($7,917 provision for income taxes / $47,284 pretax income = 16.7%) and the weighted-average shares used to compute diluted earnings per share of 2,859.[26]

---

[23] 2021 Form 10-K, page 88. The amount of advertising expenses included in quarterly marketing and sales expenses was not disclosed.
[24] 2021 Form 10-K, page 80.
[25] February 2, 2022 Earnings Release, page 8.
[26] *Ibid.*