LATHAM & WATKINS LLP
Elizabeth L. Deeley (CA Bar No. 230798)
  elizabeth.deeley@lw.com
Melanie M. Blunschi (CA Bar No. 234264)
  melanie.blunschi@lw.com
Nicholas Rosellini (CA Bar No. 316080)
  nick.rosellini@lw.com
505 Montgomery Street, Suite 2000
San Francisco, CA 94111
Telephone: +1.415.391.0600

Andrew B. Clubok (*pro hac vice*)
  andrew.clubok@lw.com
Susan E. Engel (*pro hac vice*)
  susan.engel@lw.com
555 Eleventh Street, N.W., Suite 1000
Washington, D.C. 20004-1304
Telephone: +1.202.637.2200

*Attorneys for Defendants Meta Platforms,
Inc., Mark Zuckerberg, David Wehner,
Sheryl Sandberg, and Susan Li*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### OAKLAND DIVISION

PLUMBERS AND STEAMFITTERS
LOCAL 60 PENSION TRUST, Individually
and on Behalf of All Others Similarly
Situated,

Plaintiffs,

v.

META PLATFORMS, INC., MARK
ZUCKERBERG, DAVID WEHNER,
SHERYL SANDBERG, and SUSAN LI,

Defendants.

Case No. 4:22-cv-01470-YGR

**DEFENDANTS' NOTICE OF MOTION
AND MOTION TO DISMISS THE
SECOND AMENDED COMPLAINT
FOR VIOLATIONS OF THE FEDERAL
SECURITIES LAWS; MEMORANDUM
OF POINTS AND AUTHORITIES IN
SUPPORT**

Date:   April 16, 2024
Time:   2:00 p.m.
Court:  Courtroom 1, 4th Floor
Judge:  Hon. Yvonne Gonzalez Rogers

LATHAM & WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

DEFS' MOT. TO DISMISS
SECOND AM. COMPLAINT
CASE NO. 4:22-cv-01470-YGR

1

## NOTICE OF MOTION AND MOTION TO DISMISS

2

**TO PLAINTIFFS AND TO THEIR ATTORNEYS OF RECORD:**

3        PLEASE TAKE NOTICE that on April 16, 2024 at 2:00 p.m. in Courtroom 1 of the United

4   States District Court for the Northern District of California, located at 1301 Clay Street, Oakland,

5   California, Defendants Meta Platforms, Inc. ("Meta"), Mark Zuckerberg, David Wehner, Sheryl

6   Sandberg, and Susan Li ("Individual Defendants," collectively with Meta "Defendants") will and

7   hereby do move for an order dismissing with prejudice Plaintiffs' Second Amended Complaint for

8   Violations of the Federal Securities Laws ("SAC"), Dkt. 77.

9        This motion is made pursuant to Federal Rules of Civil Procedure 8(a), 9(b), and 12(b)(6),

10  on the grounds that each of the causes of action in the SAC fails to state a claim as a matter of law.

11  The motion is based on this Notice of Motion and Motion to Dismiss, the Memorandum of Points

12  and Authorities, Defendants' Second Request for Judicial Notice, and the accompanying

13  declaration of Melanie M. Blunschi enclosed herewith, as well as the pleadings and papers on file

14  in this action, the arguments of counsel, and any other matter that the Court may properly consider.

15

## STATEMENT OF RELIEF SOUGHT

16       Meta seeks an order pursuant to Federal Rule of Civil Procedure 12(b)(6) dismissing this

17  action with prejudice for failure to state a claim upon which relief can be granted.

18

19  DATED:  November 14, 2023            LATHAM & WATKINS LLP

20                                       By:  /s/ *Andrew B. Clubok*
                                             Andrew B. Clubok (*pro hac vice*)
21                                            andrew.clubok@lw.com
                                             Susan E. Engel (*pro hac vice*)
22                                            susan.engel@lw.com
                                             555 Eleventh Street, N.W., Suite 1000
23                                            Washington, D.C. 20004-1304
                                             Telephone: +1.202.637.2200
24

25                                           Elizabeth L. Deeley (CA Bar No. 230798)
                                             elizabeth.deeley@lw.com
26                                           Melanie M. Blunschi (CA Bar No. 234264)
                                             melanie.blunschi@lw.com
27                                           Nicholas Rosellini (CA Bar No. 316080)
                                             nick.rosellini@lw.com
28

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

1

DEFS.' MOT. TO DISMISS
SECOND AM. COMPLAINT
CASE NO. 4:22-cv-01470-YGR

505 Montgomery Street, Suite 2000
San Francisco, CA 94111
Telephone: +1.415.391.0600

*Attorneys for Defendants Meta Platforms, Inc.,
Mark Zuckerberg, David Wehner, Sheryl
Sandberg, and Susan Li*

LATHAM&WATKINS
ATTORNEYS AT LAW
SAN FRANCISCO

1

## <u>TABLE OF CONTENTS</u>

2

<u>Page</u>

3  I.      INTRODUCTION .................................................................................................. 1

4  II.     FACTUAL BACKGROUND................................................................................ 2

5          A.      The iOS Privacy Changes ....................................................................... 2

6          B.      The Reels Introduction............................................................................ 5

7          C.      Sandberg's Alleged Conduct .................................................................. 7

8  III.    PROCEDURAL HISTORY.................................................................................. 8

9          A.      Plaintiffs' FAC ........................................................................................ 8

10         B.      The Court's Dismissal Of The FAC ....................................................... 9

11         C.      Plaintiffs' SAC ...................................................................................... 10

12 IV.     LEGAL STANDARD......................................................................................... 11

13 V.      ARGUMENT ...................................................................................................... 12

14         A.      The Allegations About The iOS Changes Must Be Dismissed
                   Again ..................................................................................................... 12

15                1.      The New Challenged Statements Were Not False Or
16                        Misleading .................................................................................. 12

17                2.      The Old Challenged Statement Was Not False Or
                          Misleading Either ....................................................................... 15

18                3.      Plaintiffs Also Fail To Plead Loss Causation ........................... 17

19         B.      The Allegations About Reels Must Be Dismissed Again.................... 18

20                1.      The New Challenged Statements Were Not False Or
21                        Misleading .................................................................................. 18

22                2.      The Old Challenged Statement Was Not False Or
                          Misleading Either ....................................................................... 19

23         C.      The Allegations About Sandberg's Conduct Must Be Dismissed
24                 Again ..................................................................................................... 20

25                1.      Plaintiffs Still Have Not Pled An Actionable Misstatement .................. 20

26                2.      The Section 14(a) Claim Fails For Additional Reasons ......................... 22

27         D.      There Is Still No Strong Inference Of Scienter .................................... 22

28                1.      Plaintiffs' Scienter Theory Remains Fundamentally Flawed ................. 23

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

i

DEFS.' MOT. TO DISMISS
SECOND AM. COMPLAINT
CASE NO. 4:22-cv-01470-YGR

2.      No Set Of Allegations Raises A Strong Inference Of
        Scienter .................................................................................... 23

E.      Dismissal Should Be With Prejudice ................................................... 25

VI.     CONCLUSION ......................................................................................... 25

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

DEFS.' MOT. TO DISMISS
SECOND AM. COMPLAINT
CASE NO. 4:22-cv-01470-YGR

1

## TABLE OF AUTHORITIES

2

Page(s)

3

### CASES

4

*Adams v. Standard Knitting Mills, Inc.*,
   623 F.2d 422 (6th Cir. 1980) ........................................................................... 22

5

*Alexander v. Sandoval*,
   532 U.S. 275 (2001) ......................................................................................... 22

6

7

*Anderson v. 1399557 Ontario Ltd.*,
   2019 WL 5693749 (D. Minn. Nov. 4, 2019) .................................................... 19

8

*Berson v. Applied Signal Tech., Inc.*,
   527 F.3d 982 (9th Cir. 2008) ........................................................................... 24

9

10

*Boykin v. K12, Inc.*,
   54 F.4th 175 (4th Cir. 2022) ............................................................................ 24

11

*Brody v. Transitional Hosps. Corp.*,
   280 F.3d 997 (9th Cir. 2002) ........................................................................... 12

12

13

*Cowin v. Bresler*,
   741 F.2d 410 (D.C. Cir. 1984) ......................................................................... 22

14

*Curry v. Yelp Inc.*,
   875 F.3d 1219 (9th Cir. 2017) ......................................................................... 26

15

16

*Desaigoudar v. Meyercord*,
   223 F.3d 1020 (9th Cir. 2000) ......................................................................... 20

17

*Fecht v. Price Co.*,
   70 F.3d 1078 (9th Cir. 1995) ........................................................................... 16

18

19

*Gardner v. Martino*,
   563 F.3d 981 (9th Cir. 2009) ........................................................................... 26

20

*Greenberg v. Cooper Companies, Inc.*,
   2013 WL 2403648 (N.D. Cal. May 31, 2013) ................................................. 25

21

22

*Greenberg v. Sunrun Inc.*,
   233 F. Supp. 3d 764 (N.D. Cal. 2017) ....................................................... 13, 17

23

*Grigsby v. BofI Holding, Inc.*,
   979 F.3d 1198 (9th Cir. 2020) ......................................................................... 18

24

25

*In re BofI Holding, Inc. Sec. Litig.*,
   977 F.3d 781 (9th Cir. 2020) ........................................................................... 18

26

*In re Convergent Techs. Sec. Litig.*,
   948 F.2d 507 (9th Cir. 1991) ........................................................................... 14

27

28

*In re Dynavax Sec. Litig.*,

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

iii

DEFS.' MOT. TO DISMISS
SECOND AM. COMPLAINT
CASE NO. 4:22-cv-01470-YGR

2018 WL 2554472 (N.D. Cal. Jun. 4, 2018) .................................................. 25

*In re Herbalife, Ltd. Sec. Litig.*,
2015 WL 12734014 (C.D. Cal. July 28, 2015) ............................................ 10

*In re NVIDIA Corp. Sec. Litig.*,
768 F.3d 1046, 1056-57 (9th Cir. 2014) ................................................ 23, 25

*In re Oracle Corp. Sec. Litig.*,
627 F.3d 376 (9th Cir. 2010) ................................................................... 13

*In re Paypal Holdings, Inc. S'holder Deri. Litig.*,
2018 WL 466527 (N.D. Cal. Jan. 18, 2018) .............................................. 22

*In re Rigel Pharms., Inc. Sec. Litig.*,
697 F.3d 869 (9th Cir. 2012) ................................................................... 11

*J.I. Case Co. v. Borak*,
377 U.S. 426 (1964) ................................................................................ 22

*Kasilingam v. Stitch Fix, Inc.*,
2022 WL 10966359 (9th Cir. Oct. 19, 2022) ............................................. 19

