1

**POMERANTZ LLP**
Jeremy A. Lieberman

2
Austin P. Van
600 Third Avenue, 20th Floor

3
New York, NY 10016
Telephone: (212) 661-1100

4
jalieberman@pomlaw.com
avan@pomlaw.com

5

Jennifer Pafiti (SBN 282790)

6
1100 Glendon Avenue, 15th Floor
Los Angeles, California 90024

7
Telephone: (310) 405-7190
jpafiti@pomlaw.com

8

*Counsel for Lead Plaintiffs*

9

*Additional Counsel on Signature Page*

10

11
**UNITED STATES DISTRICT COURT**

12
**NORTHERN DISTRICT OF CALIFORNIA**

13
**OAKLAND DIVISION**

14

15
PLUMBERS AND STEAMFITTERS
LOCAL 60 PENSION TRUST, Individually

16
and on Behalf of All Others Similarly
Situated,

17
                            Plaintiff,

18

19
        v.

20
META PLATFORMS, INC., MARK
ZUCKERBERG, DAVID WEHNER,

21
SHERYL SANDBERG, and SUSAN LI,

22
                            Defendants.

CASE NO.  4:22-cv-01470-YGR

**OPPOSITION TO DEFENDANTS' MOTION
TO DISMISS THE SECOND AMENDED
COMPLAINT FOR VIOLATIONS OF THE
FEDERAL SECURITIES LAWS**

**CLASS ACTION**

Hon. Yvonne Gonzalez Rogers

23

24

25

26

27

28

**TABLE OF CONTENTS**

I. INTRODUCTION ...................................................................................................... 1

II. FACTUAL BACKGROUND .................................................................................... 3

    A. Meta Misled Investors About the Material Impact of Apple's iOS Changes ........ 3

    B. Meta Misled Investors About the Impact of Its Transition to Reels ..................... 4

    C. Meta Misstated and Omitted Defendant Sandberg's "Other Benefits" ................ 5

III. LEGAL STANDARDS ............................................................................................. 6

    A. Section 10(b) of the Exchange Act ........................................................................ 6

        1. Material Misrepresentation or Omission ................................................... 6

        2. Loss Causation .......................................................................................... 6

        3. Scienter ..................................................................................................... 7

    B. Section 14(a) and Rule 14-9(a) ............................................................................. 7

IV. META MISLED INVESTORS ABOUT THE MATERIAL IMPACT OF IOS ............. 7

    A. New Allegations Show the Originally Pled Misstatements Were Misleading ...... 7

    B. Additional, Newly Pled Misstatements Were Also False and Misleading ........... 12

        1. "In Line with Expectations" Misstatements ............................................. 12

        2. Effective Mitigation Misstatements .......................................................... 14

    C. The SAC Adequately Pleads Loss Causation ....................................................... 15

    D. The SAC Adequately Pleads Scienter .................................................................. 16

V. META MISELD INVESTORS ABOUT ITS TRANSITION TO REELS .................... 17

    A. New Allegations Show the Originally Pled Misstatements Were Misleading .... 17

    B. Additional, Newly Pled Misstatements Were Also False and Misleading ......... 19

    C. The SAC Adequately Pleads Loss Causation ...................................................... 20

    D. The SAC Adequately Pleads Scienter .................................................................. 20

VI. META MISLED INVESTORS ABOUT DEFENDANT SANDBERG'S BENEFITS .. 21

    A. The SAC Adequately Pleads a Section 14(a) Violation ...................................... 21

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

              1.     The SAC Adequately Pleads Misleading Statements and Omissions ..... 21

              2.     The SAC Adequately Pleads an Essential Link ....................................... 24

    B.     The SAC Adequately Pleads a Section 10(b) Violation by Pleading Scienter .... 25

VII.    CONCLUSION ............................................................................................................. 25

# TABLE OF ABBREVIATIONS

| | |
|---|---|
| **10-K** | Annual Report on SEC Form 10-K |
| **10-Q** | Quarterly Report on SEC Form 10-Q |
| **Cat.** | Category of Misstatements as listed in ECF No. 81-1. |
| **Class Period** | April 9, 2021 to June 9, 2022 |
| **Company** | Meta Platforms, Inc. |
| **Defendants** | Meta Platforms, Inc., Mark Zuckerberg, David Wehner and Sheryl Sandberg |
| **Defs.' Ex.** | Exhibit to Defendants' Motion to Dismiss the Second Amended Complaint (ECF No. 82) |
| **Effective Mitigation Misstatements** | Defendants' misleading statements alleged at SAC ¶¶ 231, 239, 241 |
| **FE** | former employee |
| **Hearing or Hr'g Tr.** | July 18, 2023 Hearing on Defendants' Motion to Dismiss the Amended Complaint (ECF No. 76) |
| **Individual Defendants** | Mark Zuckerberg, David Wehner, Sheryl Sandberg and Susan Li |
| **Lead Plaintiffs** | Menorah Mivtachim Insurance Ltd., Menorah Mivtachim Pensions and Gemel Ltd., The Phoenix Insurance Company Ltd. and The Phoenix Provident Pension Fund Ltd. |
| **Material Impact Misstatements** | Defendants' misleading statements alleged at SAC ¶¶ 227, 229, 231, 233, 239, 241, 243, 245 |
| **Meta** | Meta Platforms, Inc. |
| **Motion or Mot.** | Defendants' Notice of Motion and Motion to Dismiss the Second Amended Complaint; Memorandum of Points and Authorities in Support (November 14, 2023) (ECF No. 82) |
| **Opinion or Op.** | July 21, 2023 Order (ECF No. 74) |
| **Plaintiffs** | Menorah Mivtachim Insurance Ltd., Menorah Mivtachim Pensions and Gemel Ltd., The Phoenix Insurance Company Ltd. and The Phoenix Provident Pension Fund Ltd. |
| **PSLRA** | Private Securities Litigation Reform Act of 1995 (15 U.S.C. § 78u–4) |
| **Q1 2021** | first quarter ended March 31, 2021 |
| **Q2 2021** | second quarter ended June 30, 2021 |
| **Q3 2021** | third quarter ended September 30, 2021 |
| **Q4 2021** | fourth quarter ended December 31, 2021 |
| **Reels Effect Misstatements** | Defendants' misleading statements alleged at SAC ¶¶ 198-202, 204, 206, 208 |
| **Sandberg Benefits Misstatements** | Defendants' misleading statements alleged at SAC ¶¶ 225, 247 |
| **SEC** | United States Securities and Exchange Commission |

| SAC or Second Amended Complaint | Second Amended Complaint for Violations of the Federal Securities Laws (September 18, 2023) (ECF No. 77) |
| --- | --- |
| *WSJ* | *The Wall Street Journal* |

1                          **TABLE OF AUTHORITIES**

2                                                                    **Page(s)**

3   **Cases**

*Berson v. Applied Signal Tech., Inc.*,
   527 F.3d 982 (9th Cir. 2008) ...................................................................................6, 16, 21

*Cowin v. Bresler*,
   741 F.2d 410 (D.C. Cir. 1984) ..............................................................................................24

*Dura Pharms., Inc. v. Broudo*,
   544 U.S. 336 (2005) ................................................................................................................6

*E. Ohman J:or Fonder AB v. NVIDIA Corp.*,
   81 F.4th 918 (9th Cir. 2023) ......................................................................................9, 11, 17

*Faulkner v. ADT Sec. Servs., Inc.*,
   706 F.3d 1017 (9th Cir. 2013) ........................................................................................10, 16

*Fecht v. Price Co.*,
   70 F.3d 1078 (9th Cir. 1995) ..................................................................................................6

*In re Atossa Genetics Inc. Sec. Litig.*,
   868 F.3d 784 (9th Cir. 2017) .....................................................................................6, 10, 23

*In re BofI Holding, Inc. Sec. Litig.*,
   977 F.3d 781 (9th Cir. 2020) ..................................................................................................6

*In re Daou Sys.*,
   411 F.3d 1006 (9th Cir. 2005) ........................................................................................20, 21

*In re Facebook, Inc. Sec. Litig.*,
   84 F.4th 844 (2023)..................................................................................................................8

*In re Gilead Scis. Sec. Litig.*,
   536 F.3d 1049 (9th Cir. 2008) ................................................................................................6

*In re Gupta Corp. Sec. Litig.*,
   900 F. Supp. 1217 (N.D. Cal. 1994) ....................................................................................11

*In re Hot Topic, Inc. Sec. Litig.*,
   No. CV 13–02939 (SJO), 2014 WL 7499375 (C.D. Cal. May 2, 2014) .................................7

*In re Maxim Integrated Prods., Inc., Deriv. Lit.*,
   574 F. Supp. 2d 1046 (N.D. Cal. 2008) ...............................................................................24

*In re McKesson HBOC, Inc. Sec. Litig.*,
   126 F. Supp. 2d 1248 (N.D. Cal. 2000) ...............................................................................22

*In re NVIDIA Corp. Sec. Litig.*,
   768 F.3d 1046 (9th Cir. 2014) ......................................................................17

*In re Quality Sys. Sec. Litig.*,
   865 F.3d 1130 (9th Cir. 2017) .........................................................................8

*In re Syntex Corp. Sec. Litig.*,
   95 F.3d 922 (9th Cir. 1996) .......................................................................6, 11

*In re Twitter, Inc. Sec. Litig.*,
   506 F. Supp. 3d 867 (N.D. Cal. 2020) .......................................................8, 11

*In re Wells Fargo & Co. S'holder Deriv. Litig.*,
   282 F. Supp. 3d 1074 (N.D. Cal. 2017) ........................................................24

