United States District Court
Northern District of California

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

**PLUMBERS AND STEAMFITTERS LOCAL 60 PENSION TRUST,** *individually and on behalf of all others similarly situated,*

Plaintiffs,

v.

**META PLATFORMS, INC.**, *et al.*,

Defendants.

Case No. 4:22-cv-01470-YGR

**ORDER GRANTING MOTION TO DISMISS WITH PREJUDICE**

Re: Dkt. Nos. 82 & 83

Pending before the Court is the motion to dismiss filed by defendants Meta Platforms, Inc., and several of its executives.[1] In short, defendants assert that plaintiffs'[2] second amended complaint ("SAC", Dkt. No. 77) is insufficiently detailed to satisfy the heightened pleading standard applicable to federal securities claims. Plaintiffs oppose.

Having carefully considered the briefing and pleadings, as well as documents subject to judicial notice and incorporated by reference in the SAC, the Court determines plaintiffs have not carried their burden. Despite its girth of over 100 pages, the SAC fails to state actionable securities law claims under the law, and dismissal is therefore required. Given plaintiffs have amended their pleadings twice, including to remedy substantially similar issues previously identified by this Court, further amendment would be futile. Based thereon, the Court **GRANTS** defendants' motion **WITH PREJUDICE.**[3]

---

[1] Plaintiffs bring this case against Meta Platforms, Inc. ("Meta") as well as its Chief Executive Officer ("CEO") Mark Zuckerberg, Chief Operating Officer ("COO") Sheryl Sandberg, Chief Financial Officer ("CFO") David Wehner, and Vice President of Finance Susan Li (collectively, the "Individual Defendants"). Unless otherwise specified, the Court uses "defendants" to refer collectively to Meta and the Individual Defendants. From time to time, the Court refers to "Meta" by its former name "Facebook" based on the time periods at issue.

[2] Lead plaintiffs in this action are Menorah Mivtachim Insurance Ltd., Menorah Mivtachim Pensions and Gemel Ltd., The Phoenix Insurance Company Ltd., and the Phoenix Provident Pension Fund Ltd. (collectively, "plaintiffs").

[3] Pursuant to Federal Rule of Civil Procedure 78(b) and Civil Local Rule 7-1(b), the Court finds the motions referenced herein appropriate for decision without oral argument.

United States District Court
Northern District of California

## I. BACKGROUND

### A. Factual Allegations in the SAC

#### *i. Meta*

Meta is a Delaware corporation with its principal executive offices located in Menlo Park, California. (SAC ¶ 24.) Meta's "Family of Apps" is comprised of several mobile apps operated by the company, including Facebook, Instagram, Messenger, and WhatsApp, which are collectively used by 3.5 billion people.[4] (*Id.* ¶¶ 30, 43.) Substantially all of Meta's revenue (as much as 98% during the class period) comes from selling advertising for display in its Family of Apps. (*Id.* ¶¶ 30, 50.)

#### *ii. The Impact of Apple's iOS Privacy Changes on Meta's Business*

In June 2020, Apple, Inc. announced that, beginning with iOS 14 (hereinafter, the "Apple iOS" or the "iOS"), users would have access to new privacy controls. (*Id.* ¶ 58.) This new feature, App Tracking Transparency ("ATT"), went live in "late April 2021." (*Id.* ¶ 62.) It allows "iPhone users to opt-out of permitting apps, like Meta's Family of Apps, to track their internet behavior." (*Id.* ¶ 59.) If users exercise their opt-out right through ATT, "iOS communicates to the app developer that [they] do[] not want their information to be tracked and shared with anyone in any way. Once this setting has been selected, apps may no longer leverage data collected on untracked iOS devices beyond what they may observe within their own ecosystem." (*Id.* ¶ 60.) These changes negatively "impacted Meta's ad targeting and measuring capabilities." (*Id.* ¶ 63.) Allowing users to exercise their ATT opt-out rights "lowered the number of users that [could] be tracked," thereby limiting the amount of information advertisers could use for targeting and decreasing its accuracy. (*Id.*) Thus, ATT "lower[ed] the value of Meta's advertisements." (*Id.*)

Meta informed investors that it was taking steps to mitigate these negative impacts, including by using "aggregated events management," a technique which would "allow Meta and its advertisers to make use of aggregated ad-campaign-level data for users who opted out of being

---

[4] As is well known, Facebook is a social media and networking platform. Within Facebook, the News Feed, "a constantly updated, personally customized scroll of photos and links to news stories," is used "to push content to [ ] users." SAC ¶ 31. Instagram is another social media platform. "Instagram Feed" is a similar feature to Facebook's News Feed. *Id.* ¶ 32.

tracked once the iOS changes were implemented." (*Id.* ¶ 67.) Another mitigation tactic involved "closing an 'underreporting gap' of the number of customers whose viewing of an ad 'converted' into a sale, app installation, or other targeted activity on an advertiser's website." (*Id.* ¶ 68.)

Meta repeatedly acknowledged that the iOS changes would create "some kind of headwind" for the company. (*See, e.g.*, *id.* at 21.) The gravamen of the SAC posits that Meta directly and inaccurately implied that the iOS changes were not *already* having material, negative impacts on the company at the time such statements were made. To that end, plaintiffs assert the iOS changes had a material impact on Meta's targeting and measurement capabilities, specifically, and on Meta's revenue and financial performance, generally, by the second quarter of 2021 at the latest.

*iii. Sandberg's Purported Use of Meta Resources for Personal Benefit*

Plaintiffs also allege Meta misled investors regarding defendant Sandberg's[5] use of corporate resources for her personal benefit to write and promote her second book, suppress unflattering news stories, plan her wedding, and operate her foundation.[6] The specific allegations are as follows:

**Writing and Promotion of Sandberg's Second Book.** Sandberg's second book, "Option B: Facing Adversity, Building Resilience, and Finding Joy," was written and promoted using Meta resources. (*Id.* ¶ 153.) Meta staff also assisted Sandberg with the promotional tour for "Option B" as well as her first book, "Lean In: Women, Work, and the Will to Lead." (*Id.*) Sandberg identifies and thanks over 40 Meta employees in the acknowledgments sections of her books. (*See id.* ¶¶ 153–54 (identifying the individuals, their job titles, and their estimated salaries).) The acknowledgments generally state that the employees read drafts of the books and provided feedback.

**Suppressing Unflattering News Stories.** Sandberg worked with Facebook employees and

---

[5] Of note, Sandberg stepped down as Meta's COO in June 2022. *Id.* ¶ 146.

[6] Plaintiffs acknowledge that the specific allegations they make concerning Sandberg's use of Meta resources for her personal benefit are drawn "in substantial part" from reports published by *The Wall Street Journal*. *Id.* ¶ 145. They are quick to note that they "have taken steps to confirm that *The Wall Street Journal*'s reporting is based on reports from individuals with personal knowledge of the matters, including by interviewing a co-author of part of the reporting, *The Wall Street Journal* employee Keach Hagey, who confirmed that [the paper] has a 'stringent' fact review process." *Id.*



United States District Court
Northern District of California

others in 2016 and again in 2019 to dissuade the *Daily Mail's* digital version, the *MailOnline*, from publishing reports of the existence of a restraining order against her ex-boyfriend, Bobby Kotick.[7] (*Id.* ¶ 147.) In 2016, Sandberg threatened the *MailOnline* that an article revealing such information "could damage the news organization's business relationship with Facebook." (*Id.* ¶ 148.) Facebook executives acknowledged that any intervention by Sandberg, regardless of the specific words used, "could well be perceived as a threat, given the social-media giant's power over web traffic and Sandberg's own power and influence."[8] (*Id.*) The *MailOnline* ultimately elected not to publish the reports. (*Id.* ¶ 149.) In 2019, Sandberg again expressed concerns regarding the publishing of reports about Kotick by the *MailOnline.* (*Id.* ¶ 150.) She corresponded by email with senior figures at the *MailOnline*, and again, the news organization declined to publish any story regarding a restraining order against Kotick. (*Id.*)

**Other Alleged Uses of Meta Resources for Personal Benefit.** Sandberg also used Meta resources "to support her personal foundation," "help her plan her wedding,"[9] and complete "tasks for her family." (*Id.* ¶¶ 157–59.)

* * *

In the fall of 2021, Meta initiated an internal investigation into Sandberg's potential use of company resources for personal benefit, including with respect to her second book, wedding planning, and foundation. (*Id.* ¶ 160.) This effort was combined with an investigation initiated earlier regarding Sandberg's purported use of Meta resources, in violation of Meta's Code of

---

[7] Plaintiffs assert that, over the period lasting 2016–19, "Sandberg benefitted from work by Meta employees on some of her personal public relations," both in connection with the reports concerning Kotick as well as other topics. *Id.* ¶ 151. Kotick and Sandberg, in fact, "regularly tapped employees at one another's companies for public-relations advice." *Id.*

[8] Plaintiffs concede that "Kotick and a spokeswoman for Meta have made statements denying that Sandberg threatened the *Daily Mail* organization . . . ." *Id.* ¶ 152.

[9] Plaintiffs note that a spokeswoman for Sandberg was quoted in a June 2022 article as stating Sandberg "did not inappropriately use company resources in connection with the planning of her wedding." *Id.* ¶ 167. Plaintiffs suggest that use of the word "inappropriately" "tacitly suggest[s] [that] she in fact did" use company resources for wedding planning purposes. *Id.*

Conduct,[10] to dissuade the *MailOnline* from publishing reports of the restraining order against Kotick. (*Id.*) The investigation is ongoing. (*Id.* ¶ 164.)

*iv. Meta's Transition to Reels*

Plaintiffs allege defendants misled investors to believe that its transition to a new in-app video format was not impacting its business.