*Lloyd v. CVB Fin. Corp.*,
811 F.3d 1200 (9th Cir. 2016) ........................................................... 12, 17

*M & M Hart Living Tr. v. Glob. Eagle Ent., Inc.*,
2017 WL 5635424 (C.D. Cal. Aug. 20, 2017) ........................................... 19

*Manzarek v. St. Paul Fire & Marine Ins. Co.*,
519 F.3d 1025 (9th Cir. 2008) ................................................................. 14

*Metzler Inv. GMBH v. Corinthian Colls., Inc.*,
540 F.3d 1049 (9th Cir. 2008) ................................................................. 23

*Next Century Commc'ns Corp. v. Ellis*,
318 F.3d 1023 (11th Cir. 2003) ............................................................... 18

*Nguyen v. Endologix, Inc.*,
962 F.3d 405 (9th Cir. 2020) ................................................................... 24

*Okla. Firefighters Pension Fund & Ret. Sys. v K12 Inc.*,
66 F. Supp. 3d 711 (E.D. Va. 2014) ......................................................... 18

*Omnicare, Inc. v. Laborers Dist. Council Constr. Ind. Pension Fund*,
575 U.S. 175 (2015) ................................................................................ 14

*Or. Pub. Emps. Ret. Fund v. Apollo Grp. Inc.*,
774 F.3d 598 (9th Cir. 2014) ................................................................... 16

*Plumber & Steamfitters Loc. 773 Pension Fund v. Danske Bank A/S.*,
11 F.4th 90 (2d Cir. 2021) ................................................................. 20, 21

*Police Ret. Sys. of St. Louis v. Intuitive Surgical, Inc.*,
759 F.3d 1051 (9th Cir. 2014) ................................................................. 12

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

DEFS.' MOT. TO DISMISS
SECOND AM. COMPLAINT
CASE NO. 4:22-cv-01470-YGR

*Prodanova v. H.C. Wainwright & Co., LLC,*
   993 F.3d 1097 (9th Cir. 2021) ............................................................................... 23

*Rombach v. Chang,*
   355 F.3d 164 (2d Cir. 2004)................................................................................... 19

*Ronconi v. Larkin,*
   253 F.3d 423 (9th Cir. 2001) ........................................................................... 12, 15

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.,*
   551 U.S. 308 (2007)................................................................................................ 23

*Thant v. Karyopharm Therapeutics Inc.,*
   43 F.4th 214 (1st Cir. 2022) .................................................................................. 14

*Weston Family P'ship LLLP v. Twitter, Inc.,*
   29 F.4th 611 (9th Cir. 2022) ..........................................................................passim

*Yates v. Mun. Mortg. & Equity*, LLC,
   744 F.3d 874 (4th Cir. 2014) ................................................................................. 24

*Yuan v. Facebook, Inc.,*
   2021 WL 4503105 (N.D. Cal. Sept. 30, 2021) ..................................................... 11

*Zucco Partners, LLC v. Digimarc Corp.,*
   552 F.3d 981 (9th Cir. 2009) ................................................................................. 23

**STATUTES**

15 U.S.C. § 78u-4(b)(1)(B)............................................................................................ 12

15 U.S.C. § 78u-4(b)(2)(A)..................................................................................... 12, 23

**RULES**

Fed. R. Civ. P. 9(b) ....................................................................................................... 11

**REGULATIONS**

17 C.F.R. § 229.105 ................................................................................................ 16, 20

LATHAM&WATKINS<sub>LLP</sub>
ATTORNEYS AT LAW
SAN FRANCISCO

DEFS.' MOT. TO DISMISS
SECOND AM. COMPLAINT
CASE NO. 4:22-cv-01470-YGR

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

<u>**MEMORANDUM OF POINTS AND AUTHORITIES**</u>

## I.      INTRODUCTION

Plaintiffs' First Amended Complaint ("FAC") contained four categories of alleged misstatements, expanding dramatically on the original complaint in search of a theory that could survive dismissal.  It failed:  This Court dismissed their kitchen-sink attempt to plead fraud by hindsight.  Now, Plaintiffs' Second Amended Complaint ("SAC") abandons their primary set of allegations based on antitrust claims against Google and adds ten new, never-before-challenged statements to the remaining three sets, ensuring that the SAC still spans more than 300 paragraphs.  As this Court observed, however, "just because a complaint is long doesn't mean that it's substantive."  Hr'g Tr. 45:6-8 (Dkt. 76).  That is as true now as it was then.

Plaintiffs' amended allegations about the impact of the iOS changes fail for the same reason as before:  Meta warned investors about the major challenges ahead and kept them apprised of the rapidly evolving situation.  Meta cautioned from the start that the iOS changes would be "very problematic," stated after Q2 that they were already proving "very challenging," and declared after Q3 that they had been "fundamentally profound."  Nothing else Defendants said was remotely false or misleading.  And the market responded exactly as one would expect:  After *each* of the iOS challenged statements, in conjunction with allegedly "weak" earnings for Q2 and Q3, Meta's stock dropped.  That is how securities markets are supposed to work, not an indication of fraud.

Plaintiffs' Reels allegations are similarly flawed.  All along, Meta said its long-term strategy for Reels was to follow the same "playbook" it had used in prior product launches:  Grow engagement first, and only later start to monetize.  No reasonable investor could have understood Meta to be saying that Reels, despite being in the nascent stages of monetization on Instagram (and nowhere near even that point on Facebook), was already profitable.  Meta explained that, while some initial signs were encouraging, Reels was still monetizing at lower rates than other products—and could cannibalize existing revenue streams.  Here too, in the wake of the challenged statements, Meta's stock responded as one would expect:  It dropped.  Again, that is not fraud.

Plaintiffs' claims about Sheryl Sandberg fare even worse.  Plaintiffs try to build out their

LATHAM & WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

1

DEFS.' MOT. TO DISMISS
SECOND AM. COMPLAINT
CASE NO. 4:22-cv-01470-YGR

1    sparse allegations of misstated compensation figures primarily by pointing to acknowledgments in

2    her book, <u>Option B</u>, in which Sandberg thanked several coworkers for being "generous with their

3    time" and showing "compassion" during the writing process.  But that expression of gratitude

4    came in a book published *in April 2017*—long before even the earliest compensation period

5    covered by the challenged proxy statements—and cannot seriously be countenanced as an

6    admission that Meta employees were doing extracurricular projects for Sandberg while on the

7    clock in later years.  As for the rest of their allegations, Plaintiffs have done essentially nothing,

8    apart from distorting a denial of wrongdoing from Sandberg's spokesperson.

9        In addition, Plaintiffs still lack any coherent scienter theory.  It would make no sense for

10   Meta to conceal known negative effects from the iOS changes or Reels, only to come clean shortly

11   afterwards, while emphasizing risks and ongoing challenges in the interim.  And the notion that

12   Defendants consciously deceived investors because they did not factor unproven rumors about

13   mainly pre-2018 conduct into 2018-2021 compensation disclosures makes even less sense.  Across

14   the board, the innocent account is more compelling than Plaintiffs' confounding story.

15       The Court should now dismiss this case with prejudice.

16   **II.    FACTUAL BACKGROUND**

17       **A.    The iOS Privacy Changes**

18       The SAC now leads with allegations about changes Apple made to privacy settings on iOS,

19   the operating system that runs the iPhone.  But before and after the iOS changes were "rolled out

20   in late April 2021," SAC ¶ 62, Meta warned that they would be "very problematic," Ex. 5 at 15—

21   and kept investors apprised of the rapidly evolving situation as it developed.[1]

22   **Q4 2020.**  During its Q4 2020 earnings call on January 27, 2021, Meta warned that the iOS

23   changes would cause "significant" business "headwinds in 2021," with an "increasing impact

24   through the year."  *Id.* at 9, 12.  Specifically, Meta explained in its Form 10-K that Apple's changes

25   "will reduce [our] ability to target and measure advertising, which we expect will in turn reduce

26   the budgets marketers are willing to commit to us and other advertising platforms."  Ex. 7 at 17.

27

28   _____

[1]  Unless otherwise noted, all exhibits are to the Blunschi declaration, filed herewith.

LATHAM&WATKINS^LLP
ATTORNEYS AT LAW
SAN FRANCISCO

2

DEFS.' MOT. TO DISMISS
SECOND AM. COMPLAINT
CASE NO. 4:22-cv-01470-YGR

1    Wehner further cautioned that "some advertisers and businesses" will "decide that it's not cost-

2    effective to advertise" on Meta's platforms and "drop out" altogether.  Ex. 6 at 12.  Given the

3    "uncertain" future, Meta did not provide numerical revenue guidance for the future.  Ex. 4 at 2.

4        **Q1 2021.**  On March 2, 2021, at an investor conference, Wehner again warned that Meta

5    "expect[ed]" the iOS changes to cause "an impact to [Meta's] business and to impact our growth

6    rates."  SAC ¶ 71.  He also voiced uncertainty about the iOS changes' "relative effect" on various

7    competitors "in the [mobile advertising] ecosystem," which was "not clear yet."  *Id.*  Then, within

8    days of the iOS changes' April release, Meta released Q1 earnings data.  Ex. 10 at 1-2.  Meta's

9    April 28, 2021, Form 10-Q again warned that the iOS changes "will limit our ability to target and

10   measure ads effectively" and "impact monetization."  Ex. 13 at 53.

11       On Meta's Q1 earnings call, Sandberg again emphasized the "challenges coming."  Ex. 11

12   at 5.  Wehner echoed that sentiment, saying that Meta "continue[d] to expect" that the iOS changes

13   "will be a headwind for the remainder of the year."  *Id.* at 11.  While Meta hoped the impact would

14   be "manageable," given "encouraging progress" on mitigation, the company "continue[d] to be

15   concerned" about these "challenges."  *Id.*  To avoid setting off-the-mark market expectations, Meta

16   again did not specify an expected range for future revenue following Q1.  Ex. 10 at 2.

17       **Q2 2021.**  On Meta's July 28, 2021 Q2 earnings call, Wehner warned that, while the iOS

18   changes were "not fully rolled out," their "impact" was "in line with our expectations."  Ex. 16 at

19   20 (**Statement 4a**).[2]  That is, they were already "very challenging," *id.* at 14, and had caused

20   "deceleration" of Meta's growth "rate[s]," Ex. 17 at 7.  Li added that Meta's responsive steps had

21   "mitigated some of the impact" but "obviously" were "not as performant as [the] real-time data."