*Kearns v. Ford Motor Co.*,
   567 F.3d 1120 (9th Cir. 2009) .......................................................................23

*Knollenberg v. Harmonic, Inc.*,
   152 F. App'x 674 (9th Cir. 2005) ....................................................................7

*Maiman v. Talbott*,
   No. SACV 09-0012 AG (ANx), 2010 U.S. Dist. LEXIS 142712 (C.D. Cal.
   Aug. 9, 2010) ...................................................................................................7

*No. 84 Emp.-Teamster Joint Council Pension v. Am. W. Holding Corp.*,
   320 F.3d 920 (9th Cir. 2003) .........................................................................17

*Oaktree Principal Fund V, L.P. v. Warburg Pincus LLC*,
   No. 15-cv-8574 (PSG), 2018 WL 6137169 (C.D. Cal. Aug 29, 2018) ..................23

*Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*,
   575 U.S. 175 (2015).................................................................................14, 15

*Or. Pub. Emps. Ret. Fund v. Apollo Grp. Inc.*,
   774 F.3d 598 (9th Cir. 2014) .........................................................................20

*Rhode Island v. Alphabet, Inc.*,
   1 F.4th 687 (9th Cir. 2021) .........................................................................7, 8

*Siracusano v. Matrixx Initiatives, Inc.*,
   585 F.3d 1167 (9th Cir. 2009) ....................................................................8, 18

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
   551 U.S. 308 (2007).............................................................................7, 17, 25

*United States v. Laurienti*,
   611 F.3d 530 (9th Cir. 2010) .........................................................................19

**Statutes**

15 U.S.C. §78j(b) ........................................................................................................6, 25

PSLRA ........................................................................................................................23

**Rules**

Fed. R. Civ. P. 9(b) ....................................................................................................23

**Other Authorities**

17 C.F.R. § 229.105 ....................................................................................................11

17 C.F.R. § 229.402I(2)(ix) ........................................................................................21

17 C.F.R. § 240.14a ...........................................................................................7, 21, 24

64 FR 45150-01 (1999) No. 99 ....................................................................................11

OPPOSITION TO DEFENDANTS' MOTION TO DISMISS (CASE NO. 4:22-cv-01470-YGR)

1    **I.    INTRODUCTION**

2         During the Class Period, Defendants repeatedly and unmistakably misled investors about

3    three central aspects of Meta's business.

4         *First*, Defendants directly implied that the impact of Apple's iOS privacy changes on

5    Meta's business was not yet "*material*."  Defendants also stated that the impact was "in line with

6    Meta's expectations" that the impact would be "manageable," in part because the Company could

7    effectively "mitigate" a major part of the impact.  Meta knew that these representations were false.

8    Meta internally studied the impact of the iOS changes before and after their introduction and found

9    that the changes decreased Meta's targeting and measurement capabilities by 40% and decreased

10   Meta's *net income* by at least 6.7% in Q2 2021 and 9.6% in Q3 2021, the quarters when Meta was

11   making these misstatements—amounts that are unquestionably material to investors.  The most

12   sophisticated investors in the world were *demonstrably* misled.  J.P Morgan stated the impact from

13   iOS was "much bigger than expected," and Morgan Stanely stated, "what was once described as

14   'manageable' now appears to be a $10B revenue headwind in 2022."

15        In its Order, the Court expressed a single reason for dismissing this claim—the Court found

16   that plaintiffs had not adequately pled that the iOS changes "as a factual matter, materially and

17   significantly impacted Meta's business as of Q2 and Q3 2021." Op. 3.  The SAC amply addresses

18   this concern.  The SAC pleads new statements by multiple former employees *quantifying* the

19   impact of the iOS changes on Meta's targeting and measurement capabilities and on its financials.

20   The SAC also newly pleads admissions by Defendants in February 2022 that the iOS changes had

21   materially impacted their business in Q2 and Q3 2021.

22        *Second*, Meta directly implied in its SEC filings that the introduction of its short-form video

23   format Reels was not negatively impacting its business, when in fact it was.  In its Order, the Court

24   stated two reasons for dismissing this claim:  (1) that Plaintiffs had not adequately pled "a negative

25   impact on Meta's business during Q2 and Q3 2021," and (2) that statements on Meta's February

26   2, 2022 conference call did not serve as corrective disclosures.  Again, the SAC squarely addresses

27   both of these concerns—the SAC newly pleads that in its February 3, 2022 Annual Report, Meta

28   stated that "new features such as Reels . . . adversely affected advertising revenue growth in the

1

1    second half of 2021." That is, Defendants expressly admitted that by July 28, 2021 and October

2    26, 2021, when they directly implied Reels was not negatively impacting Meta's business, Reels

3    in fact already was negatively impacting Meta. This newly pleaded admission likewise serves as

4    an actionable corrective disclosure. Further statements by Meta executives confirm these

5    conclusions.

6        *Third*, in the Company's 2021 and 2022 proxy statements, Defendants misled investors by

7    failing to include among Defendant Sandberg's "other benefits" that she had received extensive

8    personal assistance from Meta employees in burying a news story adverse to her ex-boyfriend,

9    planning her wedding, editing her personal memoir and supporting her personal foundation. The

10   SAC addresses the Court's concerns about this claim by newly alleging that the allegations are

11   based on statements about *actual conduct*, not about the *topic of an investigation*, and by newly

12   alleging that the statements were material not necessarily because of the dollar amount, but because

13   the personal benefits Sandberg received exposed Meta to public criticism and Sandberg to

14   investigation. Moreover, any concern that the assistance Sandberg received also benefited the

15   Company, and so might not need to be disclosed, may be put to rest—SEC guidance makes clear

16   that where an item "confers a . . . benefit that has a personal aspect," it must be disclosed "without

17   regard to whether it may be provided for some business reason."

18       Recognizing that the SAC squarely addresses each of the Court's concerns, Defendants

19   barely mention the Court's Order. Defendants *do not even dispute*, for example, that the iOS

20   changes did not have a material impact on Meta's business in Q2 and Q3 2021, the sole ground

21   the Court gave in its Order for dismissing that claim. Instead, they revive largely the same

22   arguments they presented previously that the Court considered and rightly did not adopt as part of

23   its reasoning. These arguments fail for the same reasons they did in previous briefing, and for

24   additional reasons based on new allegations.

25       Plaintiffs carefully considered each statement by the Court in its Order and at the Hearing,

26   and undertook a diligent, far-reaching investigation to address every one of those concerns. That

27   investigation was successful: the claims in the SAC are solidly substantiated. This important case

28   should now proceed to discovery.

## II.    FACTUAL BACKGROUND

### A.    Meta Misled Investors About the Material Impact of Apple's iOS Changes

Meta's revenues come almost entirely from advertising, and Meta largely relies on Apple's iOS mobile operating system to access the target market for its advertisers. SAC ¶ 50. Beginning in 2Q 2021, Apple introduced a new version of iOS with updated privacy settings that prevented Meta from accessing most of the information about users that it had previously used to make ads targeted to those users and to measure the effectiveness of those ads. SAC ¶¶ 102-06. Accordingly, Apple's privacy changes to iOS greatly hindered Meta's targeting and measurement capabilities and made the platform far less attractive for advertisers. SAC ¶¶ 107-11.

As multiple former employees have confirmed, when Apple's iOS privacy changes were introduced in Q2 2021, they were immediately adopted by 85% percent of users and immediately had a material impact on Meta's business. SAC ¶¶ 103, 105, 109. Specifically, Meta's targeting and measurement capabilities decreased *by 40%*, which immediately caused advertisers to flatline or decrease their ad spend with Meta. SAC ¶¶ 103, 107-11. Likewise, according to multiple former employees, Apple's iOS changes caused a drop in Meta's revenues of about 4% in Q2 2021 and a drop in revenue of more than 5% (by one account 10-15%) in Q3 2021. SAC ¶¶ 9, 102-03, 107-11. The drops in Meta's revenue of 4% in Q2 2021 and more than 5% in Q3 2021 amounted to drops in Meta's *net income* (the most critical financial metric for investors) of *6.7%* and *9.6%* respectively. SAC ¶ 112.

Beginning early on, the *only* statement Meta made in its SEC filings about the impact directly implied that it was not material. SAC ¶ 128. In fact, Meta repeatedly told investors that they were taking steps to "mitigate" the impact and making "encouraging progress" on these mitigation efforts, and that the impact was "in line with [its] expectations" that the impact would be "manageable." SAC ¶¶ 67-84. Meta studied the impact extensively each quarter and learned in Q2 2021 that the changes were having a devastating impact on Meta's business, yet nevertheless made these statements in each of Q2 and Q3. SAC ¶¶ 107, 120-27.

On February 2, 2022, analysts were stunned when Meta finally revealed that its mitigation efforts were not working and that Apple's iOS privacy changes were having a material adverse

impact on Meta's measurement and targeting capabilities—to such a degree that they would reduce Meta's 2022 revenues by $10 billion. SAC ¶¶ 129-39. These admissions, together with the disclosures concerning Reels described below, caused a 26% drop in Meta's value in one day—in absolute terms, the largest single-day drop in value of a U.S. company in history. SAC ¶ 133. The most sophisticated stock analysts in the world, such as J.P Morgan, were completely caught off guard by Meta's announcement of the impact, stating, "We believe the iOS headwind of ~$10B this year is . . . much bigger than expected." SAC ¶ 134. Investors even expressly claimed to have been misled, with Morgan Stanely stating, for example: "what was once described as 'manageable' now appears to be a $10B revenue headwind in 2022." *Id.*

### B. Meta Misled Investors About the Impact of Its Transition to Reels

On August 5, 2020, Meta introduced a short-form video format called "Reels" on Instagram. SAC ¶ 190. Meta introduced ads on Reels in June 2021. SAC ¶ 191. Meta's introduction of Reels, and its shift in content from older picture and text formats to a short-form video format, involved a tradeoff. On the one hand, users spend more hours overall viewing short-form videos with Reels than they do looking at older content formats with pictures and text. On the other hand, due to the short-form video format of Reels, in which ads are displayed only between videos, Meta displays fewer ads per hour on Reels than per hour on older formats in which ads may be placed between pictures or text that a user may scroll through quickly. Crucially, whether Meta's shift from older content formats to Reels caused a net positive or negative impact for Meta's results of operations cannot be inferred merely from the fact that Reels monetizes at a lower rate, i.e., that Meta displays fewer ads per hour on Reels than on other formats. As users spend more time on Reels than on older formats, the introduction of Reels may well have increased the total number of ads viewed by users, resulting in a net positive impact on Meta's business.