By way of background, Meta's Family of Apps competes with TikTok, a mobile app that hosts full-screen, short-form videos that play automatically. (*Id.* ¶¶ 185, 188.) To more effectively compete with TikTok, on August 5, 2020, Meta debuted a new feature on its Instagram app called "Reels," which "allows users to create, view and share short, 15- or 30-second videos."[11] (*Id.* ¶ 190.) On June 16, 2021, Meta debuted "full screen, vertical ads" on Instagram Reels. (*Id.* ¶ 191.)

Ads on Instagram Reels are at once harder to monetize and more engaging than ads on the classic Instagram Feed. They are more difficult to monetize because users can only view one ad at a time. This distinguishes Reels ads from ads in the Instagram "Home" tab, in which "many ads may be interspersed between user-generated content," all of which are viewed together, thereby enabling a larger number of simultaneous ad impressions. (*See generally id.* ¶ 193.) On the other hand, users typically view Reels ads for longer periods of time; thus, they are more "engaging." (*Id.* ¶ 194.) "Reels is so engaging that many users have shifted their engagement from older formats in Meta's Family of Apps, such as Instagram photos and Facebook News Feed, to Reels. In this way, Reels is partly 'cannibalizing' user engagement in older content formats in Meta's Family of Apps." (*Id.*) Despite this tradeoff, "Meta believes that engagement with short-form video on Reels increases overall user engagement with Meta's content." (*Id.*)

Meta acknowledged, at various points during the class period, the tradeoffs described above. In other words, the company admitted that the debut of Reels would continue to shift some user

---

[10] On June 7, 2021, Meta's board of directors adopted a Code of Conduct for its officers, directors, and employees, violations of which may result in disciplinary action up to and including termination. *Id.* ¶ 141. Individuals subject to the Code are prohibited, among others, from "receiv[ing] a personal benefit from [their] position at Meta." *Id.* ¶ 142.

[11] *See also id.* ¶¶ 45–49 (describing the Reels feature and its rollout).

engagement to formats that are less easily monetized. Meta directly and repeatedly implied, however, that this shift was not adversely affecting its business and results of operations. Plaintiffs allege these statements were inaccurate insofar as they implied that Reels was positively impacting the company whereas in fact the transition to Reels was having a negative impact. (*See, e.g.*, *id.* ¶ 203.)

B. Challenged Statements

Plaintiffs challenge 17 statements[12] by Meta, which fall into three broad categories, namely statements concerning: (i) the impact of Apple's iOS privacy changes; (ii) defendant Sandberg's purported receipt of personal assistance from Meta; and (iii) Meta's transition to Reels. They read as follows:

*i. Statements Concerning the Impact of Apple's iOS Privacy Changes*

Statement 1a (*id.* ¶ 235 (emphasis in original)):

> [M]obile operating system and browser providers, such as Apple and Google, have announced product changes as well as future plans to limit the ability of websites and application developers to collect and use these signals to target and measure advertising. For example, in April 2021, Apple made certain changes to its products and data use policies in connection with changes to its iOS 14 operating system that reduce our and other iOS developers' ability to target and measure advertising, which may in turn reduce the budgets marketers are willing to commit to us and other advertising platforms.

---

[12] This figure is comprised of each statement challenged by plaintiffs, which is not to say each of these 17 statements contains different content. *See* Dkt. No. 88-1, Letter from Lead Plaintiffs' Counsel, Attachment A at 2–3, 5–8. For instance, Statements 2a and 2b are identical. However, they were made at different times. They are analyzed, *infra*, at Section III.D.

There are also repeats. First, Statement 5b is the same Q2 statement from Wehner as Statement 4d. Plaintiffs do not defend Wehner's comments in the context of Category 5, which plaintiffs refer to as the "Effective Mitigation Misstatements." *See* Opp. at 14 (articulating plaintiffs' argument as to the Effective Mitigation Misstatements without citing to paragraph 231 of the SAC, which contains Statement 5b). Plaintiffs therefore waive any argument as to Statement 5b and the motion is **GRANTED** as to that statement.

Second, Statement 5a is the same Q2 statement by Li as Statement 4c. Plaintiffs do not address Statement 5a in their opposition and therefore forfeit any challenge to it. The motion is **GRANTED** as to that statement. The Court analyzes the substance of Li's commentary in Statement 4c, *infra*, at Section III.B.ii.

Third, Statement 5d is the same Q3 statement by Li as Statement 4e. Because it appears plaintiffs offer the same statement by Li in connection with different theories of falsity, the Court analyzes them separately. *See infra* Sections III.B.ii (Statement 4e); III.B.iii (Statement 5d).



United States District Court
Northern District of California

> [. . .]
> These developments have limited our ability to target and measure the effectiveness of ads on our platform and negatively impacted our advertising revenue, and *if we are unable to mitigate these developments as they take further effect in the future, our targeting and measurement capabilities will be materially and adversely affected*, which would in turn significantly impact our future advertising revenue growth.

Statement 1b (*id.* ¶ 243 (emphasis in original)):

> Our advertising revenue in the third quarter of 2021 was negatively impacted by marketer reaction to targeting and measurement challenges associated with iOS changes. *If we are unable to mitigate these developments as they take further effect in the future, our targeting and measurement capabilities will be materially and adversely affected, which would in turn significantly impact our future advertising revenue growth*.

Statement 4a, by defendant Wehner (*id.* ¶ 227):

> In terms of your question on ATT, so the impact from the ATT changes has really generally been in line with our expectation.

Statement 4b, by defendant Wehner (*id.* ¶ 227):

> On the iOS changes, really very much in line with expectations on things like opt-in rates. So I would say, overall, the impact has been in line with our expectations. So, not a huge surprise there.

Statement 4c, by defendant Li (*id.* ¶ 231):

> In general, the -- I think the impact of ATT has been really quite close on almost all of the dimensions that we look at when we think about kind of the iOS adoption curve, the opt-in rate, the impact post opt-out to ARPU. Those have all been quite similar to the early projections that we had that we kind of had factored into our Q1 and Q2 guidance. So I think -- so that's really been pretty consistent. And I think in the landscape we're at now, effectively we're looking at the sort of primary buckets of mitigations. There's -- obviously, there's conversion to API which allows advertisers to share data for the opted in users over server side channels. And then we also have the Aggregated Events Measurement tool that's allowing us to receive aggregated campaign-level data for opted out users. And so I think the impact kind of to – to our revenue ecosystem has been pretty in line with how we expected those would perform.

Statement 4d, by defendant Wehner (*id.* ¶ 231):

> And I think there's always the opportunity, I mean, given the -- Apple is obviously -- and Google with Android, they have a lot of power as platform providers. And so I think there's always an opportunity or risk, and we call that out clearly in our risk factors, of them changing things. So we have to continually monitor this and see if there's any changes coming and then, you know, update everyone accordingly. But at least so far, like Susan said, it's been largely in-line.

Statement 4e, by defendant Li (*id.* ¶ 241):

> We had a range of expected impact from the [ATT] changes and ultimately what we've seen is in that range but it's really on the higher end of what we had



United States District Court
Northern District of California

> expected, and I think the underreporting of web conversions has really been a bigger issue than we expected, but it's something that we're very focused on helping to through better modeling techniques.

Statement 5a, by defendant Li (*id.* ¶ 231):

> In general, the -- I think the impact of ATT has been really quite close on almost all of the dimensions that we look at when we think about kind of the iOS adoption curve, the opt-in rate, the impact post opt-out to ARPU. Those have all been quite similar to the early projections that we had that we kind of had factored into our Q1 and Q2 guidance. So I think -- so that's really been pretty consistent. And I think in the landscape we're at now, effectively we're looking at the sort of primary buckets of mitigations. There's -- obviously, there's conversion to API which allows advertisers to share data for the opted in users over server side channels. And then we also have the Aggregated Events Measurement tool that's allowing us to receive aggregated campaign-level data for opted out users. And so I think the impact kind of to – to our revenue ecosystem has been pretty in line with how we expected those would perform.

Statement 5b, by defendant Wehner (*id.* ¶ 231):

> And I think there's always the opportunity, I mean, given the -- Apple is obviously -- and Google with Android, they have a lot of power as platform providers. And so I think there's always an opportunity or risk, and we call that out clearly in our risk factors, of them changing things. So we have to continually monitor this and see if there's any changes coming and then, you know, update everyone accordingly. But at least so far, like Susan said, it's been largely in-line.

Statement 5c, by defendant Sandberg (*id.* ¶ 239):

> There are two big challenges coming from this iOS changes. The one is targeting and one is measurement. I'm taking the second one first. On measurement, we think we can address more than half of that underreporting by the end of the year . . . .

Statement 5d, by defendant Li (*id.* ¶ 241):

> We had a range of expected impact from the [ATT] changes and ultimately what we've seen is in that range but it's really on the higher end of what we had expected, and I think the underreporting of web conversions has really been a bigger issue than we expected, but it's something that we're very focused on helping to through better modeling techniques.

*ii. Statements Concerning Sandberg's Compensation*

Statement 3a (*id.* ¶ 225):

> In a section titled, "Perquisites and Other Benefits," a table presenting the total compensation awarded to, earned by, or paid to each of the named executive officers for services rendered. In addition to "Salary," "Bonus" and "Stock Awards," the table listed "All Other Compensation" to Defendant Sandberg as "$7,646,560, $4,370,631, and $2,914,831 in 2020, 2019, and 2018, respectively, for costs related to personal security for Ms. Sandberg at her residences and during personal travel pursuant to Ms. Sandberg's overall security program; and approximately $872,413, $1,316,468, and $908,677 in 2020, 2019, and 2018,



United States District Court
Northern District of California

> respectively, for costs related to personal usage of private aircraft.