22   *Id.* at 8.  When asked if they were "suggesting that [Meta was] not seeing any material impact,"

23   Wehner answered "No."—and Li reiterated, "No not at all."  *Id.* at 6.

24       Meta stressed that the Q2 impact was just the start.  Wehner "expect[ed]" the iOS changes

25   to "have a more significant impact in [Q3]."  Ex. 16 at 8.  Meta's Q2 Form 10-Q reiterated that the

26   iOS changes "have limited our ability to target and measure the effectiveness of ads on our

27   ─────────────

28   [2] Plaintiffs' statement chart identifies only categories of statements.  *See* Dkt. 81-1.  Defendants
     have filed an updated chart that uses letters to identify individual statements within each category.

platform and negatively impacted our advertising revenue."  SAC ¶ 235.  And it warned that, "if we are unable to mitigate these developments as they take further effect in the future, our targeting and measurement capabilities will be materially and adversely affected, which would in turn significantly impact our future advertising revenue growth."  *Id.* (**Statement 1a**) (emphasis omitted).  While Meta did not specify an expected range for future revenues, it "expect[ed] year-over-year total revenue growth rates to decelerate significantly," due largely to iOS "headwinds."  Ex. 15 at 2.  Given these and other developments, along with allegedly "weak financial results," Meta's stock price fell by 4.01% on July 29.  SAC ¶¶ 263-64.

**Q3 2021.**  As Meta had predicted, and as it confirmed at the end of Q3, the "worst of the iOS headwinds manifested in Q3."  Ex. 22 at 8.  Wehner called them "fundamentally profound."  *Id.* at 7.  Li noted that the Q3 impact was "really on the higher end of what we had expected."  *Id.* at 2 (**Statement 4e**).  Sandberg added that, "if it wasn't for [iOS], we would have seen positive quarter-over-quarter revenue growth."  Ex. 21 at 5.  And since adoption of the iOS changes "hit critical mass in Q3," "the accuracy of our ads targeting decreased," and "measuring [ad] outcomes became" even "more difficult."  *Id.*  "On measurement," Meta was "making good progress fixing" some problems—e.g., "underreporting iOS web conversions"—but Meta had to "continue to work on this into 2022."  *Id.*  "Targeting," Sandberg warned, was an even "longer-term challenge," since Meta had to "rebuild [its] targeting and optimization systems to work with less data."  *Id.* at 10.  In short, Wehner explained, Meta had "expected [the iOS changes] to be disruptive," and they "clearly ha[d] been."  Ex. 22 at 2.  Future "uncertainty" persisted, too, given how the iOS changes might "intersect" with the "holiday season," Ex. 21 at 14, how "advertisers would react," Ex. 22 at 2, and how well Meta could "improve" its mitigation efforts, *id.* at 6-7.

Consistent with these warnings, Meta's Q3 Form 10-Q reiterated its risk disclosure about the iOS changes' impact and potential for future harm.  Ex. 23 at 56.  And with the benefit of more information gained during Q3, Meta projected that Q4 revenues would be "$31.5 billion to $34 billion."  Ex. 20 at 2.  Afterwards, and amidst another round of allegedly "weak financial results" for Q3, Meta's stock fell by 3.92%.  SAC ¶¶ 265-66.

**Q4 2021.**  On February 2, 2022, Meta reported $33.67 billion in revenue for Q4, a figure

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

DEFS.' MOT. TO DISMISS
SECOND AM. COMPLAINT
CASE NO. 4:22-cv-01470-YGR

near the top of its projected range. Ex. 24 at 1. Even so, Li cautioned, "there [we]re still significant targeting and measurement headwinds" from the iOS changes. Ex. 26 at 4. Wehner added that "those headwinds will be particularly strong" in 2022. *Id.* at 10. And Sandberg said that "we expect the overall targeting and measurement headwinds to moderately increase" going forward. Ex. 25 at 5. Further, while Meta "did succeed in closing approximately half" of the "underreporting gap" it had previously identified, it turned out that those efforts affected only "a very small slice" of "the overall revenue landscape" during Q4. Ex. 26 at 4. All told, Wehner forecasted that "the impact of iOS overall as a headwind" for "2022" would be "$10 billion." Ex. 25 at 10. But there was even more significant news: Meta also reported that—for the first time in nearly two decades—its number of daily active users had declined from a prior quarter. Ex. 27 at 13. The next day, Meta's stock price fell by 26.39%. SAC ¶ 222.

### B.    The Reels Introduction

The SAC also renews allegations based on Reels, the short-form video product that Meta initially launched on Instagram (but not Facebook) on August 5, 2020—without any ads. SAC ¶¶ 190-91. According to Plaintiffs, Reels was Meta's answer to the "rise of TikTok," *id.* ¶ 189, a rival app, *id.* ¶ 186. Meta introduced Reels "to compete effectively" with "TikTok's highly engaging format." *Id.* ¶ 189. Here too, Meta warned about the risks associated with Reels and kept investors apprised of the progress of the nascent product launch.

**Q4 2020.** On Meta's January 27, 2021 Q4 earnings call, Sandberg outlined Meta's long-term strategy for Reels. Ex. 5 at 18-19. Meta, she explained, has a playbook: "[W]e're going to follow the same pattern we followed on other things like Stories." *Id.* "We launch a consumer product." *Id.* "We make sure there's product market fit, and people are using it." *Id.* "Then we launch an ad product." *Id.* And even afterwards, she continued, "we work very diligently" on "improv[ing]" and "scal[ing]" the ads strategy over time. *Id.*

As Meta's Form 10-K cautioned, however, this familiar approach means that Meta often "make[s] product and investment decisions that may not prioritize short-term financial results." Ex. 7 at 18. For example, Meta "may introduce new features or other changes to existing products" that "attract users away from" older products with "more proven means of monetization." *Id.* And

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

DEFS.' MOT. TO DISMISS
SECOND AM. COMPLAINT
CASE NO. 4:22-cv-01470-YGR

1   "from time to time, these efforts have reduced, and may in the future reduce, engagement with one

2   or more products and services in favor of other products or services that we monetize less

3   successfully or that are not growing as quickly," which in turn "may adversely affect our business

4   and results of operations and may not produce the long-term benefits that we expect." *Id.*

5      **Q1 2021.**  On March 2, 2021, Sandberg reiterated that Meta was taking its widely known,

6   long-term approach to Reels.  Ex. 8 at 9.  This oft-tread "path to monetize" a new product, she

7   warned, is "always hard work," never immediate or certain.  *Id.*  Then, after Q1 but before Reels

8   ads launched on Instagram, Wehner detailed monetization challenges with Reels.  Ex. 11 at 10-11.

9   Yes, Reels was popular:  It was "seeing really strong engagement" on Instagram.  *Id.*  But "video"

10  products have "relatively fewer impressions on a time spent basis"—i.e., there are less frequent

11  opportunities to show users ads.  *Id.*  Meta hoped to rely on its past "experience" in "trying to work

12  to close th[is] gap" in impression rates.  Ex. 12 at 14.  For now, though, Wehner warned that ads-

13  free Reels was competing not only with "others['] products," like TikTok, but also Meta's "own

14  products," like News Feed.  *Id.*  That dynamic mirrored what Meta's Q1 Form 10-Q reiterated

15  often happened with new products more generally.  Ex. 13 at 54.

16     **Q2 2021.**  "On June 16, 2021," after nearly a year of gaining traction on Instagram, "Meta

17  launched ads on Reels on Instagram."  SAC ¶ 191.  Six weeks later, on Meta's Q2 earnings call,

18  Zuckerberg emphasized the importance of taking the long view with Reels.  He explained that,

19  like it or not, video "is becoming the primary way that people use our products and express

20  themselves."  Ex. 16 at 1.  Reels was "already the largest contributor to engagement growth on

21  Instagram."  *Id.*  And since Meta had just "begun to make ads available," Wehner characterized

22  Reels as an investment, saying, "I think Reels is a really significant future opportunity." *Id.* at 13.

23     That said, Sandberg warned that full Reels monetization would not be immediate, given

24  what "[o]ur process has been" with prior product launches. *Id.* at 18.  Sandberg added that "we're

25  seeing very strong growth in video monetization" video products like Reels, and that "we think

26  we're continually getting better at monetizing [them]." *Id.* at 23.  But Reels was "still monetizing

27  at lower rates."  *Id.*  Simply put, as Wehner explained, "It's still very early on the advertising front,

28  but we think this should be a good ad format."  Ex. 17 at 2 (**Statement 6b**).  Meta's Q2 Form 10-Q

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

6

DEFS.' MOT. TO DISMISS
SECOND AM. COMPLAINT
CASE NO. 4:22-cv-01470-YGR

1    reiterated the risk disclosure about product launches generally.  Ex. 18 at 55.

2        **Q3 2021.**  At the tail end of Q3, on September 29, 2021, Meta launched an ads-free version

3    of Reels on Facebook.  SAC ¶ 48.  A few weeks later, on Meta's Q3 earnings call, Zuckerberg

4    reiterated that "Reels is already the primary driver of engagement growth on Instagram."  Ex. 21

5    at 3.  Given those early indications, he said, "I think that there's a huge amount of potential ahead,"

6    which made him "optimistic" about Reels' future.  *Id.*  Still, he cautioned that "we're still closer

7    to the beginning of that journey than we are to [Reels'] maturity" as a fully monetized product.  *Id.*

8    at 13.  Wehner agreed that Reels had "been a bright spot for Instagram," with "good growth" on

9    engagement.  *Id.* at 10.  But he too warned that "we're just starting to roll out ads in Instagram"

10   and "haven't gotten to a monetization point with Reels on Facebook."  *Id.*  Further, Wehner advised

11   that, "[w]henever we launch new experiences," "you're always going to see some amount of

12   shifting of people's time and attention to the new areas."  *Id.* at 18.  That said, "we do think" Reels

13   is worth "investing" in because it can "drive incremental engagement."  *Id.*  Meta's Q3 Form 10-Q

14   reiterated the risk disclosure about product launches generally.  Ex. 23 at 57.

15       **Q4 2021.**  On Meta's February 2, 2022 Q4 earnings call, Zuckerberg said that "we're in

16   the middle of a transition" towards "short-form video like Reels," cautioning that, "as more activity

17   shifts towards [Reels], we're replacing some time in News Feed and other higher monetizing

18   surfaces."  Ex. 25 at 2.  But he was "confident that leaning harder into these trends is the right

19   short-term tradeoff to make in order to get long-term gains."  *Id.*  Sandberg reiterated that "Reels

20   monetizes at a lower rate than [News] Feed and Stories"—and agreed this was "a transition."  *Id.*

21   at 5.  But she noted that Meta has "made successful transitions before," giving it "a playbook"

22   when it comes to "monetizing" new products.  *Id.*  While also "confident in our ability to monetize

23   over time," Wehner reminded investors that, "right now, there's relatively few ads" on Reels.  *Id.*

24   at 10.  Looking ahead, Zuckerberg acknowledged that Reels is "going to monetize at a somewhat

25   lower rate."  *Id.* at 19.  But he said, "I think this is clearly the right strategy," because Reels "is

26   what people want."  *Id.*  So Meta's just had "to roll it out as quickly and as well as we can."  *Id.*

27       **C.    Sandberg's Alleged Conduct**

28       Plaintiffs' final set of allegations concerns alleged misstatements of Sandberg's annual

DEFS.' MOT. TO DISMISS
SECOND AM. COMPLAINT
CASE NO. 4:22-cv-01470-YGR

compensation. Plaintiffs say that proxy statements from April 9, 2021, and April 8, 2022, disclosing her non-salary compensation for the years 2018 through 2021 should have accounted for allegedly improper personal assistance. SAC ¶ 231 (**Statement 3a**); ¶ 247 (**Statement 3b**). Plaintiffs claim the assistance came to light in two news articles, both of which focused on allegations regarding pre-2018 conduct. *Id.* ¶¶ 273, 277.