The only statement Meta made in its SEC filing addressing the impact of Reels directly implied that the shift to Reels was not adversely affecting Meta's business and results of operations. SAC ¶¶ 197-204. In every other communication with investors in which Meta discussed its transition to Reels, Meta at no point stated or implied whether the transition was negatively impacting its business. SAC ¶¶ 199, 200, 206. Investors were left with only the

Company's statement in its SEC filings implying the transition was not having a negative impact. All the while, however, Meta was well aware that the Company would suffer losses initially in transitioning to Reels, as Meta later revealed its transition strategy involved short-term losses for long-term gains.  SAC ¶¶ 214, 219.  Meta finally announced on February 2, 2022 that the transition to Reels was creating a "headwind" that was negatively impacting the Company's business. SAC ¶¶ 217, 221.  Meta confirmed this fact in its February 3, 2022 Annual Report which admitted that "new features such as Reels . . . adversely affected advertising revenue growth in the second half of 2021."  SAC ¶ 216.  When investors learned for the first time that the transition to Reels would require a period of losses, Meta's stock collapsed.  SAC ¶¶ 221-22.  Indeed, analysts such as Morgan Stanley were shocked by Reels' negative impact on growth, stating, "revenue guide was ~6% below us, with FB talking to headwinds from impressions/time shifting toward video surfaces like Reels."  Defs.' Ex. 34 at 1.

## C.     Meta Misstated and Omitted Defendant Sandberg's "Other Benefits"

Defendant Sandberg, Meta's COO, repeatedly used Company resources for undisclosed personal benefit, including assistance in quashing adverse personal news stories about her boyfriend, planning her wedding, writing her personal book and supporting her personal foundation.  SAC ¶ 146.  For example, in 2016 and 2019, Defendant Sandberg and multiple Facebook employees formed a team to address an adverse new story against Sandberg's then boyfriend, Activision Blizzard Inc.'s CEO Bobby Kotick.  SAC ¶¶ 147-48.  The team discussed what damaging information they believed the U.K. publication *MailOnline* had obtained against Kotick, and whether they could persuade the publication's leadership that Kotick had been wrongfully accused.  *Id*.  The team successfully suppressed this personal story both years.  SAC ¶¶ 149-50.  Moreover, during their three-year relationship, from 2016 up to and including 2019, Kotick regularly used Facebook employees for public-relations advice.  SAC ¶ 151.  Sandberg likewise used Meta employees to help plan her wedding in 2022.  SAC ¶ 158.

In its April 9, 2021 and April 8, 2022 Proxy Statements, Meta made extensive disclosures about Defendant Sandberg's historical use of corporate resources for personal matters such as security and use of private aircraft, but the Company failed to disclose Sandberg's improper use

1  of corporate resources for the personal matters described above. SAC ¶¶ 162, 170-73, 181-82.

2  Defendant Sandberg knew that she was receiving personal benefits from Meta other than those

3  disclosed in the Company's annual proxy filings with the SEC because Sandberg knew about her

4  own actions. SAC ¶ 174.

5          When *The Wall Street Journal* published multiple articles revealing Sandberg's misuse of

6  corporate resources for personal expenses, Meta's stock dropped precipitously. SAC ¶¶ 176-78,

7  180-83. Sandberg resigned from her role as COO in early June 2022. SAC ¶ 179.

8  **III.    LEGAL STANDARDS**

9          On a 12(b)(6) motion, the court "accept[s] the Plaintiffs' allegations as true and construe[s]

10 them in the light most favorable to Plaintiffs." *In re Atossa Genetics Inc. Sec. Litig.*, 868 F.3d 784,

11 793 (9th Cir. 2017). When ruling on a motion to dismiss a securities case, any "skepticism is best

12 reserved for later stages of the proceedings when the plaintiff's case can be rejected on evidentiary

13 grounds." *In re Gilead Scis. Sec. Litig.*, 536 F.3d 1049, 1057 (9th Cir. 2008).

14         **A.     Section 10(b) of the Exchange Act**

15               **1.     Material Misrepresentation or Omission**

16         A statement is misleading "if it would give a reasonable investor the 'impression of a state

17 of affairs that differs in a material way from the one that actually exists.'" *Berson v. Applied Signal

18 Tech., Inc.*, 527 F.3d 982, 985 (9th Cir. 2008). Unless "the adequacy of the disclosure . . . is so

19 obvious that reasonable minds could not differ," the question of "[w]hether a statement is

20 misleading and whether adverse facts were adequately disclosed . . . should be left to the trier of

21 fact." *In re Syntex Corp. Sec. Litig.*, 95 F.3d 922, 926 (9th Cir. 1996) (quoting *Fecht v. Price Co.*,

22 70 F.3d 1078, 1081 (9th Cir. 1995)).

23               **2.     Loss Causation**

24         Plaintiffs face a minimal bar in pleading loss causation. To plead loss causation, Plaintiffs

25 need only "provide enough factual content to give the defendant 'some indication of the loss and

26 the causal connection that the plaintiff has in mind,'" which "should not prove burdensome." *In re

27 BofI Holding, Inc. Sec. Litig.*, 977 F.3d 781, 794 (9th Cir. 2020) (quoting *Dura Pharms., Inc.  v.

28 Broudo*, 544 U.S. 336, 347 (2005)) (cited by Defendants).

### 3. Scienter

The required inference of scienter "need not be irrefutable . . . or even the most plausible," and no "smoking-gun" is required. *See Tellabs, Inc. v. Makor Issues & Rights, Ltd*., 551 U.S. 308, 324 (2007). A "strong inference" is merely one that is "cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Id*. That is, "a tie goes to the Plaintiff." *Maiman v. Talbott*, No. SACV 09-0012 AG (Anx), 2010 WL 11421950, at *5 (C.D. Cal. Aug. 9, 2010). Allegations showing "'actual access to the disputed information' . . . support[] a strong inference of scienter." *Rhode Island v. Alphabet, Inc.*, 1 F.4th 687, 706 (9th Cir. 2021).

### B. Section 14(a) and Rule 14-9(a)

A plaintiff may state a claim under Section 14(a) by alleging that: "(1) a proxy statement contained a material misrepresentation or omission which (2) caused the plaintiff injury and (3) that the proxy solicitation itself, rather than the particular defect in the solicitation materials, was an essential link in the accomplishment of the transaction." *In re Hot Topic, Inc. Sec. Litig*., No. CV 13–02939 (SJO), 2014 WL 7499375, at *4 (C.D. Cal. May 2, 2014). No allegations of scienter are required to plead a claim under Section 14(a)—merely negligence suffices. *See Knollenberg v. Harmonic, Inc*., 152 F. App'x 674, 682 (9th Cir. 2005).

## IV. META MISLED INVESTORS ABOUT THE MATERIAL IMPACT OF IOS

### A. New Allegations Show the Originally Pled Misstatements Were Misleading

Defendants explicitly misled investors in Meta's SEC filings about the material impact of Apple's iOS privacy changes on Meta's business (Defendants' "Material Impact Misstatements" (**Cat. 1**)). SAC ¶ 70. In its Q2 and Q3 2021 Forms 10-Q, Meta stated, concerning the iOS privacy change developments:

> [1] These developments have limited our ability to target and measure the effectiveness of ads on our platform and negatively impacted our advertising revenue, [2] and if we are unable to mitigate these developments as they take further effect in the future, *our targeting and measurement capabilities will be materially and adversely affected*, which would in turn significantly impact our future advertising revenue growth.

(Emphasis added.) These Misstatements implied that Apple's iOS privacy changes had not yet "*materially* and adversely affected" Meta's "targeting and measurement capabilities," and had not yet "significantly impact[ed]" Meta's advertising revenues. The Misstatements implied these

7

falsehoods in at least two distinct ways.  *First*, the company *contrasted* the current state of affairs in clause [1] with a potential future state of affairs in clause [2], and expressly distinguished the former from the latter by stating that as the developments "take further effect in the future," the effect could be *material*.  The Company made clear that "if they were unable to mitigate these developments," the current state of affairs would *change*—the impact would become material— and so unmistakably implied that the current impact was not yet material.  *See In re Quality Sys. Sec. Litig.*, 865 F.3d 1130, 1144 (9th Cir. 2017) (statement is misleading if it "affirmatively create[s] an impression of a state of affairs that differ[s] in a material way from the one that actually exist[s]").  *Second*, and independently, Meta implied in clause [2] alone that the risk of a *material* adverse effect from the iOS privacy changes was merely hypothetical and had not yet materialized.[1]  Multiple recent Ninth Circuit cases confirm such statements are misleading.  *See In re Facebook, Inc. Sec. Litig.*, 84 F.4th 844, 858 (2023) (risk disclosures are misleading where "a company's SEC filings warned that risks 'could' occur when, in fact, those risks had already materialized"); *Alphabet, Inc.*, 1 F.4th at 703 (same); *In re Twitter, Inc. Sec. Litig.*, 506 F. Supp. 3d 867, 883 (N.D. Cal. 2020) (quoting *Siracusano v. Matrixx Initiatives, Inc.*, 585 F.3d 1167, 1181 (9th Cir. 2009); *Berson*, 527 F.3d at 986 (9th Cir. 2008)).[2]

In its Opinion, the Court dismissed Plaintiffs' original claims based on the Material Impact Misstatements for a single reason:  "plaintiffs ha[d] not adequately pled that the adverse consequences of the changes had, as a factual matter, materially and significantly impacted Meta's business as of Q2 and Q3 2021."  Op. at 3.  The SAC provides three categories of new factual allegations amply addressing this deficiency.  SAC ¶¶ 101-19.