Statement 3b (*id.* ¶ 247):

> In a section titled, "Perquisites and Other Benefits," a table presenting the total compensation awarded to, earned by, or paid to each of the named executive officers for services rendered. In addition to "Salary," "Bonus" and "Stock Awards," the table listed "All Other Compensation" to Defendant Sandberg as $8,981,973, $7,646,560, and $4,370,631 in 2021, 2020, and 2019, respectively, for costs related to personal security for Ms. Sandberg at her residences and during personal travel pursuant to Ms. Sandberg's overall security program; and approximately $2,292,964, $872,413, and $1,316,468 in 2021, 2020, and 2019, respectively, for costs related to personal usage of private aircraft.

*iii. Statements Concerning Meta's Transition to Reels*

Statements 2a and 2b (*id.* ¶¶ 237, 245 (identical) (emphasis supplied)):

> We also may introduce new features or other changes to existing products, or introduce new stand-alone products, that attract users away from properties, formats, or use cases where we have more proven means of monetization. For example, we previously introduced the Stories format, which we do not currently monetize at the same rate as News Feed. In addition, as we focus on growing users and engagement across our family of products, from time to time *these efforts have reduced, and may in the future reduce, engagement with one or more products and services in favor of other products or services that we monetize less successfully or that are not growing as quickly. These decisions may adversely affect our business and results of operations* and may not produce the long-term benefits that we expect.

Statement 6a, by defendant Sandberg (*id.* ¶ 229 (emphasis in original)):

> I can talk about video ads. So *we're seeing very strong growth in video monetization across* Watch, Feed, *Reels*. And we think we're continually getting better at monetizing video, but they are still monetizing at lower rates versus Feed Stories, but we have a lot here. We have 2 billion people watching in-stream ad eligible videos per month.

Statement 6b, by defendant Wehner (*id.* ¶ 233 (emphasis in original)):

> Yeah, I mean, *Reels is going well*. It's still obviously early in its launch, but we've now rolled it out to 80 markets since launching it about a year ago.
> [. . .]
> And then on the ads front, you know, *ads are now available to all advertisers* and in almost all markets where Reels is live. It's still very early on the advertising front, but *we think this should be a good ad format*."

## II. LEGAL FRAMEWORK

The standard for a motion to dismiss is well-known and not in dispute. Thus, the Court identifies here only the specific legal frameworks implicated by plaintiffs' securities claims, including the applicable pleading standard.



United States District Court
Northern District of California

A. Section 10(b)

"To plead securities fraud under Section 10(b) of the [Securities Exchange Act of 1934] or Rule 10b-5, [p]laintiffs must allege: '(1) a misstatement or omission (2) of material fact (3) made with scienter (4) on which [plaintiffs] relied (5) which proximately caused [the plaintiffs'] injury.'" *Knollenberg v. Harmonic, Inc.*, 152 Fed. Appx. 674, 678 (9th Cir. 2005) (quoting *DSAM Global Value Fund v. Altris Software, Inc.*, 288 F.3d 385, 388 (9th Cir. 2002)). Section 10(b) and Rule 10b-5(b) "do not create an affirmative duty to disclose any and all material information," but instead a duty to include all facts necessary to render a statement accurate and not misleading once a company elects to disclose that material information. *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 44–45, 47; 17 C.F.R. § 240.10b–5(b).

B. Section 14(a)

In contrast to the broad sweep of Section 10(b) of the Act, Section 14(a) is focused specifically on disclosures companies make in proxy statements provided to shareholders before they vote on corporate activities. "To state a claim under Section 14(a) [of the Securities Exchange Act of 1934], a plaintiff must establish that (1) a proxy statement contained a material misrepresentation or omission which (2) caused the plaintiff injury and (3) that the proxy solicitation, rather than the particular defect in the solicitation materials, was an essential link in the accomplishment of the transaction." *Knollenberg*, 152 Fed.Appx. at 682 (cleaned up). "An omitted fact [in a proxy statement] is material if there is a substantial likelihood that a reasonable shareholder would consider it important in deciding how to vote." *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 449 (1976).

C. Pleading Standard

The Private Securities Litigation Reform Act of 1995 ("PSLRA") "modified the liberal, notice pleading standard found in the Federal Rules of Civil Procedure." *Desaigoudar v. Meyercord*, 223 F.3d 1020, 1021 (9th Cir. 2000). Securities complaints that sound in fraud are examined under the heightened pleading standards of Federal Rule of Civil Procedure 9(b) and the PSLRA, which "require [plaintiffs] to plead [their] case with a high degree of meticulousness." *Id.* at 1022. Specifically, Rule 9(b), as modified by the PSLRA, demands that securities fraud plaintiffs identify:

"(1) each statement alleged to have been misleading; (2) the reason or reasons why the statement is misleading; and (3) all facts on which that belief is formed." *Id.* at 1023. The Supreme Court has held that "literal accuracy is not enough: An issuer must as well desist from misleading investors by saying one thing and holding back another." *Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*, 575 U.S. 175, 192 (2015). Indeed, a statement is actionably false or misleading if it would give a reasonable investor "an impression of a state of affairs that differs in a material way from the one that actually exists." *Brody v. Transitional Hospital Corp.*, 280 F.3d 997, 1006 (9th Cir. 2002).

When plaintiff alleges an omission, the omission is only material if "a *reasonable* investor would have viewed the non[-]disclosed information as having *significantly* altered the total mix of information made available." *Matrixx Initiatives, Inc.*, 563 U.S. at 44 (cleaned up) (emphasis in original). "'[O]nce defendants cho[o]se to tout' positive information to the market, 'they [are] bound to do so in a manner that wouldn't mislead investors,' including disclosing adverse information that cuts against the positive information." *Schueneman v. Arena Pharm., Inc.*, 840 F.3d 698, 706 (9th Cir. 2016) (quoting *Berson v. Applied Signal Tech. Inc.*, 527 F.3d 982, 987 (9th Cir. 2008)).

## III. ANALYSIS

As previously stated, the challenged statements fall into three categories, those pertaining to: (i) the impact of Apple's iOS privacy changes on Meta's business; (ii) misrepresentations regarding Meta COO Sheryl Sandberg's compensation; and (iii) Meta's transition to Reels. The Court first addresses defendants' request for judicial notice and then considers each of the three categories of challenged statements in turn.

### A. Request for Judicial Notice

Preliminarily, the Court examines defendants' request that the Court consider certain additional documents beyond the SAC. (Dkt. No. 83, Request for Judicial Notice ("RJN").) These include, among others, copies of Meta SEC filings referenced in the SAC, transcripts of investor calls on which the Individual Defendants spoke, and portions of Sandberg's books. (*See id.* at 2.)[13] Defendants assert these documents are incorporated by reference in the SAC, properly the subjects

[13] The Court's citations herein use the page numbers appearing on the ECF-stamped headers of the relevant documents.

United States District Court
Northern District of California

of judicial notice, or both. Plaintiffs did not respond to defendants' motion and therefore waive any objection thereto.

"In ruling on a [Rule] 12(b)(6) motion, a court may generally consider only allegations [i] contained in the pleadings, [ii] exhibits attached to the complaint, and [iii] matters properly subject to judicial notice." *Swartz v. KPMG LLP*, 476 F.3d 756, 763 (9th Cir. 2007). The first and third of these categories are relevant here. With respect to the first, the doctrine of incorporation by reference "treats certain documents as though they are part of the complaint itself" and may therefore be considered on a motion to dismiss. *Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 1002 (9th Cir. 2018). To qualify, plaintiff must "refer[] extensively to the document" in the complaint "or the document [must] form[] the basis of the plaintiff's claim." *Id.* (citation and quotations omitted). Once deemed incorporated by reference, "the entire document is assumed to be true for purposes of [the] motion to dismiss . . . ." *In re NVIDIA Corp. Sec. Litig.*, 768 F.3d 1046, 1058 n.6 (9th Cir. 2014) (quotation and citation omitted).

Separately, a court may take judicial notice of facts "not subject to reasonable dispute" because they are either "(1) generally known within the trial court's territorial jurisdiction; or (2) can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201. To that end, a court may take judicial notice of "'matters of public record' without converting a motion to dismiss into a motion for summary judgment." *Lee v. City of Los Angeles*, 250 F.3d 668, 689 (9th Cir. 2001) (quoting *MGIC Indem. Corp. v. Weisman*, 803 F.2d 500, 504 (9th Cir. 1986)). "SEC filings" are, thus, one example of public records of which courts may take judicial notice. *See Dreiling v. Am. Express Co.*, 458 F.3d 942, 946 n.2 (9th Cir. 2006). Publications are treated similarly where they are proffered "to indicate what was in the public realm at the time," not for their truth. *Von Saher v. Norton Simon Museum of Art at Pasadena*, 592 F.3d 954, 960 (9th Cir. 2010) (cleaned up). This is an important point. Courts take judicial notice of the existence of a document, not for the truth of facts contained therein. *See, e.g.*, *Lee*, 250 F.3d at 690.

Here, defendants ask the Court to consider 37 separate exhibits in addition to the SAC. These exhibits fall into three categories (with minor overlap): (i) documents previously granted

judicial notice; (ii) documents offered under the incorporation by reference doctrine; and (iii) documents for which judicial notice was not previously sought.

With respect to the first category, the Court already granted defendants' request for judicial notice of Exhibits 7, 9, 11–14, 16–19, 21–26, 28, and 35–37.[14] As plaintiffs have not contested this ruling, the Court sees no reason to diverge from it, as to the 20 exhibits mentioned.

The second category comprises Exhibits 1, 3, 8, and 29–34 which defendants contend are incorporated by reference in the SAC. (RJN at 8:24–26.) The exhibits themselves comprise the acknowledgments sections of Sandberg's two books (Exs. 1 & 3), analyst reports relative to Meta's stock performance (Exs. 29–34), and the transcript of an investor conference (Ex. 8). While "the mere mention of the existence of a document is insufficient" to apply the doctrine, here, the Court finds plaintiffs' reliance extensive to support key components of their factual allegations. *See Khoja*, 899 F.3d at 1002 (quotation & citation omitted). Thus, the Court determines they are properly considered incorporated by reference into the SAC. *See United States v. Ritchie*, 342 F.3d 903, 908 (9th Cir. 2003) ("Even if a document is not attached to a complaint, it may be incorporated by reference into a complaint if the plaintiff refers extensively to the document or the document forms the basis of the plaintiff's claim.").