The first article, from April 21, 2022, reported that Sandberg was "facing internal scrutiny over two occasions in which she [allegedly] pressed a U.K. tabloid to shelve" an unflattering (and later recanted) accusation against her ex-boyfriend, Bobby Kotick. Ex. 36 at 1. The article claimed that she "[w]ork[ed] with a team that included [Meta] employees as well as paid outside advisers" in 2016. *Id.* These "public-relations advisers" worried that the "story would reflect negatively on her reputation." *Id.* The article also reported that Sandberg herself had "contacted" the Daily Mail in 2019—and that Meta had "started a review of [her] actions" in fall 2021. *Id.* The story was sourced from unnamed "people with knowledge of the matter." *Id.* at 2. A month later, Sandberg "informed Meta of her decision to resign from her position as [COO]." SAC ¶ 275.

The second article, from June 10, 2022, reported that Meta was also reviewing alleged "work [Meta] employees did to support [Sandberg's] foundation" and "her second book," Option B, "which focused on her grieving process following the sudden death of her [first] husband" in 2015. Ex. 37 at 1. The article also relayed allegations about Sandberg's "coming wedding." *Id.* at 1-2. But it noted that her spokeswoman had denied them, stating: "Sheryl did not inappropriately use company resources in connection with the planning of her wedding." *Id.* at 2. The article confirmed that Meta's investigation "played no role in [Sandberg's] decision" to resign as COO (but stay on as a director). *Id.* It too relied on anonymous "people familiar with the matter." *Id.*

## III.   PROCEDURAL HISTORY

### A.   Plaintiffs' FAC

Plaintiffs' FAC was a scattershot salvo of four separate complaints in one. The FAC's primary set of allegations accused Meta of misleading investors about a purportedly anticompetitive contract. FAC ¶¶ 61-124 (Dkt. 55). The FAC also faulted Meta for supposedly:

1   (i) implying the iOS changes had not yet materially impacted Meta during Q2 and Q3;

2   (ii) describing Reels' then-existing impact in a misleading way; and (iii) omitting personal

3   assistance from Sandberg's compensation figures in two proxy statements.  *Id.* ¶¶ 125-221.

4   Plaintiffs dropped their claims against Li, and the remaining Defendants moved to dismiss.  The

5   bulk of the dispute boiled down to four statements repeated on a quarterly or annual basis:

6   - **Antitrust Allegations:**  "We face significant competition in every aspect of our
    business," including, "for example, Google, Apple, [and others]."  *E.g.*, FAC ¶ 223.

7

8   - **iOS Allegations:**  Revenue was "negatively impacted" by "targeting and measurement
    challenges associated with iOS changes"—and, "[i]f we are unable to mitigate these
9   developments as they take further effect in the future, our targeting and measurement
    capabilities will be materially and adversely affected, which would in turn significantly
10  impact our future advertising revenue growth."  *E.g.*, FAC ¶ 227.

11  - **Reels Allegations:**  "We also may introduce new [products] that attract users away"
    from others with "more proven means of monetization"—and "from time to time these
12  efforts have reduced, and may in the future reduce, engagement with" other products,
    which "may adversely affect our business and results of operations."  *E.g.*, FAC ¶ 247.
13

14  - **Sandberg Allegations:**  "All Other Compensation" given to Sandberg constituted
    "costs related to personal security" and "personal usage of private aircraft"—with no
15  mention of allegedly improper personal assistance.  *E.g.*, FAC ¶ 231.

16  On July 18, 2023, this Court held a hearing on Defendants' motion to dismiss the FAC.

17      **B.      The Court's Dismissal Of The FAC**

18      After spending "an hour and 26 minutes going through all of the problems with [the FAC],"

19  the Court ruled from the bench.  The Court granted Defendants' motion to dismiss with leave to

20  amend, as well as their unopposed request for judicial notice.  Hr'g Tr. 37:19-38:2, 73:16-23.

21      On Plaintiffs' antitrust allegations, the Court held that "[t]he word 'significant' cannot be,

22  in and of itself, sufficient for a securities violation," which foreclosed Plaintiffs' challenge to

23  Meta's statement about facing "significant competition."  *Id.* at 12:6-13:24.  The Court concluded

24  that Plaintiffs had not "allege[d] sufficient facts to plausibly state antitrust issues."  *Id.* at 12:3-4.

25      On the iOS changes, Plaintiffs admitted that their "complaint" was that Meta "didn't use

26  the term 'significant' or 'materially'" in the retrospective portion of its iOS risk disclosures.  *Id.* at

27  36:6-12.  And they conceded that they did not "take issue with the accuracy of [Meta's earnings]

28  data."  *Id.* at 39:9-11.  As a result, this Court struggled to see "how [there could be] an actionable

LATHAM&WATKINS™
ATTORNEYS AT LAW
SAN FRANCISCO

9

DEFS.' MOT. TO DISMISS
SECOND AM. COMPLAINT
CASE NO. 4:22-cv-01470-YGR

1    misrepresentation just because [Meta didn't] use the word 'significant' or 'material.'" *Id.* at

2    39:12-15.  The Court also faulted Plaintiffs for "not [having] described" their confidential witness

3    "with sufficient detail," *id.* at 40:7-9, and for "suggest[ing]" that their purported corrective

4    disclosure—Wehner's projection of a $10 billion headwind in 2022—was "backward-looking

5    when it's not," *id.* at 46:24-47:3.

6          On Reels, the Court "concur[red]" that, through Q3 2021, "everybody in the world knew

7    [Meta's] growth strategy [wa]s to drive folks to Reels," even though Meta had placed "no ads

8    whatsoever on Reels on Facebook and only recently started ads on Instagram." *Id.* at 54:19-55:1.

9    The Court also noted that "generic" risk disclosures about product launches did not "open[] the

10   door" to a duty to give real-time reports on Reels' early effects on earnings. *Id.* at 58:10-20.

11         Finally, the Court found that Plaintiffs gave "[n]o details" about the improper assistance

12   Sandberg allegedly received.  *Id.* at 71:21-24.  Their news articles also cited "confidential

13   witnesses" who were not inherently "acceptable." *Id.* at 70:16-20.  And regardless, the articles

14   were "talking about *an investigation*" into Sandberg's conduct. *Id.* at 69:21-25 (emphasis added).

15   Plaintiffs' Section 14(a) claims also fail because there was no "essential link" between the proxies

16   and Plaintiffs' losses—both because the proxies "concerned Sandberg's election as a director, not

17   [COO]," and because the vote on compensation was "nonbinding." *Id.* at 62:2-14, 63:14-17.

18         Three days later, the Court incorporated and "reiterated" in a written dismissal order the

19   "reasons stated on the record at" the hearing.  *See* Dkt. 74 ("FAC Order") at 1.

20         **C.**     **Plaintiffs' SAC**

21         The SAC drops Plaintiffs' antitrust allegations but still challenges statements related to

22   iOS, Reels, and Sandberg's compensation—including some statements about iOS and Reels that

23   Plaintiffs never challenged before.  It spans 343 paragraphs, complete with a 10-page report by an

24   anonymous "certified public accountant."  SAC ¶ 112; *see* SAC Ex. B.[3]  And it brings claims

---

[3] This "expert report[]" offering a convoluted opinion on a series of self-serving assumptions was "generated for purposes of prosecuting this litigation" and should therefore be struck.  *In re Herbalife, Ltd. Sec. Litig.*, 2015 WL 12734014, at *1 (C.D. Cal. July 28, 2015).  Plaintiffs' counsel know better, having been reprimanded for filing a similarly "procedurally improper" report in the past.  *See Yuan v. Facebook, Inc.*, 2021 WL 4503105, at *2 (N.D. Cal. Sept. 30, 2021).

1   against Li once again, despite Plaintiffs' previous decision to voluntarily dismiss her from this

2   lawsuit.  SAC ¶ 28.

3       Besides challenging the iOS risk disclosures, *id.* ¶¶ 235, 243 (**Statements 1a & 1b**),

4   Plaintiffs attack statements that the Q2 impact had "been in line with our expectations," *id.* ¶ 227

5   (**Statements 4a & 4b**); *see id.* ¶ 231 (**Statements 4c & 4d**).  They similarly target Li's October 25,

6   2021, statement that the Q3 impact was "really on the higher end of what we had expected."  *Id.*

7   ¶ 241 (**Statement 4e**).  Next, Plaintiffs challenge three statements about mitigation efforts: (1) Li's

8   Q2 description of "primary buckets of mitigations," *id.* ¶ 231 (**Statement 5a**); (2) Sandberg's Q3

9   remark that "measuring" and "targeting" were the "two big [iOS] challenges," and that, "[o]n

10  measurement, we think we can address more than half of that underreporting by the end of the

11  year," *id.* ¶ 239 (**Statement 5c**); and (3) Li's Q3 statement that, "I think the underreporting of web

12  conversions has really been a bigger issue than we expected."  *Id.* ¶ 241 (**Statement 5d**).[4]

13      As for Reels, Plaintiffs now attack more than just risk disclosures about product launches

14  generally.  *See id.* ¶ 237 (**Statement 2a**); *id.* ¶ 245 (**Statement 2b**).  They challenge Sandberg's

15  Q2 remark that "we're seeing very strong growth in video monetization" on "Reels," while noting

16  that it was "still monetizing at lower rates."  *Id.* ¶ 229 (**Statement 6a**).  And they attack Wehner's

17  Q2 statements that "Reels is going well" and that "we think this should be a good ad format,"

18  despite his warning that "[i]t's still very early on the advertising front."  *Id.* ¶ 233 (**Statement 6b**).

19      Plaintiffs' claims regarding Sandberg's alleged conduct challenge the same two proxy

20  statements as before.  *Id.* ¶ 225 (**Statement 3a**); *id.* ¶ 247 (**Statement 3b**).