*First*, the SAC contains new allegations from multiple confidential witnesses *quantifying* the impact of the iOS changes on Meta's business.  According to FE1, by June 2021 when 85% of iPhone users had adopted iOS's privacy settings, the *actual decrease* in Meta's targeting and

---

[1] In the same two ways, Meta also implied that the iOS privacy changes had not yet "significantly impact[ed Meta's] future advertising revenue growth."

[2] Plaintiffs' argument is not, as Defendants suggest, simply that clause [1] "didn't use the term significant[ly] or 'materially.'"  Mot. 16.  *Defendants* chose to use these terms in clause [2] to describe hypothetical risks that already had materialized, and while Defendants could have edited these statements in any number of ways to make them not misleading, they failed to do so.

measurement capability from the iOS changes, measured by the "signal match rate," was *40%*. SAC ¶ 103. FE1 confirmed that "a decrease in signal match rates of 40% was highly material" because, at a minimum, "this decrease caused most advertisers not to increase their ad spend with Meta during this period." *Id.* FE1 was inarguably in a position to know these facts because FE1's job was to study the impact of the iOS changes on Meta's business. SAC ¶¶ 101-02. FE4 likewise noted, based on internal reports FE4 saw, that by Q3 2021 the "vast majority" of technology-focused advertisers *decreased* spending due to the iOS changes. SAC ¶¶ 108-09.

Moreover, multiple confidential witnesses quantified the impact of the changes on Meta's *revenues*: FE2 stated that the changes decreased Meta's revenues by 10-15% in Q3 2021, and FE1 likewise stated that the changes decreased Meta's revenues in Q3 2021 by greater than 5%, and in Q2 2021 by about 4%. SAC ¶¶ 107, 110. FE4 also confirmed that the changes "definitely" had an impact of greater than 5% on revenues during this period. SAC ¶ 109. A certified accountant calculated that minimum decreases of 5% and 4% in revenue in Q3 2021 and Q2 2021 amounted to decreases of *9.6% and 6.7%* respectively of Meta's *net income* for those quarters—amounts that are manifestly material to Investors. SAC ¶ 112; *see E. Ohman J:or Fonder AB v. NVIDIA Corp.*, 81 F.4th 918, 942 (9th Cir. 2023) (expert opinions may support falsity allegations).

*Second*, the SAC newly contains admissions by Defendants in Q4 2021 that the iOS changes had had a material impact on their business in Q2 and Q3 2021. SAC ¶¶ 105, 113-18. Defendant Wehner stated on February 2, 2022 that "the iOS 14.5 rollout . . . really impacted our growth rates in Q3 and Q4," and referenced the "big iOS 14 headwinds" from the second half of 2021. SAC ¶ 113. Defendant Wehner also directly implied that the iOS headwind in Q3 2021 amounted to "a meaningful slowdown in growth" in e-commerce. SAC ¶ 115. Similarly, Defendant Li stated on the Q4 2021 investors follow-up call that "there are *still* significant targeting and measurement headwinds that we are facing," implying that those "significant" headwinds did not begin in Q4 but rather were still continuing from at least Q3. SAC ¶ 105.

*Finally*, Meta's admission in February 2022 that the iOS changes would have an ongoing $10 billion impact on Meta's revenues in 2022 shows that the impact had been material ever since the changes were adopted by almost all users (~85%) in Q2 2021. Indeed, as the SAC explains,

9

the minimum quantitative impact of the iOS changes on Meta's Q2 and Q3 2021 revenues can be inferred from this admission of a $10 billion 2022 impact, the fact that iOS had been adopted by 85% of users by Q2 2021, and the fact that the impact in 2022 was expected to be less than the impact in 2021.  SAC ¶¶ 106, 119.  Such reasonable inferences must be drawn in Plaintiffs' favor.  *See Faulkner v. ADT Sec. Servs., Inc.*, 706 F.3d 1017, 1019 (9th Cir. 2013).

Defendants *do not even dispute that the impact was material*.  Rather, Defendants rehash their old arguments, rightly ignored by the Court, which assume that the impact *was* material.

*First*, Defendants argue that Meta already had informed investors that the impact of the iOS changes was material.  Mot. 16.  Defendants again search everywhere in vain for some statement by Meta that the changes were having a material impact—none exists.  Defendants quote selectively again from a July 28, 2021 exchange between Susan Li and an analyst.

> Q:  Are you suggesting that you're not seeing any material impact at all to your ad revenue, maybe help quantify that?  [. . .]  I mean, do you think you'll lose a few percentage points of growth here?  Or how do you view that?  [. . .]
>
> Li:  No, sorry, I'm not suggesting that at all.  We certainly see an impact.  [. . .] [T]here is definitely an impact, although I don't think we've quantified that.

As explained before, far from implying that Meta had experienced a *material* impact, Li glaringly declined to repeat that operative term in the question and stated only that Meta had experienced "an impact."  Her responding "no" to the question, "[a]re you suggesting that you're not seeing any material impact at all," in no way implied that Meta was indeed experiencing a material impact. Read in any light, and certainly in the light most favorable to Plaintiffs, *In re Atossa*, 868 F.3d at 793, she was stating that, while Meta had experienced some impact, her comment was not meant to address the extent of that impact.  In any event, any ambiguity in what she meant was clearly resolved when she explained in the same breath that she "d[id]n't think [Meta had] quantified that," directly implying she was declining to characterize the extent or materiality of the impact.

Moreover, Defendants' assertion that investors already knew that the impact of the iOS changes was material is demonstrably false:  when Defendants first announced the financial impact of the changes (an impact only modestly above the SEC's threshold for materiality[3]), Meta's stock

---

[3] Even if Meta's 2022 revenue had been projected in February 2, 2022 not to have increased at all

1   dropped by an historic 26%.  SAC ¶ 133.  J.P. Morgan wrote, for example, that the impact was

2   "much bigger than expected."  SAC ¶ 134.  Investors clearly had no idea that the impact of the

3   changes was material.[4]  *See E. Ohman J:or Fonder AB*, 81 F.4th at 942 ("[A]ctual market results

4   relevant in determining whether statements were false . . . .").

5          Indeed, in additional alleged misstatements addressed below, Defendants repeatedly

6   reiterated that the iOS changes were *not* material.  Defendants stated that they were making

7   "encouraging progress" to "mitigate" any impact and that the impact was "manageable" and "in

8   line" with expectations.  SAC ¶¶ 70-98.  The Material Impact Misstatements are all the more

9   misleading in this context, which must be considered.  *See In re Syntex Corp.*, 95 F.3d at 929.

10         *Second*, Defendants argue that the key adverb "materially" in the Material Impact

11   Misstatements is too vague to be actionable.  Mot. 16.  Certainly not.  In the context of the SEC

12   "Risk Disclosures" section in which the term appears, the term has the same legally defined

13   meaning given to it by the SEC in the regulations governing that section.  *See* 17 C.F.R. § 229.105

14   ("Risk factors") (requiring "a discussion of the material [risk] factors"); SAC ¶¶ 81-85.  To ask

15   the Court to hold that "materially" in this context is vague is to ask unreasonably that the Court

16   hold the SEC regulations themselves to be vague.  Moreover, the term is "capable of objective

17   verification," using SEC guidelines, under which impacts on key metrics of greater than 5% are

18   presumptively material.  SAC ¶¶ 82-85; *see* SEC Staff Accounting Bulletin No. 99, 64 Fed. Reg.

19   45150-01 (Aug. 19, 1999); *In re Gupta Corp. Sec. Litig.*, 900 F. Supp. 1217, 1231 (N.D. Cal.

20   1994).[5]  As explained above, the impact of the iOS changes on Meta's net income comfortably

21   exceeds that threshold.  Contrary to Defendants' misleading selective quotations, the court in

22   *Twitter* and this Court never came close to holding that the term "material" as used in an SEC

23   ────────────────

24   in 2022, and so to have been $117,929,000,000, SAC ¶ 50, the $10 billion impact of iOS changes
     in 2022 would have amounted to an impact of approximately 8.5%, modestly higher than the
25   SEC's general 5% threshold for materiality.  SAC ¶¶ 83-84.

26   [4] Defendants misleadingly suggest that Meta provided "hard data" showing that the impact of the
     iOS changes was material.  Mot. 16.  Absolutely not.  Nowhere in Meta's financial statements or
27   anywhere else did it ever provide any kind of quantification of the impact of the iOS changes on
     Meta's business, nor could investors deduce such figures from Meta's broad financial metrics.

28   [5] Moreover, the term "significantly" in the context of the Material Impact Misstatements is also
     not vague as it appears as a synonym to the term of art "material."