The third category for which judicial notice is sought is comprised of excerpts from Sandberg's books (Exs. 1 & 3), Meta's SEC filings (Exs. 2, 4, 10, 15 & 20), a presentation by Meta to investors (Ex. 27), transcripts of calls Meta convened for investors (Exs. 5–6 & 8), as well as analyst reports concerning Meta's stock performance (Exs. 29–34). All are categories of records of which courts routinely take judicial notice.[15] The Court therefore takes judicial notice of these

---

[14] *See* Dkt. No. 74, Order Granting Motion to Dismiss (the "Prior Order") at 1 n.1 (granting defendants' requests for judicial notice relative to plaintiffs' first amended complaint ("FAC")).

[15] *See Von Saher*, 592 F.3d at 960 (taking judicial notice "of the fact that various newspapers, magazines, and books have published [certain] information" in order to show what was in the public domain at the time); *In re Apple Inc. Sec. Litig.*, No. 19-cv-02033-YGR, 2020 WL 2857397, at *6 (N.D. Cal. June 2, 2020) ("Courts routinely take judicial notice of SEC filings in securities cases where authenticity is not disputed because their accuracy cannot reasonably be questioned."); *Sanders v. Realreal, Inc.*, No. 19-cv-07737-EJD, 2021 WL 1222625, at *4 (N.D.

exhibits for the purpose of understanding "what was in the public realm at the time." *Von Saher*, 592 F.3d at 960.

Accordingly, defendants' request is **GRANTED**.

B. Impact of iOS Privacy Changes on Meta's Business

Plaintiffs challenge three categories of statements regarding the impact of Apple's iOS privacy changes on Meta. The first category consists of Meta's quarterly reports for Q2 and Q3 2021, respectively **Statements 1a & 1b**. These statements were previously challenged in plaintiffs' FAC and addressed in the Court's Prior Order. The second category consists of newly challenged statements indicating the impact of the iOS privacy changes in Q2 and Q3 2021 was "in line" with Meta's expectations (**Statements 4a–4e**). The third category consists of newly challenged statements discussing Meta's efforts to mitigate the impact of the iOS privacy changes (**Statements 5a–5d**). The Court addresses each in turn.

*i. Statements 1a & 1b*

Plaintiffs' challenge largely identical language appearing in both of Meta's Q2 and Q3 Form 10-Q's (Statements 1a & 1b, respectively). Referring to the Apple iOS privacy changes, Meta wrote:

> [I]f we are unable to mitigate these developments as they take further effect in the future, our targeting and measurement capabilities will be materially and adversely affected, which would in turn significantly impact our future advertising revenue growth.

(SAC ¶¶ 235, 243.)

Plaintiffs assert these statements were false and misleading because they suggested that, as of Q2 2021 and Q3 2021, "Apple's iOS privacy changes had not yet '*materially* and adversely affected' Meta's 'targeting and measurement capabilities,' and had not yet 'significantly impact[ed]' Meta's advertising revenues." (Dkt. No. 84, Plaintiffs' Opposition to Defendants'

---

Cal. Mar. 31, 2021) ("Transcripts of earnings calls and investor presentations are publicly available documents and are thus matters of public record not subject to reasonable dispute."); *In re Century Aluminum Co. Sec. Litig.*, 2011 WL 830174, at *9 (N.D. Cal. Mar. 3, 2011) ("[C]ourts routinely take judicial notice of analyst reports, not in order to take notice of the truth of the matters asserted therein, but in order to determine what may or may not have been disclosed to the public.").



United States District Court
Northern District of California

Motion to Dismiss ("Opp.") at 15:26–28.)

Defendants seek dismissal on the grounds that plaintiffs have failed to adequately plead both falsity and loss causation relative to this theory. Regarding loss causation, the Ninth Circuit set out the pleading standard in *Lloyd v. CVB Financial Corp.*:

> Even when deceptive conduct is properly pleaded, a securities fraud complaint must also adequately plead loss causation. Loss causation is shorthand for the requirement that investors must demonstrate that the defendant's deceptive conduct caused their claimed economic loss. Thus, like a plaintiff claiming deceit at common law, the plaintiff in a securities fraud action must demonstrate that an economic loss was caused by the defendant's misrepresentations, rather than some intervening event. The burden of pleading loss causation is typically satisfied by allegations that the defendant revealed the truth through *corrective disclosures* which caused the company's stock price to drop and investors to lose money.

811 F.3d 1200, 1209 (9th Cir. 2016) (cleaned up) (emphasis supplied).

Here, the parties disagree on whether certain statement(s) constitute viable corrective disclosures for loss causation purposes. Defendants identify and respond to three potential pathways for pleading loss causation, all of which are of similar character: One, an announcement by defendant Wehner wherein he commented that Meta faced headwinds of about $10 billion in 2022. Defendants posit that a forward-looking statement cannot be refashioned into a retrospective observation and the analyst reports to which plaintiffs refer understood Wehner's comments as a forecast, not retrospective correction. Two, Wehner's observation on a Q4 2021 call, that Apple's iOS changes "really impacted [Meta's] growth rates in Q3 and Q4 2021." (*See* Dkt. No. 82, Defendants' Motion to Dismiss ("Mot.") at 25:24–25 (quoting SAC ¶ 268).) Three, Li's observation on the same call that Meta was "still" facing "significant" headwinds, suggesting such headwinds arose earlier in time. (*Id.* at 25:26–27 (quoting SAC ¶ 269).) These defendants characterize as merely "confirmatory information" that aligned with Meta's past disclosures, not viable corrective disclosures.

Plaintiffs do not propose any other corrective disclosures, instead doubling down on comments made by Wehner and Li on the Q4 2021 investor call. Plaintiffs make essentially three arguments: One, the iOS changed were "adopted (i.e., accepted and implemented)" by "approximately 85% of iOS users" by "the start of June 2021." (SAC ¶ 75.) Two, Wehner and Li's

statements on the Q4 2021 investor call "revealed that the iOS changes had been having a material impact on Meta's revenues since Q2 2021." (Opp. at 23:20–20.) Three, "As the limitations from iOS changes peaked at the end of Q2 2021, and remained relatively constant in Q4 2021 and Q1-Q4 2022, when Meta revealed that those limitations were causing a material revenue impact in 2022, investors reasonably could infer that the iOS limitations were causing a material revenue impact in Q3 and Q4 2021 as well." (*Id.* at 23:21–24:4.)

The Court agrees with defendants. Plaintiffs have not pled a viable corrective disclosure relative to Statements 1a and 1b for at least three reasons.

*One*, Wehner's prediction of Meta's 2022 financial condition was not a corrective disclosure of past, 2021 performance. He predicted that Meta would experience headwinds "on our business in 2022 . . . on the order of $10 billion." (*See, e.g.*, SAC ¶ 268.) It strains credulity to reverse engineer this forward-looking observation into a retrospective analysis. Relatedly, to the extent analysts were "shocked" by Wehner's statements, their surprise was focused on Meta's prediction of 2022 headwinds, not the company's past 2021 performance.[16] This further

---

[16] The SAC alleges, "[a]s confirmation that Meta had thoroughly misled investors about the materiality of the impact of the iOS changes on Meta's targeting and measurement capabilities and revenues, the most sophisticated stock analysts in the world were completely caught off guard by Meta's announcement of the impact." SAC ¶ 134. Plaintiffs also allege that contemporaneous analyst reports support their theory that Wehner's statements on the February 2, 2022 investor call operated as corrective disclosures of the impact of Apple's iOS privacy changes on Meta's Q2 and Q3 2021 performance. *Id.* ¶¶ 134–39.

That simply is not accurate. These allegations are unsupported by documents incorporated by reference into the SAC and are appropriately disregarded on that basis. The Court reviewed each analyst report and confirmed what defendants assert in their reply: "no analyst claims to have been confused by Statements 1a and 1b." Dkt. No. 86, Defendants' Reply in Support of their Mot. ("Reply") at 9:6–7; *see, e.g.*, Ex. 30 to Mot. at 2 (stating, as the first sentence of the report, "Meta Platforms reported a generally in-line [Q4 2021] earnings report but provided [Q1 2022] guidance (surprisingly and) clearly below our/Street expectations."); Ex. 31 to Mot. at 2 ("Apple iOS changes will [ ] have a bigger impact than expected in 2022 . . . . We believe the iOS headwind of ~$10B this year is also much bigger than expected . . . . [W]e believe management's tone around iOS impact has deteriorated, and what was once described as 'manageable' now appears to be a $10B revenue headwind in 2022."); Ex. 32 to Mot. at 2 ("FB's Q4 [2021] results were OK, but the Q1 [2022] outlook was meaningfully below expectations . . . ."); Ex. 33 to Mot. at 2 ("The surprise was [Q1 2022] revenue guidance at $27-29bn, below Street at $30.29bn with multiple [Q1 2022] headwinds that will likely continue in [Q2 2022]."); Ex. 34 to Mot. at 2 ("The $29bn

United States District Court
Northern District of California

undermines plaintiffs' arguments that a reasonable investor would have interpreted Wehner's comments as a corrective disclosure.