21  **IV.   LEGAL STANDARD**

22      Plaintiffs must satisfy "demanding pleading requirements."  *In re Rigel Pharms., Inc. Sec.*

23  *Litig.*, 697 F.3d 869, 876 (9th Cir. 2012).  They must plead their claims with "particularity," Fed.

24  R. Civ. P. 9(b), giving precise allegations about the "who, what, when, where, and how."  *Weston*

25  *Family P'ship LLLP v. Twitter, Inc.*, 29 F.4th 611, 619 (9th Cir. 2022).  They must "specify each

26  statement alleged to have been misleading" and the "reasons why."  15 U.S.C. § 78u-4(b)(1)(B).

27  _____

28  [4]  **Statement 5b**, which is the same Q2 statement from Wehner as **Statement 4d**, seems to have
    been mistakenly copy-and-pasted into Category 5 on Plaintiffs' chart.  *See* Dkt. 81-1 at 7.

DEFS.' MOT. TO DISMISS
SECOND AM. COMPLAINT
CASE NO. 4:22-cv-01470-YGR

1    And their allegations must "giv[e] rise to a strong inference" of scienter.  *Id.* § 78u-4(b)(2)(A).

2    **V.    ARGUMENT**

3         For all three remaining sets of allegations, Plaintiffs *still* have not adequately pled an

4    actionable misstatement or loss causation—or both.  And, as before, there is no strong inference

5    of scienter.  Each of these shortcomings independently justifies dismissal with prejudice.

6         **A.    The Allegations About The iOS Changes Must Be Dismissed Again**

7         Plaintiffs' iOS allegations remain meritless.  No challenged statement was demonstrably

8    "false at the time" it was made, *Ronconi v. Larkin*, 253 F.3d 423, 431 (9th Cir. 2001), or otherwise

9    "affirmatively create[d] an impression of a state of affairs that differ[ed] in a material way from

10   the one that actually exist[ed]," *Brody v. Transitional Hosps. Corp.*, 280 F.3d 997, 1006 (9th Cir.

11   2002).  Nor have Plaintiffs shown that any challenged statement, "as opposed to some other fact,

12   foreseeably caused [their] loss."  *Lloyd v. CVB Fin. Corp.*, 811 F.3d 1200, 1210 (9th Cir. 2016).

13        **1.    The New Challenged Statements Were Not False Or Misleading**

14        Plaintiffs challenge two new groups of iOS-related statements.  The first are remarks by

15   various Defendants saying, in substance, that the impact from the iOS changes during Q2 and Q3

16   was "in line" with Meta's expectations.  The second discussed Meta's ongoing efforts to mitigate

17   the impact of the iOS changes to the extent possible.  Neither is false or misleading.

18        **"In Line" With Expectations (Statements 4a, 4b, 4c, 4d & 4e)**.  Most of the new iOS

19   challenged statements concern Wehner and Li's July 28, 2021, remarks that the Q2 "impact" from

20   the iOS changes "ha[d] been in line with our expectations."  *E.g.*, SAC ¶ 227 **(Statement 4b)**.

21   "Nothing about [these statements] would give a reasonable investor the impression that [the iOS

22   changes' impact] was different than it was in reality."  *Police Ret. Sys. of St. Louis v. Intuitive*

23   *Surgical, Inc.*, 759 F.3d 1051, 1061 (9th Cir. 2014).  Meta had prudently *declined* to provide

24   numerical guidance for Q2, given the uncertain and challenging environment.  Ex. 10 at 2.  Meta

25   expected that the iOS changes would be "very problematic," Ex. 5 at 15, and would cause

26   "significant" business "headwinds in 2021," with an "increasing impact through the year," *id.* at

27   9, 12.  After Q2, Defendants warned that the iOS changes had contributed to "deceleration" of

28   Meta's growth "rate[s]" during Q2, Ex. 17 at 7, and were already "very challenging," Ex. 16 at 14.

LATHAM&WATKINS<sub>LLP</sub>
ATTORNEYS AT LAW
SAN FRANCISCO

12

DEFS.' MOT. TO DISMISS
SECOND AM. COMPLAINT
CASE NO. 4:22-cv-01470-YGR

1   Meta also accurately disclosed, in Plaintiffs' own telling, "weak financial results" for the quarter.

2   SAC ¶ 263.  The market reacted accordingly:  Meta's stock price fell by 4.01% on July 29.  *Id.*

3   ¶ 264.  "That is precisely how securities markets are supposed to work," not fraud.  *Greenberg v.*

4   *Sunrun Inc.*, 233 F. Supp. 3d 764, 772 (N.D. Cal. 2017) (observing that investors use "publicly

5   available information to assess th[e] risk" of investments for themselves).

6   So too for Li's October 25, 2021, statement that the iOS changes' Q3 impact was "really

7   on the higher end of what we had expected."  SAC ¶ 241 **(Statement 4e)**.  What Meta had expected

8   for Q3—and disclosed to investors—was that the Q3 impact would be even "more significant" as

9   "compared to [Q2]," Ex. 16 at 8, and that Meta's growth rates would "decelerate significantly,"

10  Ex. 15 at 2.  After Q3, Meta candidly told investors that the impact had indeed been "fundamentally

11  profound," Ex. 22 at 7, "clearly" disruptive, *id.* at 2, and even "more difficult" than in Q2,

12  Ex. 21 at 5.  Li's statement thus underscored for investors that the negative effects that Meta had

13  previously warned about had materialized—and were on the more severe end of Meta's "range of

14  expected impact[s]."  SAC ¶ 241.  Once again, Meta's stock dropped in response to this realization

15  of previously disclosed expectations, along with purportedly "weak financial results" that

16  Plaintiffs concede were accurately reported.  *Id.* ¶¶ 265-66.  That is not fraud.

17  Plaintiffs try to cobble together a falsity theory in two ways, but both fail.  First, they harp

18  on the allegation that Meta "had conducted internal studies calculating the impact" of the iOS

19  changes—without any details of what those studies purportedly showed.  *Id.* ¶ 121.  But Meta had

20  no duty to "reveal [any] internal projections" trying to quantify the iOS changes' Q2 and Q3

21  impact, *In re Oracle Corp. Sec. Litig.*, 627 F.3d 376, 391 (9th Cir. 2010), much less the "projected

22  impact" that FE3 alleges Meta calculated before the iOS changes were released, SAC ¶ 108.  That

23  is because the securities laws prohibit only statements that *themselves* "paint a misleading picture."

24  *Twitter*, 29 F.4th at 615.  Defendants' statements were not misleading:  They had warned that the

25  iOS changes would be bad, and then confirmed later that the iOS changes had, in fact, been bad.

26  Second, Plaintiffs seize on Wehner's Q1 statement that "we think" the impact "will be

27  manageable."  SAC ¶ 73.  They claim this remark assured investors that the anticipated impact

28  was "not material," *id.* ¶ 78, so the allegedly material impacts after Q2 and Q3 were "not 'in line'

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

13

DEFS.' MOT. TO DISMISS
SECOND AM. COMPLAINT
CASE NO. 4:22-cv-01470-YGR

1    with Wehner's expectation that the changes were 'manageable.'" *E.g.*, *id.* ¶¶ 228, 232.  Wrong

2    again.  For starters, the word "manageable" is too "imprecise" to make subsequent statements

3    actionable.  *Twitter*, 29 F.4th at 621.  And since Wehner had said "we think" the impact "will be

4    manageable," SAC ¶ 73, any later endorsement of that "subjective and uncertain assessment[]" is

5    *also* an inactionable opinion, *Omnicare, Inc. v. Laborers Dist. Council Constr. Ind. Pension Fund*,

6    575 U.S. 175, 186 (2015).  Furthermore, standing by a belief that the impact would ultimately be

7    "manageable" does *not* imply that it was "immaterial."  Those words are not synonyms.

8         At their core, the in-line-with-expectations statements cannot be understood "to mean  the

9    [iOS changes' impact] was benign."  *Thant v. Karyopharm Therapeutics Inc.*, 43 F.4th 214, 223

10   (1st Cir. 2022).  In the very Q4 statement that Plaintiffs cite as a corrective disclosure, Wehner

11   remarked once again that the impact to date "was in line with our expectations."  Ex. 25 at 10.

12   That was true, since Meta's expectations had been grim all along:  Meta warned from the start that

13   the iOS changes would be "very problematic," Ex. 5 at 15, stated after Q2 that they were already

14   proving "very challenging," Ex. 16 at 14, and declared after Q3 that they had been "fundamentally

15   profound," Ex. 22 at 7.  Plaintiffs' claim that "Defendants had never previously characterized the

16   iOS 14 headwinds as 'big'" until Q4, SAC ¶ 113, must be rejected, as it is "contradicted by [the

17   very] documents referred to in the [SAC]."  *Manzarek v. St. Paul Fire & Marine Ins. Co.*, 519 F.3d

18   1025, 1030-31 (9th Cir. 2008).  And their allegations that confidential witnesses "confirmed that

19   Apple's iOS privacy changes had materially impacted Meta's business and revenues by Q2" add

20   nothing.  *See* SAC ¶¶ 107-112.  "No investor, in the face of [Meta's] substantive disclosures, could

21   reasonably conclude" that Meta had "surmounted all obstacles" caused by the iOS changes.  *In re*

22   *Convergent Techs. Sec. Litig.*, 948 F.2d 507, 516 (9th Cir. 1991).

23        **Mitigation Efforts (Statements 5a, 5c & 5d).**  Plaintiffs also challenge three statements

24   related to Meta's attempts to mitigate the effects of the iOS changes.  They first challenge Li's Q2

25   statement that, "I think in the landscape we're at now, effectively we're looking at the sort of

26   primary buckets of mitigations."  SAC ¶ 231 **(Statement 5a)**.  Plaintiffs claim this assertion "failed

27   to tell the whole truth" because the mitigations Li mentioned "were not preventing the iOS privacy

28   changes from having a severely adverse impact."  *Id.* ¶ 232.  But Li's statement, prefaced with

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

14

DEFS.' MOT. TO DISMISS
SECOND AM. COMPLAINT
CASE NO. 4:22-cv-01470-YGR

"I think," was an inactionable opinion about what she saw as the two main mitigations that could help blunt some of the impact. *Omnicare*, 575 U.S. at 186. Worse, Plaintiffs' gripe that Li didn't "tell the 'whole truth'" misunderstands the law. SAC ¶ 232. Again, Section 10(b) forbids only misleading statements; it does not require "complete disclosure of all material information whenever a company speaks on a particular topic." *Twitter*, 29 F.4th at 615. Li's remark could not have misled anyone: She explicitly cautioned that mitigation measures were "obviously . . . not as performant as [the] real-time data" taken away by the iOS changes. Ex. 17 at 8.