OPPOSITION TO DEFENDANTS' MOTION TO DISMISS (CASE NO. 4:22-cv-01470-YGR)

1   filing is "meaningless."  Mot. at 16 (citing *Weston Fam. P'Ship LLLP v. Twitter, Inc.*, 29 F.4th

2   611, 621 (9th Cir. 2022); Hr'g Tr. 40:23-41:2).

3       Defendants argue that determining materiality involves "delicate assessments," Mot. 16,

4   but to the extent that is true, their misstatements were all the more misleading—Defendants'

5   misstatements implied that the iOS impact was unequivocally *not material*, and so implied that

6   under any "delicate assessment" of the facts, no reasonable investor could find the impact to be

7   material.  Reasonable investors resoundingly found the impact to be material.  SAC ¶¶ 133-35.

8       **B.     Additional, Newly Pled Misstatements Were Also False and Misleading**

9       The SAC alleges further misstatements by Defendants that, together with the Material

10  Impact Misstatements, mutually reinforce the conclusion that Defendants misled investors about

11  the impact of the iOS privacy changes on Meta's business.

12          **1.     "In Line with Expectations" Misstatements**

13      On successive calls with investors on July 28, 2021, Defendants Wehner and Li repeatedly

14  stated, using similar wording, that "the impact [of the iOS changes] has been in line with our

15  expectations." (**Cat. 4**) SAC ¶¶ 227, 231, 241.  These statements were misleading because Wehner

16  previously had stated, on the 1Q 2021 investor conference call, that Defendants expected that "the

17  impact on our own business [from the iOS privacy changes] will be manageable," and indeed, as

18  explained above, Meta repeatedly implied in its risk disclosures that the iOS changes were not

19  having a material impact on its business.  Yet in fact, by 2Q 2021, Apple's iOS privacy changes

20  were having a material, adverse impact on Meta's targeting and measurement capabilities and its

21  advertising revenues and growth, so the impact of Apple's iOS privacy changes were not "in line"

22  with Meta's stated expectations that the changes were "manageable" and "[im]material."  Indeed,

23  the SAC newly alleges *proof* that investors were *actually misled* by these misstatements—J.P.

24  Morgan's analysts noted that Meta's description of the iOS impact as "manageable" had misled

25  them to believe that the impact was *not* on the order of $10 billion per year:  "what was once

26  described as 'manageable' now appears to be a $10B revenue headwind in 2022."  SAC ¶ 134.

27      Once again, Defendants have combed through their statements in search of any suggestion

28  that the iOS changes were unmanageable or would have a material impact, and found only phrases

that they misleadingly take out of context.  Mot. 12.  Statements in Q2 that the changes were "very problematic" or "very challenging" did not suggest that those problems and challenges were not "manageable" and thus ultimately "[im]material."  SAC ¶¶ 73, 227-28.  And the context reads:

> [T]his has been very challenging for advertisers to navigate, and we're working with them to help them navigate these changes.  And we've introduced solutions to help them do that through approaches like our aggregated events management API . . . .

Defs.' Ex. 16 at 14.  Contrary to Defendants' selective quotation, this statement suggested that iOS changes were primarily a *technical* challenge "*for advertisers*" for which Meta had provided "*solutions*."  Similarly, Defendants' statement in Q3 that the iOS changes were "a little bit more disruptive than we anticipated" did not suggest that the changes were unmanageable—if anything, the diminutive phrasing suggested the opposite.  Defs.' Ex. 22 at 2.  Contrary to Defendants' misleading quotation, Meta stated in Q3 that the "iOS 14 ATT *changes*," i.e., Apple's structural software changes, were "fundamentally profound," *not* that the *impact* of those changes on Meta's business was profound.  Meta's statement in Q3 that the iOS impact would be "more significant" as "compared to [Q2]" did not suggest to investors that the impact would be material or unmanageable, or even that the impact in Q3 would be significant, only that it would be "more significant," i.e., greater, than in Q2.[6]  In any event, as explained above, in Q2 and Q3, Meta expressly implied that the impact of iOS changes on Meta's business was not material, which cancelled any notion investors may have had that these cherry-picked phrases by Meta were meant to suggest that the impact of the iOS changes was material or unmanageable.

Defendants also argue that the word "manageable" is "too imprecise" to be actionable.[7] Yet no such precision is required.  Wehner's statements that the impact of iOS was "manageable" were materially misleading simply if reasonable investors would have understood that term to mean that the impact was materially different from an impact that would give rise to an annualized

---

[6] Similarly, statements that Meta had experienced revenue "headwinds" did nothing to imply that those headwinds were *material*, as Meta routinely used the term "headwind" to refer to numerically immaterial impacts as well.  *See, e.g.*, ECF No. 61-17 at 6 (immaterial impact of $307 million or 0.91% called a "headwind").

[7] According to Defendants, their statements that the impact of the iOS changes was "in line" with their expectations were statements of opinion, Mot. 14, but that is wrong—Defendants' statements were falsifiable statements of fact about whether the actual measured impact of the iOS changes Meta observed in Q2 and Q3 was consistent with Meta's forecasts for that impact.

OPPOSITION TO DEFENDANTS' MOTION TO DISMISS (CASE NO. 4:22-cv-01470-YGR)

1   $10B revenue headwind.  Reasonable investors, including Morgan Stanley, understood the term

2   in exactly that way, and they stated as much in their reports.  SAC ¶¶ 134-39, 223.

3                          **2.        Effective Mitigation Misstatements**

4          In statements on the October 25, 2021 investor call, Defendants misled investors to believe

5   that Meta could effectively mitigate a major part of the impact of the iOS changes on Meta's

6   business ("Effective Mitigation Misstatements") (**Cat. 5**).  Defendant Sandberg stated:

7          There are two big challenges coming from this iOS changes.  The one is targeting
           and one is measurement. I'm taking the second one first. On measurement, we think
8          we can address more than half of that underreporting by the end of the year . . . .

9   SAC ¶ 239.  This statement created the impression that underreporting was a major part of the

10  problems Meta faced from the iOS changes—one of the two "big challenges" coming from those

11  changes—and that Meta could solve the majority of that "big challenge" by the end of the year.

12  In fact, as Meta later admitted, Meta's underreporting of web conversions was only a "very small

13  slice of the overall . . . revenue landscape," so addressing those web conversions did not materially

14  mitigate the impact of the iOS changes.  SAC ¶ 132.  Similarly, on the October 25, 2021 follow-

15  up investor call, Defendant Li stated:

16         I think the underreporting of web conversions has really been a bigger issue than
           we expected, but it's something that we're very focused on helping to through better
17         modeling techniques.

18  SAC ¶ 241.  This statement was also materially false and misleading because it likewise gave the

19  impression that the iOS impact largely resulted from Meta's underreporting of web conversions

20  and that Meta could effectively address that underreporting, when in fact, Meta's underreporting

21  of web conversions was only a "very small slice" of the problem.   SAC ¶¶ 132, 240, 242.

22  Moreover, the Effective Mitigation Misstatements were all the more misleading in the context of

23  Meta's other misstatements, which together created the impression that the impact of the iOS

24  changes was "[im]material" and "manageable" partly because Meta was mitigating that impact.

25         Defendants argue first that both of these statements are "inactionable opinions."  Mot. 15.

26  Sandberg's statement that underreporting was one of "two big challenges" was not an opinion.  In

27  any event, it is well-established that opinions are actionable under the securities laws, *Omnicare,*

28  *Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, 575 U.S. 175, 189 (2015), and the

                                                  14

1  Effective Mitigation Misstatements are actionable because they did not "fairly align[] with the
2  information in [Meta's] possession at the time"—at no point did the underreporting of web
3  conversions account for a large part of the revenue impact from the iOS changes.  *Id.*; SAC ¶¶ 240,
4  242.  Defendants also argue that these Misstatements did not "impl[y] that fixing underreporting
5  would be a cure-all."  Mot. 15.  Even if that is true, the Misstatements implied that the
6  underreporting of web conversions was one of only "two big challenges coming from the iOS
7  changes" and so falsely implied that they could solve a large part of the iOS problem by addressing
8  the underreporting.  *Finally*, Defendants accuse Plaintiffs of pleading "fraud by hindsight," but
9  they are mistaken.  Li's October 25, 2021 statement made clear that Meta was tracking the impact
10  of the underreporting in real time, SAC ¶ 241, so Defendants knew as of the date of their statements
11  that underreporting did not account for a large part of the impact of the iOS changes.

12        **C.    The SAC Adequately Pleads Loss Causation**

13        The truth concealed by the Material Impact Misstatements was revealed on February 2,
14  2021 when, among other things, Defendant Wehner revealed that "the impact of iOS overall as a
15  headwind" in 2022 was a manifestly material "$10 billion," and so shocked analysts who noted
16  that this impact belied Meta's prior statements that the impact was "manageable."[8]  SAC ¶ 114.
17  This statement revealed that the impact of the iOS changes on Meta's targeting and measurement
18  capabilities was material because the changes, which had been adopted by 85% of users by Q2
19  2021, SAC ¶ 75, had limited those capabilities enough to cause a material impact on Meta's
20  business results.  Wehner's statement also revealed that the iOS changes had been having a
21  material impact on Meta's revenues since Q2 2021.[9]  SAC ¶ 268.  As the limitations from iOS

22

---

23  [8] Separately, Li's revelation on February 2, 2022 that underreporting was only a "very small slice"
24  of the problems from the iOS changes straightforwardly revealed the falsity of her statements
    suggesting that such underreporting was a major part of those problem.  SAC ¶ 132.