*Two*, Wehner and Li's other statements on the Q4 2021 investor call did not correct, but rather confirmed.[17] The Court views these statements as in line with earlier disclosures by Meta concerning the impact of Apple's iOS privacy changes, not as a corrective disclosure containing new information. Meta had repeatedly warned investors, during and prior to Q3 2021, about the impact of the iOS privacy changes on its business.[18] The Court discerns nothing in the above-quoted statement that provides new or different information relative to Meta's earlier disclosures. There simply is not support for the notion that the statements on the February 2, 2022 Q4 2021 investor call were a corrective disclosure.[19]

Accordingly, plaintiffs have not pled loss causation for Statements 1a and 1b through a viable corrective disclosure of Meta's Q2 and Q3 2021 performance, which, again, are the reporting periods to which Statements 1a and 1b pertain. Defendants' motion to dismiss is therefore **GRANTED** with respect to these statements. The Court need not address the fraud component as the issue is mooted.[20]

---

top end of FB's [Q1 2022] revenue guide was ~6% below us . . . .").

[17] Preliminarily, the Court disregards any observation regarding Q4 2021 performance as irrelevant to Statements 1a and 1b, which pertain to Meta's Q2 and Q3 2021 performance.

[18] For instance, Meta had already warned investors, in Q2 2021, that the changes were, at that time, "very challenging for advertisers," Meta's primary customers, "to navigate." Ex. 16 to Mot. at 15. When asked, again in Q2 2021, whether Meta was "suggesting that [the company was] not seeing any material impact to your ad revenue" based on the iOS changes, Wehner said "No." Ex. 17 to Mot. at 7. In Q3 2021, Wehner characterized iOS-related headwinds as "fundamentally profound," while Li characterized them as "really on the higher end of what we had expected." Ex. 22 to Mot. at 8, 3.

[19] The fact that Meta's stock price actually declined following the release of Statements 1a and 1b further underscores the fact that investors were acting on Meta's warnings at the times they were given. SAC ¶¶ 263–66.

[20] The SAC references statements by four former Meta employees referred to, respectively, as FE1, FE2, FE3, and FE4. *See, e.g.*, *id.* ¶¶ 101-04, 107-12. Plaintiffs' opposition refers to statements from FE1, FE2, and FE4 (not FE3) for the following purposes: (i) to support their assertion that Statements 1a and 1b were misleading; and (ii) to assert the SAC adequately pleads scienter as to the iOS privacy changes. Opp. at 16-17, 24. As set forth herein, the Court does not

United States District Court
Northern District of California

*ii. Statements 4a–4e*

Next, the Court considers plaintiffs' challenges to statements made by defendants Wehner and Li on the Q2 2021 investor calls held on July 28, 2021 and by Li on the Q3 2021 follow-up investor call. (**Statements 4a–4e**).

While the phrasing of these statements differs slightly, the gravamen remains the same: each states that the impact of Apple's iOS privacy changes on Meta's business was generally in line with their expectations at the time the statements were made. This is true for the statements Wehner and Li made on the Q2 2021 investor calls. (*See id.* ¶ 227 ("[T]he impact from the ATT changes has really generally been in line with our expectation.") (**Statement 4a**); *id.* ("I would say, overall, the impact [of the iOS privacy changes] has been in line with our expectations.") (**Statement 4b**); *id.* ¶ 231 ("I think the impact kind of to—to our revenue ecosystem has been pretty in line with how we expected those [systems impacted by the iOS privacy changes] would perform.") (**Statement 4c**); *id.* (remarking that the impact of Apple's iOS privacy changes "at least so far" has "been largely in-line.") (**Statement 4d**).) It is also true for Li's comment on the Q3 2021 investor call. (*See id.* ¶ 241 ("We had a range of expected impact from the [ATT] changes and ultimately what we've seen is in that range but it's really on the higher end of what we had expected . . . .") (**Statement 4e**).)

Here, plaintiffs effectively argue that Statements 4a–4e are false and misleading because (i) the impact of the iOS privacy changes was in fact material when the statements were made; and (ii) the impact was therefore not "in line" with Meta's expectations. Plaintiffs support this theory by referencing Wehner's comment, after Q1 2021, that "we think" the impact of the iOS changes "will be manageable," which they contend is undermined by his later statement that Meta faced a headwind of about $10 billion in 2022 due to the changes. (*Id.* ¶¶ 73, 114, 228.)

This argument is fundamentally flawed. Meta did not say, in any of Statements 4a–4e, that

---

reach falsity as to Statements 1a and 1b given the loss causation element is dispositive. The Court does not consider the former employee allegations in connection with the alleged falsity of other statements given plaintiffs have not defended the SAC in such a manner. The Court similarly does not reach scienter as to any challenged statement. Thus, the former employee witnesses are immaterial to this Order.

the impact of the iOS privacy changes was "immaterial."[21] They said the impact was generally in line with their expectations, which they had previously characterized by saying the changes would be "manageable." There is no tension here. Something can be challenging, risky, or perhaps even material, *as well* as manageable. *See, e.g.*, *Thant v. Karyopharm Therapeutics, Inc.*, 43 F.4th 214, 223 (1st Cir. 2022) (ruling that "no reasonable investor would interpret" defendant's statement that a drug's "safety profile was 'predictable' and 'manageable' to mean the drug was benign" with respect to its treatment of an already ill patient group). Thus, the Court does not credit plaintiffs' theory of falsity as to Statements 4a–4e.[22]

Plaintiffs' arguments to the contrary fail. For instance, they point to two analyst reports to argue that "investors were *actually misled* by [Statements 4a–4e]" insofar as Meta falsely suggested that the impact of the iOS changes "was *not* on the order of $10 billion per year." (Opp. at 20:23–25.) There are several issues with this approach. Primarily, it misrepresents Meta's statements concerning the $10 billion headwind. As discussed at length herein, this headwind was *forecasted* for 2022. (*See, e.g.*, SAC ¶ 268 ("[W]e believe the impact of iOS overall as a headwind on our business in 2022 is on the order of $10 billion . . . .").) Meta's prediction as to 2022 headwinds is therefore irrelevant to Statements 4a–4e, which concern Q2 and Q3 2021. Thus, even if market watchers like J.P. Morgan

[21] Plaintiffs repeatedly seek to analogize "manageable" to "immaterial." For instance, they refer, at page 20 of their Opposition, to representations by Meta that the iOS privacy changes "were 'manageable' and '[im]material.'" Despite placing "[im]aterial" in quotation marks, they do not provide a record citation to indicate *where* defendants drew an equivalence between something being "manageable" and "immaterial." When plaintiffs make a similar move on page 21, they cite to three paragraphs in the SAC (¶¶ 73, 227, and 228), none of which use the words "material" or "immaterial." Thus, plaintiffs have not pointed the Court to any instance where defendants suggested changes that were "manageable" were not "material." In fact, Wehner explicitly told investors he was *not* saying that Meta was suggesting it was not seeing a material impact. *See supra* note 18.

[22] Even were this not the case, the Court views the word "manageable" as too "imprecise and noncommittal" to ground a securities law claim. *See Weston Family P'ship LLP v. Twitter, Inc.*, 29 F.4th 611, 621 (9th Cir. 2022). It is not as though plaintiffs allege Meta made a specific prediction as to how the impact would be managed, on what timeline, and in reference to which monetary thresholds. *See In re Cutera Sec. Litig.*, 610 F.3d 1103, 1111 (9th Cir. 2010) ("[M]ildly optimistic, subjective assessment hardly amounts to a securities violation.").

United States District Court
Northern District of California

commented, "what was once described as 'manageable' now appears to be a $10B revenue headwind in 2022,"[23] this does not mean that J.P. Morgan viewed challenges created by the iOS changes in Q2 and Q3 2021 as *unmanageable.* The analyst reports do not help plaintiffs' cause.

Accordingly, plaintiffs have failed to plead an actionable theory of falsity as to Statements 4a–4e. Defendants' motion to dismiss is **GRANTED** as to these statements.

*iii. Statements 5c & 5d*

Last, the Court considers plaintiffs' challenges to statements Meta made concerning mitigation efforts the company undertook in relation to the iOS changes (**Statements 5c & 5d**). The Court begins by revisiting the specific statements before analyzing the sufficiency of plaintiffs' pleadings.

Plaintiffs first challenge, as Statement 5c, defendant Sandberg's comments on the Q3 2021 investor call:

> There are two big challenges coming from this iOS change. The one is targeting and one is measurement. I'm taking the second one first. On measurement, we think we can address more than half of that underreporting by the end of the year . . . .

(*Id.* ¶ 239.)

Plaintiffs also challenge, as Statement 5d, defendant Li's comments on the same call:

> I think the underreporting of web conversions has really been a bigger issue than we expected, but it's something that we're very focused on helping to through [*sic*] better modeling techniques.

(*Id.* ¶ 241.)

Plaintiffs' theories of falsity as to Statements 5c and 5d are virtually identical. They allege the statements "created the impression that underreporting was a major part of the problems Meta faced from the iOS changes . . . and that Meta could solve the majority of that 'big challenge' by the end of the year." (Opp. at 22:9–11.) This was not true, plaintiffs assert, because Meta later admitted that "underreporting of web conversions was only a 'very small slice of the overall . . . revenue landscape,' so addressing those web conversions did not materially mitigate the impact of the iOS changes." (*Id.* at 22:12–14 (quoting SAC ¶ 132).) Furthermore, plaintiffs view Statements

[23] *See* Ex. 31 to Mot. at 2.

5c and 5d as being at odds with other statements made by Meta allegedly suggesting that the impact of Apple's iOS privacy changes was manageable.