Plaintiffs next challenge—and brazenly mischaracterize—statements that Sandberg and Li made during Meta's Q3 earnings calls. Li said, "I think the underreporting of web conversions has really been a bigger issue than we expected." SAC ¶ 241 (**Statement 5d**). Noting that this "underreporting" issue was one of the "measurement" challenges posed by iOS (as distinct from "targeting" problems), Sandberg said, "we think we can address more than half of that underreporting by the end of [2021]." *Id.* ¶ 239 (**Statement 5c**). Plaintiffs claim these statements "gave the misleading impression that the iOS impact largely concerned Meta's underreporting of web conversions" and that Meta "could [thus] effectively mitigate the impact of the iOS changes to make them immaterial." *Id.* ¶ 242; *see also id.* ¶ 240 (similar). But both remarks are inactionable opinions. And regardless, neither implied that fixing underreporting would be a cure-all. Li merely stated her view that underreporting was a "bigger" issue than originally thought; not that it was the biggest iOS-related problem. *Id.* ¶ 241. Sandberg warned that fixing underreporting would not solve "[t]argeting" problems, which required "a multiyear effort." Ex. 21 at 10. And even as to "measurement," she said only that underreporting was one problem that Meta was optimistic it could partially solve by year's end. *See id.* at 5, 10. On top of all that, Plaintiffs are impermissibly pleading "[f]raud by hindsight." *Ronconi*, 253 F.3d at 430 n.12. While it turned out that underreporting was "a very small slice" of "the overall [Q4] revenue landscape," Ex. 26 at 4, that does not show that either Q3 statement was false *when made*.

### 2.     The Old Challenged Statement Was Not False Or Misleading Either

Plaintiffs also continue their "missing adverb" attack. Meta's Form 10-Qs for Q2 and Q3 warned that (i) the iOS changes "have limited our ability to target and measure the effectiveness

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

of ads on our platform and negatively impacted our advertising revenue," and (ii) "if we are unable to mitigate these developments as they take further effect in the future, our targeting and measurement capabilities will be materially and adversely affected, which would in turn significantly impact our future advertising revenue growth."   SAC ¶¶ 235, 243 **(Statements 1a & 1b)**.  Plaintiffs complain that the retrospective statement "didn't use the term significant[ly] or 'materially.'"  Hr'g Tr. 36:6-12.  They claim this "directly implied" (whatever that means) that existing effects were not significant or material, SAC ¶¶ 236, 244—never mind that Meta's February 2, 2022 Form 10-K used *identical* adverb-free phrasing, Ex. 28 at 17.

Plaintiffs' position is still meritless.  Wehner and Li removed all conceivable ambiguity by *expressly disclaiming* any "suggest[ion]" that Meta was "not seeing any material impact" from the iOS changes.  Ex. 17 at 6.  Further, the missing adverbs are too "vague" for their absence to be actionable.  *Or. Pub. Emps. Ret. Fund v. Apollo Grp. Inc.*, 774 F.3d 598, 606 (9th Cir. 2014).  As this Court recognized, "[t]he word 'significant' cannot be, in and of itself, sufficient for a securities violation."  Hr'g Tr. 12:6-8 (discussing since-abandoned antitrust allegations).  That knocks out the revenue-facing portion of Plaintiffs' challenge, since "significantly" is the only modifier that Meta used to characterize potential future revenue effects.  And as to targeting and measurement, the adverb "materially" is equally "incapable of objective verification."  *Twitter*, 29 F.4th at 621. The word "material," this Court noted, is "meaningless" standing alone.  Hr'g Tr. 40:23-41:2.

At any rate, assessing materiality "requires delicate assessments of the inferences a 'reasonable shareholder' would draw from a given set of facts."  *Fecht v. Price Co.*, 70 F.3d 1078, 1080 (9th Cir. 1995).  It was not fraud for Meta to refrain from trying to make such "delicate assessments" itself and, instead, to disclose accurate past financial data, while warning of potential future effects.  *Id.*  Using adverbs only in the forward-looking statement made perfect sense:  As Plaintiffs admit, 17 C.F.R. § 229.105 required Meta to "provide under the caption 'Risk Factors' a discussion of the *material* factors that make [its securities] speculative or risky."  SAC ¶ 251 (emphasis added).  Characterizing future risks as "material" and "significant" was consistent with that command.  Meta's retrospective statements, by contrast, came with hard data—making it unnecessary (and potentially unhelpful) to add vague color commentary.

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

Plaintiffs' own allegations prove the point.  Even under their simplistic "rule of thumb" treating any 5% change as material, Plaintiffs cannot decide what qualifies.  *Id.* ¶ 84.  While they claim that the iOS changes "decreased Meta's advertising revenue" in Q3 by "greater than 5%," they now allege that the Q2 impact on revenues was only "4%."  *Id.* ¶ 237.  Seeing the obvious problem for their Q2 revenue challenge, Plaintiffs change their criterion, insisting that this alleged "4% decrease" was still "manifestly material" because it equated to a "6.7% decrease in net income," a *different* accounting metric.  *Id.* ¶ 112.  Yet just a few lines later, Plaintiffs contrast Q2 with Q3, asserting that only "the impact of the iOS changes in Q3[]" was "material."  *Id.* ¶ 118.

These statistical shenanigans show the folly of trying to characterize past iOS effects as material or not.  Instead, Meta issued accurate earnings data, detailed the ongoing challenges, and let investors make their own assessments.  That is, again, "precisely how securities markets are supposed to work."  *Greenberg*, 233 F. Supp. 3d at 772.

### 3.    Plaintiffs Also Fail To Plead Loss Causation

Plaintiffs' iOS allegations fail for another reason:  They have not pled a viable "corrective disclosure" that "revealed the [purported] truth" and "caused [Meta's] stock price to drop."  *Lloyd*, 811 F.3d at 1209.  They continue to assert that Wehner's projection of a "$10 billion" headwind for 2022 "revealed that Meta had misled investors about the preceding year."  SAC ¶ 130.  This Court rejected Plaintiffs' "extrapolation" of this "forward-looking" statement into a "backward-looking" one.  Hr'g Tr. 47:24-48:1.  Belaboring the point changes nothing.  And Plaintiffs' analyst reports claimed surprise about the future forecast, not Meta's past results.  SAC ¶¶ 134-39; *see* Exs. 29-34.  That itself is no surprise, since Meta *met* its Q4 revenue guidance.  *E.g.*, Ex. 30 at 1 ("Meta Platforms reported a generally in-line 4Q earnings report but provided 1Q guidance (surprisingly and) clearly below our/Street expectations.").

Striking out there, Plaintiffs have turned to other Q4 statements.  They first note Wehner's remark that the iOS changes "really impacted our growth rates in Q3 and Q4."  SAC ¶ 268.  They then focus on Li's acknowledgement that Meta was "still" facing "significant" headwinds in Q4, arguing that this meant the headwinds "were 'still' continuing from at least Q3."  *Id.* ¶ 269.  But neither of those statements "reveal[ed] new information to the market."  *In re BofI Holding, Inc.*

LATHAM & WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

1    *Sec. Litig.*, 977 F.3d 781, 794 (9th Cir. 2020).  Given Meta's extensive Q2 and Q3 disclosures

2    about the iOS changes, *supra* at 3-4, these remarks were mere "confirmatory information," not

3    viable corrective disclosures.  *Grigsby v. BofI Holding, Inc.*, 979 F.3d 1198, 1205 (9th Cir. 2020).

4    **B.    The Allegations About Reels Must Be Dismissed Again**

5    Plaintiffs still fail to plead an actionable misstatement regarding Reels.  Meta did "not have

6    an obligation to offer an instantaneous update of every internal development" about the new

7    product, especially given "the oft-tortuous path of product development." *Twitter*, 29 F.4th at 620.

8    **1.    The New Challenged Statements Were Not False Or Misleading**

9    Plaintiffs now challenge statements that Sandberg and Wehner made about Reels on Meta's

10   Q2 earnings calls.  Both are inactionable as a matter of law.  And neither was misleading in any

11   event, particularly given Meta's repeated emphasis on its long-term Reels strategy.

12   **Sandberg (Statement 6a).**  Plaintiffs first challenge Sandberg's Q2 remark noting that

13   "we're seeing very strong growth in video monetization" on "Reels" and other products.  SAC

14   ¶ 229.  But describing something as "strong" is textbook "puff[ery]."  *Next Century Commc'ns*

15   *Corp. v. Ellis*, 318 F.3d 1023, 1028 (11th Cir. 2003); *accord Okla. Firefighters Pension Fund &*

16   *Ret. Sys. v  K12 Inc.*, 66 F. Supp. 3d 711, 721-22 (E.D. Va. 2014).  At any rate, Plaintiffs do not

17   dispute that Meta was seeing promising monetization *growth* on Reels, just as Sandberg said.

18   Instead, Plaintiffs claim this statement was "a half-truth" because they claim that "Reels

19   was negatively impacting [Meta's] financial results overall."  SAC ¶ 200.  That does not work.

20   For starters, as this Court held last time, Plaintiffs have nothing to back up their "bald assertion"

21   of a negative impact from Reels.  FAC Order at 3.  Their confidential witnesses say nothing about

22   Reels.  *See* SAC ¶¶ 101-12.  And Reels did *not* involve a zero-sum tradeoff, as Meta has explained.

23   *See* Dkt. 68 at 9.  Rather than just cannibalize Meta's more fully monetized products, Reels also

24   draws users' time and attention—and with it, ad dollars—away from competitors like TikTok.  *Id.*

25   Even crediting Plaintiffs' conclusory allegation of a negative Q2 impact, nothing about

26   Sandberg's statement "affirmatively create[d] an impression of a state of affairs that differs in a

27   material way from the one that [allegedly] exist[ed]."  *Brody*, 280 F.3d at 1006.  She explicitly

28   cautioned that Reels was "still monetizing at lower rates versus" older offerings.  SAC ¶ 229.  She

18

1    and others repeatedly explained that Meta was "follow[ing] the same pattern" as it had with prior

2    product launches, Ex. 5 at 19—i.e., "build[] the consumer product first," and then slowly but surely

3    embark on the "path to monetiz[ation]," Ex. 8 at 9. No reasonable investor could take her to be

4    saying that Reels was already profitable just six weeks after ads launched on Instagram.

5        **Wehner (Statement 6b).** Plaintiffs also challenge Wehner's statements on Meta's Q2

6    follow-up earnings call stating that "Reels is going well" and that "we think this should be a good

7    ad format." SAC ¶ 233. Both remarks are paradigmatic puffery. *See, e.g.*, *M & M Hart Living*

8    *Tr. v. Glob. Eagle Ent., Inc.*, 2017 WL 5635424, at *8 (C.D. Cal. Aug. 20, 2017) ("going well" is

9    "puffery"); *Anderson v. 1399557 Ontario Ltd.*, 2019 WL 5693749, at *8 (D. Minn. Nov. 4, 2019)

10   ("good product" is too). The latter is an inactionable opinion (and forward-looking) to boot.