25  [9] Similarly, on February 2, 2022, Defendant Wehner stated, "the iOS 14.5 rollout . . . *really*
26  *impacted our growth rates in Q3 and Q4.*"  SAC ¶ 130.  On the same day, Defendant Li stated,
    "There are *still significant targeting and measurement headwinds* that we are facing," implying
27  that those "significant" headwinds did not begin in Q4, but rather were "still" continuing from at
    least Q3.  SAC ¶ 131.  Defendants are mistaken in claiming that these statements did not reveal
28  any new information to the market—as explained above, *supra* Part IV(B)(1)-(2), Defendants had
    never previously revealed that the impact of the iOS changes on Meta's business was material.

1  changes peaked at the end of Q2 2021, and remained relatively constant in Q4 2021 and Q1-Q4

2  2022, when Meta revealed that those limitations were causing a material revenue impact in 2022,

3  investors reasonably could infer that the iOS limitations were causing a material revenue impact

4  in Q3 and Q4 2021 as well.

5        The Court rightly did not mention loss causation for Plaintiffs' iOS claims in its Opinion

6  or at the Hearing.  Defendants accuse Plaintiffs of "extrapolat[ing]" (i.e., inferring).  Mot. 17.  To

7  be sure, the revelation that the iOS problems were having a material impact in 2021 requires the

8  simple inference described above from the facts that the iOS limitations were having an ongoing

9  material impact in 2022 and the limitations had peaked in Q3 2021.  Yet such an inference is

10  wholly proper—indeed, the Court must draw all reasonable inferences in Plaintiffs' favor in ruling

11  on motion to dismiss.  *See e.g.*, *Faulkner*, 706 F.3d at 1019.

12        **D.        The SAC Adequately Pleads Scienter**

13        Defendants knew that the impact of Apple's iOS privacy changes was material by Q2 2021

14  at the latest, and so knew that the Material Impact Misstatements were misleading.  Both before

15  and after the introduction of Apple's iOS privacy changes, Defendants—including Defendants

16  Wehner and Li personally—assured investors that the impact of Apple's iOS privacy changes was

17  in line with Meta's expectations.  SAC ¶¶ 227, 231, 235, 239, 241.  Accordingly, Meta repeatedly

18  admitted that it had conducted internal studies calculating the impact of Apple's iOS privacy

19  changes on Meta's business, and that the results of these studies were known to the CFO.[10]  These

20  studies, personally drafted by FE1, SAC ¶¶ 102, 107, and known to other former employees as

21  well, SAC ¶¶ 108-11, showed Defendants that the iOS privacy changes had a material impact in

22  targeting and measurement capabilities, revenues and net income by Q2 2021.  The core operations

23  inference further supports a strong inference of scienter—it would be "absurd to suggest" that

24  management lacked knowledge of changes that reduced Meta's ad targeting and measurement

25  capabilities, the core of its business, by almost half.  *Berson*, 527 F.3d at 989; SAC ¶¶ 107-11.

26

27  [10] Similarly, Defendant Li's statement in Q3 2021 that "underreporting of web conversions has
really been a bigger issue than we expected," shows that Meta monitored the impact of

28  underreporting of web conversions, and so knew that such underreporting was only a "very small
slice" of the problem.  SAC ¶¶ 91, 241.

1    Defendants argue that the theory of scienter advanced in the SAC is "nonsensical" because,

2  according to Defendants, the SAC alleges in effect that Meta "pointlessly conceal[ed] negative

3  effects of the iOS privacy changes for a time, only to face 'inevitable fallout' later on."[11] Mot. 23-

4  24.  Not so.  The SAC amply alleges that Defendants hoped to mitigate the impact of the iOS

5  privacy changes.  SAC ¶¶ 231, 235, 239, 241, 243.  Defendants plausibly may have attempted to

6  mislead the market in Q2 and Q3 under the belief that their mitigation efforts would succeed by

7  Q4 2021, allowing them to avoid disclosing any $10 billion impact in 2022.

8    Defendants also argue that the SAC fails to plead Defendants' motive.  Defendants' desire

9  to escape the fallout from the iOS privacy changes certainly explains Defendants' actions.  Yet in

10  any event, caselaw is clear that the SAC need not plead motive at all to adequately plead scienter—

11  Defendants' knowledge of the falsity of their misstatements suffices.  *See Tellabs*, 551 U.S. at 325.

12  **V.    META MISLED INVESTORS ABOUT ITS TRANSITION TO REELS**

13      **A.    New Allegations Show the Originally Pled Misstatements Were Misleading**

14    During the Class Period, Defendants misled investors by implying that Meta's transition

15  from focusing users on text and photos to short-form videos in Reels was not having a net negative

16  impact on the Company's results of operations, when in fact it was.  In its Q2 and Q3 2021 Forms

17  10-Q, Meta made the following statements (the "Reels Effect Misstatements") (**Cat. 2**):

18      We also may introduce new features or other changes to existing products, or
       introduce new stand-alone products, that attract users away from properties,
19      formats, or use cases where we have more proven means of monetization, such as
       News Feed.  In addition, as we focus on growing users and engagement across our
20      family of products, from time to time these efforts have reduced, and may in the
       future reduce, engagement with one or more products and services in favor of other
21      products or services that we monetize less successfully or that we are not growing
       as quickly.  *These decisions may adversely affect our business and results of*
22      *operations* and may not produce the long-term benefits that we expect.

23  SAC ¶¶ 237; 245 (emphasis added).  These Misstatements were misleading because they directly

24  implied that, while there was a risk that Meta's decision to introduce a "new feature[]" "may

---

25  [11] Remarkably, Defendants appear to argue that knowledge that a statement is misleading does not
    support a strong inference of scienter.  Mot. 22-23.  Defendants are mistaken about black-letter
26  law.  *See, e.g.*, *No. 84 Emp.-Teamster Joint Council Pension v. Am. W. Holding Corp.*, 320 F.3d
    920, 942 (9th Cir. 2003) (scienter adequately pleaded where "allegations . . . raise[d] a strong
27  inference that Defendants knew that the . . . problems were ongoing and, thus, that the statements
    made . . . were false").  Defendants misleadingly quote *NVIDIA*, but that case certainly never held
28  the contrary.  *See In re NVIDIA Corp. Sec. Litig.*, 768 F.3d 1046, 1056-59 (9th Cir. 2014).

17

1  adversely affect [Meta's] business and results of operations," that risk had not yet materialized.

2  *See, e.g.*, *Siracusano*, 585 F.3d at 1181.  In fact, by the time of the Reels Effect Misstatements,

3  Meta's decision to introduce Reels already had had, overall, an adverse effect on Meta's business.

4  Meta first disclosed this fact on a February 2, 2022 conference call in which it revealed that its

5  transition to Reels was, from its introduction, having a net negative impact on Meta's business and

6  results of operations.  SAC ¶¶ 217-20.

7          In its Order, the Court stated only one reason that Plaintiffs had not adequately pleaded that

8  the Reels Effect Misstatements were false and misleading:  the Court found that Plaintiffs had not

9  adequately pleaded that the introduction of Reels in fact had a negative impact on Meta's business

10  during Q2 and Q3.  Op. at 3.  The SAC squarely addresses this concern by newly pleading that

11  Defendants themselves *admitted* such a negative impact:  Defendants informed investors in their

12  February 3, 2022 Annual Report, in no uncertain terms, that Reels had "adversely affected" Meta's

13  business "in the second half of 2021":

14          [W]e have introduced new features such as Reels, which is growing in usage but is
            not currently monetized at the same rate as our feed or Stories products. [. . .] These
15          trends adversely affected advertising revenue growth in the second half of 2021.

16  SAC ¶ 216.  That is, Defendants expressly admitted that by July 28, 2021, at the time of they made

17  their first Reels Effect Misstatement, and of course by October 26, 2021, when they made the

18  second Reels Effect Misstatement, Reels already was negatively impacting Meta.    Further

19  statements by Meta executives, previously pleaded, confirm this conclusion.  SAC ¶¶ 217-20.

20          Defendants ignore this new allegation, which is dispositive.  Instead, Defendants argue that

21  the Reels Effect Misstatement was too generic to be read as referring to Reels, and misleadingly

22  claim that the Court "concluded" as much.  Not so.  The Court's expressions of uncertainty in a

23  dialogue with Plaintiffs' counsel at the Hearing was not a conclusion.  Mot. 19.  More importantly,

24  new allegations in the SAC supply the missing context of those Misstatements and now make clear

25  that they referred unmistakably to Reels.  *First*, the SAC newly alleges that "Reels was the only

26  new product introduced during the Class Period."  SAC ¶¶ 210-11.  Defendants acknowledge this

27  dispositive fact in their Motion, Mot. 19, and yet offer no argument for why it would not eliminate

28  any concerns about the genericness of the Reels Effect Misstatements—it does.  *Second*, as newly

18

1    alleged, Meta *admitted* that the Reels Effect Misstatements referred to Reels in their February 3,

2    2022 10-K when they *added an express reference to Reels* in the same paragraph.[12]  SAC ¶ 212.

3        *Finally*, Defendants argue repeatedly that Meta was not required to offer "real-time"

4    updates about Reels.  Mot. 18, 20.  That is certainly true, but when Meta did speak, Meta was

5    required not to mislead investors by implying that Reels was not negatively impacting its business.

6        **B.    Additional, Newly Pled Misstatements Were Also False and Misleading**

7        The newly alleged misstatements in paragraphs 229 and 233 of the SAC were also

8    misleading.  *First*, on the July 28, 2021 investor call, Defendant Sandberg stated:

9        I can talk about video ads. So *we're seeing very strong growth in video monetization
         across* Watch, Feed, *Reels*. And we think we're continually getting better at
10       monetizing video, but they are still monetizing at lower rates versus Feed Stories . . . .