Defendants attack plaintiffs' challenges to Statement 5c and 5d on three grounds. First, both are inactionable opinions given the qualifying language. (*See* SAC ¶ 241 ("I *think* the underreporting of web conversations has really been a bigger issue than we expected . . . .") (emphasis supplied); ¶ 239 ("[W]e *think* we can address more than half of [the] underreporting by the end of [2021] . . . .") (emphasis supplied).) Second, defendants take issue with plaintiffs' interpretation of what the statements in fact said. Nothing in either Statement 5c or 5d, they argue, "implied that fixing underreporting would be a cure-all. Li merely stated her view that underreporting was a 'bigger' issue than originally thought; not that it was the biggest iOS-related problem." (Mot. at 23:17–19.) Sandberg, for that matter, "warned that fixing underreporting would not solve '[t]argeting' problems, which required a 'multiyear effort.'" (*Id*. at 23:19–21 (quoting Ex. 21 to Mot. at 10).) Third, plaintiffs misrepresent the facts insofar as they rely upon a later statement by Meta that underreporting was "a very small slice of the overall . . . revenue landscape" because plaintiffs omit a key phrase. The quoted text in fact refers to the Q4 2021 revenue landscape and, thus, does not prove that either Statement 5c or 5d (concerning Q3 2021 performance) was false when made. (*See* SAC ¶ 132 (excerpting Li's comments on the February 2, 2022 Investor Follow-Up Call).)

Plaintiffs respond with four arguments: One, "Sandberg's statement that underreporting was one of 'two big challenges' was not an opinion." (Opp. at 22:26.) Two, statements of opinion are actionable under *Omnicare* where, as is the case with Statements 5c and 5d, the challenged statements do not "fairly align[] with the information in [Meta's] possession at the time" they were made. *See Omnicare*, 575 U.S. at 189. Three, Statements 5c and 5d falsely implied that Meta could solve for the impact of Apple's iOS privacy changes by addressing underreporting. Four, plaintiffs rebut defendants' argument concerning the Q4 2021 revenue landscape by asserting that Statement 5d "made clear that Meta was tracking the impact of the underreporting in real time, so Defendants knew as of the date of their statements that underreporting did not account for a large part of the impact of the iOS changes." (Opp. at 23:9–11 (internal citation omitted).)

The Court is not convinced. The challenged statements are inactionable for several reasons.

*First*, and primarily, plaintiffs' interpretation of what Statements 5c and 5d actually say is strained and overwrought. With respect to Statement 5c, defendant Sandberg did *not* say: (i) targeting and measurement are the only two challenges arising out of the Apple iOS privacy changes; (ii) underreporting is the sole component of the measurement-related challenges; or (iii) addressing "more than half of th[e] underreporting" would mean that the measurement-related challenges were largely resolved. With respect to Statement 5d, Li similarly did not say that underreporting was the biggest issue for Meta. Despite these, plaintiffs ask this Court to infer that Meta implied to investors that solving the problem of underreporting would effectively solve the problems caused by Apple's introduction of the iOS privacy changes. Yet, these inferences are not warranted and not consistent with what the statements communicate.

*Second*, in the absence of additional factual allegations, the Court agrees with defendants that, as to these two statements, plaintiffs' plead "[f]raud by hindsight." *Ronconi v. Larkin*, 253 F.3d 423, 430 n.12 (9th Cir. 2001), *abrogated on other grounds by Tellabs, Inc. v. Major Issues & Rights, Inc., Ltd.*, 551 U.S. 308 (2007). Defendants are correct that there is no suggestion in the briefing that underreporting was "a very small slice" of *any* revenue landscape until Q4 2021. (*See* SAC ¶ 132.) Statements 5c and 5d were made in October 2021 during the Q3 2021 investor call. Thus, plaintiffs have not pled a factual basis for alleging that Statements 5c and 5d were false at the time they were made. To the extent plaintiffs respond by saying that "Meta was tracking the impact of the underreporting in real time," this is unsupported by their own complaint.[24] Further, even if the Court were to credit plaintiffs' bald assertion regarding real-time tracking, that still would not provide a basis for their falsity theory as, again, the "very small slice" comment came in Q4 2021. Plaintiffs point to no allegations in the SAC that support the inference that the same circumstances existed in Q3 2021.

---

[24] Plaintiffs' opposition cites three paragraphs in the SAC to support this argument: Paragraphs 240, 241, and 242. In short, none of these paragraphs contains allegations supporting the inference that Meta was tracking, in real-time, the impact of underreporting. Paragraphs 240 , 241, and 242 consist, respectively, of: plaintiffs' explanation of why Statement 5c is allegedly false; the text of Statement 5d; and plaintiffs' explanation of why Statement 5d is allegedly false.

United States District Court
Northern District of California

*Third*, both statements are inactionable opinions. In this circuit, one way plaintiffs may satisfy the pleading standard for opinion statements is by alleging that "there is no reasonable basis for the belief" articulated in the challenged statement.[25] *City of Dearborn Heights Act 345 Police & Fire Retirement Sys.*, 856 F.3d at 616. This is the approach taken by plaintiffs, who write that Sandberg and Li's statements did not "fairly align[] with the information in [Meta's] possession at the time" they were made. (Opp. at 23:1–2 (quoting *Omnicare*, 575 U.S. at 189).) However, plaintiffs point to no allegations in the SAC that support this conclusion. As set forth previously, *see supra* note 24, plaintiffs do not plead supporting factual allegations for the notion that contemporaneous reporting was conducted. Thus, the Court declines to consider plaintiffs' challenges to Statements 5c and 5b actionable opinion statements.

* * *

Given the pleading deficiencies identified above relative to Statements 1a and 1b; Statements 4a–4e; and Statements 5c and 5d, plaintiffs have failed to state a securities claim arising out of defendants' disclosures on the impact of the iOS privacy changes. Statements 1a and 1b fail because plaintiffs have failed to allege loss causation through a corrective disclosure. Statements 4a–4e fail for want of an actionable theory of falsity. Statements 5c and 5d fail for multiple, interrelated reasons. Accordingly, defendants' motion is **GRANTED** as to these statements.

C. Sandberg's Compensation

Plaintiffs bring Sections 10(b) and 14(a) claims concerning similar language in proxy statements issued by Meta on April 9, 2021 (**Statement 3a**) and April 8, 2022 (**Statement 3b**),

---

[25] The standard is set forth as follows:

> [P]laintiffs [may] establish falsity in three ways: if (1) the statement is not actually believed, (2) there is no reasonable basis for the belief, or (3) the speaker is aware of undisclosed facts tending seriously to undermine the statement's accuracy. The first and third methods of pleading falsity under this standard are consistent with *Omnicare*'s standards for pleading falsity under the material misrepresentation theory of liability and the omission theory of liability, respectively. However, *Omnicare* clarifies that pleading falsity by alleging that there is no reasonable basis for the belief is permissible only under an omissions theory of liability . . . .

*City of Dearborn Heights Act 345 Police & Fire Retirement Sys. v. Align Tech., Inc.*, 856 F.3d 605, 616 (9th Cir. 2017) (cleaned up).

respectively. These statements amount to disclosures in which information concerning Sandberg's total compensation, including her salary, bonus, stock awards, personal security, and usage of private aircraft were provided to shareholders.[26]

Plaintiffs allege these disclosures are (i) materially false and misleading because they did not mention that Sandberg "received significant 'Other Benefits' beyond personal security and private aircraft usage throughout the Class Period in the form of personal assistance on personal matters;" and (ii) "materially misleading because they omitted" such benefits. (SAC ¶ 226.) The Court begins by assessing whether plaintiffs have adequately pled the statements were in fact false or misleading, as this is a common element of both their Sections 10(b) and 14(a) claims.[27]

Preliminarily, the Court revisits the portion of its Prior Order concerning plaintiffs' claims relative to Sandberg's alleged receipt of undisclosed benefits. It states, in relevant part:

> [P]laintiffs' allegations, even if credited, do not establish that Sandberg received such [personal] assistance; their allegations are drawn from press reports concerning an *investigation* conducted by Meta regarding the alleged improper assistance. As defendants' correctly note, Meta has no duty to disclose uncharged, unadjudicated wrongdoing, such as the existence of an in-progress investigation.

(Prior Order at 4 (quotation and citation omitted) (emphasis in original).)

Plaintiffs concede that the Court was "certainly correct" when it ruled that defendants were "not required *sua sponte* to disclose uncharged, unadjudicated wrongdoing." (Opp. at 30:8–9 (internal quotation omitted).) However, plaintiffs counter that, unlike their FAC, the SAC "alleges, using quotations of the reporting, that '*The Wall Street Journal* reported that individuals with knowledge of the matters stated that Sandberg *actually used Company resources for personal benefit*, not merely that Meta was investigating Sandberg for using Company resources for

---

[26] Instruction 4 to Item 402(c)(2)(ix) of Regulation S-K requires, "If the total value of all perquisites and personal benefits is $10,000 or more for any named executive officer, then each perquisite or personal benefit, regardless of its amounts, must be identified by type . . . . Perquisites and other personal benefits shall be valued on the basis of the aggregate incremental cost to the registrant." 17 C.F.R. § 229.402(c)(2)(ix).

[27] Finding this analysis dispositive, the Court does not reach the other required elements of plaintiffs' Section 14(a) claims. *See Knollenberg*, 152 Fed. Appx. at 682 (describing such requirements).

personal benefit.'" (*Id.* at 30:4–7 (quoting SAC ¶ 165) (emphasis in original).)

The Court disagrees. Plaintiffs' claims concerning Sandberg rely principally on the same press reports as the FAC. The only difference is that plaintiffs now reframe *The Wall Street Journal*'s reporting as reflective of actual events rather than as allegations Meta is considering as part of its investigation. This reframing is nothing more than smoke and mirrors. The underlying reporting relied upon by plaintiffs has not changed and the investigation is concededly ongoing.[28] Thus, the Court sees no reason to depart from its Prior Order, which discounted plaintiffs' allegations insofar as they are drawn from *The Wall Street Journal*'s work and concern unadjudicated wrongdoing the company need not disclose.