11       In any event, as with Sandberg's statement, Plaintiffs do not back up their assertion of a

12   negative Q2 impact from Reels, and no reasonable investor would take Wehner to be asserting that

13   Reels was *already* profitable. All he said was that the early stages of monetization were promising

14   so far, and that he was optimistic about the future. That was not false or misleading. The "people

15   in charge of an enterprise are not required to take a gloomy, fearful or defeatist view of the future."

16   *Rombach v. Chang*, 355 F.3d 164, 174 (2d Cir. 2004). Nothing required otherwise of Wehner.

17       **2.      The Old Challenged Statement Was Not False Or Misleading Either**

18       Plaintiffs' renewed challenge to Meta's Q2 and Q3 risk disclosures about product launches

19   fail for the same reason as before. *See* SAC ¶¶ 237, 245 **(Statements 2a & 2b)**. These statements

20   "only generally describe" the risks inherent in product launches across the board, without saying

21   anything specific to the Reels introduction. *Kasilingam v. Stitch Fix, Inc.*, 2022 WL 10966359, at

22   *2 (9th Cir. Oct. 19, 2022) (unpublished). And since they're "generic," this Court correctly

23   concluded that they didn't "open[] the door" to a duty for Meta to disclose Reels' then-existing

24   effect on Meta's bottom line. Hr'g Tr. 58:16-20. The Court should stand by that ruling.

25       Plaintiffs now say that "reasonable investors would have understood these" risk disclosures

26   "to refer specifically to Reels" because "Reels was the only new product introduced during the

27   Class Period." SAC ¶¶ 210-11. But even if that were true of Reels, it would not change the reality

28   that Plaintiffs have only a "bald assertion" of a negative impact for Q2 and Q3. FAC Order at 3.

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

19

DEFS.' MOT. TO DISMISS
SECOND AM. COMPLAINT
CASE NO. 4:22-cv-01470-YGR

1   Nor would it mean that these risk disclosures somehow referred *only* to the here-and-now Reels

2   launch.  Meta's discussion of "material [risk] factors," 17 C.F.R. § 229.105, had to cover past,

3   present, *and* future product launches.[5]  That is why Meta's risk disclosures have had substantially

4   the same language since 2013.  *E.g.*, Ex. 2 at 17.  And it is why they did not trigger a duty to

5   provide "real-time" updates about Reels in particular.  *Twitter*, 29 F.4th at 615.

6         **C.**   **The Allegations About Sandberg's Conduct Must Be Dismissed Again**

7         Plaintiffs' Section 10(b) and Section 14(a) claims regarding Sandberg's conduct fare no

8   better.  They still have not alleged an actionable misstatement with particularity.  *See Desaigoudar*

9   *v. Meyercord*, 223 F.3d 1020, 1022 & n.5 (9th Cir. 2000).  Nor have they shown "an essential link"

10  between the proxies and any loss-causing corporate action, as Section 14(b) requires.  *Id.* at 1024.

11        **1.**   **Plaintiffs Still Have Not Pled An Actionable Misstatement**

12        Plaintiffs claim once again that two proxy statements disclosing Sandberg's compensation

13  for 2018 through 2021 misled investors by not disclosing additional compensation she supposedly

14  received through improper personal assistance.  But they nowhere allege any change to Sandberg's

15  reported compensation in the years since those proxies were issued on April 9, 2021 and April 8,

16  2022.  And their own sources assert that, if any misfeasance occurred, Sandberg would simply

17  "repay" Meta, Ex. 37 at 3—something Plaintiffs have conceded, Dkt. 65 at 24.  For that reason

18  alone, Plaintiffs have failed to plead that the compensation disclosures were false or misleading.

19        More fundamentally, as this Court held, "Meta ha[d] no 'duty to disclose uncharged,

20  unadjudicated wrongdoing.'"  FAC Order at 4 (quoting *Plumber & Steamfitters Loc. 773 Pension*

21  *Fund v. Danske Bank A/S.*, 11 F.4th 90, 98 (2d Cir. 2021)).  Plaintiffs now contend that their

22  complaint alleges more than "merely that Meta was investigating Sandberg."  SAC ¶ 168.  That

23  misses the point.  The dispositive legal principle is that companies are not required to engage in "a

24  rite of confession" by disclosing unproven allegations.  *Plumber & Steamfitters*, 11 F.4th at 98.

25  That is what Plaintiffs' articles consist of—unproven allegations based on anonymous sources

26  whose credibility this Court correctly questioned.  Hr'g Tr. 69:10-70:20.  Meta had no duty to

27  ───────────────

28  [5] That the same risk disclosure in Meta's February 2, 2022 Form 10-K used Reels as an example just proves that it covered product launches generally—including, *but not limited to*, Reels.

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

20

DEFS.' MOT. TO DISMISS
SECOND AM. COMPLAINT
CASE NO. 4:22-cv-01470-YGR

1    disclose uncharged, unadjudicated allegations of wrongdoing.

2            In any event, Plaintiffs' allegations remain deeply flawed and hopelessly vague.  The lion's

3    share of the SAC's additions focus on "the 'Acknowledgements' section in both of [Sandberg's]

4    books."  SAC ¶ 153.  But <u>Option B</u> was "published in April 2017," *id.*, and <u>Lean In</u> came out

5    in 2013, Ex. 1 at 2.  Any assistance "in writing and promoting" these books thus happened *before*

6    2018, the earliest compensation period covered by the proxies.  SAC ¶ 156; *see* Ex. 9 at 45.  These

7    allegations are also worse than just irrelevant, however:  They would turn simple human kindness

8    into an actionable violation of the federal securities laws.  In <u>Option B</u>, Sandberg thanked "friends

9    and colleagues" for being "generous with their time" and showing "compassion," "candor," and

10   "trust" throughout the writing process, after her first husband passed away.  Ex. 3 at 3-4, 6.  That

11   expression of gratitude scarcely suggests that Meta employees were conscripted into helping out

12   with a pet project on company time.  It shows that coworkers with whom Sandberg was personally

13   close supported her during the most difficult time of her life.

14           Plaintiffs' Kotick allegations are unchanged—and fail for the same reasons as before.

15   Plaintiffs allege that "Sandberg worked with a team that included [Meta] employees [and] paid

16   outside advisers" to "persuade" a media outlet "not to report on" a since-recanted accusation

17   against Kotick "in 2016" and "in 2019."  SAC ¶ 147.  But Plaintiffs *still* do not address the fact

18   that the team reportedly worked together only in 2016, Ex. 36 at 2-3, while their only 2019

19   allegation cites "emails" sent by Sandberg herself, not by Meta employees, SAC ¶ 150.  Nor have

20   Plaintiffs "grappled with" the reality that Sandberg's "reputation is concededly integral to the

21   company's success," making coordination on PR matters entirely appropriate.  FAC Order at 4.

22           As for Sandberg's wedding, Plaintiffs have added zero new supporting facts.  Instead, they

23   distort a statement from "her spokeswoman," which asserted that "Sheryl did not inappropriately

24   use company resources in connection with the planning of her wedding."  SAC ¶ 167 (emphasis

25   omitted).  Plaintiffs claim this comment "denied only that [Sandberg's] use of Company resources

26   to plan her wedding was inappropriate, not that she had used Company resources for that purpose."

27   *Id.* ¶ 277.  That is like saying that someone who declares, "I did not spill coffee on the couch!" has

28   confessed to spilling coffee somewhere else.  Plaintiffs' transparent attempt to twist the flat denial

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

21

DEFS.' MOT. TO DISMISS
SECOND AM. COMPLAINT
CASE NO. 4:22-cv-01470-YGR

1   of an accusation into an admission of guilt ignores how people speak and should be rejected.

2        Finally, Plaintiffs allege in conclusory fashion that Sandberg improperly received "help

3   with her foundation and family-member tasks." *Id.* ¶ 166.  The core problem this Court found

4   with these and the rest of the Sandberg allegations remains:  "No details."  Hr'g Tr. 71:21-24.

5                **2.        The Section 14(a) Claim Fails For Additional Reasons**

6        Plaintiffs' failure to plead an actionable misstatement of Sandberg's compensation

7   warrants dismissal of their Section 10(b) claim and Section 14(a) claim alike.  But the latter

8   additionally fails because Plaintiffs have not satisfied the essential-link requirement.[6]

9        Plaintiffs' Section 14(a) claim cannot survive unless their losses were the "result of the

10  corporate action authorized by [the allegedly misleading] proxy statement."  *Cowin v. Bresler*, 741

11  F.2d 410, 428 (D.C. Cir. 1984); *accord In re Paypal Holdings, Inc. S'holder Deri. Litig.*, 2018 WL

12  466527, at *4 (N.D. Cal. Jan. 18, 2018).  Plaintiffs cannot meet that bar.  To begin, as this Court

13  held, "the non-binding 'say on pay' vote cannot form the basis of an 'essential link'" because it

14  was not "*legally required to authorize*" Sandberg's compensation package.  FAC Order at 5.

15  Recognizing this, Plaintiffs now say that if Sandberg's supposedly "improper conduct" had been

16  disclosed, she "would not have been re-elected" as a director.  SAC ¶ 173.  But even crediting that

17  rank "speculat[ion]," FAC Order at 4 n.5, it does not matter—because Plaintiffs' losses were not

18  meaningfully tied to her election as a director.  Plaintiffs point to a stock drop after "Sandberg

19  informed Meta of her decision to resign" as COO, SAC ¶ 179, but she was never elected as COO

20  and *stayed on* as a director.  FAC Order at 4.  Any losses allegedly suffered after Sandberg received

21  bad press, SAC ¶¶ 176-77, 181-83, were "only an incident to the election of directors" and "not

22  actionable under Section 14(a)," either.  *Cowin*, 741 F.2d at 428.  There is no essential link.

23              **D.        There Is Still No Strong Inference Of Scienter**

24       Plaintiffs' claims all fail for another independent reason:  Their allegations do not give rise

25  _____

26  [6]  Plaintiffs also have no cause of action under Section 14(a).  Although *J.I. Case Co. v. Borak*, 377 U.S. 426 (1964) implied one, that decision applied a long since "abandoned" approach to statutory interpretation and should be overruled. *Alexander v. Sandoval*, 532 U.S. 275, 287 (2001).