11   SAC ¶ 229 (**Cat. 6a**).  This statement was misleading because Meta was not experiencing *any*

12   economic growth from monetizing video on Reels—Meta was losing money from Reels.  SAC

13   ¶ 230.  Defendants argue that Plaintiffs have not alleged that Meta was losing money from Reels,

14   Mot. 18, but as noted above, they ignore new allegations pointing to Defendants' admission of

15   exactly that in their 2021 Annual Report.  SAC ¶¶ 212, 216.  Sandberg's statement that Reels was

16   "still monetizing at lower rates versus Feed" in no way reversed her statement that Meta was

17   experiencing growth from monetizing Reels—the former addressed the *rate* of monetization (e.g.,

18   revenue per ad) while the latter statement addressed the *overall* monetization (i.e., income) from

19   the product.  And contrary to Defendants' speculation, there is no reason why a new ad format on

20   an established ad platform like Instagram cannot be profitable six weeks after launching ads.

21       *Second*, on Meta's July 28, 2021 investor follow-up call, in response to a question seeking

22   "details" about Reels "monetization," Defendant Wehner stated, "Reels is going well."  SAC ¶ 233

23   (**Cat. 6b**).  This statement was at best only a half-truth—Reels was losing money, and so in at least

24   one sense critical to investors, Reels was not "going well."  *See Laurienti*, 611 F.3d at 539 (Section

---

[12] In any event, even if (out of context) the statement could be read as stating a general rule, the statement would still be misleading:  for Meta to imply that, as a general rule, no product introductions were then negatively impacting its business, when at the time the only product launch that year was indeed negatively impacting its business, would be misleading for failure to disclose this material exception to the general rule.  *See United States v. Laurienti*, 611 F.3d 530, 539 (9th Cir. 2010) (Section 10(b) "prohibits the telling of material half-truths").

10(b) "prohibits the telling of material half-truths").  Defendants argue that this statement is "paradigmatic puffery," Mot. 19, but unlike most such positive statements, Wehner's statement about Reels was objectively falsifiable as a statement about whether monetization of Reels was currently financially successful.  *See Or. Pub. Emps. Ret. Fund v. Apollo Grp. Inc*., 774 F.3d 598, 606 (9th Cir. 2014) ("Statements by a company that are capable of objective verification are not 'puffery' and can constitute material misrepresentations.")  As explained above, Reels at the time was losing money.  SAC ¶¶ 212, 216.

### C.    The SAC Adequately Pleads Loss Causation

The SAC newly pleads that on February 3, 2022, Defendants disclosed unequivocally in their 2021 10-K that the transition to Reels had been having a negative impact on Meta's business:

> [W]e have introduced new features such as Reels, which is growing in usage but is not currently monetized at the same rate as our feed or Stories products. [. . .] These trends adversely affected advertising revenue growth in the second half of 2021.

SAC ¶ 216.  Similarly, during an earnings call on February 2, 2022, Defendant Zuckerberg stated, "in the beginning . . . as the engagement of the new things starts to replace some of the engagement of the old thing, *it creates a near-term headwind for revenue*."  SAC ¶ 219.  These allegations straightforwardly plead "the causal connection that the plaintiff has in mind"—they revealed that Meta's representations that the transition to Reels was not having a negative impact were false.  *See In re Daou Sys.*, 411 F.3d 1006, 1026 (9th Cir. 2005).  Defendants rightly do not dispute that the SAC adequately pleads loss causation for claims based on the Reels Effect Misstatements.

### D.    The SAC Adequately Pleads Scienter

Defendants knew that the transition to Reels was negatively impacting Meta's business during the Class Period and so knew that the Reels Effect Misstatements were misleading.  Defendants made statements making clear that they understood that the impact of the transition initially would be negative, but that they were investing in Reels strategically to realize benefits in the future.  SAC ¶¶ 214-20.  As noted above, on February 2, 2022, Defendant Zuckerberg stated, "in the beginning our ads system and business are not as tuned for the new format, so as the engagement of the new things starts to replace some of the engagement of the old thing, it creates a near-term headwind for revenue."  SAC ¶ 219.  On the same call, Zuckerberg noted, "[W]e think

20

1   it's definitely the right thing to lean into this and to push us hard to grow Reels as quickly as

2   possible and not hold on the brakes at all, even though it may create some near-term slower growth

3   than we would have wanted." *Id*.  Moreover, as the transition to Reels was a strategic, company-

4   altering decision made at the highest levels that directly impacted Meta's core advertising business,

5   the core operations inference also supports scienter. *See Berson*, 527 F.3d at 989.

6        In its Opinion, the Court rightly did not address whether the SAC adequately pleads

7   scienter for the Reels Effect Misstatements.  In their Motion, Defendants repeat their argument

8   that Plaintiffs' theory of scienter is nonsensical because, according to Defendants, there was no

9   reason for Meta to hold back on disclosing the negative impact of Reels if such disclosure was

10  inevitable down the road.  Mot. at 24.  Yet as Plaintiffs argued previously, such a disclosure was

11  not inevitable.  Defendants believed Reels would eventually have a positive impact on Meta's

12  business.  SAC ¶¶ 214-20.  Meta could have waited until Reels was positively impacting its

13  business to comment on that impact and so have avoided any negative disclosure.  Yet Meta did

14  speak and falsely implied that Reels was not negatively impacting its revenue.[13]

15  **VI.    META MISLED INVESTORS ABOUT DEFENDANT SANDBERG'S BENEFITS**

16       **A.    The SAC Adequately Pleads a Section 14(a) Violation**

17            **1.    The SAC Adequately Pleads Misleading Statements and Omissions**

18       In Meta's April 9, 2021 and April 8, 2022 Proxy Statements, Defendants misled investors

19  by listing the "Perquisites and Other Benefits" and "All Other Compensation" paid to Defendant

20  Sandberg, yet failing to disclose, as required by law, *see* 17 C.F.R. § 229.402I(2)(ix), that she had

21  received extensive assistance from Meta employees on a variety of personal matters.  SAC ¶¶ 225,

22  247 ("Sandberg Benefits Misstatements") (**Cat. 3**).  Sandberg used corporate resources to bury

23  unflattering news stories about her boyfriend, SAC ¶¶ 145-50, to plan her wedding, SAC ¶ 158, to

24  write and promote her books, SAC ¶ 153, and to support her personal foundation, SAC ¶ 157.

25

26

---

27  [13] Defendants also argue that they gave "warnings tempering short-term expectations."  Mot. 24.
    As explained in detail previously, ECF No. 65 at 19-20, at no point prior to February 2, 2022, did
28  Defendants state or imply to investors that Reels was having a negative impact on Meta's business
    or financial condition—indeed, they implied the opposite.  SAC ¶¶ 196-213.

1    The Court in its Opinion found three deficiencies in the allegations concerning Sandberg's

2   misstatements, and the SAC squarely addresses all three. *First*, the Court found that the allegations

3   "did not establish that Sandberg received such assistance," because the allegations were "drawn

4   from press reports concerning an investigation . . . ." Op. at 4.   The SAC newly alleges, using

5   quotations of the reporting, that "*The Wall Street Journal* reported that individuals with knowledge

6   of the matters stated that *Sandberg actually used Company resources for personal benefit*, not

7   merely that Meta was investigating Sandberg for using Company resources for personal benefit."[14]

8   SAC ¶ 165.   While the Court is certainly correct that Defendants were not required *sua sponte* "to

9   disclose uncharged, unadjudicated wrongdoing," Op. at 4, Defendants nevertheless violated the

10   securities laws when they stated Sandberg's compensation without including the additional

11   compensation she received in the form of personal assistance.

12    *Second*, the Court found that the Complaint lacked "allegations concerning the materiality

13   of the alleged personal assistance in light of Sandberg's substantial compensation." Op. at 4.   The

14   SAC newly alleges the basis for the materiality of these misstatements, at ¶ 140:

15    These misstatements of Sandberg's compensation were material, not primarily because
     of the dollar value of the undisclosed benefits, but because the personal benefits
16   received were prohibited under Meta's Code of Conduct, and so exposed Meta to public
     criticism and Sandberg to Company investigation and sanctions. The statements were
17   also material because they were untruths that Sandberg's conduct had led the Company
     to disseminate, subjecting the Company itself to sanctions and scrutiny.

18

19    *Finally*, the Court held that Plaintiffs had not adequately grappled with the possibility that

20   the assistance Sandberg received was beneficial to the company. Op. at 4.   Under SEC guidance,

21   "[a]n item is a . . . personal benefit if it confers a direct or indirect benefit that has a personal aspect

22   without regard to whether it may be provided for some business reason or for the convenience of

23   the company." *In re Dow Chem. Co.*, Exchange Act Release No. 83581, 2018 WL 3238796, at *1

24   (July 2, 2018).   As there should be no question that Sandberg received a personal benefit from

25   wedding planning and PR assistance for her boyfriend, SEC guidance is clear that these benefits

26   must have been disclosed.   Moreover, the Proxy disclosed other personal benefits that were also

27

28   [14] Newspapers are widely considered to be a proper basis for allegations. *See, e.g.*, *In re McKesson
     HBOC, Inc. Sec. Litig.*, 126 F. Supp. 2d 1248, 1272 (N.D. Cal. 2000) (investigative reporting in
     the *Wall Street Journal* is a reasonable basis for allegations in securities fraud §10(b) cases).

1   useful for Meta, such as Sandberg's security and private jet travel, SAC ¶ 162, so particularly given

2   this context, the Proxy was misleading for failing similarly to disclose Sandberg's use of Meta

3   employees for personal matters, even if that assistance was somehow also useful for Meta.