Plaintiffs' principal counterargument takes the form of a solitary case citation in a footnote to their Opposition and does not provide a basis to reconsider. There, they rely upon in-district authority for the proposition that "investigative reporting in [*The*] *Wall Street Journal* is a reasonable basis for allegations in securities fraud §10(b) cases." (*Id*. at 30 n.14.) Yet, plaintiffs' misunderstand the case cited. It in fact stands for a different proposition entirely, that to the extent "a newspaper article corroborates plaintiff's own investigation and provides detailed factual allegations, it can—at least in combination with plaintiff's *investigative efforts*—be a reasonable source of information and belief allegations." *In re McKesson HBOC, Inc. Sec. Litig.*, 126 F.Supp.2d 1248, 1272 (N.D. Cal. 2000). This case is opposite. Plaintiffs do not allege conducting an independent investigation into Sandberg's conduct. Rather than corroborate their own investigation by reference to *The Wall Street Journal*'s reporting, they instead rely entirely on *The Wall Street Journal*'s reporting, which they aver is subject to rigorous fact-checking protocols.[29]

Thus, the Court concludes plaintiffs have failed to adequately plead Sandberg received undisclosed personal benefits from Meta as their allegations are derived entirely from press reports

---

[28] *See* SAC ¶ 164 ("Meta is continuing to conduct an internal investigation of Defendant Sandberg's improper use of Company resources for personal benefit, according to people knowledgeable about the matter . . . .").

[29] *See supra* note 6.

concerning behavior that Meta is currently investigating, not any investigation of their own.

Nonetheless, the Court next considers each category of personal benefits Sandberg allegedly received from Meta and/or its employees as if the allegations had not been based on *The Wall Street Journal*'s reporting. As shown below, this does not change the outcome.

**Public Relations.** The SAC contains allegations that, in both 2016 and 2019, Sandberg received unreported personal assistance in the form of a team of Facebook employees and paid outside advisers who helped her quash news stories revealing the existence of a restraining order against her ex-boyfriend Bobby Kotick. Plaintiffs allege this "team worked to suppress the story both in 2016, when [they] began dating, and in 2019, when [they] [were] breaking up." (SAC ¶ 147.) These allegations are insufficient to support plaintiffs' securities claims for two reasons: First, neither Statement 3a or 3b disclosed Sandberg's 2016 compensation.[30] Assistance she may or may not have received in 2016 is therefore immaterial to this lawsuit.[31]

---

[30] *See* SAC ¶ 225 ("On or about April 9, 2021, Meta filed a Proxy Statement on Schedule 14A with the SEC . . . in which the Company included, in a section titled, 'Perquisites and Other Benefits,' a table presenting the total compensation awarded to, earned by, or paid to [Sandberg] for services rendered . . . . in ***2020***, ***2019***, and ***2018*** . . . .") (emphasis supplied); *see also id.* ¶ 247 ("On or about April 8, 2022, Meta filed a Proxy Statement on Schedule 14A with the SEC in which the Company included, in a section titled, 'Perquisites and Other Benefits,' a table presenting the total compensation awarded to, earned by, or paid to [Sandberg] for services rendered . . . . in ***2021***, ***2020***, and ***2019*** . . . .") (emphasis supplied).

[31] Plaintiffs counter that defendants had an ongoing duty to correct past misstatements and, thus, Statements 3a and 3b are actionable insofar as they do not contain corrective disclosures of Sandberg's past receipt of personal benefits. There are at least two problems with this argument. One, plaintiffs do not plead the content of past disclosures made by Meta concerning Sandberg's 2016 compensation. The Court cannot and does not infer, with no factual basis to do so, that Meta did not contemporaneously disclose any relevant personal benefits.

Two, plaintiffs' authority does not compel a different result. They cite *Oaktree Principal Fund V, L.P. v. Warburg Pincus LLC* , which held "that an individual can be held liable for failing to correct an earlier statement when the failure to correct would itself render the statement misleading." No. CV 15-8574-PSG, 2018 WL 6137169, at *13 (C.D. Cal. Aug. 29, 2018). *Oaktree* is notable in two ways. First, the court there admitted that the Ninth Circuit had not explicitly recognized such a duty, and therefore this Court is not required to adopt the same approach. *Id.* at *12. Second, defendants in that case learned that an earlier statement about a company's financials was demonstrably incorrect. *Id.* at *11. Here, the SAC does not assert Meta concluded their investigation into Sandberg, reached a conclusion as to her alleged receipt of undisclosed personal benefits, and determined that earlier disclosures (such as those here at issue)

Second, as for the 2019 activities of Sandberg's "team" of Facebook employees and outside advisers, the SAC alleges "Sandberg and her team continued their strategy to suppress" the story about Kotick. (*Id.* ¶ 150.) Plaintiffs conspicuously do not provide basic details about what assistance the team provided, when they provided it, and/or how they provided it. This lack of detail is notable since the SAC goes on to allege the actions Sandberg *herself* took in 2019 to quash the story.[32] (*See id.* (explaining that Sandberg sent emails to high-ranking individuals at the *MailOnline*'s parent organization advocating against publishing the story).) In light of this, the Court declines to credit plaintiffs' bald allegations that Sandberg's "team" provided public relations assistance in 2019, or even between 2016 and 2019, without plaintiffs having alleged more about the nature of that assistance.

Since plaintiffs' allegations of wrongdoing in 2016 are irrelevant to the challenged proxy statements, which were issued for different years, and plaintiffs have not pled with particularity what actions, if any, Sandberg's "team" took on her behalf in 2019, the Court finds plaintiffs have failed to sufficiently plead that Sandberg received improper personal assistance relative to public relations matters.

**Personal Books.** Plaintiffs assert that "Sandberg used Meta resources to write and promote her second book" and that Meta employees supported Sandberg during the book tours for her first and second books. (*Id.* ¶ 153.) To support these allegations, plaintiffs point to the acknowledgment sections of both books, in which Sandberg thanks friends and colleagues for reviewing manuscripts and providing comments. (*Id.* ¶ 154.) Plaintiffs extrapolate from there, compiling a list of the Meta employees thanked, their approximate salaries, and the monetary value of the time they purportedly spent reading drafts of the books. (*Id.* ¶¶ 153–55; 163.)

With respect to plaintiffs' position that the "book acknowledgments are flat admissions by Sandberg that she received Facebook employee assistance," the Court disagrees. (*Id.* ¶ 155.)

---

were incorrect. In other words, Meta cannot be held liable for failing to disclose information that does not exist.

[32] Obviously, insofar as Sandberg herself sought to block publication of an article, this does not represent receipt of personal benefits from Meta.

Plaintiffs paint with too broad a brush. The mere fact that individuals employed at Meta offered Sandberg feedback or other help with her books does not raise a reasonable inference that such assistance was provided in their official capacities as Meta employees, or on behalf of the company. They could just as easily have provided comments voluntarily as Sandberg's friends and colleagues. In other words, more is required for plaintiffs to adequately plead Sandberg's receipt of book-related personal assistance from Meta. *See Twitter*, 29 F.4th at 619 (requiring that plaintiffs plead the "who, what, when, where, and how" of alleged fraud to satisfy the heightened pleading standard under Rule 9(b)).

**Wedding Planning.** The SAC alleges, without more, that Sandberg "used corporate resources to help her plan her wedding." (SAC ¶ 158.) This falls well short of the pleading standard applicable here. *See Twitter*, 29 F.4th at 619. Plaintiffs' other allegation relative to Sandberg's wedding fares no better. For the first time in the SAC, plaintiffs cite a statement from Sandberg's spokeswoman stating, "Sheryl did not inappropriately use company resources in connection with the planning of her wedding." (SAC ¶ 167.) Plaintiffs assert this statement "tacitly suggest[s]" Sandberg *did* use company resources for her wedding, although she viewed such use as appropriate. (*Id.*) This argument strains credulity. Plaintiffs would have this Court read ambiguity into a statement containing none. The Court will not indulge such speculation.

**Foundation Work.** Plaintiffs assert that "Sandberg also used Meta employees in such highly personal matters as . . . helping with her family's foundation." (*Id.* ¶ 13; *see also id.* ¶ 157.) Again, no supporting factual allegations are made regarding such assistance. Without more, these conclusory allegations fail to provide sufficient notice to defendants of the bases on which plaintiffs intend to proceed. *See Desaigoudar*, 223 F.3d at 1022 (requiring plaintiffs to plead securities cases "with a high degree of meticulousness" under Rule 9(b) and the PSLRA).

* * *

The deficiencies identified above are fatal to both plaintiffs' Section 10(b) and 14(a) claims concerning Statements 3a and 3b. As with the FAC, plaintiffs again base their allegations on press reports of ongoing investigations of unadjudicated wrongdoing. Even if such allegations are credited as showing certain events *actually* occurred (not just that they are *alleged* to have

happened), the Court finds plaintiffs' allegations are implausible, insufficiently detailed, or both. Accordingly, defendants' motion is **GRANTED** as to plaintiffs' claims concerning Sandberg's compensation.

D. Meta's Transition to Reels

Plaintiffs' remaining claims concern identical risk disclosures made in the company's Q2 and Q3 2021 Form 10-Q's (**Statements 2a & 2b**, respectively) as well as statements by individual defendants Sandberg and Wehner on Q2 2021 investor calls (**Statements 6a & 6b**, respectively). All concern Meta's transition to Reels, a new video format for online content. The Court begins by revisiting the content of the challenged statements before proceeding with its analysis.

Statements 2a and 2b contain the same risk disclosure language referring to Meta's development of new products:

> We also may introduce new features or other changes to existing products, or introduce new stand-alone products, that attract users away from properties, formats, or use cases where we have more proven means of monetization . . . . In addition, as we focus on growing users and engagement across our family of products, from time to time these efforts have reduced, and may in the future reduce, engagement with one or more products and services in favor of other products or services that we monetize less successfully or that are not growing as quickly. These decisions may adversely affect our business and results of operations and may not produce the long-term benefits that we expect.