27  *Borak* controls for now, but this Court's "special responsibility" to narrowly construe judicially created causes of action still demands requiring "scienter" for Section 14(a) claims.  *Adams v.*

28  *Standard Knitting Mills, Inc.*, 623 F.2d 422, 428 (6th Cir. 1980); *see infra* at 25.

LATHAM & WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

22

DEFS.' MOT. TO DISMISS
SECOND AM. COMPLAINT
CASE NO. 4:22-cv-01470-YGR

1  to a "strong inference" of scienter.  15 U.S.C. § 78u-4(b)(2)(A).  Plaintiffs must do more than just

2  "plausibly allege knowledge" of undisclosed facts; rather, they need particularized allegations

3  showing that Defendants "intentionally misled investors, or acted with deliberate recklessness"

4  towards a danger of doing so.  *In re NVIDIA Corp. Sec. Litig.*, 768 F.3d 1046, 1056-57 (9th Cir.

5  2014); *accord In re Rigel*, 697 F.3d at 883.  And to survive dismissal, the "inference of scienter

6  must be more than merely plausible or reasonable—it must be cogent and at least as compelling

7  as any opposing inference of nonfraudulent intent."  *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,

8  551 U.S. 308, 314 (2007).  Plaintiffs are still nowhere close to satisfying this stringent standard.

9          **1.**        **Plaintiffs' Scienter Theory Remains Fundamentally Flawed**

10          Plaintiffs have made no new attempt to show that Defendants had a plausible motive to

11  deceive investors.  *See* SAC ¶¶ 280-84.  They do not allege any stock sales by Sandberg or Li.

12  They do not dispute that all of Zuckerberg and Wehner's sales were made pursuant to 10b5-1

13  trading plans or to satisfy tax obligations.  *See, e.g.*, *Metzler Inv. GMBH v. Corinthian Colls., Inc.*,

14  540 F.3d 1049, 1067 n.11 (9th Cir. 2008).  They do not "provide 'a meaningful trading history'"

15  for anyone.  *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 1005 (9th Cir. 2009).  And

16  their allegation of a $75 billion share "repurchase[]" program, SAC ¶ 250, shows that Defendants

17  had every reason *not* to inflate Meta's stock price, which would have required Meta to pay that

18  inflated price when repurchasing stock.

19          That is damning.  Difficult as it is in any securities case to plead scienter, "the lack of a

20  plausible motive" allegation in particular "makes it much less likely that a plaintiff can show a

21  strong inference of scienter."  *Prodanova v. H.C. Wainwright & Co., LLC*, 993 F.3d 1097, 1108

22  (9th Cir. 2021).  And here, the lack of any plausible motive not only fails to support Plaintiffs'

23  position.  It renders their scienter theory nonsensical, as explained below.

24          **2.**        **No Set Of Allegations Raises A Strong Inference Of Scienter**

25          Once again, the "more plausible inference" for each set of allegations is that Defendants

26  acted honestly, "not that [they] were intentionally or with deliberate recklessness seeking to

27  mislead the market."  *Nguyen v. Endologix, Inc.*, 962 F.3d 405, 419 (9th Cir. 2020).

28          **iOS Allegations.**  Plaintiffs' scienter theory regarding the iOS changes still "does not make

LATHAM&WATKINS<sub></sub>
ATTORNEYS AT LAW
SAN FRANCISCO

23

DEFS.' MOT. TO DISMISS
SECOND AM. COMPLAINT
CASE NO. 4:22-cv-01470-YGR

1  a whole lot of sense." *Id.* at 415.  They accuse Meta of pointlessly concealing negative effects of

2  the iOS changes for a time, only to face "inevitable fallout" shortly thereafter.  *Id.*  This theory has

3  no "legs" because, as just explained, Plaintiffs do not and cannot show that Defendants "sought to

4  profit from this scheme in the interim, such as by selling off their stock" strategically.  *Id.*

5  Defendants also repeatedly warned about the iOS changes and *disclaimed* any suggestion that the

6  impact was immaterial.  *Supra* at 3-4.  If Defendants "aimed to inflate [Meta's] share price," they

7  "could have chosen far less ambiguous language than [they] did."  *Boykin v. K12, Inc.*, 54 F.4th

8  175, 186 (4th Cir. 2022).  Case-in-point:  Meta's stock *dropped* after the challenged statements

9  were made.  SAC ¶¶ 263-66.  And when Meta gave numerical guidance for Q4, Meta met that

10  guidance.  Ex. 24 at 1.  All told, then, the far more compelling inference is that Defendants were

11  "endeavoring in good faith to inform" investors, not deceive them.[7]  *Yates v. Mun. Mortg. &*

12  *Equity*, LLC, 744 F.3d 874, 888 (4th Cir. 2014).

13       **Reels Allegations.**  Plaintiffs' scienter theory regarding Reels is similarly flawed.  It would

14  make no sense to conceal known negative effects from Reels, only to face (supposedly) "inevitable

15  fallout" within months.  *Nguyen*, 962 F.3d at 415.  Wehner's and Li's explicitly cautious statements

16  about Reels on earnings calls, like Meta's risk disclosure about product launches generally, would

17  be an odd way "to inflate [Meta's] share price," *K12*, 54 F.4th at 186—especially given Meta's

18  myriad other warnings tempering short-term expectations.  And as with iOS, Meta's stock *dropped*

19  in the wake of the challenged Reels statements.  SAC ¶¶ 263-66.  So here too the most compelling

20  inference is innocent:  Meta warned about "the oft-tortuous path of product development," *Twitter*,

21  29 F.4th at 620, while "investigat[ing]" Reels' trajectory as the product grew on Instagram and

22  launched on Facebook, *In re NVIDIA*, 768 F.3d at 1056.[8]

23

24  [7]  The SAC's expanded reliance on confidential witnesses changes nothing.  All four were
low-level employees, a half-dozen rungs from having direct contact with any individual defendant.

25  *See* SAC ¶¶ 104-09.  They also offer only vague hearsay allegations that the iOS changes caused
revenue drops of "approximately 4%" during Q2 and "greater than 5%" during Q3.  *Id.* ¶ 107.

26  Even if credited, those figures scarcely show sufficiently "devastating" impacts to support a core
operations theory.  *Berson v. Applied Signal Tech., Inc.*, 527 F.3d 982, 987 (9th Cir. 2008).

27  [8]  It does not matter that, with an additional quarter's worth of data, Meta later found that Reels
(among other factors) "adversely affected advertising revenue in the second half of 2021."  SAC

28  ¶ 270.  This Q4 disclosure does not show that Meta reached that conclusion *after Q3* but

LATHAM&WATKINS<sub>LLP</sub>
ATTORNEYS AT LAW
SAN FRANCISCO

24

DEFS.' MOT. TO DISMISS
SECOND AM. COMPLAINT
CASE NO. 4:22-cv-01470-YGR

1    **Sandberg Allegations.**  Plaintiffs' scienter theory regarding Sandberg's alleged conduct

2    makes even less sense.  Defendants could not have deliberately or recklessly misled investors about

3    Sandberg's 2018-2021 compensation by failing to disclose personal assistance allegedly received

4    in 2017 or even earlier.  Yet recycled press articles about pre-2018 events make up most of

5    Plaintiffs' allegations.  Regardless, it is far more plausible that colleagues close to Sandberg

6    volunteered their personal time to help with an emotionally fraught writing process, not that they

7    were forced to do so while on the job.  It is likewise far more plausible that Meta PR personnel

8    appropriately coordinated with Sandberg's personal advisers regarding the Kotick matter given its

9    obvious implications for her concededly crucial reputation, as opposed to providing services to

10   Sandberg in her personal capacity that were unrelated to their day-to-day duties.  And it is far more

11   plausible that an executive earning millions of dollars paid for her own wedding, rather than

12   misappropriating company resources.  On top of all that, Plaintiffs' prior concession that the value

13   of any assistance deemed improper in hindsight would simply be repaid—rather than added to

14   Sandberg's compensation totals—buries a dagger in the notion that Defendants fraudulently tried

15   to mislead the market about her compensation.  *See* Dkt. 65 at 24.

16          **E.     Dismissal Should Be With Prejudice**

17          This case should be dismissed with prejudice.  Plaintiffs "cannot cure the deficiencies of

18   [their] claims through further amendment," so "granting further leave to amend would be futile."

19   *Greenberg v. Cooper Companies, Inc.*, 2013 WL 2403648, at *15 (N.D. Cal. May 31, 2013)

20   (Gonzalez Rogers, J.).  Plaintiffs have had two "prior opportunit[ies] to amend."  *In re Dynavax*

21   *Sec. Litig.*, 2018 WL 2554472, at *9 (N.D. Cal. Jun. 4, 2018) (Gonzalez Rogers, J.).  Yet the SAC

22   "failed to remedy the deficiencies" with their existing allegations and instead dredged up new,

23   equally meritless claims.  *Curry v. Yelp Inc.*, 875 F.3d 1219, 1228 (9th Cir. 2017).  There is "no

24   need to prolong the litigation" any further.  *Gardner v. Martino*, 563 F.3d 981, 990 (9th Cir. 2009).

25   **VI.   CONCLUSION**

26          For all these reasons, this action should be dismissed with prejudice.

27

28   _____

     deliberately or recklessly failed to disclose it—especially given the lack of *any* factual allegations,
     from confidential witnesses or otherwise, supporting contemporaneous knowledge.

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

25

DEFS.' MOT. TO DISMISS
SECOND AM. COMPLAINT
CASE NO. 4:22-cv-01470-YGR

1    Dated: November 14, 2023        LATHAM & WATKINS LLP

2

                                     By:   */s/ Andrew B. Clubok*

3

                                     Andrew B. Clubok (pro hac vice)
            andrew.clubok@lw.com

4

                                     Susan E. Engel (pro hac vice)
            susan.engel@lw.com

5

                                     555 Eleventh Street, N.W., Suite 1000
            Washington, D.C. 20004-1304

6

                                     Telephone: +1.202.637.2200

7

8

                                     Elizabeth L. Deeley (CA Bar No. 230798)
            elizabeth.deeley@lw.com

9

                                     Melanie M. Blunschi (CA Bar No. 234264)
            melanie.blunschi@lw.com

10

                                     Nicholas Rosellini (CA Bar No. 316080)
            nick.rosellini@lw.com

11

                                     505 Montgomery Street, Suite 2000
            San Francisco, CA 94111

12

                                     Telephone: +1.415.391.0600

13

14

                                     *Attorneys for Defendants Meta Platforms, Inc.,*

15

                                     *Mark Zuckerberg, David Wehner, Sheryl*
                                     *Sandberg, and Susan Li*

16

17

18

19

20

21

22

23

24

25

26

27

28

LATHAM & WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

DEFS.' MOT. TO DISMISS
SECOND AM. COMPLAINT
CASE NO. 4:22-cv-01470-YGR