4          Defendants renew their argument that allegations concerning Sandberg are "hopelessly

5   vague." Mot. 21.  That is not an accurate description of the SAC's allegations.  Plaintiffs specify

6   exactly what statements were misleading, who made them, where and when they were made, and

7   how they are misleading, and so satisfy Rule 9(b) and the PSLRA—they "give defendants notice

8   of the particular misconduct" that is alleged to be fraudulent, i.e., the misleading statements and

9   the reasons they were misleading. *Kearns v. Ford Motor Co.*, 567 F.3d 1120, 1124 (9th Cir. 2009).

10          Defendants also argue that the proxies covered only the period 2018-2022, and that the

11   SAC alleges only assistance from before that time period.  Mot. 21.  Defendants ignore the pages

12   of detailed allegations in the SAC alleging that Sandberg used Meta employees in 2019 to bury an

13   unflattering story about her ex-boyfriend and in planning her 2022 wedding, which clearly show

14   that Sandberg failed to disclose "other benefits" of her employment for the 2018-2022 time

15   period.[15]  SAC ¶¶ 143-50.  The SAC clearly alleges, for example that "from 2016 up to and

16   including 2019, Mr. Kotick and Defendant Sandberg regularly tapped employees at one another's

17   companies for public-relations advice." SAC ¶ 151.  Moreover, Plaintiffs' allegations regarding

18   Sandberg's omissions of personal assistance she received in drafting and marketing her book in

19   2017 and 2013 are actionable because Meta had an ongoing duty to correct those misstatements,

20   including during the Class Period when Meta discussed Sandberg's compensation.[16]  *See Oaktree*

21

---

22   [15] Defendants argue that Plaintiffs misread Sandberg's tacit admission through her spokeswoman

23   that that she used company resources in planning her wedding (albeit "not inappropriately"), but
     Defendants, not Plaintiffs, "ignore[] how people speak." Mot. 21-22.  Sandberg's statement that

24   she "did not inappropriately use company resources in connection with the planning of her
     wedding" conveys that she used company resources in planning her wedding (albeit not

25   inappropriately), just as the statement "I did not intentionally spill coffee on the couch," conveys
     that the speaker spilled coffee on the couch (albeit unintentionally).  And even if there were a

26   dispute about Sandberg's meaning, her meaning must be viewed "in the light most favorable to
     Plaintiffs" in ruling on a motion to dismiss. *In re Atossa*, 868 F.3d at 793.

27   [16] Defendants' argument that Plaintiffs are somehow attacking "simple human kindness" is
     melodramatic.  Mot. 21.  Certainly there was nothing wrong with Sandberg's thanking her

28   employees, but her acknowledgements of personal assistance from Meta employees evidence that
     she failed to disclose all personal benefits she received from her job.

23

OPPOSITION TO DEFENDANTS' MOTION TO DISMISS (CASE NO. 4:22-cv-01470-YGR)

1   *Principal Fund V, L.P. v. Warburg Pincus LLC*, No. 15-cv-8574 (PSG), 2018 WL 6137169, at *13

2   (C.D. Cal. Aug 29, 2018) ("[A]n individual can be held liable for failing to correct an earlier

3   statement when the failure to correct would itself render the statement misleading.").

### 2.  The SAC Adequately Pleads an Essential Link

5          Plaintiffs may satisfy the essential link requirement of Section 14(a) by alleging that "the

6   proxy statement at issue directly authorize[d] the loss-generating corporate action." *In re Wells*

7   *Fargo & Co. S'holder Deriv. Litig.*, 282 F. Supp. 3d 1074, 1104 (N.D. Cal. 2017).  Here, the loss-

8   generating corporate action was the election of Defendant Sandberg as a director.  The Proxy

9   Statements authorized the election of an individual as director who had not received undisclosed

10  personal benefits.  In fact, shareholders received an individual who had indeed received such

11  undisclosed benefits—and they related to an embarrassing scandal.  Shareholders are entitled

12  (among other things) to the difference between the value of Meta with a liability-free individual

13  as director, and the value of Meta with a director tainted by a scandal, valued after that scandal

14  was disclosed.  *See In re Maxim Integrated Prods., Inc., Deriv. Lit.*, 574 F. Supp. 2d 1046, 1066

15  (N.D. Cal. 2008) (election of officers actionable under Section 14(a)).[17]

16         Defendants argue that "Plaintiffs' losses were not meaningfully tied to [Sandberg's]

17  election as a director," because one of the three loss causation events was Sandberg's

18  announcement that she was resigning as COO, even though she stayed on as a director.  Mot. 22.

19  Defendants are again demonstrably wrong—Defendants ignore that Meta's stock price dropped

20  on June 10, 2022 on further news that Meta was investigating Sandberg, *after* Sandberg already

21  had announced her resignation as COO.  This stock drop shows that investors all along were

22  concerned with liability associated with Sandberg in her role as director, not merely as COO.[18]

---

24  [17] While the SAC reasonably alleges that Sandberg would not have been elected as director had
    she disclosed that she had received improper benefits, that allegation is not pivotal—the losses that
25  occurred in April and June 2022 still would not have occurred if Defendant Sandberg had disclosed
    her scandal when seeking election as a director and nevertheless been elected as director, just as
26  they would not have occurred had she disclosed her scandal and then not been elected.  SAC ¶ 179.

    [18] Defendants also cite to caselaw holding that "continued fraudulent acts" following an election
27  are only "incident to the election" and are not loss-causing corporate action.  Mot. 22 (citing *Cowin
    v. Bresler*, 741 F.2d 410, 428 (D.C. Cir. 1984)).  That is true, but here, the loss-causing corporate
28  action was the election of a director with an undisclosed scandal, not any "continued fraudulent
    acts" "subsequent" to her election.  *Cowin*, 741 F.2d at 428.

24

**B.      The SAC Adequately Pleads a Section 10(b) Violation by Pleading Scienter**

There is no genuine doubt that Defendant Sandberg knew that she was receiving personal benefits from Meta other than those disclosed in Meta's annual proxy filings because Defendant Sandberg knew about her own actions.  SAC ¶ 174.  As explained above, Defendant Sandberg personally directed Meta employees, and used company resources, to help her plan her wedding, write her personal book, assist with her personal foundation, and kill an unflattering news story about her ex-boyfriend.  *Id*.  The Court did not address scienter in its Opinion.

Defendants' arguments against Sandberg simply ignore or deny the allegations of the SAC. Defendants argue first that Sandberg could not have knowingly misled investors about her 2018-2021 compensation because, according to Defendants, the alleged personal assistance was received prior to 2018.  Mot. at 25.  Yet as explained above, the SAC alleges multiple forms of assistance Sandberg received in the 2018-2021 period.  SAC ¶¶ 145-83.  Defendants then argue that it is somehow implausible that Sandberg realized that she was receiving a personal benefit from tasks like wedding planning, but Defendants surely have it backwards—it is "at least as plausible" that Sandberg realized, or was reckless in not realizing, that she was benefitting personally from Meta employees' assistance with highly personal matters, including her boyfriend's PR problems, planning her wedding, editing her personal memoir, than that she somehow failed to grasp this. *See Tellabs*, 551 U.S. at 324.  This inference is all the more plausible given Sandberg's own statements—Sandberg disclosed other personal benefits (e.g., security and private jet travel) and stated that they were "other compensation" received due to her "high visibility," yet failed to disclose personal benefits such as wedding planning that Defendants claim Sandberg received for the same reason.[19]  ECF No. 61-10 at 52-53; ECF No. 61-8 at 51-52.

**VII.      CONCLUSION**

Defendants' Motion should be denied.

---

[19] Defendants also argue that "the value of any assistance deemed improper in hindsight would simply be repaid," but the federal securities laws do not allow for do-overs—Defendants were required accurately to disclose Sandberg's full compensation, including her personal benefits, in their SEC filings, and they acted, at a minimum, severely recklessly if they held off in disclosing her compensation accurately on the theory that they could correct the statement later.  SAC ¶ 140.

1

Dated:  January 16, 2024

Respectfully submitted,

2

**POMERANTZ LLP**

3

*/s/ Austin P. Van*
Jeremy A. Lieberman (admitted *pro hac vice*)

4

Austin P. Van (admitted *pro hac vice*)
600 Third Avenue, 20th Floor

5

New York, New York 10016
Telephone:  (212) 661-1100

6

Facsimile:  (917) 463-1044
E-mail:  jalieberman@pomlaw.com

7

avan@pomlaw.com

8

Jennifer Pafiti (SBN 282790)
1100 Glendon Avenue, 15th Floor

9

Los Angeles, California  90024
Telephone:  (310) 405 7190

10

Facsimile:  (917) 463 1044
jpafiti@pomlaw.com

11

12

Orly Guy
Eitan Lavie
HaShahar Tower

13

Ariel Sharon 4, 34th Floor
Givatayim, Israel 5320047

14

Telephone: +972 (0) 3 624 0240
Facsimile: +972 (0) 3 624 0111

15

E-mail:  oguy@pomlaw.com
eitan@pomlaw.com

16

17

*Attorneys for Lead Plaintiffs*

18

19

20

21

22

23

24

25

26

27

28

26

1

### CERTIFICATE OF SERVICE

2        I, Austin P. Van, hereby certify that a true and correct duplicate copy of the foregoing

3   Opposition to Defendants' Motion to Dismiss the Second Amended Class Action Complaint for

4   Violations of the Federal Securities Laws was filed electronically on January 16, 2024.  Notice of

5   this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system

6   or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic

7   Filing.  Parties may access this filing through the Court's CM/ECF System.

8                                                    */s/ Austin P. Van*
                                                     Austin P. Van
9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

OPPOSITION TO DEFENDANTS' MOTION TO DISMISS (CASE NO. 4:22-cv-01470-YGR)