(SAC ¶¶ 237, 245.) Plaintiffs allege Statements 2a and 2b were "materially false and misleading" because, "by the time of the statement[s], Meta's decision to introduce its product Reels . . . had, on net, adversely affected Meta's business and results of operations." (*See, e.g.*, *id.* ¶ 238 (internal quotations omitted).)

Statements 6a and 6b are similar. They are reflections offered by defendants Sandberg and Wehner, respectively, on Q2 2021 calls with Meta investors held on July 28, 2021. In Statement 6a, Sandberg observed that the company was "seeing very strong growth in video monetization," including with Reels. (*Id.* ¶ 229.) In Statement 6b, Wehner responded to an investor's question by saying, "Reels is going well. It's still obviously early in its launch, but we've now rolled it out to 80 markets since launching it about a year ago." (*Id.* ¶ 233.) He then added that, with respect to monetization, "ads are now available to all advertisers and in almost all markets where Reels is live. It's still very early on the advertising front, but we think this should be a good ad format." (*Id.*)

United States District Court
Northern District of California

Plaintiffs summarize their theory of falsity relative to Statements 2a, 2b, 6a, and 6b as follows: "During the Class period, Defendants misled investors by implying that Meta's transition from focusing users on text and photos to short-form videos in Reels was not having a net negative impact on the Company's results of operations, when in fact it was." (Opp. at 25:14–16.) For this theory of falsity to be actionable under Section 10(b), plaintiffs must have adequately pled, as a threshold matter, that the introduction of Reels negatively impacted Meta during Q2 and Q3 2021, the periods covered by Statements 2, 6a, and 6b. The Court therefore concentrates its analysis on whether plaintiffs cleared this hurdle.

A preliminary review of plaintiffs' SAC indicates that they plead only that Meta's February 3, 2022 Form 10-K stated that Meta's "advertising revenue growth" was "adversely affected . . . in the second half of 2021." (SAC ¶ 216.) Given Meta reports its finances to investors and regulators on a quarterly basis, the Court interprets "second half of 2021" to pertain to Q3 and Q4 2021.[33] Plaintiffs have ***not***, therefore, (i) alleged any negative impact on Meta's business caused by the transition to Reels during Q1 or Q2 2021; or (ii) offered a cognizable theory of falsity as to statements concerning Meta's performance during those quarters. This renders Statements 2a (Q2 2021 Form 10-Q), as well as 6a and 6b (statements on Q2 2021 investor calls) inactionable.

Having established that plaintiffs' challenges to three of the four Reels-related statements may not proceed, the Court turns to Statement 2b, which is found in Meta's Q3 2021 Form 10-Q. As excerpted above, this statement consists of a risk disclosure made by Meta regarding product development activities, generally. (*Id.* ¶ 245.)

Defendants' primary argument is that Statement 2b is too generic to be actionable. That is, its general observations about Meta's product development approach do not open the door to Meta needing to provide additional specifics regarding the Reels' product launch. *See Kasilingam v.*

[33] Plaintiffs admit that Statement 2a was made on a Q2 2021 form and that Statements 6a and 6b were made on Q2 2021 investor calls. The logical inference is that such statements pertained to Q2 2021 performance, *not* as to Meta's financial performance as of the days the statements were made (July 29, 2021 and July 28, 2021, respectively).

*Stitch Fix, Inc.*, No. 21-16837, 2022 WL 10966359, at *2 (9th Cir. 2022) (unpub.) (finding inactionable statements that "only generally describe" a company's marketing efforts); *Twitter*, 29 F.4th at 620 (finding that generic statements do not create an "obligation to offer an instantaneous update of every internal development" about a specific product, given "the oft-tortuous path of product development").

Plaintiffs make two arguments in response: One, the SAC alleges that, "Reels was the only new product introduced [by Meta] during the Class Period . . . ." (SAC ¶ 211.) Thus, any comments in Statement 2b concerning product launches would be understood by reasonable investors to pertain to the introduction of Reels. Two, Meta admitted that its risk disclosures encompass Reels, as evidenced by the company adding an explicit reference to Reels to a later, nearly identical risk disclosure in its February 3, 2022 Form 10-K. (*See id.* ¶ 212.)

On reply, defendants reject the notion that Statement 2b pertained specifically to the transition to Reels with three additional arguments: One, Meta's discussion of material risk factors is required by law to encompass past, present, and future product launches and therefore Statement 2b, by necessity, is sweeping in nature. *See* 17 C.F.R. § 229.105. The fact that Meta has used substantially the same risk disclosure in SEC filings since 2013 further underscores that Statement 2b does not refer only to the launch of Reels but to past, present, and future product development, generally. Two, Meta's addition of a reference to Reels in its later, February 3, 2022 Form 10-K proves only that their risk disclosure "covers product launches generally, including, *but not limited to*, Reels." (Reply at 13:16–18 (emphasis in original).) Three, more specific statements made by Meta at the time of Statement 2b make clear that "Meta was pursuing its usual long-term launch strategy," during which new products might at first monetizer slower as compared to established offerings. (*Id.* at 13:20.) This mitigated any potential confusion relative to the applicability of Statement 2b's generic pronouncements to the debut of Reels.

In short, the Court agrees with defendants. No reasonable investor could have been misled by the generalized observations contained in Statement 2b, which must be analyzed with the greater "context" of statements made by Meta concerning Reels. *See Police Retirement Sys. of St. Louis v. Intuitive Surgical, Inc.*, 759 F.3d 1051, 1060 (9th Cir. 2014) (considering the "context" in which

United States District Court
Northern District of California

challenged statements of corporate optimism were made). Beginning in Q4 2020, well before Statement 2b was made regarding Q3 2021 earnings, Meta leadership outlined a strategy for Reels that drew from Meta's long-standing playbook, through which social media engagement tools are debuted only to be later monetized for ad revenue. (*See, e.g.*, Ex. 5 to Mot. at 18–19.) Meta continued to emphasize their long-term play with Reels, including in Q1 2021; Q2 2021; and Q3 2021. (*See, e.g.*, Ex. 8 to Mot. at 9–10; Ex. 16 to Mot. at 1, 5, 10, 13; Ex. 21 to Mot. at 13–14.) Defendants even clarified that monetization would not be immediate and, as with past product launches, the process of learning how to most efficiently monetize a new feature was ongoing. (*See, e.g.*, Ex. 16 to Mot. at 18, 23.)[34] Accordingly, it strains credulity to assert that reasonable investors would interpret Statement 2b's generic observations as (i) pertaining specifically to Reels; and (ii) rely on Statement 2b to assume Reels was monetizing well so soon after its launch.

Plaintiffs offer no counterarguments that compel a different result. *First*, plaintiffs do not respond to defendants' authority that generic comments do not necessarily open the door to federal securities law claims and are thus deemed to have waived that issue. *Second*, it is not at all clear that Statement 2b is a statement about Reels simply because Reels was the product launch then occurring at Meta. Further, the fact that Meta has used substantially this same disclosure language for about a decade further undermines plaintiffs' claims that a reasonable investor could read Statement 2b as pertaining specifically to the transition to Reels.

*Third*, Meta's decision to address Reels, specifically, in its February 3, 2022 Form 10-K does not change the analysis. Again, Meta has historically and consistently used this template language to describe a broad range of product launches. That Reels is included among the range of products implicated by the statement only underscores its sweeping, non-specific nature. Generic statements characterized by such sweeping language do not open the door to actionable securities claims. *See, e.g.*, *Kasilingam*, 2022 WL 10966359, at *2.

---

[34] The Court either took judicial notice of or deemed incorporated by reference each of the exhibits relied on here. *See infra* Section III.A. The Court emphasizes that it relies upon the judicially noticed exhibits not for their truth but as helpful datapoints in understanding what information had been provided to the market at the relevant times.

United States District Court
Northern District of California

*  *  *

Accordingly, plaintiffs have failed to adequately plead an actionable theory of falsity as to Statements 2a, 2b, 6a, and 6b. Plaintiffs' theories as to Statements 2a, 6a, and 6b are unsupportable given the allegations in the SAC. Statement 2b is too generic to be actionable, and furthermore, any theory of falsity as to Statement 2b is undermined by the context within which Meta made the risk disclosure. Defendants' motion is therefore **GRANTED** as to these statements.

E. Leave to Amend

The Court must now consider whether further leave to amend is appropriate. As reflected in the record, the instant complaint represents plaintiffs' third attempt to meet the heighted pleading standard applicable to federal securities claims. Their failure to do so suggests further leave to amend would be futile. This is for at least two reasons. First, the Court previously identified similar issues as discussed here both at the hearing on the motion to dismiss plaintiffs' FAC as well as in the Court's Prior Order granting that motion without prejudice.

Second, plaintiffs nowhere in the briefing address the concept of further amendment, leaving this Court to conclude that even they may not think further amendment would be helpful. Given these, and against the backdrop of the above-identified pleading deficiencies, the Court concludes leave to amend would be futile and declines to grant it here. *See Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 1007 (9th Cir. 2009), *as amended* (Feb. 10, 2009) (cleaned up) ("[W]here the plaintiff has previously been granted leave to amend and has subsequently failed to add the requisite particularity to its claims, the district court's discretion to deny leave to amend is particularly broad."); *Saul v. United* States, 928 F.2d 829, 843 (9th Cir. 1991) ("A district court does not err in denying leave to amend where the amendment would be futile or where the amended complaint would be subject to dismissal.") (internal citations omitted).

///

///

United States District Court
Northern District of California

## IV. CONCLUSION

For the foregoing reasons, the Court determines plaintiffs have not plausibly alleged violations of federal securities law. Given further amendment would be futile, the motion to dismiss is **GRANTED WITH PREJUDICE.**

The Clerk is directed to close the case.

This terminates Dkt. No. 82.

**IT IS SO ORDERED.**

Dated: September 17, 2024

YVONNE GONZALEZ ROGERS
UNITED STATES DISTRICT COURT JUDGE